UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

--------------------------------------------------------

EDWARD C. HUGLER, ACTING SEC'Y
OF LABOR, U.S. DOL,

      Plaintiff,

  -vs-                 Case No. 1:17-cv-00589

DURA-FIBRE, LLC,

      Defendant.

--------------------------------------------------------


      Examination of TIMOTHY JACOBS, taken at
the instance of the Defendant, under and pursuant to the
Federal Rules of Civil Procedure, before KATHLEEN E.
CARTER, a Certified Realtime Reporter, Registered Merit
Reporter and Notary Public in and for the State of
Wisconsin, at Neenah City Hall, Hauser Room, 211 Walnut
Street, Neenah, Wisconsin, on Wednesday, August 9, 2017,
commencing at 12:54 p.m. and concluding at 4:00 p.m.

Ex. 3

Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 1 of 44   Document 33-4

DURAFIBRE00001

2

```
 1                    A P P E A R A N C E S

 2   U.S. DEPARTMENT OF LABOR,
     OFFICE OF THE SOLICITOR, by
 3   MR. DAVID J. RUTENBERG,
     230 South Dearborn Street, Room 844,
 4   Chicago, Illinois 60604,
     appeared on behalf of the Plaintiff.
 5
     REINHART, BOERNER, VAN DEUREN, S.C., by
 6   MR. JOHN H. ZAWADSKY,
     22 East Mifflin Street, Suite 600,
 7   Madison, Wisconsin 53703,
     appeared on behalf of the Defendant.
 8
                    A L S O   P R E S E N T
 9
     MR. LUKE BENRUD, President, Dura-Fibre.
10

11
                        * * * * *
12
                        I N D E X
13

14   Examination:                              Page
```

```
15   By Mr. Zawadsky.................................   4
     By Mr. Rutenberg............................... 116
16   By Mr. Zawadsky............................... 119

17
     Exhibits    Identified:                     Page
18
     Exhibit 1 - Document Regarding a Lawsuit That Was
19               Filed By CoVantage Credit Union
                 Against Mr. Jacobs And His Wife
20               Regarding a "Foreclosure Of Mortgage"..  22
     Exhibit 2 - Subpoena to Appear.....................  23
21   Exhibit 3 - Handwritten Notes......................  26
     Exhibit 4 - Handwritten Notes......................  26
22   Exhibit 5 - Handwritten Notes......................  28
     Exhibit 6 - Document Entitled, "Statement".........  28
23   Exhibit 7 - Affidavit Given To The National Labor
                 Relations Board........................  29
24   Exhibit 8 - Letter From Union Worker Lisa Van Kooy.  35
     Exhibit 9 - Appeal Tribunal Decision...............  33
25   Exhibit 10 - Document Entitled, "Dura-Fibre Call in
                  Log"..................................  37
```

BROWN & JONES REPORTING, INC.

DURAFIBRE00002

**Page 3**

| | | | |
|---|---|---|---|
| 1 | Exhibit 11 - | Document Entitled, "Safety Incident | |
| | | Report".................................... | 37 |
| 2 | Exhibit 12 - | Safety Incident Report Regarding Mike | |
| | | Prokash Dated May 23, 2013.............. | 45 |
| 3 | Exhibit 13 - | Safety Incident Report Regarding Mike | |
| | | Prokash Dated May 23, 2013.............. | 46 |
| 4 | Exhibit 14 - | Safety Incident Report Regarding Mike | |
| | | Prokash June 6, 2013...................... | 46 |
| 5 | Exhibit 15 - | "Laminator Leadman" Job Description..... | 54 |
| | Exhibit 16 - | Document Entitled, "Accident | |
| 6 | | Reporting/Investigation Plan"............ | 55 |
| | Exhibit 17 - | Labor Agreement............................ | 61 |
| 7 | Exhibit 18 - | Safety Incident Report Regarding Mr. | |
| | | Jacobs Dated May 22, 2013............... | 62 |
| 8 | Exhibit 19 - | Department of Workforce Development | |
| | | Discharge Questionnaire.................. | 63 |
| 9 | Exhibit 20 - | Grievance Filed On Mr. Jacobs' Behalf.. | 79 |
| | Exhibit 21 - | Charge Mr. Jacobs Filed Against | |
| 10 | | Dura-Fibre With The National Labor | |
| | | Relations Board On Or About June 18, | |
| 11 | | 2013........................................ | 84 |
| | Exhibit 22 - | Letter To Mr. Zawadsky Withdrawing the | |
| 12 | | NLRB Charge............................... | 86 |
| | Exhibit 23 - | Letter From Claudia Moraga.............. | 91 |
| 13 | Exhibit 24 - | Correspondence Between Tim Jacobs And | |
| | | Claudia Moraga............................ | 92 |
| 14 | Exhibit 25 - | Letter From The Department Of Labor To | |
| | | Mr. Jacobs................................. | 95 |
| 15 | Exhibit 26 - | Letter To Dura-Fibre From The U.S. | |
| | | Department Of Labor...................... | 97 |

16

17  Disposition Of Original Exhibit/s:
     Nos. 1 and 2 - Attached To Original Transcript
18   Nos. 3 to 14 - Retained By Mr. Jacobs
     Nos. 15 to 26 - Attached To Original Transcript
19

20

21

22  Certified Questions:                        Page   Line

23  By Mr. Zawadsky      ...........................   112   2

24

25

**Page 4**

1              TRANSCRIPT OF PROCEEDINGS

2              TIMOTHY JACOBS, called as a witness

3      herein, having been first duly sworn on oath, was

4      examined and testified as follows:

5                      EXAMINATION

6  BY MR. ZAWADSKY:

7      Q    Mr. Jacobs, could you identify yourself.

8      A    Timothy Jacobs.  What else do you need?

9      Q    What's your current address?

10     A    ▩▩▩▩▩▩▩▩▩▩▩▩▩▩

11     Q    And how long have you lived at that address?

12     A    Four years, five years.

13     Q    Is that -- do you own the property?

14     A    No.  I rent there.

15     Q    Okay.  Have you ever had a deposition taken before?

16     A    Not that I can recall.

17     Q    So what's going to happen -- you're aware that

18          there's a federal court lawsuit that's been filed

19          against Dura-Fibre?

20     A    Yes.

21     Q    And you're aware that in that lawsuit is a claim

22          made by the Department of Labor that you were

23          terminated for protected activity under the

24          Occupational Safety and Health Act?

25     A    Yes.

**Page 5**

1      Q    Okay.  Have you seen the complaint?

2      A    No.

3      Q    Okay.  So that's why you're here today.

4      A    Um-hum.

5      Q    Okay.  And you received a subpoena that we served

6          on you?

7      A    Right.

8      Q    Okay.  So what's going to happen today is we have a

9          court reporter here -- right here.

10     A    Um-hum.

11     Q    That's the court reporter.

12     A    Yep.

13     Q    And she'll transcribe your testimony -- my

14          questions and your testimony.

15     A    Okay.

16     Q    Okay?  Mr. Rutenberg here is representing the

17          Department of Labor.

18     A    Okay.

19     Q    Okay?  And he may object from time to time to some

20          questions that I ask.

21     A    Okay.

22     Q    It's highly unlikely that he will direct you not to

23          answer a question.  He's making the objections to

24          make -- to preserve a position, evidentiary

25          position, in the record.  That's why he would be

**Page 6**

1          doing that.

2      A    Okay.

3      Q    Okay?  After we're completed with the deposition,

4          the court reporter will prepare a transcript of our

5          conversation this afternoon.  Okay?

6      A    Yes.

7      Q    And then you'll be provided with that transcript to

8          review it.  You understand?

9      A    I understand, yeah.

10     Q    And then you'll have an opportunity to make

11          corrections if you think there is anything on that

12          transcript that you want to correct.

13     A    All right.

14     Q    Okay?  Are you on any medications that would impair

15          your ability to testify here today?

16     A    No.

17     Q    Do you have any medical conditions that would

18          impair your ability to testify today?

19     A    I am having a little problem with short-term

20          memory.

21     Q    Okay.  So if we're looking to a large degree at

22          events that occurred in 2013 --

23     A    I think I will be fine.

24     Q    Okay.  And may I ask what the problem is with your

25          short-term memory?

**7**

1  A  I'm not sure if it's the medication I'm on or -- I
2  am scheduled to have a scan done.
3  Q  Oh, okay. In your opinion, why were you terminated
4  by Dura-Fibre?
5  A  For twisting my ankle.
6  Q  Okay. So was that the only reason you were
7  terminated, was for twisting your ankle?
8  MR. RUTENBERG: I just want to object for
9  speculation. Go ahead.
10  THE WITNESS: That would have been the
11  last thing that sent me out the door.
12  BY MR. ZAWADSKY:
13  Q  Okay. Are there any other things that were part of
14  what you believe were the reasons for your
15  termination?
16  A  No.
17  Q  And what evidence supports your claim that you were
18  terminated because you injured your ankle or
19  twisted your ankle?
20  A  I followed rules, filling out an accident report,
21  and I was -- received points for a "near miss."
22  Q  So you filled out a report --
23  A  Um-hum. Yes.
24  Q  -- from the ankle injury, correct?
25  A  Yes.

**8**

1  Q  And you're characterizing it as a "near miss,"
2  correct?
3  A  Yes.
4  Q  Okay. Did it get changed from a "near miss" to an
5  "accident" during the course of that investigation?
6  A  Yes. I think they tried to do that, yeah.
7  Q  Okay. Well, they did it, right?
8  A  They -- well, I -- yeah, I guess so.
9  Q  I mean, not that you have to agree with what they
10  did --
11  A  Right.
12  Q  -- but that's what -- when you were terminated,
13  they said you were terminated because --
14  A  Of an accident.
15  Q  That they felt was preventable, correct? Not you.
16  A  That's how they felt.
17  Q  Yeah, that's how they felt.
18  As you sit here today, do you believe
19  they were honest with you when they said that they
20  were terminating you -- by "they," I'm assuming the
21  company made the decision. Is that who we're
22  talking about?
23  A  Yes.
24  Q  Where I'm a little bit confused is there's a safety
25  committee at Dura-Fibre, right?

**9**

1  A  Yes.
2  Q  And that safety committee, if I understand
3  correctly, and we'll go into this in more detail in
4  a little while, is made up of two members of
5  management and two members of the bargaining unit?
6  A  Yes.
7  Q  And when I say "bargaining unit," I'm talking about
8  those employees represented by the Steelworkers
9  Union.
10  A  Yes.
11  Q  So if there's an accident that is potentially going
12  to result in discipline, that's reviewed by the
13  safety committee, correct?
14  A  Yes.
15  Q  There's actually a form that they -- that they look
16  over and they assign points to?
17  A  Yes.
18  Q  And you were -- you were active in the union for a
19  long time, right?
20  A  Right.
21  Q  Were you in any position in the union when you were
22  terminated by Dura-Fibre?
23  A  Was I in any --
24  Q  Yeah, were you an officer, were you the secretary
25  or --

**10**

1  A  I was the secretary of the union.
2  Q  Okay. And before this deposition, we chitchatted a
3  little bit about back in 2004 when Dura-Fibre
4  acquired the company from Menasha -- was it Menasha
5  Paper?
6  A  Menasha Corporation.
7  Q  Menasha Corporation. And Menasha Corporation was
8  union, right?
9  A  Yes.
10  Q  And they represented -- the union represented the
11  employees at Menasha Paper -- was it Menasha Paper
12  or just Menasha -- Menasha Corporation when it was
13  acquired -- when the Laminating Division was
14  acquired by Dura-Fibre, right?
15  A  Yes.
16  Q  I mean, you were part of that bargaining unit,
17  right?
18  A  Right.
19  Q  And there was -- there were several meetings
20  between Dura-Fibre, Brian Dunsirn and myself, and
21  the members of the union committee that were now
22  representing the employees at Dura-Fibre that
23  previously had represented the employees at Menasha
24  Corporation, Laminating, correct?
25  A  As far as I know. If I -- well, I did leave around

## 11

1 that time.
2 Q Okay. Were you at the first meeting? Do you
3 recall whether you were at that first meeting in
4 2004?
5 A I don't.
6 Q Tim Long was there.
7 A I don't recall if I was or not.
8 Q Okay. Maybe you were, maybe you weren't?
9 A Yeah.
10 Q So when you say you left, what does that mean? You
11 left the company?
12 A I left the company.
13 Q And why did you leave the company?
14 A I relocated to Antigo for a different job.
15 Q Okay. And then, at some point -- I mean, it wasn't
16 because you were unhappy with Dura-Fibre?
17 A No.
18 Q And, in fact, you have other family that have
19 worked and continue to work at Dura-Fibre, correct?
20 A Correct.
21 Q You had one brother that retired from Dura-Fibre,
22 correct?
23 A Correct.
24 Q What's his first name?
25 A Wayne.

## 12

1 Q And then you have another brother, Tom, that still
2 works at Dura-Fibre, correct?
3 A Correct.
4 Q Okay. Any other family members that I'm missing
5 here?
6 A Nope.
7 Q Okay. So a lot of Jacobs have had close ties to
8 Dura-Fibre, or previously to Menasha Corporation,
9 for a long period of time, right?
10 A Right.
11 Q And prior to 2004, when Dura-Fibre acquired the
12 Laminating Division of Menasha Corporation, how
13 long had you worked for the Menasha Corporation?
14 A Almost 19 years, I think.
15 Q So you had 19 years with Menasha Corporation. Then
16 you brought that seniority with you when you joined
17 Dura-Fibre, right?
18 A Right.
19 Q So -- and then you lost your seniority when you
20 quit?
21 A I did.
22 Q And then you came back in, what, 2010?
23 A Yes.
24 Q And then you -- so you've had about another three
25 years of seniority when you were terminated?

## 13

1 A Right.
2 Q Okay. After you came back in 2010, did you get
3 involved with the union again, as a -- as an
4 officer?
5 A I don't remember --
6 Q Okay.
7 A -- if it was 2010 or not.
8 Q Okay. Approximately -- at some point before you
9 were terminated, you were back --
10 A Right.
11 Q -- in, right? You were the union secretary,
12 correct?
13 A Correct.
14 Q And from time to time you'd be involved in union
15 negotiations with the company?
16 A Correct.
17 Q Bargaining a new contract?
18 A Correct.
19 Q And so you were familiar with the contract?
20 A Yes.
21 Q And you knew the provisions of the contract?
22 A Yes.
23 Q You knew the provisions regarding the safety
24 committee?
25 A Yes.

## 14

1 Q You knew the provisions regarding discipline?
2 A Yes.
3 Q You knew the provisions regarding work rules?
4 A Yes.
5 I mean, am I correct that there were -- the work
6 rules were actually attached to the contract at
7 Dura-Fibre?
8 A No, I don't think so.
9 Q Okay. But -- we'll talk about that later. Okay?
10 In any event -- and then from time to
11 time there would be grievances filed by employees
12 at Dura-Fibre complaining about, for example, some
13 discipline was taken?
14 A Correct.
15 Q And you might be part of that -- representing the
16 union at those meetings processing grievances?
17 A Correct.
18 Q And what is a grievance?
19 A A complaint filed by an employee for -- maybe he
20 felt something was done wrong to him. So if there
21 was any points assessed, we would work on getting
22 them removed or resolve the issue.
23 Q And in order to file a grievance, the union or the
24 employer both would have to identify parts of the
25 contract that were violated, right?

## 15

1 A Correct.
2 Q Okay. And then if a grievance wasn't resolved,
3    potentially it could go to arbitration?
4 A Correct.
5 Q Did you prepare -- do anything to prepare for your
6    deposition today?
7         MR. RUTENBERG: I'm just going to object
8    to the question to the extent it invades the
9    common-interest/joint-defense doctrine.
10        MR. ZAWADSKY: I don't think --
11        MR. RUTENBERG: Answer to the extent --
12    you may answer that to the extent it doesn't
13    invade -- your answer doesn't invade that doctrine.
14        MR. ZAWADSKY: Just for the record, I
15    don't think that defense applies at all. If
16    there's ever -- if there's going to be any attempt
17    to have Mr. Jacobs not testify in certain areas
18    based on that assertion, I'm going to ask that
19    those questions be certified for potential review
20    by the Court. So I'm just giving you advance
21    notice of that.
22        THE WITNESS: Could you repeat the
23    question?
24 BY MR. ZAWADSKY:
25 Q Sure. I think you answered it. Did you do

## 16

1    anything to prepare for your deposition today?
2 A I went through my documents.
3 Q And what documents did you review?
4 A I have stuff from Department of Labor, my
5    statements that were made, personal letters that I
6    drew up after I was let go on how incidents went --
7 Q Okay.
8 A -- NLRB, my write-up slips, and wages and the old
9    labor agreement.
10 Q And so -- and you -- I noticed that you have all of
11    that, you -- a series -- a pad and a series of
12    files in front of you; is that correct?
13 A That's correct.
14 Q And are those documents that you are prepared to
15    let me have to -- in response to your subpoena that
16    I served on you?
17 A Right.
18        MR. RUTENBERG: May I, for the record,
19    state Mr. Jacobs did provide those documents to me,
20    which I scanned unchanged. I have them on CD. It
21    does not include the pad, as those are --
22        THE WITNESS: This is just --
23        MR. ZAWADSKY: Yeah, maybe you better
24    take that pad -- put that pad away. Unless you
25    want me to look at it. Okay.

## 17

1        So to make -- just so that I understand,
2    so if I'm going to ask -- if I'm going to look at
3    documents, I'm going to look at the original
4    document, and then you're going to provide me with
5    a copy later on? Or how is that going to work?
6        MR. RUTENBERG: What do you mean?
7        MR. ZAWADSKY: Well, we're going to --
8        MR. RUTENBERG: We have a CD here.
9        MR. ZAWADSKY: Yeah, but I'm going to
10    have to identify those exhibits, and have him
11    identify them, and ask him questions about the
12    documents. So I'm wondering how we're going to do
13    that.
14        MR. RUTENBERG: Will you welcome him to
15    your documents?
16        THE WITNESS: Sure.
17        MR. ZAWADSKY: And then I take it you
18    probably don't have access to copying resources at
19    this building; is that correct?
20        THE REPORTER: I don't.
21        MR. RUTENBERG: To clarify, there's -- we
22    have a CD here for you to take back.
23        MR. ZAWADSKY: I understand that --
24        MR. RUTENBERG: Okay.
25        MR. ZAWADSKY: -- but she -- she normally

## 18

1    would mark everything as an exhibit. So that's
2    where the issue is going -- well, we'll figure
3    something out.
4        (Discussion off the record.)
5 BY MR. ZAWADSKY:
6 Q Mr. Jacobs, have you talked to anyone about this
7    deposition or about what you were going to testify
8    about today before you came here today?
9        MR. RUTENBERG: And I'm still going to
10    put the same objection on the record, the common
11    interest defense doctrine, and instruct the
12    deponent not to answer to the extent it might
13    invade that doctrine.
14 BY MR. ZAWADSKY:
15 Q You can still answer the question, if you remember
16    the question. Did you talk to anybody about what
17    you were going to testify about today?
18 A No.
19 Q Okay. Did you talk to anyone prior to this
20    deposition about -- to help you refresh your
21    recollection as to the circumstances surrounding
22    this lawsuit?
23        MR. RUTENBERG: The same objection.
24        THE WITNESS: No.
25 BY MR. ZAWADSKY:

**19**

| | | |
|---|---|---|
| 1 | Q | Have you talked to Mr. Rutenberg prior to today? |
| 2 | A | Yes. |
| 3 | Q | Okay. When? |
| 4 | A | Yesterday. |
| 5 | Q | Okay. Prior to yesterday had you talked to him? |
| 6 | A | Yes. |
| 7 | Q | Okay. |
| 8 | A | On the phone. |
| 9 | Q | Okay. And how long ago was that? |
| 10 | A | A couple weeks. |
| 11 | Q | Okay. Any other conversations with Mr. Rutenberg? |
| 12 | A | No. |
| 13 | Q | Okay. And when you talked to him on the phone, how |
| 14 | | long did that conversation last? |
| 15 | A | Minutes. |
| 16 | Q | Okay. Five minutes? |
| 17 | A | Yes, maybe. |
| 18 | Q | And when you talked to him yesterday, was that in |
| 19 | | person? |
| 20 | A | Yes. |
| 21 | Q | And how long did that conversation or meeting take? |
| 22 | A | Maybe an hour. |
| 23 | Q | Okay. Was that here in Neenah? |
| 24 | A | Appleton. |
| 25 | Q | Appleton. Okay. What is the highest level of |

**20**

| | | |
|---|---|---|
| 1 | | education you've completed? |
| 2 | A | 12. |
| 3 | Q | So you graduated from high school? |
| 4 | A | I did. |
| 5 | Q | Okay. And what high school? |
| 6 | A | Menasha High. |
| 7 | Q | And any education following high school? |
| 8 | A | Just what the company sent me through out at the |
| 9 | | tech for management, union management training, or |
| 10 | | a little bit of -- what was it all? I don't |
| 11 | | recall. |
| 12 | Q | Well, you had some safety training from time to |
| 13 | | time? |
| 14 | A | Yeah. |
| 15 | Q | Okay. What was your job -- when you were |
| 16 | | terminated at Dura-Fibre, what was your job? |
| 17 | A | I was a leadman on a paper machine. |
| 18 | Q | And what machine? |
| 19 | A | Laminator. |
| 20 | Q | Okay. Did you get any special training on that, or |
| 21 | | is that just you acquired through experience at |
| 22 | | the -- at the plant? |
| 23 | A | Through experience. |
| 24 | Q | So somebody trained you on that machine? |
| 25 | A | Yes. |

**21**

| | | |
|---|---|---|
| 1 | Q | Okay. And then you became apparently pretty good |
| 2 | | at it, right? |
| 3 | A | Right. |
| 4 | Q | And then, at some point in time, you were promoted |
| 5 | | to leadman? |
| 6 | A | Yes. |
| 7 | Q | At that -- did that occur while you were at Menasha |
| 8 | | Corporation, or did it occur only after you |
| 9 | | returned to Dura-Fibre in 2010? |
| 10 | A | Menasha Corporation. |
| 11 | Q | Okay. So when you left in 2004, 2005, to go to |
| 12 | | Antigo, at that point you were a leadman on the |
| 13 | | laminator machine? |
| 14 | A | I was. |
| 15 | Q | And when you came back in 2010, were you hired back |
| 16 | | into that position? |
| 17 | A | I was. |
| 18 | Q | Okay. Other than this lawsuit, have you ever been |
| 19 | | involved in any other legal proceedings? |
| 20 | A | Such as? |
| 21 | | MR. ZAWADSKY: Well, I have a couple |
| 22 | | here. Mark this Exhibit 1. |
| 23 | | (Exhibit No. 1 was marked.) |
| 24 | | BY MR. ZAWADSKY: |
| 25 | Q | I'm handing Mr. Jacobs Exhibit 1. Mr. Jacobs, have |

**22**

| | | |
|---|---|---|
| 1 | | you seen that document before? |
| 2 | A | Yes. |
| 3 | Q | So this, apparently, is a lawsuit that was filed by |
| 4 | | Wisconsin -- or CoVantage Credit Union against you |
| 5 | | and your wife regarding a -- it says a "Foreclosure |
| 6 | | of Mortgage." Do you see that? |
| 7 | A | Yes. |
| 8 | Q | Okay. And what happened with that lawsuit? |
| 9 | A | The bank took the house over. |
| 10 | Q | So you -- so you ended up leaving your home? |
| 11 | A | I did. |
| 12 | Q | Okay. And why was the foreclosure action |
| 13 | | initiated; do you recall? |
| 14 | A | After I lost my job, I couldn't afford it. |
| 15 | Q | Okay. And how long had you been unemployed when |
| 16 | | this was first filed? Do you recall? It looks to |
| 17 | | me like it was filed on March 19th of 2014. Do you |
| 18 | | see that "Filing Date" on the top left-hand |
| 19 | | corner -- top left-hand corner? |
| 20 | A | Um-hum. |
| 21 | Q | Okay. So the document seems to me to say that on |
| 22 | | March 19th, 2014, this lawsuit was filed against |
| 23 | | you and your wife saying they wanted to take back |
| 24 | | your house. |
| 25 | A | Yeah. |

**23**

1  Q  Does that sound right?
2  A  Yeah.  It could have been, yeah.
3  Q  Okay.  And you were terminated in --
4  A  May.
5  Q  -- May of 2013?
6  A  (Witness nods head.)
7  Q  So when did you stop making payments to the credit
8     union; do you recall?
9  A  No.
10 Q  Okay.  Take that back from you.  Have you ever been
11    convicted of a crime?
12 A  No.
13       MR. ZAWADSKY:  Mark this as Exhibit
14    No. 2.
15       (Exhibit No. 2 was marked.)
16 BY MR. ZAWADSKY:
17 Q  I'm giving the witness Exhibit No. 2.  Mr. Jacobs,
18    have you seen that document before?
19       MR. RUTENBERG:  You can feel free to flip
20    through.
21       THE WITNESS:  Yes.
22 BY MR. ZAWADSKY:
23 Q  Okay.  And the document instructs you to appear
24    today where we are right now --
25 A  Right.

**24**

1  Q  -- to testify, right?
2  A  Yes.
3  Q  And then it also had attached to it a number of
4     document requests that start on Page 3 of this
5     document?
6  A  Yep.
7  Q  As I understand it, those files you have in front
8     of you are your best effort to comply with my
9     requests, correct?
10 A  Correct.
11 Q  Okay.  So the first document -- the first item I
12    ask for is, "Any documents relating to and
13    including communications between you and
14    plaintiff," which is the Department of Labor here,
15    or the Occupational Safety and Health
16    Administration, "including but not limited to
17    attorneys or investigators, from May 23, 2013, to
18    the present, including, but not limited to, notes
19    or written correspondence."  Do you have that with
20    you today?
21 A  Yes.
22 Q  Is it in a certain file, or is it just
23    interspersed?
24 A  No, it's nothing really in order.
25       MR. ZAWADSKY:  Okay.  If this is okay

**25**

1     with you, Counsel, I'm just going to take all those
2     files and kind of go through them one by one, and
3     ask him questions, and mark those documents which I
4     want to make exhibits.  So --
5        MR. RUTENBERG:  Can we go off the record
6     for a second?
7        MR. ZAWADSKY:  Sure.
8        (Discussion off the record.)
9        (Exhibit Nos. 3 through 14 were marked.)
10       MR. ZAWADSKY:  Back on the record.
11 BY MR. ZAWADSKY:
12 Q  So, Mr. Jacobs, before the break, you had produced
13    a number of files with documents in them that you
14    represent were responsive to the documents I asked
15    for in my subpoena, correct?
16 A  Correct.
17 Q  Okay.  And I'm going to take a series of these
18    documents -- and as I understand it, your counsel
19    is going to provide me with a CD with all of the
20    documents, but for purposes of the deposition
21    today, we're going to go through documents I took
22    out of these files and ask you to identify them,
23    and I may ask you a couple questions about them.
24    Okay?
25 A  Okay.

**26**

1  Q  Okay.  The first document is Exhibit 3.  Can you
2     tell me what that is?
3  A  This was basically my -- everything that happened
4     during the incident with Steve Wiltz, and I think
5     me twisting my ankle's in there, all the
6     information that went on that day.
7  Q  Do you remember approximately when you drafted that
8     document?
9  A  I think that was the day after I was let go.
10 Q  Okay.
11 A  After the 23rd.  It was --
12 Q  It was the 24th of May?  Around --
13 A  Around there, yeah.  Maybe the evening of the 23rd.
14    I don't know.
15 Q  And then why did you draft the document?
16 A  Because I had grievances filed, and I wanted to be
17    able to recollect what happened.
18 Q  Okay.  And this may have been a document you
19    reviewed before your deposition today?
20 A  I never reviewed it, no.
21 Q  Okay.  And I'm going to put Exhibit 4 in front of
22    you.  It's a two-page document.  Can you tell me
23    what that is?  Make it closer, if that helps.  Is
24    that your handwriting?
25 A  Um-hum.

## 27

1 Q Okay.

2 A **These were probably notes from a union/management**

3 **meeting maybe.**

4 Q Okay.

5 A **Maybe. I'm not sure.**

6 Q It looks like there's a date on the top of Page 1,

7 Tuesday, May 28th.

8 A **Um-hum.**

9 Q And then the following -- on Page 2 there's a date

10 of May 30th, 2013. Did I say 2008? May 28th,

11 2013, on Page 1, and then May 30th, 2015. The

12 first -- Page 1 seems to be a meeting with

13 management and union.

14 A **Um-hum.**

15 Q And Page 2 says, "Meeting on grievance filed May

16 24th," and then you have "union board" on there.

17 So that might have been a separate meeting, right?

18 A **It could have been, yeah.**

19 Q So the way that I understand the document -- I

20 think you're saying the same thing -- is that these

21 are documents -- now, the grievance has been filed,

22 and the grievance is being processed, and you're

23 documenting what's occurring during the processing

24 of the grievance?

25 A **It's possible. I was the secretary. I kept notes.**

## 28

1 Q So, anyway, you drafted these documents?

2 A **Yes.**

3 Q And would it be fair to say you probably drafted

4 these documents on the dates at the top of each

5 page?

6 A **Yes.**

7 Q Okay. And then I have a two-page exhibit, Exhibit

8 5. It looks to me -- I'm just going to

9 characterize the document and see if we can move

10 this along -- that it's notes of what occurred with

11 respect to the events leading up to your

12 termination.

13 A **Yes.**

14 Q And is that your handwriting?

15 A **Yes.**

16 Q And do you remember approximately when you prepared

17 that?

18 A **No.**

19 Q Okay. Would it have been after you prepared the

20 earlier notes that we looked at, which was the day

21 after you were terminated?

22 A **It could have been. It could be, like, a rewrite**

23 **of it, too. I don't know.**

24 Q Okay. And then I'm going to put Exhibit 6 in front

25 of you, which is a statement -- says "Statement" at

## 29

1 the top.

2 A **Um-hum.**

3 Q And that document -- can you tell me what that

4 document is?

5 A **This might have been a statement that was given to**

6 **NLRB.**

7 Q Okay. This is something you prepared in support of

8 a charge you had filed against Dura-Fibre for the

9 National Labor Relations Board?

10 A **Correct.**

11 Q Okay. And then Exhibit 7, can you identify that

12 for me? Let me do it. Is that an affidavit you

13 gave the National Labor Relations Board?

14 A **I think so, yes.**

15 Q Okay. Does it say, "Confidential Witness" --

16 A **"Affidavit," yes.**

17 Q -- "Affidavit"? Yes. And then I'm going to show

18 you something on Page 8. I'm first going to read

19 it to you, and then you can look at it because it's

20 a little bit awkward. It says on Page 8 -- this is

21 in your affidavit -- "Right now, I think the

22 company did this to set an example that they can do

23 whatever they want to do. Long said that I was

24 used as an example to do what they want when they

25 want, and I just happened to be the one that it was

## 30

1 going to be done to."

2 A **Correct.**

3 Q Okay. So this is why the company terminated you,

4 to set an example?

5 A **That ain't why I was terminated. I was terminated**

6 **because of the write-ups that they gave me.**

7 Q Okay. What's this about an example? You say, "I

8 think the company did this to set an example." Is

9 that -- that's you saying that, right?

10 A **No, that's Tim Long saying that.**

11 Q No. I'm going to argue with you a little bit.

12 Counsel can object.

13 MR. ZAWADSKY: Let -- can I just get --

14 stand next to him? Because we -- should we look at

15 the same document together?

16 MR. RUTENBERG: Sure.

17 MR. ZAWADSKY: Okay. Take the long way

18 around. So counsel can see this, too.

19 BY MR. ZAWADSKY:

20 Q So this is an affidavit you gave the National Labor

21 Relations Board, right?

22 A **Yes.**

23 Q And that was sworn to you under oath? You swore to

24 this under oath, right?

25 A **Right.**

## 31

1 Q  Okay. So here is what I'm focusing on. Line 11
2    through 13 on Page 8 of your affidavit. These
3    lines here. Okay?
4 A  Um-hum.
5 Q  Okay. So it says, "Right now, I" -- "I" is you,
6    right?
7 A  I guess, yes.
8 Q  You know who you are, right?
9 A  Yep.
10 Q  All right.
11        "-- I think that the company did this to
12    set an example that they can do whatever they want
13    to do." Do you see that?
14 A  Yep.
15 Q  Okay. You agree with that?
16 A  Yes.
17 Q  Okay. "Long" -- and "Long" is Tim Long?
18 A  Right.
19 Q  Tim Long was active in the union?
20 A  He was a union member.
21 Q  Union member?
22 A  He wasn't on the board at the time.
23 Q  Not at the time. But somebody was -- you had
24    worked with him for a long time?
25 A  Yes.

## 32

1 Q  I'm going to say you kind of were friends with him?
2 A  Yeah.
3 Q  So you talked to him about being terminated, right?
4 A  Yeah.
5 Q  And he said -- "Long" -- this is Long now -- "said
6    that I was used as an example to do what they want
7    to do when they want, and I just happened to be the
8    one that it was going to be done to," correct?
9 A  Correct.
10 Q  That's what Long told you, right?
11 A  Right.
12 Q  That's pretty much what you say, too, right?
13 A  In a roundabout way, yes.
14 Q  Okay. You filed -- you applied for unemployment
15    compensation after you were terminated?
16 A  I did.
17 Q  Okay. And there was a hearing on the application?
18 A  Yes.
19 Q  You attended the hearing?
20 A  I did.
21 Q  You testified?
22 A  Yes.
23 Q  At that hearing, when you testified, did you say
24    anything about you thought you were fired because
25    you reported an injury?

## 33

1 A  I don't recall.
2        MR. ZAWADSKY: Once again, I -- Counsel,
3    I'm going to approach the witness, just so I can
4    highlight a portion of this document.
5 BY MR. ZAWADSKY:
6 Q  So you received the decision on -- after the
7    hearing, right?
8 A  Right.
9 Q  And you were awarded unemployment compensation,
10    correct?
11 A  Correct.
12 Q  Okay. So -- and this is -- is that the decision,
13    Exhibit 9?
14 A  Yes.
15 Q  Okay. I'm just going to highlight something for
16    you in the decision. On Page 4, at the bottom, of
17    the decision -- do you see the bottom that I'm
18    pointing to?
19 A  Um-hum.
20 Q  Okay. It says, "The employer may have" -- "may
21    have made a valid business decision in discharging
22    the employee." Do you see that?
23 A  I do.
24 Q  Do you agree with that?
25 A  No.

## 34

1 Q  Why not?
2 A  Because the company sat in that meeting and told
3    them that I was one of their best workers down
4    there. So why would that make that a valid --
5 Q  Okay.
6 A  -- business decision?
7 Q  So is that the only reason why you disagree with
8    that statement by the judge?
9 A  Yes.
10 Q  Okay.
11 A  I can't really recall how much I said in that
12    meeting because the judge spent most of his time
13    talking to him and Jamie.
14 Q  Has Dura-Fibre ever said that you weren't a good
15    worker?
16 A  No.
17 Q  In fact, there was a hearing held with Don Mackey
18    on your grievance, right, mediator Don Mackey?
19 A  Yes.
20 Q  And what happened? What was a result of that
21    hearing?
22 A  That he sided with the company.
23 Q  So he decided your grievance didn't have merit,
24    right?
25 A  I guess, yes.

---

**35**

1  Q  After that, did the company provide you with a
2     letter of reference?
3  A  **I asked for one, but I did not pick it up.**
4  Q  Okay. So you never saw it?
5  A  **No.**
6  Q  Okay. You are aware that one at least had -- you
7     were told one had been prepared that you could pick
8     up?
9  A  **Right.**
10 Q  Okay. Okay. And just -- I know I've asked the
11    question, but I just want -- no one ever told you
12    that you weren't a very good production employee?
13    Am I correct about that?
14 A  **Correct.**
15 Q  Okay. In fact, would it be fair to say, in your
16    opinion, that by terminating you, that Dura-Fibre
17    lost a very valuable employee?
18 A  **I feel they did.**
19 Q  Can you identify Exhibit 8 for me, please.
20 A  **That's a letter from one of the union workers.**
21 Q  Okay. And that union worker is?
22 A  **Lisa Van Kooy.**
23 Q  Okay.
24              MR. RUTENBERG: Can you just tell me what
25    exhibit that was?

---

**36**

1              MR. ZAWADSKY: Sure. It's Exhibit 8.
2  BY MR. ZAWADSKY:
3  Q  And then it doesn't look like it's dated. Do you
4     know when you got that letter? I'm assuming she
5     gave it to you. Or am I wrong? I mean, where did
6     that come from?
7  A  **It came directly from Lisa. It was given to me in**
8     **an envelope after -- I'm not sure if it was after I**
9     **was fired or before we had our meeting over at the**
10    **union hall.**
11 Q  Well, it would have been after you were fired but
12    before you -- while the grievance was still being
13    processed maybe?
14 A  **Maybe.**
15 Q  Okay. And then did you ask her to write the
16    letter, or did she just do it on her own?
17 A  **Just did it on her own.**
18 Q  Because she was supportive of you?
19 A  **Yes.**
20 Q  Okay. Do you know if a copy of this letter was
21    ever provided to the company at any point in time
22    ever?
23 A  **Not to my recollection.**
24 Q  Okay. I'm going to show you Exhibit 10. Can you
25    tell me what that is? It's a two-page document.

---

**37**

1     It's titled, "Dura-Fibre Call In Log."
2  A  **Yep. As leadmen, we took all the call-ins on the**
3     **machine.**
4  Q  Okay.
5  A  **Or in the plant.**
6  Q  So this is an example of where you were taking the
7     call-ins?
8  A  **Right.**
9  Q  Okay. Exhibit 11. Could you identify that for me,
10    please.
11 A  **"Safety Incident Report."**
12 Q  Okay. And is that kind of just the form that was
13    used by the safety committee when there was an
14    accident they were investigating?
15 A  **Right.**
16 Q  Okay. And if I look at the form -- keep it in
17    front of you -- it has a number of different
18    categories; do you see that?
19 A  **Right.**
20 Q  Okay. And in Category 1 is "Past Behavior or
21    History of Unsafe Acts." Do you see that?
22 A  **Yep.**
23 Q  And then it looks like there's points that are
24    assessed, zero through 4. Do you see the
25    categories there?

---

**38**

1  A  **I do.**
2  Q  Were you involved in preparing this document back
3     when you were active in the union?
4  A  **I think it was provided by the company. I was one**
5     **that didn't agree with it.**
6  Q  Okay.
7  A  **But I think changes were actually made to it.**
8  Q  Based on your input?
9  A  **Based on my -- I don't know, with my input or**
10    **somebody else's input.**
11 Q  You were -- you were never shy about vocalizing
12    disagreements with management, right?
13 A  **No.**
14 Q  I mean, my impression of -- my understanding of a
15    lot of employees' perception of you is that you
16    stood up for other employees.
17 A  **I did.**
18 Q  So the final -- the final document that was
19    compiled was a -- was produced after management and
20    the union had an opportunity to discuss it, right?
21 A  **Repeat that again.**
22 Q  This document had input from you and other union
23    members before a final draft was prepared?
24 A  **Not so much from me, I don't think. I didn't agree**
25    **with the document.**

---

---

**39**

1 Q Okay. Did you ever tell anybody you didn't agree
2 with the document?
3 A Yes.
4 Q Who did you tell?
5 A Luke.
6 Q Okay.
7 A Jamie.
8 Q Okay. Did any of your problems with the
9 document -- are they reflected on the final
10 document from what was the initial draft? Do you
11 recall?
12 A I don't recall.
13 Q Okay. So the document was prepared after
14 Dura-Fibre acquired the facility, right?
15 A Correct.
16 Q And there was a meeting or meetings between the
17 union officers and company management?
18 A Correct.
19 Q And you attended those meetings?
20 A Probably some of them, yes.
21 Q Some of them. And at those meetings, this document
22 that was going to be utilized by the safety
23 committee was discussed?
24 A Yes, at some of them.
25 Q Okay. And at some point in time the company said,

---

**40**

1 "Okay, here's the document we're going to be
2 using"?
3 A Yeah.
4 Q And was there any grievance filed by the union
5 saying, "No, this document is" -- "violates the
6 contract"?
7 A Not that I recall.
8 Q Okay. So would it be fair to say that this
9 document was a result of discussions or
10 negotiations between the union and the company?
11 A It was used, yes.
12 Q No. But I'm saying that the union -- company
13 didn't just issue the document, there were
14 discussions between the union and the company
15 before the final document issued, right?
16 A Yes, there was.
17 Q Okay. Now, looking at the document today, just
18 right now, okay --
19 A Um-hum.
20 Q -- is there anything in that document that you
21 don't think is appropriate?
22 A The whole thing.
23 Q Why?
24 A Because we have a union contract, and this is
25 something that should have been voted on between

---

**41**

1 the union board and --
2 Q Okay.
3 A If it's an addition to our contract outside a
4 contract.
5 Q Okay. Other than that, just the document itself,
6 forget about -- I understand procedurally you're
7 saying this is improper, right?
8 A Right.
9 Q Okay. But the document itself as a tool to assess
10 accidents. How do you like the document?
11 A I don't.
12 Q Why not?
13 A Because people can be assessed points outside of
14 what the contract says.
15 Q Okay. Is -- if I understand the safety committee,
16 there's two members -- two people from the union,
17 and there's two management people, right?
18 A Correct.
19 Q Did you ever participate in safety committee
20 meetings?
21 A I did.
22 Q Okay. And there'd be a dialogue about a particular
23 accident between the four committee members, right?
24 A Correct.
25 Q And then say, for example, "Past Behavior or

---

**42**

1 History of Unsafe Acts," that seems to me that
2 would not be something you'd -- you'd just either
3 know it or not because it would be in the
4 employees' records, right?
5 A Correct.
6 Q Okay. "Intent." That seems to me to be more of a
7 decision that was made by the members of the
8 committee, right?
9 A No.
10 Q Why do you say no?
11 A It was in there -- if I recall, it was in there
12 to -- the company had put that in there.
13 Q Okay. Now you're on the committee. Now you're --
14 you're -- I'm putting you on the safety committee
15 right now. Okay?
16 A Right.
17 Q So we've gone through past behavior, and now we're
18 going to discuss intent at a particular accident,
19 okay? Okay. When you looked at intent, there was
20 an element of discretion, if you will, in terms of
21 deciding which category it fit in, right?
22 A Correct.
23 Q Okay. "Knowledge or Skills," that seems to me just
24 fact oriented, right?
25 A Correct.

---

BROWN & JONES REPORTING, INC.

DURAFIBRE00012

**43**

1  Q  "Property Damage." That seems to me, once again,
2      fact oriented?
3  A  Correct.
4  Q  And then "Actual Injury/Incident Type." You see
5      the different types?
6  A  Correct.
7  Q  All right. So, for example, a "near miss" would be
8      zero points, right?
9  A  Correct.
10 Q  "First aid only," one point?
11 A  Correct.
12 Q  All right. And then I take all those, and I added
13     those up, right?
14 A  Yep.
15 Q  And then if it's a "near miss" accident -- if it's
16     not an actual incident, I can go to a "near miss"
17     accident? So it's one or the other, right?
18 A  Correct.
19 Q  Okay. Add all those up, and I get a subtotal,
20     correct?
21 A  Correct.
22 Q  All right. And then I can lose points? I can have
23     points deducted, right?
24 A  Correct.
25 Q  So that seems to me that there's not really -- it

**44**

1      doesn't specify exactly what you would look at in
2      taking points away, right?
3  A  Right.
4  Q  What would you discuss when you were at that place
5      in the safety committee discussions?
6  A  A safety committee meeting would be about any
7      incidents, accidents, preventive.
8  Q  If I'm looking at other contributing factors, would
9      I say, geez, this guy has worked here for ten
10     years -- if you were looking at other contributing
11     factors, would possibly something that would be
12     discussed -- would be this is a very good employee,
13     and usually a very safe employee, he should be
14     given minus 4 because of that?
15         MR. RUTENBERG: Objection. Speculation.
16     You can answer.
17         THE WITNESS: Possibly.
18 BY MR. ZAWADSKY:
19 Q  Okay. But there was some discussion about -- when
20     you were on the committee, there would be some
21     discussion about the deducts under "Other
22     Contributing Factors," right?
23 A  Right.
24 Q  Okay. And then, if I understand the form, I would
25     take the subtotal under the -- where the points are

**45**

1      assessed and subtract anything under the "Other
2      Contributing Factors" and come up with a final
3      number of points, right?
4  A  Correct.
5  Q  Okay. So if it was 4 points -- under this form, it
6      seems to me it says, "4 to 6, Constructive
7      feedback, coaching, or first step corrective
8      action, verbal warning," right?
9  A  Right.
10 Q  Okay. And I don't -- so then I get into -- if it's
11     more points, then I started getting into more
12     serious discipline assessed, right?
13 A  Correct.
14 Q  Okay. Tell me what Exhibit 12 is.
15 A  This is Mike Prokash. He's an operator on the
16     machine, leadman.
17 Q  Okay. How many points did he get assessed for
18     that, that episode?
19 A  Minus 2 -- 4.
20 Q  Okay. So he didn't get any points taken off in
21     terms of discipline points, right?
22 A  2 -- they had it at 6, minus 2. They had it at 6,
23     and then there was a minus 2.
24 Q  But under the form, if he's at 4, "Constructive
25     feedback, coaching, or first corrective action,"

**46**

1      right?
2  A  Correct.
3  Q  Can you look -- identify Exhibit 13 for me?
4  A  Another one from Mike Prokash.
5  Q  And how many points did he end up with?
6  A  6.
7  Q  So, once again, no disciplinary points assessed,
8      right?
9  A  Right.
10 Q  And then third example?
11 A  Same thing, Mike Prokash.
12 Q  Number of points?
13 A  2.
14 Q  So no discipline?
15 A  Right.
16 Q  Why -- why are -- is there a reason that you had
17     these three safety incident reports involving Mike
18     Prokash in those files that you produced today?
19 A  He gave me them as a leadman. Exactly don't know
20     when the days was. Maybe during my -- stuff that
21     was going on with the union at the end. But he
22     gave me them for proof that people weren't treated
23     the same.
24 Q  Okay. So he's saying, "Look at these three times I
25     got investigated by the safety committee," right?

### 47

1  A  Right.
2  Q  So Exhibit 12 is dated May 23, 2013, right?
3  A  Right.
4  Q  That's the same day you were terminated, right?
5  A  Right.
6  Q  And Exhibit 13 is dated May 23, 2013?
7  A  Right.
8  Q  And then Exhibit 14 is dated June 6th, 2013?
9  A  Right.
10 Q  Okay.  So is there anything in there that -- where
11    it shows that you feel you were treated differently
12    than Mr. Prokash was treated?
13 A  Maybe a little.
14 Q  Could you tell me what "a little" is?
15 A  He received two incidents one day, one further on
16    down the line, and received zero points for it.
17 Q  Okay.  What does that -- in your -- from your
18    perspective, what does that tell me, or what might
19    it tell me?
20 A  It was treated differently than what happened to
21    me.
22 Q  Okay.  How?
23 A  I -- we filled out the form as a "near miss," and I
24    received points for it.
25 Q  Okay.  So why was Mike Prokash, in your opinion,

### 48

1  treated differently than you?
2  A  Because he didn't receive any points.
3  Q  We've established that, right?
4  A  Right.
5  Q  Okay.  Anything else?  Anything else?  Any
6     reason -- other reason -- and you can speculate
7     now -- why Mike Prokash was not given points, and
8     you were?
9        MR. RUTENBERG:  Object, speculation.  No
10    basis of knowledge.
11       THE WITNESS:  Yeah.  I -- I don't know.
12    It was a long time ago.  I don't remember.
13 BY MR. ZAWADSKY:
14 Q  Is it unfair that sometimes employees are given
15    points and sometimes they're not?
16 A  Yes.
17 Q  But it would depend on the circumstances of the
18    accident or "near miss," correct?
19       MR. RUTENBERG:  I'm going to object.
20    Again, speculation.
21       THE WITNESS:  Not always.
22 BY MR. ZAWADSKY:
23 Q  Sometimes?
24 A  Sometimes.
25 Q  And it would also sometimes depend on the

### 49

1  employee's safety record, under the form?
2  A  Yes.
3  Q  Do you know, Mr. Jacobs, how long that form had
4     been in use prior to your termination on May 23rd,
5     2013?
6  A  No.  Can't remember.
7  Q  Other than you, did anyone else that was a member
8     of the -- any union officers not like the form?
9  A  I would say a couple of them did.
10 Q  Who?
11 A  Tim Voelker, Steve Wiltz.
12 Q  So periodically the union and Company negotiated an
13    agreement?
14 A  Yes.  On some things, yeah.
15 Q  But the union could propose elimination of that
16    form if they wanted to, right?
17 A  I am not sure.
18 Q  Why?  Why aren't you sure?
19 A  I don't know.
20 Q  Okay.
21 A  I don't know the answer to that.
22 Q  Okay.  But to your knowledge, the union never did
23    propose elimination of the form in any negotiation
24    in which you were involved?
25 A  No, not that I know of.

### 50

1  Q  Okay.  After you left Dura-Fibre, where did you
2     become next employed?
3  A  Appleton Coated.
4  Q  Okay.  And how long after you left Dura-Fibre did
5     you -- were you hired at Appleton Coated?
6  A  Almost a year.
7  Q  Okay.  And just so we have it for the record, what
8     does Appleton -- what does Dura-Fibre do?
9  A  Specialty products, paper products.  Specialty
10    paper products.
11 Q  Could you give me an example?
12 A  Furniture backs, totes, Dura-Wrap, something they
13    call slit-and-remove.  There's boxes for airlines.
14 Q  So what kind of customers would they have?
15    Dura-Fibre, what kind of customers would they have?
16 A  A lot.
17 Q  Okay.  And then where is Dura-Fibre located?
18 A  6th Street, Menasha.  352 6th Street, Menasha.
19 Q  Why did it take you so long to get a new job after
20    you were terminated from Dura-Fibre?
21       MR. RUTENBERG:  Object to the form of the
22    question.
23       THE WITNESS:  Needed just rest, knocked
24    down.
25 BY MR. ZAWADSKY:

**51**

1 Q So you felt like you had been -- you were
2 depressed?
3 A Very much.
4 Q Did you receive any medical attention during that
5 period of time that you were depressed?
6 A Later on down the line, I did.
7 Q After you were working at Appleton?
8 A Yes, I think it was.
9 Q So while you were -- during that period between
10 terminated at Dura-Fibre and when you started your
11 new job, you didn't see a psychologist or a
12 psychiatrist?
13 A I don't think so.
14 Q Okay. Any other -- did you see any other medical
15 provider during that time frame?
16 A Not that I -- I don't think so.
17 Q Okay.
18 A I might have. I'm just not sure.
19 Q Okay. And then -- so you started working at
20 Appleton Coated. What did you do -- or what are
21 you doing at Appleton Coated?
22 A A laborer.
23 Q Okay. Are you still working there?
24 A No.
25 Q What happened?

**52**

1 A I tore up my left shoulder, a pre-injury from when
2 I was up north.
3 Q And how recently was this?
4 A After I was there three years.
5 Q So that would have been sometime in 2016?
6 A Right.
7 Q So have you worked anywhere since 2016?
8 A No.
9 Q Okay. Are you collecting any kind of benefits as a
10 result of that most recent episode that you
11 described?
12 A I have a -- permanent disabilities. The mill
13 accommodates my insurance for the next three years.
14 Q So that wasn't a workers' comp injury?
15 A It was.
16 Q Oh, it was. Okay. So are you receiving workers'
17 comp benefits?
18 A Not anymore.
19 Q For a period of time you received workers' comp
20 benefits?
21 A Right.
22 Q And then was there a settlement of that claim that
23 you got?
24 A Yeah.
25 Q A dis- -- a permanent partial disability?

**53**

1 A Right.
2 Q Okay. And when did you get that settlement?
3 A Last year sometime.
4 Q How old are you?
5 A 52.
6 Q And have you looked for a job since you exhausted
7 your workers' compensation benefits that you just
8 described in 2016?
9 A No.
10 Q Okay. Do you intend to?
11 A Not at this time.
12 Q Okay. Given your physical condition, could you do
13 the work you were doing at Dura-Fibre at the time
14 you were terminated?
15 A No.
16 Q So you'd be physically incapable of doing that job?
17 A Right.
18 Q So would I be correct to say that you're no longer
19 seeking reinstatement at Dura-Fibre?
20 A Not unless they could meet my restrictions I have
21 now.
22 Q What could -- do you think you could do at
23 Dura-Fibre with the restrictions you have?
24 A It wouldn't be a laborer job. It'd have to be a
25 place I can sit, a place I can move.

**54**

1 Q You understand I'm not trying to make you feel bad,
2 right?
3 A Right. But it's still --
4 Q No, I can see you're getting --
5 A -- a little tough.
6 Q Yeah. No -- no, I appreciate that. I -- but I
7 have to ask these questions. You understand that?
8 A I understand.
9 Q Okay. Okay. Now, a leadman gets paid more -- is
10 paid more at Dura-Fibre than a regular bargaining
11 unit employee, right?
12 A Right.
13 Q Do you remember how much more?
14 A Not off the top of my head.
15 Q Okay. If I said $2 an hour more, would that sound
16 about right?
17 A It could be.
18 Q Okay. And the lead person is paid more because
19 they have more responsibilities, right?
20 A Correct.
21 (Exhibit No. 15 was marked.)
22 BY MR. ZAWADSKY:
23 Q Mr. Jacobs, could you look at Exhibit 15 and tell
24 me what that is.
25 A It's my job title as "Laminator Leadman."

---

**55**

1 Q And you were familiar with that job title and that
2 job description?
3 A Yep.
4 Q Yes?
5 A Yes.
6 Q Okay. And that's -- is that fairly accurate as to
7 what your job duties were as leadman?
8 A Plus.
9 Q Plus -- there were more? There was more than that?
10 A Oh, sure.
11 Q Okay. Are you familiar with the "Accident
12 Reporting/Investigation Plan" that was in effect at
13 Dura-Fibre?
14 A I'm pretty sure they had one, yeah.
15 MR. ZAWADSKY: Okay. This is for your
16 counsel. Not your counsel, but counsel.
17 Could you mark that as an exhibit,
18 please.
19 (Exhibit No. 16 was marked.)
20 BY MR. ZAWADSKY:
21 Q I'm handing the witness Exhibit 16. At the top of
22 this, Mr. Jacobs, it says "Accident
23 Reporting/Investigation Plan." Have you seen that
24 document before?
25 A Yep.

---

**56**

1 Q So you -- when you were working at Dura-Fibre as a
2 leadman, you were -- you were aware of this policy,
3 right?
4 A Yes.
5 Q Okay. What's the difference between a "near miss"
6 and an accident, if you know?
7 A When somebody almost gets hurt.
8 Q Is a "near miss"?
9 A Yeah.
10 Q If somebody does get hurt --
11 A It would be an accident.
12 Q Okay. So it's a pretty -- a pretty simple
13 distinction, right?
14 A Right.
15 Q And under the policy, the safety coordinator and
16 the supervisor must be notified of the accident or
17 "near miss" immediately, correct?
18 A Correct.
19 Q And then, as a leadman, you should have reported,
20 under the policy, Mr. Wiltz's injury the day that
21 it occurred before the end of shift, right?
22 A No, I made the decision that -- according to Steve,
23 he wasn't -- he was fine.
24 Q Right. But you could -- you could understand why
25 the company felt that you should have reported it

---

**57**

1 before the end of shift?
2 A No.
3 Q Okay. The policy says that it's supposed to be
4 reported before the end of the shift, right?
5 A If it was an injury, I would have reported it.
6 Q Okay. What's your disagreement with receiving
7 discipline for not reporting Mr. Wiltz's, I'm going
8 to call it, injury -- you can disagree with me if
9 you'd like -- by the end of the shift on May 22nd?
10 MR. RUTENBERG: I'm just going to object.
11 Mr. Jacobs never said it was an injury. That's
12 your --
13 MR. ZAWADSKY: I said -- I said "injury."
14 I understand. I --
15 MR. RUTENBERG: It's for the record.
16 BY MR. ZAWADSKY:
17 Q What would -- what did Mr. Wiltz tell you happened
18 when you were on shift with him on May 22nd?
19 A Told me he tweaked his shoulder.
20 Q Okay. So did you report that Mr. Wiltz reported to
21 you that he tweaked his shoulder before the end of
22 the shift?
23 A Right.
24 Q Did you?
25 A Did I?

---

**58**

1 Q Yeah.
2 A No.
3 Q Okay.
4 A Because Steve Wiltz told me he was fine.
5 Q Okay. So you made the determination that it didn't
6 rise to something that needed to be reported?
7 A That's right. I was paid to make them decisions.
8 Q Okay. And the next day what happened?
9 A He came in and told me he was sorer than he was
10 yesterday.
11 Q And then did you report it?
12 A And I said, "It has to be reported."
13 Q Okay. Do you see why sometimes you need to report
14 events even though the employee may not feel at the
15 time that he's injured?
16 MR. RUTENBERG: Going to object to the
17 form of the question.
18 THE WITNESS: It's -- it's hindsight, I
19 guess, is what you want to call it. You know, I
20 can't foresee --
21 BY MR. ZAWADSKY:
22 Q Aren't you suing -- aren't you suing -- aren't you
23 being -- isn't the -- is Dura-Fibre being sued
24 based on hindsight?
25 MR. RUTENBERG: I'm going to object.

---

**59**

1    That's a legal conclusion.

2  BY MR. ZAWADSKY:

3  Q  I don't mean legally. I just mean just the way you

4    and I would talk if we were in a bar together.

5    Isn't that hindsight?

6  A  **You can never predict an injury.**

7  Q  Right. Okay. You're not a doctor?

8  A  **I am not.**

9  Q  Okay. So you made a decision that -- based on the

10    information provided to you by Mr. Wiltz, that you

11    did not feel it needed to be reported on May 22nd?

12  A  **Yes.**

13  Q  And when Mr. Wiltz provided you with more

14    information the following day, you decided it

15    should be reported?

16  A  **I did.**

17  Q  Okay. Do you fault the company for disciplining

18    you for that?

19  A  **Yes.**

20  Q  Why?

21  A  **I feel it was wrong.**

22  Q  Okay. And why do you think -- if you know, what

23    motivation do you feel the company had in assessing

24    that discipline against you for not reporting that

25    episode?

**60**

1  A  **I don't know. I just feel it's something that**

2    **should have never happened.**

3  Q  Okay.

4  A  **Stuff like this has happened in the past.**

5  Q  Okay. So other times employees have had, I'll call

6    it, injuries or "near misses" and not reported

7    them, right?

8  A  **Yes.**

9  Q  And they haven't been disciplined?

10  A  **Yes.**

11  Q  But you were disciplined?

12  A  **Right.**

13  Q  So do I understand correctly that you feel you were

14    treated differently than other employees that were

15    treated in the past prior to your termination?

16  A  **Maybe a little.**

17  Q  Okay. And do you have any opinion as to why you

18    were treated differently?

19  A  **No.**

20  Q  Okay. So what you're complaining about, if you

21    will, and I'm not saying it in a bad way -- but

22    what you're saying is, "It doesn't matter why the

23    company did what it did, it's the fact that I was

24    treated differently that I take issue with"?

25        MR. RUTENBERG: I'm going to object to

**61**

1    mischaracterization of prior testimony.

2        THE WITNESS: Treated differently, yes.

3  BY MR. ZAWADSKY:

4  Q  Would it be your opinion that an employee should

5    never be treated differently than other employees

6    under similar circumstances?

7  A  **Everybody should be treated equal.**

8  Q  Okay. And have you seen the plant discipline rules

9    before?

10  A  **Yes.**

11  Q  Okay.

12        (Exhibit No. 17 was marked.)

13  BY MR. ZAWADSKY:

14  Q  I'm going to show you Exhibit 17. Have you seen

15    that before?

16  A  **Yes.**

17  Q  Okay. At the very top of it, the 32.2 -- do you

18    see 32.2?

19  A  **Right.**

20  Q  It says, "The plant discipline rules are contained

21    in Exhibit B." Do you see that?

22  A  **Right.**

23  Q  Earlier I asked you if the rule -- the disciplinary

24    rules were part of the contract, and you said no.

25    Do you remember that testimony?

**62**

1  A  **No.**

2  Q  Okay. Would you agree with me that the

3    disciplinary rules were attached to the contract as

4    Exhibit B?

5  A  **Yes.**

6  Q  Okay. And you were familiar with the disciplinary

7    rules?

8  A  **Yes.**

9  Q  Okay. And then Article 34, I see, "Health & Safety

10    Committee"; do you see that?

11  A  **Right.**

12  Q  And that's the contractual provisions that lay out

13    the Health & Safety Committee that we've discussed

14    earlier, correct?

15  A  **Correct.**

16  Q  Okay. And you were -- you were part of the

17    negotiations that led to that provision, right?

18  A  **This labor -- I think I was.**

19  Q  Okay.

20        (Exhibit No. 18 was marked.)

21  BY MR. ZAWADSKY:

22  Q  I'm placing Exhibit 18 in front of Mr. Jacobs.

23    Have you seen Exhibit 18 before?

24  A  **I do not think I have a copy of this. Maybe I do.**

25  Q  Okay. Do you see at the bottom there, "Refused to

DURAFIBRE00017

## 63

1　sign"?
2　A　Right.
3　Q　Would that have been you refusing to sign?
4　A　Yes.
5　Q　And can you tell me why you refused to sign?
6　A　Because I disagree with this document.
7　Q　So did you think by signing it, you were somehow
8　　agreeing to the points that were assessed?
9　A　Yeah.
10　Q　Okay. And so you were given eight points for this
11　　violation?
12　A　I guess.
13　Q　Okay.
14　　　　(Exhibit No. 19 was marked.)
15　BY MR. ZAWADSKY:
16　Q　I'm going to place Exhibit 19 in front of you,
17　　Mr. Jacobs. Can you tell me what Page 1 is? You
18　　know, I don't -- I don't even know if you've ever
19　　seen this before.
20　　　　MR. RUTENBERG: Take time to review it.
21　　　　MR. ZAWADSKY: Yeah, I don't -- I'm
22　　not -- I don't want to get to the rest of it. I
23　　just want to look at Page 1 for the time being.
24　　　　If you want to, by the way -- maybe
25　　that's not a bad idea. Why don't we take a

## 64

1　seven-and-a-half-minute break, and then I'll come
2　　back, and I'll ask you about it. So take a look
3　　through the document.
4　　　　THE WITNESS: Okay.
5　　　　MR. ZAWADSKY: Yeah. Thank you.
6　　　　(Recess had.)
7　BY MR. ZAWADSKY:
8　Q　Mr. Jacobs, have you had a chance to look over that
9　　exhibit that I put in front of you?
10　A　I did.
11　Q　Okay. I'm going to skip Page 1, okay. Go to Page
12　　2. Do you see what Page 2 says --
13　A　Yep.
14　Q　-- "Total Points"? Is that your understanding of
15　　the points that were assessed against you while you
16　　were employed at Dura-Fibre?
17　A　This is the points that were assessed --
18　Q　Yeah, you got 4 points for "Sick" on June 13th,
19　　2011, as an example?
20　A　Right.
21　Q　Okay. And we'll go through some more detail, but
22　　I -- this -- this document purports to show that
23　　you got to 24 points on or about May 22, 2013. Do
24　　you see that?
25　A　Yep.

## 65

1　Q　And under the union contract, 24 points is
2　　automatic termination?
3　A　Right.
4　Q　And prior to your termination, other employees at
5　　Dura-Fibre, to your knowledge, have been terminated
6　　when they reached 24 points?
7　A　Correct.
8　Q　So if the union filed a grievance when somebody was
9　　terminated for reaching 24 points, the battleground
10　　would be whether or not the last episode should be
11　　assessed a certain number of points or whether the
12　　whole discipline should be tossed out?
13　A　I'm not understanding what --
14　Q　Okay. When an employee reaches 24 points, you
15　　don't file a grievance, it's all over, right?
16　A　No.
17　Q　Well, the employee can't get their job back,
18　　correct?
19　A　If there's a grievance filed, an active --
20　Q　Right. So they have to file the grievance under
21　　the union contract to challenge the termination?
22　A　Correct.
23　Q　Under the union contract?
24　A　Correct.
25　Q　Okay. All right. If I ask you to turn to the next

## 66

1　page -- so this appears to be dated May 23rd -- May
2　　23, 2013, right?
3　A　Correct.
4　Q　And this appears to deal with the -- I'm going to
5　　just read from it -- an accident in which you
6　　stepped awkwardly on your right foot coming off a
7　　stairway and twisted your ankle, correct?
8　A　Correct.
9　Q　Okay. Is that accurate? What happened is --
10　A　Yes.
11　Q　Okay. And once again you refused to sign, right?
12　A　Correct.
13　Q　Can I ask you to turn to the next page. And then
14　　is this another form dealing with that ankle
15　　sprain?
16　A　Correct.
17　Q　And down at the bottom, under "Prevention," it
18　　reads, "Plant foot on ground more squarely when
19　　coming off stairs or any locations off ground
20　　floor"; do you see that?
21　A　I see that.
22　Q　Okay. And you signed that document, right?
23　A　Right.
24　Q　And do you agree that you should have planted your
25　　foot on the ground more squarely when coming off

---

**67**

1      the stairs?

2 A    **It could. I can't remember the exact -- how**

3      **everything happened.**

4 Q    Okay.

5 A    **Stuff like that happens fast.**

6 Q    Okay. Can I ask you to turn to the next page. So

7      we talked about this document before, right? You

8      refused to sign this document, right?

9 A    **Correct.**

10 Q   And this also deals with the same episode, right,

11     spraining your ankle?

12 A   **Correct.**

13 Q   Okay. Can you turn to the next page. It's dated

14     May 22, 2013, right?

15 A   **Correct.**

16 Q   And this deals with the failure to report Mr.

17     Wiltz's -- whatever happened to Mr. Wiltz, your

18     failure to report it by the end of the shift,

19     right?

20 A   **Correct.**

21 Q   And then the next page is dated March 19th, 2013?

22 A   **Correct.**

23 Q   And you were assessed 4 points, right?

24 A   **Correct.**

25 Q   You don't dispute that was okay, right?

---

**68**

1 A    **Right.**

2 Q    Okay. And then the next page is January 31, 2013.

3      It says, "Tardiness & Absenteeism, Free

4      Occurrence"; do you see that?

5 A    **Correct.**

6 Q    What does that mean?

7 A    **Per the contract, we were allowed a free**

8      **occurrence.**

9 Q    Okay. So you got yours?

10 A   **Right.**

11 Q   And then the next one is 10-25-12, right?

12 A   **Correct.**

13 Q   And this apparently is that you hurt your back

14     "tripping over a hose and you left" -- "and yet

15     left it for others to trip over," correct?

16 A   **That's what this says.**

17 Q   Okay. Did you trip over a hose?

18 A   **I did.**

19 Q   Okay. Did you take care of it after you tripped

20     over it? Did you take care of the hose so that

21     somebody else didn't trip over it?

22 A   **No, I was injured.**

23 Q   All right. Did you -- did you feel you had done

24     anything wrong -- do you think that you properly

25     were disciplined for tripping over the hose?

---

**69**

1 A    **No.**

2 Q    Okay. Did you file a grievance?

3 A    **We requested a meeting.**

4 Q    Okay. And after the meeting, did you file a

5      grievance?

6 A    **No.**

7 Q    Okay. Why not?

8 A    **Because Jamie threw it all out.**

9 Q    She did?

10 A   **She did.**

11 Q   So it says zero points. So she tossed it out, so

12     you were okay, but you didn't feel it had to be

13     challenged?

14 A   **Right. It says zero points.**

15 Q   Okay. So the fact that you received a discipline

16     was okay with you as long as you didn't get any

17     points for it, right?

18         MR. RUTENBERG: I'm going to object.

19     That mischaracterizes previous testimony.

20         THE WITNESS: Repeat.

21         MR. ZAWADSKY: I don't understand the

22     objection, but he's made the objection for the

23     record.

24     BY MR. ZAWADSKY:

25 Q   So you're okay with what this discipline slip says

---

**70**

1      because you didn't receive any points, correct?

2 A    **No.**

3 Q    Okay. Why not?

4 A    **Because it's -- shouldn't have been a discipline**

5      **slip.**

6 Q    Okay. The next one is dated 10-18-12. And so I

7      think this also deals with the -- oh, the hose,

8      right?

9 A    **Yep.**

10 Q   Okay. Next one also deals with the hose?

11 A   **Yes.**

12 Q   Okay. And the next page, "Accident Investigation

13     Form" dated 10-18-12, also deals with the hose,

14     correct?

15 A   **Correct.**

16 Q   Yeah. So following the hose incident, you were

17     aware that the company might discipline you or any

18     other employee for a tripping episode, correct?

19 A   **Correct.**

20 Q   The next page is dated 10-24-12, and this is the

21     safety committee's report, right?

22 A   **Right.**

23 Q   And so the safety committee said this is a

24     7-pointer, right?

25 A   **I guess,**

---

**BROWN & JONES REPORTING, INC.**

## 71

1 Q Well, the total is 7 points under "Total," right?
2 A Right.
3 Q And -- so that's where the initial 4 points was
4    assessed against you, right?
5 A Right.
6 Q Then Jamie reduced that to zero?
7 A Right.
8 Q Did Jamie do that on her own, do you know, or do
9    you know how that came about?
10 A I talked to her up in the office and explained what
11    I needed to, to argue my case, and she agreed to
12    it.
13 Q So do you think that Jamie treated you fairly in
14    this -- under these circumstances?
15 A No. This? No.
16 Q No, no. Jamie, in taking no points, zero points.
17    Did Jamie treat you fairly?
18 A I think so, yes.
19 Q Okay. Next page is dated, I believe, 10 -- October
20    2, 2012, 4 points for tardiness and absenteeism,
21    right?
22 A Right.
23 Q And you -- nothing -- nothing inappropriate about
24    that, correct?
25 A No.

## 72

1 Q Okay. The next one is June 28th, 2012.
2 A Correct.
3 Q 4 points for tardiness and absenteeism, correct?
4 A Correct.
5 Q Once again, no disagreement, right?
6 A No.
7 Q 4-23-12 you got your freebie, right --
8 A Right.
9 Q -- apparently? You're okay with that, right?
10 A Right.
11 Q March 21, 2012. You got zero points because you
12    had a doctor's slip, right?
13 A Right.
14 Q The next one, December -- kind of guess it's 16,
15    2011, 4 points for absenteeism, correct?
16 A Right.
17 Q No disagreement?
18 A No.
19 Q And then November 15th, 2011, zero points because
20    you have a doctor's excuse, right?
21 A Right.
22 Q And then July 13th, 2011, you received 4 --
23    originally 8 points, and then it was reduced to 4
24    points, for a safety violation, right?
25 A Yep.

## 73

1 Q Okay. And the next page is the safety committee's
2    report where they assessed you initially 9 points,
3    correct?
4 A Yes. I don't recall this injury.
5 Q Okay. Do you recall filing a grievance at all on
6    this one?
7 A No.
8 Q Do you recall whether or not you disagreed with
9    being assessed discipline for this episode?
10 A No, I don't recall.
11 Q Okay. And then finally we have -- it looks to me
12    like June 13th on the top, but if I look at the
13    signatures, June 20th, 2011, 4 points for
14    absenteeism, correct?
15 A Correct. Past three days.
16 Q What do you mean?
17 A According to the contract, past three days.
18 Q Oh, past three days, okay. You didn't call in for
19    three days?
20 A No, they have three days to write us up.
21 Q Okay. Oh, you're saying procedurally this was
22    in- -- was improper?
23 A Right.
24 Q Did you file a grievance?
25 A Did not.

## 74

1 Q Okay. So that -- does that constitute, the best of
2    your knowledge, all the discipline you received
3    while you were employed at Dura-Fibre?
4 A To the best of my knowledge.
5 Q Okay. Thank you. If I understand correctly, you
6    don't recall what happened in that July, 2011,
7    where you received initially 8, and then it was
8    reduced to 4, right?
9      MR. RUTENBERG: I'm sorry. Could you --
10    I just didn't hear that.
11      MR. ZAWADSKY: Oh, I'm sorry.
12 BY MR. ZAWADSKY:
13 Q If I recall your testimony, that you were assessed
14    originally 8 points, then that was reduced to 4,
15    for a safety violation in July, 2011. Do you
16    remember our discussion about that?
17 A Yes.
18 Q And looks to me, based on what I saw, that perhaps
19    it was something about lifting, that you hurt your
20    back. Does that refresh your recollection?
21 A No.
22 Q Okay. When -- I'm going to jump to May 22nd, 2013,
23    when Mr. Wiltz told you that he had -- I think your
24    testimony is he tweaked his shoulder?
25 A Um-hum.

## 75

1  Q  Did he say "tweak" or he felt it pop?
2  A  He said "tweaked."
3  Q  And what -- how did you interpret that when he said
4     that?
5  A  I asked him if he was all right.
6  Q  Did you --
7  A  I asked -- if I ain't mistaken, I asked him about
8     an accident report, and he said, "Nope, I'm fine."
9  Q  All right.  Did you tell him to wait until the
10    following day to see how it felt?
11 A  No.
12 Q  And then the following day he told you his shoulder
13    was sore?
14 A  Correct.
15 Q  And then you decided to report it?
16 A  I did.
17 Q  And then what did you do -- so you reported it to
18    whom?
19 A  I filled out the accident report.  I went to find
20    Scott and couldn't locate him.  He was the
21    supervisor at the time.
22 Q  Is "Scott" Scott Blair?
23 A  Yes.
24 Q  Okay.
25 A  And from there I walked it up to the front office

## 76

1     and handed it to Jamie.
2  Q  And Jamie is Jamie Gonnering?
3  A  Right.
4  Q  G-O-N-N-E-R-I-N-G?
5  A  Right.
6  Q  And she was the human resource director?
7  A  Correct.
8  Q  And what did you tell Jamie when you handed her the
9     report?
10 A  I told her exactly what happened with Steve.  I
11    said, "Yesterday he tweaked his shoulder, said, oh,
12    he was fine, and then today he came in sore, filled
13    out an accident report."  And I couldn't find
14    Scott, so I gave it -- gave it to her.
15 Q  Did Jamie ask you why you had failed to report the
16    accident or, I'll call it, the "near miss" --
17 A  No.
18 Q  -- the day before?
19 A  No.
20 Q  Okay.  So you were -- it was your understanding
21    that you were disciplined for not reporting it?
22 A  Right.
23 Q  When you had the ankle injury on the following day,
24    May 22nd, 2013 -- the ankle injury --
25 A  Correct.

## 77

1  Q  -- were you in a hurry when that happened?
2  A  I don't recall.
3  Q  Okay.  And how often did you take that set of
4     stairs on an average workday?
5  A  100 times.
6  Q  Was that the first time you twisted your ankle
7     coming down those stairs?
8  A  Probably.
9  Q  Then how soon after this episode did you report it?
10 A  When I seen Scott Blair a little later in the day.
11 Q  Same day, same shift?
12 A  Yeah.
13 Q  So this was an accident because you had an injury,
14    right?
15       MR. RUTENBERG:  I'm going to object to
16    the form of the question.  You can answer.
17       THE WITNESS:  I don't feel it was an
18    accident.
19 BY MR. ZAWADSKY:
20 Q  You don't feel it was an accident?
21 A  I was fine.
22 Q  Okay.
23 A  I was a little sore.
24 Q  Do you remember our discussion earlier today about
25    "near miss" versus accident?

## 78

1  A  Right.
2  Q  And what's an accident?
3  A  When somebody gets hurt.
4  Q  Okay.  Were you hurt?
5  A  No.
6  Q  Was your ankle sore?
7  A  Sure.
8  Q  But you weren't hurt?
9  A  You went and jogged around the block, are you going
10    to be sore?  But you're okay.
11 Q  Are we shifting to you asking me questions now?
12 A  No.
13 Q  Okay.  So you're saying there's a distinction
14    between being sore and having an accident?
15 A  Sure.
16 Q  Okay.  So after you were terminated, you filed a
17    grievance?
18 A  On the 23rd I filed the grievance, I think it was.
19 Q  Protesting your termination?
20 A  Right.
21 Q  Okay.
22       (Exhibit No. 20 was marked.)
23 BY MR. ZAWADSKY:
24 Q  Handing the witness the Exhibit No. 20.  Have you
25    seen this before?

**79**

1  A  Right.
2  Q  Okay. So --
3  A  I have.
4  Q  -- the first page is a grievance that was filed on
5     your behalf, right?
6  A  Correct.
7  Q  It looks to me like that grievance was filed on or
8     about June 4th of 2013, right?
9  A  Correct.
10 Q  And was it filed by Tim Voelker?
11 A  Yes.
12 Q  Okay. And Tim Voelker was a union official?
13 A  He was.
14 Q  Was he the president, or do you know what he was?
15 A  Treasurer.
16 Q  Okay. So then he's asked for the remedy of
17    "8-point violation dismissed, job reinstated, back
18    pay," right?
19 A  Correct.
20 Q  So if I'm understanding this correctly, he's not
21    challenging the 4-point violation, right?
22 A  Yeah -- I'm not sure.
23 Q  Under the remedy --
24 A  Under this one, probably not, no.
25 Q  Okay. And then going to Page 2 -- do you see that?

**80**

1     This was attached to that grievance, right?
2  A  Right.
3  Q  So this was giving -- this was an argu- -- these
4     are the arguments that the union was making as to
5     why they felt the company violated the contract,
6     right?
7  A  Correct.
8  Q  And they talk about you were given 4 points for
9     reporting an accident according to information in
10    the Safety Incident Form? Do you see that in the
11    middle of that document?
12 A  Yes.
13 Q  And later on they say, "The 8-point violation
14    should be dismissed." Do you see that?
15 A  Yes.
16 Q  So if I'm reading this correctly, they're not
17    asking to have the 4-point violation dismissed?
18 A  This might have been turned in before I got to
19    verify it.
20 Q  Okay. And then the third page is the company
21    response, correct?
22 A  Yep.
23 Q  Did you see this at or about the time that the
24    grievance was being processed?
25 A  Not that I recall.

**81**

1  Q  Okay. We talked about this, a little bit
2     later that -- eventually there was a hearing with
3     Don Mackey, right?
4  A  Correct.
5  Q  Okay. And you attended that hearing with
6     Mr. Mackey, correct?
7  A  Correct.
8  Q  Okay. What arguments do you recall the union made
9     to Mr. Mackey as to why that 8-point violation
10    should be tossed out?
11 A  I do not have all the paperwork on that, and I
12    can't recall the whole thing.
13 Q  Can you recall any of it?
14 A  Not much of it, no.
15 Q  Who, if it was one person, more than one let me
16    know, was the main spokesperson for you and for the
17    union at the hearing with Mr. Mackey?
18 A  On the union board, it would have been probably
19    Steve and Tim Voelker.
20 Q  And "Steve" is?
21 A  Union president.
22 Q  Steve Wiltz?
23 A  Yeah.
24 Q  So Mr. Wiltz and Mr. Voelker would have been -- in
25    terms of the employee members of the union group,

**82**

1     would have been arguing on behalf of -- your
2     behalf, right?
3  A  Correct.
4  Q  Anyone else present that would have argued?
5  A  Dan Nett was there.
6  Q  Dan who?
7  A  Nett.
8  Q  How do you spell that?
9  A  N-E-T-T.
10 Q  And who is Dan Nett?
11 A  Vice president.
12 Q  Of the union?
13 A  Of the union.
14 Q  Okay. Anyone else that you can recall?
15 A  A union representative was there.
16 Q  Do you know his name or her name?
17 A  I forget.
18 Q  Did that person speak at all during the hearing?
19 A  Yes. We were --
20 Q  Did --
21 A  We were in two separate rooms.
22 Q  Right. So the union was in one room, the company
23    was in a different room? Yes?
24 A  Yes.
25 Q  And Mr. Mackey would meet with the union and then

## 83

1   meet with the company?
2 A Correct.
3 Q Okay. When Mr. Mackey was meeting with the union
4   group, then the union would make its arguments as
5   to why they felt the grievance should be granted,
6   right?
7 A Correct.
8 Q And then Mr. Mackey would meet with the company and
9   come back and give the union group the company's
10   arguments?
11 A Correct.
12 Q And then the union would be given an opportunity to
13   respond to the company's arguments?
14 A Correct.
15 Q As you sit here today, do you recall any arguments
16   the union made to Mr. -- anyone from the union made
17   to Mr. Mackey as to why your grievance should be
18   sustained?
19 A I don't recall.
20 Q Okay. Were you disappointed when Mr. Mackey ruled
21   against you?
22 A I was.
23 Q Okay. Did he explain why he ruled against you?
24 A I don't recall.
25 Q You also, after your termination, filed an unfair

## 84

1   labor practice charge with the National Labor
2   Relations Board?
3 A I did.
4 Q Okay.
5         (Exhibit No. 21 was marked.)
6 BY MR. ZAWADSKY:
7 Q I'm going to give Mr. -- I'm putting Exhibit 21 in
8   front of Mr. Jacobs. Mr. Jacobs, is this -- is
9   this the charge you had filed against Dura-Fibre
10   with the National Labor Relations Board on or about
11   June 18th, 2013?
12 A Yes.
13 Q Okay. And that's your signature at the bottom?
14 A It is.
15 Q And then you signed, and the line above that says,
16   "I declare that I read the above charge and the
17   statements are true to the best of my knowledge and
18   belief"; do you see that?
19 A Right.
20 Q So when you signed that on June 6th, 2013, and
21   submitted it to the National Labor Relations Board,
22   you believed everything that was in that charge,
23   right?
24 A Yes.
25 Q Okay. And you state that the basis of the charge

## 85

1   is, "On May 23, 2013, the employer discriminated
2   against employee Timothy Jacobs by discharging him
3   in order to discourage union activities and/or
4   protected concerted activities"; do you see that?
5 A Um-hum.
6 Q What union activities was the company trying to
7   discourage?
8 A Contract time was coming up.
9 Q So they were trying to make a preemptive move to
10   get rid of you before negotiations started?
11 A Possibly.
12 Q Would that -- and, once again, this is your
13   opinion. Would that have been -- would that have
14   been to send a message to the rest of the committee
15   members?
16 A Possibly.
17 Q Okay. Anything else I'm missing as to "possibly"?
18 A No.
19 Q Okay. Is that similar to what you said in your
20   affidavit that we talked about earlier about being
21   made an example?
22 A Yes.
23 Q Okay. So you gave the NLRB an affidavit, right?
24 A Correct.
25 Q And what happened to the charge?

## 86

1 A I didn't follow through.
2 Q What does that mean?
3 A I had to drop everything within NLRB.
4 Q Why?
5 A The company asked me to before we went to our
6   meeting with Don Mackey.
7 Q Okay. And you said, "Okay"?
8 A I had to sign papers.
9 Q Okay.
10         (Exhibit No. 22 was marked.)
11 BY MR. ZAWADSKY:
12 Q Can you identify Exhibit 22 for me?
13 A This is withdrawal.
14 Q Okay. So this is a letter to me, right?
15 A Yep.
16 Q You're copied on it, right?
17 A Right.
18 Q Telling me that you are withdrawing the charge,
19   right?
20 A Right.
21 Q And did you withdraw the charge?
22 A I did.
23 Q Okay. Before you withdrew the charge, did you have
24   to explain to the NLRB why you were withdrawing the
25   charge?

DURAFIBRE00023

## 87

1   A   No.
2   Q   Okay. So, at some point in time after you were
3       terminated, you decided to contact OSHA, correct?
4   A   Correct.
5   Q   Why?
6   A   Because of the process that terminated me was not
7       correct. I felt it wasn't correct.
8   Q   Okay. So did you decide to contact OSHA on your
9       own?
10   A   I did.
11   Q   How did you know about OSHA?
12   A   Knew about it a long time.
13   Q   Okay. So you just had -- just had knowledge that
14       there was an OSHA, right?
15   A   Yeah. I always knew there was.
16   Q   Okay. And so did you look up anything before you
17       contacted OSHA?
18   A   No.
19   Q   Didn't go on the web or anything to look up any
20       site about anything?
21   A   No.
22   Q   Did you look up their phone number?
23   A   Yep.
24   Q   Okay. Is that the only research you did before you
25       contacted OSHA?

## 88

1   A   As far as I can remember, yes.
2   Q   Did you talk to anyone before you contacted OSHA?
3   A   Not that I can recall, no.
4   Q   Okay. And so when you called OSHA, what was the
5       point of your call?
6   A   I called the Appleton office, explained the
7       situation, and they gave me the number to -- was it
8       Milwaukee or Madison area? Wherever Claudia was
9       from. And I discussed the situation with her.
10   Q   When you first called OSHA, did you tell them the
11       nature of why you felt you were fired?
12   A   I don't recall.
13   Q   Okay. If I told you that you told that person that
14       you called that you were fired because of you were
15       the union secretary, would you disagree with that?
16   A   No. It could have been part of my conversation.
17       Don't know.
18   Q   Okay. So after that conversation, then what
19       happened next? You call Appleton office, have a
20       conversation, you tell them what happened to you?
21   A   Correct.
22   Q   Okay. Then what happens? They give you Claudia
23       Moraga's phone number?
24   A   Right.
25   Q   Okay. And you call Claudia?

## 89

1   A   I did.
2   Q   And tell me about that conversation.
3   A   I went through everything that happened with her,
4       and that was about it, I think.
5   Q   Okay.
6   A   A couple -- maybe contacted once or twice to see
7       how things were going.
8   Q   Okay. Did you make any notes of that
9       conversation -- I don't see any notes, but did you
10       make any notes --
11   A   No, I --
12   Q   -- of the call?
13   A   No, I don't think so.
14   Q   Okay. When you called the NLRB in Appleton, did
15       they tell you that you needed to file something in
16       writing?
17             MR. RUTENBERG: Let me clarify. Do you
18       mean NLRB or --
19             MR. ZAWADSKY: I'm sorry. Thank you,
20       Counsel.
21   BY MR. ZAWADSKY:
22   Q   When you called OSHA on June 4th, 2013, to talk to
23       them about what happened to you, did they tell you
24       you needed to file a written complaint?
25   A   I don't recall.

## 90

1   Q   Maybe yes, maybe no?
2   A   (Witness nods head.)
3   Q   So following the conversation with Claudia Moraga,
4       what, if anything, happened next with respect to
5       your contact with OSHA?
6   A   Clarify that a little bit.
7   Q   You talked to Claudia Moraga?
8   A   I did.
9   Q   Did anything happen after that? Did you ever hear
10       from her again?
11   A   No. Only with my contact, I think.
12   Q   Your what?
13   A   Only me contacting her --
14   Q   Okay.
15   A   -- once or twice after.
16   Q   Okay. Did you ever look at a complaint that she
17       drafted up?
18   A   I don't recall.
19   Q   Okay. So you never drafted up a complaint?
20             MR. RUTENBERG: I'm going to object to
21       the extent that "complaint" is a legal conclusion
22       and is a legal term of art.
23             MR. ZAWADSKY: Well, I disagree. Answer
24       the question.
25             MR. RUTENBERG: That's fine.

BROWN & JONES REPORTING, INC.

DURAFIBRE00024

---

**91**

1  THE WITNESS: Not that I recall, no.
2  MR. ZAWADSKY: Okay. Mark this document.
3  (Exhibit No. 23 was marked.)
4  BY MR. ZAWADSKY:
5  Q  Would you look at Exhibit -- is it 23? Tell me
6  what that is.
7  A  It's a -- I guess a letter saying there's an
8  attached statement.
9  Q  Is that from Claudia Moraga?
10  A  Taken on the phone, yep. Yes, it is.
11  Q  Does that appear to be to you?
12  A  Yes.
13  Q  Are you "Mr. Jacobs"?
14  A  I am.
15  Q  One of many, right?
16  A  Probably.
17  Q  So -- but this is dated July 3rd, right?
18  A  It is.
19  Q  Okay. So she makes reference to an earlier call on
20  June 21, right?
21  A  Yeah.
22  Q  Okay. Does that help refresh your recollection
23  about contacts?
24  A  Yeah, a little bit.
25  Q  Now, this is actually an email, though, right?

---

**92**

1  A  No. I don't have email. This was probably sent to
2  me.
3  Q  You don't think this was an email?
4  A  I don't -- don't recall, no.
5  Q  Okay.
6  MR. ZAWADSKY: Can you mark this
7  document.
8  (Exhibit No. 24 was marked.)
9  BY MR. ZAWADSKY:
10  Q  I'll take this from you. Have you seen Exhibit 24,
11  please, before? Have you seen that email --
12  correspondence before?
13  A  I must have, yes.
14  Q  Okay. So if you look at the very bottom, it looks
15  like that's the document we just discussed, right,
16  "Attached is your complaint"?
17  A  Right.
18  Q  Okay. Then on July 3rd -- it's looking like an
19  email to me, but you tell me if it's not an
20  email -- you say to her, "The attachment never came
21  through," question mark, question mark, correct?
22  A  Correct.
23  Q  All right. So did you receive something from her
24  on July 3rd, and then you responded saying the
25  attachment never came through?

---

**93**

1  A  Yes, I think so.
2  Q  Okay. So it looks to me -- once again I'm just
3  trying to understand it -- that she sent you what
4  she said was an "attached complaint statement" that
5  she had drafted up on July 3rd at 10:35 a.m. Do
6  you see that?
7  A  Yes.
8  Q  And then on -- 2:02 you respond, right?
9  A  Yes.
10  Q  Is that texting then, if it's not email?
11  A  It might be.
12  Q  Okay.
13  A  I -- I highly doubt it. I don't text much either.
14  Q  Okay. Well, there's no Pony Express in Neenah,
15  right?
16  A  Of course not.
17  Q  Okay. How does -- I mean, something had to be
18  happening here for this correspondence to be going
19  back and forth. I'm just trying to understand how
20  that happened, if it wasn't email and if it wasn't
21  texting.
22  A  A lot of her stuff came by mail.
23  Q  Okay. All right. And then, just to follow
24  through, it looks to me like 15 minutes later she
25  responds to you --

---

**94**

1  A  I might have texted then.
2  Q  Okay.
3  A  Maybe I did.
4  Q  Okay.
5  A  Maybe I did. I don't know.
6  Q  Okay. All I'm trying -- yeah, this isn't -- I'm
7  not trying to trip you up here. I'm just trying --
8  I'm showing you that this is very quick
9  back-and-forth here. Right?
10  A  Right.
11  Q  Okay. So then you respond to her email that was
12  2:17 at 3:08; do you see that?
13  A  Yes.
14  Q  Okay. And you say, "Yes, we got this," meaning the
15  complaint she drafted, "and making a few
16  adjustments" --
17  A  Right.
18  Q  -- "and adding more incidents as well. Thank you.
19  Look forward to hearing from you soon"?
20  MR. RUTENBERG: I just want to object to
21  your characterization. You're characterizing this
22  as a "complaint." It actually, in the original
23  correspondence, states "complainant's statement."
24  MR. ZAWADSKY: Yeah, well, that's not
25  true, so we're a little bit past that.

---

95

1          MR. RUTENBERG: On DOL0016.
2          MR. ZAWADSKY: She drafted it. Let's
3    just stop the nonsense here.
4    BY MR. ZAWADSKY:
5    Q    Claudia Moraga drafted the document that you were
6    reviewing, correct? You didn't draft it?
7    A    I don't know. Show me what you want.
8    Q    I'm going to shortly, but I'm just making the point
9         that you talked to her, and then she sent you a
10        document to review, correct?
11   A    It could have been, yes.
12   Q    You don't remember?
13   A    No, I don't.
14         MR. ZAWADSKY: Would you mark this as an
15   exhibit.
16         (Exhibit No. 25 was marked.)
17   BY MR. ZAWADSKY:
18   Q    Can you identify Exhibit 25 for me, please.
19   A    It's a letter.
20   Q    From?
21   A    From the Department of Labor.
22   Q    Okay. To?
23   A    Me.
24   Q    Okay. And it says what?
25   A    It says, "Attached are the two copies of the

---

96

1    complaint that the Investigator Claudia Moraga took
2    over the phone on July 21st, 2013."
3    Q    And -- on June 21?
4    A    June 21.
5    Q    And the June 21, 2013, was a phone conversation
6         between you and Claudia Moraga, correct?
7    A    It must have been.
8    Q    Okay. Following that phone conversation, it
9         appears she drafted up a document for you to
10        review?
11   A    Yes.
12   Q    Okay.
13   A    I would think that.
14   Q    Is that your best recollection?
15   A    My best recollection, yeah.
16   Q    And then you were being asked to "review, modify,
17        sign and return" a copy, correct?
18   A    Correct.
19   Q    All right.
20         MR. ZAWADSKY: Mark this.
21         (Exhibit No. 26 was marked.)
22   BY MR. ZAWADSKY:
23   Q    We've marked Exhibit 26. I'm handing that to
24        Mr. Jacobs. Have you seen this document before?
25        It may help you if you look at Page 3. This is a

---

97

1         letter sent to the company, right?
2    A    It looks that way, yeah.
3    Q    Okay. Would you turn -- would you turn to Page 4
4         of the document. So there's two pages attached to
5         this and you -- at the end of Page 2 of what's
6         attached it says, "Timothy Jacobs, 7-12-13"; do you
7         see that?
8    A    Yes.
9    Q    Is that your signature?
10   A    It is.
11   Q    And is that the date you signed that?
12   A    Must have been.
13   Q    Okay. So was this the document that you signed and
14        returned to OSHA following the correspondence we
15        just reviewed?
16   A    As far as I know, it could be, yes. I don't see
17        any other ones.
18   Q    All right. To the best of your knowledge, is this
19        the complaint you filed against Dura-Fibre or had
20        filed on your behalf --
21   A    Yes, to the best of my knowledge.
22   Q    -- against Dura-Fibre claiming that Dura-Fibre
23        violated OSHA when they fired you?
24   A    Correct.
25   Q    Okay. Okay. In that document you state, "I am the

---

98

1         secretary in the union local U.S. Steelworkers
2         local 432-2"; do you see that? Bottom first
3         paragraph.
4    A    Yep.
5    Q    So that's you saying that, right?
6    A    Yes.
7    Q    Okay. How is that relevant?
8    A    It ain't.
9    Q    Why is it in there?
10   A    I don't know.
11   Q    So is that something that Claudia Moraga put in
12        there?
13   A    No.
14   Q    You put that in there?
15   A    Yeah.
16   Q    Okay.
17   A    Probably did.
18   Q    Why?
19   A    Because she asked everything -- all my information,
20        what I did at work.
21   Q    Okay. At any time prior to your termination or at
22        the termination meeting did you ever claim you were
23        being terminated because you had reported an
24        injury?
25   A    Might have. I don't know.

---

99

1  Q  At any point prior to or during the meeting at
2     which you were terminated, did you ever claim that
3     you were fired because of your union activities?
4  A  I don't recall.
5  Q  At any point after you were terminated and you were
6     having a grievance process by your union, did you
7     ever tell the union that you felt you were
8     terminated because you had reported an injury?
9  A  I don't recall.
10 Q  Did you ever tell the union that you felt that you
11    had been terminated because of your union
12    activities?
13 A  Don't recall.
14 Q  Are there any documents that we haven't looked at
15    that would refresh your recollection?
16 A  Not that I know of.
17 Q  You state in Page 2 of that complaint document --
18    turn to the next page.  You state -- I'm taking it
19    this is your statement since you signed it, okay?
20    Mr. Jacobs?
21 A  Yes.
22 Q  So I'm calling it "your statement," okay?  Are you
23    okay with that?
24 A  Yes.
25 Q  Okay.  You state, "Now policies have changed to

100

1     management discretion.  If something is to be
2     considered an accident or tell anyone of an
3     accident or near misses they are afraid of being
4     punished."  Do you see that?
5  A  Correct.
6  Q  Okay.
7  A  Yeah.
8  Q  Is that true?
9  A  Yes.
10 Q  How do you know that?
11 A  Been told.
12 Q  By whom?
13 A  Employees that said they hurt themselves in the
14    past and never reported it.
15 Q  Names?
16 A  Tim Long.
17 Q  Anyone else?
18 A  Lisa Van Kooy.
19 Q  The one we talked about earlier?
20 A  (Witness nods head.)
21 Q  Okay.
22 A  Possibly more.  Don't know at this time.
23 Q  Okay.  You then make the statement, "No one has
24    ever been terminated from an accident or injury."
25    Do you see that?

101

1  A  Yep.
2  Q  True?
3  A  To my knowledge.
4  Q  And then you say, "I believe I was terminated on
5     May 23rd because I reported an injury."  At the
6     bottom.  Do you see that?
7  A  Yes.
8  Q  Aren't the two inconsistent?
9  A  Up till that day I didn't know.
10 Q  Okay.  So you're the only one, to your knowledge,
11    that was ever been terminated for reporting an
12    injury?
13 A  Right.
14 Q  What's the injury?
15 A  Twisted my ankle.
16 Q  I thought you told me that twisting your ankle
17    wasn't an injury.
18 A  It wasn't.
19 Q  Okay.  So how would I phrase that problem?
20 A  A "near miss."
21 Q  Okay.  So you're the only one, that you're aware
22    of, that ever was terminated for reporting a "near
23    miss"?
24 A  Right.
25 Q  Okay.  Do you remember the name of the person you

102

1     talked to on June 4th, 2013, when you called, I
2     guess, the Appleton OSHA office?
3  A  I don't remember the name.
4  Q  If I said Jason Grunow, G-R-U-N-O-W?
5  A  Possibly.
6  Q  Possibly.  You don't remember?
7  A  No.
8  Q  After the complaint was sent out on, I think is,
9     June -- July 12th -- isn't it?  Is it dated July
10    12th?  The top one?
11 A  Yeah.  July 19th?
12 Q  July 19th.  Any other conversations with anybody
13    from OSHA other than Mr. Rutenberg, which you've
14    already described?
15 A  With Claudia and Denise Keller.
16 Q  Okay.  What were your conversations with Claudia?
17 A  Not a whole lot.  It was a long process.
18 Q  All right.  Was there anything substantive that you
19    ever discussed with Claudia after the complaint
20    that was sent out on July 19th?
21 A  I don't think so.
22 Q  Okay.  Who was the other person?  Denise Keller?
23 A  Right.
24 Q  Who was she?
25 A  I think she took over for Claudia.

### 103

1  Q  Okay. Did you ever talk -- you talked to her?
2  A  I have.
3  Q  And what did you guys talk about?
4  A  Progress.
5  Q  Just in general or in your case or what?
6  A  Just called to ask how the case was doing.
7  Q  And what were you told?
8        MR. RUTENBERG: I'm just going to object
9  to the extent that this question invades the
10  government's deliberative process, privilege.
11  Please answer.
12        THE WITNESS: I was told that it's a long
13  process, and she would let me know if any changes
14  or anything came about.
15  BY MR. ZAWADSKY:
16  Q  When did you first learn that a lawsuit had been
17  filed?
18  A  That's when I -- probably was with Denise, the
19  first lady I talked to.
20  Q  Okay. If I understand your earlier testimony,
21  you've never seen a copy of the complaint?
22  A  I'm not sure.
23  Q  As you sit here this afternoon, you don't recall
24  ever seeing a copy of the complaint?
25  A  Right.

### 104

1  Q  What do you think are your damages that Dura-Fibre
2  caused you because of -- because they terminated
3  you?
4  A  Loss of wages and emotional stress.
5  Q  What's the emotional distress?
6  A  Excuse me?
7  Q  What is the emotional distress?
8  A  It caused problems at home. My wife left -- or I
9  left my wife for a month and a half.
10  Q  How was that related to your termination?
11  A  Because I was nobody that -- nobody wanted to live
12  with me.
13  Q  So was the cause of that conduct by you your
14  reaction to your termination?
15  A  No.
16  Q  Was it just involuntary?
17  A  After being terminated, I felt pretty useless.
18  Q  Okay. So you felt useless, and then you did not
19  see a doctor?
20  A  Had no insurance.
21  Q  Okay. So no psychiatrist?
22  A  No.
23  Q  No psychologist?
24  A  No.
25  Q  But you're asking me to believe you that you have

### 105

1  suffered emotional distress?
2  A  Yes.
3  Q  How would you prove that?
4  A  Ask my wife.
5  Q  Okay. Are you still married?
6  A  I am. We got back together after about a month and
7  a half.
8  Q  Okay. Other than asking your wife, anybody else I
9  should talk to about your emotional distress?
10  A  Maybe the kids, family.
11  Q  Okay. What kids do you have?
12  A  I got three kids.
13  Q  All right. Names?
14  A  Brian, Brittany and Crystal.
15  Q  Are they all adults now?
16  A  Yes.
17  Q  And then who else in your family have you talked
18  to?
19  A  I moved in with my mom when I left.
20  Q  Is she still around?
21  A  She passed away about a month ago.
22  Q  Oh, I'm sorry to hear that.
23  A  Thank you.
24  Q  Anyone else?
25  A  Umm --

### 106

1  Q  Wayne?
2  A  No.
3  Q  Tom?
4  A  Possibly Tom. I don't recall. I kind of separated
5  myself away from everybody.
6  Q  Okay. Did I cover everybody in the family?
7  A  No, I got sisters, too.
8  Q  Did you talk to your sisters?
9  A  Very seldom.
10  Q  Okay. So once again circling back to emotional
11  distress -- so I should talk to your wife, right?
12  A  Yeah.
13  Q  I should -- I can talk -- I might want to talk to
14  your three children, right?
15  A  Right.
16  Q  I'm not saying I'm going to. I'm just trying to
17  identify them.
18  A  Yeah, whatever.
19  Q  And your mother we can't talk to, at least any
20  means I know of, right?
21  A  Right.
22  Q  Anyone else in the family, then, who might be able
23  to testify to that?
24  A  Not that I recall.
25  Q  Any friends, any people other than family?

### 107

1  A   **No. I did nothing with nobody.**
2  Q   Okay. After you go to work for -- is it Appleton
3       Coating?
4  A   **Right.**
5  Q   Do you get health insurance again?
6  A   **I do.**
7  Q   And then do you go see a psychiatrist?
8  A   **Psychiatrist, no.**
9  Q   Do you see a psychologist?
10  A   **I do not.**
11  Q   Do you see a doctor?
12  A   **Yes.**
13  Q   Okay. What is that doctor's name?
14  A   **Dr. Michael Johnson.**
15  Q   Okay. Does Dr. Michael Johnson -- do you tell
16       Dr. Michael Johnson about your depression?
17  A   **Yes.**
18  Q   Does he prescribe anything for you?
19  A   **Yes.**
20  Q   What does he prescribe?
21  A   **I can't remember the names.**
22  Q   Okay. An antidepressant?
23  A   **Two of them, yeah.**
24  Q   Okay. And did you take them?
25  A   **Yes.**

### 108

1  Q   Did they help?
2  A   **To some extent, yes.**
3  Q   Okay. As you sit here in front of me today, are
4       you depressed?
5  A   **Yes.**
6  Q   Are you partially depressed about the workers' comp
7       injury that we talked about earlier?
8  A   **A combination of things.**
9  Q   Not being able to work at a lot of jobs anymore,
10       right?
11  A   **Right.**
12  Q   A lot of factors would go into your current
13       depression, right?
14  A   **Current, yes.**
15  Q   Is the depression the same thing as the emotional
16       distress, that you used that term earlier? Is that
17       the same -- can I, in my head, say emotional
18       distress is the same as depression, or is it
19       different?
20  A   **Maybe different.**
21  Q   Okay. How would it be different?
22  A   **Of my actions after I was let go compared to what**
23       **they are now.**
24  Q   Okay. So Dr. Johnson is the doctor you've seen?
25  A   **Yes. He's my family doctor.**

### 109

1  Q   Okay. Other than him, is there any other physician
2       or health care provider that you've discussed your
3       emotional distress or your depression?
4  A   **No.**
5  Q   Okay. And how often are you seeing Dr. Johnson
6       since you started seeing him?
7  A   **I see him on and off quite a bit.**
8  Q   Okay.
9  A   **I regularly see doctors.**
10  Q   Okay. Luke Benrud, do you know who he is?
11  A   **Yes, I do.**
12  Q   Who is he?
13  A   **The person sitting next to you.**
14  Q   What -- does he have a position at Dura-Fibre?
15  A   **As far as I know, when I was there, he ran the**
16       **place.**
17  Q   Okay. So he was the boss?
18  A   **He was the boss.**
19  Q   Okay. Did you -- how would you describe your
20       relationship with Mr. Benrud?
21  A   **Pretty good.**
22  Q   Did you consider Mr. Benrud a trustworthy person?
23  A   **I thought I could, yeah.**
24  Q   Scott Blair. Who is Scott Blair?
25  A   **He was a foreman at the time.**

### 110

1  Q   Okay. At Dura-Fibre?
2  A   **At Dura-Fibre, yes.**
3  Q   Would he be someone you would have reported to when
4       you worked at Dura-Fibre?
5  A   **Yes, sometimes.**
6  Q   Okay. And how would you describe your relationship
7       with Scott?
8  A   **So-so.**
9  Q   Okay. Not as good as with Luke?
10  A   **Right.**
11  Q   Did you consider Scott trustworthy?
12  A   **Sometimes.**
13  Q   Sometimes yes, sometimes no?
14  A   **Right.**
15  Q   Jamie Gonnering. Who is Jamie Gonnering?
16  A   **She was human resource at the time.**
17  Q   Okay. And how would you describe your relationship
18       with Jamie Gonnering?
19  A   **Sometimes okay, sometimes not.**
20  Q   Was Jamie trustworthy?
21  A   **What's that?**
22  Q   Was Jamie trustworthy?
23  A   **Sometimes.**
24  Q   Sometimes yes, sometimes no?
25  A   **Yeah.**

**BROWN & JONES REPORTING, INC.**     DURAFIBRE00029

**111**

1 Q Was Dura-Fibre -- up to when you were -- the day
2 you were terminated, was Dura-Fibre a good place to
3 work?
4 A **Yes. I was there a long time.**
5 Q Did you like working there?
6 A **Yes.**
7 Q Did you feel employees were treated fairly by
8 management at Dura-Fibre?
9 A **No.**
10 Q So why -- well, how were employees not treated
11 fairly by management at Dura-Fibre?
12 A **On discipline actions.**
13 Q Okay. So at times you felt that employees were
14 disciplined unfairly?
15 A **Yes.**
16 Q Other than you, other employees were disciplined
17 unfairly?
18 A **Yes.**
19 Q And any opinion or any examples as to how they were
20 treated differently or unfairly by Dura-Fibre?
21 Other employees, not you.
22 A **Some would receive write-ups and some people**
23 **wouldn't.**
24 Q Okay. In your conversations with Claudia Moraga
25 and, I guess, Denise Keller -- is that her name?

**112**

1 A Yes, I think so.
2 Q Did you become aware that they had interviewed --
3 Denise and Claudia had interviewed a number of
4 other Dura-Fibre employees --
5 MR. RUTENBERG: I'm going to object to
6 that question --
7 BY MR. ZAWADSKY:
8 Q -- about your termination?
9 MR. RUTENBERG: I'm going to object to
10 that question to the extent it invades the
11 government's informer privilege, which the
12 government holds.
13 MR. ZAWADSKY: Counsel, I just want to
14 say quickly, you understand that that informer
15 privilege does not allow you not to give us
16 information which you failed to provide in your
17 discovery responses? We're going to have a --
18 we're going to chat about that.
19 MR. RUTENBERG: That's fine, we can have
20 a chat. But for the purposes today, which is at
21 this deposition, for that question you just asked,
22 I'm objecting to it to the extent that it invades
23 the government informer privilege, and I'm going to
24 instruct the deponent not to reveal any knowledge
25 he might have regarding individuals who may or may

**113**

1 not have -- may have spoken to OSHA.
2 MR. ZAWADSKY: We discussed earlier, if
3 this happened, that you would just certify that.
4 Thank you.
5 BY MR. ZAWADSKY:
6 Q Are you aware that OSHA interviewed other employees
7 at Dura-Fibre?
8 MR. RUTENBERG: Same objection.
9 MR. ZAWADSKY: There is no basis for that
10 objection the way I asked that question.
11 MR. RUTENBERG: We can argue it later.
12 MR. ZAWADSKY: We're not going to argue
13 it. I'm just telling you, don't make that
14 object- -- kind of objection unless I'm implicating
15 OSHA.
16 MR. RUTENBERG: I'm allowed --
17 MR. ZAWADSKY: Are you aware -- no, you
18 are not.
19 MR. RUTENBERG: Excuse me. I'm allowed
20 to make --
21 MR. ZAWADSKY: Not an objection --
22 (Discussion off the record.)
23 BY MR. ZAWADSKY:
24 Q Are you aware that OSHA has interviewed -- not
25 through OSHA. Are you aware that other -- that

**114**

1 employees at Dura-Fibre have talked to OSHA?
2 MR. RUTENBERG: Same objection.
3 THE WITNESS: No.
4 BY MR. ZAWADSKY:
5 Q Okay. If I told you that employees -- Dura-Fibre
6 employees -- felt you were fired because you stood
7 up for employees, would that surprise you?
8 A No.
9 Q If I told you -- once again, this isn't an
10 established fact, I'm just telling you something,
11 okay -- that employees said that you pushed
12 management buttons when you were at Dura-Fibre,
13 would you disagree with that?
14 A To some extent.
15 Q Sometimes you did, sometimes you didn't?
16 A Right.
17 Q Sometimes you disagreed with management?
18 A Right.
19 Q And sometimes you did not get along with
20 management?
21 A Right.
22 Q Do you file income taxes?
23 A I do.
24 Q When you have income, right?
25 A Yeah.

### 115

1  Q   Okay.  And when you do that, do you fill out income
2      tax forms?
3  A   I do.
4  Q   Okay.  State and federal?
5  A   Right.
6  Q   Okay.  And do you attach necessary documents, such
7      as your W4s?
8  A   Yeah.
9  Q   Okay.  And do you mail those documents, those
10     forms, in to the IRS and the State Department of
11     Revenue?
12 A   I have somebody do them for me.
13 Q   Okay.  But they, then, file them on your behalf?
14 A   Yes, they must --
15 Q   Okay.
16 A   -- yeah.
17 Q   So you don't just call up the IRS saying, "Send me
18     a check back for $475"?
19 A   No.
20         MR. ZAWADSKY:  Okay.  Well, I'm going to
21     be on time here.  I'm just about -- okay.  Can I
22     have five minutes just to chat with Luke?
23         MR. RUTENBERG:  You want to talk to Luke?
24         MR. ZAWADSKY:  Yes.
25         MR. RUTENBERG:  I didn't know if you said

### 116

1      you or me.
2         (Recess had.)
3         MR. ZAWADSKY:  I have no further
4      questions.
5         (Discussion off the record.)
6         MR. RUTENBERG:  Okay.  This is, for the
7      record, David Rutenberg, and I'm just going to ask
8      a few cross-examination questions of the deponent,
9      Mr. Jacobs.
10        EXAMINATION
11 BY MR. RUTENBERG:
12 Q   Before, if you recall, Mr. Jacobs, you testified as
13     to certain communications you had with OSHA.  Do
14     you remember that?
15 A   Yes.
16 Q   Do you remember how long after your termination on
17     May 23rd, 2013, you first contacted OSHA?
18 A   A week or two.
19 Q   Week or two.  Why did you contact OSHA?
20 A   Because of the way my discharge happened and the
21     way people were being treated unfairly down there,
22     afraid to voice their opinion on injuries.
23 Q   Okay.  Did you understand, when you called OSHA,
24     that you were filing a complaint with OSHA?
25 A   Yes.

### 117

1  Q   Why?
2  A   Why was I filing a complaint?
3  Q   Why did you understand you were filing a complaint?
4         MR. ZAWADSKY:  I'm just going to object.
5      Asked and answered.  Go ahead and answer.
6         THE WITNESS:  You want to know why I
7      filed a complaint?
8  BY MR. RUTENBERG:
9  Q   No, I wanted to know why did you understand you
10     were filing a complaint when you made the call?
11 A   I was -- I called to file a complaint, and the
12     person I talked to at Appleton, you know, he
13     explained a lot of what was supposed to go on or
14     what's going to go on, and then I was pushed over
15     to Claudia.
16 Q   Okay.  And then did you give -- is it Claudia
17     Moraga?
18 A   Yes.
19 Q   And you gave Claudia Moraga a statement?
20 A   I did.
21 Q   Okay.
22         MR. ZAWADSKY:  Could I just clarify a
23     statement?  Telephonically or in writing or how --
24     what kind of statement?
25         MR. RUTENBERG:  Sure.

### 118

1  BY MR. RUTENBERG:
2  Q   Was it telephonic?
3  A   I'm pretty sure it was.
4  Q   Okay.  Speaking about that statement that we were
5      talking about -- I believe you testified to before,
6      the statement that you provided to Claudia
7      Moraga -- do you remember that?
8  A   Somewhat.
9  Q   Okay.  I'm just going to turn to that statement.
10     Counsel for Dura-Fibre -- and I'm turning to, I
11     believe, what is Exhibit 26.  Counsel for
12     Dura-Fibre went over the sentence with you, "I
13     believe I was terminated on May 23rd because I
14     reported an injury," correct?
15 A   Correct.
16 Q   Did you mean by that that you characterized what
17     happened to your ankle as an injury or because the
18     company characterized what happened to your ankle
19     as an injury?
20         MR. ZAWADSKY:  Object.  Leading.  Answer
21     the question.
22 BY MR. RUTENBERG:
23 Q   Or anything else?
24 A   Probably more of the company saying it's an injury.
25     I always said it was a "near miss."

## 119

1    Q    Okay. In between the time you began work for

2        Appleton and ended work with Dura-Fibre, did you

3        apply to any other jobs aside from Appleton?

4    A    **Yes, quite a few of them.**

5    Q    When did you start applying after you lost your job

6        at Dura-Fibre, if you recall?

7    A    **Probably after I was living with my mom for a**

8        **while.**

9    Q    Okay.

10    A    **After a month.**

11    Q    Okay. You lost your insurance when you left

12        Dura-Fibre; is that right?

13    A    **I did.**

14    Q    Your health insurance?

15    A    **I did.**

16    Q    Okay. Could you afford to see a psychiatrist or a

17        psychologist after you left Dura-Fibre?

18    A    **No.**

19    Q    Why not?

20    A    **No money.**

21             MR. RUTENBERG: No further questions.

22             MR. ZAWADSKY: I have got a couple.

23             EXAM NATION

24    BY MR. ZAWADSKY:

25    Q    You said you looked for jobs a month or so after

## 120

1        you were terminated from Dura-Fibre?

2    A    **Yep. Probably before then because when you collect**

3        **unemployment, there's a certain amount of jobs you**

4        **had to look for every week. Some I did on my**

5        **phone, some I did personally.**

6    Q    Did you apply to Menasha Packaging?

7    A    **I don't recall.**

8    Q    Did you apply to SCA?

9    A    **I think I did.**

10    Q    Did you apply to Apbion? A-P-B-I-O-N, Apbion.

11    A    **I think I did.**

12    Q    Did you apply to Sunoco?

13    A    **Not sure.**

14    Q    Did you apply to Kimberly-Clark?

15    A    **Not sure.**

16    Q    Neenah Paper?

17    A    **I'm not sure.**

18    Q    Expera, E-X-P-E-R-A?

19    A    **I don't remember.**

20    Q    Progressive Converting?

21    A    **Maybe.**

22    Q    Alpha-Prime?

23    A    **Maybe.**

24    Q    Resource One?

25    A    **Possibly.**

## 121

1    Q    How would you know what jobs you applied for?

2    A    **If I had them -- a lot of them -- some I did**

3        **applications, and turned them in, and some of them**

4        **I did on the phone under job searches.**

5    Q    Okay. Would you supply that information to Job

6        Service every week?

7    A    **Yeah.**

8    Q    So they -- you'd say, "I applied to these three

9        jobs"?

10    A    **They give a sheet to fill out or whatever.**

11    Q    Okay. And you'd fill out the sheet every week?

12    A    **Yeah.**

13    Q    And then there you'd put the companies that you

14        applied for?

15    A    **Right.**

16             MR. ZAWADSKY: Okay. No further

17        questions.

18             MR. RUTENBERG: Thank you.

19             (Proceedings concluded at 4:00 p.m.)

20

21

22

23

24

25

## 122

1    STATE OF WISCONSIN    )

2                      ) SS:

       COUNTY OF MILWAUKEE    )

3

4

5

6        I, KATHLEEN E. CARTER, a Certified

7    Realtime Reporter, Registered Merit Reporter and Notary

8    Public in and for the State of Wisconsin, do hereby

9    certify that the above deposition of TIMOTHY JACOBS was

10    recorded by me on Wednesday, August 9, 2017, and reduced

11    to writing under my personal direction.

12        I further certify that I am not a

13    relative or employee or attorney or counsel of any of

14    the parties, or a relative or employee of such attorney

15    or counsel, or financially interested directly or

16    indirectly in this action.

17        In witness whereof I have hereunder set

18    my hand and affixed my seal of office at Milwaukee,

19    Wisconsin, this 17th day of August, 2017.

20

21

22        _____

                 Notary Public

23                 In and for the State of Wisconsin

24

25    My Commission Expires: March 12, 2021.

**$**

$475 [1] - 115:18

**1**

1 [12] - 2:18, 3:17, 21:22, 21:23, 21:25, 27:6, 27:11, 27:12, 37:20, 63:17, 63:23, 64:11
10 [3] - 2:25, 36:24, 71:19
10-18-12 [2] - 70:6, 70:13
10-24-12 [1] - 70:20
10-25-12 [1] - 68:11
100 [1] - 77:5
10:35 [1] - 93:5
11 [3] - 3:1, 31:1, 37:9
112 [1] - 3:23
116 [1] - 2:15
119 [1] - 2:16
12 [5] - 3:2, 20:2, 45:14, 47:2, 122:25
12:54 [1] - 1:19
12th [2] - 102:9, 102:10
13 [4] - 3:3, 31:2, 46:3, 47:6
13th [1] - 64:18, 72:22, 73:12
14 [4] - 3:4, 3:18, 25:9, 47:8
15 [5] - 3:5, 3:18, 54:21, 54:23, 93:24
15th [1] - 72:19
16 [4] - 3:5, 55:19, 55:21, 72:14
17 [3] - 3:6, 61:12, 61:14
17th [1] - 122:19
18 [5] - 3:7, 3:10, 62:20, 62:22, 62:23
18th [1] - 84:11
19 [5] - 3:8, 12:14, 12:15, 63:14, 63:16
19th [6] - 22:17, 22:22, 67:21, 102:11, 102:12, 102:20
1:17-cv-00589 [1] - 1:6

**2**

2 [20] - 2:20, 3:17, 3:23, 23:14, 23:15, 23:17, 27:9, 27:15, 45:19, 45:22, 45:23, 46:13, 54:15, 64:12, 71:20, 79:25, 97:5, 99 17

20 [3] - 3:9, 78:22, 78:24
2004 [4] - 10:3, 11:4, 12:11, 21:11
2005 [1] - 21:11
2008 [1] - 27:10
2010 [5] - 12:22, 13:2, 13:7, 21:9, 21:15
2011 [7] - 64:19, 72:15, 72:19, 72:22, 73:13, 74:6, 74:15
2012 [3] - 71:20, 72:1, 72:11
2013 [25] - 6:22, 23:5, 24:17, 27:10, 27:11, 47:2, 47:6, 47:8, 49:5, 64:23, 66:2, 67:14, 67:21, 68:2, 74:22, 76:24, 79:8, 84:11, 84:20, 85:1, 89:22, 96:2, 96:5, 102:1, 116:17
2013............. [2] - 3:2, 3:3
2013................. [1] - 3:7
2013.................... [1] - 3:4
2013...................... ............ [1] - 3:11
2014 [2] - 22:17, 22:22
2015 [1] - 27:11
2016 [3] - 52:5, 52:7, 53:8
2017 [3] - 1:18, 122:10, 122:19
2021 [1] - 122:25
20th [1] - 73:13
21 [8] - 3:9, 72:11, 84:5, 84:7, 91:20, 96:3, 96:4, 96:5
211 [1] - 1:17
21st [1] - 96:2
22 [8] - 2:6, 2:20, 3:7, 3:11, 64:23, 67:14, 86:10, 86:12
22nd [5] - 57:9, 57:18, 59:11, 74:22, 76:24
23 [11] - 2:20, 3:2, 3:3, 3:12, 24:17, 47:2, 47:6, 66:2, 85:1, 91:3, 91:5
230 [1] - 2:3
23rd [8] - 26:11, 26:13, 49:4, 66:1, 78:18, 101:5, 116:17, 118:13
24 [8] - 3:13, 64:23, 65:1, 65:6, 65:9, 65:14, 92:8  92 10

24th [2] - 26:12, 27:16
25 [3] - 3:14, 95:16, 95:18
26 [7] - 2:21, 2:21, 3:15, 3:18, 96:21, 96:23, 118:11
28 [2] - 2:22, 2:22
28th [3] - 27:7, 27:10, 72:1
29 [1] - 2:23
2:02 [1] - 93:8
2:17 [1] - 94:12

**3**

3 [6] - 2:21, 3:18, 24:4, 25:9, 26:1, 96:25
30th [2] - 27:10, 27:11
31 [1] - 68:2
32.2 [2] - 61:17, 61:18
33 [1] - 2:24
34 [1] - 62:9
35 [1] - 2:24
352 [1] - 50:18
37 [2] - 2:25, 3:1
3:08 [1] - 94:12
3rd [4] - 91:17, 92:18, 92:24, 93:5

**4**

4 [23] - 2:15, 2:21, 26:21, 33:16, 37:24, 44:14, 45:5, 45:6, 45:19, 45:24, 64:18, 67:23, 71:3, 71:20, 72:3, 72:15, 72:22, 72:23, 73:13, 74:8, 74:14, 80:8, 97:3
4-23-12 [1] - 72:7
4-point [2] - 79:21, 80:17
432-2 [1] - 98:2
45 [1] - 3:2
46 [2] - 3:3, 3:4
4:00 [2] - 1:19, 121:19
4th [3] - 79:8, 89:22, 102:1

**5**

5 [2] - 2:22, 28:8
52 [1] - 53:5
53703 [1] - 2:7
54 [1] - 3:5
55 [1] - 3:6

**6**

6 [7] - 2:22, 3 4,

28:24, 45:6, 45:22, 46:6
600 [1] - 2:6
60604 [1] - 2:4
61 [1] - 3:6
62 [1] - 3:7
63 [1] - 3:8
6th [4] - 47:8, 50:18, 84:20

**7**

7 [3] - 2:23, 29:11, 71:1
7-12-13 [1] - 97:6
7-pointer [1] - 70:24
79 [1] - 3:9

**8**

8 [9] - 2:24, 29:18, 29:20, 31:2, 35:19, 36:1, 72:23, 74:7, 74:14
8-point [3] - 79:17, 80:13, 81:9
84 [1] - 3:11
844 [1] - 2:3
86 [1] - 3:12

**9**

9 [5] - 1:18, 2:24, 33:13, 73:2, 122:10
91 [1] - 3:12
92 [1] - 3:13
95 [1] - 3:14
97 [1] - 3:15

**A**

a.m [1] - 93:5
ability [2] - 6:15, 6:18
able [3] - 26:17, 106:22, 108:9
Absenteeism [1] - 68:3
absenteeism [4] - 71:20, 72:3, 72:15, 73:14
access [1] - 17:18
Accident [4] - 3:5, 55:11, 55:22, 70:12
accident [28] - 7:20, 8:5, 8:14, 9:11, 37:14, 41:23, 42:18, 43:15, 43:17, 48:18, 56:6, 56:11, 56:16, 66:5, 75:8, 75:19, 76:13, 76:16, 77:13, 77:18, 77:20, 77:25, 78:2, 78:14, 80:9 100:2, 100 3,

100:24
accidents [2] - 41:10, 44:7
accommodates [1] - 52:13
according [3] - 56:22, 73:17, 80:9
accurate [2] - 55:6, 66:9
acquired [6] - 10:4, 10:13, 10:14, 12:11, 20:21, 39:14
Act [1] - 4:24
ACTING [1] - 1:4
action [4] - 22:12, 45:8, 45:25, 122:16
actions [2] - 108:22, 111:12
active [4] - 9:18, 31:19, 38:3, 65:19
activities [5] - 85:3, 85:4, 85:6, 99:3, 99:12
activity [1] - 4:23
Acts [2] - 37:21, 42:1
Actual [1] - 43:4
actual [1] - 43:16
add [1] - 43:19
added [1] - 43:12
adding [1] - 94:18
addition [1] - 41:3
address [2] - 4:9, 4:11
adjustments [1] - 94:16
Administration [1] - 24:16
adults [1] - 105:15
advance [1] - 15:20
Affidavit [2] - 2:23, 29:17
affidavit [7] - 29:12, 29:16, 29:21, 30:20, 31:2, 85:20, 85:23
affixed [1] - 122:18
afford [2] - 22:14, 119:16
afraid [1] - 100:3, 116:22
afternoon [2] - 6:5, 103:23
ago [3] - 19:9, 48:12, 105:21
agree [8] - 8:9, 31:15, 33:24, 38:5, 38:24, 39:1, 62:2, 66:24
agreed [1] - 71:11
agreeing [1] - 63:8
agreement [2] - 16:9, 49:13

**Agreement...........**
**............** [1] - 3:6
**ahead** [2] - 7:9,
117:5
**aid** [1] - 43:10
**ain't** [3] - 30:5,
75:7, 98:8
**airlines** [1] - 50:13
**allow** [1] - 112:15
**allowed** [3] - 68:7,
113:16, 113:19
**almost** [3] - 12:14,
50:6, 56:7
**Alpha** [1] - 120:22
**Alpha-Prime** [1] -
120:22
**amount** [1] - 120:3
**ankle** [16] - 7:5,
7:7, 7:18, 7:19,
7:24, 66:7, 66:14,
67:11, 76:23, 76:24,
77:6, 78:6, 101:15,
101:16, 118:17,
118:18
**ankle's** [1] - 26:5
**answer** [13] - 5:23,
15:11, 15:12, 15:13,
18:12, 18:15, 44:16,
49:21, 77:16, 90:23,
103:11, 117:5,
118:20
**answered** [2] -
15:25, 117:5
**antidepressant** [1]
- 107:22
**Antigo** [2] - 11:14,
21:12
**anyway** [1] - 28:1
**Apbion** [2] - 120:10
**APBION** [1] -
120:10
**Appeal** [1] - 2:24
**appear** [2] - 23:23,
91:11
**Appear...................**
**..** [1] - 2:20
**appeared** [2] - 2:4,
2:7
**Appleton** [16] -
19:24, 19:25, 50:3,
50:5, 50:8, 51:7,
51:20, 51:21, 88:6,
88:19, 89:14, 102:2,
107:2, 117:12,
119:2, 119:3
**application** [1] -
32:17
**applications** [1] -
121:3
**applied** [4] - 32:14,
121:1, 121:8,
121:14
**applies** [1] - 15:15

**apply** [6] - 119:3,
120:6, 120:8,
120:10, 120:12,
120:14
**applying** [1] -
119:5
**appreciate** [1] -
54:6
**approach** [1] - 33:3
**appropriate** [1] -
40:21
**arbitration** [1] -
15:3
**area** [1] - 88:8
**areas** [1] - 15:17
**argu** [1] - 80:3
**argue** [2] - 30:11,
71:11, 113:11,
113:12
**argued** [1] - 82:4
**arguing** [1] - 82:1
**arguments** [6] -
80:4, 81:8, 83:4,
83:10, 83:13, 83:15
**art** [1] - 90:22
**Article** [1] - 62:9
**aside** [1] - 119:3
**assertion** [1] -
15:18
**assess** [1] - 41:9
**assessed** [16] -
14:21, 37:24, 41:13,
45:1, 45:12, 45:17,
46:7, 63:8, 64:15,
64:17, 65:11, 67:23,
71:4, 73:2, 73:9,
74:13
**assessing** [1] -
59:23
**assign** [1] - 9:16
**assuming** [2] -
8:20, 36:4
**attach** [1] - 115:6
**attached** [8] - 14:6,
24:3, 62:3, 80:1,
91:8, 93:4, 97:4,
97:6
**Attached** [4] - 3:17,
3:18, 92:16, 95:25
**attachment** [2] -
92:20, 92:25
**attempt** [1] - 15:16
**attended** [3] -
32:19, 39:19, 81:5
**attention** [1] - 51:4
**attorney** [2] -
122:13, 122:14
**attorneys** [1] -
24:17
**August** [3] - 1:18,
122:10, 122:19
**automatic** [1] -
65:2

**average** [1] - 77:4
**awarded** [1] - 33:9
**aware** [11] - 4:17,
4:21, 35:6, 56:2,
70:17, 101:21,
112:2, 113:6,
113:17, 113:24,
113:25
**awkward** [1] -
29:20
**awkwardly** [1] -
66:6

**B**

**back-and-forth** [1]
- 94:9
**backs** [1] - 50:12
**bad** [3] - 54:1,
60:21, 63:25
**bank** [1] - 22:9
**bar** [1] - 59:4
**bargaining** [5] -
9:5, 9:7, 10:16,
13:17, 54:10
**based** [6] - 15:18,
38:8, 38:9, 58:24,
59:9, 74:18
**basis** [3] - 48:10,
84:25, 113:9
**battleground** [1] -
65:9
**became** [1] - 21:1
**become** [2] - 50:2,
112:2
**began** [1] - 119:1
**behalf** [7] - 2:4, 2:7,
79:5, 82:1, 82:2,
97:20, 115:13
**Behalf.** [1] - 3:9
**Behavior** [2] -
37:20, 41:25
**behavior** [1] -
42:17
**belief** [1] - 84:18
**benefits** [4] - 52:9,
52:17, 52:20, 53:7
**Benrud** [3] -
109:10, 109:20,
109:22
**BENRUD** [1] - 2:9
**best** [9] - 24:8,
34:3, 74:1, 74:4,
84:17, 96:14, 96:15,
97:18, 97:21
**better** [1] - 16:23
**Between** [1] - 3:13
**between** [12] -
10:20, 24:13, 39:16,
40:10, 40:14, 40:25,
41:23, 51:9, 56:5,
78:14, 96:6, 119:1
**bit** [10] - 8 24  10 3,
122:6

20:10, 29:20, 30:11,
81:1, 90:6, 91:24,
94:25, 109:7
**Blair** [4] - 75:22,
77:10, 109:24
**block** [1] - 78:9
**board** [4] - 27:16,
31:22, 41:1, 81:18
**Board** [7] - 3:10,
29:9, 29:13, 30:21,
84:2, 84:10, 84:21
**Board...................**
**....** [1] - 2:23
**BOERNER** [1] - 2:5
**boss** [2] - 109:17,
109:18
**bottom** [8] - 33:16,
33:17, 62:25, 66:17,
84:13, 92:14, 98:2,
101:6
**boxes** [1] - 50:13
**break** [2] - 25:12,
64:1
**Brian** [2] - 10:20,
105:14
**Brillion** [1] - 4:10
**Brittany** [1] -
105:14
**brother** [2] - 11:21,
12:1
**brought** [1] - 12:16
**building** [1] - 17:19
**business** [2] -
33:21, 34:6
**buttons** [1] -
114:12
**BY** [49] - 4:6, 7:12,
15:24, 18:5, 18:14,
18:25, 21:24, 23:16,
23:22, 25:11, 30:19,
33:5, 36:2, 44:18,
48:13, 48:22, 50:25,
54:22, 55:20, 57:16,
58:21, 59:2, 61:3,
61:13, 62:21, 63:15,
64:7, 69:24, 74:12,
77:19, 78:23, 84:6,
86:11, 89:21, 91:4,
92:9, 95:4, 95:17,
96:22, 103:15,
112:7, 113:5,
113:23, 114:4,
116:11, 117:8,
118:1, 118:22,
119:24

**C**

**call-ins** [2] - 37:2,
37:7
**care** [3] - 68:19,
68:20, 109:2
**CARTER** [2] - 1:15

**case** [3] - 71:11,
103:5, 103:6
**Case** [1] - 1:6
**categories** [2] -
37:18, 37:25
**category** [1] -
42:21
**Category** [1] -
37:20
**caused** [2] - 104:2,
104:8
**CD** [4] - 16:20,
17:8, 17:22, 25:19
**certain** [5] - 15:17,
24:22, 65:11,
116:13, 120:3
**Certified** [3] - 1:15,
3:22, 122:6
**certified** [1] - 15:19
**certify** [3] - 113:3,
122:9, 122:12
**challenge** [1] -
65:21
**challenged** [1] -
69:13
**challenging** [1] -
79:21
**chance** [1] - 64:8
**changed** [2] - 8:4,
99:25
**changes** [2] - 38:7,
103:13
**characterization**
[1] - 94:21
**characterize** [1] -
28:9
**characterized** [2] -
118:16, 118:18
**characterizing** [2] -
8:1, 94:21
**Charge** [1] - 3:9
**charge** [11] - 29:8,
84:1, 84:9, 84:16,
84:22, 84:25, 85:25,
86:18, 86:21, 86:23,
86:25
**Charge...................**
**..........** [1] - 3:12
**chat** [3] - 112:18,
112:20, 115:22
**check** [1] - 115:18
**Chicago** [1] - 2:4
**children** [1] -
106:14
**chitchatted** [1] -
10:2
**circling** [1] -
106:10
**circumstances** [4]
- 18:21, 48:17, 61:6,
71:14
**City** [1] - 1:17
**Civil** [1] - 1:14

**claim** [5] - 4:21, 7:17, 52:22, 98:22, 99:2

**claiming** [1] - 97:22

**clarify** [4] - 17:21, 89:17, 90:6, 117:22

**Clark** [1] - 120:14

**Claudia** [22] - 3:12, 3:13, 88:8, 88:22, 88:25, 90:3, 90:7, 91:9, 95:5, 96:1, 96:6, 98:11, 102:15, 102:16, 102:19, 102:25, 111:24, 112:3, 117:15, 117:16, 117:19, 118:6

**close** [1] - 12:7

**closer** [1] - 26:23

**coaching** [2] - 45:7, 45:25

**Coated** [4] - 50:3, 50:5, 51:20, 51:21

**Coating** [1] - 107:3

**collect** [1] - 102:2

**collecting** [1] - 52:9

**combination** [1] - 108:8

**coming** [5] - 66:6, 66:19, 66:25, 77:7, 85:8

**commencing** [1] - 1:19

**Commission** [1] - 122:25

**committee** [19] - 8:25, 9:2, 9:13, 10:21, 13:24, 37:13, 39:23, 41:15, 41:19, 41:23, 42:8, 42:13, 42:14, 44:5, 44:6, 44:20, 46:25, 70:23, 85:14

**Committee** [2] - 62:10, 62:13

**committee's** [2] - 70:21, 73:1

**common** [2] - 15:9, 18:10

**common-interest/ joint-defense** [1] - 15:9

**communications** [2] - 24:13, 116:13

**comp** [4] - 52:14, 52:17, 52:19, 108:6

**companies** [1] - 121:13

**company** [37] - 8:21, 10:4, 11:11, 11:12, 11:13, 13:15, 20 8, 29:22, 30:3,

30:8, 31:11, 34:2, 34:22, 35:1, 36:21, 38:4, 39:17, 39:25, 40:10, 40:12, 40:14, 42:12, 56:25, 59:17, 59:23, 60:23, 70:17, 80:5, 80:20, 82:22, 83:1, 83:8, 85:6, 86:5, 97:1, 118:18, 118:24

**Company** [1] - 49:12

**company's** [2] - 83:9, 83:13

**compared** [1] - 108:22

**compensation** [3] - 32:15, 33:9, 53:7

**compiled** [1] - 38:19

**complainant's** [1] - 94:23

**complaining** [2] - 14:12, 60:20

**complaint** [23] - 5:1, 14:19, 89:24, 90:16, 90:19, 90:21, 92:16, 93:4, 94:15, 94:22, 96:1, 97:19, 99:17, 102:8, 102:19, 103:21, 103:24, 116:24, 117:2, 117:3, 117:7, 117:10, 117:11

**completed** [2] - 6:3, 20:1

**comply** [1] - 24:8

**concerted** [1] - 85:4

**concluded** [1] - 121:19

**concluding** [1] - 1:19

**conclusion** [2] - 59:1, 90:21

**condition** [1] - 53:12

**conditions** [1] - 6:17

**conduct** [1] - 104:13

**Confidential** [1] - 29:15

**confused** [1] - 8:24

**consider** [2] - 109:22, 110:11

**considered** [1] - 100:2

**constitute** [1] - 74:1

**Constructive** [1] - 45:6, 45:24

**contact** [5] - 87:3

87:8, 90:5, 90:11, 116:19

**contacted** [5] - 87:17, 87:25, 88:2, 89:6, 116:17

**contacting** [1] - 90:13

**contacts** [1] - 91:23

**contained** [1] - 61:20

**continue** [1] - 11:19

**contract** [19] - 13:17, 13:19, 13:21, 14:6, 14:25, 40:6, 40:24, 41:3, 41:4, 41:14, 61:24, 62:3, 65:1, 65:21, 65:23, 68:7, 73:17, 80:5, 85:8

**contractual** [1] - 62:12

**contributing** [2] - 44:8, 44:10

**Contributing** [1] - 44:22, 45:2

**conversation** [6] - 6:5, 19:14, 19:21, 88:16, 88:18, 88:20, 89:2, 89:9, 90:3, 96:5, 96:8

**conversations** [4] - 19:11, 102:12, 102:16, 111:24

**Converting** [1] - 120:20

**convicted** [1] - 23:11

**coordinator** [1] - 56:15

**copied** [1] - 86:16

**copies** [1] - 95:25

**copy** [6] - 17:5, 36:20, 62:24, 96:17, 103:21, 103:24

**copying** [1] - 17:18

**corner** [2] - 22:19

**Corporation** [1] - 10:6, 10:7, 10:12, 10:24, 12:8, 12:12, 12:13, 12:15, 21:8, 21:10

**correct** [125] - 6:12, 7:24, 8:2, 8:15, 9:13, 10:24, 11:19, 11:20, 11:22, 11:23, 12:2, 12:3, 13:12, 13:13, 13:16, 13:18, 14:5, 14:14, 14:17, 15:1, 15:4, 16:12, 16:13, 17:19, 24:9, 24:20, 25:15, 25:16

29:10, 30:2, 32:8, 32:9, 33:10, 33:11, 35:13, 35:14, 39:15, 39:18, 41:18, 41:24, 42:5, 42:22, 42:25, 43:3, 43:6, 43:9, 43:11, 43:18, 43:20, 43:21, 43:24, 45:4, 45:13, 46:2, 48:18, 53:18, 54:20, 56:17, 56:18, 62:14, 62:15, 65:7, 65:18, 65:22, 65:24, 66:3, 66:7, 66:8, 66:12, 66:16, 67:9, 67:12, 67:15, 67:20, 67:22, 67:24, 68:5, 68:12, 68:15, 70:1, 70:14, 70:15, 70:18, 70:19, 71:24, 72:2, 72:3, 72:4, 72:15, 73:3, 73:14, 73:15, 75:14, 76:7, 76:25, 79:6, 79:9, 79:19, 80:7, 80:21, 81:4, 81:6, 81:7, 82:3, 83:2, 83:7, 83:11, 83:14, 85:24, 87:3, 87:4, 87:7, 88:21, 92:21, 92:22, 95:6, 95:10, 96:6, 96:17, 96:18, 97:24, 100:5, 118:14, 118:15

**corrections** [1] - 6:11

**corrective** [2] - 45:7, 45:25

**correctly** [5] - 9:3, 60:13, 74:5, 79:20, 80:16

**Correspondence** [1] - 3:13

**correspondence** [5] - 24:19, 92:12, 93:18, 94:23, 97:14

**Counsel** [3] - 25:1, 33:2, 89:20

**counsel** [11] - 25:18, 30:12, 30:18, 55:16, 112:13, 118:10, 118:11, 122:13, 122:15

**COUNTY** [1] - 122:2

**couple** [6] - 19:10, 21:21, 25:23, 49:9, 89:6, 119:22

**course** [2] - 8:5, 93:16

**Court** [1] - 15:20

**COURT** [1] - 1:1

**court** [4] - 4:18, 5 9, 5:11 6:4

**CoVantage** [2] - 2:19, 22:4

**cover** [1] - 106:6

**Credit** [2] - 2:19, 22:4

**credit** [1] - 23:7

**crime** [1] - 23:11

**cross** [1] - 116:8

**cross-examination** [1] - 116:8

**Crystal** [1] - 105:14

**current** [3] - 4:9, 108:12, 108:14

**customers** [2] - 50:14, 50:15

**D**

**Damage** [1] - 43:1

**damages** [1] - 104:1

**Dan** [3] - 82:5, 82:6, 82:10

**Date** [1] - 22:18

**date** [3] - 27:6, 27:9, 97:11

**Dated** [3] - 3:2, 3:3, 3:7

**dated** [13] - 36:3, 47:2, 47:6, 47:8, 66:1, 67:13, 67:21, 70:6, 70:13, 70:20, 71:19, 91:17, 102:9

**dates** [1] - 28:4

**David** [1] - 116:7

**DAVID** [1] - 2:3

**days** [6] - 46:20, 73:15, 73:17, 73:18, 73:19, 73:20

**deal** [1] - 66:4

**dealing** [1] - 66:14

**deals** [5] - 67:10, 67:16, 70:7, 70:10, 70:13

**Dearborn** [1] - 2:3

**December** [1] - 72:14

**decide** [1] - 87:8

**decided** [4] - 34:23, 59:14, 75:15, 87:3

**deciding** [1] - 42:21

**decision** [10] - 8:21, 33:6, 33:12, 33:16, 33:17, 33:21, 34:6, 42:7, 56:22, 59:9

**Decision............** [1] - 2:24

**decisions** [1] - 58:7

**declare** [1] - 84:16

**deducted** [1] -

43:23
**deducts** [1] - 44:21
**Defendant** [3] - 1:8, 1:13, 2:7
**defense** [3] - 15:9, 15:15, 18:11
**degree** [1] - 6:21
**deliberative** [1] - 103:10
**Denise** [5] - 102:15, 102:22, 103:18, 111:25, 112:3
**Department** [9] - 3:8, 3:14, 3:15, 4:22, 5:17, 16:4, 24:14, 95:21, 115:10
**DEPARTMENT** [1] - 2:2
**deponent** [3] - 18:12, 112:24, 116:8
**deposition** [11] - 4:15, 6:3, 10:2, 15:6, 16:1, 18:7, 18:20, 25:20, 26:19, 112:21, 122:9
**depressed** [4] - 51:2, 51:5, 108:4, 108:6
**depression** [5] - 107:16, 108:13, 108:15, 108:18, 109:3
**describe** [3] - 109:19, 110:6, 110:17
**described** [3] - 52:11, 53:8, 102:14
**description** [1] - 55:2
**Description...** [1] - 3:5
**detail** [2] - 9:3, 64:21
**determination** [1] - 58:5
**DEUREN** [1] - 2:5
**Development** [1] - 3:8
**dialogue** [1] - 41:22
**difference** [1] - 56:5
**different** [7] - 11:14, 37:17, 43:5, 82:23, 108:19, 108:20, 108:21
**differently** [9] - 47:11, 47:20, 48:1, 60:14, 60:18, 60:24, 61 2, 61:5  111:20

**direct** [1] - 5:22
**direction** [1] - 122:11
**directly** [2] - 36:7, 122:15
**director** [1] - 76:6
**dis** [1] - 52:25
**disabilities** [1] - 52:12
**disability** [1] - 52:25
**disagree** [6] - 34:7, 57:8, 63:6, 88:15, 90:23, 114:13
**disagreed** [2] - 73:8, 114:17
**disagreement** [3] - 57:6, 72:5, 72:17
**disagreements** [1] - 38:12
**disappointed** [1] - 83:20
**Discharge** [1] - 3:8
**discharge** [1] - 116:20
**discharging** [2] - 33:21, 85:2
**disciplinary** [4] - 46:7, 61:23, 62:3, 62:6
**discipline** [18] - 9:12, 14:1, 14:13, 45:12, 45:21, 46:14, 57:7, 59:24, 61:8, 61:20, 65:12, 69:15, 69:25, 70:4, 70:17, 73:9, 74:2, 111:12
**disciplined** [6] - 60:9, 60:11, 68:25, 76:21, 111:14, 111:16
**disciplining** [1] - 59:17
**discourage** [2] - 85:3, 85:7
**discovery** [1] - 112:17
**discretion** [2] - 42:20, 100:1
**discriminated** [1] - 85:1
**discuss** [3] - 38:20, 42:18, 44:4
**discussed** [8] - 39:23, 44:12, 62:13, 88:9, 92:15, 102:19, 109:2, 113:2
**discussion** [4] - 44:19, 44:21, 74:16, 77:24
**Discussion** [4] - 18:4, 25:8, 113:22, 116:5

**discussions** [3] - 40:9, 40:14, 44:5
**dismissed** [3] - 79:17, 80:14, 80:17
**Disposition** [1] - 3:17
**dispute** [1] - 67:25
**distinction** [2] - 56:13, 78:13
**distress** [8] - 104:5, 104:7, 105:1, 105:9, 106:11, 108:16, 108:18, 109:3
**DISTRICT** [2] - 1:1, 1:2
**Division** [2] - 10:13, 12:12
**doctor** [5] - 59:7, 104:19, 107:11, 108:24, 108:25
**doctor's** [3] - 72:12, 72:20, 107:13
**doctors** [1] - 109:9
**doctrine** [4] - 15:9, 15:13, 18:11, 18:13
**document** [58] - 17:4, 22:1, 22:21, 23:18, 23:23, 24:4, 24:5, 24:11, 26:1, 26:8, 26:15, 26:18, 26:22, 27:19, 28:9, 29:3, 29:4, 30:15, 33:4, 36:25, 38:2, 38:18, 38:22, 38:25, 39:2, 39:9, 39:10, 39:13, 39:21, 40:1, 40:5, 40:9, 40:13, 40:15, 40:17, 40:20, 41:5, 41:9, 41:10, 55:24, 63:6, 64:3, 64:22, 66:22, 67:7, 67:8, 80:11, 91:2, 92:7, 92:15, 95:5, 95:10, 96:9, 96:24, 97:4, 97:13, 97:25, 99:17
**Document** [5] - 2:18, 2:22, 2:25, 3:1, 3:5
**documenting** [1] - 27:23
**documents** [20] - 16:2, 16:3, 16:14, 16:19, 17:3, 17:12, 17:15, 24:12, 25:3, 25:13, 25:14, 25:18, 25:20, 25:21, 27:21, 28:1, 28:4, 99:14, 115:6, 115:9
**DOL** [1] - 1:4
**DOL0016** [1] - 95:1

**Don** [4] - 34:17, 34:18, 81:3, 86:6
**done** [5] - 7:2, 14:20, 30:1, 32:8, 68:23
**door** [1] - 7:11
**doubt** [1] - 93:13
**down** [7] - 34:3, 47:16, 50:24, 51:6, 66:17, 77:7, 116:21
**Dr** [5] - 107:14, 107:15, 107:16, 108:24, 109:5
**draft** [4] - 26:15, 38:23, 39:10, 95:6
**drafted** [10] - 26:7, 28:1, 28:3, 90:17, 90:19, 93:5, 94:15, 95:2, 95:5, 96:9
**drew** [1] - 16:6
**drop** [1] - 86:3
**duly** [1] - 4:3
**Dundas** [1] - 4:10
**Dunsirn** [1] - 10:20
**Dura** [72] - 2:9, 2:25, 3:10, 3:15, 4:19, 7:4, 8:25, 9:22, 10:3, 10:14, 10:20, 10:22, 11:16, 11:19, 11:21, 12:2, 12:8, 12:11, 12:17, 14:7, 14:12, 20:16, 21:9, 29:8, 34:14, 35:16, 37:1, 39:14, 50:1, 50:4, 50:8, 50:12, 50:15, 50:17, 50:20, 51:10, 53:13, 53:19, 53:23, 54:10, 55:13, 56:1, 58:23, 64:16, 65:5, 74:3, 84:9, 97:19, 97:22, 104:1, 109:14, 110:1, 110:2, 110:4, 111:1, 111:2, 111:8, 111:11, 111:20, 112:4, 113:7, 114:1, 114:5, 114:12, 118:10, 118:12, 119:2, 119:6, 119:12, 119:17, 120:1
**DURA** [1] - 1:7
**Dura-Fibre** [71] - 2:9, 2:25, 3:10, 3:15, 4:19, 7:4, 8:25, 9:22, 10:3, 10:14, 10:20, 10:22, 11:16, 11:19, 11:21, 12:2, 12:8, 12:11, 12:17, 14:7, 14:12, 20:16, 21:9, 29:8, 34:14, 35:16, 37:1, 50:1, 50:4,

50:8, 50:15, 50:17, 50:20, 51:10, 53:13, 53:19, 53:23, 54:10, 55:13, 56:1, 58:23, 64:16, 65:5, 74:3, 84:9, 97:19, 97:22, 104:1, 109:14, 110:1, 110:2, 110:4, 111:1, 111:2, 111:8, 111:11, 111:20, 112:4, 113:7, 114:1, 114:5, 114:12, 118:10, 118:12, 119:2, 119:6, 119:12, 119:17, 120:1
**DURA-FIBRE** [1] - 1:7
**Dura-Wrap** [1] - 50:12
**during** [9] - 8:5, 26:4, 27:23, 46:20, 51:4, 51:9, 51:15, 82:18, 99:1
**duties** [1] - 55:7

---

### E

**East** [1] - 2:6
**EASTERN** [1] - 1:2
**education** [2] - 20:1, 20:7
**EDWARD** [1] - 1:4
**effect** [1] - 55:12
**effort** [1] - 24:8
**eight** [1] - 63:10
**either** [2] - 42:2, 93:13
**element** [1] - 42:20
**elimination** [2] - 49:15, 49:23
**email** [9] - 91:25, 92:1, 92:3, 92:11, 92:19, 92:20, 93:10, 93:20, 94:11
**emotional** [9] - 104:4, 104:5, 104:7, 105:1, 105:9, 106:10, 108:15, 108:17, 109:3
**employed** [3] - 50:2, 64:16, 74:3
**employee** [16] - 14:19, 33:22, 35:16, 35:17, 44:12, 44:13, 54:11, 58:14, 61:4, 65:14, 65:17, 70:18, 81:25, 85:2, 122:13, 122:14
**employee's** [1] - 49:1
**employees** [24] - 9 8, 10:11, 10:22, 10:23  14 11  38 16,

48:14, 60:5, 60:14,
61:5, 65:4, 100:13,
111:7, 111:10,
111:13, 111:16,
111:21, 112:4,
113:6, 114:1, 114:5,
114:6, 114:7,
114:11
  **employees'** [2] -
38:15, 42:4
  **employer** [3] -
14:24, 33:20, 85:1
  **end** [9] - 46:5,
46:21, 56:21, 57:1,
57:4, 57:9, 57:21,
67:18, 97:5
  **ended** [2] - 22:10,
119:2
  **Entitled** [4] - 2:22,
2:25, 3:1, 3:5
  **envelope** [1] - 36:8
  **episode** [8] - 45:18,
52:10, 59:25, 65:10,
67:10, 70:18, 73:9,
77:9
  **equal** [1] - 61:7
  **established** [2] -
48:3, 114:10
  **evening** [1] - 26:13
  **event** [1] - 14:10
  **events** [3] - 6:22,
28:11, 58:14
  **eventually** [1] -
81:2
  **evidence** [1] - 7:17
  **evidentiary** [1] -
5:24
  **exact** [1] - 67:2
  **exactly** [3] - 44:1,
46:19, 76:10
  **examination** [1] -
116:8
  **Examination** [2] -
1:12, 2:14
  **EXAMINATION** [3]
- 4:5, 116:10,
119:23
  **examined** [1] - 4:4
  **example** [15] -
14:12, 29:22, 29:24,
30:4, 30:7, 30:8,
31:12, 32:6, 37:6,
41:25, 43:7, 46:10,
50:11, 64:19, 85:21
  **examples** [1] -
111:19
  **Excuse** [1] - 113:19
  **excuse** [2] - 72:20,
104:6
  **exhausted** [1] -
53:6
  **Exhibit** [76] - 2:18,
2:20, 2 21 2:21,

2:22, 2:22, 2:23,
2:24, 2:24, 2:25,
3:1, 3:2, 3:3, 3:4,
3:5, 3:5, 3:6, 3:7,
3:8, 3:9, 3:9, 3:11,
3:12, 3:13, 3:14,
3:15, 21:22, 21:23,
21:25, 23:13, 23:15,
23:17, 25:9, 26:1,
26:21, 28:7, 28:24,
29:11, 33:13, 35:19,
36:1, 36:24, 37:9,
45:14, 46:3, 47:2,
47:6, 47:8, 54:21,
54:23, 55:19, 55:21,
61:12, 61:14, 61:21,
62:4, 62:20, 62:22,
62:23, 63:14, 63:16,
78:22, 78:24, 84:5,
84:7, 86:10, 86:12,
91:3, 91:5, 92:8,
92:10, 95:16, 95:18,
96:21, 96:23,
118:11
  **exhibit** [6] - 18:1,
28:7, 35:25, 55:17,
64:9, 95:15
  **Exhibit/s** [1] - 3:17
  **exhibits** [2] - 17:10,
25:4
  **Exhibits** [1] - 2:17
  **Expera** [1] - 120:18
  **EXPERA** [1] -
120:18
  **experience** [2] -
20:21, 20:23
  **Expires** [1] -
122:25
  **explain** [2] - 83:23,
86:24
  **explained** [3] -
71:10, 88:6, 117:13
  **Express** [1] - 93:14
  **extent** [10] - 15:8,
15:11, 15:12, 18:12,
90:21, 103:9, 108:2,
112:10, 112:22,
114:14

## F

  **facility** [1] - 39:14
  **fact** [8] - 11:18,
34:17, 35:15, 42:24,
42:2, 60:23, 69:15,
114:10
  **factors** [3] - 44:8,
44:11, 108:12
  **Factors** [2] - 44:22,
45:2
  **failed** [2] - 76:15,
112:16
  **failure** [2] - 67 16
67:18

  **fair** [3] - 28:3,
35:15, 40:8
  **fairly** [5] - 55:6,
71:13, 71:17, 111:7,
111:11
  **familiar** [4] - 13:19,
55:1, 55:11, 62:6
  **family** [8] - 11:18,
12:4, 105:10,
105:17, 106:6,
106:22, 106:25,
108:25
  **far** [4] - 10:25, 88:1,
97:16, 109:15
  **fast** [1] - 67:5
  **fault** [1] - 59:17
  **federal** [2] - 4:18,
115:4
  **Federal** [1] - 1:14
  **feedback** [2] - 45:7,
45:25
  **felt** [18] - 8:15,
8:16, 8:17, 14:20,
51:1, 56:25, 75:1,
75:10, 80:5, 83:5,
87:7, 88:11, 99:7,
99:10, 104:17,
104:18, 111:13,
114:6
  **few** [3] - 94:15,
116:8, 119:4
  **Fibre** [71] - 2:9,
2:25, 3:10, 3:15,
4:19, 7:4, 8:25,
9:22, 10:3, 10:14,
10:20, 10:22, 11:16,
11:19, 11:21, 12:2,
12:8, 12:11, 12:17,
14:7, 14:12, 20:16,
21:9, 29:8, 34:14,
35:16, 37:1, 39:14,
50:1, 50:4, 50:8,
50:15, 50:17, 50:20,
51:10, 53:13, 53:19,
53:23, 54:10, 55:13,
56:1, 58:23, 64:16,
65:5, 74:3, 84:9,
97:19, 97:22, 104:1,
109:14, 110:1,
110:2, 110:4, 111:1,
111:2, 111:8,
111:11, 111:20,
112:4, 113:7, 114:1,
114:5, 114:12,
118:10, 118:12,
119:2, 119:6,
119:12, 119:17,
120:1
  **FIBRE** [1] - 1:7
  **figure** [1] - 18:2
  **file** [12] - 14:23,
24:22, 65:15, 65:20,
69:2 69 4, 73:24,

89:15, 89:24,
114:22, 115:13,
117:11
  **Filed** [3] - 2:19, 3:9,
3:9
  **filed** [26] - 4:18,
14:11, 14:19, 22:3,
22:16, 22:17, 22:22,
26:16, 27:15, 27:21,
29:8, 32:14, 40:4,
65:8, 65:19, 78:16,
78:18, 79:4, 79:7,
79:10, 83:25, 84:9,
97:19, 97:20,
103:17, 117:7
  **files** [6] - 16:12,
24:7, 25:2, 25:13,
25:22, 46:18
  **filing** [5] - 73:5,
116:24, 117:2,
117:3, 117:10
  **Filing** [1] - 22:18
  **fill** [3] - 115:1,
121:10, 121:11
  **filled** [4] - 7:22,
47:23, 75:19, 76:12
  **filling** [1] - 7:20
  **final** [6] - 38:18,
38:23, 39:9, 40:15,
45:2
  **finally** [1] - 73:11
  **financially** [1] -
122:15
  **fine** [8] - 6:23,
56:23, 58:4, 75:8,
76:12, 77:21, 90:25,
112:19
  **fired** [8] - 32:24,
36:9, 36:11, 88:11,
88:14, 97:23, 99:3,
114:6
  **first** [20] - 4:3, 11:2,
11:3, 11:24, 22:16,
24:11, 26:1, 27:12,
29:18, 43:10, 45:7,
45:25, 77:6, 79:4,
88:10, 98:2, 103:16,
103:19, 116:17
  **fit** [1] - 42:21
  **five** [3] - 4:12,
19:16, 115:22
  **flip** [1] - 23:19
  **floor** [1] - 66:20
  **focusing** [1] - 31:1
  **follow** [2] - 86:1,
93:23
  **followed** [1] - 7:20
  **following** [10] -
20:7, 27:9, 59:14,
70:16, 75:10, 75:12,
76:23, 90:3, 96:8,
97:14
  **follows** [1] - 4 4

**foot** [3] - 66:6,
66:18, 66:25
  **foreclosure** [1] -
22:12
  **Foreclosure** [2] -
2:20, 22:5
  **foreman** [1] -
109:25
  **foresee** [1] - 58:20
  **forget** [2] - 41:6,
82:17
  **form** [16] - 9:15,
37:12, 37:16, 44:24,
45:5, 45:24, 47:23,
49:1, 49:3, 49:8,
49:16, 49:23, 50:21,
58:17, 66:14, 77:16
  **Form** [2] - 70:13,
80:10
  **forms** [2] - 115:2,
115:10
  **forth** [2] - 93:19,
94:9
  **forward** [1] - 94:19
  **four** [2] - 4:12,
41:23
  **frame** [1] - 51:15
  **Free** [1] - 68:3
  **free** [2] - 23:19,
68:7
  **freebie** [1] - 72:7
  **friends** [2] - 32:1,
106:25
  **front** [11] - 16:12,
24:7, 26:21, 28:24,
37:17, 62:22, 63:16,
64:9, 75:25, 84:8,
108:3
  **furniture** [1] -
50:12

## G

**geez** [1] - 44:9
  **general** [1] - 103:5
  **given** [9] - 29:5,
36:7, 44:14, 48:7,
48:14, 53:12, 63:10,
80:8, 83:12
  **Given** [1] - 2:23
  **Gonnering** [4] -
76:2, 110:15,
110:18
  **GONNERING** [1] -
76:4
  **government** [2] -
112:12, 112:23
  **government's** [2] -
103:10, 112:11
  **graduated** [1] -
20:3
  **granted** [1] - 83:5
  **grievance** [28] -

14:18, 14:23, 15:2, 27:15, 27:21, 27:22, 27:24, 34:18, 34:23, 36:12, 40:4, 65:8, 65:15, 65:19, 65:20, 69:2, 69:5, 73:5, 73:24, 78:17, 78:18, 79:4, 79:7, 80:1, 80:24, 83:5, 83:17, 99:6

**Grievance** [1] - 3:9
**grievances** [3] - 14:11, 14:16, 26:16
**ground** [3] - 66:18, 66:19, 66:25
**group** [3] - 81:25, 83:4, 83:9
**Grunow** [1] - 102:4
**GRUNOW** [1] - 102:4
**guess** [10] - 8:8, 31:7, 34:25, 58:19, 63:12, 70:25, 72:14, 91:7, 102:2, 111:25
**guy** [1] - 44:9
**guys** [1] - 103:3

## H

**half** [3] - 64:1, 104:9, 105:7
**hall** [1] - 36:10
**Hall** [1] - 1:17
**hand** [3] - 22:18, 22:19, 122:18
**handed** [2] - 76:1, 76:8
**handing** [4] - 21:25, 55:21, 78:24, 96:23
**handwriting** [2] - 26:24, 28:14
**Handwritten** [3] - 2:21, 2:21, 2:22
**Hauser** [1] - 1:17
**head** [5] - 23:6, 54:14, 90:2, 100:20, 108:17
**health** [3] - 107:5, 109:2, 119:14
**Health** [4] - 4:24, 24:15, 62:9, 62:13
**hear** [3] - 74:10, 90:9, 105:22
**hearing** [11] - 32:17, 32:19, 32:23, 33:7, 34:17, 34:21, 81:2, 81:5, 81:17, 82:18, 94:19
**held** [1] - 34:17
**help** [4] - 18:20, 91:22, 96:25, 108:1
**helps** [1] - 26:23

**hereby** [1] - 122:8
**herein** [1] - 4:3
**hereunder** [1] - 122:17
**high** [3] - 20:3, 20:5, 20:7
**High** [1] - 20:6
**highest** [1] - 19:25
**highlight** [2] - 33:4, 33:15
**highly** [2] - 5:22, 93:13
**hindsight** [3] - 58:18, 58:24, 59:5
**hired** [2] - 21:15, 50:5
**History** [2] - 37:21, 42:1
**holds** [1] - 112:12
**home** [2] - 22:10, 104:8
**honest** [1] - 8:19
**hose** [8] - 68:14, 68:17, 68:20, 68:25, 70:7, 70:10, 70:13, 70:16
**hour** [2] - 19:22, 54:15
**house** [2] - 22:9, 22:24
**HUGLER** [1] - 1:4
**hum** [13] - 5:4, 5:10, 7:23, 22:20, 26:25, 27:8, 27:14, 29:2, 31:4, 33:19, 40:19, 74:25, 85:5
**human** [2] - 76:6, 110:16
**hurry** [1] - 77:1
**hurt** [8] - 56:7, 56:10, 68:13, 74:19, 78:3, 78:4, 78:8, 100:13

## I

**idea** [1] - 63:25
**Identified** [1] - 2:17
**identify** [12] - 4:7, 14:24, 17:10, 17:11, 25:22, 29:11, 35:19, 37:9, 46:3, 86:12, 95:18, 106:17
**Injury/Incident** [1] - 43:4
**input** [4] - 38:8, 38:9, 38:10, 38:22
**instance** [1] - 1:13
**instruct** [2] - 18:11, 112:24
**instructs** [1] - 23:23
**insurance** [5] - 52:13, 104:20, 107:5, 119:11, 119 14

73:22
**inappropriate** [1] - 71:23
**incapable** [1] - 53:16
**Incident** [7] - 3:1, 3:2, 3:3, 3:4, 3:7, 37:11, 80:10
**incident** [4] - 26:4, 43:16, 46:17, 70:16
**incidents** [4] - 16:6, 44:7, 47:15, 94:18
**include** [1] - 16:21
**including** [3] - 24:13, 24:16, 24:18
**income** [3] - 114:22, 114:24, 115:1
**inconsistent** [1] - 101:8
**indirectly** [1] - 122:16
**individuals** [1] - 112:25
**information** [7] - 26:6, 59:10, 59:14, 80:9, 98:19, 112:16, 121:5
**informer** [3] - 112:11, 112:14, 112:23
**initial** [2] - 39:10, 71:3
**initiated** [1] - 22:13
**injured** [3] - 7:18, 58:15, 68:22
**injuries** [2] - 60:6, 116:22
**injury** [26] - 7:24, 32:25, 52:1, 52:14, 56:20, 57:5, 57:8, 57:11, 57:13, 59:6, 73:4, 76:23, 76:24, 77:13, 98:24, 99:8, 100:24, 101:5, 101:12, 101:14, 101:17, 108:7, 118:14, 118:17, 118:19, 118:24
**Illinois** [1] - 2:4
**immediately** [1] - 56:17
**impair** [2] - 6:14, 6:18
**implicating** [1] - 113:14
**impression** [1] - 38:14
**improper** [2] - 41:7

**intend** [1] - 53:10
**intent** [3] - 42:6, 42:18, 42:19
**interest** [1] - 18:11
**interest/joint** [1] - 15:9
**interested** [1] - 122:15
**interpret** [1] - 75:3
**interspersed** [1] - 24:23
**interviewed** [4] - 112:2, 112:3, 113:6, 113:24
**invade** [2] - 15:13, 18:13
**invades** [4] - 15:8, 103:9, 112:10, 112:22
**investigated** [1] - 46:25
**investigating** [1] - 37:14
**investigation** [1] - 8:5
**Investigation** [1] - 70:12
**Investigator** [1] - 96:1
**investigators** [1] - 24:17
**involuntary** [1] - 104:16
**involved** [5] - 13:3, 13:14, 21:19, 38:2, 49:24
**involving** [1] - 46:17
**IRS** [2] - 115:10, 115:17
**issue** [4] - 14:22, 18:2, 40:13, 60:24
**issued** [1] - 40:15
**it'd** [1] - 53:24
**item** [1] - 24:11
**itself** [2] - 41:5, 41:9

## J

**Jacobs** [31] - 2:19, 3:7, 3:9, 3:13, 3:18, 4:7, 4:8, 12:7, 15:17, 16:19, 18:6, 21:25, 23:17, 25:12, 49:3, 54:23, 55:22, 57:11, 62:22, 63:17, 64:8, 84:8, 85:2, 91:13, 96:24, 97:6, 99:20, 116:9, 116:12
**JACOBS** [3] - 1:12, 4 2, 122 9

**Jacobs'** [1] - 3:9
**Jacobs**.................
.......... [1] - 3:14
**Jamie** [18] - 34:13, 39:7, 69:8, 71:6, 71:8, 71:13, 71:16, 71:17, 76:1, 76:2, 76:8, 76:15, 110:15, 110:18, 110:20, 110:22
**January** [1] - 68:2
**Jason** [1] - 102:4
**Job** [2] - 3:5, 121:5
**job** [17] - 11:14, 20:15, 20:16, 22:14, 50:19, 51:11, 53:6, 53:16, 53:24, 54:25, 55:1, 55:2, 55:7, 65:17, 79:17, 119:5, 121:4
**jobs** [6] - 108:9, 119:3, 119:25, 120:3, 121:1, 121:9
**jogged** [1] - 78:9
**JOHN** [1] - 2:6
**Johnson** [5] - 107:14, 107:15, 107:16, 108:24, 109:5
**joined** [1] - 12:16
**judge** [2] - 34:8, 34:12
**July** [13] - 72:22, 74:6, 74:15, 91:17, 92:18, 92:24, 93:5, 96:2, 102:9, 102:11, 102:12, 102:20
**jump** [1] - 74:22
**June** [17] - 3:4, 3:10, 47:8, 64:18, 72:1, 73:12, 73:13, 79:8, 84:11, 84:20, 89:22, 91:20, 96:3, 96:4, 96:5, 102:1, 102:9

## K

**KATHLEEN** [2] - 1:14, 122:6
**keep** [1] - 37:16
**Keller** [3] - 102:15, 102:22, 111:25
**kept** [1] - 27:25
**kids** [3] - 105:10, 105:11, 105:12
**Kimberly** [1] - 120:14
**Kimberly-Clark** [1] - 120:14
**kind** [10] - 25:2, 32:1, 37:12, 50:14, 50:15  52 9, 72:14, 106:4  113:14,

117:24
  **knocked** [1] - 50:23
  **Knowledge** [1] -
42:23
  **knowledge** [12] -
48:10, 49:22, 65:5,
74:2, 74:4, 84:17,
87:13, 97:18, 97:21,
101:3, 101:10,
112:24
  **Kooy** [3] - 2:24,
35:22, 100:18

## L

  **labor** [3] - 16:9,
62:18, 84:1
  **LABOR** [2] - 1:4,
2:2
  **Labor** [15] - 2:23,
3:6, 3:10, 3:14,
4:22, 5:17, 16:4,
24:14, 29:9, 29:13,
30:20, 84:1, 84:10,
84:21, 95:21
  **Labor**...................
[1] - 3:15
  **laborer** [2] - 51:22,
53:24
  **lady** [1] - 103:19
  **Laminating** [3] -
10:13, 10:24, 12:12
  **Laminator** [2] - 3:5,
54:25
  **laminator** [2] -
20:19, 21:13
  **large** [1] - 6:21
  **last** [4] - 7:11,
19:14, 53:3, 65:10
  **lawsuit** [8] - 4:18,
4:21, 18:22, 21:18,
22:3, 22:8, 22:22,
103:16
  **Lawsuit** [1] - 2:18
  **lay** [1] - 62:12
  **lead** [1] - 54:18
  **leading** [1] - 28:11,
118:20
  **leadman** [9] -
20:17, 21:5, 21:12,
45:16, 46:19, 54:9,
55:7, 56:2, 56:19
  **Leadman** [2] - 3:5,
54:25
  **leadmen** [1] - 37:2
  **learn** [1] - 103:16
  **least** [2] - 35:6,
106:19
  **leave** [2] - 10:25,
11:13
  **leaving** [1] - 22:10
  **led** [1] - 62:17
  **left** [16] - 11:10,

11:11, 11:12, 21:11,
22:18, 22:19, 50:1,
50:4, 52:1, 68:14,
68:15, 104:8, 104:9,
105:19, 119:11,
119:17
  **left-hand** [2] -
22:18, 22:19
  **legal** [4] - 21:19,
59:1, 90:21, 90:22
  **legally** [1] - 59:3
  **letter** [9] - 35:2,
35:20, 36:4, 36:16,
36:20, 86:14, 91:7,
95:19, 97:1
  **Letter** [5] - 2:24,
3:11, 3:12, 3:14,
3:15
  **letters** [1] - 16:5
  **level** [1] - 19:25
  **lifting** [1] - 74:19
  **limited** [2] - 24:16,
24:18
  **Line** [2] - 3:22, 31:1
  **line** [3] - 47:16,
51:6, 84:15
  **lines** [1] - 31:3
  **Lisa** [4] - 2:24,
35:22, 36:7, 100:18
  **live** [2] - 4:10,
104:11
  **lived** [1] - 4:11
  **living** [1] - 119:7
  **LLC** [1] - 1:7
  **local** [2] - 98:1,
98:2
  **locate** [1] - 75:20
  **located** [1] - 50:17
  **locations** [1] -
66:19
  **Log"** [1] - 37:1
  **Log"**.....................
............. [1] - 2:25
  **look** [24] - 9:15,
16:25, 17:2, 17:3,
29:19, 30:14, 36:3,
37:16, 44:1, 46:3,
54:23, 63:23, 64:2,
64:8, 73:12, 87:16,
87:19, 87:22, 90:16,
91:5, 92:14, 94:19,
96:25, 120:4
  **Look** [1] - 46:24
  **looked** [5] - 28:20,
42:19, 53:6, 99:14,
119:25
  **looking** [5] - 6:21,
40:17, 44:8, 44:10,
92:18
  **looks** [11] - 22:16,
27:6, 28:8, 37:23,
73:11, 74:18, 79:7
92:14, 93:2  93 24

97:2
  **lose** [1] - 43:22
  **loss** [1] - 104:4
  **lost** [5] - 12:19,
22:14, 35:17, 119:5,
119:11
  **Luke** [5] - 39:5,
109:10, 110:9,
115:22, 115:23
  **LUKE** [1] - 2:9

## M

  **machine** [6] -
20:17, 20:18, 20:24,
21:13, 37:3, 45:16
  **Mackey** [12] -
34:17, 34:18, 81:3,
81:6, 81:9, 81:17,
82:25, 83:3, 83:8,
83:17, 83:20, 86:6
  **Madison** [2] - 2:7,
88:8
  **mail** [2] - 93:22,
115:9
  **main** [1] - 81:16
  **management** [14] -
9:5, 20:9, 27:13,
38:12, 38:19, 39:17,
41:17, 100:1, 111:8,
111:11, 114:12,
114:17, 114:20
  **March** [5] - 22:17,
22:22, 67:21, 72:11,
122:25
  **mark** [11] - 18:1,
21:22, 23:13, 25:3,
55:17, 91:2, 92:6,
92:21, 95:14, 96:20
  **marked** [16] -
21:23, 23:15, 25:9,
54:21, 55:19, 61:12,
62:20, 63:14, 78:22,
84:5, 86:10, 91:3,
92:8, 95:16, 96:21,
96:23
  **married** [1] - 105:5
  **matter** [1] - 60:22
  **mean** [16] - 8:9,
10:16, 11:10, 11:15,
14:5, 17:6, 36:5,
38:14, 59:3, 68:6,
73:16, 86:2, 89:18,
93:17, 118:16
  **meaning** [1] -
94:14
  **means** [1] - 106:20
  **mediator** [1] -
34:18
  **medical** [3] - 6:17,
51:4, 51:14
  **medication** [1] -
7:1
  **medications** [1] -

6:14
  **meet** [4] - 53:20,
82:25, 83:1, 83:8
  **meeting** [17] - 11:2,
11:3, 19:21, 27:3,
27:12, 27:17, 34:2,
34:12, 36:9, 39:16,
44:6, 69:3, 69:4,
83:3, 86:6, 98:22,
99:1
  **Meeting** [1] - 27:15
  **meetings** [6] -
10:19, 14:16, 39:16,
39:19, 39:21, 41:20
  **member** [3] -
31:20, 31:21, 49:7
  **members** [10] - 9:4,
9:5, 10:21, 12:4,
38:23, 41:16, 41:23,
42:7, 81:25, 85:15
  **memory** [2] - 6:20,
6:25
  **Menasha** [20] -
10:4, 10:6, 10:7,
10:11, 10:12, 10:23,
12:8, 12:12, 12:13,
12:15, 20:6, 21:7,
21:10, 50:18, 120:6
  **merit** [1] - 34:23
  **Merit** [2] - 1:15,
122:7
  **message** [1] -
85:14
  **Michael** [3] -
107:14, 107:15,
107:16
  **middle** [1] - 80:11
  **Mifflin** [1] - 2:6
  **might** [14] - 14:15,
18:12, 27:17, 29:5,
47:18, 51:18, 70:17,
80:18, 93:11, 94:1,
98:25, 106:13,
106:22, 112:25
  **Mike** [9] - 3:2, 3:3,
3:4, 45:15, 46:4,
46:11, 46:17, 47:25,
48:7
  **mill** [1] - 52:12
  **MILWAUKEE** [1] -
122:2
  **Milwaukee** [2] -
88:8, 122:18
  **minus** [4] - 44:14,
45:19, 45:22, 45:23
  **minute** [1] - 64:1
  **minutes** [4] -
19:15, 19:16, 93:24,
115:22
  **mischaracterizati
on** [1] - 61:1
  **mischaracterizes**
[1] - 69 19

  **miss** [16] - 7:21,
8:1, 8:4, 43:7,
43:15, 43:16, 47:23,
48:18, 56:5, 56:8,
56:17, 76:16, 77:25,
101:20, 101:23,
118:25
  **misses** [2] - 60:6,
100:3
  **missing** [2] - 12:4,
85:17
  **mistaken** [1] - 75:7
  **modify** [1] - 96:16
  **mom** [2] - 105:19,
119:7
  **money** [1] - 119:20
  **month** [2] - 104:9,
105:6, 105:21,
119:10, 119:25
  **Moraga** [11] - 90:3,
90:7, 91:9, 95:5,
96:1, 96:6, 98:11,
111:24, 117:17,
117:19, 118:7
  **Moraga's** [1] -
88:23
  **Moraga**............. [1]
- 3:12
  **Moraga**..................
....... [1] - 3:13
  **Mortgage** [1] - 22:6
  **Mortgage".** [1] -
2:20
  **most** [2] - 34:12,
52:10
  **mother** [1] - 106:19
  **motivation** [1] -
59:23
  **move** [3] - 28:9,
53:25, 85:9
  **moved** [1] - 105:19
  **MR** [145] - 2:3, 2:6,
2:9, 4:6, 7:8, 7:12,
15:7, 15:10, 15:11,
15:14, 15:24, 16:18,
16:23, 17:6, 17:7,
17:8, 17:9, 17:14,
17:17, 17:21, 17:23,
17:24, 17:25, 18:5,
18:9, 18:14, 18:23,
18:25, 21:21, 21:24,
23:13, 23:16, 23:19,
23:22, 24:25, 25:5,
25:7, 25:10, 25:11,
30:13, 30:16, 30:17,
30:19, 33:2, 33:5,
35:24, 36:1, 36:2,
44:15, 44:18, 48:9,
48:13, 48:19, 48:22,
50:21, 50:25, 54:22,
55:15, 55:20, 57:10,
57:13, 57:15, 57:16,
58:16  58 21  58 25,

59:2, 60:25, 61:3,
61:13, 62:21, 63:15,
63:20, 63:21, 64:5,
64:7, 69:18, 69:21,
69:24, 74:9, 74:11,
74:12, 77:15, 77:19,
78:23, 84:6, 86:11,
89:17, 89:19, 89:21,
90:20, 90:23, 90:25,
91:2, 91:4, 92:6,
92:9, 94:20, 94:24,
95:1, 95:2, 95:4,
95:14, 95:17, 96:20,
96:22, 103:8,
103:15, 112:5,
112:7, 112:9,
112:13, 112:19,
113:2, 113:5, 113:8,
113:9, 113:11,
113:12, 113:16,
113:17, 113:19,
113:21, 113:23,
114:2, 114:4,
115:20, 115:23,
115:24, 115:25,
116:3, 116:6,
116:11, 117:4,
117:8, 117:22,
117:25, 118:1,
118:20, 118:22,
119:21, 119:22,
119:24, 121:16,
121:18
**must** [5] - 56:16,
92:13, 96:7, 97:12,
115:14

## N

**N-E-T-T** [1] - 82:9
**name** [7] - 11:24,
82:16, 101:25,
102:3, 107:13,
111:25
**names** [3] - 100:15,
105:13, 107:21
**National** [8] - 2:23,
3:10, 29:9, 29:13,
30:20, 84:1, 84:10,
84:21
**nature** [1] - 88:11
**near** [18] - 7:21,
8:1, 8:4, 43:7,
43:15, 43:16, 47:23,
48:18, 56:5, 56:8,
56:17, 60:6, 76:16,
77:25, 100:3,
101:20, 101:22,
118:25
**necessary** [1] -
115:6
**need** [2] - 4:8,
58:13
**needed** [6] - 50 23

58:6, 59:11, 71:11,
89:15, 89:24
**Neenah** [5] - 1:17,
1:18, 19:23, 93:14,
120:16
**negotiated** [1] -
49:12
**negotiation** [1] -
49:23
**negotiations** [4] -
13:15, 40:10, 62:17,
85:10
**Nett** [3] - 82:5,
82:7, 82:10
**never** [13] - 26:20,
35:4, 38:11, 49:22,
57:11, 59:6, 60:2,
61:5, 90:19, 92:20,
92:25, 100:14,
103:21
**new** [3] - 13:17,
50:19, 51:11
**next** [23] - 30:14,
50:2, 52:13, 58:8,
65:25, 66:13, 67:6,
67:13, 67:21, 68:2,
68:11, 70:6, 70:10,
70:12, 70:20, 71:19,
72:1, 72:14, 73:1,
88:19, 90:4, 99:18,
109:13
**NLRB** [8] - 3:12,
16:8, 29:6, 85:23,
86:3, 86:24, 89:14,
89:18
**nobody** [3] -
104:11, 107:1
**nonsense** [1] -
95:3
**normally** [1] -
17:25
**north** [1] - 52:2
**Nos** [4] - 3:17,
3:18, 3:18, 25:9
**Notary** [3] - 1:16,
122:7, 122:22
**notes** [8] - 24:18,
27:2, 27:25, 28:10,
28:20, 89:8, 89:9,
89:10
**Notes....................
.** [3] - 2:21, 2:21,
2:22
**nothing** [4] - 24:24,
71:23, 107:1
**notice** [1] - 15:21
**noticed** [1] - 16:10
**notified** [1] - 56:16
**November** [1] -
72:19
**number** [10] - 24:3,
25:13, 37:17, 45:3,
46:12, 65:11, 87:22,

88:7, 88:23, 112:3

## O

**oath** [3] - 4:3,
30:23, 30:24
**object** [21] - 5:19,
7:8, 15:7, 30:12,
48:9, 48:19, 50:21,
57:10, 58:16, 58:25,
60:25, 69:18, 77:15,
90:20, 94:20, 103:8,
112:5, 112:9,
113:14, 117:4,
118:20
**objecting** [1] -
112:22
**objection** [10] -
18:10, 18:23, 44:15,
69:22, 113:8,
113:10, 113:14,
113:21, 114:2
**objections** [1] -
5:23
**Occupational** [2] -
4:24, 24:15
**occur** [2] - 21:7,
21:8
**occurred** [3] - 6:22,
28:10, 56:21
**Occurrence** [1] -
68:4
**occurrence** [1] -
68:8
**occurring** [1] -
27:23
**October** [1] - 71:19
**OF** [7] - 1:2, 1:4,
2:2, 2:2, 4:1, 122:1,
122:2
**office** [6] - 71:10,
75:25, 88:6, 88:19,
102:2, 122:18
**OFFICE** [1] - 2:2
**officer** [2] - 9:24,
13:4
**officers** [2] - 39:17,
49:8
**official** [1] - 79:12
**often** [2] - 77:3,
109:5
**old** [2] - 16:8, 53:4
**once** [11] - 33:2,
43:1, 46:7, 66:11,
72:5, 85:12, 89:6,
90:15, 93:2, 106:10,
114:9
**One** [1] - 120:24
**one** [34] - 11:21,
25:2, 29:25, 32:8,
34:3, 35:3, 35:6,
35:7, 35:11, 35:20,
38:4  43:10  43:17,
46:4  47:15  55:14,

68:11, 70:6, 70:10,
72:1, 72:14, 73:6,
79:24, 81:15, 82:22,
91:15, 100:19,
100:23, 101:10,
101:21, 102:10
**ones** [1] - 97:17
**operator** [1] - 45:15
**opinion** [8] - 7:3,
35:16, 47:25, 60:17,
61:4, 85:13, 111:19,
116:22
**opportunity** [3] -
6:10, 38:20, 83:12
**order** [3] - 14:23,
24:24, 85:3
**oriented** [2] -
42:24, 43:2
**original** [2] - 17:3,
94:22
**Original** [3] - 3:17,
3:17, 3:18
**originally** [2] -
72:23, 74:14
**OSHA** [26] - 87:3,
87:8, 87:11, 87:14,
87:17, 87:25, 88:2,
88:4, 88:10, 89:22,
90:5, 97:14, 97:23,
102:2, 102:13,
113:1, 113:6,
113:15, 113:24,
113:25, 114:1,
116:13, 116:17,
116:19, 116:23,
116:24
**outside** [2] - 41:3,
41:13
**own** [5] - 4:13,
36:16, 36:17, 71:8,
87:9

## P

**p.m** [3] - 1:19,
121:19
**Packaging** [1] -
120:6
**pad** [4] - 16:11,
16:21, 16:24
**Page** [23] - 2:14,
2:17, 3:22, 24:4,
27:6, 27:9, 27:11,
27:12, 27:15, 29:18,
29:20, 31:2, 33:16,
63:17, 63:23, 64:11,
64:12, 79:25, 96:25,
97:3, 97:5, 99:17
**page** [17] - 26:22,
28:5, 28:7, 36:25,
66:1, 66:13, 67:6,
67:13, 67:21, 68:2,
70:12, 70:20  71:19
73:1  79:4, 80:20,

99:18
**pages** [1] - 97:4
**paid** [4] - 54:9,
54:10, 54:18, 58:7
**Paper** [4] - 10:5,
10:11, 120:16
**paper** [3] - 20:17,
50:9, 50:10
**papers** [1] - 86:8
**paperwork** [1] -
81:11
**paragraph** [1] -
98:3
**part** [6] - 7:13,
10:16, 14:15, 61:24,
62:16, 88:16
**partial** [1] - 52:25
**partially** [1] - 108:6
**participate** [1] -
41:19
**particular** [2] -
41:22, 42:18
**parties** [1] - 122:14
**parts** [1] - 14:24
**passed** [1] - 105:21
**Past** [2] - 37:20,
41:25
**past** [8] - 42:17,
60:4, 60:15, 73:15,
73:17, 73:18, 94:25,
100:14
**pay** [1] - 79:18
**payments** [1] -
23:7
**people** [7] - 41:13,
41:16, 41:17, 46:22,
106:25, 111:22,
116:21
**per** [1] - 68:7
**perception** [1] -
38:15
**perhaps** [1] - 74:18
**period** [4] - 12:9,
51:5, 51:9, 52:19
**periodically** [1] -
49:12
**permanent** [2] -
52:12, 52:25
**person** [10] - 19:19,
54:18, 81:15, 82:18,
88:13, 101:25,
102:22, 109:13,
109:22, 117:12
**personal** [2] - 16:5,
122:11
**personally** [1] -
120:5
**perspective** [1] -
47:18
**phone** [10] - 19:8,
19:13, 87:22, 88:23,
91:10  96 2, 96:5
96:8, 120 5, 121 4

BROWN & JONES REPORTING, INC.

DURAFIBRE00040

**phrase** [1] - 101:19
**physical** [1] - 53:12
**physically** [1] - 53:16
**physician** [1] - 109:1
**pick** [2] - 35:3, 35:7
**place** [6] - 44:4, 53:25, 63:16, 109:16, 111:2
**placing** [1] - 62:22
**Plaintiff** [2] - 1:5, 2:4
**plaintiff** [1] - 24:14
**Plan** [2] - 55:12, 55:23
**Plan"**......... [1] - 3:6
**Plant** [1] - 66:18
**plant** [4] - 20:22, 37:5, 61:8, 61:20
**planted** [1] - 66:24
**plus** [1] - 55:8
**Plus** [1] - 55:9
**point** [12] - 11:15, 13:8, 21:4, 21:12, 36:21, 39:25, 43:10, 87:2, 88:5, 95:8, 99:1, 99:5
**pointing** [1] - 33:18
**points** [55] - 7:21, 9:16, 14:21, 37:23, 41:13, 43:8, 43:22, 43:23, 44:2, 44:25, 45:3, 45:5, 45:11, 45:17, 45:20, 45:21, 46:5, 46:7, 46:12, 47:16, 47:24, 48:2, 48:7, 48:15, 63:8, 63:10, 64:15, 64:17, 64:18, 64:23, 65:1, 65:6, 65:9, 65:11, 65:14, 67:23, 69:11, 69:14, 69:17, 70:1, 71:1, 71:3, 71:16, 71:20, 72:3, 72:11, 72:15, 72:19, 72:23, 72:24, 73:2, 73:13, 74:14, 80:8
**Points** [1] - 64:14
**policies** [1] - 99:25
**policy** [4] - 56:2, 56:15, 56:20, 57:3
**Pony** [1] - 93:14
**pop** [1] - 75:1
**portion** [1] - 33:4
**position** [5] - 5:24, 5:25, 9:21, 21:16, 109:14
**possible** [1] - 27:25
**possibly** [10] - 44:11, 44:17, 85:11, 85 16, 85:17, 100:22 102:5,

102:6, 106:4, 120:25
**potential** [1] - 15:19
**potentially** [2] - 9:11, 15:3
**practice** [1] - 84:1
**pre** [1] - 52:1
**pre-injury** [1] - 52:1
**predict** [1] - 59:6
**preemptive** [1] - 85:9
**prepare** [4] - 6:4, 15:5, 16:1
**prepared** [7] - 16:14, 28:16, 28:19, 29:7, 35:7, 38:23, 39:13
**preparing** [1] - 38:2
**prescribe** [2] - 107:18, 107:20
**present** [2] - 24:18, 82:4
**preserve** [1] - 5:24
**president** [3] - 79:14, 81:21, 82:11
**President** [1] - 2:9
**pretty** [8] - 21:1, 32:12, 55:14, 56:12, 104:17, 109:21, 118:3
**preventable** [1] - 8:15
**Prevention** [1] - 66:17
**preventive** [1] - 44:7
**previous** [1] - 69:19
**previously** [2] - 10:23, 12:8
**Prime** [1] - 120:22
**prior** [10] - 12:11, 18:19, 19:1, 19:5, 49:4, 60:15, 61:1, 65:4, 98:21, 99:1
**privilege** [4] - 103:10, 112:11, 112:15, 112:23
**problem** [3] - 6:19, 6:24, 101:19
**problems** [2] - 39:8, 104:8
**procedurally** [2] - 41:6, 73:21
**Procedure** [1] - 1:14
**PROCEEDINGS** [1] - 4:1
**Proceedings** [1] - 121:19
**proceedings** [1] - 21:19

**process** [5] - 87:6, 99:6, 102:17, 103:10, 103:13
**processed** [3] - 27:22, 36:13, 80:24
**processing** [2] - 14:16, 27:23
**produced** [3] - 25:12, 38:19, 46:18
**production** [1] - 35:12
**products** [3] - 50:9, 50:10
**progress** [1] - 103:4
**Progressive** [1] - 120:20
**Prokash** [10] - 3:2, 3:3, 3:4, 45:15, 46:4, 46:11, 46:18, 47:12, 47:25, 48:7
**promoted** [1] - 21:4
**proof** [1] - 46:22
**properly** [1] - 68:24
**property** [2] - 4:13, 43:1
**propose** [2] - 49:15, 49:23
**protected** [2] - 4:23, 85:4
**protesting** [1] - 78:19
**prove** [1] - 105:3
**provide** [5] - 16:19, 17:4, 25:19, 35:1, 112:16
**provided** [6] - 6:7, 36:21, 38:4, 59:10, 59:13, 118:6
**provider** [2] - 51:15, 109:2
**provision** [1] - 62:17
**provisions** [5] - 13:21, 13:23, 14:1, 14:3, 62:12
**psychiatrist** [5] - 51:12, 104:21, 107:7, 107:8, 119:16
**psychologist** [4] - 51:11, 104:23, 107:9, 119:17
**Public** [3] - 1:16, 122:8, 122:22
**punished** [1] - 100:4
**purports** [1] - 64:22
**purposes** [2] - 25:20, 112:20
**pursuant** [1] - 1:13
**pushed** [2] -

114:11, 117:14
**put** [9] - 16:24, 18:10, 26:21, 28:24, 42:12, 64:9, 98:11, 98:14, 121:13
**putting** [2] - 42:14, 84:7

**Q**

**Questionnaire......**
......... [1] - 3:8
**questions** [12] - 5:14, 5:20, 15:19, 17:11, 25:3, 25:23, 54:7, 78:11, 116:4, 116:8, 119:21, 121:17
**Questions** [1] - 3:22
**quick** [1] - 94:8
**quickly** [1] - 112:14
**quit** [1] - 12:20
**quite** [2] - 109:7, 119:4

**R**

**ran** [1] - 109:15
**reached** [1] - 65:6
**reaches** [1] - 65:14
**reaching** [1] - 65:9
**reaction** [1] - 104:14
**read** [3] - 29:18, 66:5, 84:16
**reading** [1] - 80:16
**reads** [1] - 66:18
**really** [3] - 24:24, 34:11, 43:25
**Realtime** [2] - 1:15, 122:7
**reason** [5] - 7:6, 34:7, 46:16, 48:6
**reasons** [1] - 7:14
**receive** [5] - 48:2, 51:4, 70:1, 92:23, 111:22
**received** [11] - 5:5, 7:21, 33:6, 47:15, 47:16, 47:24, 52:19, 69:15, 72:22, 74:2, 74:7
**receiving** [2] - 52:16, 57:6
**recent** [1] - 52:10
**recently** [1] - 52:3
**Recess** [2] - 64:6, 116:2
**recollect** [1] - 26:17
**recollection** [7] - 18:21, 36:23, 74:20, 74:24, 76:14, 96 15

99:15
**record** [15] - 5:25, 15:14, 16:18, 18:4, 18:10, 25:5, 25:8, 25:10, 49:1, 50:7, 57:15, 69:23, 113:22, 116:5, 116:7
**recorded** [1] - 122:10
**records** [1] - 42:4
**reduced** [5] - 71:6, 72:23, 74:8, 74:14, 122:10
**reference** [2] - 35:2, 91:19
**reflected** [1] - 39:9
**refresh** [4] - 18:20, 74:20, 91:22, 99:15
**refused** [4] - 62:25, 63:5, 66:11, 67:8
**refusing** [1] - 63:3
**Regarding** [6] - 2:18, 2:20, 3:2, 3:3, 3:4, 3:7
**regarding** [5] - 13:23, 14:1, 14:3, 22:5, 112:25
**Registered** [2] - 1:15, 122:7
**regular** [1] - 54:10
**regularly** [1] - 109:9
**REINHART** [1] - 2:5
**reinstated** [1] - 79:17
**reinstatement** [1] - 53:19
**related** [1] - 104:10
**relating** [1] - 24:12
**Relations** [8] - 2:23, 3:10, 29:9, 29:13, 30:21, 84:2, 84:10, 84:21
**relationship** [3] - 109:20, 110:6, 110:17
**relative** [2] - 122:13, 122:14
**relevant** [1] - 98:7
**relocated** [1] - 11:14
**remedy** [2] - 79:16, 79:23
**remember** [21] - 13:5, 18:15, 26:7, 28:16, 48:12, 49:6, 54:13, 61:25, 67:2, 74:16, 77:24, 88:1, 95:12, 101:25, 102:3, 102:6, 107:21, 116:14, 116:16, 118:7,

120:19
**remove** [1] - 50:13
**removed** [1] - 14:22
**rent** [1] - 4:14
**repeat** [3] - 15:22, 38:21, 69:20
**report** [16] - 7:20, 7:22, 57:20, 58:11, 58:13, 67:16, 67:18, 70:21, 73:2, 75:8, 75:15, 75:19, 76:9, 76:13, 76:15, 77:9
**Report** [5] - 3:2, 3:3, 3:4, 3:7, 37:11
**Report".................
...............** [1] - 3:1
**reported** [18] - 32:25, 56:19, 56:25, 57:4, 57:5, 57:20, 58:6, 58:12, 59:11, 59:15, 60:6, 75:17, 98:23, 99:8, 100:14, 101:5, 110:3, 118:14
**REPORTER** [1] - 17:20
**Reporter** [4] - 1:15, 1:16, 122:7
**reporter** [3] - 5:9, 5:11, 6:4
**reporting** [6] - 57:7, 59:24, 76:21, 80:9, 101:11, 101:22
**Reporting/ Investigation** [3] - 3:6, 55:12, 55:23
**reports** [1] - 46:17
**represent** [1] - 25:14
**representative** [1] - 82:15
**represented** [4] - 9:8, 10:10, 10:23
**representing** [3] - 5:16, 10:22, 14:15
**requested** [1] - 69:3
**requests** [2] - 24:4, 24:9
**research** [1] - 87:24
**resolve** [1] - 14:22
**resolved** [1] - 15:2
**Resource** [1] - 120:24
**resource** [2] - 76:6, 110:16
**resources** [1] - 17:18
**respect** [2] - 28:11, 90:4

**respond** [3] - 83:13, 93:8, 94:11
**responded** [1] - 92:24
**responds** [1] - 93:25
**response** [2] - 16:15, 80:21
**responses** [1] - 112:17
**responsibilities** [1] - 54:19
**responsive** [1] - 25:14
**rest** [3] - 50:23, 63:22, 85:14
**restrictions** [2] - 53:20, 53:23
**result** [4] - 9:12, 34:20, 40:9, 52:10
**Retained** [1] - 3:18
**retired** [1] - 11:21
**return** [1] - 96:17
**returned** [2] - 21:9, 97:14
**reveal** [1] - 112:24
**Revenue** [1] - 115:11
**review** [7] - 6:8, 15:19, 16:3, 63:20, 95:10, 96:10, 96:16
**reviewed** [4] - 9:12, 26:19, 26:20, 97:15
**reviewing** [1] - 95:6
**rewrite** [1] - 28:22
**rid** [1] - 85:10
**rise** [1] - 58:6
**Road** [1] - 4:10
**room** [2] - 82:22, 82:23
**Room** [2] - 1:17, 2:3
**rooms** [1] - 82:21
**roundabout** [1] - 32:13
**rule** [1] - 61:23
**ruled** [2] - 83:20, 83:23
**rules** [8] - 7:20, 14:3, 14:6, 61:8, 61:20, 61:24, 62:3, 62:7
**Rules** [1] - 1:14
**RUTENBERG** [53] - 2:3, 7:8, 15:7, 15:11, 16:18, 17:6, 17:8, 17:14, 17:21, 17:24, 18:9, 18:23, 23:19, 25:5, 30:16, 35:24, 44:15, 48:9, 48:19, 50:21, 57:10, 57:15, 58:16, 58:25, 60:25, 63:20, 69:18,

74:9, 77:15, 89:17, 90:20, 90:25, 94:20, 95:1, 103:8, 112:5, 112:9, 112:19, 113:8, 113:11, 113:16, 113:19, 114:2, 115:23, 115:25, 116:6, 116:11, 117:8, 117:25, 118:1, 118:22, 119:21, 121:18
**Rutenberg** [5] - 5:16, 19:1, 19:11, 102:13, 116:7
**Rutenberg............
...................** [1] - 2:15

---

## S

**S.C** [1] - 2:5
**safe** [1] - 44:13
**Safety** [10] - 3:1, 3:2, 3:3, 3:4, 3:7, 4:24, 24:15, 62:9, 62:13, 80:10
**safety** [22] - 8:24, 9:2, 9:13, 13:23, 20:12, 37:11, 37:13, 39:22, 41:15, 41:19, 42:14, 44:5, 44:6, 46:17, 46:25, 49:1, 56:15, 70:21, 70:23, 72:24, 73:1, 74:15
**sat** [1] - 34:2
**saw** [2] - 35:4, 74:18
**SCA** [1] - 120:8
**scan** [1] - 7:2
**scanned** [1] - 16:20
**scheduled** [1] - 7:2
**school** [3] - 20:3, 20:5, 20:7
**Scott** [9] - 75:20, 75:22, 76:14, 77:10, 109:24, 110:7, 110:11
**seal** [1] - 122:18
**searches** [1] - 121:4
**SEC'Y** [1] - 1:4
**second** [1] - 25:6
**secretary** [6] - 9:24, 10:11, 13:11, 27:25, 88:15, 98:1
**see** [49] - 22:6, 22:18, 28:9, 30:18, 31:13, 33:17, 33:22, 37:18, 37:21, 37:24, 43:4, 51:11, 51:14, 54:4, 58:13, 61:18, 61:21, 62:9, 62:10, 62:25, 64:12, 64:24

66:20, 66:21, 68:4, 75:10, 79:25, 80:10, 80:14, 80:23, 84:18, 85:4, 89:6, 89:9, 93:6, 94:12, 97:7, 97:16, 98:2, 100:4, 100:25, 101:6, 104:19, 107:7, 107:9, 107:11, 109:7, 109:9, 119:16
**seeing** [3] - 103:24, 109:5, 109:6
**seeking** [1] - 53:19
**seldom** [1] - 106:9
**Send** [1] - 115:17
**send** [1] - 85:14
**seniority** [3] - 12:16, 12:19, 12:25
**sent** [8] - 7:11, 20:8, 92:1, 93:3, 95:9, 97:1, 102:8, 102:20
**sentence** [1] - 118:12
**separate** [2] - 27:17, 82:21
**separated** [1] - 106:4
**series** [3] - 16:11, 25:17
**serious** [1] - 45:12
**served** [2] - 5:5, 16:16
**Service** [1] - 121:6
**set** [6] - 29:22, 30:4, 30:8, 31:12, 77:3, 122:17
**settlement** [2] - 52:22, 53:2
**seven** [1] - 64:1
**seven-and-a-half-minute** [1] - 64:1
**several** [1] - 10:19
**sheet** [2] - 121:10, 121:11
**shift** [8] - 56:21, 57:1, 57:4, 57:9, 57:18, 57:22, 67:18, 77:11
**shifting** [1] - 78:11
**short** [2] - 6:19, 6:25
**short-term** [2] - 6:19, 6:25
**shortly** [1] - 95:8
**shoulder** [6] - 52:1, 57:19, 57:21, 74:24, 75:12, 76:11
**show** [5] - 29:17, 36:24, 61:14, 64:22, 95:7
**showing** [1] - 94:8

**shows** [1] - 47:11
**shy** [1] - 38:11
**Sick** [1] - 64:18
**sided** [1] - 34:22
**sign** [1] - 63:1, 63:3, 63:5, 66:11, 67:8, 86:8, 96:17
**signature** [2] - 84:13, 97:9
**signatures** [1] - 73:13
**signed** [6] - 66:22, 84:15, 84:20, 97:11, 97:13, 99:19
**signing** [1] - 63:7
**similar** [2] - 61:6, 85:19
**simple** [1] - 56:12
**sisters** [2] - 106:7, 106:8
**sit** [5] - 8:18, 53:25, 83:15, 103:23, 108:3
**site** [1] - 87:20
**sitting** [1] - 109:13
**situation** [2] - 88:7, 88:9
**Skills** [1] - 42:23
**skip** [1] - 64:11
**slip** [3] - 69:25, 70:5, 72:12
**slips** [1] - 16:8
**slit** [1] - 50:13
**slit-and-remove** [1] - 50:13
**so-so** [1] - 110:8
**SOLICITOR** [1] - 2:2
**someone** [1] - 110:3
**sometime** [2] - 52:5, 53:3
**sometimes** [19] - 48:14, 48:15, 48:23, 48:24, 48:25, 58:13, 110:5, 110:12, 110:13, 110:19, 110:23, 110:24, 114:15, 114:17, 114:19
**somewhat** [1] - 118:8
**soon** [2] - 77:9, 94:19
**sore** [6] - 75:13, 76:12, 77:23, 78:6, 78:10, 78:14
**sorer** [1] - 58:9
**sorry** [4] - 74:9, 74:11, 89:19, 105:22
**sound** [2] - 23:1, 34:15

BROWN & JONES REPORTING, INC.

DURAFIBRE00042

**South** [1] - 2:3
**speaking** [1] - 118:4
**special** [1] - 20:20
**specialty** [2] - 50:9
**specify** [1] - 44:1
**speculate** [1] - 48:6
**speculation** [4] - 7:9, 44:15, 48:9, 48:20
**spell** [1] - 82:8
**spent** [1] - 34:12
**spoken** [1] - 113:1
**spokesperson** [1] - 81:16
**sprain** [1] - 66:15
**spraining** [1] - 67:11
**squarely** [2] - 66:18, 66:25
**SS** [1] - 122:1
**stairs** [4] - 66:19, 67:1, 77:4, 77:7
**stairway** [1] - 66:7
**stand** [1] - 30:14
**start** [2] - 24:4, 119:5
**started** [5] - 45:11, 51:10, 51:19, 85:10, 109:6
**state** [7] - 16:19, 84:25, 97:25, 99:17, 99:18, 99:25, 115:4
**State** [4] - 1:16, 115:10, 122:8, 122:23
**STATE** [1] - 122:1
**statement** [15] - 28:25, 29:5, 34:8, 91:8, 93:4, 94:23, 99:19, 99:22, 100:23, 117:19, 117:23, 117:24, 118:4, 118:6, 118:9
**Statement** [1] - 28:25
**Statement"........** [1] - 2:22
**statements** [2] - 16:5, 84:17
**states** [1] - 94:23
**STATES** [1] - 1:1
**Steelworkers** [2] - 9:8, 98:1
**step** [1] - 45:7
**stepped** [1] - 66:6
**Steve** [8] - 26:4, 49:11, 56:22, 58:4, 76:10, 81:19, 81:20, 81:22
**still** [8] - 12:1, 18:9, 18 15, 36:12, 51:23, 54 3, 105:5, 105:20

**stood** [2] - 38:16, 114:6
**stop** [2] - 23:7, 95:3
**Street** [5] - 1:18, 2:3, 2:6, 50:18
**stress** [1] - 104:4
**stuff** [5] - 16:4, 46:20, 60:4, 67:5, 93:22
**submitted** [1] - 84:21
**subpoena** [3] - 5:5, 16:15, 25:15
**Subpoena** [1] - 2:20
**substantive** [1] - 102:18
**subtotal** [2] - 43:19, 44:25
**subtract** [1] - 45:1
**sued** [1] - 58:23
**suffered** [1] - 105:1
**suing** [2] - 58:22
**Suite** [1] - 2:6
**Sunoco** [1] - 120:12
**supervisor** [2] - 56:16, 75:21
**supply** [1] - 121:5
**support** [1] - 29:7
**supportive** [1] - 36:18
**supports** [1] - 7:17
**supposed** [2] - 57:3, 117:13
**surprise** [1] - 114:7
**surrounding** [1] - 18:21
**sustained** [1] - 83:18
**swore** [1] - 30:23
**sworn** [2] - 4:3, 30:23

**T**

**Tardiness** [1] - 68:3
**tardiness** [2] - 71:20, 72:3
**tax** [1] - 115:2
**taxes** [1] - 114:22
**tech** [1] - 20:9
**telephonic** [1] - 118:2
**telephonically** [1] - 117:23
**ten** [1] - 44:9
**term** [4] - 6:19, 6:25, 90:22, 108:16
**terminated** [40] - 4:23, 7:3, 7:7, 7:18, 8:12, 8 13, 9:22,

12:25, 13:9, 20:16, 23:3, 28:21, 30:3, 30:5, 32:3, 32:15, 47:4, 50:20, 51:10, 53:14, 65:5, 65:9, 78:16, 87:3, 87:6, 98:23, 99:2, 99:5, 99:8, 99:11, 100:24, 101:4, 101:11, 101:22, 104:2, 104:17, 111:2, 118:13, 120:1
**terminating** [2] - 8:20, 35:16
**termination** [15] - 7:15, 28:12, 49:4, 60:15, 65:2, 65:4, 65:21, 78:19, 83:25, 98:21, 98:22, 104:10, 104:14, 112:8, 116:16
**terms** [3] - 42:20, 45:21, 81:25
**testified** [5] - 4:4, 32:21, 32:23, 116:12, 118:5
**testify** [7] - 6:15, 6:18, 15:17, 18:7, 18:17, 24:1, 106:23
**testimony** [8] - 5:13, 5:14, 61:1, 61:25, 69:19, 74:13, 74:24, 103:20
**text** [1] - 93:13
**texted** [1] - 94:1
**texting** [2] - 93:10, 93:21
**THE** [21] - 2:2, 7:10, 15:22, 16:22, 17:16, 17:20, 18:24, 23:21, 44:17, 48:11, 48:21, 50:23, 58:18, 61:2, 64:4, 69:20, 77:17, 91:1, 103:12, 114:3, 117:6
**themselves** [1] - 100:13
**there'd** [1] - 41:22
**third** [2] - 46:10, 80:20
**three** [13] - 12:24, 46:17, 46:24, 52:4, 52:13, 73:15, 73:17, 73:18, 73:19, 73:20, 105:12, 106:14, 121:8
**threw** [1] - 69:8
**ties** [1] - 12:7
**Tim** [10] - 3:13, 11:6, 30:10, 31:17, 31:19, 49:11, 79:10, 79:12, 81:19, 100 16

**TIMOTHY** [3] - 1:12, 4:2, 122:9
**Timothy** [3] - 4:8, 85:2, 97:6
**title** [2] - 54:25, 55:1
**titled** [1] - 37:1
**today** [22] - 5:3, 5:8, 6:15, 6:18, 8:18, 15:6, 16:1, 18:8, 18:17, 19:1, 23:24, 24:20, 25:21, 26:19, 40:17, 46:18, 76:12, 77:24, 83:15, 108:3, 112:20
**together** [3] - 30:15, 59:4, 105:6
**Tom** [3] - 12:1, 106:3, 106:4
**took** [5] - 22:9, 25:21, 37:2, 96:1, 102:25
**tool** [1] - 41:9
**top** [10] - 22:18, 22:19, 27:6, 28:4, 29:1, 54:14, 55:21, 61:17, 73:12, 102:10
**tore** [1] - 52:1
**tossed** [2] - 65:12, 69:11, 81:10
**total** [1] - 71:1
**Total** [2] - 64:14, 71:1
**totes** [1] - 50:12
**tough** [1] - 54:5
**trained** [1] - 10:24
**training** [3] - 20:9, 20:12, 20:20
**transcribe** [1] - 5:13
**Transcript** [2] - 3:17, 3:18
**transcript** [3] - 6:4, 6:7, 6:12
**TRANSCRIPT** [1] - 4:1
**treasurer** [1] - 79:15
**treat** [1] - 71:17
**treated** [17] - 46:22, 47:11, 47:12, 47:20, 48:1, 60:14, 60:15, 60:18, 60:24, 61:2, 61:5, 61:7, 71:13, 111:7, 111:10, 111:20, 116:21
**Tribunal** [1] - 2:24
**tried** [1] - 8:6
**trip** [4] - 68:15, 68:17, 68:21, 94:7
**tripped** [1] - 68:19
**tripping** [3] - 68:14,

68:25, 70:18
**true** [4] - 84:17, 94:25, 100:8, 101:2
**trustworthy** [4] - 109:22, 110:11, 110:20, 110:22
**trying** [9] - 54:1, 85:6, 85:9, 93:3, 93:19, 94:6, 94:7, 106:16
**Tuesday** [1] - 27:7
**turn** [8] - 65:25, 66:13, 67:6, 67:13, 97:3, 99:18, 118:9
**turned** [2] - 80:18, 121:3
**turning** [1] - 118:10
**tweak** [1] - 75:1
**tweaked** [5] - 57:19, 57:21, 74:24, 75:2, 76:11
**twice** [2] - 89:6, 90:15
**twisted** [4] - 7:19, 66:7, 77:6, 101:15
**twisting** [4] - 7:5, 7:7, 26:5, 101:16
**two** [16] - 9:4, 9:5, 26:22, 28:7, 36:25, 41:16, 41:17, 47:15, 82:21, 95:25, 97:4, 101:8, 107:23, 116:18, 116:19
**two-page** [3] - 26:22, 28:7, 36:25
**Type** [1] - 43:4
**types** [1] - 43:5

**U**

**U.S** [4] - 1:4, 2:2, 3:15, 98:1
**umm** [1] - 105:25
**unchanged** [1] - 16:20
**under** [23] - 1:13, 4:23, 30:23, 30:24, 44:21, 44:25, 45:1, 45:5, 45:24, 49:1, 56:15, 56:20, 61:6, 65:1, 65:20, 65:23, 66:17, 71:1, 71:14, 79:23, 79:24, 121:4, 122:11
**unemployed** [1] - 22:15
**unemployment** [3] - 32:14, 33:9, 120:3
**unfair** [2] - 48:14, 83:25
**unfairly** [4] - 111:14, 111:17, 111:20, 116:21
**unhappy** [1] -

DURAFIBRE00043

11:16

**Union** [4] - 2:19, 2:24, 9:9, 22:4

**union** [68] - 9:18, 9:21, 10:1, 10:8, 10:10, 10:21, 13:3, 13:11, 13:14, 14:16, 14:23, 20:9, 23:8, 27:13, 27:16, 31:19, 31:20, 31:21, 35:20, 35:21, 36:10, 38:3, 38:20, 38:22, 39:17, 40:4, 40:10, 40:12, 40:14, 40:24, 41:1, 41:16, 46:21, 49:8, 49:12, 49:15, 49:22, 65:1, 65:8, 65:21, 65:23, 79:12, 80:4, 81:8, 81:17, 81:18, 81:21, 81:25, 82:12, 82:13, 82:15, 82:22, 82:25, 83:3, 83:4, 83:9, 83:12, 83:16, 85:3, 85:6, 88:15, 98:1, 99:3, 99:6, 99:7, 99:10, 99:11

**union/ management** [1] - 27:2

**unit** [4] - 9:5, 9:7, 10:16, 54:11

**UNITED** [1] - 1:1

**unless** [3] - 16:24, 53:20, 113:14

**unlikely** [1] - 5:22

**Unsafe** [2] - 37:21, 42:1

**up** [30] - 9:4, 16:6, 16:8, 22:10, 28:11, 35:3, 35:8, 38:16, 43:13, 43:19, 45:2, 46:5, 52:1, 52:2, 71:10, 73:20, 75:25, 85:8, 87:16, 87:19, 87:22, 90:17, 90:19, 93:5, 94:7, 96:9, 101:9, 111:1, 114:7, 115:17

**ups** [2] - 30:6, 111:22

**useless** [2] - 104:17, 104:18

**utilized** [1] - 39:22

### V

**valid** [2] - 33:21, 34:4

**valuable** [1] - 35:17

**VAN** [1] - 2:5

**Van** [3] - 2:24, 35:22, 100:18

**verbal** [1] - 45:8

**verify** [1] - 80:19

**versus** [1] - 77:25

**vice** [1] - 82:11

**violated** [3] - 14:25, 80:5, 97:23

**violates** [1] - 40:5

**violation** [8] - 63:11, 72:24, 74:15, 79:17, 79:21, 80:13, 80:17, 81:9

**vocalizing** [1] - 38:11

**Voelker** [5] - 49:11, 79:10, 79:12, 81:19, 81:24

**voice** [1] - 116:22

**voted** [1] - 40:25

**vs** [1] - 1:6

### W

**W3053** [1] - 4:10

**W4s** [1] - 115:7

**wages** [2] - 16:8, 104:4

**wait** [1] - 75:9

**walked** [1] - 75:25

**Walnut** [1] - 1:17

**warning** [1] - 45:8

**Wayne** [2] - 11:25, 106:1

**web** [1] - 87:19

**Wednesday** [2] - 1:18, 122:10

**week** [5] - 116:18, 116:19, 120:4, 121:6, 121:11

**weeks** [1] - 19:10

**welcome** [1] - 17:14

**whereof** [1] - 122:17

**whole** [4] - 40:22, 65:12, 81:12, 102:17

**Wife** [1] - 2:19

**wife** [7] - 22:5, 22:23, 104:8, 104:9, 105:4, 105:8, 106:11

**Wiltz** [11] - 26:4, 49:11, 57:17, 57:20, 58:4, 59:10, 59:13, 67:17, 74:23, 81:22, 81:24

**Wiltz's** [3] - 56:20, 57:7, 67:17

**WISCONSIN** [2] - 1:2, 122:1

**Wisconsin** [7] - 1:17, 1:18, 2:7, 22:4, 122:8, 122:19, 122:23

**withdraw** [1] -

86:21

**withdrawal** [1] - 86:13

**Withdrawing** [1] - 3:11

**withdrawing** [2] - 86:18, 86:24

**withdrew** [1] - 86:23

**Witness** [4] - 23:6, 29:15, 90:2, 100:20

**witness** [6] - 4:2, 23:17, 33:3, 55:21, 78:24, 122:17

**WITNESS** [19] - 7:10, 15:22, 16:22, 17:16, 18:24, 23:21, 44:17, 48:11, 48:21, 50:23, 58:18, 61:2, 64:4, 69:20, 77:17, 91:1, 103:12, 114:3, 117:6

**wondering** [1] - 17:12

**workday** [1] - 77:4

**worker** [2] - 34:15, 35:21

**Worker** [1] - 2:24

**workers** [2] - 34:3, 35:20

**workers'** [5] - 52:14, 52:16, 52:19, 53:7, 108:6

**Workforce** [1] - 3:8

**works** [1] - 12:2

**Wrap** [1] - 50:12

**write** [5] - 16:8, 30:6, 36:15, 73:20, 111:22

**write-up** [1] - 16:8

**write-ups** [2] - 30:6, 111:22

**writing** [3] - 89:16, 117:23, 122:11

**written** [2] - 24:19, 89:24

### Y

**year** [2] - 50:6, 53:3

**years** [8] - 4:12, 12:14, 12:15, 12:25, 44:10, 52:4, 52:13

**yesterday** [4] - 19:4, 19:5, 19:18, 58:10

**Yesterday** [1] - 76:11

**yourself** [1] - 4:7

### Z

**ZAWADSKY** [91] - 2:6, 4:6 7:12,

15:10, 15:14, 15:24, 16:23, 17:7, 17:9, 17:17, 17:23, 17:25, 18:5, 18:14, 18:25, 21:21, 21:24, 23:13, 23:16, 23:22, 24:25, 25:7, 25:10, 25:11, 30:13, 30:17, 30:19, 33:2, 33:5, 36:1, 36:2, 44:18, 48:13, 48:22, 50:25, 54:22, 55:15, 55:20, 57:13, 57:16, 58:21, 59:2, 61:3, 61:13, 62:21, 63:15, 63:21, 64:5, 64:7, 69:21, 69:24, 74:11, 74:12, 77:19, 78:23, 84:6, 86:11, 89:19, 89:21, 90:23, 91:2, 91:4, 92:6, 92:9, 94:24, 95:2, 95:4, 95:14, 95:17, 96:20, 96:22, 103:15, 112:7, 112:13, 113:2, 113:5, 113:9, 113:12, 113:17, 113:21, 113:23, 114:4, 115:20, 115:24, 116:3, 117:4, 117:22, 118:20, 119:22, 119:24, 121:16

**Zawadsky** [2] - 3:11, 3:23

**zawadsky**............. ....................... [2] - 2:15, 2:16

**zero** [9] - 37:24, 43:8, 47:16, 69:11, 69:14, 71:6, 71:16, 72:11, 72:19