2015 WL 137272
Only the Westlaw citation is currently available.
United States District Court,
W.D. Wisconsin.

Michael KOZIARA, Plaintiff,

v.

BNSF RAILWAY COMPANY, Defendant.

No. 13–cv–834–jdp.
|
Signed Jan. 9, 2015.

**Attorneys and Law Firms**

Matthew H. Morgan, Nicholas Delton Thompson, Nichols Kaster, PLLP, Minneapolis, MN, for Plaintiff.

Bruce Jay Douglas, Colton D. Long, Ogletree Deakins, Minneapolis, MN, for Defendant.

**Opinion**

OPINION & ORDER

JAMES D. PETERSON, District Judge.

**\*1** Plaintiff Michael Koziara was a 30–year employee of defendant BNSF Railway Company when he reported a workplace injury. In the course of BNSF's investigation of the injury, BNSF discovered that Koziara had taken some used railroad ties from the company, and BNSF fired him. Koziara contends that the firing was not a legitimate response to any rule violations related to the accident or to the alleged theft of the railroad ties, but that it was retaliation for his good-faith reporting of a workplace injury.

Koziara filed suit under the Federal Rail Safety Act's (FRSA) anti-retaliation provision, 49 U.S.C. § 20109. BNSF has moved for summary judgment dismissing Koziara's complaint entirely. Koziara has moved for partial summary judgment that he has made a prima facie case of retaliation. Both motions will be denied because two issues are genuinely disputed: whether Koziara's injury report was made in good faith, and whether BNSF would have terminated Koziara for the theft if he had not reported the injury.

ALLEGATIONS OF FACT

Unless otherwise indicated, the following facts are material and undisputed.

BNSF is a railroad company, engaged in the business of transporting freight by rail. Koziara began working for BNSF more than 30 years ago, in the company's Maintenance of Way Department. By 2006, Koziara held the position of foreman and supervised a crew of workers who performed track maintenance.

On September 9, 2010, Koziara supervised a crew that was assigned to remove and reinstall crossing planks in East Winona, Wisconsin. Crossing planks (also referred to as crossing panels) are large pieces of timber—approximately 16 feet by 18 inches by 7 inches—used at railroad crossings to allow cars to drive over the tracks. Each plank weighs about 1,200 pounds. Crossing planks are secured to the track bed with large wood screws, or "lags." Typically, the lags are removed with a hydraulic tool before the plank is lifted to allow maintenance on the track. Koziara's crew, however, had difficulty removing the lags at the crossing on which they were working. George Zielke, one of Koziara's crewmembers, suggested using a front-end loader to pry the planks loose without removing the lags. Koziara approved the suggestion.

Zielke positioned the front-end loader on one side of the crossing and began prying up a plank while Koziara stood on the other side of the crossing, about five feet away. The plank abruptly came loose and struck Koziara in the left shin. [1] The impact did not knock Koziara down, and when he examined his leg, it was reddened in the area of impact, but Koziara did not think that he was seriously hurt. Later that same day, Koziara reported the incident to an assistant roadmaster, but he did not file a personal injury report or seek medical attention after going home that evening. The next day, a Friday, Koziara returned to work and completed his duties without incident.

Over the weekend of September 11 and 12, 2010, Koziara worked on his four-wheel ATV at his home. Sometime during the weekend, the plow on the front end of the ATV fell on his right toe, although the record does not indicate whether he was injured. On Monday, September 13, Koziara went to a previously scheduled doctor's appointment for an unrelated medical procedure. During

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   1

a physical examination, Koziara told his doctor about the workplace incident, and the doctor recommended an x-ray. Koziara received the results of the x-ray that same day, and learned that he had sustained a fractured tibia in his left leg.

**\*2** Once Koziara learned about the fracture, he called two of his co-workers, Bradly Underhill[2] and Tom Arentz, and informed them that he would have to miss work for as much as four weeks. Koziara told Underhill and Arentz, however, that the reason he would be out was because he injured his leg at home. In his deposition, Koziara explained that he decided to misrepresent the source of his injury because he was afraid of reporting a workplace injury to BNSF. After speaking with his co-workers, Koziara called Don Willings, a local chairman of the union to which Koziara belonged. Willings advised Koziara to report the injury as work-related and referred Koziara to Russ Ingebritson, a plaintiff's attorney affiliated with the union. Koziara called Ingebritson that same day, still Monday, September 13.

Shortly after speaking to Ingebritson, Koziara called Underhill and Arentz for a second time. During this round of phone calls, Koziara told his co-workers that he had been kidding about being injured at home, and that the real injury had happened at work. Koziara next called Roadmaster Michael Veitz to discuss the workplace accident. When Veitz asked why Koziara had waited five days to report the injury—in violation of BNSF's 72–hour reporting rule—Koziara explained that he had only just found out about the extent of his injuries that morning. Veitz instructed Koziara to complete a BNSF Personal Injury Report. Koziara complied, and submitted a report the following day.

BNSF accepted Koziara's injury report and paid for his medical services. Although Koziara was eventually disciplined for careless conduct during the events of September 9, BNSF never disciplined him for filing an untimely injury report. Per company policy, Veitz investigated the incident and performed a "reenactment" of the accident. Veitz invited several members of Koziara's crew to participate in the reenactment, including Zielke, Underhill, and two others. After completing the reenactment, Veitz prepared a report of how the injury occurred, in which he concluded that Koziara had moved into work zone when he was hit:

> The [front-end loader] operator was having a difficult time getting the panel to move, so he applied slightly more pressure from the forks. The foreman then moved onto the crossing when the panel came loose and hit the foreman in the leg.... [Koziara] moved into the work zone of the end loader and was struck in the leg when the lags holding the crossing panel gave way.

Dkt. 35, at 53.

Veitz's investigation led to what BNSF considered to be another potential cause of Koziara's injury. Veitz interviewed members of Koziara's crew and obtained written statements from them. Those crewmembers reported seeing Koziara jumping off or possibly falling from a trailer a week before the September 9 accident. They recounted seeing Koziara hopping around on one foot afterward, as if he were injured. During his deposition, Veitz testified that although he could not remember the details, the witnesses he interviewed about the earlier incident "seemed like [they] were getting nervous that something was not quite right, and [that Underhill] wanted to get it off his chest and tell me that possibly Mr. Koziara could also have got[ten] hurt at that location." Dkt. 30 (Veitz Dep. at 95:13–18).

**\*3** Veitz's investigation also led to evidence of other potential wrongdoing by Koziara. Veitz learned that on the day that Koziara had jumped or fallen from the trailer, he had given away 20 used railroad ties to a local farmer without BNSF's permission. Koziara and his crew loaded the ties onto a pair of trailers, one belonging to Koziara and the other to the farmer.[3] Veitz referred the possible theft to BNSF's Resource Protection Department, which in turn referred the issue to the Buffalo County Sheriff's Department. The sheriff's department investigated, but did not bring criminal charges.

BNSF continued with its own disciplinary process against Koziara, holding two investigatory hearings. Both hearings were presided over by Michael Heille, a BNSF supervisor who was not involved in the underlying incident and did not have any supervisory authority over Koziara. The first hearing addressed Koziara's September

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

9 injury, and the second addressed his alleged theft of the company's ties. After the first hearing, Heille recommended a 30–day suspension because Koziara violated two of the company's operating rules concerning general safety. Specifically, Heille concluded that Koziara had placed himself in harm's way by moving toward the front-end loader while it was removing a crossing plank, in violation of Rules 1.1.2 and 1.6, which require employees to be attentive and careful to avoid injury. [4]

BNSF also assigned Koziara "points," pursuant to a policy that was in effect at the time. The parties dispute the purpose of these points: Koziara contends that they were used to single out employees for increased supervision and testing; BNSF contends that they were used to select employees for a non-disciplinary, customized safety program. Although Koziara was never enrolled in this program (and was apparently fired before he could have felt the effects of his points), the parties' dispute is material to the question of whether assigning points constituted a retaliatory action.

Koziara's alleged theft was the subject of the second hearing, which occurred about a month after the first. Both Veitz and Zielke were called to testify. Koziara maintained that he had received permission from Veitz to give the ties to a local farmer, and that Zielke had overheard the conversation. Koziara admitted that he used BNSF equipment and personnel to load the ties onto the two trailers during company time, but testified that it was common practice for employees to take used ties. But Veitz testified that Koziara had never asked for permission, although he noted that earlier in the year, Koziara had asked about a different set of ties. Zielke confirmed that he was aware of Koziara's first conversation with Veitz, but denied overhearing any later discussion.

BNSF ultimately determined that Koziara had taken the ties without permission and that his theft warranted dismissal. In a termination letter dated November 9, 2010, BNSF dismissed Koziara "for theft and dishonest conduct [and] the unauthorized removal of BNSF property and the misuse of company equipment for personal use while on duty." Dkt. 35–24, at 4.

**\*4** Koziara filed a complaint with the U.S. Occupational Safety and Health Administration (OSHA). He alleged that BNSF had retaliated against him for reporting a work injury. OSHA dismissed the complaint, finding that "[a] preponderance of the evidence demonstrates that [Koziara]'s decision to remove rail planks with lags still intact led to his injury and subsequent suspension. A preponderance of the evidence failed to establish that [Koziara] had authority to remove scrap rail ties from [BNSF]'s property, resulting in his termination." Dkt. 36–18, at 4. Koziara appealed to an administrative law judge, and when no decision issued within 210 days, he pursued an action in this court. *See* 49 U.S.C. § 20109(d) (3). Koziara filed his complaint on December 4, 2013, alleging unlawful retaliation. The court has subject matter jurisdiction under 28 U.S.C. § 1331 because Koziara's cause of action arises under federal law.

## ANALYSIS

Both parties have moved for summary judgment. BNSF contends that it is entitled to judgment as a matter of law because Koziara cannot prove the elements of a retaliation claim under FRSA, or alternatively, because BNSF has affirmatively established that it would have taken the same disciplinary action regardless of whether Koziara reported the injury. Dkt. 20, at 1–2. Koziara has moved for partial summary judgment, contending that he has established the elements of a FRSA retaliation claim as a matter of law, and that the only question for trial is whether BNSF would have taken the same action regardless of his injury report. Dkt. 39, at 1.

Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To avoid summary judgment, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* A party may not simply rely on the allegations in its pleadings to create such a dispute, but must "demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [its] favor." *Johnson v. City of Fort Wayne, Ind.,* 91 F.3d 922, 931 (7th Cir.1996).

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.    3

The court cannot necessarily grant summary judgment for one party or the other simply because there are cross-motions. Instead, the court "look[s] to the burden of proof that each party would bear on an issue of trial; [and] then require[s] that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact" as to that question. *Santaella v. Metro. Life Ins. Co.,* 123 F.3d 456, 461 (7th Cir.1997). Here, Koziara will bear the burden of proving the elements of his retaliation claim, and BNSF will bear the burden of proving that it would have taken the same disciplinary actions regardless of Koziara's protected activity. The record contains factual disputes that preclude either party from receiving judgment as a matter of law, and so the court will deny both parties' motions. However, at trial, the undisputed elements of Koziara's prima facie case will be deemed to have been established.

**A. Retaliation claims under FRSA**

 **\*5** Congress passed FRSA in 1970 "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. After the law went into effect, however, Congress learned that railroad workers who complained about safety conditions were often retaliated against for their actions. *See Reed v. Norfolk S. Ry. Co.,* No. 12–cv–873, 2013 WL 1791694, at \*3 (N.D.Ill. Apr.26, 2013), *aff'd on other grounds,* 740 F.3d 420 (7th Cir.2014). Congress responded with an anti-retaliation provision which, as now amended, provides that:

> A railroad carrier engaged in interstate or foreign commerce ... may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done ... to notify, or attempt to notify, the railroad carrier or the Secretary of Transportation of a work-related personal injury or work-related illness of an employee.

§ 20109(a)(4). [5]

Retaliation claims under FRSA are governed by the rules and procedures set forth in 49 U.S.C. § 42121, part of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR–21). *See* § 20109(d)(2)(A). Thus, to establish a retaliation claim under FRSA, Koziara must show by a preponderance of the evidence that: (1) he engaged in protected activity; (2) his employer knew that he engaged in the protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor to the unfavorable action. *Harp v. Charter Commc'ns, Inc.,* 558 F.3d 722, 723 (7th Cir.2009). [6] If Koziara establishes his prima facie case, BNSF can avoid liability if it proves by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of Koziara's protected behavior. *Id.* As indicated above, the parties' motions for summary judgment address both components of this burden-shifting framework. Ultimately, however, there are disputes of fact material to both Koziara's prima facie case and to BNSF's defense.

**B. Koziara's prima facie case**
Neither party is entitled to summary judgment on the issue of whether Koziara can establish a prima facie case of retaliation. Koziara's task at this stage is not onerous. *See Araujo v. N.J. Transit Rail Operations, Inc.,* 708 F.3d 152, 159 (3d Cir.2013) ("It is worth emphasizing that the AIR–21 burden-shifting framework that is applicable to FRSA cases is much easier for a plaintiff to satisfy than the *McDonnell Douglas* standard."). BNSF does not dispute that Koziara has met the second and third elements of his prima facie case: Koziara's employer knew that he reported an injury, and Koziara suffered two adverse actions in the form of suspension and termination. However, BNSF disputes whether the points it assigned to Koziara constitute an adverse employment action because they were part of a now-defunct system, and because Koziara was never enrolled in the safety program associated with that system. More important, BNSF disputes whether Koziara satisfies the "good faith" requirement of the first element, and whether his injury report was a contributing factor to the adverse employment actions he suffered. Koziara responds that he has established all four elements. The court discusses all four elements in turn.

**1. Protected activity**

**\*6** BNSF argues that Koziara cannot meet the first element of his prima facie case because his protected activity was not undertaken in good faith. FRSA only protects an employee's "*good faith* act done ... to notify, or attempt to notify, the railroad carrier or the Secretary of Transportation of a work-related personal injury." § 20109(a)(4) (emphasis added). BNSF identifies two reasons why the court should conclude, as a matter of law, that Koziara's injury report was not made in good faith: (1) Koziara initially lied about his injury to his co-workers, and (2) the record suggests that Koziara may have been injured at some other time. The company asserts that these reasons preclude Koziara from establishing his prima facie case. BNSF's evidence is sufficient to create a dispute of fact on the issue, but the company is not entitled to judgment as a matter of law that Koziara did not report his injury in good faith.

The parties do not direct the court to any binding precedent that explicitly discusses the good faith requirement for FRSA retaliation claims. Other district courts that have considered the question, however, have held that "the relevant inquiry remains whether, *at the time he reported his injury* to Defendant, Plaintiff genuinely believed the injury he was reporting was work-related." *Ray v. Union Pac. R.R. Co.,* 971 F.Supp.2d 869, 884 (S.D.Iowa 2013) (original emphasis); *see also Davis v. Union Pac. R.R. Co.,* No. 12–cv–2738, 2014 WL 3499228, at \*7 (W.D.La. July 14, 2014). ("[W]hen a plaintiff brings a claim under the FRSA alleging he was retaliated against for reporting a work-related injury, [he must have] actually believed, at the time he reported the injury, that it was work-related."). This rule emphasizes the subjective component of good faith, but this component makes up only half of the inquiry.

The Seventh Circuit—albeit, in the context of a different whistleblower statute—has held that good faith requires objective reasonableness. *Lang v. Nw. Univ.,* 472 F.3d 493, 495 (7th Cir.2006) ("What Lang actually believed is irrelevant ... The right question is whether her belief had a reasonable objective basis..... [The False Claims Act] is not unique in this respect. Other anti-retaliation statutes ... also are limited to the protection of objectively reasonable reports and do not prevent employers from discharging workers who enter fantastic realms."); *see also Gutierrez v. Norfolk & S. Ry. Co.,* No. 12–cv–2396, 2014 WL 551684, at \*4 (N.D.Ill. Feb.12, 2014) ("Under the FRSA, the employee must 'reasonably' believe in the unlawfulness

of the employer's actions which he is reporting.... In addition, the 'reasonableness must be scrutinized under both a subjective and objective standard.' ") (internal citations and quotation marks omitted). Thus, to establish his prima facie case, Koziara must identify evidence that: (1) he subjectively believed his reported injury was work-related; and (2) his belief was objectively reasonable. On these questions, there are factual disputes that preclude either party from being entitled to summary judgment.

**\*7** The record contains evidence of Koziara's subjective belief that his injury was work-related, and evidence of the objective reasonableness of that belief. For example, BNSF does not dispute the basic nature of the accident (*i.e.,* that Koziara was struck by a 1,200–pound plank) or that a doctor diagnosed Koziara with a fractured tibia. The injury report that Koziara submitted to BNSF is also evidence of his subjective belief; he described his injury as a fractured tibia and he identified the incidents of September 9 as the cause. From this evidence, a reasonable jury could conclude that Koziara reported his injury in good faith.

But a jury could also reach the opposite conclusion because there is other evidence in the record. Koziara admits that he initially did not think that the injury was that bad, and he was able to work the day after the accident. Moreover, Koziara admits that in his first set of phone calls, he told his co-workers that he would miss work because of an accident at home. When Veitz investigated the injury report, members of Koziara's crew alluded to an earlier workplace incident where Koziara fell or jumped off of a trailer and then hopped around on one foot as if injured. BNSF contends that the earlier accident might have been the real cause of Koziara's injury, and that a jury could therefore be skeptical of how sincerely he believed the later accident caused his fractured tibia. [7] There is also evidence in the record that on October 19, 2010, Koziara had a phone conversation with a Buffalo County Sherriff's Officer and stated that he was "currently off of work as he hurt himself on the day of [the alleged theft]." Dkt. 36–8, at 8. Koziara's initial evaluation of his leg, the misstatements he made to others, and the possible alternative cause of his injury all undercut his testimony that he subjectively believed the source and severity of his injury when he reported it to BNSF. A jury could view this evidence, even in light of a diagnosed fractured tibia, and reasonably conclude that Koziara did not report his injury in good faith. Thus, neither party is entitled to summary

judgment on the first element of Koziara's prima facie case.

### 2. BNSF knew of Koziara's report

BNSF does not dispute that it knew about Koziara's injury report at the time it suspended and later terminated him. Dkt. 56, at 7, and Dkt. 57, at 28–29. Koziara has established the second element of his prima facie case.

### 3. Adverse personnel action

BNSF does not dispute that Koziara's suspension and termination qualify as adverse employment actions. Koziara can therefore proceed with his prima facie case using these two actions. But BNSF argues that the points it assessed against Koziara do not constitute an adverse action. It is not clear to the court why, in light of the two undisputed adverse actions, the points matter in this case. Nevertheless, the court will consider the issue.

The company explains that: (1) the safety program associated with the points was not part of BNSF's "disciplinary process;" (2) Koziara did not know about the points until years after his termination; and (3) Koziara did not identify the points as an adverse action in his filing with OSHA. Dkt. 60, at 5 n. 2. Koziara responds that BNSF's points policy *per se* violates FRSA "because it distinguishes between employees who engage in protected activity and employees who do not." Dkt. 39, at 7. Koziara further contends that assigning points constitutes an adverse action because it discourages employees from reporting safety injuries to BNSF. Koziara's reading of the points policy lacks factual support, as does his assertion that the points materially altered the terms of employment at BNSF.

**\*8** The Supreme Court defines an "adverse action," as a consequence "that a reasonable employee would have found [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (internal citations and quotation marks omitted). Courts have applied this definition in whistleblower cases. *See, e.g., Halliburton, Inc. v. Admin. Review Bd.,* 771 F.3d 254, 260 (5th Cir.2014) ("[An] antiretaliation claim requires an 'adverse action' that meets *Burlington's* definition of material adversity, *i.e.,* an action harmful enough that it well

might have dissuaded a reasonable worker from engaging in statutorily protected whistleblowing."); *Schlicksup v. Caterpillar, Inc.,* No. 09–cv–1208, 2010 WL 2774480, at \*3 (C.D.Ill. July 13, 2010) ("To determine whether an employee suffered an 'unfavorable personnel action,' Courts apply the adverse employment standard used in Title VII retaliation claims.") (internal citations omitted). Here, receiving points and increasing the likelihood of enrollment in a safety program falls short of the standard for an adverse action because Koziara has not introduced evidence that BNSF used the points in making disciplinary decisions or that participation in the company's safety program was such an onerous burden as to dissuade employees from reporting injuries.

Koziara is incorrect to assert that the policy *per se* violates FRSA. The policy assigns points for injuries and safety violations. *See* Dkt. 40–16, at 2. But the policy does not impose discipline for accumulating points, and a BNSF supervisor testified that under the policy, if an employee accumulated a certain number of points, the employee "would be involved in a program with their supervisor requiring them to sit down and develop a safety process to ensure the safety going forward of this employee ." Dkt. 32 (Rankin Dep. 89:3–9). The supervisor further testified that the points had "nothing to do with the discipline process." *Id.* (Rankin Dep. 102:19–20). Koziara does not direct the court to evidence that contradicts the supervisor's summary of the points program, nor does Koziara explain how being forced to participate in the safety program would materially alter the terms of employment at BNSF, such that a reasonable employee would be dissuaded from reporting injuries.

Instead, Koziara selectively quotes from Heille's deposition testimony to argue that points were a factor in his disciplinary decisions. The argument is unpersuasive. Heille testified that, per standard instructions, he included a copy of Koziara's injury record in the disciplinary recommendation that he submitted to his superiors. The record presumably listed the points that Koziara had accumulated while at BNSF. When asked whether he looked at the injury record, Heille responded that he "may have" because BNSF had a policy that allowed a shorter probationary period after a rules infraction for employees who had at least five years of injury-free and disciplinary-free service. Dkt. 48 (Heille Dep. 85:22). Koziara does not suggest, however, that an employee's number of points determines the length of the probationary period. Instead,

the record establishes that the points were designed to identify and assist employees with unsafe behaviors. Koziara has failed to adduce other evidence which would enable a reasonable jury to conclude that receiving points would dissuade BNSF employees from reporting injuries, and so Koziara cannot use the points as an adverse action in making his prima facie case; he can rely only on his suspension and termination.

#### 4. Contributing factor

**\*9** For the final element in his prima facie case, Koziara must show a causal connection between his injury report and BNSF's adverse actions. Congress purposefully selected a low standard for causation in FRSA claims because it "recognized that employees in the transportation industry are often best able to detect safety violations and yet, because they may be threatened with discharge for cooperating with enforcement agencies, they need express protection against retaliation for reporting these violations." *Formella v. U.S. Dep't of Labor,* 628 F.3d 381, 388–89 (7th Cir.2010). Thus, Koziara does not need to show that his report was the "but-for" cause of BNSF's adverse actions, only that it was a "contributing factor." "[A] 'contributing factor' is something less than a substantial or motivating one;" instead, the term means " 'any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision.' " *Addis v. Dep't of Labor,* 575 F.3d 688, 691 (7th Cir.2009) (quoting *Marano v. Dep't of Justice,* 2 F.3d 1137, 1140 (Fed.Cir.1993)). Under FRSA's "contributing factor" standard for causation, "a prima facie case does not require that the employee conclusively demonstrate the employer's retaliatory motive.... But the contributing factor that an employee must prove is intentional retaliation prompted by the employee engaging in protected activity." *Kuduk v. BNSF Ry. Co.,* 768 F.3d 786, 791 (8th Cir.2014) (internal citations and quotation marks omitted). Koziara has cleared this hurdle because the undisputed evidence shows that his injury report triggered the investigation which led to both his suspension and termination.

BNSF does not dispute that it suspended Koziara because of his negligence and inattentiveness in the accident that led to his injury—the very accident that Koziara described in his report to the company. BNSF's own proposed facts tell a straightforward story: Koziara was injured and he reported his injury; BNSF investigated and held a hearing to discuss the incident; and then, BNSF suspended

Koziara. *See* Dkt. 19, ¶¶ 79, 85–91, 118–19. Koziara's report set the subsequent investigation and disciplinary process in motion, and this undisputed chain of events is sufficient evidence that Koziara's report contributed to his suspension. *See Smith–Bunge v. Wis. Cent., Ltd.,* No. 13–cv–2736, 2014 WL 5023471, at \*7 (D.Minn. Oct.8, 2014) (employee's injury report was a "contributing factor" in a railroad's decision to suspend him for failing to timely report injuries).

For the same reasons, Koziara has presented sufficient evidence from which a jury could conclude that his injury report was a contributing factor to his termination. Koziara's injury report led Veitz to investigate, and it was during that investigation that BNSF learned about Koziara's alleged theft. Again, BNSF's own proposed facts confirm that Koziara's injury report was the triggering event for the company's investigation and resulting discipline. *See* Dkt. 19, ¶ 94 ("*During his investigation* of the events of September 9, 2010, Roadmaster Veitz learned of [Koziara] removing about ties [sic] and providing them away to a local farmer.") (emphasis added).

**\*10** Koziara's termination is less entwined with his injury report, but a contributing factor is *any* factor that *tends* to affect the outcome of the decision. *Addis,* 575 F.3d at 691. For example, in *Ray,* another district court considered a similar "chain of events" approach to causation under FRSA. 971 F.Supp.2d at 888. *Ray* involved a railroad worker who lied to his supervisor about whether his knee injuries were work-related. *Id.* at 872. When the worker finally reported his injuries as work-related, he was fired for dishonesty and failure to timely report an injury. *Id.* With regard to causation, the court found that "if Plaintiff had not reported the alleged work-related injury, Defendant would not have undertaken an investigation into either the honesty of Plaintiff's statement to [his supervisor] in October 2009 or the timeliness of Plaintiff's injury report, and Plaintiff would not have been terminated." *Id.* at 888.[8] Koziara, like the worker in *Ray,* can satisfy the final element of his prima facie case because his injury report was the first link in a chain of events that culminated in BNSF's termination decision.

BNSF essentially tries to escape this result by listing the horribles that will follow if railroad workers can construct prima facie retaliation claims using a "chain

of events" theory of causation. According to BNSF, Koziara's approach to FRSA would leave the company unable to ever discipline any employee who reports an injury. Dkt. 56, at 8–10, and Dkt. 60, at 5–6. Specifically, BNSF fears that "employees [will file] preemptive personal injury reports in the face of impending discipline for unrelated performance issues," and use the reports "as a shield against discipline for a rules violation." Dkt. 56, at 9. The argument is unpersuasive because BNSF conflates the two separate aspects of FRSA's burden-shifting framework.

Permitting Koziara to establish causation through a "chain of events" theory does not, as BNSF contends, prevent the company from ever disciplining its employees. Nor does it impose "strict liability" on a railroad carrier any time it disciplines an employee who filed an incident report. Under § 42121(b)(2)(B)(ii), which FRSA incorporates, employers are not liable for retaliation if they "demonstrate[ ], by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of [the employee's protected] behavior." Thus, when an employee establishes a prima facie case of retaliation, he does not automatically win his case, as BNSF apparently fears; the burden simply shifts to the employer to explain why its actions were lawful. *See Harp,* 558 F.3d at 723, 726. Although BNSF is correct that the Seventh Circuit views "temporal proximity between an employee's protected activity and an adverse employment action [as] rarely sufficient to show that the former caused the latter," *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 635 (7th Cir.2011), Koziara offers more than mere temporal proximity in this case. His injury report *initiated* the events that led to his discipline, and was therefore a contributing factor to the adverse actions that he suffered.

**\*11** BNSF may, understandably, disagree with the low causation requirements for railroad employees who allege retaliation, but the legislative histories of FRSA and other whistleblower statutes confirm that Congress crafted these requirements with a purpose in mind. Koziara has produced evidence by which a reasonable jury would have to conclude that his injury report was a contributing factor in BNSF's disciplinary decisions, and he is therefore entitled to summary judgment that he has met the fourth element of his prima facie case.

### C. BNSF's defense to liability

BNSF has moved, in the alternative, for summary judgment on its defense against Koziara's claim. Specifically, BNSF contends that even if Koziara can prove his prima facie case, it would have taken the same disciplinary action regardless of whether Koziara had reported his injury. If BNSF can prove its contention by clear and convincing evidence, then Koziara's retaliation claim fails as a matter of law. *See* § 42121(b)(2)(B)(ii); *Harp,* 558 F.3d at 723, 726.

At this stage, "the employer must show that 'the truth of its factual contentions [is] highly probable.' " *Araujo,* 708 F.3d at 159. BNSF faces a "steep burden," *id.* at 162, because Koziara is the non-moving party, and so the court construes all facts in his favor. But to withstand summary judgment, Koziara must create a genuine dispute of fact as to whether his injury report motivated BNSF to retaliate against him. *See Kuduk,* 768 F.3d at 791 ("FRSA provides that a rail carrier may not discharge or in any other way *discriminate* against an employee for engaging in protected activity.... As the [Supreme] Court explained in *Staub,* the essence of this intentional tort is 'discriminatory animus.' ") (original emphasis) (internal citations and quotation marks omitted). The same "chain of events" theory that Koziara advanced with regard to causation will not, by itself, suffice at this stage in the analysis.

BNSF states that it suspended, and later terminated, Koziara because he violated workplace rules. Even if the company's justification is facially legitimate, BNSF cannot obtain summary judgment if the record suggests that discriminatory animus crept into its disciplinary decisions. *Araujo,* 708 F.3d at 163 ("While the facts in the record may show that [the employee] was technically in violation of written rules, they do not shed any light on whether [the company's] decision to file disciplinary charges was retaliatory."). Koziara can therefore withstand summary judgment by identifying evidence that BNSF selectively enforced its rules, investigated him for the purpose of manufacturing a rule violation, or otherwise discriminated against him in retaliation for his injury report.

Koziara contends that BNSF has selectively enforced its rules against him, and the record contains disputes of fact on this issue. With regard to Koziara's suspension, BNSF admits that it never disciplined the co-worker who was standing next to Koziara when he was injured on September 9. Dkt. 57, at 16. Although the co-worker was

apparently uninjured—and so did not file an injury report—he was standing just as close to the front-end loader as Koziara was, and so he presumably violated the same rules. BNSF asserts that its "basis for finding that Koziara allegedly violated Rule 1.1.2 and Rule 1.6 was that he was standing too close to the front-end loader," *id.,* so the fact that the company did not discipline another employee who engaged in nearly identical conduct undercuts the assertion that BNSF would have suspended Koziara regardless of whether he reported his injury. BNSF notes that Koziara, unlike the other employee, was a foreman, but the company does not otherwise defend its uneven treatment. Dkt. 60, at 7. A jury could accept BNSF's response, but could just as easily reject it, and find that discriminatory animus motivated the company's actions.

 **\*12** Similar evidence of inconsistent application of the rules precludes BNSF from showing that it would have terminated Koziara for his theft regardless of his injury report. The parties disagree about whether BNSF would have ever learned of the alleged theft if not for the report, but their dispute is largely irrelevant at this stage of the case. At the second step of FRSA's burden-shifting framework, the question is: assuming BNSF had learned of the alleged violation, would it have taken the same action in the absence of Koziara's injury report? *See Ray,* 971 F.Supp.2d at 888–89 (recognizing that there would not have been an investigation or discipline without the plaintiff's injury report, but nevertheless evaluating whether the defendant consistently applied its policies).

If BNSF had supported its motion by presenting evidence that employee theft inevitably results in severe discipline, the company might have been entitled to summary judgment. But BNSF has only identified one employee who stole scrap metal and was terminated. In contrast, Koziara has identified evidence that suggests that BNSF employees often took, or saw others take, used ties for personal use. Specifically, Koziara points to exhibits that he submitted during his disciplinary hearings and to deposition testimony from witnesses in this case. According to the testimony, many employees never asked BNSF's permission because they did not think they needed it, and others apparently took company property without consequences. *See, e.g.,* Dkt. 24 (Mitchell Dep. at 31:19–39:6) (explaining that it was common practice to take ties with permission from contractors and that BNSF supervisors did not need to give permission because the ties were not BNSF property); Dkt. 25 (Underhill Dep.

at 24:19–25:4) (explaining that BNSF employees generally thought it was okay to take ties and that all of the "30 year" people had done it); Dkt. 36–4, at 87 (hearing exhibit explaining that employees and private citizens would take ties without permission).

In light of Koziara's evidence that other instances of theft went unpunished, and that BNSF did not always aggressively investigate employees who took ties without the company's permission, a jury could conclude that BNSF selectively enforced its rules against Koziara, or investigated him just to find a reason to terminate him. Either would be evidence of discriminatory animus, and so BNSF has not met its high burden of showing by clear and convincing evidence that it would have terminated Koziara even if he had not reported an injury. *Compare Ray,* 971 F.Supp.2d at 891 (railroad failed to meet its burden when the evidence "demonstrate[d] that Defendant does not always permanently dismiss an employee for a dishonesty violation"), *with Kuduk v. BNSF Ry. Co.,* 980 F.Supp.2d 1092, 1102 (D.Minn.2013), *aff'd,* 768 F.3d 786 (BNSF met its burden when "[a] review of BNSF's past practices involving similarly situated employees indicates that within the six month period following Plaintiff's June 9, 2010 violation, two other employees were dismissed for committing the same serious rule violation"). BNSF is not entitled to summary judgment on its defense.

 **\*13** Although Koziara did not move for summary judgment on BNSF's defense to liability, he informed the company that if *it* moved for summary judgment on the issue, then he would ask the court to *sua sponte* grant summary judgment in his favor. Dkt. 54–1, at 2. Koziara's brief in opposition to BNSF's motion makes this very request. Dkt. 52, at 16. Even if Koziara had properly briefed and presented the issue, he would not be entitled to summary judgment for largely the same reasons that BNSF is not entitled to summary judgment: there are genuine disputes of fact as to whether the company would have taken the same disciplinary action regardless of Koziara's injury report.

### D. Conclusion

To briefly summarize how the case now stands:

The parties filed cross-motions for summary judgment on the question of whether Koziara has proven his prima facie case. There is no dispute that: (1) BNSF knew about

Koziara's protected conduct; (2) BNSF took two adverse actions against Koziara (suspension and termination); and (3) Koziara's protected conduct was a contributory factor in these actions. Koziara is entitled to summary judgment on these elements. However, there is a genuine dispute as to whether Koziara reported his injury in good faith. Koziara's motion will therefore be denied, as it pertains to this element, and BNSF's motion will be denied in full.

BNSF moved for summary judgment on the question of whether it would have taken the same adverse actions against Koziara despite his injury report. There is a genuine dispute of fact on this issue, and BNSF's motion will therefore be denied.

ORDER

IT IS ORDERED that:

1. Defendant BNSF Railway Company's motion for summary judgment, Dkt. 18, is DENIED.

2. Plaintiff Michael Koziara's motion for summary judgment, Dkt. 37, is DENIED in substantial part, consistent with the opinion above.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 137272

Footnotes

1    The parties dispute whether Koziara had moved toward the plank while Zielke was prying it up, but the details of whether Koziara was careless are not material to this case.

2    There is some confusion about when Koziara called Underhill. In his proposed findings of fact, Koziara stated that the call occurred on September 12, Dkt. 38, ¶ 39, and BNSF did not dispute the fact, Dkt. 57, at 10. In its own proposed findings of fact, however, BNSF stated that the call occurred on September 13, Dkt. 19, ¶¶ 59–60, and Koziara did not dispute the date of the call, Dkt. 53, at 15. Yet, in their respective replies, the parties have swapped positions; BNSF now contends that the call occurred on September 12, and Koziara contends that the call occurred the day after. The exact date of the call is largely irrelevant because it is not, as BNSF argues, dispositive evidence of what Koziara believed at the time he reported his injury to the company.

3    The parties dispute who owned the 20 ties at that time Koziara took them. BNSF contends that the ties were company property and that Koziara stole them. Koziara contends that he had permission to take the ties or, alternatively, that they were the property of a third-party contractor. The dispute is marginally relevant because this court does not need to decide whether BNSF was correct to conclude that Koziara stole company property.

4    Rule 1.1.2 provides that "[e]mployees must be careful to prevent injuring themselves or others. They must be alert and attentive when performing their duties and plan their work to avoid injury." Dkt. 36–13, at 6. Rule 1.6 provides that "[e]mployees must not be ... [c]areless of the safety of themselves or others ." *Id.* at 11.

5    The parties agree that BNSF is a railroad carrier engaged in interstate commerce, and that Koziara qualified as an employee during the relevant time period. Dkt. 61, at 2.

6    The parties refer to these four elements as Koziara's "prima facie case," and the court adopts their terminology for efficiency's sake.

7    BNSF also contends that Koziara may have injured himself at home, while working on his ATV. The record does not support this contention because the ATV plow fell on Koziara's *right* toe, but Koziara fractured and reported an injury to his *left* leg.

8    BNSF correctly observes that *Ray* must yield to the Eighth Circuit's decision in *Kuduk.* Dkt. 56, at 5 n. 5. But *Kuduk* simply confirmed that "a contributing factor is 'any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision,' " and explained that "more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." 768 F.3d at 791–92. BNSF does not explain how *Kuduk* invalidates *Ray's* discussion of causation.

**End of Document**       © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 4772411
Only the Westlaw citation is currently available.
United States District Court,
D. Minnesota.

Jonathan HALL, Plaintiff,

v.

SOO LINE RAILROAD COMPANY, d/
b/a Canadian Pacific Railway, Defendant.

Civ. No. 17–2120 (PAM/SER)
|
Signed October 19, 2017
|
Filed 10/20/2017

**Attorneys and Law Firms**

Thomas W. Fuller, Hunegs LeNeave & Kvas, Wayzata, MN, for Plaintiff.

Margaret M. Bauer Reyes, Tracey Holmes Donesky, Stinson Leonard Street LLP, Minneapolis, MN, for Defendant.

**Opinion**

### MEMORANDUM AND ORDER

Paul A. Magnuson, United States District Court Judge

**\*1** This matter is before the Court on Defendant's Motion to Dismiss. For the following reasons, the Motion is denied without prejudice.

### BACKGROUND

Plaintiff Jonathan Hall worked as a conductor at Defendant Canadian Pacific Railway ("CP")[1] for slightly more than one year. (Compl. (Docket No. 1) ¶¶ 12–13.) On October 3, 2015, Hall injured his back while working. (Id. ¶ 16.) The parties vehemently dispute the injury—both how it occurred and how serious it was. It is undisputed, however, that Hall did not report the injury to his supervisor on that day.

Hall went to the emergency room the following day, October 4, 2015. (Id. ¶ 18.) He was prescribed pain medication and the physician told him not to take certain of the medicines while working. (Donesky Decl. (Docket No. 11) Tab A (Hall Dep.) at 164–66; see also Fuller Aff. (Docket No. 14) Ex. 10 at 8 ("[The doctor] told me to only use those [pills] on my days off.").) Hall did not report the injury to CP that day, either, and in fact he continued working. (Compl. ¶ 23.)

On October 15, Hall went to the emergency room again. (Id. ¶ 25.) The doctor prescribed additional medication and told Hall not to work temporarily. The next day, Hall visited a general practitioner, who gave Hall workers' compensation paperwork. Hall contends that he tried to call his supervisor on October 15 but did not reach him; according to Hall, he slipped the workers compensation paperwork under his supervisor's door on October 16 after his doctor's visit. (Id. ¶¶ 28–29.) Hall's supervisor, Chris Danula, did not receive the papers until October 18. (Id. ¶ 30.) Danula called Hall that day; the call was recorded and a transcription is in the record. (Fuller Aff. Ex. 10.) During the call, Hall described the injury and his medical treatment; his description of the injury conflicts with the Complaint's depiction of the injury as very minor.

CP's rules require its employees to report any injury sustained on the job "immediately." (Compl. ¶ 37 (quoting CP's Gen. Code of Operating Rules ("GCOR") 1.2.5).) Because CP did not think that Hall reported his injury immediately after he suffered it, CP scheduled a disciplinary hearing as the parties' Collective Bargaining Agreement required. (Fuller Aff. Ex. 13.) The hearing was held on November 3, 2015; Hall appeared, was represented by his union representative, testified, examined witnesses, and presented evidence. (Fuller Aff. Ex. 17; Donesky Decl. Tab Q.)[2] After the hearing, the hearing officer determined that Hall had violated GCOR 1.2.5. (Donesky Decl. Tab BB.) Another reviewer then examined the hearing officer's conclusions and the record. That reviewer determined that Hall had violated GCOR 1.2.5 and that, in light of Hall's previous disciplinary history and his short employment with CP, the appropriate punishment was dismissal. (Id.) After several other reviewers concurred in the recommendation, CP terminated Hall's employment on November 17, 2015. (Fuller Aff. Ex. 15.)

**\*2** Hall appealed his termination to CP, and that appeal was denied. Hall also filed for arbitration under the Railway Labor Act, which remains pending.

Case: 1:17-cv-00589-WCG Filed: 03/08/18 Page 11 of 31 Document 33-42

After the disciplinary hearing but before the decision issued, Hall also filed a complaint under the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109, with the Occupational Safety and Health Administration ("OSHA"). (Donesky Decl. Tab JJ.) OSHA investigated, and on August 8, 2016, it dismissed Hall's complaint because it found that the complaint was unsupported by reasonable cause. (Id. Tab KK.) Hall objected to the dismissal and sought a de novo hearing before an Administrative Law Judge ("ALJ"), as provided in the regulations. (Id. Tab LL.) The parties then engaged in extensive discovery, including expert discovery and multiple depositions. (See Fuller Aff. Exs. 18–20 (depositions for ALJ proceeding).)

In May 2017, Hall moved the ALJ for a partial summary decision. [3] At about the same time, CP asked the ALJ to exclude two of Hall's expert witnesses who had been disclosed after the discovery deadline passed. (Donesky Decl. Tab QQ.) On Thursday, June 15, 2017, the ALJ granted CP's motion to exclude the expert witnesses. (Id. Tab RR.) On Friday, June 16, 2017, the ALJ denied Hall's motion for partial summary determination. (Id. Tab SS.) The hearing in front of the ALJ was scheduled for Monday, June 26. But on Monday, June 19, Hall instead filed this federal lawsuit, claiming that CP violated the FRSA by retaliating against him for reporting his work-related injury.

CP now moves to dismiss. CP first asks that the Court find that Hall has waived his right to file a federal lawsuit by litigating the propriety of his termination before the ALJ. CP also contends that Hall has failed to state a claim on which relief can be granted, or in the alternative that CP is entitled to summary judgment. CP argues that pre-discovery summary judgment is appropriate because the record before the ALJ was ostensibly fully developed.

## DISCUSSION

### A. Waiver

The FRSA provides that a railroad employee challenging an employment action must pursue administrative remedies through the Department of Labor, which includes OSHA. 49 U.S.C. § 20109(d). Although this remedy is initially exclusive, the FRSA also provides a mechanism for the employee to bring a federal lawsuit:

> [I]f the Secretary of Labor has not issued a final decision within 210 days after the filing of the complaint and if the delay is not due to the bad faith of the employee, the employee may bring an original action at law or equity for de novo review in the appropriate district court of the United States ....

Id. § 20109(d)(3). An employee who receives a final decision on his administrative complaint, however, may only seek review of that decision in the Court of Appeals. Id. § 20109(d)(4).

CP asks the Court to determine that an employee who participates in the administrative review process, including engaging in discovery and motion practice, at some point waives his right to bring a lawsuit. CP points to the expenses it incurred defending the administrative action, and the prejudice it will suffer from the now two-year time period between Hall's injury and discovery in this matter. According to CP, equitable principles should bar Hall from pursuing this litigation.

**\*3** But no federal case has held that the statutory right to bring a federal suit is subject to waiver. As another Judge in this District noted, although it is

> extremely wasteful to permit a plaintiff to do what [the railroad employee] has done—that is, to pursue an administrative process almost to its conclusion ... and then start all over again in federal court[,] ... based on the plain language of § 20109(d)(3) and the weight of the case law interpreting that provision, the Court has no choice but to hold that [the employee] did not waive his right to bring this lawsuit.

Gunderson v. BNSF Ry. Co., 29 F. Supp. 3d 1259, 1262 (D. Minn. 2014) (Schiltz, J.). The plaintiff in Gunderson litigated before the ALJ for four years, including participating in a six-day evidentiary hearing and receiving an unfavorable ruling from the ALJ, before filing a lawsuit during the 10–day period between that

Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 12 of 31   Document 33-42

ruling and the date the ALJ's decision became a final order under 29 C.F.R. § 1982.114(a). Gunderson v. BNSF Ry. Co., 850 F.3d 962, 967 (2017).

CP relies solely on the Eighth Circuit's opinion in Gunderson for its argument here. See id. But Gunderson did not hold that a railroad employee can waive his federal-court rights in some circumstances. Rather, the court merely stated that it disagreed with Gunderson's argument that an employee could never waive his right to bring a lawsuit. Id. at 972. Noting that the Supreme Court has in general presumed the applicability of waiver, and that the FRSA allows for equitable remedies, "it is likely that common law principles of laches may apply to cut off an employee's right to sue, or at least to seek equitable relief, some time after the § 20109(d)(3) action accrues." Id. Thus the court did not definitively determine that waiver was appropriate in that case or any other, instead reserving the question for another day because BNSF had not developed the record on waiver before the district court. Id. Indeed, one member of the panel did not join the opinion's discussion of the waiver issue because it was "pure dicta, on an issue raised sua sponte." Id. (Colloton, J., concurring).

CP has attempted to do here what BNSF failed to do in Gunderson: develop a record of delay and prejudice. See id. (quoting Brown–Mitchell v. Kan. City Power & Light Co., 267 F.3d 825, 827 (8th Cir. 2001)). And although CP's argument is attractive, this is not the appropriate case to determine that a railroad employee can waive the right to file a lawsuit. Hall actively pursued his administrative remedies for less than a year, from the OSHA decision in August 2016 until mid-June 2017. While it is undoubtedly frustrating to spend time and money defending an administrative action, all of the discovery the parties engaged in before the ALJ hearing will be applicable to this proceeding. The discovery process here will therefore be short, reducing costs and the consequent prejudice to CP considerably. CP's Motion on this point is denied.

**B. Motion to Dismiss/Summary Judgment**
CP also contends that the Court can rely solely on the record before the ALJ to determine that Hall's dismissal was not in retaliation for engaging in protected activity under the FRSA.

*4 The FRSA prohibits rail carriers from retaliating against employees who engage in safety-related protected activities. 49 U.S.C. § 20109. As relevant here, the FRSA provides that a rail carrier "may not discharge ... or in any other way discriminate against" an employee for, lawfully and in good faith, reporting a workplace injury. Id. § 20109(a)(4). To prove unlawful retaliation, the employee must show that (1) he engaged in a protected activity, (2) the rail carrier knew that he engaged in that activity, (3) he suffered an adverse employment action, and (4) the circumstances raise an inference that the protected activity was a "contributing factor" in the adverse employment action. See id. § 20109(d)(2)(A)(i); 29 C.F.R. § 1982.104(e)(2). Even if the employee makes that showing, the rail carrier may avoid liability by furnishing "clear and convincing evidence" that it would have taken the same adverse employment action regardless of any protected activity. 29 C.F.R. § 1982.104(e)(4).

CP contends that the "contributing factor" requirement means more than "but-for" causation. But while the employee "must demonstrate more than a mere factual connection between his injury report and his discipline," he need not "conclusively demonstrate [the company's] retaliatory motive to establish a prima facie case." Heim v. BNSF Ry. Co., 849 F.3d 723, 727 (8th Cir. 2017). Rather, the employee "must demonstrate that [the company's] discipline was, at least in part, intentional retaliation prompted by his injury report." Id. Even the case CP relies on most heavily describes the "contributing factor" standard as "lenient." Kuduk v. BNSF Ry. Co., 768 F.3d 786, 792 (8th Cir. 2014).

FRSA requires an employee to show that the employee intended to retaliate against him because he reported an injury. But an employee need not demonstrate that retaliation was the only motive, and in any event the existence of a retaliatory motive is necessarily record-specific. See BNSF Ry. Co. v. U.S. Dep't of Labor Admin. Review Bd., 867 F.3d 942, 947 (8th Cir. 2017) ("[I]ntentional discrimination may be inferred 'from evidence the falsity of the employer's explanation.") (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000)).

In this case, CP's rules require that an injured employee file an injury report "immediately" and thus any discipline for violating this rule will almost by definition be caused by the filing of an injury report. There is therefore

no question that Halls' termination was caused by the filing of his injury report. The question is whether CP retaliated against him for reporting that he was injured, or legitimately disciplined him for failing to comply with CP's rules. All of these issues depend on an evaluation of the facts in the record, and Hall insists that the record is not as fully developed as CP contends. For example, in this proceeding Hall will likely be allowed to present expert testimony, which is missing from the administrative record due to the ALJ's determination that Hall's expert designations were untimely. If Hall's evidence is insufficient as a matter of law to establish his prima facie case, CP can move for summary judgment at that time.

The determination that summary judgment is premature is not, however, an invitation for the parties to engage in extensive discovery in this matter. Both parties have taken multiple depositions and engaged in document production. There is no need to reinvent the wheel in this proceeding. The Court expects any scheduling order to reflect a greatly truncated discovery schedule, so that this dispute, which has already been litigated for two years, can be resolved.

## CONCLUSION

CP has not established that Hall waived his right to bring this lawsuit, nor has it established that summary judgment on his FRSA is appropriate at this stage of the litigation. Accordingly, **IT IS HEREBY ORDERED that** the Motion to Dismiss and/or for Summary Judgment (Docket No. 7) is **DENIED without prejudice**.

### All Citations

Slip Copy, 2017 WL 4772411

Footnotes

1    Plaintiff's actual employer was Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific Railway, not Defendant Soo Line Railroad Company.

2    Plaintiff's attorney's affidavit contains only the first two pages of the hearing transcript. Defendant's attorney's declaration contains the entire transcript.

3    Neither party included this motion in the supporting documents provided to the Court.

**End of Document**                                                        © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.                4

2015 WL 10889991
Only the Westlaw citation is currently available.
United States District Court,
D. Idaho.

Thomas E. Perez, Secretary of Labor, United
States Department of Labor, Plaintiff,

v.

Sandpoint Gas N Go & Lube Center,
Inc., an Idaho corporation; and Sydney
M. Oskoui, an individual, Defendants.

Case No. 2:14-CV-00357-BLW
|
Signed 09/29/2015

**Opinion**

JUDGMENT

B. Lynn Winmill, Chief Judge

 **\*1** JUDGMENT IS HEREBY ENTERED in favor of
Plaintiff Thomas E. Perez, Secretary of Labor, United
States Department of Labor, and against Defendants
Sandpoint Gas N Go & Lube Center, Inc., an Idaho
corporation; and Sydney M. Oskoui, an individual, as
follows:

1. Plaintiff's Motion for Default Judgment against
Defendants Sandpoint Gas N Go & Lube Center, Inc., an
Idaho corporation; and Sydney M. Oskoui, an individual;
is GRANTED;

2. As compensatory damages for violations of Section
11(c) of the Occupational Safety and Health Act ("OSH
Act" or "the Act"), 29 U.S.C. § 660(c), Defendants shall
pay $979.25 for lost wages and prejudgment interest
thereon through June 30, 2015, plus postjudgment interest
at the rate established by 28 U.S.C. § 1961 from June 30,
2015 through the date of payment in full; Defendants shall
make this payment to Daniel Kramer by cashier's check;
with a copy of the check sent the same date to Plaintiff
as proof of payment, within 15 days of the date of this
judgment;

3. As punitive damages for violations of Section 11(c)
of the Act, Defendants shall pay $100,000.00, plus

postjudgment interest at the rate established by 28 U.S.C.
§ 1961 from the date of this judgment through the date of
payment in full; Defendants shall make this payment to
Daniel Kramer by cashier's check; with a copy of the check
sent the same date to Plaintiff as proof of payment, within
15 days of the date of this judgment;

4. Defendants, their officers, agents, servants, employees
and all persons acting or claiming to act in their behalf
and interest are permanently enjoined from violating the
provisions of Section 11(c)(1) of the Act, 29 U.S.C. § 660(c)
(1);

5. Defendants shall post a complete copy of this Judgment
at the Sandpoint Gas n' Go and Lube Center as a notice
stating to all concerned the following:

> Defendants Sydney M. Oskoui and Sandpoint Gas
> n' Go & Lube Center will not discharge or in any
> manner discriminate against employees because of filing
> a complaint with OSHA, giving a statement to an
> OSHA investigator, giving testimony in a proceeding
> before the Occupational Safety and Health Review
> Commission, making a complaint within the company
> about workplace safety or health, or otherwise engaging
> – whether real, perceived, or suspected – in any other
> activities protected by Section 11(c) of the Occupational
> Safety and Health Act.

> Any employee who believes that he or she has
> been discharged or otherwise discriminated against
> by Defendants in violation of Section 11(c) of the
> Occupational Safety and Health Act may make a
> complaint to the Boise Area Office of the Occupational
> Safety and Health Administration, at (208) 321-2960,
> alleging such retaliation.

The Judgment shall be posted on each employee bulletin
board where other labor and employment law notice
posters are posted; or, if no such bulletin board exists,
behind the front counter. Defendants shall post this
Judgment and submit proof of such posting by filing a
declaration with this Court within 15 days of the date of
this judgment stating that this Judgment has been posted,
and attaching a photograph of the posted Judgment to
the declaration. This Judgment shall remain posted for 90
days from the date of posting.

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.          1

**\*2** 7. Upon application by the Plaintiff, costs shall be taxed by the Clerk against Defendants in favor of the Plaintiff.

8. Defendants shall be jointly and severally liable for the amounts due under this Judgment.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 10889991

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.   2

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

THOMAS E. PEREZ, Secretary of Labor,  )
United States Department of Labor,  )
  )
            Plaintiff,  )
  )
v.  )      Case No. 4:14-CV-00398-SRB
  )
SOUTHWESTERN BELL  )
TELEPHONE COMPANY,  )
  )
            Defendant.  )

## <u>ORDER</u>

Before the Court is Defendant's Motion for Summary Judgement (Doc. #61). For the reasons explained below, Defendant's motion is denied.

## I.    Background

Plaintiff Thomas E. Perez, Secretary of the United States Department of Labor ("Department of Labor"), filed this case on May 2, 2014, against Defendant Southwestern Bell Telephone Company ("Southwestern Bell"), asserting violations of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651, et seq. ("OSHA"). Department of Labor alleges Southwestern Bell discriminated against four employees for reporting work-related injuries.

Southwestern Bell provides communication and entertainment services to customers throughout the Kansas City metropolitan area. (Doc. #62, ¶ 2). It employs premises technicians who are dispatched "to perform, installation of and repair work on its customer service offerings," and "Customer Service Technicians to perform installation, testing, and maintenance mainly on phone lines and fiber." Id. at ¶¶ 3, 4. Southwestern Bell has various safety rules and procedures and failure to comply with those rules and procedures could result in discipline or other consequences. Id. at ¶¶ 5, 6. Southwestern Bell requires employees to promptly report any

workplace injury. Id. at ¶ 9. Failure to report a workplace injury may result in discipline. Id. at ¶ 10.

According to the allegations in the complaint, four technicians, Raymond Courtney, Thomas Warren, David Flores, and James Garrison ("employees"), incurred injuries while on service calls. On October 3, 2011, Raymond Courtney, a Premises Technician, reported an injury to his back that occurred when he bent to retrieve a zip tie. Id. at ¶¶ 15, 17. A formal investigation was conducted into the incident, and Courtney was ultimately placed on a six-month Performance Notice for "violat[ing] bending and lifting safety procedures." Id. at ¶¶ 16, 20. The Performance Notice did not result in a loss of compensation. Id. at ¶ 21. Courtney initiated an OSHA complaint based on allegations that he was given a Performance Notice for reporting an injury, and the allegations were investigated by OSHA. Id. at ¶¶ 22, 23.

Thomas Warren, a Premises Technician, reported an injury to his ankle after stepping in what has been described as a "depression" by the Department of Labor or a "hole" by Southwestern Bell. Id. at ¶ 30; Doc. #64, p. 25, ¶ 30. An investigation occurred, and Warren was issued a Written Reminder. (Doc. #62, ¶¶ 31, 35). A complaint was filed with OSHA on behalf of Warren alleging he was given a Written Reminder as a result of his injury report. Id. at ¶ 38.

David Flores, a Customer Service Technician, reported an injury to his wrist that occurred as a result of a fall while he was working. Id. at ¶ 48. An investigation was conducted by several managers, and a Performance Notice was issued after the managers determined Flores violated the safety rules. Id. at ¶¶ 49, 51. Flores did not receive a loss of compensation or benefits as a result of this injury report. Id. at ¶ 52. However, on Flores' annual performance appraisal, he received a performance rating of "does not meet expectations." Id. at ¶ 53. Flores filed a

2

complaint with OSHA alleging he was given an unsatisfactory annual performance appraisal for reporting a workplace injury. Id. at ¶ 58.

James Garrison, a Premises Technician, reported an injury he received to his knee after stepping into a depression while working in a snow-covered area. Id. at ¶ 66. Garrison was not disciplined by way of performance notice or other discipline in connection with reporting the injury. Id. at ¶ 69. However, on Garrison's 2011 annual performance appraisal, he received a "does not meet expectations" which Garrison attributes to his 2011 personal injury. Id. at ¶ 71; Doc. #64, p. 29, ¶ 71. Garrison filed a complaint with OSHA on March 29, 2012, claiming his injury report was the cause of his unsatisfactory 2011 annual performance appraisal and that he was denied promotional opportunities in retaliation for his 2011 injury. Id. at ¶ 72.

Southwestern Bell filed its motion for summary judgment claiming Department of Labor cannot establish a prima facie case because the employees did not engage in protected activity as defined by Section 11(c) of OSHA and no adverse action was taken against the employees. Southwestern Bell also claims there are non-discriminatory reasons for its actions, and Plaintiff cannot establish that these reasons are pretextual. Lastly, Southwestern Bell alleges Department of Labor's claims are moot, and injunctive relief is not appropriate. Department of Labor asserts a genuine dispute exists as to whether the employees were disciplined for violating work rules. Department of Labor argues that "[n]one of the employees did anything wrong under Southwestern Bell's safety policies, and but for being injured, they would never have been charged with safety violations." (Doc. #64, p. 6). Oral arguments were presented to the Court on May 23, 2016.

Case 1:17-cv-00589-WCG Filed 03/29/18 Page 19 of 31 Document 33-42
Case 4:14-cv-00598-SRB Document 68 Filed 07/05/16 Page 3 of 15

## II.     Legal Standard

A moving party is entitled to summary judgment on "part of [a] claim or defense" … "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate if the evidence, viewed in the light most favorable to the [nonmovant] and giving [the nonmovant] the benefit of all reasonable inferences, shows there are no genuine issues of material fact and [the movant] is entitled to judgment as a matter of law." Price v. N. States Power Co., 664 F.3d 1186, 1191 (8th Cir. 2011). "Once the moving party has made and supported their motion, the nonmoving party must proffer admissible evidence demonstrating a genuine dispute as to a material fact." Holden v. Hirner, 663 F.3d 336, 340 (8th Cir. 2011). A party opposing summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514 (1986).

"Summary judgment is an extreme remedy which is not to be granted unless the movant has established his right to judgment [with] such clarity as to leave no room for controversy and that the other party is not entitled to recover under any possible circumstances." New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir. 1977). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 526–27 (8th Cir. 2007). Summary judgment should not be granted if a reasonable jury could find for the nonmoving party. Woodsmith Publ'g Co. v. Meredith Corp., 904 F.2d 1244, 1247 (8th Cir. 1990) (citing Anderson, 477 U.S. at 248).

4

### III.     Analysis

OSHA was enacted to "assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. 651(b). OSHA's anti-retaliation provision is set forth in 29 U.S.C. 660(c), and referred to herein as § 11(c). Reich v. Hoy Shoe Co., Inc., 32 F.3d 361, 365 (8th Cir. 1994). "In considering retaliation cases, this Court has adopted a three-pronged framework for analysis." Id. The Eighth Circuit provides,

> First, the plaintiff must make a prima facie case … Second, once the plaintiff has established a prima facie case, the burden shifts to the employer to articulate an appropriate non-discriminatory reason for its action. Finally, if the employer satisfies this burden, the plaintiff must then demonstrate that the proffered reason is pretextual.

Id. (internal citations omitted). Southwestern Bell contends Department of Labor cannot establish a prima facie case of retaliation and is unable to establish that Southwestern Bell's alleged non-discriminatory reasons for its actions were pretextual.

### a.  Prima Facie Case of Retaliation

Department of Labor "must initially establish a prima facie case of retaliation by showing [the employee's] participation in a protected activity, subsequent adverse action by the employer, and some evidence of a causal connection between the protected activity of the [employee] and the subsequent adverse action by the employer." Schweiss v. Chrysler Motors Corp., 987 F.2d 548, 549 (8th Cir. 1993); see also Reich, 32 F.3d at 365. Department of Labor's burden at the prima facie case stage of the analysis "is not onerous." Torgerson v. City of Rochester, 643 F.3d 1031 (8th Cir. 2011).

Southwestern Bell contends Department of Labor cannot establish that the employees engaged in protect activity or that an actionable adverse action was taken against the employees by Southwestern Bell.

5

Case 1:17-cv-00589-WCG  Document 33  Filed 03/29/18  Page 21 of 31  Document 33-42
Case 4:14-cv-00598-SRB  Document 68  Filed 07/05/16  Page 8 of 35

### 1. Protected Activity

Southwestern Bell claims § 11(c) only prohibits "employers from retaliating against employees who file complaints." (Doc. #62, p. 18) (citing <u>Reich</u>, 32 F.3d at 364 n.1). Southwestern Bell explains § 11(c) is a whistleblower statute that prohibits discrimination "against any employee because such employee [1] has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or [2] has testified or is about to testify in any such proceeding or [3] because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter." 29 U.S.C. § 660(c). Southwestern Bell concludes that "[n]one of the[] provisions in the Act afford employees the right to report an injury to an employer" and the Court should not defer to the language in 29 C.F.R. § 1904.36 because the language is clear and unambiguous. (Doc. #62, pp. 18-19). Conversely, Department of Labor claims § 8(c) of OSHA demonstrates the "clear congressional intent to allow the Secretary to prescribe regulations necessary to implement the recordkeeping mandate." (Doc. #64, p. 32). Therefore, Department of Labor concludes that § 1904.36 is authorized by § 8(c) of OSHA and "is the Secretary's permissible interpretation of the OSH Act." <u>Id</u>.

Section 1904.36 provides,

> Section 11(c) of the Act prohibits you from discriminating against an employee for reporting a work-related fatality, injury or illness. That provision of the Act also protects the employee who files a safety and health complaint, asks for access to the part 1904 records, or otherwise exercises any rights afforded by the OSH Act.

"The OSH Act is safety legislation that is remedial and preventative in nature and is to be liberally construed to effectuate its congressional purpose." <u>Reich</u>, 32 F.3d at 368 (citing <u>Whirlpool Corp. v. Marshall</u>, 445 U.S. 1, 13 (1980)). "The scope of rights protected implicitly and explicitly under the Act is broad." <u>Perez v. U.S. Postal Serv.</u>, 76 F. Supp. 3d 1168, 1184

(W.D. Wash. 2015) (citing 29 CF.R. § 1904.36). The Occupational Safety and Health

Administration explains,

> Section 1904.35 of the final rule therefore establishes an affirmative requirement for employers to involve their employees and employee representatives in the recordkeeping process. The employer must inform each employee of how to report an injury or illness, and must provide limited access to the injury and illness records for employees and their representatives. Section 1904.36 of the final rule makes clear that § 11(c) of the Act prohibits employers from discriminating against employees for reporting work-related injuries and illnesses. Section 1904.36 does not create a new obligation on employers. Instead, it clarifies that the OSH Act's anti-discrimination protection applies to employees who seek to participate in the recordkeeping process.

Occupational Injury and Illness Recording and Reporting Requirements, 66 FR 5916-01.

"Recording or reporting a work-related injury … does not mean that the employer or employee

was at fault, that an OSHA rule has been violated, or that the employee is eligible for workers'

compensation or other benefits." 29 C.F.R. § 1904.0.

Here, Department of Labor presented evidence that each of the four employees reported a

work-related injury. Reporting an injury or illness is a right under the recordkeeping process of §

11(c) put into place by OSHA. The Court finds no evidence or case law to support Southwestern

Bell's theory that § 1904.36 of the Code of Federal Regulation is invalid or inapplicable to this

matter. Therefore, pursuant to § 1904.36, the Court finds that § 11(c) appropriately applies to the

action in this case. Thus, the Court concludes that the employees' actions are deemed protected

activities under § 11(c).

### 2. Adverse Action

Southwestern Bell alleges written disciplines and "does not meet expectations"

performance ratings do not sufficiently establish an actionable adverse action. Southwestern

Bell, quoting Littleton v. Pilot Travel Ctrs., LLC, claims the Eighth Circuit has "consistently

held that, to be materially adverse, retaliation cannot be trivial; it must produce some 'injury or

7

harm.'" 568 F.3d 641, 644 (8th Cir. 2009). It is Southwestern Bell's belief that the employees suffered no actual harm because "they remained in their same positions and received the same compensation and benefits." (Doc. #62, p. 19). Conversely, Department of Labor asserts that Southwestern Bell's actions are sufficient to be deemed "adverse actions" because they resulted in actions that "might have dissuaded a reasonable worker" from reporting a personal injury. Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

In Littleton, the Eighth Circuit acknowledged Burlington "modified the Eighth Circuit's element of an adverse employment action" to require "a showing that the alleged retaliatory action was materially adverse, that is, the action 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Littleton, 568 F.3d at 644 (citing Burlington, 548 U.S. at 68). The Eighth Circuit further explained,

> The material adverse action issue is difficult. Our post-Burlington Northern decisions have consistently held that, to be materially adverse, retaliation cannot be trivial; it must produce some "injury or harm." Thus, we have concluded that commencing performance evaluations, or sending a critical letter that threatened "appropriate disciplinary action," or falsely reporting poor performance, or "lack of mentoring and supervision" were actions that did not establish a prima facie case of retaliation, absent showings of materially adverse consequences to the employee.

Id. (internal citations omitted). Furthermore, it is noted that the Supreme Court has observed that "[c]ontext matters." Id. (quoting Burlington, 548 U.S. at 69). "In adopting the 'reasonable employee' standard, the Supreme Court further emphasized that alleged harms are to be judged by an objective standard that takes into account the particular circumstances under which they occur." Perez v. U.S. Postal Serv., No. C12-00315 RSM, 2014 WL 3925317, at *5 (W.D. Wash. Aug. 12, 2014) (citing Burlington). OSHA "is safety legislation that is remedial and preventative in nature and is to be liberally construed to effectuate its congressional purpose." Reich, 32 F.3d at 368.

8

Here, Raymond Courtney reported an injury to his back that occurred when he bent to retrieve a zip tie. (Doc. #62, ¶¶ 15, 17). Following a formal investigation, Courtney was placed on a six-month Performance Notice for "violat[ing] bending and lifting safety procedures." Id. at ¶¶ 16, 20. Thomas Warren reported an injury to his ankle after stepping in what has been described as a "depression" by the Department of Labor and a "hole" by Southwestern Bell. Id. at ¶ 30; Doc. #64, p. 25, ¶ 30. Following an investigation, Warren was issued a Level Two Written Reminder which was placed in his file. (Doc. #62, ¶¶ 31, 35). David Flores reported an injury to his wrist the occurred as a result of a fall when his foot became entangled in weeds while he was working. Id. at ¶ 48, Doc. #64, p. 9, ¶ 7. Following an investigation conducted by several managers, a Level One Performance Notice was issued after the managers determined Flores violated the safety rules. Id. at ¶¶49, 51. Flores' annual performance appraisal reported that "because of a personal injury you have failed to met [sic] the minimum requirement and DO NOT MEET EXPECTATIONS." (Doc. #64-11, p. 3). James Garrison reported an injury he received to his knee after stepping into a depression while working in a snow-covered area. (Doc. #62, ¶ 66). Subsequently, on Garrison's 2011 annual performance appraisal, he received a "does not meet expectations" as a result of his 2011 personal injury. Id. at ¶ 71; Doc. #64, p. 29, ¶ 71.

Southwestern Bell's disciplinary actions in this case are more than simply "commencing performance evaluations, or sending a critical letter that threatened 'appropriate disciplinary action,' or falsely reporting poor performance, or 'lack of mentoring and supervision.'" Littleton, 568 F.3d at 644. Department of Labor presented deposition testimony from Reynolds, Smith, Garrison, Flores, and Warren that the disciplinary actions still remain and are visible within the employees' computer file and personnel file. (Doc. #64, p. 21, ¶¶ 73-74). Pursuant to the

deposition testimony of Smith and Warren, when an employee is disciplined "it plays a role on whether an employee can transfer or not." Id. at ¶ 75. Although the employees remained in their same positions and received the same compensation and benefits, the evidence demonstrates that the disciplinary consequences remain in their computer files and play a role in employment opportunities which, taken in context with all evidence presented, appears to create a "materially adverse consequences to the employee." Littleton, 568 F.3d at 644.

The Court finds that Department of Labor has presented sufficient factual allegations to show that the adverse action element can be satisfied. Accordingly the Court finds that Department of Labor has presented sufficient evidence to establish its prima facie case in order to survive summary judgment. Thus, the burden shifts to Southwestern Bell to provide a "legitimate, non-discriminatory reason" for its actions taken against the four employees after they reported their personal injuries.

### b. Pretext

Since Department of Labor has established a prima facie case, Southwestern Bell must articulate a legitimate, non-discriminatory reason for its actions. See Reich, 32 F.3d at 365. "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." Torgerson, 643 F.3d at 1047 (quoting Floyd v. State of Mo. Dep't of Soc. Servs., Div. of Family Servs., 188 F.3d 932, 936 (8th Cir. 1999)). Southwestern Bell alleges a determination was made that the accidents that resulted in the employees' injuries were preventable and caused by the employees' "failure to follow Defendant's safety policies and procedures." (Doc. #62, p. 24). Southwestern Bell further claims it had "legitimate, non-discriminatory reasons" for the actions at issue in this case and "acted in accordance with OSHA's own guidelines." Reich, 32 F.3d at 365. Because Southwestern Bell

has established a "legitimate, non-discriminatory reason" for its action and satisfied its burden, the burden then shifts to Department of Labor to "demonstrate that the proffered reason is pretextual." Id.

Department of Labor alleges Southwestern Bell gave poor reviews and imposed discipline as a result of the employees' personal injury rather than a violation of safety rules. Department of Labor explains that there is no basis in fact to support Southwestern Bell's assertion that the employees violated their safety training because had they not been injured they would not have been disciplined for their conduct. Southwestern Bell argues it had an honest belief that the employees engaged in safety violations, and that even though the employees did not agree with the determination, it is not enough to show pretext.

"There are at least two ways a plaintiff may demonstrate a material question of fact regarding pretext." Torgerson, 643 F.3d at 1047 (citing Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1118 (8th Cir. 2006)). "A plaintiff may show that the employer's explanation is 'unworthy of credence ... because it has no basis in fact.'" Id. "Alternatively, a plaintiff may show pretext 'by persuading the court that a [prohibited] reason more likely motivated the employer.'" Id. "Either route amounts to showing that a prohibited reason, rather than the employer's stated reason, actually motivated the employer's action." Id. "[A] plaintiff bringing an employment discrimination claim may succeed in resisting a motion for summary judgment where the evidence, direct or circumstantial, establishes a genuine issue of fact regarding an unlawful motivation for the adverse employment action (i.e., a motivation based upon a protected characteristic), even though the plaintiff may not be able to create genuine doubt as to the truthfulness of a different, yet lawful, motivation." Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1018 (8th Cir. 2005)

In support of its claim, Department of Labor presents Flores' 2011 Performance Appraisal which states, "Unfortunately because of a personal injury you have failed to met [sic] the minimum requirement and DO NOT MEET EXPECTATIONS." (Doc. #64-11, p. 3). Garrison testified in his deposition that he learned in February 2012, more than a year later, that the personal injury report "would give [him] a 'does not meet' for that category, which would put [him] in the 'does not meet' for the overall appraisal, which would carry over for the following two years as far as any job vacancy requests." (Doc. #62-5, 142:25 - 143:4). During the deposition of Larry Greg, Garrison's Area Manager, he was asked whether Garrison's appraisal, downgraded as a result of the personal injury report, was inappropriate and should not have occurred because Garrison was not found to be at fault, to which he answered "[p]otentially, yes. This should not have been." (Doc. #64-13, 106:1 - 10). In reference to the incident leading to Warren's injury report, Corey Smith, manager of network services for Southwestern Bell, testified that "walking across a depression" is "not a violation of a Southwestern Bell safety rule." (Doc. #62-8, 83:15 – 20).

Viewing all reasonable inferences in the light most favorable to Department of Labor, the Court finds that a trier of fact could conclude that Southwestern Bell's actions were pretextual. The facts presented provide a genuine issue of fact regarding an unlawful motivation for the retaliatory adverse employment action. Thus, Department of Labor has met their burden of demonstrating a genuine issue of material fact sufficient to preclude summary judgment.

### c. Mootness

Southwestern Bell contends that Department of Labor's claims are moot. Specifically, Southwestern Bell claims a live controversy no longer exists "because there is no potential for any continuing harm to Claimants based on the disciplines or appraisals at issue," and "the

12

disciplines and appraisals at issue are ineffectual." (Doc. #62, p. 28). Department of Labor argues it has a "legally cognizable interest in the outcome of this case because [the Secretary seeks] … to prohibit Defendant from committing future violations of § 11(c)." (Doc. #64, p. 41).

At the outset, a case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." <u>Fed. Home Loan Mortg. Corp. v. Grantz</u>, 568 Fed. Appx. 482, 483 (8th Cir. 2014) (internal citation omitted). As stated above, the employees have a cognizable interest in the outcome of this action because the disciplinary consequences remain in their computer files and play a role in employment opportunities. Furthermore, Department of Labor has an interest in the outcome of this action in that it is imperative employers comply with the interests and goals of OSHA. Thus, the Court finds that this cause of action is not moot.

### d. Injunctive Relief

Lastly, Southwestern Bell asserts that Department of Labor's request for injunctive relief is improper because Department of Labor cannot establish its underlying claim, and it has failed to request to enjoin specific conduct. Department of Labor acknowledges it is not pursuing monetary damages for the individual employees, but is "seeking an injunction to expunge the employees' records and to prohibit Defendant from committing future violations of § 11(c)." (Doc. #64, p. 41). Department of Labor further states that "[§] 11(c)(2) of the Act expressly provides for injunctive relief." <u>Id</u>. at p. 42. Department of Labor explains that the other cases cited by Southwestern Bell differ from that before this Court in that the defendants in the other referenced cases "do not dispute that § 11(c) protected reporting of work-related injuries." <u>Id</u>. Therefore, Department of Labor maintains that injunctive relief is "necessary because Defendant

maintains that § 11(c) does not prohibit retaliation against employees for reporting work-related injuries." Id. at p. 43.

Following oral arguments presented on May 23, 2016, the Court requested the parties provide additional Eighth Circuit case law regarding the facts necessary to properly seek injunctive relief with the required specificity. Department of Labor presented Metro. St. Louis Equal Hous. Opportunity Council v. Lighthouse Lodge, LLC, No. 2:09-CV-04019-NKL, 2009 WL 1576735, at *5 (W.D. Mo. June 4, 2009), which states, "As EHOC correctly notes, there is no specific pleading requirement for injunctive relief. See Fed. R. Civ. P. 8(e)(1). In FHA actions courts may grant injunctive relief as they deem appropriate. 42 U.S.C. § 3613(c)(1)(d)." Southwestern Bell responded that the portion of Metro cited by Department of Labor only relates to the sufficiency of the pleading. Conversely, Southwestern Bell does not provide any Eighth Circuit case law to guide the Court in its decision; rather, it directed the Court to a previous order entered in this action. Southwestern Bell points to this Court's November 14, 2014, Order which provides that "Southwestern Bell is subject to liability (if any) only as to any alleged retaliatory acts that occurred within the 30 day limitations period prior to a complainant's complaint to OSHA." (Doc. #18).

Subsequently, on June 30, 2016, counsel for Department of Labor directed the Court's attention to a June 27, 2016, Supreme Court decision. In the decision, the Supreme Court explained, "The Federal Rules of Civil Procedure state that (with an exception not relevant here) a 'final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.'" Whole Woman's Health v. Hellerstedt, 15-274, 2016 WL 3461560, at *13 (U.S. June 27, 2016), as revised (June 27, 2016) (quoting Fed. R. Civ. P. 54(c)). The Supreme Court disagreed with the Court of Appeals' conclusion that "the District Court

14

Case: 1:17-cv-00589-WSC Doc. #: 88 Filed: 03/08/18 Page: 30 of 31 Document #: 542
Case 4:14-cv-00589-SRB Document 68 Filed 07/08/16 Page 14 of 15

should not have granted more relief than anyone requested or briefed" because in addition the "petitioners asked for such other and further relief as the Court may deem just, proper, and equitable." Id. (internal citation omitted).

Here, Department of Labor has requested "judgment permanently enjoining and restraining Defendant, its officers, agents, servants, employees and those persons in active concert or participation with it, from violating the provisions of Section 11 (c)(1) of the Act, and for such other and further relief as may be necessary and appropriate." (Doc. #1, § IX). The complaint further requests "judgment against Defendant, for removal of the disciplinary actions from Complainants' records, expungement of any mention of their protected activity, if any, from their employment records, the posting of a notice for employees stating that Defendant will not in any manner discriminate against employees because of their engagement in protected activities under Section 11(c) of the Act, for such other and further relief as may be necessary and appropriate, and for costs." Id.

The Court finds that upon review of the complaint, and pursuant to Hellerstedt and Rule 54(c), the Court has the authority to grant injunctive relief more broad than what was specifically requested in the pleadings when the relief is warranted by the evidence.

### IV.  Conclusion

Accordingly, for the reasons explained above, it is hereby

ORDERED that Defendant's Motion for Summary Judgement (Doc. #61) is DENIED.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH, JUDGE
UNITED STATES DISTRICT COURT

DATE: July 8, 2016

15