UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

```
-----------------------------
                          :
IN THE MATTER OF:         :
                          :
R. ALEXANDER ACOSTA,      :
Secretary of Labor,       :
U.S. Department of Labor, :
                          :
     Plaintiff,           : Civil Action No.
v.                        : 017-C-589
                          :
DURA-FIBRE, LLC,          :
                          :
     Defendant.           :
-----------------------------
```

Wednesday
November 29, 2017

Appleton, Wisconsin

DEPOSITION OF:

SCOTT BLAIR

taken on behalf of Counsel for the Plaintiff, pursuant to notice, at the DOL/OSHA Appleton Area Office, 1648 Tri Park Way, Appleton, Wisconsin, at 9:00 a.m., when were present:

Neal R. Gross and Co., Inc.
(202) 234-4433        Washington DC        www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 1 of 249   Document 34-2
EXHIBIT B

APPEARANCES:


FOR THE PLAINTIFF:


DAVID J. RUTENBERG, ESQ.

U.S. DEPARTMENT OF LABOR

230 South Dearborn Street

Room 844

Chicago, Illinois 60604

312-353-6990

rutenberg.david.j@dol.gov



FOR THE DEFENDANT:


JOHN H. ZAWADSKY, ESQ.

REINHART, BOERNER, VAN DUREN, S.C.

22 East Mifflin Street

Suite 600

Madison, Wisconsin 53703

602-229-2202

jzawadsky@reinhartlaw.com

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 2 of 249   Document 34-2

# CONTENTS

WITNESS                          DIRECT   CROSS

Scott Blair                      4


EXHIBITS                                                 PAGE

1     Notice of Deposition-personal . . . . . . . . . . . . . .6
3     Notice of Deposition-company. . . . . . . . . . . . . . .6
6     Labor agreement . . . . . . . . . . . . . . . . . . . . 38
7     Employee handbook . . . . . . . . . . . . . . . . . . . 54
9     Accident reporting investigation plan . . . . . . . . . 72
13    Discipline slip . . . . . . . . . . . . . . . . . . . .106
14    Accident investigation. . . . . . . . . . . . . . . . .135
15    Near miss and incident form . . . . . . . . . . . . . .143
16    Revised version of near miss
      incident form . . . . . . . . . . . . . . . . . . . . .160
17    Safety incident report. . . . . . . . . . . . . . . . .171
18    Discipline slip . . . . . . . . . . . . . . . . . . . .196
21    Entire incident documentation . . . . . . . . . . . . .111
25    E-mail, dated 05-30-13. . . . . . . . . . . . . . . . .223
26    Discussion items for meeting. . . . . . . . . . . . . .225
29    Accident form . . . . . . . . . . . . . . . . . . . . .183
30    Safety incident report. . . . . . . . . . . . . . . . .183
33    Accident report . . . . . . . . . . . . . . . . . . . .210

34    Accident form and safety

      incident report . . . . . . . . . . . . . . . . . . . .219

35    Accident form and safety

      incident report . . . . . . . . . . . . . . . . . . . .221

37    Accident form . . . . . . . . . . . . . . . . . . . . .203

38    Near miss incident form . . . . . . . . . . . . . . . .222

42    Handwritten meeting minutes . . . . . . . . . . . . . .226

44    Documentation slip. . . . . . . . . . . . . . . . . . .114

45    Accumulated points for Tim Jacobs . . . . . . . . . . .179

47    Safety incident report. . . . . . . . . . . . . . . . .183

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 3 of 249   Document 34-2

P R O C E E D I N G S

(8:55 a.m.)

1

2

3      MR. RUTENBERG:  We are here on the record today

4    for the deposition of Mr. Scott Blair in the matter of

5    Secretary of Labor v. Dura-Fibre, LLC.  I request the

6    court reporter to administer the oath.

7      THE REPORTER:  Please raise your right hand.

8    WHEREUPON,

9              SCOTT BLAIR

10   was called as a witness by Counsel for the Plaintiff, and

11   having been duly sworn, was examined and testified as

12   follows:

13   DIRECT EXAMINATION

14   BY MR. RUTENBERG:

15      Q    Can you please state your name and

16   spell it for the record?

17      A    Scott Blair, B-L-A-I-R

18      Q    What is your home address and telephone number,

19   Mr. Blair?

20      A    73 South Oakwood Road, Oshkosh, Wisconsin 54904,

21   phone number 920-237-0336.

22      Q    And do you have a personal cell phone number?

23      A    Yes.

24      Q    What is the personal cell phone number?

25      A    920-420-0423.

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 4 of 249   Document 34-2

1          Q    Mr. Blair, my name is Dave Rutenberg.  I'm an

2     attorney with the Solicitors Office of the U.S. Department

3     of Labor.  I represent the Occupational Safety and Health

4     Commission in this matter.

5                    In this room is also John Zawadsky of the law

6     firm Reinhart, Boerner, Van Duren, S.C. who represents

7     Dura-Fibre in this case, correct?

8          A    Yes.

9          Q    And he represents you as a management employee

10    and 3(b)(6) designee for the purposes of today's

11    deposition, is that correct?

12         A    Yes.

13         Q    Okay, you're here because you received two

14    notices of deposition, is that correct?

15         A    Correct.

16         Q    Okay, have you seen these notices of deposition?

17         A    I don't believe I've seen them physically.  I've

18    just been told of them.

19         Q    Okay, I request, you know, I notice that you're

20    looking over to your attorney.  The questions are for you,

21    so it's just a matter of whether you know or don't know,

22    okay?  If you don't know, then you don't know.

23                    What I'm handing you is, I've pre-labeled as

24    GX-1 and GX-3 for the record.  I've pre-labeled

25    sequentially the exhibits that will be used for today's

1    deposition and tomorrow's deposition, we'll be using the

2    same sets of records.

3        A    Okay.

4            MR. ZAWADSKY:  You have copies for me, don't you?

5            MR. RUTENBERG:  May I request Counsel hold on to

6    the copies for tomorrow to the extent ---

7            MR. ZAWADSKY:  Okay.

8            MR. RUTENBERG:  So, what I have pre-labeled is

9    GX-1 and GX-3.  Take a look, take a moment to look at

10   them.  While Mr. Blair is reviewing the two exhibits in

11   front of him, I'll just state, I might refer to them as GX

12   rather than exhibits.  Just know that GX and exhibits are

13   interchangeable for today's purposes.

14            (Government's Exhibit Nos. GX-1 and GX-3 were

15            marked for identification.)

16           MR. ZAWADSKY:  Okay.

17           MR. RUTENBERG:  Let me know when you're ready.

18           MR. ZAWADSKY:  Counsel, he may not really

19   understand what this is.

20           MR. RUTENBERG:  Okay.

21           MR. ZAWADSKY:  Okay.

22           MR. RUTENBERG:  Referring to Exhibit A attached

23   to GX-3?

24           MR. ZAWADSKY:  Yes.

25           MR. RUTENBERG:  Okay.

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 6 of 249   Document 34-2

```
 1          MR. ZAWADSKY:  He understands he's supposed to

 2   testify on a couple of the subject matters, but he

 3   doesn't, I don't think he understands that he's not going

 4   to

 5   testify --

 6          MR. RUTENBERG:  Okay.  Mr. Blair, let me know

 7   when you're ready, or if you have any questions I can

 8   answer those for you.

 9          THE WITNESS:  Okay, hold on one second, sure.

10          MR. ZAWADSKY:  I mean you're free to ask him

11   questions about anything you want, but I'm just, as a --

12   BY MR. RUTENBERG:

13      Q    So, have you had a chance to review GX-1 and GX-

14   3?

15      A    Yes.

16      Q    Okay, Mr. Blair, you're representing the

17   corporation Dura-Fibre LLC, as well as yourself, at this

18   deposition, is that correct?

19      A    Yes.

20          MR. ZAWADSKY:  Can I just interject for limited

21   purposes for a couple of the subject matters and the

22   30(b)(6) notice.

23          MR. RUTENBERG:  That's right, we'll get to that.

24   BY MR. RUTENBERG:

25      Q    You understand that as the designated individual
```

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 7 of 249   Document 34-2

1     testifying at this deposition for certain topics, on

2     behalf of the corporation, you have to testify to matters

3     that are known or reasonably available to the organization

4     as identified in the Notice of Deposition?

5          A    Yes.

6          Q    If your answers as an individual is different

7     from that of the corporate representative, please state so

8     on the record.

9          A    Okay.

10         Q    And in particular, you're testifying regarding

11    subject matters six and 14, as set forth in Exhibit A to

12    GX-3, is that correct?

13         A    Yes.

14         MR. RUTENBERG:  For the record, Mr. Blair is

15    testifying both in his personal capacity and as the

16    designated corporate representative, pursuant to Rule

17    30(b)(6) of the Federal Rules of Civil Procedure.

18            Counsel for Plaintiff and counsel for

19    Defendants agreed prior to deposition that the individual

20    deposition of Scott Blair and the 30(b)(6) deposition of

21    the corporate defendant, with regard to the stated topics,

22    would occur simultaneously, rather than during two

23    distinct depositions.

24            This approach is agreed upon in part for

25    efficiency purposes.  Mr. Zawadsky, do you agree with this

1   characterization?

2            MR. ZAWADSKY:  I do.

3   BY MR. RUTENBERG:

4        Q    Mr. Blair, have you ever been deposed before?

5        A    I don't believe so.

6        Q    I want to start with explaining the process and

7   ground rules by which the deposition will be conducted.

8   The first rule is that since the court reporter is taking

9   down everything that is said and is transcribing the

10  words, we both need to make sure that all of our

11  interactions, my questions and your answers, are verbal.

12  That means answers cannot be a head nod, a hand gesture,

13  or any other nonverbal queue.  Will you make sure all of

14  your answers are verbal?

15       A    Yes.

16       Q    This also applies to other normal things people

17  do in most conversations like saying uh-huh to mean yes.

18  Will you use your words to answer any questions instead of

19  saying things like uh-huh?

20       A    Yes.

21       Q    I will ask the questions and you will answer the

22  questions.  The court reporter will be taking down

23  everything we say.  Do you understand?

24       A    Yes.

25       Q    Because the court reporter is taking down

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 9 of 249   Document 34-2

1    everything we say, you need to wait until my entire
2    question is asked before you answer.  I know that in
3    casual and unrecorded conversation people speak over
4    people all the time.  That will make the court reporter's
5    job very difficult.  Will you wait to answer a question
6    until I am finished asking, even if you think you know
7    what the question will be?
8        A    Yes.
9        Q    The court reporter swore you in before we
10   started, is that correct?
11       A    Yes.
12       Q    Your answers are being given under oath, just
13   like if we were in a court room.  Do you understand?
14       A    Yes.
15       Q    If you don't understand something that I am
16   asking or something that I am saying, you may let me know.
17   I will clarify or rephrase the question.  I want to make
18   sure you understand the questions before you answer them.
19   Will you ask for clarifications when you need them?
20       A    Yes.
21       Q    I also ask that you answer all questions fully
22   and truthfully.  Will you answer all questions fully and
23   truthfully?
24       A    Yes.
25       Q    If you need a short break, let me know, and we

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 10 of 249   Document 34-2

1   will take a break at the appropriate time.  If I have

2   asked you a question, answer the question first and then

3   request that a break be taken.  Will you answer a pending

4   question before asking for a break?

5          A    Yes.

6          Q    There are a few questions that I must ask.  Have

7   you had any alcohol in the last 24 hours?

8          A    No.

9          Q    Have you taken any drugs in the last 24 hours?

10         A    No.

11         Q    Are you taking any medications that will impair

12   your ability to answer my questions accurately, fully, and

13   truthfully?

14         A    No.

15         Q    Are there any medications that have been

16   prescribed to you that you are supposed to be taking or

17   have not been taking pursuant to your doctor's directions?

18         A    No.

19         Q    Is there any other reason you think that might

20   affect your ability to give me accurate, full, and

21   truthful answers?

22         A    No.

23         Q    What did you do to prepare for today's

24   deposition?

25         A    I reviewed some of the paperwork that attorney

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 11 of 249   Document 34-2

1    Zawadsky provided to me over the past several weeks.

2         Q    What kind of paperwork?

3              MR. ZAWADSKY:  Object, attorney/client privilege.

4    BY MR. RUTENBERG:

5         Q    Agreed.  Did you speak to, aside from your

6    attorney, did you speak to anyone  about the deposition

7    before coming in, before today?

8         A    Yes, my president of Dura-Fibre, Luke Benrud.

9         Q    And what did you and Mr. Benrud talk about?

10             MR. ZAWADSKY:  Can I just specify, outside the

11   presence of counsel.

12             THE WITNESS:  Oh, no.

13   BY MR. RUTENBERG:

14        Q    Aside from Mr. Benrud, have you spoken, within

15   the presence of counsel, have you spoken to anyone else

16   about today's deposition?

17        A    Just my wife, letting her know that's where I was

18   going to be today.

19        Q    I want to turn to talking about your background

20   and about Dura-Fibre, LLC generally.  What is the highest

21   level of education you have you've obtained?

22        A    Associates Degree.

23        Q    In what?

24        A    Police science.

25        Q    Say that again.

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 12 of 249   Document 34-2

1      A      Police science.

2      Q      Police science?

3      A      Yes.

4      Q      From where?

5      A      Fox Valley Technical College.

6              MR. ZAWADSKY:  Can I just ask, do you want

7      anything to drink?

8              THE WITNESS:  Not right now.

9              MR. ZAWADSKY:  Okay.

10             THE WITNESS:  Check back in an hour.

11             MR. ZAWADSKY:  No, I just, you seem like you're

12     getting a little bit hoarse --

13     BY MR. RUTENBERG:

14     Q      When did you graduate?

15     A      1995.

16     Q      What did you do after college?

17     A      I was a deputy, sheriff's deputy for 14 years.

18             MR. RUTENBERG:  Off the record.

19             (Off the record.)

20             MR. RUTENBERG:  Okay, back on.

21     BY MR. RUTENBERG:

22     Q      So when did you stop, when did you, what did you

23     do after being a sheriff's deputy?

24     A      I came to Dura-Fibre.

25     Q      That's Dura-Fibre, LLC?

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 13 of 249   Document 34-2

1      A    Yes.

2      Q    Okay, for today's purposes, we'll just refer to

3  Dura-Fibre, LLC as Dura-Fibre or the Company, do you

4  understand?

5      A    Okay, yes.

6      Q    If you don't know what company I am talking

7  about, feel free to ask, but I'm sure that will not a

8  problem today.

9      A    Of course.

10     Q    So what year was that when you started with Dura-

11  Fibre?

12     A    2009.

13     Q    Was Dura-Fibre, was it called Dura-Fibre in 2009?

14     A    Yes.

15     Q    And what did you do for Dura-Fibre when you first

16  started there?

17     A    I started working on the laminator.  I was a

18  production operator.

19     Q    And what was your job as a production operator?

20     A    I held a couple different jobs.  My primary job

21  eventually was dry-end operator.

22     Q    Okay, and what does that entail for you to do?

23     A    Runs the, runs the main part of the laminator,

24  what's called the dry-end.  It takes care of quality,

25  order changes, controls the pace of the machine.  You can

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 14 of 249   Document 34-2

1    act as a lead, in leu of a lead.

2         Q    What does it mean to act as a lead?

3         A    Basically, oversee the entire, basically oversee

4    the other four or five guys on the machine and make any

5    decisions if there is no supervisor available.

6         Q    What did you do after you were a production

7    operator?

8         A    I was promoted to shift supervisor on the third

9    shift.

10        Q    When was that?

11        A    It was around March of 2012.

12        Q    And what were your duties in the position as

13   shift supervisor, the third shift?

14        A    I was the scheduler, primary scheduler on the

15   laminator, and then at that point, pretty much the only

16   machine that worked on third shift was the laminator, so I

17   was the overseer of the laminator.  Any decisions that

18   were, any overall decisions that needed to be made that a

19   lead wasn't capable of making would come to me.  I would

20   just, overall plant supervision.

21        Q    When was the third shift?

22        A    What's that?

23        Q    What time of day is third shift?

24        A    10:00 p.m. to 6:00 a.m.

25        Q    Did you supervisor individuals who worked on the

Neal R. Gross and Co., Inc.
(202) 234-4433                 Washington DC                 www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 15 of 249   Document 34-2

1    laminator?

2         A    Yes.

3         Q    Who?

4         A    Names?  There's too many names to remember.

5         Q    Okay.

6         A    A lot, most people aren't even here, aren't even

7    at Dura-Fibre anymore.

8         Q    What were you after, did you have any positions

9    after you were shift supervisor on third shift?

10        A    was, after third, I was on third shift for about

11   a year and then around March, February or March of 2013, I

12   moved to first shift as the primary plant supervisor.

13        Q    I'm sorry, you said the first shift?

14        A    Yep.

15        Q    Primary plant supervisor?

16        A    Yes.

17        Q    Is that a different position than shift

18   supervisor on third shift?

19        A    No, just had more responsibilities.  I was more

20   responsible for the converting machines, more employees,

21   got more involved in meetings with the office staff.  Just

22   more to do with the day-to-day business activities on the

23   first shift than what I was doing on the third shift.

24        Q    Why don't you give some examples of those day-to-

25   day activities?

Neal R. Gross and Co., Inc.
(202) 234-4433               Washington DC               www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 16 of 249   Document 34-2

1    A  Just working with customer service more, being

2 asked when orders can ship and run, working with the

3 converting machines to make sure specific orders for that

4 day were going to get out the door.  I was more a part of

5 the safety committee at that point, the safety team.

6    Q  As a result of being a plant supervisor?

7    A  More or less just being on first shift.  While I

8 was on third shift there was a different supervisor who

9 was on first shift that did a lot of those same

10 responsibilities.

11    Q  I understand.  Who was that?

12    A  His name was Steve Griffin.

13    Q  Did you believe Steve Griffin left or got a new

14 job?

15    A  Yeah, he's been gone for a couple of years now.

16    Q  What were your duties as part of the safety, well

17 first of all, let me ask you, what's the safety team?

18    A  The safety team is the, safety team would meet

19 once a week to just discuss any, just in open forum, any

20 safety related topics that any employees or office staff

21 had.  We'd also review any accidents that happened since

22 we met last.

23    Q  Who was on the safety team?

24    A  Generally, it was myself, Luke Benrud, Jamie

25 Gonnering, at the time, and then any, any production

Neal R. Gross and Co., Inc.
(202) 234-4433    Washington DC    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 17 of 249   Document 34-2

1    staff, any union employees that wanted to come to the

2    meeting were welcome.

3         Q    What was Luke Benrud's position?

4         A    He was director of operations.

5         Q    And Jamie Gonnering?

6         A    Human resources manager.

7         Q    Is Jamie Gonnering still with the company?

8         A    No.

9         Q    Do you know why she left?

10        A    She pursued a different employment at a different

11   company.

12        Q    Where is she now?

13        A    I don't believe, I thought it was called some

14   Flare Flexible Packaging, I think.  That's where she was

15   last.  I don't know if she's moved on since then.  I'm not

16   aware.

17        Q    Understood.  Luke Benrud is no longer the

18   director of operations, is that right?

19        A    Correct.

20        Q    What is his position now?

21        A    President of Dura-Fibre.

22        Q    Did he move from director of operations to

23   president of Dura-Fibre?

24        A    Yes.

25        Q    When did that happen?

Neal R. Gross and Co., Inc.
(202) 234-4433               Washington DC               www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 18 of 249   Document 34-2

```
1          A     Two years ago, two-and-a-half years ago.

2          Q     Beside from the safety team, excuse me, do you

3    call it the safety committee, safety team?

4          A     Just safety team.

5          Q     Did you still supervise folks during the first

6    shift?

7          A     Yes.

8          Q     Did you supervise Tim Jacobs?

9          A     Yes.

10         Q     And did you supervise Steve Wilz?

11         A     I did.

12         Q     What's your, what position did you have after you

13   were plant supervisor?

14         A     I'm currently production planning manager.

15         Q     And that's what you, that's the position you took

16   after plant supervisor?

17         A     Yes.

18         Q     Okay.

19         A     I've been in that position for approximately a

20   year-and-a-half.

21         Q     Okay, can you repeat the name of the title?

22         A     Production planning manager.

23         Q     Now, what does that entail you to do?

24         A     I still maintain scheduling on the laminator.  I

25   do most of the raw material allocations for our job, for
```

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 19 of 249   Document 34-2

1    our work orders, and I do probably 90 percent of the

2    purchasing in the company.

3            Q    Are you still on the safety team?

4            A    No.

5            Q    Who replaced you as your previous position?

6            A    Eric Braemer is his name, B-R-A-E-M-E-R.

7            Q    What generally, what does Dura-Fibre do?

8            A    We make paper boarder.  We laminate various

9    grades of rolls of paper together, sheet it, and either

10   dye cut it or don't dye cut it.  We have furniture parts

11   that we make for the furniture industry.  It's called, we

12   have a line called high strength folding carton, which is

13   basically consumer packaging.  And we make like, we have

14   industrial packaging for slip sheets, just things for, you

15   know, heavy shipping, you know, heavy, fragile products.

16           Q    You said Dura-Fibre's clients tend to be other

17   businesses?

18           A    Correct.

19           Q    I want to talk about Dura-Fibre's safety and

20   disciplinary policies.  Unless indicated otherwise, you

21   can assume I'm talking about Dura-Fibre's policies as they

22   existed on or around May 2013.  Do you understand?

23           A    Yes.

24           Q    So if I talk about the present tense, I'm really

25   talking about 2013.

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 20 of 249   Document 34-2

1          A     Okay.

2          Q     Does Dura-Fibre have written disciplinary and

3    safety policies?

4          A     Yes.

5          Q     Tell me about how Dura-Fibre goes about

6    disciplining it's employees.

7          A     Well, if an operator, generally if a supervisor

8    witnesses any type of violation, they have the discretion

9    to do a write-up slip at that point and issue points.  If

10   there's any employees report anything that another

11   employee is doing, then an investigation is done.  If an

12   employee comes and reports that something happened and

13   it's determined at a later point that they violated one of

14   the plant rules, then a discipline form would be filled

15   out at that point.

16          Then the operator, when the employee is issued a

17   discipline slip, they have the option to accept the

18   discipline as is or to request a meeting with the director

19   of operations to talk about it further, if they have any

20   concerns or disagreements with it.

21          Q     So, there are two options, so if a supervisor

22   witnesses or a manager witnesses something, a violation,

23   then they can do a write up, you said?

24          A     Correct.

25          Q     And issue points?

Neal R. Gross and Co., Inc.
(202) 234-4433              Washington DC              www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 21 of 249   Document 34-2

1           A    Correct.

2           Q    On the spot?

3           A    Yep.

4           Q    What kind of violations are you talking about?

5     Are you talking about safety violations?

6           A    Could be safety violations, it could be quality,

7     it could be wasting company time, sorry, calling in sick,

8     being late to work are some examples, insubordination.

9           Q    And alternately, did you say, so you can issue

10    points on the spot.  Were there other ways that points can

11    be issued if not on the spot?

12          A    Yes, if there needs to be more investigation, if

13    there's a claim made by another employer if an employee,

14    if you see something and you need to obviously do some

15    further investigation, talk to some other people, points

16    can be issued at a later time after the investigation is

17    complete.

18          Q    Okay, and who issues those points?

19          A    Generally, the supervisor would issue discipline,

20    but any member of management is capable of issuing

21    discipline.

22          Q    Okay, you talked about points.  What are you

23    referring to when you talk about points?

24          A    Dura-Fibre has a point system for their, for it's

25    discipline.  Total number of 24 points at the time is what

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 22 of 249   Document 34-2

1   it would take to terminate an employee.  You would have

2   anywhere from four to eight to 24 points based on the

3   severity of the violation.

4               An employee would accumulate points over the

5   course of his tenure with the company.  If they went so

6   many months without getting points, they can earn points

7   back.  And then obviously once they get to 24 points, then

8   there is a discussion regarding termination.

9       Q   And so is it the supervisor who determines how

10  many points are issued for a given violation?

11      A   Correct.

12      Q   Is there any guidelines for the supervisor to

13  follow?

14      A   In the union contract it lays out what all the

15  plant rules are.  Each, they're broken down by category.

16  All the four point violations are together, the eight

17  points, and so on.

18      Q   Do you have discretion to award fewer than four

19  or more than eight points for a given violation?

20      A   Generally, no.  It's pretty black and white,

21  what's in there.

22      Q   So if you see something, you must award at least

23  four points?

24      A   Yes.

25      Q   Okay, so when an employee reaches 24 points, must

Neal R. Gross and Co., Inc.
(202) 234-4433            Washington DC            www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 23 of 249   Document 34-2

1    they be terminated?

2         A    Generally, that's been the practice, yes.

3         Q    It's been the practice, but does any policy

4    require them to be terminated?

5         A    I don't know if it's actually a Dura-Fibre policy

6    or if it's just a statement in the union contract that

7    once 24 points is reached termination will be, will

8    continue, or termination will, termination process will

9    start.

10        Q    Okay, are points something you think that

11   employees want to avoid getting assigned?

12        A    Yes.

13        Q    Why?

14        A    You get too many and it eventually leads to your

15   dismissal from the company.

16        Q    Who determines whether an investigation is

17   necessary, ongoing, excuse me, who determines whether an

18   investigation is necessary before awarding points?

19        A    The supervisor should be able to make that

20   determination.  Sometimes HR is involved if it's,

21   depending on the circumstances of the incident.  Some

22   things are very black and white, some things there's a

23   little bit more involved.

24        Q    What's an example of a black and white issue?

25        A    Employee calls in sick.

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 24 of 249   Document 34-2

1      Q    You mean without a doctor's note?

2      A    Correct and comes back the next day and doesn't

3  say that they were in any type of an accident or there was

4  any kind of family emergency or something that would fall

5  under FMLA.

6      Q    What falls into the grey area?

7      A    Grey area would be say there was some damage from

8  a, there was a wall got damaged by a tow motor, and you

9  can narrow it down to a certain time-frame but there was a

10  couple different operators.  And you may have some

11  evidence to suggest that Employee A did it, but you're not

12  100 percent sure.  You would need to do, you know,  more

13  due diligence in investigating before you could reasonably

14  determine that that employee was responsible for it.

15      Q    Does the supervisor get any input from anyone

16  else in the company regarding how many points should be

17  assigned?

18      A    At times, yes.

19      Q    Okay, what happens in those cases?

20      A    Well, the conversation is, the conversation is

21  given or the conversation takes place and ultimately if

22  the supervisor is the one that wants to issue the

23  discipline, ultimately it is normally up to them.  But if,

24  again, if HR or the director of ops has any other input

25  that could influence how they proceed with that

Neal R. Gross and Co., Inc.
(202) 234-4433                 Washington DC                 www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 25 of 249   Document 34-2

1   discipline, that's kind of a case-by-case basis.

2       Q    So, who in those cases would determine how many

3   points are assigned to an employee, and if, well, who in

4   those cases would determine whether points are assigned to

5   an employee?

6       A    The supervisor should ultimately determine if

7   points are going to be given because the employee always

8   has the option to go to the director of operations for

9   that meeting.  If, depending on, again, depending on the

10  incident there's been, there could be a time where you may

11  have two different violations potentially violated here.

12  One could be a four point violation.  One could be an

13  eight point.  And then there's discussion is okay, do we

14  want to go, do we want to just stick to one violation or

15  go after both of them or one of the two.  So those could

16  be the kind of discussions that take place behind the

17  scenes before discipline is actually issued.

18      Q    Okay, do you get input from union employees?

19      A    Generally, no.

20      Q    Can you think of any times where you have

21  received input from union employees?

22      A    When we would get to the safety team, if there

23  was an accident investigation where points would

24  ultimately be issued then it's a, kind of a joint effort

25  or a joint decision based between the safety team and a

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 26 of 249   Document 34-2

1    couple of members of the union staff would come in, and

2    they would discuss the accident and determine if any

3    points were to be awarded for that.

4         Q    Okay, so is that what happens whenever

5    disciplinary points are issued due to alleged safety

6    violations?

7         A    Correct.

8         Q    Okay, so in the cases of safety violations, the

9    safety team, I believe you discussed previously, is

10   involved in that discussion, is that correct?

11        A    Yes, safety --

12             MR. ZAWADSKY:  Counsel, I don't mean to

13   interfere, but I just want to make sure that you

14   understand he's still talking about 2013.  He's not

15   talking about currently.

16             THE WITNESS:  Yes.

17   BY MR. RUTENBERG:

18        Q    Okay.  And so you mentioned on the safety team,

19   at the time it was yourself, Luke Benrud, and Jamie

20   Gonnering,  is that right?

21        A    Yes.

22        Q    And you were, for lack of a better word,

23   permanent members at that time?

24        A    Yes, primary members.

25        Q    Primary members.  And then who else served on the

1    safety team?

2        A    Every so often, a maintenance manager would come

3    in and be a part of it, and then again, any floor

4    employees would have the ability to come in whenever they

5    would want.  If it was a matter of if we had to review an

6    accident, then we would take two people off the floor to

7    represent the union and have their input as well in a

8    situation like that.

9        Q    Did management have to take, have to follow what

10    the union folks on the safety committee believed would be

11    the appropriate course of action?

12        A    Not necessarily.  It would be discussed as a

13    team.

14        Q    Okay, and who ultimately makes the decision from

15    the team?

16        A    Probably the director, Luke would probably have

17    the final say.  But again, we would keep it very, it would

18    be a very, you know, open discussion.  If the union

19    employees thought there was something that, you know,

20    wasn't right or unfair, you know, they would speak up and

21    that would all be taken into consideration, but ultimately

22    it's the company's decision.

23        Q    Okay, and who determined, how is it determined

24    which or how many union employees, first, how is it

25    determined how many union employees are included in a

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 28 of 249   Document 34-2

1    safety committee meeting?

2         A    The union contract states that whenever an

3    accident report was going to be going over that the

4    minimum of two union employees had to present.

5         Q    And was it typically two?

6         A    Generally, yeah.

7         Q    And then who, how was it determined who would,

8    what two employees of these two employees would be sitting

9    in on a particular committee meeting?

10        A    Safety meetings were generally at 2:00 o'clock in

11   the afternoon, so we would usually take two of the

12   converting operators because we could shut down one dye

13   cutter machine with minimal other, you know, issues for

14   the rest of the plant.  Verus taking two laminator

15   employees, now you have six, you know, three or four other

16   laminator employees that are standing around doing

17   nothing.  The laminator is down, so generally the

18   converting crew is the crew that we would take.

19        Q    Okay.

20        A    Not always, but that's generally how it would

21   work.

22        Q    Because it made sense from a production

23   standpoint?

24        A    Correct.

25        Q    And so those two folks would be, it would just

Neal R. Gross and Co., Inc.
(202) 234-4433              Washington DC              www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 29 of 249   Document 34-2

1  depend on who those two folks happened to be at that given

2  time?

3        A    Correct.

4        Q    What kind of training did union employees receive

5  to serve on the committee?

6        A    That I'm not certain of.

7        Q    Okay, do you know of any?

8        A    I don't know what type.  If there was any

9  training done, it would be by the union stewards or the

10  union, the union leaders.

11        Q    But the company did not provide training for

12  employees who served on the safety committee on what's to

13  be expected on the safety committee, for instance?

14        A    Not that I know of.

15        Q    Okay, what about what their roles are on the

16  safety committee?

17        A    They would, I mean, we would explain, Jamie would

18  usually explain if it was people who hadn't been a part of

19  one of these before.  She would just explain, okay, we had

20  an accident that happened.  I would go over the

21  circumstance of the accident.  She would talk about the

22  safety incident form that we were going off of, at the

23  time, and just explain that.  And we would go line by line

24  discussing each item and then come to a decision after

25  that.

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 30 of 249   Document 34-2

```
 1        Q     What's a safety incident form?
 2        A     It is what, it's a form that we were using at the
 3   time for any type of safety incident.  If an accident, in
 4   this case, an accident happened, there is different
 5   criteria that we would follow.  There would be employees,
 6   basically there was five or six different line items that
 7   we would assign anywhere from, I believe it was one to
 8   five points based off of.  And then those points would be
 9   tallied up and then there was a chart that designated
10   whether there was going to be a, just a sort of remedial
11   training, a verbal warning, written discipline for four
12   points or eight points.  That just depends on how many,
13   how high the other point totaled.
14        Q     So it's kind of like a rubric?
15        A     Basically, yeah.
16        Q     Okay, and who developed that rubric?
17        A     The company developed it along with the union
18   leaders.  The form was devised and the union had input as
19   to some of the aspects of it and then ultimately it was
20   agreed upon by both parties.
21        Q     Okay, and what aspects did they have them put
22   into?
23        A     Mostly like dollar values.  For instance, one of
24   the, if there was a --
25        Q     Like physical damage?
```

Neal R. Gross and Co., Inc.
(202) 234-4433        Washington DC        www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 31 of 249   Document 34-2

1        A     Yeah, physical damage, one of the categories on

2    there was employees, did they have the knowledge to, what

3    was their knowledge level?  Are they a 20 year veteran,

4    are they, have they been there two months?  So there's

5    different points assigned based on how, you know, how

6    experienced the operator.  If you're just thinking, okay,

7    should this operator have known better in this case.

8             Another line item was an employee's past

9    history, where there was, you would go back X number of

10   years for one category, you know, zero to six months, six

11   months to one year, one year to three years, and then

12   depending on how many incidents they had in that group, or

13   how many times that it had happened in that series of

14   groups would determine how many points they got.  So they

15   would have input and say, well instead of going back zero

16   to six months let's go back zero to a year.

17        Q     Sure.

18        A     So, that was all hashed out before the form was

19   made final.  That's the type of input they would, you

20   know, they would have in that.

21        Q     And who determined what the various categories

22   would be?

23        A     Basically, the company came up with the form, and

24   then the union had their input on it.  But the form

25   itself, the categories, the columns, and all that was

Neal R. Gross and Co., Inc.
(202) 234-4433           Washington DC           www.nealrgross.com
Case 1:17-cv-00589-WCG  Filed 03/08/18  Page 32 of 249  Document 34-2

1    devised by the company.

2         Q    Okay, and when did that come into be a --

3         A    I think that I was still on third shift at the

4    time, so it may have been, it probably sometime in 2012

5    that it came up.  That's just, I'm just guessing.

6         Q    I understand.  So you said that when the two

7    union employees, at least two but typically two union

8    employees, would join the, we'll call it the standing

9    safety team, Ms. Gonnering would show them that rubric.

10   What did you call the sheet?

11        A    Safety incident form.

12        Q    The safety incident form, is that right?

13        A    Yes.

14        Q    And this may be a repeat, so I apologize, did the

15   company ever provide training on the use of the safety

16   incident form to safety team members?

17        A    Prior to those employees coming in for that

18   particular meeting, I don't believe so, but I'm not 100

19   percent certain.

20        Q    Okay, so this could be when they first come in

21   for their first meeting, that could be the first time they

22   worked with the sheet?

23        A    Possibly.

24        Q    Okay, in fact, it probably was because they

25   probably wouldn't have used this sheet if they weren't

Neal R. Gross and Co., Inc.
(202) 234-4433               Washington DC               www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 33 of 249   Document 34-2

```
1    part of the meeting, right?
2         A    Say that again.
3         Q    They wouldn't have use of this sheet if they
4    weren't part of the team.
5         A    Correct.  They wouldn't see that sheet unless
6    they were part of the meeting, yes.
7         Q    Okay.
8         A    Or if they were involved in it at some point
9    themselves.  If they were, if they were the person that
10   was being investigated in a previous incident.
11        Q    Sure, or if they had served previously?
12        A    Yes.
13        Q    So in the course of our discussion you mentioned
14   a couple of things.  You mentioned the labor agreement, is
15   that right?
16        A    Yes.
17        Q    Is the labor, and the labor agreement, from my
18   understanding, what you said, does it set forth certain
19   safety rules?
20        A    Safety rules are generally identified in the
21   company handbook.
22        Q    Okay.
23        A    There are some safety violations that are listed
24   in the union handbook.  Failure to wear protective PPE
25   would be an example.
```

Neal R. Gross and Co., Inc.
(202) 234-4433             Washington DC             www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 34 of 249   Document 34-2

1       Q    What's the difference between a safety violation

2   and a safety rule?

3       A    Well, a violation, I guess, a safety rule is

4   something that's put in place, and a violation is a

5   violation of that rule.

6       Q    Okay, so if you break a rule in the company

7   handbook, the violation is a violation of something in the

8   labor agreement?

9       A    If the labor agreement spells out a violation of

10  a plant rule, then yes, it can be disciplined for that.

11      Q    Okay, are there incidences where the safety

12  violations don't spell out the discipline for a safety

13  rule?

14      A    Ask the question again.

15      Q    Yes, I guess I'm just not totally understanding

16  what the distinction is between the safety violations and

17  the safety rules in the handbook.

18      A    You're talking in the company handbook?

19      Q    In the company handbook, yes.

20      A    Well, the company --

21           MR. ZAWADSKY:  This is no question.

22           THE WITNESS:  Okay.

23  BY MR. RUTENBERG:

24      Q    Can you please clarify what the difference is?

25      A    Well, the company handbook will spell out certain

Neal R. Gross and Co., Inc.
(202) 234-4433              Washington DC              www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 35 of 249   Document 34-2

1    work rules, safety rules, and other, just other company

2    rules.  And then if the, based off of that, specifically

3    what's in the union handbook is, the violations that are

4    listed in the union handbook can come separately, or they

5    can come from the, the company handbook, or they can be

6    just standing rules alone.

7              For instance, like there may be, just say, a

8    PPE, failure to wear PPE, it may be a union violation rule

9    in the union handbook.  It may not specifically, it's

10   something that may not specifically be addressed in the

11   company handbook, but it's in the union handbook so it's

12   an agreed upon rule.

13        Q    The union agreement, labor agreement?

14        A    Yes, the labor agreement, yes.

15        Q    Yes, okay, so there's the handbook, there's the

16   labor agreement.  Are there any other sort of sources for

17   disciplinary or safety policies?

18        A    Generally, that's it.

19        Q    Okay, is the employee handbook part of the labor

20   agreement?  And I can clarify if you don't understand the

21   question.

22        A    Re-ask the question, please.

23        Q    Sure, does the labor agreement make reference to

24   the handbook as being part of the labor agreement?

25        A    Yes.

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 36 of 249   Document 34-2

1       Q    It does?

2       A    At times, yes.  I don't know the union, I don't

3   know neither one like the back of my hand but, yes.

4       Q    I understand.  Okay, are employees given these

5   documents?

6       A    Yes.

7       Q    Okay, when are employees, and when I say these

8   documents I'm referring to the labor agreement and the

9   company handbook.  Is it called the company handbook?

10      A    Yes.

11      Q    Okay, they're given these documents?

12      A    Yes.

13      Q    When?

14      A    Company handbook usually is given, I'm guessing,

15   at orientation on their first day by human resources.  The

16   union handbook is given to them, I believe, once they pass

17   their probation and they get into the union.  I could be

18   wrong.  The union leaders may give them a contract right

19   off the get-go.

20      Q    Okay, I want to talk a little bit about the labor

21   agreement, and what I'm handing you --

22         MR. ZAWADSKY:  Are you don't with these two

23   exhibits?

24         MR. RUTENBERG:  I should be.

25         MR. ZAWADSKY:  Do you want to give them to the

Neal R. Gross and Co., Inc.
(202) 234-4433         Washington DC         www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 37 of 249   Document 34-2

1    reporter?

2              MR. RUTENBERG:  Why don't you just hold onto

3    them?  There could be a bunch of them and we'll just be

4    swapping back and forth.

5              MR. ZAWADSKY:  Okay.

6    BY MR. RUTENBERG:

7         Q    What I'm handing you is pre-labeled as Exhibit 6

8    or GX-6.  Feel free to take a look at that.

9              (Government's Exhibit No. GX-6 was marked for

10             identification.)

11             MR. ZAWADSKY:  Thank you.

12   BY MR. RUTENBERG:

13        Q    Let me know when you're ready.

14        A    I'm ready.

15        Q    What is GX-6?

16        A    I'm sorry?

17        Q    What is GX-6?  What is the Exhibit 6?

18             MR. ZAWADSKY:  He wants you to identify it.

19   BY MR. RUTENBERG:

20        A    It's the labor agreement between Dura-Fibre and

21   the USW.

22        Q    Okay, does it appear to be a full, accurate, and

23   complete copy?

24        A    It does.

25        Q    And this was, from what dates was this enforced?

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 38 of 249   Document 34-2

1          A     October 19th 2009 to June 22nd 2013.

2          Q     Okay, and presumably there's a new one?

3          A     Yes.

4          Q     Okay, how was the labor agreement, do you know

5     how the labor agreement was created?

6          A     Discussions between the company and the, the

7     union leaders long ago when the union was first

8     established at Dura-Fibre.

9          Q     Okay, were you involved?

10         A     No.

11         Q     Okay, do you know what the purpose of the labor

12    agreement is?

13         A     To govern, to govern how Dura-Fibre, certain

14    aspects of the employee's rights and privileges and

15    expectations while employed with the company.

16         Q     Okay, before we talked about the safety team, is

17    that right?

18         A     Yes.

19         Q     Could you please turn to page 17 of GX-7, I'm

20    sorry, GX-6?  And I would just direct your attention to

21    Article 34 health and safety committee.  Is that the

22    safety team you're talking about?

23         A     Yes.

24         Q     So, if we use the term safety team or health and

25    safety committee, you understand what we're talking about

Neal R. Gross and Co., Inc.
(202) 234-4433               Washington DC               www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 39 of 249   Document 34-2

1    here?

2          A    Correct.

3          Q    Okay, do you know who Lonnie Zeppel is?

4          A    Yes.

5          Q    Before you were talking about the training, do

6    you know if Lonnie Zeppel was trained on how to be a

7    committee member?

8          A    I am not certain.

9          Q    Do you know who Mark Woody is?

10         A    Yes.

11         Q    Do you know if he was trained?

12         A    I am not certain.

13         Q    Did you ever train him?

14         A    No.

15         Q    I will refer you to 34.2 on page 17.  Do you see

16   that paragraph, 34.2?

17         A    Yes.

18         Q    It says plant, can you read that for me, please?

19         A    Plant health and safety rules as established by

20   this committee are recognized as a part of this agreement,

21   which shall be the duty of the company and the union to

22   enforce compliance with all health and safety rules and

23   requirements.

24         Q    Do you know what plant health and safety rules

25   this is referring to?

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 40 of 249   Document 34-2

1        A     Just all safety, all safety rules that are

2    identified either by the union contract or the company

3    handbook.

4        Q     So, were them rules in the employee handbook, the

5    one you discussed before, were those established by the

6    Health and safety committee?

7        A     I don't necessarily know if they were established

8    by the health and safety committee.  The company itself

9    would establish rules, and then what the, I'm not sure how

10   things were established long ago when all this was

11   created.

12       Q     Okay, well were any rules put into place while

13   you, were any safety rules put into place while you served

14   on the committee.

15       A     Any new rules?

16       Q     Yes or any updated rules or amended rules?

17       A     I don't remember what was new between those

18   periods of time when I was involved.

19       Q     So you don't remember if any rules were

20   established or amended?

21       A     Not off the top of my head, no.

22       Q     Okay, if I could refer you to page 20 of GX-6.

23   What does page 20 show?

24       A     The beginning of the plant discipline rules.

25       Q     Okay, and does this set forth the point system

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG    Filed 03/08/18    Page 41 of 249    Document 34-2

1  policy for violations?

2          A    It does.

3          Q    Okay, now I'm going to, you know, terms like

4  points and disciplinary points.  If you don't know what

5  I'm talking about, just please ask me and I'll do the same

6  for you.

7          A    Yes.

8          Q    Does the company use a particular name for the

9  rules that are assigned that you discussed before?

10         A    A particular name?

11         Q    Yeah, like are they just called points?

12         A    Points, yes.

13         Q    So can you read paragraph one under Exhibit B of

14  Exhibit 6?

15         A    Any employee who accumulates 24 points for

16  violation of plant rules is just cause for discharge.

17         Q    Okay, in your mind, is that required discharge?

18         A    For the most part, yes.

19         Q    Okay, are there other events that can lead to

20  discharge if the employee has not received 24 points?

21         A    I'm just trying to think of an example.  In most,

22  in my time, most events that have happened have been able

23  to be tied to the union contract, I guess.  If somebody,

24  if somebody, yeah, I mean I've never had this happen, but

25  if somebody just stopped showing up for work because they

1    were in jail or they just took off, I mean, eventually

2    they would be terminated for, you would accumulate a

3    couple of

4    no-call/no-shows and you would get up to 24 points.

5              For the most part, in my experience

6    everything is tied to the point system for termination.

7    I'm sure there are, I'm sure there are occurrences that

8    could happen that haven't.

9    Q    So you can't think of any particular occurrence

10   that's not tied to the point system?

11   A    Not, not, not right now, no.

12   Q    Okay, but there are individual acts that can lead

13   to 24 points, is that right?

14   A    Yes.

15   Q    And are those all set forth in the agreement?

16   A    Yes.

17   Q    Where?

18   A    Bottom of page 21, group 3 into page 22.

19   Q    Okay, can an employee be discharged if they don't

20   reach 24 points?

21   A    Generally with this as the criteria, no.

22   Q    Can you think of any time where an employee has

23   been discharged without having reached 24 points?

24   A    No.

25   Q    Okay, so when an incident occurs, whether it be

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 43 of 249   Document 34-2

1  safety, tardiness, et cetera, do the managers seek to tie

2  that incident to some place within the labor agreement?

3        A     Generally, yes.

4        Q     So, that they may assign points?

5        A     Yeah, these rules govern how we assign points and

6  how they're tracked.

7        Q     Okay, do you rely on any other documents to

8  determine how to assign points other than that rubric you

9  talked about before?

10       A     Other than that, no.

11       Q     I want to refer you to page 20 again, paragraph

12  four, excuse me, group one, paragraph four.

13       A     Okay.

14       Q     What does it say?

15       A     Committing an unsafe act, four to eight points

16  with input from the safety committee.

17       Q     Okay, what is an unsafe act?

18       A     Just an event that a person does that doesn't

19  have regard for safety or a reckless act, reckless

20  behavior.

21       Q     Okay, and what do you mean, not regard for --

22       A     Just being careless.

23       Q     What are examples of careless acts?

24       A     Walking across moving conveyors when there's

25  walkways available, not having PPE on, you know, steel

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 44 of 249   Document 34-2

1    toed shoes or hearing protection, eye protection, trying

2    to lift something improperly that's heavier than what

3    you're capable of lifting when there's a hoist available,

4    reckless driving of a tow motor, are just some examples.

5        Q    Do you have separate, does Dura-Fibre have

6    separate policies or relating to how folks should lift?

7        A    There is, I believe there is a, there is some

8    training on proper lifting technics during orientation.

9    I'm not 100 percent sure of that.

10       Q    Are there any guidance documents?

11       A    That I'm not sure of.

12       Q    Okay, what about on PPE, and PPE, just to be

13   clear is personal protective equipment, correct?

14       A    Correct.

15       Q    Such as goggles?

16       A    Hearing, yes, hearing, earplugs, eye protection,

17   steel toed shoes.

18       Q    Okay, is there any training that the employees

19   receive on PPE?

20       A    Yes, generally that's at orientation.

21       Q    Okay, and are there documents that they are given

22   related to that training?

23       A    Yeah, there's video that they usually watch, and

24   then they take a quiz, and then those quiz results are

25   generally, become a part of their personnel file.

Neal R. Gross and Co., Inc.
(202) 234-4433              Washington DC              www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 45 of 249   Document 34-2

```
1        Q    Does an employee, I'm sorry.

2        A    And then whenever there's retraining, if there's

3   yearly training or every other year retraining then that

4   happens as well and documentation is kept on that.

5        Q    Such as like a fair?

6        A    Correct.

7        Q    A safety fair.

8        A    Yes.

9        Q    Okay, and are there safety rules in the employee

10  handbook relating to PPE?

11       A    I believe so.

12       Q    Okay, what about to lifting?

13       A    Lifting, I'm not 100 percent sure what's all

14  spelled out in there.

15       Q    Okay, what about say driving?

16       A    Like a tow motor?  I'm not, I'm not certain what

17  is referenced in the, specifically, in the company

18  handbook in regards to that.

19       Q    And then so you said careless, what would

20  reckless behavior be?

21       A    Driving top speed on a tow motor around a corner

22  without sounding a horn.

23       Q    What's a tow motor?

24       A    A forklift.

25       Q    A forklift, and are the folks who drive
```

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 46 of 249   Document 34-2

```
1    forklifts, are they trained on how to drive a forklift?
2         A    Yes.
3         Q    And do they have certifications?
4         A    There's a training, yeah, they're training by a
5    certified trainer.  They have to watch a video, take a
6    quiz, and they have to go through a training process, a
7    training checklist before they're allowed to operate a tow
8    motor, a forklift, on their own.
9         Q    So, does the company provide such training?
10        A    Yes.
11        Q    Or at least pay for it?
12        A    Yes, we have in-house employees who do the
13   training.
14        Q    Okay, so they would know when they're doing
15   something wrong, is that correct?  Or should they know?
16        A    They should.
17        Q    Okay.
18        A    Can we take a quick three minutes or so?
19             MR. RUTENBERG:  Absolutely.
20             (Off the record.)
21             MR. RUTENBERG:  We're back on the record.
22   BY MR. RUTENBERG:
23        Q    Mr. Blair, we were talking about the labor
24   agreement and the term unsafe act, as used in the labor
25   agreement, is that right?
```

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 47 of 249   Document 34-2

1      A      Yes.

2      Q      Okay, have employees been trained in the meaning

3   of an unsafe act?

4      A      I don't believe there's been any specific

5   training other than knowing what's covered in orientation.

6   There are some unsafe acts I'm sure they have been trained

7   on.  Tow motor drivers, for instance, they know the

8   difference between the proper operation and reckless

9   operation.  Same with lifting techniques, so it's not a,

10  there are certain situations or certain circumstances,

11  yes, where they're trained on what's safe and what's

12  unsafe.

13     Q      Okay, is there anything else you can think of

14  beyond lifting and using a forklift?

15     A      Not off the top of my head, as a general rule.  A

16  lot of it is just common sense.

17     Q      Okay, but are they, and just, you know, to ask a

18  slightly different question, are they trained on the

19  contours of what an unsafe act as used in the agreement

20  is?

21     A      There's not that specific amount of training

22  done, no, that I am aware of.

23     Q      Is something like bumping your head, is that an

24  unsafe act?

25     A      It could be construed as one, if you didn't, if

1    you weren't watching what you were doing.

2        Q    Okay, can an act that leads to an employee

3    hurting or injuring themselves not be an unsafe act?

4        A    Of course.

5        Q    What's an example of that?

6        A    If something falls off a shelf and injures an

7    employee, that they have no control over.

8        Q    Anything else?

9        A    That's about all that I can think of.  Just any

10   event where there, it's out of the employee's control that

11   they got hurt.  Another employee hits them with a tow

12   motor, that's nothing they initiated.  They were the

13   victim in that case.

14       Q    So, just to ask the question, is it possible to

15   hurt, is it possible for an employee to commit an unsafe

16   act without hurting himself or someone else?

17       A    Sure.

18       Q    What's an example of that?

19       A    Committing an unsafe act where they don't hurt,

20   if there trying to pick up too much, if a forklift

21   requirement stated a certain amount of pounds and they

22   pick up over that and a forklift starts to tilt forward or

23   it obstructs their view and they almost run into

24   something.  I mean, that's considered an unsafe act.

25       Q    Okay, have you issued unsafe acts where no one's

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC              www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 49 of 249   Document 34-2

1    been hurt, or have you ever issued points for an unsafe

2    act where someone, no one's been hurt or damage has been

3    done?

4         A    I may have.  I don't remember any, I don't

5    remember all the disciplines that I handed out during my

6    time as a supervisor.

7         Q    But can you think of any?

8         A    Not off the top of my head, no.

9         Q    Okay, have you handed out disciplinary points

10   where it's determined that an employee has committed an

11   unsafe act?

12        A    Yes, in the Jacobs case, yes.

13        Q    Okay, any other cases?

14        A    None that I can remember.

15        Q    Okay, has the company, you sat on the safety

16   committee right?

17        A    Yes.

18        Q    Has the company issued disciplinary points to

19   other people based off of unsafe acts.

20        A    I'm not certain.  I haven't been, during my time

21   when I haven't been on part of the safety team, I'm not

22   certain.

23        Q    But the time that you were on the safety team?

24        A    Yes.

25        Q    Okay, and where any of those issued in cases

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 50 of 249   Document 34-2

1    where no one was injured or no property damage occurred?

2        A    I don't, I don't recall.

3        Q    Is it possible, has there been a situation where

4    an employee has hurt himself or herself due to an

5    accident, but no points resulted?

6        A    I guess it's possible.  I don't recall specific

7    incidence, though.

8        Q    Okay, it says in the, it says in the labor

9    agreement at GX-6 that four to eight points with input

10   from the safety committee are --

11       A    Yes.

12       Q    Right, and you indicated before that once it is

13   determined there is an unsafe act, an employee must get

14   four to eight points, is that correct?

15       A    That's how it reads.  Based off the safety

16   incident report, though, I believe it says there's, again

17   everything from remedial training, verbal warning.  I

18   don't know if verbal warning is for sure on there.

19   Remedial training and then four to eight points depending

20   on how high, how the criteria is met on that form.

21       Q    Okay, so just to clarify from before, it is

22   possible for an employee to commit an unsafe act but

23   receive fewer than four points, is that correct?

24       A    Based off, if going off of that safety incident

25   report, then I would say yes.

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 51 of 249   Document 34-2

1    Q Okay, is it possible to go more than, get more

2 than eight points?

3    A I don't believe so, I believe eight is the limit

4 on that form.

5    Q Regardless of how egregious the unsafe act is it

6 can't go above eight, is that right?

7    A I'm fairly certain, I mean unless there's a

8 situation where somebody deliberately damages company

9 property with a tow motor, they recklessly drive into a

10 rack and damage equipment, that could be construed, I mean

11 that could be construed as something more than an unsafe

12 act, though, so.

13    Q Right, so it probably wouldn't be listed as an

14 unsafe act?

15    A Probably, yeah.

16    Q Can you think of a time in the, well, yes, can

17 you think of a time or an incident where an employee hurt

18 or injured himself but did not receive points?

19    MR. ZAWADSKY: I'm going to object.  I believe

20 that question has been asked and answered.

21 BY MR. RUTENBERG:

22    Q You can still answer.

23    A Not that I can think of off the top of my head.

24    Q How often are employees injured, or is it

25 determined that they're injured?

Neal R. Gross and Co., Inc.
(202) 234-4433   Washington DC   www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 52 of 249   Document 34-2

1    A    I mean it runs in streaks.  We have good, I mean

2  we have good years and there's years where's there's been,

3  you know, maybe multiple recordables.  It just kind of

4  comes in streaks, comes and goes.  I'm not involved in

5  that much, late, you know, the last couple years now.

6    Q    I'm talking about when you were on the safety

7  committee?

8    A    I don't know, we probably had, during that, my

9  time as a team member we probably had some of the better

10  safety numbers we've had in recent years.  I know we made

11  a big push for increased, stressing safety and, you know,

12  proper lifting techniques, proper, you know, procedures on

13  the machine to avoid injuries.  I know we did have one

14  year, I know we did have one year we were, I don't think

15  we had any recordables all year, that might have been

16  actually 2012.

17    Q    Right, to be clear I'm not just talking about

18  recordable.  I assume when you say recordable you mean

19  recordable for OSHA purposes?

20    A    Yeah.

21    Q    I know I work in a OSHA office, but I'm just

22  asking generally speaking injuries that, you know, could

23  be a small little scrape or something that gets, that you

24  guys take notice of?

25    A    Yeah, those ---

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 53 of 249   Document 34-2

1      Q     How frequently?

2      A     Yeah, those happen, I won't say they happen

3   frequently.

4      Q     How frequently?

5      A     Maybe, I don't know, once every, I don't know I'm

6   just guessing here, maybe once a month, maybe once every

7   two months.  So, they come in streaks, I may go, I may

8   have gone three months without filling out an accident

9   report, then I might have a couple in a week.  It's just

10  based on it's, there's no real pattern to it

11     Q     All right, I want to ask you, I'm going to refer

12  you to GX-7, Exhibit 7.  Please take a look, please feel

13  free to review, and let me know when you're ready.

14                        (Government's Exhibit No. GX-7 was

15                         marked for identification.)

16     A     Right.

17     Q     What is that?

18     A     Dura-Fibre employee handbook.

19     Q     Is it a full and accurate complete copy?

20     A     Appears so.

21     Q     What is its purpose?

22     A     To establish company-wide rules.

23     Q     Who developed it?

24     A     I believe the owners of the company at the time,

25  whether it was Brian Dunsirn or any of the previous

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 54 of 249   Document 34-2

1    owners.  I don't know how they've been passed along

2    through some of the ownership changes.

3         Q    Was it in force in May 2013?

4         A    Yes.

5         Q    Can we turn to page nine of GX-7.  Can you turn

6    to the safety policy piece?

7         A    Okay.

8         Q    And start, and read the sentence that starts with

9    Dura-Fibre?

10        A    Dura-Fibre is committed to providing a safe work

11   environment ---

12        Q    I'm sorry, the second paragraph that starts with

13   Dura-Fibre.

14        A    Dura-Fibre has multiple options to choose from.

15        Q    I'm sorry, I'll just, Dura-Fibre will provide,

16   you can just start with the Dura-Fibre piece.

17        A    The first sentence under safety?  Dura-Fibre will

18   provide the proper tools needed to work safely, but it is

19   up to each of us to use these tools in the proper manner.

20        Q    What does tools mean there, in your opinion?

21        A    Training and proper personal protective

22   equipment.

23        Q    And what does the second part of that sentence

24   mean to you, what does up to each of us to use these tools

25   in the proper manner?

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 55 of 249   Document 34-2

1    A    Each employee has to actually take their own, you

2   know, hold themselves accountable and take their own

3   responsibility to work safely, and use the equipment that

4   they're given, use the training that they were given, and

5   just generally, you know, common sense be able to move

6   about the plant in a safe manner.

7    Q    What do you mean, move about the plant in a safe

8   manner?

9    A    Not running, not walking through spilled, you

10  know, water spills or glue, being aware of your

11  surroundings.

12   Q    And if you could just turn to page 10, and could

13  you read the second to last full paragraph starting with

14  it?

15   A    It is the company's responsibility to provide you

16  with a safe place to work, and to give you the necessary

17  safety training so that you can avoid accidents to

18  yourself or to others.

19   Q    Okay, thank you.  So, this is once again

20  reiterating the training, is that correct?

21   A    Yes.

22   Q    And I'm sorry, I cut you off, you can read the

23  next sentence.

24   A    It is your responsibility to work safely.

25   Q    And the employees are trained, you said, annually

Neal R. Gross and Co., Inc.
(202) 234-4433            Washington DC            www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 56 of 249   Document 34-2

1    at a, is it at a safety fair?

2         A    We did have a safety fair that we had for a

3    couple of years, and then the last, probably three or four

4    years they've stopped doing that and they basically, every

5    month there's monthly safety meetings, and then the cover

6    a topic that needs to be, you know it has to, up for a

7    yearly re-training every month.

8         Q    When did you start doing that?

9         A    The monthly safety meetings?

10        Q    Yes.

11        A    There was safety meetings in, I want to say

12   probably 2014, about 2015 would be when the monthly safety

13   meetings replaced the safety fair.

14        Q    Okay, but what kind of training was provided in

15   2013 and before?

16        A    I believe we had a safety fair, where it was just

17   the one day, one day training where all the topics would

18   be covered.

19        Q    And what was covered?

20        A    PPE, I believe tow motor re-certification for

21   those who worked, or drove on a tow motor forklift, blood

22   borne pathogens I believe was a topic.  There was numerous

23   other topics, I don't remember all of them.

24        Q    Were there PowerPoints or materials provided?

25        A    PowerPoint, yeah, each presenter would take a

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 57 of 249   Document 34-2

1  topic and there would be a PowerPoint or some sort of

2  demonstration and then a quiz at the end of each topic.

3      Q    Do you know if Dura-Fibre still has these

4  PowerPoints?

5      A    I'm sure they're still somewhere on someone's

6  computer drive.

7      Q    What does it mean to work safely, according to

8  this, it is your responsibility to work safely?

9      A    Again, just use the tools that were provided to

10  you, be aware of your surroundings, know what's above you

11  and around you and on the floor where you're walking when

12  you're going up and down stairs to not trip when you're

13  coming down or upstairs.

14      Q    Can an employee, yes, go ahead.

15      A    Yeah, you know not, again, if you're working

16  underneath a machine know that it's above you, so when you

17  stand up and you bump your head you can't blame anybody

18  else but yourself.  It's common, a lot of common sense

19  stuff.

20      Q    Can an employee work safely but still injure or

21  hurt himself?

22      A    I suppose it's possible.

23      Q    Why do you suppose that?

24      A    Well, I mean if you're working safely and

25  something else happens it's out of, it's something that's

Neal R. Gross and Co., Inc.
(202) 234-4433            Washington DC            www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 58 of 249   Document 34-2

1    out of your control that happens, like I said before if

2    there's, something falls on you, if you're standing in,

3    stringing up a machine and something falls off the top of

4    the machine and hits you, you're working safely as you

5    possibly can but it's something that was out of your

6    control.

7         Q    Right, but I said, I'll just re-ask the question.

8    Can an employee work safely but still injure or hurt

9    himself?

10             MR. ZAWADSKY:    I think ---

11             MR. RUTENBERG:  So, if something falls onto

12   someone, you know, arguable that's not hurting themselves.

13             MR. ZAWADSKY:  I'm going to object, asked and

14   answered.  I think this is now the third time we're going

15   through this.  Answer that question if you can.

16             THE WITNESS:  It's possible.

17             MR. RUTENBERG: Okay, can an employee still work

18   safely and be involved in an accident?

19             MR. ZAWADSKY:  Objection, asked and answered.

20             THE WITNESS:  Yeah, I think I answered it, yeah

21   it's possible.

22   BY MR. RUTENBERG:

23        Q    Are these, are those two sentence you read, it is

24   the company's responsibility to provide you with a safe

25   place to work and to give you the necessary safety

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 59 of 249   Document 34-2

1    training so that you can avoid accidents to yourself or to

2    others, it is your responsibility to work safely, are

3    those safety rules?

4         A    A combination of safety rules, and I think just

5    common sense rules, too.

6         Q    So, do you consider those to be safety rules?

7         A    Sure.

8         Q    Could you just flip the page.  If they are safety

9    rules, why are they not under safety rules on the next

10   page?

11        A    The safety rules there's, you can't spell out

12   every single situation in life as a rule.  I mean these,

13   these safety rules are specific incidents that are

14   specific examples that have been identified.  But you

15   can't categorize everything in life, you can't necessarily

16   categorize common sense, you know, working safely.

17        Q    You keep using the phrase common sense.  What are

18   examples of accidents that can occur, or injuries that can

19   occur where an individual is not exercising common sense?

20        A    There's a big glue spill on the floor and someone

21   goes walking right through it or running through it, or

22   sliding through it and they fall and get injured.

23        Q    What else?

24        A    Again, working underneath the machinery when you,

25   you're underneath a rack where you know, you've gone in

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 60 of 249   Document 34-2

and out of this rack multiple times and then all of a
sudden you stand up and bump your head.  Or you walk, or
you're walking up or down a flight of stairs that you've
navigated dozens or hundred of times in your tenure with
the employee, or with the company, and you trip on your
way down.

Q    And that's a lack of common sense?

A    It's just a lack of, it's just carelessness.
It's just a lack of coordination.

Q    Lack of coordination?

A    If you were more careful, you were watching where
you're putting your two feet and you're using railings and
you're not trying to run, you know, run down or, you know,
navigate down or up some stairs faster than you should.

Q    And those types of incidents might be an unsafe
act?

A    I believe so, yes.

Q    Has the company ever provided training on how to
go up and down stairs?

A    Not that I know of.

Q    I want to refer you to what is the 10th bullet
point down, it's the one that's just above the bold and
immediately, and it's that bullet point.  Can you read
that,  please, it starts with every.

A    Every accident, including near misses, must be

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 61 of 249   Document 34-2

1    reported to your supervisor and human resources
2    immediately.

3        Q    So, in  your opinion what does immediately mean?

4        A    As soon as possible after the incident occurs.

5        Q    And is that the rule that it needs to happen,
6    well, immediately and so you think immediately and as soon
7    as possible mean the same thing?

8        A    Well, if an employee is injured, I mean if
9    immediately is immediately after they walk five minutes to
10   the other side of the plant to go notify, you know, human
11   resources and a supervisor because they weren't in the
12   area at the time, that's as immediate as you can get --

13       Q    Okay.

14       A    -- or if the supervisor is standing 10 feet away
15   and that immediate is 10 seconds versus five minutes, it's
16   as soon as they can get to the proper individual who they
17   are supposed to report it to.  There should be no delays.

18       Q    And is that the guidance you've provided to
19   employees?

20       A    Yes.

21       Q    No delays and immediate?

22       A    You have to report, you don't, you can't, you
23   don't wait a day to report an injury, or you don't wait
24   three hours to report an injury when you saw your
25   supervisor 10 times in that same amount of time.  That

Neal R. Gross and Co., Inc.
(202) 234-4433            Washington DC            www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 62 of 249   Document 34-2

1   would be the, to me the difference between immediately and

2   a delay, or not immediately.

3       Q    What is an accident as this phrase is used in the

4   sentence?

5       A    An event or an occurrence where there is

6   potential for, where an individual is injured or there is

7   damage to company property.

8       Q    And how do you know that definition?  Where is

9   that definition from?

10      A    It's just the definition that I know of as an

11  accident.

12      Q    Is that the company definition?

13      A    If it's defined specifically that way, that's, I

14  believe so.

15      Q    And what's a near miss?

16      A    A near miss is an incidence or occurrence of

17  something that happens that could result in an injury to

18  somebody or could result in damage, but doesn't.

19  Basically a close call.

20      Q    So, a near miss is an incident where no injury or

21  physical damage occurred?

22      A    Yes.

23      Q    So, for instance, would playing with a knife

24  that, say I'm playing with, say you're playing with a

25  knife and you don't get hurt by it, could that be a near

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 63 of 249   Document 34-2

1    miss?

2         A    Could be, if the blade is exposed, you're

3    flipping it around, or yeah, playing with it in a manner

4    outside of how it's designated to be used, sure.

5         Q    But that's a near miss?

6         A    If you're not injured, yes.

7         Q    But if you are injured, it might be an accident?

8         A    It's an accident.

9         Q    And how is it determined that an injury has

10   occurred?

11        A    Usually it's based on what you physically can

12   see, or what an employee would tell you.

13        Q    Okay, so what are some of the factors you would

14   consider as a supervisor, as to whether someone was

15   injured?

16        A    If somebody is bleeding, if somebody is limping

17   around, if somebody is favoring a body part or extremity,

18   or if they tell me, yeah, I hurt my shoulder.

19        Q    So, if an employee feels pain at any moment

20   that's considered an injury?

21        A    In my eyes, yes.

22        Q    In your eyes.  Are the employees, have the

23   employees been trained on that?

24        A    I don't know what specific training they got for

25   identifying an injury.  Again, it kind of goes back to

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG    Filed 03/08/18    Page 64 of 249    Document 34-2

```
1    common sense, an employee knows when they did something
2    and they hurt something.  They know if they feel a muscle
3    tweak or a pull or a sprain or something.  If they hit
4    their head and their head hurts, they know themselves, I'm
5    not a doctor, I can't diagnose an employee's, whether
6    they're injured or not.  Sometimes I am going off of
7    their, their opinion on what ---
8         Q    Right, so in your life have you ever bumped an
9    elbow?
10        A    Of course.
11        Q    And did the pain go away in a second, or very
12   quickly?
13        A    Sometimes.  Sometimes it stuck around for a
14   while.
15        Q    Okay, and the times where it went away quickly
16   did you consider yourself injured?
17        A    For a brief moment, probably, if I thought about
18   it that way.
19        Q    So, any time someone feels, have you ever bumped
20   your elbow and felt no pain?
21        A    I'm sure.
22        Q    Okay, would that be an injury?
23        A    I didn't feel any pain, I guess I didn't notice
24   anything different, or if I didn't, if it didn't
25   inconvenience me or it didn't throw, you know, throw a
```

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC              www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 65 of 249   Document 34-2

1    wrench in my day in any way, even for a split second, I

2    would probably say no.

3        Q    And again, though, since you're the one meting

4    out and doing investigation, did you ever provide any

5    training to the people who worked under you on, sort of

6    that definition of what injury might be?

7            MR. ZAWADSKY:  Object to form of question.

8    Answer the question if you can.

9            THE WITNESS:  Not that I specifically remember.

10   BY MR. RUTENBERG:

11       Q    So, you understand the idea of an injury is

12   somewhat subjective.  Do you believe that an injury can be

13   subjective?

14       A    I guess it's possible, I mean everybody has their

15   own tolerance for what they think, for their bodies, I

16   mean they have their own opinions, too.  So, I guess it is

17   very objective.

18       Q    Subjective.

19       A    Subjective, I'm sorry.

20       Q    That's okay.  Now, is an injury actual damage to

21   the body?

22       A    I think just any time where somebody feels

23   something pain.  I mean, it could, like you said it could

24   be a pain that goes away in five seconds, or it could be

25   something that leads to surgery.  I think it's all

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 66 of 249   Document 34-2

1    considered an injury.

2        Q    If an employee bangs his head and you see it, how

3    would you consider whether that was an injury or a near

4    miss?

5        A    It would be an injury because they, I physically

6    saw them bang their head.  They didn't just almost bang

7    their head, they actually banged their head, and I guess I

8    would question them, are you okay, and if they're,

9    generally when you bang your head there's some sort of

10   pain you feel.

11       Q    But what if they, go ahead.

12       A    If they're, if they don't, I guess I'd question

13   them, ask them if they're okay, and if they're, you know,

14   yeah, I got a little bit of a bump here or it hurts or

15   whatever, then would initiate an accident report from

16   there, I guess.

17       Q    What if they say they're okay?

18       A    Well, they may say they're okay, but that still

19   might mean they, yeah, did you hurt yourself?  Yeah, but

20   I'm okay, okay, well that's different than if, if they

21   bang their head and now they're bleeding.  But I guess

22   that would have to take, going to have to be the situation

23   where, a lot of times again you're going off of what

24   they're telling you.

25       Q    So, is there a circumstance where an employee

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 67 of 249   Document 34-2

1    might bang their head, you would witness it, and they say

2    I'm fine, I'm not hurt and you wouldn't open up an

3    investigation?

4         A    I don't know, if I was put in that situation, I

5    don't know.

6         Q    Well ---

7         A    I haven't had that type of situation

8         Q    Well, if you don't know how do, let me ask you

9    this.  If you don't know how you would react, how does the

10    company expect employees to know how to react?

11         MR. ZAWADSKY:  Object to competency of witness to

12    answer the question.  Object to form of question.  Answer

13    the question if you can.

14         THE WITNESS:  The company has to trust that the

15    employee is competent enough in, I guess for lack of a

16    better term, life, to know if you hit your, it's common to

17    me, it goes back to the common sense where if you're, if

18    you hit your head you know yourself whether, whether

19    you're hurt or not.

20    BY MR. RUTENBERG:

21         Q    Or whether you're injured?

22         A    Or whether you're injured, whether it was, it

23    doesn't even have to be a head, just you're trusting that

24    your employees are, again, just competent individuals that

25    you don't, just know some of the stuff through life.

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 68 of 249   Document 34-2

1          Q    If you could please turn to page 12 of GX-7,

2    thank you very much.  Could you just read the first three

3    sentences of the top piece that says on the job injuries?

4          A    Every injury, no matter how slight, must be

5    reported immediately to a supervisor and human resources,

6    and an incident report must be completed.  If medical

7    treatment is necessary a company leader will arrange it

8    for you promptly.  Keep going?

9          Q    Yes, please, the next sentence.

10          A    Corrective action may be taken if the incident is

11    not reported promptly or a safety policy has been

12    violated.

13          Q    Now, what is corrective action?

14          A    Just a discipline.

15          Q    So, we're talking about like the disciplinary

16    points?

17          A    Points, points, yeah.

18          Q    Or coaching?

19          A    Right up, yeah or some type of verbal talking to

20    or written warning or something along those lines.

21          Q    It says corrective action may be taken if the

22    incident is not reported promptly or safety, or a safety

23    policy has been violated.  I'll just ask again, but given

24    this language must there be corrective action taken if

25    someone is not, if an employee does not promptly report an

Neal R. Gross and Co., Inc.
(202) 234-4433              Washington DC              www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 69 of 249   Document 34-2

1   injury?

2       A    If it says may be taken, that's not an absolute,

3   or it doesn't specify that you have to.

4       Q    Have there been instances where an employee, and

5   let me just ask you, who needs to report, how does a

6   report go?  It says immediately, an injury needs to be

7   reported immediately.  So, who needs to be reported to?

8       A    The employee should report it, as it says,

9   immediately to a supervisor.  If it's a, you know, if it's

10  an employee and a lead operator is there you can report it

11  to the lead.  But regardless, between the two of them it

12  needs to get reported up the chain to the supervisor.

13      Q    Okay.

14      A    And eventually to HR, which I would, as the

15  supervisor I would do the notifications of HR, unless HR

16  happened to hear about it before me.

17      Q    And what if the supervisor is unavailable or

18  something like that?

19      A    Then they should go to human resources or go to

20  any other member of management, or try to contact the

21  supervisor or the lead.  Again, if the lead is, if it's

22  third shift and there's nobody around the lead is in

23  charge of the, of the machine, the employee would report

24  it to the lead, and then the lead would notify the

25  supervisor at the, you know, next most available time or

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC              www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 70 of 249   Document 34-2

1    the most convenient time.

2         Q    So, once it is known an injury occurs, somebody

3    must be verbally made aware of that injury that day,

4    correct?

5         A    Yes, generally before the end of their shift is

6    when it has to be, is when it has to be, no I'm sorry, let

7    me take that back, that's the accident report that has to

8    be filled out before the end of the shift.  The actual

9    reporting of the injury, again, immediately or as close to

10   immediate as possible, given who is available at the time.

11        Q    So, we're talking a little bit about accident

12   reporting.  Would you consider this to be accident

13   reporting?

14        A    Yes.

15        Q    Does Dura-Fibre have an accident reporting

16   policy?

17        A    Yes.

18        Q    What is its purpose?

19        A    Obviously to, we're legally bound to report all

20   work place accidents.  Obviously the accident serves as

21   a, the investigation takes place when a, the cause of the

22   accident has occurred sometimes they bring to light

23   policies or procedures that need to be changed.

24        Q    I'm going to refer you to GX-9, or Exhibit 9.

25   Can you take a moment to look at GX-9.  What is GX-9?

Neal R. Gross and Co., Inc.
(202) 234-4433              Washington DC              www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 71 of 249   Document 34-2

1                                          (Government's Exhibit No. GX-9 was

2                                                marked for identification.)

3      A    Accident reporting investigation plan for the

4 company.

5      Q    And is this a full, accurate and complete version

6 of the plan that was revised on January 23rd, 2013?

7      A    It appears so.

8      Q    Do you have any reason to believe it's not?

9      A    No.

10     Q    Is this the version of the plan that was in force

11 in May 2013?

12     A    Yes.

13     Q    For how long prior to this did Dura-Fibre have an

14 incident plan with this, excuse me, let me, before you

15 were talking about near miss and accidents, correct?

16     A    Yes.

17     Q    Are those discussed in the accident reporting

18 investigation plan?

19     A    They are.

20     Q    For how long prior to January 23rd, 2013 did

21 Dura-Fibre have an incident reporting plan with this near

22 miss accident definition?

23     A    I'm not certain of that.

24     Q    Has it been there since you were there?

25     A    I believe so.

Neal R. Gross and Co., Inc.
(202) 234-4433           Washington DC           www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 72 of 249   Document 34-2

1    Q    And that was 2009?

2    A    2009, yeah.  I don't recall specifically when

3   those, when verbiage changed or when that happened or

4   verbiage added.

5    Q    Can you estimate how many years prior to 2013?

6    A    I can go back, three-and-a-half years that I've

7   been here, prior to that.

8    Q    Okay.

9    A    That I recall.

10    Q    Whose responsibility is it to enforce this plan?

11    A    All members of management.  Primarily the

12   supervisor enforces the safety rules, but the human

13   resources, again any member of management who sees any

14   type of safety violation can, has the authorization to act

15   on it.

16    Q    So, it was your responsibility in part?

17    A    Primarily, yes.

18    Q    And do you know who put together this plan that

19   was revised on January 23rd, 2013?

20    A    Not specifically, no.

21    Q    Do you have any ---

22    A    Jamie Gonnering may have been involved in

23   devising this, or it may have been before her time and she

24   inherited it when she came on to the company.  I'm not

25   sure when exactly this policy came into play.

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 73 of 249   Document 34-2

1    Q    Do you know what 29 CFR 1904 is, at the top?

2    A    Not off the top of my head, no.

3    Q    So, on the fourth bullet point, can you read the

4    fourth bullet point on the first page?

5    A    Safety coordinator and the supervisor must be

6    notified of the accident or near miss immediately.  The

7    phone list is posted on the bulletin boards at the safety

8    work cell locations.

9    Q    And if you could please turn the page and look at

10    the third bullet point down.  I'm sorry, second bullet

11    point down.

12    A    The lead operator?

13    Q    Yes.

14    A    The lead operator will notify their supervisor as

15    soon as possible after an accident or near miss occurs.

16    If there is not a supervisor on duty, the lead will call

17    the supervisor at home.

18    Q    And that's kind of what you were talking about

19    before, is that someone needs to call at home if an injury

20    occurred?

21    A    Correct.

22    Q    And so before we talk about accident and near

23    miss, are these the definitions you were talking about

24    before?

25    A    Yes.

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 74 of 249   Document 34-2

1    Q    And are employees provided this plan?

2    A    Yes, this comes out at orientation.

3    Q    You mean when they first start?

4    A    Yes.

5    Q    What happens when a plan is revised, when are

6    employees provided a new plan?

7    A    Once a revision is made then there should be an

8    additional training period, or an additional training

9    session with them where they go over with the employees

10   what the changes have been.

11   Q    Okay, so looking back at those definitions of

12   accident and near miss, do you see where I'm talking

13   about?

14   A    Yes.

15   Q    That's page, it's listed as DURAFIBRE00158 of

16   Exhibit 9.  So, we have the definitions of accident and

17   near miss, can you just read me the official definition of

18   accident?

19   A    Any occurrence that led to physical harm or

20   injury to an employee, and or led to damage of company

21   property.

22   Q    Is there a difference between physical harm or

23   injury?

24   A    I guess not, really, not in my eyes.

25   Q    Are employees trained on what physical harm is?

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 75 of 249   Document 34-2

1          A     I don't believe, again, it kind of falls back

2     into the, there's, you know if you're hurt, you know if

3     you hurt something or not.  There's no specific, again we

4     can't go and define everything in life.  Some things are,

5     there's assumptions made that people understand what some

6     of these definitions are from learning them as they grow

7     up through life.

8          Q     So, as far as enforcement though, did Dura-Fibre

9     take a different, did Dura-Fibre distinguish whether

10    physical harm or injury occurred during enforcement of its

11    policies?

12         A     Say that again.

13         Q     Well, there's two words here, it says any

14    occurrence, I understand we already talked about injury

15    and how somebody can recognize or can't recognize if they

16    have an injury, but before we didn't talk about physical

17    harm.  Because it says any occurrence that led to physical

18    harm or injury.  Is there really any distinction in the

19    way Dura-Fibre treats physical harm versus injury?

20         A     I wouldn't look at it any differently, it's just

21    ---

22         Q     As someone who sits on the safety team you

23    wouldn't have looked at it differently?

24         A     It just happens to be that's the wording that's

25    in place.  But to me physical harm, injury that's, it's

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 76 of 249   Document 34-2

1    the result of an accident if somebody has some type of,

2    something happened to them that, like I said, it, out of

3    the norm.  They felt something pull and tweak or hurt.

4        Q    So, I just want to be clear.  So, as a matter of

5    enforcement, when you were enforcing the policies, or

6    somebody got hurt there wasn't, you did not distinguish

7    between injury or physical harm, correct?

8        A    No.

9        Q    Now, I want to go back a second.  Is the physical

10   harm or injury, and is it okay if I just use the term

11   injury to describe physical harm or injury, since that

12   seems to be how ---

13       A    Sure.

14       Q    -- that seems to be how the company seems to use

15   that term.

16           MR. ZAWADSKY:  Object to form.  Object to

17   statement.  I guess there was no question.

18   BY MR. RUTENBERG:

19       Q    Is the injury the act that leads to something

20   painful, or is the thing that might be painful?  Do you

21   understand the question?

22       A    No.

23       Q    So, if an employee bends an elbow.

24       A    Yes.

25       Q    That might not hurt at all, in fact I just banged

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC              www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 77 of 249   Document 34-2

1    my elbow, that did not hurt at all.

2        A    Okay.

3        Q    If I did that 40 times harder that might hurt, it

4    might fracture myself.

5        A    Yes.

6        Q    Is it the fracture that is the injury, or is it

7    the bumping that is the injury?

8        A    Well, the fracture itself is the, what the

9    diagnoses is going to be.  But before an employee would

10   know that, they would look at it and say I'm injured, I

11   don't know to what extent  yet but I'm injured.

12        Q    And similarly, with the phrase unsafe act, can

13   bumping your elbow be an unsafe act?

14        A    If you're doing it intentionally, sure.

15        Q    Okay, well what if you're not doing it

16   intentionally?  What if, I mean we're not, what if you,

17   I'm assuming most people don't intentionally bump their

18   elbows.

19        A    Again, if they're ---

20        MR. ZAWADSKY:  Again, object to form.  We're

21   continually going through speculative questions throughout

22   this deposition.  Answer the question.

23        THE WITNESS:  If somebody is aware of their

24   surroundings and they know what surrounds them and

25   they're, this accident happens I can consider it unsafe,

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 78 of 249   Document 34-2

1    yes.

2    BY MR. RUTENBERG:

3        Q    If they lightly bump their elbows would you

4    consider that an unsafe act?

5        A    If there's no injury, probably not.

6        Q    But if there is an injury it would be considered

7    an unsafe act?

8        A    Possibly.  I mean, again if it, again you just,

9    you're, to me the employee has the accountability again, I

10   guess it all goes back to employee needs to be aware of

11   their surroundings, and navigate their surroundings to the

12   best of their ability.

13       Q    Do you think it's important for employees to know

14   these distinctions between, do you think it's important

15   for employees to know the distinction as to whether a ---

16   strike the question.  Do you believe that being able to

17   distinguish among an injury, a physical harm, a near miss

18   or nothing at all is an important skill for employees to

19   know at Dura-Fibre?

20       A    For employees, sure.

21       Q    Why?

22       A    So they can, well, at least in a supervisory role

23   you need to know the difference so you can investigate

24   accordingly and note, you know, to document it

25   accordingly.

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 79 of 249   Document 34-2

1      Q   All right, for the supervisors, but what about fo

2  the non-supervisors?

3      A   Yeah, I think that an employee needs to know

4  that, what, you know, the result of their actions, what

5  that ultimately means if it's something they, if it's

6  something that they do that has a negative effect they

7  need to know whether they need to report it or not.

8      Q   Right, but I don't know if that answered my

9  question so I'm just going to ask again, because I didn't

10  quite understand the answer, I don't think it answered it.

11  Would you agree that being able to distinguish between an

12  injury, a physical harm, a near miss or nothing is an

13  important skill for employees to know?

14      MR. ZAWADSKY:  Object, asked and answered.

15  Answer the question if you can.

16      THE WITNESS:  Yes.

17  BY   MR. RUTENBERG:

18      Q   And why, and I'll be, and I'll be ---

19      MR. ZAWADSKY:  Object, object to asked and

20  answered.

21      MR. RUTENBERG:  -- talking about non-management

22  employees.

23      MR. ZAWADSKY:  That's fine, object to asked and

24  answered.

25      THE WITNESS:  Yeah, they need to know the

Neal R. Gross and Co., Inc.
(202) 234-4433         Washington DC         www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 80 of 249   Document 34-2

1  difference between if I, did I hurt myself or did I not,

2  what's the difference between an accident and a near miss.

3  They still have to, sorry, they still need to report it

4  but they should still know the difference, just that's

5  their, what the expectation of, you know, is of them,

6  their employment.

7  BY MR. RUTENBERG:

8        Q    Right, and knowing those differences is ---

9  strike that.  Can you read the next paragraph, excuse me,

10 next bullet point that begins with any employee after near

11 miss.

12       A    Any employee who reports a near miss by the end

13 of their shift will not receive any disciplinary action.

14 If a near miss is reported by someone other than the

15 employee involved, and or reported by the employee

16 involved but not by the end of their shift, disciplinary

17 action may be enforced.

18       Q    What does that mean?

19       A    It means exactly how it's spelled out.

20       Q    So, if a near miss occurs but it's reported

21 before the end of the shift, an employee will not be

22 subject to disciplinary action?

23       A    That's what it says.

24       Q    And is that who that, I say that's what it says,

25 but is that how Dura-Fibre acts?

Neal R. Gross and Co., Inc.
(202) 234-4433                 Washington DC                 www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 81 of 249   Document 34-2

1          A      Yes, a near miss, if there's no injury that

2    occurs it's a near miss.  There is no disciplinary action

3    that's going to be taken.

4          Q      And again, the supervisor determines whether the

5    injury occurred, correct?

6          A      Well, they're taking, I mean they're, sometimes

7    they're taking what is told to them by the employee, too.

8          Q      Right.

9          A      Because again, we can't diagnose, we can't

10   diagnose an injury.  We're going off of, again, a

11   combination of what we see and what we're told.

12         Q      But ultimately that is what your, what a

13   supervisor goes off of, right?

14         A      Yes.

15         Q      And ultimately it's a supervisor who makes the

16   determination, right?

17         A      Yes.

18         Q      Can an employee receive disciplinary points if he

19   reports an accident before the end of the shift?

20         A      If an accident, the accident would go to the

21   safety committee and we would go over the safety incident

22   form, and if like we explained earlier, if the criteria

23   are met, if enough points are accumulated to warrant some

24   type of discipline, then yes.

25         Q      But again, the only difference between an

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 82 of 249   Document 34-2

1 accident and a near miss is an employee, is if an employee

2 receives physical harm or injury, correct?

3   A Yes.

4   Q And please understand, I also understand that

5 we're also talking about damage to company property, but

6 that's not what this case is about.

7   A Yes.

8   Q So, we're not going to be focusing on that.

9   MR. ZAWADSKY:  That's not a question.

10 BY MR. RUTENBERG:

11   Q So, the same act can lead to an accident, or can

12 the same act lead to an accident or a near miss depending

13 on whether the person is injured or physically harmed?

14   A Sure.

15   Q So, whether disciplinary, is it true then whether

16 disciplinary points may be given out for a particular act

17 that is reported during the same shift is dependent upon

18 whether an employee received an injury or physical harm

19 from that act?

20   A Yes, because that would constitute, that's what

21 would define the accident which would lead to the accident

22 report, which would lead it to the safety team and the

23 safety incident report being filled out.

24   Q And that's regardless, though, of what the act

25 itself might be, correct?

1          A     Correct.

2          Q     When an employee reports an incident, whether

3    it's a near miss or an accident does the report increase,

4    all things being equal, that the chances that a supervisor

5    will open an investigation into the incident?

6          A     Yeah, all near misses and accidents are

7    investigated.

8          Q     If reported?

9          A     If reported, correct.

10         Q     So, therefore, just to be clear, if an employee

11   reports an incident, regardless of whether it's a near

12   miss or an accident, it will increase the changes that a

13   supervisor will open investigation, correct?

14         A     Correct.

15               MR. ZAWADSKY:  Object, asked and answered.  Go

16   ahead.

17               THE WITNESS:  Correct.

18   BY MR. RUTENBERG:

19         Q     And does opening investigation increase the

20   chances an employee, all things being equal, receives

21   disciplinary action, compared to not opening an

22   investigation?

23               MR. ZAWADSKY:  Object to form of question.

24   Answer the question if you can.

25               THE WITNESS:  If it's determined that, again if

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 84 of 249   Document 34-2

1    it's determined by the safety team that discipline is

2    warranted, then yes.

3    BY MR. RUTENBERG:

4         Q    When is an employee supposed to report an injury

5    if he does not realize he was injured until after a shift?

6         A    I would guess the answer as soon as possible

7    after realizing that.  If it's 9:00 o'clock at night

8    you're not necessarily going to call anybody and bother

9    them at home, maybe, I mean unless it's a, something that

10   you're now all of a sudden, three hours later you're going

11   to the hospital for.  Then I would make a point to call

12   down to the plant and talk to somebody who can relay that

13   message to a supervisor, human resources, or the next

14   morning if it's, again it just depends upon the severity

15   of the injury I would say.

16                   If it's something where you're getting

17   medical treatment for, then the sooner the better.  If you

18   don't realize it at the time you can't, you can't report

19   something that you don't realize happened at the time.

20   But if it's three hours later, that's I guess when the

21   injury is first noted, and then it falls under the, you

22   should call down to the plant, or time of day makes a

23   difference, too.

24        Q    Okay, walk me through what you as a supervisor

25   are supposed to do if you receive a report of an incident?

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 85 of 249   Document 34-2

1      A      First I would make sure that the employee filled

2   out an accident report.  The accident report is generally,

3   they fill out a portion of it.  Technically the accident

4   is supposed to be reported to the lead, the lead would

5   sign the accident report and turn it into me.  At that

6   point I would bring it to, generally I would bring it to

7   human resource's attention.  If they weren't around I may

8   just start the investigation right away.

9           The investigation would be, I would obviously

10  look over the report first, try to paint a picture as to

11  what I think happened.  If there's any witnesses involved

12  I would generally go out to the scene of the accident,

13  have the employee walk me through what they were doing,

14  what positions they were in.  If there's any witnesses I

15  would ask them what did they see, and then I would take

16  all that in consideration to, you know, make a

17  determination whether, was this an unsafe act or not.  The

18  report would then be turned in to human resources.

19      Q      Where does the safety committee come into play

20  here?

21      A      The safety team would follow generally at the,

22  again, at the next safety meeting.  It could be a day

23  later, it could be a week later, depends on again the

24  timing of it all.  Once it's determined that if I felt

25  that an unsafe act was committed, that's what would go in

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 86 of 249   Document 34-2

1    front of the safety team, or the safety team.  We would

2    talk, I guess whether or not an unsafe act was committed

3    we would still talk about the accident.  Because again, an

4    accident can possibly warrant some type of policy or

5    procedure change or whatever.

6         Q    Make it safer?

7         A    Right.  But if an unsafe act was, in my opinion

8    there was an unsafe act, then that's where the safety

9    incident form would follow.

10        Q    So, when the safety committee is involved, it's

11   already been determined by you or another supervisor that

12   an unsafe act occurred, correct?

13        A    Yes.

14        Q    And then it is the safety committee's job, is it

15   the safety committee's job to then determine how many,

16   what type of discipline if any the employee will get?

17        A    Yes.

18        Q    Based off there being an unsafe act?

19        A    Yes, based off that, the criteria on the form.

20        Q    Before you indicated that an employee who did not

21   realize he was hurt, or she was hurt or injured during the

22   shift should report the, the injury or physical harm the

23   next day or later that night, depending upon the time and

24   the severity of the injury, is that correct?

25        A    Yes.

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 87 of 249   Document 34-2

1      Q    Does that run afoul of the written policy;

2   however, of Dura-Fibre that all incidents need to be

3   reported immediately?

4      A    Well, it's a grey area because if you don't, if

5   you don't notice an injury you can just do something that

6   you normally do every single day.  You're lifting, you're

7   lifting a pile of sheets off of a pallet into a dumpster,

8   you do it every day multiple times a day, and so you don't

9   think anything of it.  You don't feel anything at that

10  particular time when you did that, but all of a sudden

11  four hours later you feel, oh, now I feel like I may have

12  given myself a hernia.  You don't know it at the time so

13  you can't, you can't hold anybody accountable for that at

14  the time when they don't realize when they have done it.

15     Q    So, in such a case an employee would not get

16  disciplinary points for late reporting?

17     A    In that case I would not report any, I would not

18  discipline anybody for late reporting when it, you don't

19  realize it at the time.  There's been times, and I can't

20  think of any specific examples, but I know there's been

21  times where an employee has, they've came to me and said,

22  hey, I got hurt, I'm not sure, I think it happened

23  sometime last night on my shift, I'm not sure the exact

24  time, I don't remember what I was doing, but I think it

25  happened last night.  Those are more grey areas because

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 88 of 249   Document 34-2

1    there's been times, you know, there may have been the time
2    where they've gone home that night, so you don't really
3    know, well, did this really happen at work or did it
4    happen at home.  So that's why we stress to them to report
5    these things, you know, as soon as possible.

6                    But again, going back to my other example.
7    If you're lifting up some sheets and you don't notice
8    anything out of the ordinary at the time, but then the
9    next day you feel, you think it happened from that, you
10   know, from the day before, you can only, you can't, I
11   wouldn't, again I wouldn't discipline somebody for not
12   realizing it at the time.

13        Q    That they were injured?

14        A    That they were injured.

15        Q    Right.

16        A    The symptoms may not appear right away.

17        Q    Are you doing okay, do you need a restroom?  I
18   was thinking we would do lunch at maybe about 12:15.

19        A    Okay.

20        Q    Are you hungry?

21        A    I'm fine right now.

22        Q    And if you want to plow through and get done
23   earlier, we can do that, too.  It's up to you.

24             MR. ZAWADSKY:  Can we take a five or 10 minute
25   break right now?

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 89 of 249   Document 34-2

1          MR. RUTENBERG:  Okay.

2          MR. ZAWADSKY:  How much longer do you think

3     you're going to go?

4          MR. RUTENBERG:  There's still some time, so if

5     you could just leave, keep it to five minutes, I'd

6     appreciate that, thank you.

7          (Off the record.)

8          MR. RUTENBERG:  back on the record.

9     BY MR. RUTENBERG:

10         Q    We were discussing what you do as a supervisor

11    once an incident is reported to you, whether it's a near

12    miss or an accident.  Do you determine if treatment is

13    required, medical treatment after an injury is reported?

14         A    Yeah, physically if I can, if I can, physically I

15    see there is reason for medical treatment than yes.  Or

16    I'll take, again I'm going off of what the employee is

17    telling me.

18         Q    If I could refer you to the next page on GX-9,

19    it's listed as DURAFIBRE00160, excuse me, yes, 160.  Can

20    you read the sentence that begins with our?

21         A    Our company does not discriminate against

22    employees for.

23         Q    And just the next bullet point.

24         A    Reporting a work related fatality, injury or

25    illness.

1        Q    What does that mean?

2        A    It means that if somebody actually reports an

3   injury they can't be, it can't be held against them for

4   reporting it.

5        Q    And to be clear, a near miss and an accident can

6   arise out of the same underlying action, correct?

7        A    Correct.

8        Q    The only difference being whether a physical harm

9   or injury occurred?

10       A    Correct.

11       Q    So, when an employee reports a near miss they're

12  not injured, correct?

13       A    Correct.

14       Q    And if they report that near miss, regardless of

15  what the underlying action is, they will not receive

16  disciplinary points, is that right?

17            MR. ZAWADSKY:  Object to form of question.

18

19  BY MR. RUTENBERG:

20       Q    Is that right?

21       A    Correct.

22       Q    Okay, and you understood the question, right?

23       A    Yes.

24       Q    However if the same incident, if the same action

25  occurs, the same underlying action, but that employee

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 91 of 249   Document 34-2

1    happened to have been injured by that action, they could

2    receive disciplinary points if reported during the same

3    day, is that right?

4        A    They couldn't from actually reporting it.  They

5    could from the actions that they took.

6        Q    But the only difference between the two types of

7    actions, the two different types of reports, is whether

8    the employee was injured, is that right?

9        A    Yes.

10        Q    Do you not see that as discrimination?

11            MR. ZAWADSKY:  Object.  Object to competency of

12    witness to answer the question.  Object, argumentative.

13            MR. RUTENBERG:  You enforce these rules, right?

14            MR. ZAWADSKY:  Let me finish.  Object,

15    argumentative.

16            MR. RUTENBERG:  You enforce these rules, right?

17    And I disagree on the argumentative.

18            MR. ZAWADSKY:  Doesn't matter, counsel, I have a

19    right to make an objection.  Do you understand that, you

20    understand that?

21            MR. RUTENBERG:  You don't need to raise your

22    voice to me.

23            MR. ZAWADSKY:  Yes, I do.  Apparently you are

24    telling me what I can do and what I can't do, and I resent

25    that, take strong issue with that.

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 92 of 249   Document 34-2

1    BY MR. RUTENBERG:

2        Q    Okay, I'm going to continue with my deposition

3    now.  You helped to enforce this policy, is that correct?

4        A    Yes.

5        Q    So, and as a supervisor was it your job to

6    understand what the company's policies were?

7        A    Yes.

8        Q    Do you believe, being someone who had to

9    understand the policies and to enforce them, that

10   retaining the ability to assign points for an incident

11   that occurred on the same, for an incident that was

12   reported to you, based solely on whether an employee was

13   injured or physically harmed, discriminates against an

14   employee for reporting an injury?

15       A    No.

16       Q    Okay, why not?

17       A    I don't believe it does.

18       Q    I know you don't believe it does, but why not?

19       A    It's difficult to articulate a reason.

20       Q    As it is difficult for you to articulate a reason

21   as to why that's not discrimination, do you think

22   employees may be dissuaded from reporting an act that

23   related to, that gave rise to an injury if they know they

24   can get disciplinary points for that?

25           MR. ZAWADSKY:  Object to competency of witness.

Neal R. Gross and Co., Inc.
(202) 234-4433              Washington DC              www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 93 of 249   Document 34-2

1    Answer the question, answer the question if you can.

2              THE WITNESS:  They're not, the discipline is for

3    not reporting an accident.  They don't ever get

4    disciplined for reporting an accident.  There may be,

5    again as we've talked about, there may be discipline that

6    comes out of the result of what they were doing when the

7    accident happened.  But just the sheer reporting or not,

8    the sheer reporting of it alone is not a disciplinable

9    offense.  If they don't, if they don't report it that's

10   where the problem happens.

11   BY MR. RUTENBERG:

12        Q    Right, but in this situation we're talking about

13   reporting it.

14        A    Yeah.

15        Q    But the only way to actually get that discipline,

16   as you've said before is, regardless of whether the act is

17   the same, is whether they're actually injured?

18        A    If it's determined ---

19             MR. ZAWADSKY:  Object to form of question.

20   Answer the question.

21             THE WITNESS:  If it's determined by the safety

22   committee that an unsafe act was committed, then yes, it's

23   possible.

24   BY MR. RUTENBERG:

25        Q    But if they reported it and were not injured, and

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 94 of 249   Document 34-2

1    an unsafe act occurred, they were not going to get

2    disciplinary points, right?

3         A    If they, say that again?

4         Q    If an unsafe act, if that same unsafe act

5    occurred, whatever it may be, but the employee, and no

6    employee was injured given rise from the unsafe act, they

7    would not receive disciplinary points if reported on the

8    same day, correct?

9              MR. ZAWADSKY:  Object to form of question.

10             THE WITNESS:  Please repeat that one more time.

11   BY MR. RUTENBERG:

12        Q    You just testified that if there was an unsafe

13   act that was reported on the same day and ---

14        A    The unsafe act isn't ---

15        Q    Excuse me, if there was an accident that was

16   reported on the same day, I apologize.  If an accident was

17   reported on the same day, so if somebody was injured or

18   physically harmed in a circumstance, and it was determined

19   there was an unsafe act, they could receive disciplinary

20   points, correct?

21        A    Correct.

22        Q    However, if an employee reported a near miss that

23   he was not injured, but there was still the same unsafe

24   act determined, they would not receive disciplinary

25   points, correct?

Neal R. Gross and Co., Inc.
(202) 234-4433              Washington DC              www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 95 of 249   Document 34-2

1    A    Correct.

2    Q    Okay.  All right, I want to talk about Tim Jacobs

3    now.  Do you know who Tim Jacobs is?

4    A    I do.

5    Q    Who is he?

6    A    He is a former employee of Dura-Fibre.

7    Q    And he made the complaint?  I'm not asking you to

8    make any legal conclusions or factual, but all right, let

9    me, your understanding is that this, this litigation, is

10   it your understanding that this litigation gave rise

11   resulting from Tim Jacobs at some point complaining to

12   OSHA?

13   A    Yes.

14   Q    What kind of work did he do?

15   A    He was a laminator, lead operator.

16   Q    And as laminator, lead operator what was his,

17   what were his responsibilities?

18   A    He was responsible for the overall production of

19   the laminator, overseeing the employees, making sure they

20   were doing their individual jobs.  He would fill in for

21   employees when they were sick or at a lunch break.

22   Q    Did you work with him?

23   A    Yes.

24   Q    Were you familiar with his work?

25   A    Yes.

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 96 of 249   Document 34-2

1        Q    Were you his supervisor?

2        A    Yes, I was a, I was subordinate of his when I was

3    on the machine, and then became a supervisor after I was

4    promoted.

5        Q    Okay, so you were a subordinate and then became

6    his supervisor?

7        A    Yes.

8        Q    Was he a good worker?

9        A    Overall I believe so, yes.

10       Q    What do you mean overall?

11       A    He had a few, I mean there were a few, you know,

12    attendance issues and he had some, every once in a while

13    he'd  get, you know, kind of an attitude.  But overall as

14    an operator, he was a very good operator.

15       Q    Okay, was he a good employee?

16       A    Overall I believe so.  I mean he had some, again

17    he had some issues where he accrued points throughout his

18    tenure there, obviously which is why we're here, part of

19    the reason.  But overall as just an employee doing his job

20    on the machine, yes, he was a good employee.

21       Q    Was he well liked at Dura-Fibre?

22       A    Overall I think so.

23       Q    Did you have any problems working with him?

24       A    Generally, no.  He always did what I asked him.

25       Q    And he was terminated, correct?

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 97 of 249   Document 34-2

1       A     Yes.

2       Q     On May 23rd, 2013?

3       A     Yes.

4       Q     Why?

5       A     He accumulated 24 points.

6       Q     Was he terminated for any other reasons?

7       A     No, once again, as we stated earlier, once you

8    get 24 points its grounds for termination, and the

9    decision was made to go through with the termination once

10   he received his last write up that got him to four points,

11   24 points, I'm sorry.

12      Q     Yes, I understand, thank you.  So, would he have

13   been terminated on May 23rd, 2013 had he not accumulated

14   24 disciplinary points?

15      A     Unlikely.

16      Q     You say unlikely, do you have any reason to think

17   that he would have?

18      A     No, if would have been at 20 points that day it

19   would have been business as usual.

20      Q     Aside from those 24 points that he accumulated,

21   was Dura-Fibre intending to terminate him in any case?

22      A     Not that I'm aware of.

23      Q     So, based of the information you know, but for

24   those 24 points, you know assuming he wanted to continue

25   to still work there, he would have continued to work

Neal R. Gross and Co., Inc.
(202) 234-4433              Washington DC              www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 98 of 249   Document 34-2

1    there?

2        A    Yes.

3        Q    Who determined that he would be terminated?

4        A    Jamie Gonnering kept, keeps the point files, the

5    spreadsheets of all the employees.  So, it was determined

6    after the four point, the last four point write up that he

7    had, or was going to be given, that that would put him at

8    24.

9        Q    Did you know how many points he had at that last

10    write up meeting?

11        A    No, not before I, no.  At the time the last write

12    up came in is when I knew, is when I had heard that that

13    was going to put him at 24.  I didn't know where he was at

14    prior to that.

15        Q    So, you mean after the last four points?

16        A    After, yes, after the safety committee, after the

17    safety team decided that he was going to be given four

18    points, it was at that point after that, that I had

19    learned that that was going to put him at 24.

20        Q    So, was it Jamie Gonnering who determined that

21    Mr. Jacobs would be terminated?

22        A    Between her and Luke I believe, yes.  Jamie first

23    came to the realization that this was going to put him at

24    24, and then there's a conversation I'm guessing with

25    Luke, and at some point I was brought into that, that yes,

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 99 of 249   Document 34-2

1      this is going to put him at 24.

2          Q    At what point were you brought into that?

3          A    I don't recall specifically.  It was sometime

4      after, it was sometime, I thought it was sometime after

5      the safety team met that afternoon, and he got his four

6      points.

7          Q    And what did you discuss?

8          A    Just that this write up puts him at 24 and that

9      he was probably going to be terminated.  I don't know the

10     specifics of that conversation.

11         Q    Okay, and between May 21st and May, so he was

12     terminated after he was recently issued 12 disciplinary

13     points, is that right?

14         A    The, from what I understand, from what I remember

15     the four points that he got out of that safety incident

16     form, I believe those were the points that put him over

17     the edge.

18         Q    Right.

19         A    There may have been, there was some discipline I

20     believe before that, but I don't know at what point.  At

21     some point it all added up to 20 and then that last four

22     is what , is what put him over.

23         Q    And he received eight points for failing to

24     report an alleged on-duty accident or injury that occurred

25     on May 21st, 2013, is that correct?

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 100 of 249   Document 34-2

1      A      Yes, that would have been, yes.  That was the
2  incident prior to the tripping incident.

3      Q      So, he accumulated 12 out of 24 points based off
4  of those last two incidents, is that correct?

5      A      Correct.

6      Q      And that's half of the 24 points?

7      A      Yes.

8      Q      And all of those were accumulated sometime
9  between May 21st and 22nd, is that right?

10     A      Sounds right.

11     Q      You say it sounds right, do ---

12     A      Yeah that, those days, this all happened within
13  about a three day period.  It was a Monday, Tuesday,
14  Wednesday, Thursday from beginning to end.

15     Q      Did, so are you aware that, did you do an
16  investigation of the incident the led to Steve Wilz's
17  alleged injury?

18     A      That, no, I was not involved in that
19  investigation.

20     Q      Why not?

21     A      Because I was not at the plant that day.  So, the
22  incident, that incident got reported to Jamie, and then I
23  believe Jamie took care of the investigation that
24  afternoon.

25     Q      Did she work with anyone else to do that

Neal R. Gross and Co., Inc.
(202) 234-4433              Washington DC              www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 101 of 249   Document 34-2

1    investigation?

2         A    I think Scott Gehl was part of that.

3         Q    Who is Scott Gehl?

4         A    Quality, design and quality manager.

5         Q    What did they determine?

6         A    Just that, from what I recall is the, the

7    accident that Steve Wilz had, he tweaked his shoulder

8    while stringing up something on the machine, and they, he

9    realized he tweaked his shoulder, talked to Tim about it,

10   and neither one of them  reported it.

11        Q    Do you know what Steve Wilz told Tim Jacobs?

12        A    Not off-hand, no.

13        Q    Did you ever?

14        A    I may have one time heard this, based just off of

15   conversations with Jamie when I got the scoop on what went

16   on --

17        Q    Okay.

18        A    -- but I don't remember specifics of what was

19   told to whom.

20        Q    Was Steve Wilz issued any points?

21        A    I believe he was disciplined for, yes, he was

22   disciplined for failing to report an accident.  I believe

23   I gave him those points.

24        Q    Was he disciplined for anything else?

25        A    I don't believe so.

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 102 of 249   Document 34-2

```
 1        Q    So, was he disciplined for an unsafe act?

 2        A    I don't know, I don't believe so.

 3        Q    Did Dura-Fibre conclude that Steve Wilz was

 4   injured?

 5        A    I don't recall what the specifics of the shoulder

 6   injury turned out to be.

 7        Q    Okay, so you don't know whether he received any

 8   types of medical treatment?

 9        A    I don't remember.

10        Q    How did, do you know how Dura-Fibre determined he

11   was injured?

12        A    Just based off his statements, I believe.  Again,

13   there may have been some medical treatment after that to

14   determine the more significant, an actual diagnosis, but

15   that I'm not aware of.

16        Q    I understand, you didn't do the investigation.

17        A    Right.

18        Q    And that was Jamie Gonnering and Scott Gehl?

19        A    Correct.

20        Q    Mr. Jacobs was Mr. Wilz's lead operator, is that

21   right?

22        A    Correct.

23        Q    That day?

24        A    Yeah.

25        Q    What is Mr. Wilz's job?
```

Neal R. Gross and Co., Inc.
(202) 234-4433              Washington DC              www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 103 of 249   Document 34-2

1        A    He's a roll grab driver.

2        Q    What does that mean?

3        A    He brings the big paper rolls in with the roll

4 grab machine and stages them at the roll stands were

5 another operator puts the rolls into the machine.

6        Q    Does that require lifting?

7        A    Minimal, I mean the specific part of his job, he

8 was helping string up the machine.  So that's, it's

9 generally, when they're not performing their main

10 functions, which is moving the raw materials in and out,

11 they'll help with stringing up the machine, or if the

12 machine is down they help out where, where it needs to be.

13 So, yeah, there is some expectations that there is some

14 lifting, pulling, pushing, in the course of your day.

15        Q   Do you know if Mr. Wilz continued to work for the

16 remainder of the day?

17        A    I believe he did.

18        Q    Do you know if Mr. Wilz was in pain for the

19 remainder of the day?

20        A    I don't recall.

21        Q    If Mr. Wilz indicated, do you know if Mr. Wilz

22 indicated to Tim Jacobs that he felt okay that day?

23        A    I think the statement he made was that he tweaked

24 his shoulder, but that he was okay.

25        Q    Okay.

Neal R. Gross and Co., Inc.
(202) 234-4433        Washington DC        www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 104 of 249   Document 34-2

1     A     I believe that was the statement that was made.

2     Q     Do you think that statement is a basis for, for

3 Mr. Jacobs to know that Mr. Wilz may have been injured?

4     A     Yes, because I think when a, when an employee

5 describes a tweak that they clearly felt something in

6 their extremity.  Whether it was for five seconds of five

7 minutes, they clearly felt something, and that to me would

8 constitute a reportable incident.

9     Q     Even if he said he was okay?

10     A     Yes, because he still felt something at the time.

11     Q     Has the company given training on orthopedic

12 injuries?

13     A     Not aware of that.

14     Q     So, when did Mr. Jacobs report Mr. Wilz's alleged

15 shoulder tweak, we'll call it?

16          MR. ZAWADSKY:  I'm going to make a point, to the

17 extent the witness has first hand knowledge or hearsay

18 knowledge.

19 BY MR. RUTENBERG:

20     Q     And if you don't know that's fine.

21     A     Yeah, I don't know.

22     Q     So, he did not report it to you?

23     A     No, did not come to me.  It came to light at, I

24 don't know when it came to light and to whom.

25     Q     Okay, did you issues a discipline slip to Steve

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 105 of 249   Document 34-2

1    Wilz for late reporting?

2         A    Yes.

3         Q    And did you issue a discipline slip to Mr. Jacobs

4    for late reporting?

5         A    I believe so.

6         Q    And when it's a late reporting, just so I'm

7    clear, when an employee late reports an injury or a near,

8    an accident or a near miss does the safety committee

9    determine how many points are assigned, or is it solely

10   within the purview of the supervisor?

11        A    Failure to report is a specific incident itself,

12   outlined in the union contract, which is what we go off

13   of.  Safety team is not involved in the actual failing to

14   report.  Just the unsafe acts potentially that was.

15        Q    What I'm handing you is pre-labeled as GX-13.  Do

16   you recognize GX-13?

17                    (Government's Exhibit No. GX-13 was marked

18                    for identification.)

19        A    Yes.

20        Q    Is that your handwriting?

21        A    It is.

22        Q    Does it appear to be, what is GX-13, can you

23   identify it?

24        A    It's a discipline slip that was issued to Tim

25   Jacobs for the failing to report on-duty accident.

Neal R. Gross and Co., Inc.
(202) 234-4433              Washington DC              www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 106 of 249   Document 34-2

1    Q    Did you consult with anyone before issuing this?

2    A    Yes, both Jamie and Luke.

3    Q    What did they say?

4    A    Basically we talked about the, that because he

5    did not report the, he did not report the accident the day

6    it happened that he was going to get a points.  We

7    outlined the section of the contract that applied, and I

8    believe I also listed here a couple of sections in the

9    employee handbook.

10    Q    So, did you determine then that Tim Jacobs was

11    aware Steve Wilz had injured his shoulder?

12    A    Yeah, it was made to me, it was made aware to me,

13    you know, that afternoon or the next day, whenever I got

14    back into the office after the investigation had taken

15    place.

16    Q    And what was the injury?

17    A    I don't remember what the, the long term I don't

18    remember.  It was a tweak of the shoulder is what the

19    injury was.

20    Q    Okay, and so a tweak is an injury?

21    A    To me a tweak, you physically feel something

22    that's not right.

23    Q    Okay.

24    A    So again, whether it lasts five seconds or five

25    hours, at least initially it was determined to be an

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 107 of 249   Document 34-2

1    injury.

2         Q    How long did this last, how long did this tweak

3    last?

4         A    I don't know.

5         Q    You say at least initially, was there a later

6    determination as to whether there was, it was an injury?

7         A    I'm sure Jamie followed up with him the next day

8    or later that afternoon, or as far as, hey, how are you

9    feeling.  Again, I don't know if he went in for any

10   medical treatment or what the diagnosis was, if one was

11   made.

12        Q    So, essentially here is the injury is that

13   somebody felt a tweak?

14        A    Yes.

15        Q    And do you know how long the tweak lasted for?

16        A    I do not.

17        Q    Did you know?

18        A    I don't, I may have known at one time, I may have

19   talked to him the next day, or he may have told me he was

20   fine or it still hurt, I don't recall.

21        Q    And Mr. Wilz, did he continue to work for the

22   remainder of that shift?

23        A    That day I believe so.  But again, I wasn't in

24   the, I don't think I got back to the office until after he

25   left for the day.

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 108 of 249   Document 34-2

1    Q    It says, can you read on GX-13 on the second

2    sentence under incident where it says Tim was?

3    A    Tim was notified by Steve on 5/20, and had the

4    chance to report incident to supervisor that day, but did

5    not report until 5/21.

6    Q    What is an incident?

7    A    The accident that happened.  I just referred to

8    it as an incident.  The incident that caused him to tweak

9    his shoulder.

10    Q    Okay, and what was the incident that caused him

11    to tweak his shoulder?

12    A    I believe he was stringing up the machine and he

13    was pulling out a line, believe he was pulling out a line

14    of paper and that's when he felt the tweak.

15    Q    It says at the bottom, there's no employee

16    signature here, correct?

17    A    Yes.

18    Q    Are employees supposed to sign these?

19    A    They're supposed to sign them, acknowledging

20    receipt of notice.  It doesn't mean they agree with it,

21    they're signing that they got a receipt of it.

22    Q    Okay, and in this case it appears Tim Jacobs

23    would not sign?

24    A    Correct.

25    Q    Do you know why?

1      A      Yeah, he just stated that, just what I stated on

2  there.  Stated he would not sign until the issue is

3  settled.

4      Q      And it says requested a meeting to discuss the

5  matter, do you see this?

6      A      Yep.

7      Q      When was that meeting held?

8      A      That I don't, that I don't know.

9      Q      Were you at the meeting?

10     A      Probably, but I don't recall the specifics of a

11  meeting in regards to this incident.

12     Q      What happens at those meetings, at that meeting?

13     A      Generally the employee has their say as to why

14  they think the discipline is unfair, or whatever, and then

15  a determination.  I guess a determination isn't always

16  made, but there's a conversation between the employee and

17  Luke, the director of operations, Luke at that time, and

18  then sometimes a determination is made, sometimes the

19  discipline is upheld, sometimes they'll say I need some

20  time to think about it, we'll get back together, sometimes

21  they will throw it out.  It's, those are I guess the three

22  outcomes of that meeting.  But eventually the discipline

23  is determined one way or another.

24     Q      Do you know what day you gave this to him, do you

25  know what time, excuse me, do you know what date GX-13 was

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 110 of 249   Document 34-2

1    provided to Mr. Jacobs?

2         A    It was dated 5/22.

3         Q    Do you know whether you gave it to him in the

4    morning or in the evening?

5         A    Probably the morning, because he was a day shift

6    employee, so it would have been sometime between 6 a.m.

7    and 2 p.m.

8         Q    What I'm handing you has been labeled as GX-21,

9    or Exhibit 21.  Please take a look and let me know when

10   you're  ready.

11                  (Government's Exhibit No. GX-21 was marked

12                   for identification.)

13        A    Yeah, I'm ready.

14        Q    Do you recognize GX-21?

15        A    Yes.

16        Q    What is it?

17        A    It's the documentation of the entire incidents

18   that whole week that I was asked to put together on July

19   26th.

20        Q    So, did you write this?

21        A    Yes.

22        Q    Who asked you to write it?

23        A    I believe probably Jamie or Luke.

24        Q    Do you know why?

25        A    To document the, they wanted the entire thing

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 111 of 249   Document 34-2

1    documented from my point of view, from what I recall at

2    the time.

3         Q    Right, but do you know why they wanted it

4    documented?

5         A    I don't remember why specifically.

6         Q    They didn't tell you?

7         A    I don't, they may have, I don't remember.

8         Q    Okay, July 26th, 2013, that's after Mr. Jacobs

9    was terminated, is that correct?

10        A    Yes.

11        Q    Did you question as to why they needed this

12   months after he was terminated?

13        A    Again, they probably told me at the time why they

14   wanted it, so I didn't need to question it.

15        Q    Did anyone edit this?

16        A    No.

17        Q    Were there multiple versions?

18        A    No.

19        Q    And, in fact, on the third paragraph, do you see

20   that, it says on Wednesday May 22nd, 2013?

21        A    Yes.

22        Q    It appears you stated that, well feel free to

23   read the paragraph to yourself.

24        A    Okay.

25        Q    I'm just going to ask you if this clarifies what

1    time you may have ---

2          A    It does.

3          Q    Okay, I'm going to ask what time, this may

4    clarify what time you gave him the original slip?  Does it

5    clarify?

6          A    Yeah, it appears that this, at that point at

7    11:25 we had the conversation and the slip was going to be

8    issued at that point, which is when he refused to sign it.

9          Q    And when you say the slip you're talking about

10   GX-13?

11         A    Correct.

12         Q    Do you know who Tom Jacobs is?

13         A    Yes.

14         Q    Who is Tom Jacobs?

15         A    Tim's brother.

16         Q    Is he also an employee?

17         A    Yes.

18         Q    Of Dura-Fibre?

19         A    Yes.

20         Q    Is he still?

21         A    He is.

22         Q    Have you ever had to provide discipline to Tom

23   Jacobs?

24         A    I'm sure I have.  I know I've disciplined him for

25   attendance.  Off the top of my head that's all I can

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 113 of 249   Document 34-2

1    remember.

2         Q    What I'm handing you is, I've pre-labeled as GX-

3    44.  Please take a moment.

4              (Government's Exhibit No. GX-44 was marked

5              for identification.)

6         A    Okay.

7         Q    Let me just ask you a general question.  Why do

8    you want, what is the purpose of Dura-Fibre's policy to

9    have employees report injuries to members of management?

10        A    Well again, like I said before, they're, we're

11   obligated to do so for reporting purposes, and again for,

12   we want to keep employees safe, and again we want to know

13   if any policies or procedures need to be changed as a

14   result of something that an employee did.

15        Q    After having read, first of all, what is GX-44?

16        A    It appears to be, more or less a documentation on

17   a coaching that I did with Tom Jacobs about an accident

18   that occurred with another employee.

19        Q    Was that your signature at the bottom?

20        A    Yes.

21        Q    Do you remember signing this document?

22        A    Do I remember specifically the date, you know, of

23   the details surrounding this date, no, but that is my

24   signature, so yes, I, getting re-aware of this situation.

25        Q    Did you coach, do you remember coaching Tom

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 114 of 249   Document 34-2

1    Jacobs?

2       A    If it said I did, I did.

3       Q    Do you have any reason to believe that this

4    account is inaccurate?

5       A    No.

6       Q    So, what happened in this case?  What happened,

7    what did Tom Jacobs do or not do?

8       A    So, an employee had a, an employee got an

9    accident.  I was out of the office that day, there was

10    another individual who was filling in for me as

11    supervisor.  He filled out the injury report, the injury

12    was reported to him, no problems.

13       Q    Who filled out the ---

14       A    Lisa Van Kooy wan injured, reported it to him,

15    there's no problems there.  Accident report was filled out

16    by the end of the day.  My initial issues was that I

17    hadn't been made aware of it after talking to Steve.  He

18    told me that the report had been filled out and it was, it

19    was on my desk before they left for that day, so no

20    problems there.

21       Q    I'm sorry, wait, so is it Dura-Fibre's policy

22    that a report may be filled out and just put onto a desk?

23       A    A report is supposed to be turned in before the,

24    an accident report is supposed to be filled out and turned

25    in before the end of your shift.

Neal R. Gross and Co., Inc.
(202) 234-4433           Washington DC            www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 115 of 249   Document 34-2

```
1          Q     Okay.

2          A     And at that point Steve was filling in for me as

3    a supervisor, so he was considered the supervisor on duty

4    at that point.  So he confirmed for me that next morning,

5    that yes, he was aware of the accident and that it was,

6    the report was on my desk.

7          Q     But he didn't call anyone, did he?

8          A     Who?

9          Q     Steve didn't call, I'm sorry, Tom Jacobs, I'm

10   sorry you said Steve was filling in for you?

11         A     Steve was filling in for me that day.

12         Q     Okay, did Tom Jacobs report it to Steve?

13         A     I, I don't know.

14         Q     Okay.

15         A     I don't know if he actually reported it or if he

16   just threw the, because he threw the report on the desk if

17   that was, if that was his way or reporting it because I

18   wasn't around.

19         Q     Is placing a report on a desk the same as

20   notifying the appropriate supervisor?

21         A     I would have, like I kind of coached him I would

22   have gone about it a different way.  He did, you know,

23   almost everything right here.

24         Q     But he didn't actually report it on the day --

25         A     Well again, if he ---
```

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 116 of 249   Document 34-2

1      Q    Let me ask the question, please, I don't mean to

2  interrupt.  But does Dura-Fibre's policy require an

3  employee to contact the appropriate supervisor on the day

4  of the accident?

5      A    Yes, whether he contacted Steve or not, that I'm

6  not certain of.

7      Q    Did you assign Mr. Jacobs any disciplinary points

8  for this?

9      A    I did not.

10      Q    Why not?

11      A    I'm just reading, reading this over again.  Just

12  to me this was a grey area where he, he satisfied the

13  requirements of filling out the report.  Again, I don't

14  know if at the point, I don't know if at the time I was

15  told that he had reported to Steve, so even though Steve

16  is not technically the plant supervisor he was my fill-in

17  that day.  And I, again, grey area, that's why I left it

18  to a coaching session that, you know, in the future just

19  contact me just so he's covered.

20      Q    Can you read the first sentence of the last

21  paragraph?

22      A    I further explained that, based on the fact that

23  he did fill out the accident report prior to leaving, and

24  the injury was not serious enough for medical treatment or

25  getting a drug and alcohol test, that he would not be

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 117 of 249   Document 34-2

1     facing any discipline for failing to report in this case.

2         Q    So, part of the reason, so it seems like you do

3     have discretion not to award, not to, excuse me, issue

4     disciplinary points in cases where an employee does not

5     report verbally that an accident occurred to a supervisor,

6     is that correct?

7              MR. ZAWADSKY:  I'm going to object to form.

8              THE WITNESS:  I think in this case there was

9     still, there was, like I said I think it was a grey area

10    whether he report, you know whether he, the fact that he

11    didn't report it specifically to me, like I said I don't

12    recall what conversation he had with Steve Griffin.  That

13    may have been, he didn't report it specifically to me, but

14    if had reported to Steve I may have looked back and said,

15    okay, you're, you didn't report it specifically to me but

16    you did talk to somebody who was covering for me.

17    BY MR. RUTENBERG:

18        Q    Okay, but no where in this contemporaneous

19    documentation do you even mention Steve Wilz, correct?

20        A    No, correct.

21        Q    So, maybe that happened with Steve Wilz, maybe it

22    didn't, but ---

23             MR. ZAWADSKY:  You said Steve Wilz?

24             MR. RUTENBERG:  Steve who?

25             MR. ZAWADSKY:  Steve Griffin.

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 118 of 249   Document 34-2

1    BY MR. RUTENBERG:

2        Q    Steve Griffin, excuse me, thank you very much.

3    But nowhere in this report does it mention Steve Griffin,

4    does it?

5        A    No, other than that he, other than what's in

6    paragraph three, that I confirmed with him that the

7    accident report was on my desk.

8        Q    Okay, so I want to go back to that sentence I had

9    you read.  So, it does appear, does it appear, excuse me,

10   do you have discretion not to award, not to issue

11   disciplinary points in cases where an injury is not

12   reported before the end of the shift?

13       A    Restate that, or re-ask that, please?

14       Q    Do you have discretion to not award disciplinary

15   points in cases where an employee does not, does not make

16   a report of injury before the end of shift?

17       A    In this specific case, there must have been some

18   grey area enough where I used some discretion, yes.

19       Q    So you do have discretion?

20       A    Yes.

21       Q    And in that sentence you just read, if you

22   recall, the first sentence of the last paragraph where it

23   says, let me ask you, did you decide not to award points

24   in part because the injury was not serious enough for

25   medical treatment or getting a drug and alcohol test?

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 119 of 249   Document 34-2

1      A    It was a combination of the seriousness of the

2    injury, and the fact that the accident report was filled

3    out, as it was supposed to be.

4      Q    Okay.

5      A    So again, he did, I felt Tom did, did Tom do 100

6    percent of the things correct, no, but I thought he did 80

7    to 90 percent of the things correct.  That's where I, I

8    used some discretion there.  It wasn't clearly, it wasn't

9    a black and white situation I didn't feel at the time.

10     Q    And that's in part because the serious was not,

11   the injury was not serious enough for medical treatment?

12     A    It had more to do with the, the accident report,

13   the accident report, whether it was, whether I was, it was

14   combination of the accident report, you know, being left

15   on the desk, versus me not being physically called at that

16   point because I was out of the office.  And a combination

17   of Steve also being in my place, and the fact when he,

18   when Steve Griffin confirmed for me that, yes, the

19   accident report was on my desk.  I looked at it, I was

20   like, okay could he have done it a little bit differently,

21   sure.  But I, again, I utilized my discretion and that's

22   what I, I guess coached him on.

23     Q    Okay.

24     A    In the future if this happens, just call or text

25   me just so you're covered and we don't have this grey area

1    again.

2         Q    Did Steve Wilz receive medical attention the day

3    he tweaked his shoulder?

4         A    I don't ---

5              MR. ZAWADSKY:  I'm going to object.  Asked and

6    answered.

7              THE WITNESS:  I don't remember.

8    BY MR. RUTENBERG:

9         Q    When did you find out, when did you actually

10   receive the accident reporting form?

11        A    For?

12        Q    Excuse me, for the Tom Jacobs, for the injury of

13   Ms. Lisa Van Kooy?

14        A    My, when did I actually receive the accident

15   report?

16        Q    Yes.

17        A    It looks like Thursday when I came in it was on

18   my desk.

19        Q    And when did you first find out about the

20   accident?

21        A    I'm sorry, I found out about the accident on

22   Wednesday the 26th.

23        Q    And where does it say that?

24        A    Third paragraph, the accident occurred on

25   Tuesday, I was made aware Wednesday morning.

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 121 of 249   Document 34-2

1       Q    The next day?

2       A    Yes.

3       Q    And you agree, based off of the policy we went

4   over at GX-9, that an employee is to call a supervisor,

5   correct, if they're not available, or call someone, or

6   talk to another supervisor?

7       A    Yes.

8       Q    And you don't know whether that actually occurred

9   here?

10      A    No, Steve Griffin was my, Steve Griffin was the

11  fill-in supervisor on Tuesday when this happened.  I don't

12  know what type of conversation was had between Tom and

13  Steve at that day.  If there was a conversation, if there

14  was any, if there was a conversation, Steve did confirm me

15  that there was the accident report.  I don't recall what

16  other conversation him and I had versus, you know

17  regarding, well when did he actually, did he actually

18  physically talk to you or contact you.

19      Q    And the point of this, as you said, the point of

20  this accident reporting plan is because you're required to

21  report reportables, is that right?

22      A    Correct.

23      Q    For safety reasons?

24      A    Correct.

25      Q    And for future changes that might need to be made

Neal R. Gross and Co., Inc.
(202) 234-4433              Washington DC              www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 122 of 249   Document 34-2

1    for safety purposes, correct?

2         A    Yes.

3         Q    Why is it then important that these injuries are

4    reported before the end of the shift?

5         A    Because if people are allowed to go home who

6    knows what can, what they can do to aggravate the injury

7    or do something else, and it prevents people from, you

8    know, falsifying claims.

9         Q    And isn't that specifically what happened in this

10   case, however, with Tom Jacobs?  I mean, he wrote a

11   report, but he didn't notify you, did he?

12        A    He did not notify me specifically at that time,

13   no.

14        Q    Right, and you don't know whether he notified

15   anyone else?

16        A    Correct.

17        Q    And you did take into account the seriousness of

18   an injury as to whether points would be issued, is that

19   correct?

20        A    Based off of what I wrote in here, yes.

21        Q    But Steve, but when Steve Wilz injured his

22   shoulder, and allegedly injured his shoulder, we're not

23   even sure what happened at least today, you did not ---

24             MR. ZAWADSKY:  That's not part of the question,

25   right, what you just said is not part of the question,

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 123 of 249   Document 34-2

1    right?

2            MR. RUTENBERG:  Well, I want to clarify that we,

3    that there was no, because he didn't, that Mr. Blair did

4    not actually do the investigation, is not, he testified he

5    wasn't sure of what the injury was.  So, I was clarifying

6    that.  Is there an objection?

7            MR. ZAWADSKY:  Yes, I don't know, just answer the

8    question.  I don't know why you have to do all that.

9    BY MR. RUTENBERG:

10        Q    Okay, why did you consider Steve, why did you

11   consider Mr. Tim Jacobs alleged failure to report an

12   injury to not be within a grey area?

13        A    Because there was no, there wasn't even an

14   accident report filled out.  There was no conversation

15   with either of them to me or anybody that I know of while

16   I was gone that day.  We did not find out anything until

17   the next day.  In Tom's situation and Lisa's, there was at

18   least an accident report that was filled out, and Steve

19   Griffin being the supervisor confirmed that, yes, the

20   accident report was on my desk the day before, before they

21   left.  So there's, there was my grey area that ---

22        Q    And is that part of the policy, putting an

23   accident report on the desk?

24        A    Prior to, an accident report must be turned in

25   prior to the end of the shift.  Now, that's the turned in

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 124 of 249   Document 34-2

1    that is not, not worded more specifically as must

2    physically give it to a supervisor.  If I'm in a meeting

3    at 2:00 o'clock and somebody is leaving for the day and

4    they leave it on the desk, you know, you can argue about

5    whether that's, you physically notified somebody or just

6    putting it on the desk is sufficient, and that's where

7    that, I guess coaching session came in, because there was

8    a little bit of a, like I said, a grey area.

9        Q    But you did testify previously today that your

10   understanding of the Dura-Fibre policy is that, in

11   addition to that, a verbal communication must be made

12   either to the supervisor, a fill-in supervisor, or if they

13   can't be reached another member of management, or a call

14   from home, correct?

15       A    Yes.

16       Q    And, in fact, at the time that Mr. Tom Jacobs, at

17   the time of this incident with Mr. Tom Jacobs and Lisa Van

18   Kooy, were there cell phone and home phone numbers

19   available for them to use to report?

20            MR. ZAWADSKY:  Object to form.

21   BY MR. RUTENBERG:

22       Q    Did Dura-Fibre make available your contact

23   information ---

24       A    Yes.

25       Q    -- to call you?

1      A    Yes.

2      Q    Where was the contact information left?

3      A    They probably had my cell phone in their, on

4 their , they probably had my number on their cell phones.

5      Q    Beyond that did Dura-Fibre leave your number

6 somewhere ---

7      A    Yes, my number is posted, office numbers are

8 posted in the plant.

9      Q    I want to talk now about Tim Jacobs' ankle

10 twisting.  Do you know what I mean when I say ankle

11 twisting?

12      A    Yes.

13      Q    What I am talking about when I talk about, what

14 do you believe I am talking about when I talk about Tim

15 Jacobs?

16      MR. ZAWADSKY:  I object to the form of that

17 question.  How do you, how does he know, why does it

18 matter what he thinks you're talking about?

19      MR. RUTENBERG:  I want to clarify that we're on

20 the same page.

21      MR. ZAWADSKY:  Why don't you tell  him what page

22 you're on and then he can answer the question?

23 BY MR. RUTENBERG:

24      Q    You can answer the question.

25      A    What we are talking about is when Tim came to me

Neal R. Gross and Co., Inc.
(202) 234-4433    Washington DC    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 126 of 249   Document 34-2

1    the afternoon of the, I think it was Tuesday afternoon,

2    Wednesday afternoon, I believe it was Wednesday afternoon.

3    Told me that he had tripped, or he had stumbled coming

4    down this flight of stairs coming off of our wet end,

5    which is like two or three steps, and that he, when he

6    stumbled he landed on his ankle wrong and twisted it and

7    he was out, and he wanted to report that to me.  And then

8    he had talked to me as well about how his shoulders were

9    sore from all of the splices that he was doing on the roll

10   stands.  So, an accident report was initiated.  I did my,

11   he filled out the accident report, we signed everything, I

12   did the investigation right away.

13        Q    Did you investigate as to why his shoulders hurt?

14        A    I mean I knew specifically what he, there wasn't

15   a specific incident that he could refer to.  He said I

16   believe it was just he was, just from all the repetitive

17   motion of, you know, putting his arms above his head to

18   set splices and pull paper has left his shoulders sore.

19   It was more of a he was just telling me to tell me, it was

20   more of a cumulative effect of the years of working in the

21   plant.

22        Q    So, that's not an injury?  Is that an injury?

23        A    It could be determined.  It could be considered

24   an injury if, that's, again that's more of a grey area.

25   We've had other instances like that where people have had

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 127 of 249   Document 34-2

1    just injuries from over the years, not an injury I should

2    say just the nature of the, just the nature of the job has

3    caused their extremities to deteriorate.  Whether that

4    was, I don't believe we, we didn't consider that, we

5    didn't take that into consideration as any type of an

6    injury in this specific incident.  I think if, if Tim had

7    continued to be employed it probably would have been

8    looked into a little bit further.  Just, okay, what can we

9    do here, or is it a, again is it a cumulative effect of

10   just, you know, many years of doing this work.

11       Q    Where did this conversation occur, where did he

12   report it to you?

13       A    I was in, I believe I was in my office at the

14   time.

15       Q    Not on the floor?

16       A    I don't think so.

17       Q    So, did this discussion where he reported his

18   ankle twisting and shoulder pain, did this occur on the

19   same day that you previously provided him the, or issued

20   him the eight disciplinary points?

21       A    I think it was after, it was after that in the

22   afternoon.  I'd have to refer back to my, my statement

23   that I, my three page statement that I wrote on that.  But

24   I believe it was the same day.

25       Q    Did he tell you why he was reporting the ankle

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 128 of 249   Document 34-2

1   and shoulder injury, or excuse me, the ankle and shoulder?

2       A    Because he had just gotten, because he knew he

3   had just gotten written up for failing to report and he

4   wanted to make sure he was doing the right thing.

5       Q    Do you know when he twisted his ankle?

6       A    It wasn't long before he actually came in and

7   reported it.  I don't, I'd have to look at any

8   documentation if you're looking for the exact specific

9   time, but he reported it basically very shortly after it

10  happened.

11      Q    Do you know if it occurred prior to when you met

12  with him, do you know whether it happened before or after

13  you met with him previously to assign him the eight

14  points?

15      A    I think it happened after, I'm not 100 percent

16  sure but I don't remember the exact hour by hour timeline

17  of that day.

18      Q    I understand.  So, you opened up an

19  investigation, is that right?

20      A    Yes.

21      Q    Who did you talk to?

22      A    I basically, Tim had just given me the

23  information so I walked out at that point then I, at some

24  point then I walked out and actually, again he, I had him

25  walk me through exactly what he was doing.  I may not

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 129 of 249   Document 34-2

1    have, his ankle, he may have still been favoring his ankle

2    at the time, so I don't believe I made him actually walk

3    up and down the stairs and re-enact it.  But I, you know,

4    show me the exact set of stairs where it happened, and he

5    did that, and I don't believe there was any, I would have

6    talked to any witnesses if he had listed any.  I don't

7    remember if there was any witnesses listed.

8         Q    Were there any cameras?

9         A    No.

10        Q    Was he, is there a, did you ask him whether he

11   was holding on to the railing?  Is there a railing?

12        A    There is a railing.  I don't recall if I asked

13   him if he was holding on to it or not.

14        Q    And did he tell you one way or another whether he

15   was holding on to the railing?

16        A    I don't recall what his specific verbiage to me

17   was.  He said he  was coming down the flight of stairs and

18   landed wrong on his ankle.

19        Q    Okay.

20        A    Or tripped, or tripped coming off the stairs and

21   landing on the wrong, I don't remember.

22        Q    Did he trip on the final stair?

23        A    I think it was the final stair, and then he

24   landed awkwardly on his ankle.

25        Q    Did he miss the step?

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 130 of 249   Document 34-2

1      A      I don't recall if he missed it or tripped.

2      Q      Do you know if he tripped over his own foot?

3      A      I don't recall.

4      Q      Did you note any of that information?

5      A      Whatever I would have noted would have been

6  probably on the accident report, or in the investigation

7  part of it.

8      Q      Did you have any help with the investigation?

9      A      No, I don't believe so.

10     Q      How long did the investigation last?

11     A      I probably wrapped everything up in, being out on

12  the floor probably was only 10 minutes or so, and then

13  just writing the, you know, just documenting it on the

14  form.

15     Q      And what's the form called?

16     A      It's part of the accident report, it's just the

17  investigation portion of it, it's on either page two or

18  three of the report.

19     Q      And what was your ultimate conclusion?

20     A      Well, at the time I checked there was two boxes,

21  there was accident and there was near miss accident.

22     Q      I'm going to interrupt you, I'll get to that in a

23  moment, I don't mean to be rude.  What did you conclude,

24  did you conclude that he did something wrong?

25     A      Yes.

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 131 of 249   Document 34-2

1     Q   And what did you conclude?

2     A   Just that his general, I guess overall, again

3 inattentiveness to his surroundings and his, would be un-

4 coordination for lack of a better word, led to the

5 accident.

6     Q   And how did you determine that he was being

7 inattentive?

8     A   Because he wasn't properly putting his own two

9 feet in front of the other while he was walking down the

10 flight of stairs.  A flight of stairs that he's navigated

11 successfully without tripping probably hundreds of times

12 in his time at the company.

13    Q   Did you try to find witnesses to what happened?

14    A   I don't recall.

15    Q   And just so I'm clear, by default if somebody

16 trips on a stair, or that in your mind is being

17 inattentive to the surroundings, is that right?

18    A   I think so.

19    Q   So, you filled out the accident investigation

20 form, is that right?

21    A   Yep.

22    Q   Was there a safety committee meeting?

23    A   The following, or no actually it was later that

24 afternoon.

25    Q   And it just so happened it was that afternoon?

Neal R. Gross and Co., Inc.
(202) 234-4433  Washington DC  www.nealrgross.com
Case 1:17-cv-00589-WCG  Filed 03/08/18  Page 132 of 249  Document 34-2

1          A    It just happened to be the same day, I think,

2    that we were meeting anyways.

3          Q    The accident investigation form, was that filled

4    out before or after the safety committee meeting?

5          A    Before.

6          Q    How could Mr. Jacobs have done better in going

7    down the stairs?

8          A    Took his time a little more carefully, just

9    actually been watching, watching his feet touch the

10   stairs.  It sounds very simplistic to explain, but

11   basically holding on to the railing, watching his feet be

12   placed on the steps until he was clearly safe of the

13   steps.

14         Q    But you don't know whether or not he was holding

15   the rail, right?

16         A    No, I am not, I don't recall.

17         Q    Was he running down the stairs?

18         A    I don't recall if he was running to try to do

19   something, or if he was just casually walking down.

20         Q    Do you know if he was skipping stairs down?

21         A    I don't believe so.

22         Q    Was he horse playing?

23         A    I don't think so.

24         Q    Do you know that he wasn't watching the stairs?

25         A    No, I don't.

Neal R. Gross and Co., Inc.
(202) 234-4433        Washington DC        www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 133 of 249   Document 34-2

1          Q     Was there anything else Mr. Jacobs could have

2   done better?

3          A     What I just explained, I think just watching

4   where you're, being a little more careful and watching

5   your feet hit the stairs.

6          Q     But you don't know, again, you don't know whether

7   he was watching his feet hit the stairs?

8          A     Yeah, no, I guess not.

9          Q     Did Mr. Jacobs violate any safety rules in

10  twisting his ankle?

11         A     Well, what was determined was that, by the, it

12  was determined to be an unsafe act based off of what I was

13  just explaining, and that at that point the safety team

14  determined that it was, it was a, an offense based on the

15  criteria of the safety incident form, that it was an

16  offense worthy of being disciplined for, failure to, or

17  committing an unsafe act.

18         Q     So, you determined it was, did you determine it

19  was an unsafe act prior to the meeting?

20         A     Yes, that's what, yes, yes.

21         Q     And that sounds consistent with the way you

22  typically do things, right?  Where you determine whether

23  a ---

24         A     Would determine that at the point of, of filling

25  out the accident report.

1      Q     Do you typically note what the potential

2   violation is on the accident report?

3      A     No, I don't believe so, I just, it's a box that

4   is checked.

5      Q     So, aside from your determination, did you

6   determine that Mr. Jacobs violated any other safety rules

7   aside from the fact that he committed an unsafe act?

8      A     I don't believe so.

9      Q     Are there rules or procedures about going up and

10   down stairs?

11      A     Nothing specifically drawn out, no, other than

12   just that employees have the expectation to work carefully

13   around themselves, or work, you know, I guess just what I

14   said, work carefully.  Be aware of your surroundings.

15      Q     What I'm going to hand you is GX-14.  Let's just

16   go off the record for one second.

17                  (Government's Exhibit No. GX-14 was marked

18                  for identification.)

19            (Off the record.)

20   BY MR. RUTENBERG:

21      Q     Okay, back on.  Do you recognize GX-14?

22      A     Yes.

23      Q     What is it?

24      A     It's an accident investigation form that I did at

25   the time.

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 135 of 249   Document 34-2

1          MR. RUTENBERG:  Let's just go off the record.

2          (Off the record.)

3          MR. RUTENBERG: Okay, back on the record.  We're

4    back from lunch, continuing the deposition of, the

5    individual deposition of Scott Blair, and the corporate

6    designee for, 30(b)(6) designee for topics four and 16.

7          MR. ZAWADSKY:  Six and 14.

8          MR. RUTENBERG:  Excuse me, yes, six and 14, thank

9    you, counsel.

10   BY MR. RUTENBERG:

11        Q    Mr. Blair, if you recall, when we broke for lunch

12   we were talking about the accident investigation you

13   conducted with regard, after Mr. Tim Jacobs reported to

14   you that he had twisted his ankle.  Do you recall?

15        A    Yes.

16        Q    Okay, and I had just handed you what I have

17   labeled as Exhibit 14.  Do you recognize Exhibit 14?

18        A    Yes.

19        Q    What is it?

20        A    That is the accident investigation for that was

21   attached to the actual accident investigation.

22        Q    Does this appear to be a full, accurate and

23   complete copy of the accident investigation form?

24        A    Yes.

25        Q    There's no second page?

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 136 of 249   Document 34-2

1      A    No.

2      Q    Is that your handwriting?

3      A    Yes.

4      Q    When did you complete this form?

5      A    This would have been not long after Tim came into the office and reported the incident to me.  He would have filled out the accident report at that time, or had it already filled out at that point, and then in this case it wasn't long after him reporting to me that I actually did the accident investigation.

11     Q    Okay.

12     A    Sometimes they don't always happen immediately following.  But in this case I believe it did.

14     Q    What does the accident report form look like?

15     A    It just has all the employee's information, name, address, date of birth, that type of personal information, then it describes what, it has a section that they fill out as to what they did, what the incident was, or what the accident was, if there was an injury, the extent of the injury, medical treatment, drug tests given.

21     Q    And they fill that out?

22     A    They fill that out, the lead would sign it, and then it would get turned in to me, and then I would sign it, do the investigation and human resources would eventually get it, sign it and ---

Neal R. Gross and Co., Inc.
(202) 234-4433        Washington DC        www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 137 of 249   Document 34-2

1      Q      Who signs it when the lead does the report?

2      A      When the lead does the report it would ---

3      Q      Oh, I see, okay.  And then you do the accident

4    investigation form?

5      A      Correct.

6      Q      So, how did you describe the incident to this, in

7    this case?

8      A      Well, he said he was walking down on a short

9    flight of steps, stepped awkwardly on his foot, twisting

10    his right ankle.  And I determined that, you know, he

11    basically did not step off the bottom stair squarely onto

12    his foot.

13      Q      What does it mean to step awkwardly?

14      A      Not, basically step on the side of your foot as

15    opposed to the, you know, the meat of it, I guess.

16      Q      So, you concluded that he stepped on the side of

17    his foot when he hit the ground?

18      A      It must have been, yeah.

19      Q      Did he tell you that?

20      A      I think he said he landed awkwardly.

21      Q      And do you know which side of the foot he landed

22    on?

23      A      Probably the outside of his foot.

24      Q      And why do you say that?

25      A      Just because that's how people, generally people

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 138 of 249   Document 34-2

1    don't, it's hard, your foot doesn't bend, you know, from

2    inside out as easily as it does from outside in.

3         Q    So how could he have done a better job, according

4    to you?

5         MR. ZAWADSKY:  Object, asked and answered.  You

6    answer the question.

7         THE WITNESS:  Just step squarely onto his foot.

8         MR. RUTENBERG:  Meaning what?

9         MR. ZAWADSKY:  Object, asked and answered.

10   BY MR. RUTENBERG:

11         Q    What does it mean to step squarely onto a foot?

12         A    Basically like your, like you normally walk.  You

13   normally walk you step squarely on your foot, you don't

14   walk on the sides of your foot or up on the balls or the

15   heels or you don't tip toe around.  Use the entire square

16   area of the bottom of your foot.

17         Q    Did he receive any medical treatment?

18         A    No.

19         Q    Did he receive first aid?

20         A    No.

21         Q    If he did receive first aid, who would usually

22   administer first aid, if anyone?

23         A    Well, I guess depending on what it is.  I mean if

24   it was serious enough we would warrant calling an

25   ambulance, then obviously the paramedics would.  We, you

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG  Filed 03/08/18  Page 139 of 249  Document 34-2

1    know, we're trained in CPR, I mean we're trained how to

2    stop like bleeding and that if it's a cut or something

3    like that.  I mean in this situation his first aid would

4    be basically sitting down and keeping his foot elevated if

5    it had come, if it was that serious.

6         Q    Would you have noted that as treatment given?

7         A    It would have been noted on the accident report,

8    yeah.

9         Q    GX-14, is that right?  The accident ---

10        A    Oh, treatment, oh yes, treatment given.  I would

11   have, it would have, it's noted on the accident report but

12   it would have been duplicated essentially on that if, if

13   that had been the case.

14        Q    Okay, I have a question.  So, you see across the

15   middle there, by the bottom, the top third, the bottom of

16   the top third it says accident incident and near miss?

17        A    Yes.

18        Q    What is an incident?

19        A    I'm not sure.  At the time I'm not sure the

20   wording, why we had incident noted on there.  To me an

21   accident or a near miss, they're both incidents.  So it

22   may have been just the, the way the form was constructed

23   and nobody ever caught that it was, maybe too, just an

24   unnecessary box to check.

25        Q    Did he see a doctor?

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 140 of 249   Document 34-2

1      A    No, not that I know of.  I don't believe he did.

2      Q    And the company, did Dura-Fibre ask him to see a

3  doctor?

4      A    I don't believe so, I don't believe, unless he

5  had any conversations separately from Jamie.  But I don't

6  think he was asked or, you know, demanded to.

7      Q    Did he violate any company policy?

8          MR. ZAWADSKY:  Object, asked and answered.

9  Answer the question.

10         THE WITNESS:  Well, the only policy I would say

11  is just what came out of this was the unsafe act from the,

12  from the findings of the safety team.

13  BY MR. RUTENBERG:

14     Q    Is that considered a safety violation?

15     A    In that case it was.

16     Q    Okay, why did it say on this accident

17  investigation form, where it says did a safety violation

18  occur, why does it say no?

19     A    I don't know, I think I either checked the wrong

20  box or something was going, something different, some

21  different thought process was going through my head at the

22  time.

23     Q    Okay, but you signed it, correct?

24     A    Yes.

25     Q    Do you know whose other signature that appears to

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 141 of 249   Document 34-2

1      be?

2           A     Jamie Gonnering.

3           Q     And so she, does she typically, did she typically

4      review the accident investigation forms at the time?

5           A     I assume she reviewed them before she signed

6      them.

7           Q     Did you fill out a near miss and incident form?

8           A     It's essentially our accident report, yes.

9           Q     Okay, and go ahead.

10          A     Yeah, incident form that's, when I say accident

11     form that's the form that I'm referring to is what was

12     called the near miss incident form at the time.

13          Q     And you said the employee fills this out?

14          A     The employee fills out the top section with name,

15     date of birth, the first three lines.  They fill out the,

16     well the lead, the employee would fill out the top, then

17     between them and the lead they would fill out basically

18     everything down to where the signatures are.

19          Q     I'm sorry, I admit I was trying to get an exhibit

20     to put in front of you.

21          A     Sure.

22          Q     Could you just repeat what you just said?

23          A     Okay, the employee would fill out the top three

24     sections, name, date of birth, city, address, all that

25     stuff.  The, who, what, where, when and why would get

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 142 of 249   Document 34-2

1    filled out between them and the lead and then it would get

2    passed on to me.  They would fill out, they would answer

3    some of the questions that are towards the bottom, and

4    then all the way down to the signature, then the employee

5    would sign, and at that point then they would turn it in.

6         Q    Let me put this in front of you so we can get

7    into it a little bit more specifically.  So, what I'm

8    handing you is pre-labeled GX-15, and does this appear to

9    be a full, what is GX-15?

10                   (Government's Exhibit No. GX-15 was marked

11                   for identification.)

12        A    The near miss and incident form.

13        Q    Does it appear, and in particular what near miss

14   and incident form is it?

15        A    The one specifically done for Tim Jacobs when he

16   landed on his ankle.

17        Q    Does it appear to be a full, accurate and

18   complete version?

19        A    Yes.

20        Q    Is that your signature at the bottom?

21        A    Yes.

22        Q    And it looks like we have Ms. Gonnering's and Tim

23   Jacobs, would you agree?

24        A    Correct.

25        Q    The signatures, would you agree?

Neal R. Gross and Co., Inc.
(202) 234-4433            Washington DC            www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 143 of 249   Document 34-2

1    A    Yep.

2    Q    So, let's just be a little bit clear about which

3  parts the employee would fill out, versus what a

4  supervisor might fill out or what they might fill out

5  together.  So, do you see on the left-hand part of the GX-

6  15, it says employee?

7    A    Yep.

8    Q    You testified the employee fills out all the

9  entire top section, right?

10    A    The employee would fill out the top, yep.

11    Q    And who would fill out the first row of boxes on

12  the next section that starts with date of near miss or

13  incident?

14    A    The employee really should fill out the top

15  section there.  Basically the employee and the lead, or in

16  this case the lead and myself.  If it was just a plant

17  employee and a lead, together the two of them would fill

18  this out, as best as they could before turning it into me,

19  and then I would, you know, I would obviously review it

20  and, you know, if location treated didn't happen to get

21  filled in I would check that if there was any treatment.

22  I would basically go over it again with them.

23    Q    And in this case do you recall, so in this case

24  did you and Mr. Jacobs fill in that first row in the

25  second section?

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 144 of 249   Document 34-2

1      A    Yeah, we must, either he did because he knew the

2    specific time, or we kind of filled it out together after

3    he came and reported it to me.  I'm not sure exactly how

4    much of this form had already been filled out when he came

5    and told me.  He may have brought it to me with the top

6    section already filled out, or when he came and told me

7    and I said, well, let's grab an accident report and we'll

8    start filling it out.

9      Q    Moving down, do you see where it says medical

10    treatment on the left-hand side?

11      A    Yes.

12      Q    Who filled that out?

13      A    I would have, most likely.

14      Q    Do you  have any reason to believe that you

15    didn't fill that out?

16      A    No, he may have treated it, he may have X'd it

17    just because he, we had determined at the time we weren't,

18    we didn't need to send him in.

19      Q    You mean the company and Kooy decided to send it

20    to the hospital?

21      A    Correct.

22      Q    Or to any other doctor?

23      A    Correct.

24      Q    Who filled in the description of near miss

25    incident?

Neal R. Gross and Co., Inc.
(202) 234-4433              Washington DC              www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 145 of 249   Document 34-2

1           A       Probably myself when I was questioning him, you

2    know, about the incident.

3           Q       And at the time you concluded that he, what part

4    of the body did you conclude was effected?

5           A       Right ankle.

6           Q       And what did you at the time conclude the injury

7    was?

8           A       Sprain.

9           Q       Did you check near miss accident?

10          A       I did.

11          Q       What is that?

12          A       It was a little, at the time I guess it was a

13   little, I don't want to say confusing or kind of a, what's

14   the word I'm thinking of, kind of a, I'm not sure what I'm

15   thinking of.  There's a near miss and there's an accident.

16   The way we had it listed at the time was near miss

17   accident , it's, I checked it, it didn't really seem.  To

18   me, I saw the word accident, but I can see people see the

19   word near miss on there, it's hard to, it's a poor choice

20   of wording, let's just put it that way.  To me it was a,

21   to me it was an accident, I guess, I don't know how we,

22   why the form specifically said near miss accident at the

23   time.  That was, that got, I think that got cleared up at

24   a later time and I don't think it, it no longer says that.

25          Q       When was it cleared up?

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 146 of 249   Document 34-2

1      A    I don't know, sometime since then.  I don't know

2  specifically when, but I know there was some, I mean if I

3  just look at this now, that seems like kind of a

4  contradiction, is the word I was thinking of.  It seems

5  like a contradiction.  Again, there's a near miss and

6  there's an accident, but the way this was worded, I think

7  the wording was just, it could have been better and I

8  think that's what was cleaned up later.

9      Q    So, you saw that it said near miss accident,

10  correct?

11      A    Yep.

12      Q    And did you see the asterisk attached to near

13  miss accident?

14      A    Yes.

15      Q    And what does the asterisk say?

16      A    It says no disciplinary action taken.

17      Q    Did you always consider this to be an accident?

18      A    I considered it an accident from the get go.

19      Q    Okay.

20      A    I didn't consider, I mean as far as this, how

21  this was wording, you know, maybe poor choice of wording

22  aside, to me it was always an accident.  And I mean,

23  discipline wasn't even, it wasn't even a thought process

24  of mine when I'm filling, when I'm filling these out.

25      Q    What is your thought process when filling these

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 147 of 249   Document 34-2

1   out?

2       A    Basically just documenting the incident, the way

3   it occurred, and then it going up the chain and letting

4   the safety team make the determination from there on, you

5   know,  what any follow-up should be.

6       Q    Did you find that Mr. Jacobs had abused any

7   substances?

8       A    No.

9       Q    How do you know that?

10      A    I didn't check anything on the form.

11      Q    Where it specifically says substance abuse,

12  correct?

13      A    Correct, and I believe he was sent in for a, he

14  was sent in for an alcohol drug test that afternoon, as

15  well, and the, I assume the, if it had come back positive

16  it would have been, I would have been made aware of that,

17  so.

18      Q    Had he had alcohol drug problems at work?

19      A    Not that I'm aware of.

20      Q    At any point?

21      A    Not that I'm aware of.

22      Q    Did you find that he failed to obey rules?

23      A    I did not check that.

24      Q    Okay, would you have checked it if he failed to

25  obey rules?

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 148 of 249   Document 34-2

1          A     If I thought so.

2          Q     So, what do rules refer to, if you don't think

3     he, he failed to obey rules?

4          A     Again I don't know, that's open to a lot

5     interpretation if that's technically, that's safety rules

6     or just verbal, you know, rules or instructions that he

7     was given.  I'm not certain what the, you know, deep down

8     what that, the meaning, or like I said, it could be open

9     to a lot of different interpretation.

10         Q     By an employee?

11         A     Or by any, yeah, by anybody.

12         Q     Would you suspect that if you felt that he broke

13    a rule, a safety rule, a safety rule in particular would

14    you check failure to obey rules?

15         A     If there was something blatantly obvious.  Again,

16    if this was a forklift situation where he was cruising

17    around at a high rate of speed and ran into something

18    because he wasn't paying attention, that could be tied to

19    a rule on safe forklift operation.

20         Q     Okay, so ---

21         A     Nothing immediately stood out to me at the time.

22         Q     To the extent you found Mr. Jacobs broke a rule,

23    do you not consider whatever rule he broke to be blatantly

24    obvious?

25              MR. ZAWADSKY:  Object to form.

Neal R. Gross and Co., Inc.
(202) 234-4433            Washington DC            www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 149 of 249   Document 34-2

1          THE WITNESS:  Ask it again, please?

2    BY MR. RUTENBERG:

3          Q     When you testified just now that if he had, and

4    feel free to correct me, that if Mr. Jacobs had failed to

5    obey a rule that was blatantly obvious, you would have

6    checked failure to obey rules, correct?

7          A     Yes.

8          Q     Does that mean to the extent the rule that you

9    found that he did eventually break was not blatantly

10   obvious?

11         A     Well the rule that we eventually determined he

12   broke, it was after, again it was after a discussion with

13   the safety team, and it was using the criteria on that

14   form.  At that time, at the time I'm investigating I'm

15   not, my thought  process isn't necessarily, well, did he,

16   is it a rule that he landed awkwardly on his foot.  That

17   to me, it wasn't, I guess that wasn't, I don't want to

18   say, that wasn't an obvious breaking of a rule as a

19   carelessness on a tow motor would have been.  The breaking

20   of the rule, or the discipline that was issued with the

21   rule was as a result of our process with the safety

22   incident report.  So, I wasn't even thinking about that,

23   I'm just kind of looking at the situation, just on the

24   surface right now, or at the time.

25         Q     But similarly, turning back to GX-14, which is

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 150 of 249   Document 34-2

1    the accident investigation form, you similarly did not

2    write, you similarly checked no, that a safety violation

3    didn't ---

4         A    Yeah.

5         Q    -- excuse me, let me rephrase.  You also found

6    consistent with the near miss and incident form that he

7    did not violate a safety rule, correct?

8         A    Yeah, again either my thought process at the

9    time, I wasn't thinking disciplinary way, you know, I

10   wasn't thinking a disciplinary process down the line at

11   the time, or again, or I checked the wrong box.  I don't

12   recall what my, clearly I made a mistake checking that

13   box, but I don't know what my thought process was at the

14   time when I checked it.

15        Q    But you, did you testify earlier that you had

16   determined, prior to the safety meeting, upon filling out

17   the accident investigation form that he committed a, that

18   Mr. Jacobs committed an unsafe act?

19        A    Well after, after I had filled this out I had

20   gone up and talked to Jamie after that.  And as we

21   reviewed things and I, it was discussed that, you know,

22   this is not, this is an accident, this is something that

23   we need to bring to the safety committee.

24        Q    Was it determined that he had violated an, that

25   he had performed an unsafe act?

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 151 of 249   Document 34-2

1      A      At that point we determined that, yes, it is, it

2  was considered an unsafe act, and it is something that

3  needed to be brought to the safety team.

4      Q      Did Ms. Gonnering, when you say Jamie I assume

5  you mean Ms. Gonnering?

6      A      Yes.

7      Q      Did she conduct the investigation?

8      A      No, this was a conversation her and I must have

9  had.  I don't know if Luke was involved or not, but at

10  some point it was determined that, you know, yeah, I

11  checked the box that I shouldn't have and yes, we need to

12  treat this as a, an unsafe act leading to the accident.

13      Q      Did you believe it was an unsafe act before you

14  spoke to Jamie Gonnering and Luke Benrud?

15      A      I don't recall.  I know I checked no, again I

16  don't know what my thought process was.  My initial

17  thought that was, yes, just because of the way he, again,

18  came off the flight of stairs, the way he landed, that was

19  my initial, that was my initial thought.

20      Q      Which is not reflected in GX-14 and 15?

21      A      At this point in the, at this point in the day,

22  no.  It was the next day then that I realized after I,

23  again, talked to them I realized, okay, yeah, this was

24  checked, the wrong box is checked.  And at that point I

25  had gone back to Tim and said, hey, there's a couple of

1    amendments that need to be made on here.  One was the type

2    of injury, I explained to him that I'm not a doctor, I

3    shouldn't have marked sprain, so I changed it to twist

4    because I can't make a medical diagnosis.  And then the

5    other one was that the, you know, the near miss accident,

6    again, sounded contradictory to itself and that it wasn't,

7    it was being technically investigated as an accident, not

8    a near miss or near miss accident.

9        Q    Well, couldn't you have just left near miss

10   accident unchecked, and then you wouldn't even have the

11   word near miss?

12       A    No, because we didn't want to, I didn't want to,

13   again, this term itself I thought, again, was kind of

14   contradictory.  I  did not want to keep it checked, because

15   it's really, it's a, it's not a near miss.  Yes, it's an

16   accident, but it's not a near miss.  So I, I just verbally

17   explained it to him that we're treating it as an accident.

18       Q    Have there been other circumstances where you've

19   checked near miss accident?

20       A    Probably.  If you asked me to remember one, I

21   don't.

22       Q    What did you typically do if you believed there

23   was an accident?  Did you check near miss accident or did

24   you leave it unchecked?

25       A    I probably would leave it unchecked.  I don't, I

Neal R. Gross and Co., Inc.
(202) 234-4433            Washington DC            www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 153 of 249   Document 34-2

1    don't recall.

2        Q    Well, why did you check it here if you typically

3    left it unchecked?

4        A    Well, I probably saw the word accident and that's

5    what made me check it.

6        Q    No doubt that's what you're testifying to.  But I

7    guess my question was if you said you, you testified you

8    typically left that check box unchecked when you found

9    that an accident had occurred, is that what you testified

10   to?

11       A    I believe, I mean again, I'm going, I'm just I'm

12   trying to remember how many times I've filled this out

13   over the time.

14       Q    Sure.

15       A    To go back and say that I always did it this way

16   or did it the opposite way, and how many types of each,

17   I'd be just guessing.

18       Q    Sure.

19       A    That's my hunch, what I told you is my hunch.

20       Q    So, I need to clarify.  Did you believe this was

21   an unsafe act when you filled, that mister, did you

22   believe that Mr. Jacobs twisting was an unsafe act when

23   you filled out those two forms?

24            MR. ZAWADSKY:  Object, asked and answered.  You

25   can answer the question.

Neal R. Gross and Co., Inc.
(202) 234-4433            Washington DC            www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 154 of 249   Document 34-2

1       THE WITNESS:  I believe I did.

2    BY MR. RUTENBERG:

3       Q    Then what was the purpose of, and then so when

4    you met what did, when you met with Luke Benrud and Jamie

5    Gonnering did they just tell you to change the form, near

6    miss and incident form?

7       MR. ZAWADSKY:  I'm going to object only because

8    I'm not sure he, Luke was there.  Jamie was there, Jamie

9    was there for sure.

10      THE WITNESS:  Yeah, after we discussed it she

11   probably showed me the form and said we need, this needs

12   to be amended, this is not a near miss accident it is an

13   accident.  We need to, you know, white that out, whatever,

14   and cover it with Tim.  Which is what I did the next

15   morning.

16   BY MR. RUTENBERG:

17      Q    Was Luke Benrud there?

18      A    I, he may have been, I don't know.  I know Jamie

19   for sure was there, Luke I don't know.  Luke was right

20   across the office from her, so he may have been privy to

21   that conversation.

22      Q    Did she suggest this was an unsafe act?

23      A    She suggested that we needed to, or we needed to

24   treat this like an accident and talk about it at the

25   safety meeting.  Or let me back up, this conversation with

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 155 of 249   Document 34-2

1    Jamie was the following morning.  At that point we had

2    already treated it like an accident at the safety meeting,

3    and realized then the next morning, after all the

4    determinations had been made, that the report, that the

5    box was checked incorrectly, I guess.

6         Q    Prior to this incident had you personally found

7    other employees committed unsafe acts?

8         A    Before this, I don't recall.

9         Q    Do you know if Jamie did, Jamie Gonnering?

10        A    I don't want to speak to that, I don't know.

11        Q    Typically when you fill out an accident

12   investigation form, if there was a safety violation would

13   you have set forth on the accident investigation form what

14   that particular violation would be?

15        A    Not, no not necessarily.  I would have just

16   checked the box and then there would have been, the actual

17   violation would have been talked about in the safety

18   meeting.

19        Q    So, what is the appropriate box to check on this,

20   on the near miss and incident form if there is a near

21   miss?

22        A    I would not have checked, I guess I would not

23   have checked any box.  Again this, given that this is what

24   I had to work with I wouldn't have checked any box.

25        Q    So, an unchecked box in your opinion would mean

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 156 of 249   Document 34-2

1   near miss, correct?

2        A    No, I guess I'm confusing myself here looking at

3   this.  I, it, again near miss accident was confusing at

4   the time and I, looking back at it now it's still

5   confusing when you're asking me, well what would I have

6   checked in each situation, and which is part of the reason

7   why I think the wording eventually got cleaned up.

8        Q    Yes, I don't think there's any dispute that it's

9   confusing.  I guess, so are you unable to answer the

10  question where are you supposed to check, if anywhere, if

11  it's a near miss, just a near miss?

12       A    Near miss, I guess looking at this the only

13  option is checking the box, because I know a near miss

14  does not require any discipline, and because that's stated

15  on there I guess I would look at this as, okay, it's a

16  near miss, I would check the box.

17       Q    Okay.

18       A    But at the time, again, and again this goes back

19  to what the thought process was at the time.  At the time

20  I knew that this was an accident, which is why I knew at

21  the time, I knew at the time what I was investigating was

22  an accident.

23       Q    Why?

24       A    Because he had hurt himself.  So that, I was

25  clear on that.  But again at the time I must have saw the

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 157 of 249   Document 34-2

1    word accident, and just checked the box thinking it said

2    accident.

3         Q    And you filled out sheets like this previous,

4    correct?

5         A    I must have, yeah.

6         Q    Okay.

7         A    I don't know how, and what the specific format

8    that I filled out, I don't know, I don't remember when

9    this particular version of this form came about, what

10   things were changed along the way or previous to that.

11   So, this particular form, how many times did I fill this

12   our, or have I ever, that I'm not certain.

13        Q    Who created the form?

14        A    Again, I assumed it was some combination of Jamie

15   and Luke, or the director of operations at the time and HR

16   at the time.  I don't imagine there was any, probably any

17   union involvement.

18        Q    Did you receive training on how to use the form?

19        A    When I was trained to be a supervisor, I guess,

20   yeah, it was, you know, the first time I had to do one it

21   was gone through with me.

22        Q    And do you recall what the appropriate way to

23   check or uncheck the box is depending on whether it's an

24   accident or near miss?

25        A    Again, I don't recall if this form, when I was

Neal R. Gross and Co., Inc.
(202) 234-4433            Washington DC            www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 158 of 249   Document 34-2

1   trained a year earlier as a supervisor, I don't want to

2   say that this form was exactly what this form looked like.

3       Q    Right, so I just want to be clear.  My question

4   was, were you trained on that form, that version of that

5   form?

6       A    I don't recall what type of formal training I

7   had.

8       Q    What about informal training?

9       A    If anything we probably covered it during a

10  safety meeting where Jamie took this form out and said

11  this is our new form, you know, and probably walked

12  through people how to fill it out.

13      Q    But you have no specific recollection of that?

14      A    No, no.

15      Q    Mr. Jacobs signed that document, correct?

16      A    He did.

17      Q    Was he, did you lead him to believe that this was

18  a near miss that would not require disciplinary action?

19      A    Well, if I had checked that initially I guess I

20  must have led him to believe that.

21      Q    But as alluded to before was this, was this the

22  final version of the near miss and incident form

23  associated with Mr. Jacobs' ankle twisting?

24      A    No.

25      Q    You changed it?

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 159 of 249   Document 34-2

1          A    Yes, the near miss accident was changed, and

2     again the injury where I had sprain I must have crossed

3     that out and wrote, under other I think I wrote twist or

4     twisted ankle or something.

5          Q    And did you change it before or after the safety

6     meeting?

7          A    I believe it was, well, I know I went over it

8     with him, I know I went over it with him the morning after

9     the meeting had happened.  Whether I physically adjusted

10    the form before and after, I don't remember.

11         Q    You don't remember, I'm sorry, before or after

12    the safety meeting?

13         A    Before or after the safety meeting, I don't

14    remember when it was physically changed.  At some point is

15    when we discovered the discrepancy and made the change,

16    but I don't know if that was before, before or after.

17         Q    Well, I'm going to hand you the revised near

18    miss, I'm going to hand you a copy of the revised near

19    miss and accident form, GX-16, Exhibit 16.  What is GX-16?

20                    (Government's Exhibit No. GX-16 was marked

21                    for identification.)

22         A    Revised version of the near miss incident form in

23    the Jacobs' incident.

24         Q    Does it appear to be a full accurate and complete

25    copy?

Neal R. Gross and Co., Inc.
(202) 234-4433                     Washington DC                     www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 160 of 249   Document 34-2

1      A      Yes.

2      Q      Is that your signature at the bottom?

3      A      Yes.

4      Q      Who else signed it?

5      A      Jamie signed it, and Tim had refused to sign it,

6   which I noted on there.

7      Q      Is this the revised form you were referring to

8   before?

9      A      Yes, yes the sprain has been changed to a twist

10   and the near miss accident was unchecked.

11      Q      Okay.

12      A      And this was covered with him the following

13   morning on, whenever that was, Thursday morning.

14      Q      Okay, so I'll ask again.  Did you find that

15   there, after all this review and all this time spent

16   working on the near miss and incident form, did you find

17   that the injury occurred as a result of substance abuse?

18      A      No.

19      Q      And how do you know?

20      A      Because I didn't have any, I had no evidence to

21   suggest that he was intoxicated or under the influence at

22   the time, and the drug test that he was sent in for would

23   have come back positive if there was any substance abuse.

24      Q      And in fact, again, the box was left unchecked,

25   correct?

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 161 of 249   Document 34-2

1          A    Yes.

2          Q    And did you determine that the injury occurred as

3    a result of failure to obey rules?

4          A    At the time, no.

5          Q    And again, this still came, this is still the

6    form that was provided to Mr. Jacobs the next day,

7    correct, after the safety meeting, right?

8          A    Yes.

9          Q    Why was that box left unchecked?

10         A    Because I, obviously we didn't associate the line

11   failure to obey rules with the safety violation, or the

12   committing an unsafe act.

13         Q    So, committing an unsafe act is not ---

14         A    Well, it is a safety --- yeah, I guess in

15   hindsight the box, should the box have been checked, yes.

16   But at the time, at the time initially when this would

17   have been filled out it wouldn't have had that

18   determination.  And I guess when we went back and edited

19   it that was, I guess we did view that box as needing to be

20   checked, or we did, or we didn't check it.

21         Q    What's the purpose of getting an employee's

22   signature?

23         A    Just that they acknowledge that the, that they

24   acknowledge the form.

25         Q    And that it's correct?

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 162 of 249   Document 34-2

1        A    I guess so.

2        Q    Is an ankle twist an injury?

3        A    Yes, at the time he twisted his ankle he told me

4   he was walking gingerly on it.  That was, I consider that

5   an injury.

6        Q    Okay, can you twist an ankle without, so there's

7   two, this can get a little confusing.  So, the way I'm

8   understanding it is ---

9        MR. ZAWADSKY:  Counsel, don't testify; just ask

10  him the question.

11  BY MR. RUTENBERG:

12       Q    The way I understand it is he physically twisted

13  his ankle.  Is that the unsafe act, the physical twisting

14  of an ankle?

15       MR. ZAWADSKY:  Object to the form of the

16  question.  Answer the question if you can.

17       THE WITNESS:  Ask the question again.

18  BY MR. RUTENBERG:

19       Q    Is the unsafe act the physical twisting of the

20  ankle?

21       A    The unsafe act is the, the process that he took

22  for, the process that he took stepping on his foot.  The

23  injured ankle was the result of the unsafe act of stepping

24  awkwardly like he did.  That's what was determined.

25       Q    But did he, he physically twisted his ankle

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 163 of 249   Document 34-2

1    though, correct?

2        A    Yes.

3        Q    But that wasn't the unsafe act?

4             MR. ZAWADSKY:  Object.  Look, we've gone over

5    this five times, we're not, don't answer the question

6    We're done on this line of questioning.

7             MR. RUTENBERG:  Excuse me, please answer the

8    question.

9             MR. ZAWADSKY:  No, he's not answering the

10   question.  You've asked him that repeatedly and he's

11   already explained it repeatedly.  Do not answer the

12   question.

13            MR. RUTENBERG:  That is not a reason not to

14   answer a question.

15            MR. ZAWADSKY:  Yes, it is.

16            MR. RUTENBERG:  No, it is not.

17            MR. ZAWADSKY:  It's called harassment.

18            MR. RUTENBERG:  No, it is not.

19            MR. ZAWADSKY:  It's called harassment, counsel.

20   If you don't like it, tough.  If you don't like it, tough.

21            MR. RUTENBERG:  I'm not harassing him, I'm asking

22   him a question.

23            MR. ZAWADSKY:  Then ask a new question.

24            MR. RUTENBERG:  Why are you yelling at me?

25            MR. ZAWADSKY:  Because you are asking in an

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 164 of 249   Document 34-2

1    inappropriate fashion in this deposition.

2           MR. RUTENBERG:  It is not inappropriate, I am

3    asking him about, a question ---

4           MR. ZAWADSKY:  No, you're not.

5           MR. RUTENBERG:  -- related to ---

6           MR. ZAWADSKY:  No, you're not.  He's already

7    answered, he's already testified again and again what the

8    unsafe act was.  He's already testified again and again

9    the nature of the, of his perception of the injury.  What

10   more is there to ask about?

11          MR. RUTENBERG:  I'm going to continue my

12   deposition ---

13          MR. ZAWADSKY:  You're going to do it properly,

14   counsel.

15          MR. RUTENBERG:  Did the only reason, the only

16   basis that you can tell him not to testify is if I'm ---

17          MR. ZAWADSKY:  Don't tell me what I can do.

18          MR. RUTENBERG:  -- invading a privilege.

19          MR. ZAWADSKY:  I'm telling you, an improper

20   conduct of a deposition is grounds to direct the witness.

21          MR. RUTENBERG:  I am not ---

22          MR. ZAWADSKY:  Yes, it is.

23          MR. RUTENBERG:  I am very calm.  I am asking him

24   questions.  This is not ---

25          MR. ZAWADSKY:  Whether you are calm or not is not

Neal R. Gross and Co., Inc.
(202) 234-4433              Washington DC              www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 165 of 249   Document 34-2

1      the issue.

2              MR. RUTENBERG:  You can object to it and I'm

3      going to continue, but that does not make that improper

4      conduct, and I'm sorry you feel that way.

5              MR. ZAWADSKY:  Yes, it does because you're asking

6      the same question over and over again.  Do you need time

7      to maybe call your supervisor and find out what the term

8      harassment means?

9              MR. RUTENBERG:  No, I don't, but I feel I'm being

10     harassed now.

11     BY MR. RUTENBERG:

12         Q    So, can you tell me the injury, where it says

13     check, correct?

14         A    Yes.

15         Q    A cut is an injury, right?

16         A    Yes.

17         Q    That might occur because the unsafe act is maybe

18     slipping a knife through your skin, as an example, right?

19         A    Yes.

20         Q    What is a dropped object as far as an injury?

21         A    Picking up a pallet and dropping it on your foot.

22         Q    So, in that case the injury is actually what you

23     do to your foot, not the dropping of the pallet?

24         A    The injury is the result of the action, yes.

25         Q    Okay, so you see the distinction between, do you

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 166 of 249   Document 34-2

1   see the distinction  between an action and an injury?

2         A     The action is the offense, the injury is the

3   result of it, yes.

4         Q     Okay, that's fine.  So, in this case a, is it

5   possible to twist an ankle without it being an injury?

6         A     I don't see how.

7         Q     Well, I mean can you step on an ankle and it not

8   hurt?

9         A     Of course you can step on, of course.

10        Q     I mean, you know, on the side of your ankle, on

11  the side of the foot, like you said?

12        A     Sure.

13        Q     So, would it be an unsafe act if somebody twisted

14  their ankle, but did not hurt themselves with an ankle, a

15  twisted, an injured twist?

16        A      If they were careless in how they landed on their

17  foot, sure.

18        Q     And out of curiosity, do you know what a sprain

19  is?

20        A     Do I know what a sprain is, are you asking me to

21  medically define it, no.

22        Q     Do you know what a strain is?

23        A     Again, same thing, medical definition, no.

24  Basically a pulling of the, a pulling of the muscle or the

25  ligament I believe it is.

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 167 of 249   Document 34-2

1     Q    A strain?

2     A    Is one of the two of them.

3     Q    Okay.

4     A    I know one is more serious than the other.

5     Q    Do you know if Mr. Jacobs did any damage to his

6 ligaments or injuries, or excuse me, ligaments or tendons

7 or muscles when he twisted his ankle?

8     A    No, I didn't know it at the time, and I don't

9 believe, no, I did not know that at the time.

10    Q    Do you know of any particular damage or, excuse

11 me, do you know of any particular damage or physical harm

12 he did to his ankle generally?

13    A    No.

14    Q    Did Mr. Jacobs tell you why he did not sign this

15 updated form?

16    A    I may have noted it in my conversation that I

17 documented.  I think he just, he, I don't recall what, why

18 specifically he didn't want to do it.  Like I said, I may

19 have documented it in my, in my form, but I don't recall.

20    Q    Was he upset?

21    A    Oh, yeah.

22    Q    How so?

23    A    Just very agitated about it.  I know he was

24 complaining that, you know, he was complaining that stuff

25 changes all the time around here, I think that was one

1    statement that I remember him saying.  But, I mean, he

2    wasn't, you know, he didn't use profanity or anything like

3    that, or he wasn't belligerent to the point of

4    insubordination.  But he was clearly hot about it.

5        Q    Did he explain to you what he meant by things

6    change a lot around here?

7        A    I don't recall what he, if he elaborated on that

8    at all.

9        Q    Based on the fact that it was determined Mr.

10    Jacobs injured himself when he stepped down the steps, was

11    it determined this was an accident not a near miss?

12        A    Correct.

13        Q    And since it was an accident and not a near miss

14    he  was subject to possible disciplinary action, including

15    the assignment of points, correct?

16        A    Follow the results of the safety team meeting,

17    yes.

18        Q    Had his twist not been determined an injury would

19    it have been a near miss?

20        A    If it had not, say that again.

21        Q    When he twisted his ankle.

22        A    Yep.

23        Q    Had that twist not been considered an injury,

24    would this be considered a near miss?

25        A    Well, the way it was defined, it was defined as

Neal R. Gross and Co., Inc.
(202) 234-4433        Washington DC        www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 169 of 249   Document 34-2

1  an injury.  But I guess if you would, if that was going to

2  be defined as a near miss, then no.

3      Q    Okay, because of an injury.  Had the way he

4  stepped off the final stair not resulted in a twist, but

5  he still stepped off in the same way.

6      A    Okay.

7      Q    Would this have been considered a near miss?

8      A    He probably would have not, I don't know, he

9  probably would not have reported that if he had just

10 stepped awkwardly and not hurt himself.

11     Q    Well, let's assume ---

12     A    You could have considered it a near miss.  Would

13 he have reported it to me, you know, I don't know.

14     Q    Sure, but my question wasn't did he report it to

15 you, let's just assume he reported it to you, the same

16 thing.  He stepped off the stairs, in the same manner as

17 he did, but did not twist his ankle.  Would that have been

18 considered a near miss?

19     A    More than likely, yes, because there was no

20 injury.

21     Q    And had there been no injury in this case, he

22 would not have been subject to disciplinary action,

23 correct?

24     A    If had not been marked, if there had been, if

25 there was not an injury and it was looked at as an

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 170 of 249   Document 34-2

1   accident it would not have gone to the safety committee to

2   review.

3       Q    And therefore he would not be subject to

4   disciplinary action, correct?

5       A    Correct.

6       Q    I'm going to refer you to GX-17 which I'm handing

7   to you now.  Do you recognize GX-17?

8               (Government's Exhibit No. GX-17 was marked

9               for identification.)

10      A    I do.

11      Q    What is GX-17?

12      A    That's the safety incident report that was used

13  by the safety team in the Tim Jacobs' ankle twisting

14  incident.

15      Q    And this was the form you discussed before that

16  the company put together and the union had some input

17  into?

18      A    Correct.

19      Q    So, for instance maybe the amount of property

20  damage, et cetera?

21      A    Correct.

22      Q    I want to go through the categories just so I

23  understand what they mean.  What does past behavior or

24  history of unsafe acts mean?

25      A    Just how many, what type of safety or, what type

Neal R. Gross and Co., Inc.
(202) 234-4433            Washington DC            www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 171 of 249   Document 34-2

1    of safety record this employee has.

2        Q    And how is it determined how many points there

3    are?

4        A    How is it determined?

5        Q    For that category, yes?

6        A    Well every, the farther back you, or the more

7    incidents you have in a certain amount of time, I guess

8    determines what, I mean each, each box there is pretty

9    self explanatory as to what, you know, how many points are

10   going to be assessed based on the timeframe and the

11   frequency.  Who came up with this, again, this was the

12   company and the union.  The company, I believe, put the

13   wording together, and then the union was brought into it,

14   you know, for input they had.  How much input they had

15   into the specific determining, okay if zero, if none, if

16   there's been no incidents over the last three years it's

17   going to be a zero.  I don't know who specifically came up

18   with each category or each point system or timeframe, I

19   guess.

20       Q    So, let's back up here.  So, typically the safety

21   committee fills out this form together, is that right?

22       A    Each, I believe how it worked is everybody in the

23   room was given a copy of this, and they would go through

24   and talk about each, they'd talk about it as a group and

25   determine a line score, you know, each line as a group.

Neal R. Gross and Co., Inc.
(202) 234-4433            Washington DC            www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 172 of 249   Document 34-2

1    Some of them are, you know, some of them are pretty,

2    obviously they don't need any type of discussions, they're

3    pretty black and white like property damage or actual type

4    of incident.  Either you had medical treatment or first

5    aid or none.  The first, really the second and the third

6    are the ones that are kind of, maybe open to a little bit

7    of discussion.

8         Q    Does each individual fill out their own sheet and

9    then an average is taken?

10        A    I don't know if there was an average.  I think, I

11   think everybody maybe wrote their opinion on there and

12   then everyone kind of went around the room and read off

13   what their number was, and then again there was, you know,

14   any discrepancies.  Well, we have a couple people who said

15   two, a couple people who said three, then we would, you

16   know, talk further from there and, again, come to an

17   agreement at some point.

18        Q    Does the company keep those sheets?

19        A    The ones that were handed to the employees, I

20   don't know.  I think they were probably all turned in.

21   Whether they're kept on record or not, I'm not sure.

22        Q    So, what happens when you tally up the sheets,

23   excuse me, tally up the line scores?

24        A    So, we tally up the scores and we talk about, so

25   we have our subtotal which came to eight, then other

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 173 of 249   Document 34-2

1    contributing factors is just if there's anything else that

2    we talked about that would be a basis to take points off,

3    I guess.  And then the final total is brought, brought

4    down, and then going off the score guide is what

5    determines, you know, whether there's points assessed, or

6    as it says on here  just documenting or coaching.

7         Q    Does the company make personnel, beyond

8    termination does the company make personnel decisions

9    based on how many, based at least in part on how many

10   disciplinary points an employee has?

11        A    Well there is some jobs in the plant that are

12   interview based.  So, if for instance, a lead position, a

13   dry end position, a maintenance position and one other

14   position are all interview based positions.  So, if there

15   were multiple employees all, you know, interviewing for

16   the same spot, I guess a disciplinary record, a discipline

17   record could be a factor in whether they were given that

18   job or not.  Somebody who has a attendance issues, you

19   don't want to promote somebody if you have one guy who has

20   had attendance issues and another guy who doesn't.  The

21   guy with the attendance issues who is sitting at, you

22   know, 18 points because of it, that may be a strike

23   against him in getting this position.

24        Q    Have you sat on any sort of promotion committees

25   or been in involved in any sort of promotions for other

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 174 of 249   Document 34-2

1    people?

2        A    I've been on a few interviews for dry end

3    operators.  I know I've been on some, just some external

4    issues for when we hired.  When I was promoted, or when I

5    was going to get promoted to my current position I wasn't

6    on the external candidate to take over for my position.

7        Q    And what about for internals?

8        A    Internals, yeah, dry end operators I've been

9    involved in.  I'm not involved in looking at disciplinary

10   records, that's human resources' gig.  But I'm part of the

11   interview panel with the asking of the questions and

12   determining, you know, at least initially is this

13   individual worthy of consideration from that point

14   forward.

15       Q    Okay, so thank you for that.  So moving back to

16   past behavior or history of unsafe acts.  Based off of the

17   rubric what, what do the employees look at, those sitting

18   on the safety team committee look at to determine how many

19   points an individual would receive under the past behavior

20   or history of unsafe acts?

21       A    Well, this line one is, again, more of a, I guess

22   a cut and dry type thing, whereas basically HR is going

23   back through their personnel file and looking for similar

24   safety, safety incidents, and then just looking at the

25   dates of those and then obviously they fall under this

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 175 of 249   Document 34-2

1    particular category. In this case, as it says, it's been

2    less than one year since any other injury or unsafe act.

3    So, there was something in the previous year that

4    attributed to that score of a three.

5         Q    Okay, but to be clear it doesn't say any unsafe

6    incidents, it says any injury or unsafe act, correct?

7         A    It says past behavior or history of unsafe acts.

8         Q    Right, but to actually look at what, how you

9    actually determine the specific score is merely an amount

10   of saying how many times an individual has been injured,

11   or, and or unsafe acts, right?

12        A    Yes, that's what it says, yes.

13        Q    Why does it say, so if that's the case the more

14   times an employee has been injured in the past, X amount

15   of time, whether it be six months or a year or two years,

16   can impact the amount of disciplinary points they get in

17   the future, is that right?

18        A    It impacts the number of points on this

19   particular line.

20        Q    Right, which then of course impacts the total

21   number of disciplinary points they might be ---

22        A    Yes, it doesn't necessarily mean it's going to

23   lead to discipline. If they get a three or a four on

24   this, and they get zeros all the rest of the way down,

25   ultimately it's not going to lead to any formal discipline

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 176 of 249   Document 34-2

1    other than, again, possibly a coaching session.

2         Q    Okay, an unsafe act, is that, as that term is

3    used here is unsafe act the same phrase, the same term and

4    meant in the same way as it is used in the labor

5    agreement?

6         A    I believe so.  That's what she's, what HR is

7    going off of, is past unsafe, or past documentations of

8    unsafe act to count towards, you know, this particular

9    line.

10        Q    But, in fact, if any, in this case what unsafe

11   act or injury was taken into account?

12        A    For previous, I don't know what the previous

13   incident was.

14        Q    And if Mr. Jacobs had not been injured in the

15   last year, or performed an unsafe act, in fact he would

16   have had a total of five points which would not have

17   resulted in points being assigned, is that right?

18        A    Correct, or I mean if it had been, if it had been

19   a year-and-a-half since his last incident, then he would

20   have gotten two instead of three, or if it ---

21        Q    Right.

22        A    Or if this was his first one, then yes, it would

23   have been a zero.

24        Q    But would you agree that taking injuries at all

25   into account might dissuade people from reporting

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 177 of 249   Document 34-2

1   injuries, knowing that in the future it could be held

2   against them in a future disciplinary action?

3       A    I don't think my opinion on the matter

4   necessarily means anything.  The form is what it is.  It's

5   what was put together and agreed upon by the union.

6       Q    Sure.

7       A    If the union had issues with that, then it would

8   have been their responsibility to make a bigger stink

9   about it at the time it was put together.

10      Q    May or may not be true, I'm not here to argue on

11  that.  I'm just asking about your opinion?

12      A    If a, if past injuries would be, would dissuade

13  them from, from reporting, possibly.  But at the same time

14  if the penalty for, if there's a penalty for not reporting

15  and it's found out, you're more than likely, you're better

16  off reporting.  Because you're, just because you report

17  and if it turns into an unsafe act, that doesn't

18  necessarily mean it's going to lead to discipline.

19      Q    Sure, but it doesn't say injury that led to

20  discipline, it just says injury, does it not?

21      A    Yes.

22      Q    Okay, so it says any injury, right?

23      A    But I know, but I know if I don't report

24  something I'm going to get written up, and it's found out.

25      Q    Okay.

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 178 of 249   Document 34-2

1      A      If I do, so you can look at it as, well what's

2      the lessor of two evils.

3      Q      So  whether you report or not report could lead

4      to disciplinary action for not reporting, or for more

5      harsh disciplinary action later on down the road because

6      of this line score, correct?

7      A      If you show a tendency to get injured a lot,

8      yeah, I mean yes, it's going to, going to not look

9      favorably when it comes to this particular line item on

10     this form.

11     Q      Why does it make a difference if you're, what

12     does it make, why is it important if somebody get injured?

13     I mean, why is it important if somebody had gotten injured

14     a lot in the past?

15     A      Because it shows a trend of just unsafe work

16     practices, or again, carelessness, recklessness.

17     Q      But before you testified that one could get

18     injured without careless or recklessness?

19     A      Sure, but you still look at the, you know, you

20     look at the severity, well, let me back up.  Never mind

21     what I was about to say.

22     Q      Let's look at, you can keep that out, GX-17, I

23     want to look at GX-45, which I'm handing to you now.  Do

24     you recognize GX-45?

25                    (Government's Exhibit No. GX-45 was marked

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 179 of 249   Document 34-2

1              for identification.)

2      A    I did not put it together, but I can tell you

3  what it is.

4      Q    What is it?

5      A    It's a list of all the points that Tim Jacobs had

6  accumulated that led him to, this would have been put

7  together by Jamie Gonnering prior to his dismissal to show

8  the history of his points dating back to 2011.

9      Q    So, 2013, or excuse me, May 22nd, 2013 was the

10 date that he was given these final four points, correct?

11     A    Yes.

12     Q    And in fact was, is the date on Exhibit 17 in

13 front of you, correct?

14     A    Yes.

15     Q    So, what is the one safety, how many safety

16 incidents had there been in the two years prior to the

17 ankle twisting?

18     A    It looked like there was three.

19     Q    Where?

20     A    July 13th, 2011, there was four points for a

21 safety incident report, don't know, I do not know the

22 circumstances behind that.  October 18th, four points,

23 same thing, for a safety incident report, and October 25th

24 he was given zero points in regards to another safety

25 incident.

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 180 of 249   Document 34-2

1          Q    It looks like it was gained four back, is that

2     right?

3          A    That was after 10/25.  He'd gone at, he would

4     have gained four back three months after the previous

5     incident.  So the gained four back would have happened

6     November, like January 25th.

7          Q    Not that we have to get into it, but I believe in

8     that case it was because there was, does the company have

9     a policy that they need to be given, that they need to

10    provide, that they need to assess points within three

11    days?

12         A    I believe it's, it was either three or five days

13    once the, once all the facts of the incident are known.

14         Q    Okay, well ---

15         A    I believe it was three days at the time.

16         Q    Let's just assume that's what happened with the

17    10/25 and if you disagree we can talk about it, but I

18    don't think it's material for now.  So, 10/18/12, do you

19    know what happened there?

20         A    No, I don't.

21         Q    But had he not been assigned points, those four

22    points, he would have, which were the only points he

23    received in the last year, he would have actually had a

24    point removed, is that right?

25         A    Well, no, he got four points for being sick two

1    months prior to this.  On March 19th of 2013 he got four

2    points for being sick.

3         Q    Is being sick the same as being injured?

4         A    No, sick is calling in sick, calling in absent

5    from work.

6         Q    All I'm looking at are how many injuries or

7    unsafe acts he had in the previous ---

8         A    Sick, being, calling in sick would not have been

9    looked at as a, as an injury or as, it would not have

10   taken  into account for that.

11        Q    So it looks like potentially the only unsafe act

12   he had in the previous year was on 10/18/2012?

13        A    10/18 and 10/25, there was two incidents.

14        Q    One of which was --- now, if the points are

15   gained back does that still count as an injury or unsafe

16   act for the purposes of past behavior history?

17        A    No, gaining points back just shows that they've

18   gone three months straight or 90 days, I forget whichever

19   it was, with no write ups, and at that point they get four

20   points back.

21        Q    Okay.

22        A    No write ups, call ins, anything like that.

23        Q    I'm concerned you might not have understood the

24   question.  So, just to be clear, when the points are

25   gained back?

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 182 of 249   Document 34-2

1        A    That has nothing to do with this.

2        Q    Okay, so do you still consider that incident as

3 one of the injuries or unsafe acts?

4        A    Yes, the incident still occurred.  The fact that

5 they got points back three months after that is irrelevant

6 to the fact that the incident still occurred.

7        Q    I want to talk about that incident as it relates

8 to our current Exhibit 17.  So, what I'm going to hand you

9 is GS-29, 30 and 47.  Feel free to take a look at 29, GX-

10 29, 30 and 47 and let me know when you're done.

11                (Government's Exhibit Nos. GX-29, GX-30, and

12                GX-47 were marked for identification.)

13        A    Is this the same as, oh never mind, never mind.

14        Q    And let me know when you've taken a look.

15        A    Okay.

16        Q    Do you recognize these documents?

17        A    Yes.

18        Q    What are they?

19        A    Dura-Fibre accident form from an incident on

20 October 18th, 2012, subsequent safety incident report that

21 the safety team went over, and the discipline that came

22 out of that documentation.

23        Q    Okay, so what did happen, what did, what was Mr.

24 Jacobs cited for?

25        A    He was cited for general rules, one, number four,

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 183 of 249   Document 34-2

1    I don't know, it's not written on there what that

2    specifically was but that's ---

3         Q    That's an unsafe act?

4         A    It, that's an unsafe act, okay, then that's what

5    he was cited with.

6         Q    Did you conduct the investigation?

7         A    I definitely signed the accident report.  I don't

8    recall if I did the investigation or not.

9         Q    And what does the accident report say?

10        A    The accident report states that Tim had gone

11   downstairs into the boiler room area, he tripped over a

12   hose that was laying across the floor, and that he

13   apparently told me that he had possibly re-aggravated some

14   lower back pain.

15        Q    So, someone else had put a hose across the floor,

16   right?

17        A    Yeah, a hose had, a maintenance person had

18   apparently not picked it up or wound it back up after

19   they'd been using it.

20        Q    And it shouldn't have been there, right?

21        A    It should not have been there.

22        Q    And I note, did you sign near miss accident on

23   this form as well?

24        A    I did.

25        Q    And was this supposed to be an accident or near

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 184 of 249   Document 34-2

1    miss?

2         A    It would have been an accident after he told me

3    that he had possibly re-aggravated some back pain.

4         Q    And again, he was cited for tripping over a hose

5    that should not have been there?

6         A    Well, he was cited for committing the unsafe act

7    for tripping over the hose, yes.

8         Q    Was he the one who left the hose there when you

9    tripped over it?

10        A    I don't believe so.  I believe they found who the

11   maintenance person was who left it there, if I recall.

12        Q    Okay, do you know if he was cited?

13        A    I don't want to say for sure if he was or not.

14        Q    Just curious about that.  A question, were you on

15   the safety committee?

16        A    I was not.

17        Q    Okay, so you concluded that he had an accident,

18   is that right?

19        A    Yes, because of, yes.

20        Q    Well, on GX-47, on the safety incident report,

21   the actual injury incident type is left blank, is it not?

22        A    It appears so.

23        Q    What is, is the near miss accident risk analysis

24   filled in?

25        A    Yes.

Neal R. Gross and Co., Inc.
(202) 234-4433                 Washington DC                 www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 185 of 249   Document 34-2

1          Q     With what number?

2          A     Two.

3          Q     What does that number equate to?

4          A     A chance for minor injury to occur.

5          Q     But that no injury necessarily did occur,

6     correct?

7          A     I don't know what the eventual, if it was a re-

8     aggravation of a previous lower back pain.  I don't know

9     how long that stayed with him if that was a, if that

10    continued being a, an ongoing thing I don't know.

11         Q     But you concluded it was an accident and that's

12    what it said on the accident form, right?

13         A     Yes.

14         Q     All right, would you agree that GX-47 is

15    inconsistent with that conclusion?

16         A     I don't want to speculate as to why this actual

17    injury incident type was left blank.

18         Q     And not only was it left blank, however, but the

19    near miss was not left blank.  Because I would imagine you

20    would fill one or the other in, is that right?

21         A     Yes.  It's an actual injury or near miss

22    accident, yes.

23         Q     Right, so --

24         A     So, this is, so this was left blank because they

25    went down to this next box.

Neal R. Gross and Co., Inc.
(202) 234-4433            Washington DC            www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 186 of 249   Document 34-2

1     Q     A near miss accident?

2     A     Yes.

3     Q     Which doesn't exist, right?

4     A     Well, again, there you go back to the, you know,

5     there's, there's a near miss or there's an accident.

6     Q     And a near miss is no injury?

7     A     Correct.

8     Q     Okay, I'm sorry did I interrupt you?

9     A     No.

10    Q     Okay, if we can turn back to GX-17, please?

11    A     Which one's that?

12    Q     That's the safety incident report filled out for

13    Mr. Jacobs' ankle twist.  Excuse me, for the event that

14    led to his ankle twist.  What does intent mean?

15    A     I guess it kind of covers of, you know,

16    physically what was the employee doing at the time that

17    eventually led to the accident or the incident.

18    Q     Okay, and how many --

19    A     Was it, was it, you know, on, on the scale of, as

20    zero indicates just there's no control whatsoever all the

21    way up to engaging in, you know, reckless behavior.

22    Q     What would zero be?  What are some examples of

23    that?

24    A     Again, something falling off of a, something

25    falling off a shelf or falling off the machine and hitting

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 187 of 249   Document 34-2

1  him in the shoulder.  Or, yeah, I think that's a perfect

2  example.

3      Q    Okay, assuming he didn't say knock into the

4  machine?

5      A    I'm sorry?

6      Q    Assuming he didn't say, knock into the machine or

7  something like that, right?  Well, something can't

8  actually fall off a machine onto it, it doesn't matter.

9      A    Yeah, if something falls off, if a, if a,

10  something being stored up above your head or something

11  falls off, the  vibration of the machine and it falls and

12  hits you in the shoulder, again, that would be there's no,

13  there's no control the employee necessarily has over that.

14      Q    And what was the careless overlooked minor detail

15  or precaution that he should have taken?

16      A    I guess when we, I guess when we looked at that

17  we must of looked at the fact that his awkward step or

18  his, his awkward step off the, off the step was the reason

19  we gave him the one and we didn't feel it was anymore

20  serious than that.

21      Q    Tell me about knowledge or skills.  What does

22  that mean?

23      A    That's just how much experience the person has.

24  How many times has the person been in that similar

25  situation.  How much tenure they have with the company.

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 188 of 249   Document 34-2

1    Basically a, you know, should they have known better or
2    how many times, like I said, how many times they've done
3    this same thing in the past with, with no issues.

4         Q    So, it might be higher the more experience you
5    have?

6         A    It could be because you're, the expectation is
7    that you're a more educated, experienced employee who
8    should know better.

9         Q    And what was the previous direct experience or
10    event in a similar situation?

11         A    What was probably looked at there was that he
12    had, he was very familiar with the outlay of the machine
13    and the steps and the location of all the hazards.  And,
14    again, he'd been in that situation countless times before.
15    The situation was repeated numerous times in the past with
16    no, with different outcome.

17         Q    So, he went up and down hundreds, thousands of
18    times?

19         A    He went up, he went up, down the stairs hundreds
20    of times, yes.

21         Q    Okay, and one time he tripped down?

22         A    Yes.

23         Q    One out of hundreds?

24         A    Or, yes.

25         Q    Okay, possibly more?

Neal R. Gross and Co., Inc.
(202) 234-4433              Washington DC              www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 189 of 249   Document 34-2

1          A    It could be more.

2          Q    Okay, so is actual, we talked about this a little

3     bit, but I see there it says actual injury incident type

4     or near miss accident risk analysis.  How do you determine

5     which one of those, does the company, does the safety

6     committee only fill out one of those?

7          A    Appears that's the way it's, was worded at the

8     time was that the top one was used for injuries, the

9     bottom one was used for near misses.

10         Q    Okay, and in this case which block was used?

11         A    Actually, actual injury/incident type.

12         Q    And how many points were issued for this one?

13         A    One.

14         Q    Why?

15         A    Well, it was determined that there was no

16    treatment given.  It was not, so it wasn't a near, it

17    wasn't a near miss.  There was no medical treatment given.

18    So, first aid would, was basically a, first aid other

19    than, basically, take it easy kind of thing was, I

20    believe, the only first aid that was given.  Because we

21    didn't wrap his ankle or anything like that.  It was,

22    basically, it, it, the near miss, the no treatment given,

23    I don't know why, I don't know why no treatment given was,

24    was written in there.

25         Q    Should this have been near miss, no treatment

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 190 of 249   Document 34-2

1    given?

2         A    It, I mean, no treatment given isn't written in

3    there so I'm not sure, I'm not sure what the determination

4    was for first aid.  If it was a, he, I don't know why, I

5    don't know why they came to the, why we came to one.

6         Q    Well, you were there, right?

7         A    Yeah, yeah, I was.

8         Q    At this meeting, and you also told me, you

9    testified today that he did not receive first aid or you

10   do not know of any --

11        A    Yeah, I did not, I did not know of any treatment

12   that he was given or any, or any, any medical attention.

13        Q    Which is consistent with the other forms you

14   filled out where it says no treatment given, right?

15        A    Yes.

16        Q    Or no medical attention?

17        A    Yes.  So, I don't know why, I don't know why we

18   came to the decision of one of first aid.

19        Q    Is that another gray area?

20        A    It appears so.

21        Q    Tell me about the other contributing factors.

22   What is that?

23        A    Again, that would be if there's anything else

24   that's not documented in, you know, any, anything that's

25   not covered in this that could be looked upon in their

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 191 of 249   Document 34-2

1    favor.

2         Q    What are some examples --

3         A    Well, the hose incident.  If I could go back to

4    that other incident?

5         Q    Yes, of course.

6         A    The hose incident was, there was the contributing

7    factors.  They took off three points on that because in

8    actuality the hose should have been put away.

9              Yes, he tripped over it.  Yes, he should have

10   been more careful, but in the end the hose should have

11   been put away and this wouldn't have happened.  So, in

12   that particular situation that was taken into account and

13   he was, there was some, and there was some points knocked

14   off for that.

15             In this case we did not find any other

16   contributing factors.  It was a fairly simple, you know,

17   or I don't want to say simple, but it was a fairly, fairly

18   black and white incident as to what exactly happened.

19   There was nothing else.  It wasn't that the, the floor was

20   slippery where he stepped, the steps were slippery,

21   anything like that.

22        Q    What were the stairs made of?

23        A    Steel.  They were graded so plenty of traction.

24        Q    And are the edges of the stairs, are they graded?

25        A    Yeah.  All, the entire, the entire stair is, is,

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 192 of 249   Document 34-2

1    it's, I don't want to say they're graded is the right,

2    it's, there's, it, it's made of just individual steel like

3    beams across, like very narrow ones.

4         Q    Okay, they're narrow?

5         A    Yeah, but I mean, they're only spaced an inch

6    apart together.  So, it's, it's a clear, you know, step

7    for, for a person.  They're --

8         Q    Roughly how many inches is each riser in width?

9         A    The width of the, the stairs?

10        Q    I would call that the length.  The width, how

11   much spaces --

12        A    Oh, probably 10 inches.

13        Q    Okay, and --

14        A    Maybe a foot.

15        Q    Is there a definition, do the stairs have any

16   sort of tape on them, black and yellow emergency tape?

17        A    No.  The surface, I mean, the surface of the

18   steps themselves doesn't allow you to actually put

19   anything on there.  Because, again, they're just, they're

20   just a series of vertical metal, vertical pieces of steel

21   that form the, the actual step.

22        Q    Getting back to GX-17 what does, under the other

23   contributing factors section, row, what are the

24   definition, what's the definition of minor?

25        A    It's --

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 193 of 249   Document 34-2

```
1        Q    Let me ask you this.  I'm sorry to interrupt.
2   I'll ask a different question.  Does the company have a
3   written definition of minor?
4        A    Not that I've ever seen, no.
5        Q    Does the company have a written definition of
6   substantial?
7        A    Not that I've seen.
8        Q    Significant?
9        A    No.
10       Q    How about extraordinary?
11       A    No.  It's a, basically subjective opinion.  You
12  know, when everybody talks about it, hey, if this, this
13  hose should have been put away.  You know, is that a, is
14  that a minor thing.  No, it is a pretty significant thing
15  because that caused the, that partially caused this.  So,
16  it's, it's looked at, you know, we don't, just kind of
17  looked at what's their, kind of almost on a one-to-five
18  scale almost.
19       Q    Do you know if Lonnie Zeppel had been at a
20  previous safety meeting?
21       A    I'm, I'm not sure.
22       Q    How about Mark Woody?
23       A    I am not sure.  Mind if we take a couple minutes?
24       Q    Sure.  Could we get back here at --
25       A    I just want to text my wife and let her know I'm
```

Neal R. Gross and Co., Inc.
(202) 234-4433            Washington DC            www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 194 of 249   Document 34-2

```
1    not going to be home on time.

2         Q    Okay, how about 10 after?

3         A    Sure.

4              (Off the record.)

5    BY MR. RUTENBERG:

6         Q    What happened after the safety committee, so the

7    safety committee, did the safety committee meeting

8    determine that Mr. Jacobs would receive four points?

9         A    Yes.

10        Q    Okay, was there any dissent as to that at that

11   meeting?

12        A    I don't recall any.

13        Q    What happened after the meeting as far as

14   continuing on with the, did you have a meeting afterwards

15   with Ms. Gonnering and/or Mr. Benrud after the meeting?

16        A    Yeah.  I believe we talked, and I think it was at

17   that point then that Jamie must have realized that, hey,

18   this four points is going to put him at 24.  I think

19   that's when the, I think that's when we, at least I was,

20   at least that's when I was, when I had realized that, yes,

21   this is going to lead to a termination.

22        Q    How soon after the safety committee meeting was

23   that?

24        A    It's probably right after.

25        Q    Was it in the same room as the safety committee
```

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 195 of 249   Document 34-2

1    meeting?

2        A    No.  I think we were either talking in Jamie's

3    office of Luke's office.

4        Q    Did Jamie have her point list with her?

5        A    She must have to come to that determination.

6    That's what I'm assuming she must have looked at to figure

7    that out.

8        Q    Was Ms. Gonnering at, never mind.  So, I want to

9    hand you what I've pre-labeled as GX-18.  So, Exhibit 18,

10   actually.  Do you recognize Exhibit 18?

11               (Government's Exhibit No. GX-18 was marked

12                for identification.)

13       A    Yes.

14       Q    What is it?

15       A    This is the discipline slip that was issued to

16   Tim Jacobs in regards to the ankle incident.

17       Q    Okay, and this was provided to, does this appear

18   to be a full and accurate and complete copy?

19       A    It is.

20       Q    Is that your signature?

21       A    Yes.

22       Q    Under supervisor?

23       A    Correct.

24       Q    Okay, and is this handwriting yours?

25       A    Yes.

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 196 of 249   Document 34-2

1          Q      When did you write this discipline slip?

2          A      This would have most likely been written Thursday

3    morning or the morning of the, the 23rd.  I believe that

4    was Thursday.

5          Q      Is this the day after you had that follow-up

6    meeting with Luke Benrud and Jamie Gonnering?

7          A      This, yes, this would have been, the follow-up

8    meeting took place the Wednesday of the safety meeting.

9    This would have been the, the next day, Thursday, yes.

10         Q      Okay, and it was determined at that meeting you

11   had after the safety meeting with those two individuals

12   that Mr. Jacobs would be terminated, correct?

13         A      Yes.

14         Q      Okay, we've covered what the safe act was.  The

15   Dura-Fibre employee handbook 10, what is that referring

16   to?

17         A      Believe Jamie had asked me to reference that, as

18   well, in this particular case --

19         Q      Had that been, go ahead.

20         A      Yeah, Dura-Fibre employee handbook, page 10,

21   safety policy.  I believe she was, she had a thing at the

22   time where she wanted to reference the employee handbook

23   when applicable in addition to any union contract

24   sections.

25         Q      Okay.

Neal R. Gross and Co., Inc.
(202) 234-4433               Washington DC               www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 197 of 249   Document 34-2

1      A    I don't remember the specifics as to why she, you

2    know, why she wanted that.

3      Q    Did anyone ever argue that the handbook, are you

4    aware of any employees who have argued that the handbook,

5    page 10, or handbook is not per the labor agreement?

6      A    No.

7      Q    Okay, how about is not a source for safety

8    polices?

9      A    No.

10      Q    Okay, did the safety committee meeting, did the

11    folks at the safety committee meeting consider the

12    handbook, page 10?

13      A    No.  We would have just considered the, they

14    would have just gone off the safety incident form.

15      Q    So, this was added after the fact?

16      A    This was, when we put the, when we wrote, when we

17    put the discipline together.  Yes, my, I put the general

18    rules group one which came out of the, the safety incident

19    report as it says on here, and then yeah, then Jamie had

20    asked me to add the separate entries referencing the, the

21    handbook.

22      Q    But, in fact, those points were not awarded for

23    his, or excuse me, issued because it's employee's

24    responsibility to work safely, correct?

25      A    Correct.  It was the, the four points, the four

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 198 of 249   Document 34-2

1    points came from the, the union handbook violation.  The,
2    the committing an unsafe act.
3         Q    Did Ms. Gonnering leave the company, was she
4    terminated, laid off, or did she leave on her own?
5         A    She left freely.
6         Q    Okay, did she tell you specifically what to write
7    with regard to general rules group one?
8         A    I believe she did.
9         Q    Okay, is that typical of the way, did she
10   generally tell you what to write with the discipline
11   slips?
12        A    Well, in this, in this case, like I said, there
13   was something going on at the time that I'm not, I'm not
14   entirely sure of that we needed to reference the employee
15   handbook during disciplines when, you know, when
16   applicable.
17        Q    Do you have any idea, though you're not sure of
18   what was that something, what was going on at the time?
19        A    I don't, I, honestly, I don't know.
20        Q    Was there a case against the company?
21        A    I don't, I think it might have been just a, might
22   have been just a recommendation by somebody.  I don't
23   know.
24        Q    Okay, when was Mr. Jacobs terminated?
25        A    11:45 a.m. on May 25th.

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 199 of 249   Document 34-2

1       Q   Was there a meeting?

2       A   Yes.

3       Q   Who was at that meeting?

4       A   Myself, Luke, Jamie, Tim, and I believe probably

5  the, at least three of the, maybe all four of the union

6  leaders at the time.

7       Q   Okay, do you know who those were?

8       A   Steve Wilz, Tim Voelker, Dan Nett, and I think

9  those because Tim was, Tim Jacobs was the fourth member.

10  So, I believe all three were probably present.

11      Q   Were there any objections from the union at the

12  meeting?

13      A   I don't recall the specifics.  I think they, I

14  don't, from what I remember documenting is that there was

15  some conversations after the fact.  But, the, the actual,

16  after it was, after he was told that he was being

17  terminated I just seem to remember it actually being a

18  lot, maybe lower key than I had thought that it might

19  have.  They had some conversations after we left the room

20  and I don't know what, obviously, took place there.  But,

21  the actual termination process went fairly smooth for

22  considering the circumstances.

23      Q   Did Mr. Jacobs yell?

24      A   No, I don't believe he did.

25      Q   Did he swear?

Neal R. Gross and Co., Inc.
(202) 234-4433        Washington DC        www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 200 of 249   Document 34-2

1        A     I don't think so.

2        Q     Okay, what did he say?

3        A     I, honestly, I don't recall what he said.

4        Q     Okay, Dura-Fibre assigned those final four points

5   as a result of your, as a result of your conclusions to

6   your investigation, correct?

7        A     A result of the safety incident report,

8   determinations by the safety team, yes.

9        Q     And you opened your investigation because Mr.

10  Jacobs, did you open your investigation because Mr. Jacobs

11  reported his ankle twist to you?

12       A     No.  The investigation was opened because of the

13  accident itself.  He was not, he was not investigated

14  because he reported the accident.  It was the, it was the

15  result of the accident.

16       Q     Okay, left me rephrase, and you opened your

17  investigation because Mr. Jacobs reported that he stepped

18  awkwardly on the long step, on the last step?

19       A     My, yes, my investigation was reported because of

20  the accident itself, which is required.

21       Q     Okay, I want to refer you back to GX-21 which is

22  your statement from July 26, 2013.  You indicated that you

23  changed, in your statement that you changed the near miss,

24  why?  That you unchecked in your near miss accident, why?

25       A     Because it was not a near miss.  That it was an

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 201 of 249   Document 34-2

1    accident, or that I, either that or, well, no.  Because it
2    wasn't a near miss.  It was being looked at as an
3    accident.
4         Q    You did write this, correct?  You know, we
5    discussed that, right?
6         A    Yes.
7         Q    All right, and this was done July 26th, 2013?
8         A    Yes.
9         Q    All right, if you can look at the bottom
10    paragraph of what's labeled as DURAFIBRE Bates No. 00099?
11         A    Yes.
12         Q    Could you read the second sentence of that
13    paragraph?
14         A    Starting with, I told him?
15         Q    Yes.
16         A    I told him that the term contradicts itself
17    because there is an accident and there is a near miss but
18    there's no such thing as a near miss accident.
19         Q    Keep going.
20         A    I told him, though, that the incident was still
21    considered and always viewed as an accident.
22         Q    Okay, and then just the next one.
23         A    Tim commented something to the affect of that's
24    my whole point, these forms keep changing all the time.
25         Q    So, as we discussed you found the near miss

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 202 of 249   Document 34-2

1 accident to be internally inconsistent, correct?  Is that

2 --

3          A     The, the term, yes.

4          Q     Okay, I want to refer you to, I'm handing over to

5 you GX-37.

6                    (Government's Exhibit No. GX-37 was marked

7                     for identification.)

8               MR. ZAWADSKY:  Do you want this still in front of

9 him?

10              MR. RUTENBERG:  No, it doesn't --

11 BY MR. RUTENBERG:

12         Q     What's GX-37?

13         A     An accident form for employee Eric Nelson from

14 May 7th, 2013.

15         Q     So, that's about two weeks, about a week-and-a-

16 half before you filled out Mr. Jacobs' form, correct?

17         A     Yes, yes.

18         Q     Okay, what happened in this case?  Feel free,

19 does this feel like, or is this a full accurate and

20 complete copy?

21         A     Yes, it appears so.

22         Q     Okay, do you have any reason to believe it's not?

23         A     No.

24         Q     All right, is this your handwriting?  Excuse me,

25 did you sign this?

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 203 of 249   Document 34-2

1          A     Yes, I signed it.

2          Q     Okay, did you fill out the other pieces?

3          A     No.  This is other handwriting.  This would have

4     been filled out, well,  I'm guessing whoever the lead was

5     at the time filled out the bottom portion.  Eric filled

6     out the top portion.

7          Q     What about the middle portion under description

8     of injury?

9          A     That would have been filled out by, I guess,

10    whoever the lead would have been at the time.

11         Q     Okay, so the lead does not sign this?

12         A     No.

13         Q     Did you review this?

14         A     Yes.

15         Q     This is filled out as a near miss accident isn't

16    it?

17         A     That's what was checked, yes.

18         Q     Do you know if there was ever another version

19    that was later made unchecked, that near miss accident?

20         A     No.  I don't believe so.

21         Q     Okay, what's the second page?

22         A     The second page is the accident investigation.

23         Q     And the third?

24         A     And the safety incident report that came out of

25    that.

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 204 of 249   Document 34-2

1        Q    Are these all full and accurate copies?

2        A    Yes.

3        Q    Is the handwriting on the second page yours?

4        A    Yes.

5        Q    So, you did do the accident investigation,

6   correct?

7        A    Yes.

8        Q    But, you did not fill out the accident form?

9        A    No.

10        Q    Did you sit in on the safety meeting, the safety

11   team meeting?

12        A    I did.

13        Q    Okay, and this was done roughly about the same

14   time as Mr. Jacobs', correct?

15        A    A couple weeks prior.

16        Q    Okay, did anybody ever raise any, was there any

17   injury associated with this?

18        A    No.

19        Q    Okay, and how do you know that?

20        A    It was marked no injury.  It was marked no

21   injury.

22        Q    But, there is a near miss accident is how it's

23   marked on the front page?

24        A    That's how it's marked.

25        Q    Okay, what did Mr. Nelson do incorrectly?

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 205 of 249   Document 34-2

1        A    It looked like he, putting a pallet away onto a

2    rack and he dislodged the brackets, or the supports and

3    the weight of a couple other pallets caused it to collapse

4    and there must have been some damaged product.

5        Q    Does it say that there's damaged product?

6        A    The accident report doesn't list any.  There's no

7    section for actual damage of property on there so, no.  On

8    the accident report when I described what the incident

9    was, collapse due to weight of other pallets.  I got the

10   same thing there too, is there's no, there's actually no

11   physical spot for the damage.  But, I know it was noted,

12   but it was noted on the safety incident form that there

13   was.  He was given a two for minor damage.  So, there had

14   to be some bad product that came as a result of that.

15       Q    And, in fact, on the accident investigation form

16   it says accident, not near miss, correct?

17       A    Correct.  So, that would have led me to believe

18   that a pallet would have dropped and there would have been

19   no, I guess, no loss to the company.  I guess that may not

20   have been considered an accident, or it wouldn't have been

21   as there was no accident, or as there was already no

22   injuries.  So, in this case the fact that there was damage

23   to company property is what made it an accident.

24       Q    Even though on the first page it's referred to as

25   a near miss accident?

Neal R. Gross and Co., Inc.
(202) 234-4433            Washington DC            www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 206 of 249   Document 34-2

1          A    Near miss accident, yeah, working with the

2   wording that I was given at the time.

3          Q    Yes, and did Mr. Tom Nelson engage in a safety

4   violation?

5          A    It was determined that, yes, because of his, his,

6   his operation of the tow motor was considered unsafe.

7          Q    And what was he, what violation, what did he

8   violate?

9          A    Well, there was no, well, the safety committee

10  determinated that there was no actual discipline so it was

11  constructive feedback or coaching.  So, technically,

12  there, there was no technical violation, per se, because

13  the safety incident report determined that there was no

14  actual discipline aside from basically a verbal warning.

15         Q    And constructive feedback, coaching, or first

16  corrective action is not considered discipline?

17         A    There was, yeah, there was, no, because there was

18  no actual discipline form filled out because of it.  I

19  believe he was given some extra, some additional training

20  on a forklift.  He was relatively new at the time.

21         Q    But you don't know what the safety violation was?

22         A    The, there was no, there was no safety violation

23  that came out of it.  It was this, the, the points, the

24  points that we came to, which was the four here down in

25  the score guide, relegated us to constructive feedback,

1    coaching, or first step corrective action, verbal warning.

2    I guess the verbal warning would have been the discipline,

3    for lack of a better word.

4        Q    Right, but you're talking about discipline.  I'm

5    asking about the violation.  Because you can have a

6    violation that leads to, can you have a violation that

7    leads to no disciplinary points?

8        A    Sure.  I mean, I don't, you know, what, you know,

9    if we wanted to go back into the, the handbook at the time

10   and find which specific violation this would have been, I

11   mean, we could have found something.  And that's what we

12   would have needed to do if this form determined that we

13   needed discipline.

14            There would have been a, probably a, there is

15   a section in there for damage to company property through

16   carelessness or detriment to quality, there is, there is a

17   specific sub-section in there that I could give you if I

18   had the list in front of me.  Which would have been, which

19   if this form had determined that there was discipline we

20   would have cited it.

21       Q    Well, what did you coach, who coached him?

22       A    Probably myself.

23       Q    So, what did you coach him on?

24       A    Probably just explaining how, in a similar

25   situation how he needed to be more aware of his

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 208 of 249   Document 34-2

environment, more aware of the racks and the layout. When
he's raising or lowering the forks on the forklift to make
sure he's not catching what exactly happened, that he's
clear of  obstructions when he's moving around.  And I
believe, I think we gave him some extra time with our, the
employee who trained him.

Q    Are the pallets heavy?

A    Yes.

Q    Could they hurt someone?

A    They sure could.

Q    Could they crush someone?

A    If it landed on them squarely I suppose it could.

Q    Okay, so this sounds like a very dangerous thing
that occurred, correct?

A    I mean, there was no, the racking system where
this happened, there are typically employees like working
right around this racking area.  It's generally the tow
motor and the -- in, unless somebody happened to be
walking by and a whole shelf collapsed the, you know, the
chance of injury for somebody else is relatively low.

Q    Sure, but if they were there the actual injury
would be very high?

A    Sure, it could be.

Q    Is that right?

MR. ZAWADSKY:  Object to form, speculative.

Neal R. Gross and Co., Inc.
(202) 234-4433               Washington DC               www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 209 of 249   Document 34-2

1    BY MR. RUTENBERG:

2        Q    How heavy are these pallets?

3        A    Ranges from, just depends on how much product is

4    on there, how thick the product is.  It could be 100

5    pounds to 1,500 pounds.

6        Q    And how high are they?

7        A    They could be anywhere from a foot high to four

8    feet high.

9        Q    I mean off the ground?

10        A    Oh, off the ground.  Well, these racks, the, the

11    second rack where this incident happened was probably five

12    feet off the ground from where the rack started.

13        Q    Okay, I'm going to hand you is GX-33.  Can you

14    identify the documents in GX-33, and take your time?

15                  (Government's Exhibit No. GX-33 was marked

16                  for identification.)

17        A    Okay, this is an accident report documenting a

18    discussion I had, accident investigation, and a safety

19    incident report for an incident with Dennis Neubert from

20    October 16th of 2012.

21        Q    And who's Dennis Neubert?

22        A    Former employee of Dura-Fibre.

23        Q    What kind of work did he do?

24        A    He's a roll tender.

25        Q    Do you recall this incident?

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 210 of 249   Document 34-2

1      A    Vaguely.

2      Q    What happened?

3      A    He was, he was pulling down a line of paper which

4 is fairly routine when you're stringing up the, stringing

5 up the laminator.  And he was pulled down on a line of

6 paper and he felt a pain in his shoulder.

7      Q    And was it determined he injured himself?

8      A    He, yes, he had a sharp pain in his left shoulder

9 that he said it lasted approximately 30 minutes.

10      Q    Okay, so this was a injury, not a near miss,

11 correct?

12      A    Should have been an injury, yes.

13      Q    Okay, did he report the pain to you at the end of

14 his shift?

15      A    11:00 p.m., yes.  I was actually probably working

16 that night that this happened so he probably reported to

17 me fairly shortly after the incident.

18      Q    Was he assessed points?

19      A    He was not.

20      Q    Okay, what does no lead available mean on

21 DURAFIBRE00223, under other contributing factors?

22      A    There must not have been a, there must not have

23 been a lead operator on the machine that night.

24      Q    And this you said was an accident, right?

25      A    It should have been categorized, yes, it was

Neal R. Gross and Co., Inc.
(202) 234-4433        Washington DC        www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 211 of 249   Document 34-2

1    categorized as an accident.

2         Q    Okay, did he receive any points for this being an

3    accident as per the rubric under the actual injury

4    incident type?

5         A    No, no.  It came down to constructive feedback,

6    coaching, or first step corrective action verbal warning.

7         Q    In fact, did he receive, he received zero points,

8    right?

9         A    Correct.

10        Q    Is that TBD?

11        A    Oh, under the actual injury type?

12        Q    Yes.

13        A    Yeah, I mean, at the time, I think it was put TBD

14   at the time because it was right after and that there was,

15   they were still unsure whether he was going to go in and

16   get treated, I believe.

17        Q    Well, does one need to be treated in order for it

18   to be an injury?

19        A    Well, no, but it would have effected, if he had

20   gone in for medical treatment that would have, you know,

21   that could have influenced this sheet.  Why, why TBD was

22   written on there we, we only knew what we knew at the time

23   when we were going over this form.  But I, my guess is at

24   the time maybe there was still a possibility that he was

25   going to go in and get it looked at.  I don't know, see

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 212 of 249   Document 34-2

1  this was on the 23rd, well, this was, this was done about
2  a, no, there's just some different dates on here.  I'm not
3  sure exactly when this, the supervisor at the time dated
4  it 10/18.  Dennis didn't date it until 10/23.  So, I'm not
5  sure why there was the difference in, difference in dates.
6      Q    Was he ever given points, and by points I don't
7  mean the disciplinary points, I mean the rubric points for
8  the actual injury incident type?
9      A    The actual injury?
10     Q    Incident type, I'm talking about on the rubric
11 itself.
12     A    Oh, I don't believe so.
13     Q    Okay, but --
14     A    Or it, I would have, it that would have happened
15 I guess I would have expected that this form would have
16 been amended after the fact, but I, I don't want to speak
17 on that because I had no, I would not have been, had any
18 involvement in that.
19     Q    And perhaps it was, but if it was I did not
20 receive it.  Now, were you a part of the safety team
21 meeting?
22     A    No.
23     Q    Okay, so this seems to be a different version of
24 the safety incident report than what's in Jacobs' was,
25 right?

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 213 of 249   Document 34-2

1          A     Yeah, it must have changed at some point in that

2     because there wasn't the injury and/or, or injury or near

3     miss box.

4          Q     Right, so you phrased this to, you determined

5     this was an accident, but he received no points for this

6     being an accident, correct?  Off the record, please.

7               (Off the record.)

8               MR. RUTENBERG:  Okay, back on the record.

9     BY MR. RUTENBERG:

10         Q     When we went off the record we were talking about

11    the Exhibit 33 and why Mr. Neubert was not assigned any

12    points for the actual injury incident type on the safety

13    incident report, is that right?

14         A     Yes.

15         Q     Okay, how many points was he assigned per the

16    table?

17         A     Six.

18         Q     Okay, and do you believe he should have been

19    assigned more if he was, in fact, injured?

20         A     Because I haven't given a thought because I

21    wasn't involved in here, so --

22         Q     Well, following your rubric.

23         A     Well, following the rubric, yeah, I guess if he

24    was, if he was injured, well, I guess he, it depends on

25    the seriousness of, if the, it depends on the seriousness

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 214 of 249   Document 34-2

1    of the injury, but I guess at a minimum if he would have

2    had one more point on there, which would have gotten him

3    up from six to seven which still would have been a, a

4    verbal warning at that point, if it was a recordable, if

5    it was a recordable that, or if there was, I should say if

6    it was recordable or if there was any type of medical

7    treatment sought then, yes, it could have pushed him up to

8    eight points which would have been four disciplinary

9    points.

10        Q    And you indicated that there was no, at least

11   initially, no points awarded for actual injury incident

12   type because of a waiting to see how bad the injury was to

13   get medical attention?

14        A    Well, there was no medical attention initially.

15        Q    Okay.

16        A    So, but again, I don't remember, I don't remember

17   if there was ever, if, if it was an intent by him to get

18   seen or if it was a, he said, initially he said to me that

19   it only lasted 30 minutes.  So, at that point he probably

20   just forgot about it.  But if it was something that would

21   have flared up the following day, I can't speculate on

22   what would have gone through his head.  But at some point

23   if the pain doesn't go away you're going to go in and get

24   it checked.

25        Q    Turning to the second page of Exhibit 33, what is

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 215 of 249   Document 34-2

1    this?

2         A    Documentation that I put together which must have

3    stemmed from the safety incident report.  It's my coaching

4    or constructive feedback discussion I had with Dennis.

5         Q    Okay, and why did you record this on paper?

6         A    Probably because I was asked to document it on

7    paper.

8         Q    By who?

9         A    Probably by Jamie or I, I made it a point to when

10   I was supervisor just to document a lot of my

11   conversations with them, that regard, or that didn't

12   necessarily lead to discipline, just for my own records.

13   Just --

14        Q    Okay, did you do this, all right, let me ask you

15   this can you read the last sentence of paragraph three?

16        A    Starting with I told Dennis?

17        Q    Yes.

18        A    I told Dennis that the reason he would not be

19   getting disciplined was that Luke told all employees that

20   if they reported near misses before the end of their shift

21   that they would not be subject to any punishment.

22        Q    So, ultimately it was decided this was a near

23   miss, not --

24        A    Right.

25        Q    -- not an injury, correct?  Excuse me, not an

1     accident?

2          A     Well, maybe is the wording that I used, but it

3     was determined that there was no, yeah, I guess that there

4     was no accident.  I don't know why I was, there was a lot

5     of, obviously, with that way that that form was worded, I

6     mean, there may have been some, you know, some confusion

7     on the part of near miss versus accident and near miss

8     accident.

9          Q     Well, was he injured?

10         A     He was injured, yeah.  Yeah, why I, why I put

11    this as a, a near miss I don't know.

12         Q     Well, I mean, you record it just right then and

13    there that he did not get points because he reported it as

14    the near miss, correct?

15         A     He did not get, him not getting points had, yeah,

16    him not getting points had nothing to do with him

17    reporting it.  It was investigated at the time as an

18    accident because there was an injury.

19         Q     Well, it says right here I told Dennis that the

20    reason he would not be getting discipline was that Luke

21    told all employees that if they reported near misses

22    before the end of their shift that they would not be

23    subject to any punishment.  And isn't that what happened

24    here?

25         A     Yeah.  Apparently I, like I said, I don't know if

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 217 of 249   Document 34-2

1  there was a, there was some confusion here between a near

2  miss and an accident because, ultimately, you know, there,

3  the injury didn't lead to anything.  So, maybe, I don't

4  know, maybe it was looked at as a, a near miss.  Like I

5  said there may have been some, there was probably some

6  confusion on the near miss versus an accident.

7       Q    Do you know how long Tim Jacobs was in pain when

8  he hurt his ankle?

9       A    No.  I don't believe it was --

10      Q    How does hurting an ankle, does in your mind

11  hurting an ankle and hurting a shoulder differ in any way?

12      A    No.

13      Q    But in this case with Dennis Neubert it's found

14  that he, in fact, had a near miss eventually, correct?

15      A    Well, it was still, I mean, that's what I told

16  him.  Yeah, I --

17      Q    Who makes the ultimate decision?  You make the

18  ultimate decision, right?

19      A    Yeah, I, I don't know why I put on there that it

20  was a near miss because everything about it says it should

21  have been an accident.

22      Q    But he received no disciplinary points because of

23  his near miss?

24      A    Nothing, well, there was still a safety incident

25  report.  There was still a safety incident report that was

Neal R. Gross and Co., Inc.
(202) 234-4433                Washington DC                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 218 of 249   Document 34-2

1    done that would not have been done if it was a near miss

2    from the beginning.  So, it may have been investigated

3    initially as an accident and then after the safety

4    incident report, I don't know, maybe they didn't, they

5    didn't decide that it was, I don't know if they re-labeled

6    it near miss from an accident because it didn't lead to

7    anything beyond that.  I don't know.

8        Q    Does this appear in your mind to be an

9    inconsistent application of Dura-Fibre's rules?

10        A    Yeah, there is.  It does in the sense that,

11    again, the near miss versus accident I think was confusing

12    at the time.  Which eventually, again, another reason that

13    it led to this form being, I guess, cleared up later on.

14        Q    After May 2013?

15        A    Yes.

16        Q    And, again, this was in October of 2012 so this

17    was confusing for at least between October and May 2013,

18    correct?

19        A    Yes.

20        Q    Okay, I'm handing you Exhibit 34.  Off the record

21    for a second.

22                (Government's Exhibit No. 34 was marked for

23                identification.)

24           (Off the record.)

25           MR. RUTENBERG:  Back on the record.

BY MR. RUTENBERG:

        Q    What I'm handing you is labeled as GX-34.  Do you
recognize GX, well, take a moment to look at GX-34 and do
you recognize it?

        A    Accident form and safety incident report for
another former employee, Joe Munos, from March 15th, 2012.

        Q    Is it Munes or Munos?

        A    I think it's Munes actually.

        Q    Does it appear to be a full accurate and complete
representations of these documents?

        A    Appears so.  I don't show that I had really any
involvement in any of this, so --

        Q    Okay.

        A    -- yeah, not real sure what happened here.

        Q    Who did do this investigation?  Do you know?

        A    Supervisor, I don't know is that, I'm not even
sure whose signature that is.

        Q    Okay.

        A    Might have been --

        Q    Based off of the face of the documents and my
understanding you did not do this investigation. Can you
determine what this person did?

        A    He scrapped his left, scrapped his right leg up
above the roll stands.  Okay, so he stepped into a, okay,
so he stepped into an opening, up on our bridge above the

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 220 of 249   Document 34-2

1    roll stands there's openings where the paper dives down or

2    it, where the paper is strung through and looks like he

3    had stepped through that and scrapped his leg up.  He

4    didn't fall all the way through, but scrapped his leg as

5    he kind of halfway fell into that.

6          Q    Okay, could you tell who are the committee

7    members?

8          A    Well, it looks like, I'm guessing that's Luke's

9    signature under manager/supervisor.  I'm not sure where

10   Steve or I were at the time.  Jamie Gonnering, Lisa Van

11   Kooy, I'm not sure who the, I'm not sure who number four

12   is.  Looks like a Mike, maybe.

13         Q    Okay, I appreciate that.  I can't read it either.

14   I'm just going to hand you GX-35.  Do you recognize GX-35?

15                    (Government's Exhibit No. GX-35 was marked

16                     for identification.)

17         A    Nothing I've seen before, but it's the accident

18   form investigation and safety incident report for an

19   incident with Lisa Van Kooy in July 11th of 2012.

20         Q    Okay, and do you recognize any of those

21   signatures on the bottom of GX-35?

22         A    Ted Ruten, Jamie Gonnering, and the middle one

23   I'm not sure.

24         Q    You can't tell who the supervisor is?

25         A    The supervisor looks like Luke.

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 221 of 249   Document 34-2

1    Q    Oh, okay.

2    A    I see the LB and that's my --

3    Q    Fair enough.

4    A    -- determination I can get from that.

5    Q    All right, you can put that away.  Thank you.

6    And then GX-38 is what I'm handing you.  Do you recognize

7    GX-38?

8              (Government's Exhibit No. GX-38 was marked

9              for identification.)

10   A    A near miss incident form from Mike Prokash on

11   May 23rd, 2013.

12   Q    Did you conduct this investigation?

13   A    Yes.

14   Q    Do these appear to be full accurate and complete

15   copies of the original documents?

16   A    Yes.

17   Q    Was this, was May 24th, correct, 2013?

18   A    Yeah, this incident happened, yeah, right before

19   midnight and I was notified; it must have been right after

20   midnight.

21   Q    Okay, this actually occurred on the same day Mr.

22   Jacobs was terminated, right?

23   A    Appears so.

24   Q    What happened here?

25   A    It looks like Mike was working under the roll

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 222 of 249   Document 34-2

1  stands, bumped his head, had some minor discomfort.  That

2  was about it.

3      Q    Okay, did he have any other contributing factors

4  deducting from his number of points he was awarded, he was

5  issued?

6      A    He did.

7      Q    How many?

8      A    Three.

9      Q    And what were the reasons?

10     A    Let's see there was, it says cramp, it was a

11 cramped work area.  There was no first aid.  There was no

12 signage or the floor wasn't painted.  No ability to get

13 trained since last accident.

14     Q    Is receiving no first aid a contributing factor,

15 mitigating circumstance?

16     A    Apparently it was in this case.

17     Q    Okay, Mr. Jacobs he also received no first aid,

18 is that correct?

19     A    Yes.

20     Q    Okay, but did he receive any first aid, no first

21 aid as a mitigating factor?

22     A    He did not.

23     Q    I'm going to give you Exhibit 25.  Do you

24 recognize Exhibit 25?

25              (Government's Exhibit No. GX-25 was marked

Neal R. Gross and Co., Inc.
(202) 234-4433          Washington DC          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 223 of 249   Document 34-2

1          for identification.)

2     A     Yes.  It's an e-mail that I had sent to Jamie and

3  Luke on May 30th, 2013 regarding a conversation I had with

4  Steve Wilz about his shoulder which appeared to be about a

5  week and change after the accident.

6     Q     And what did Mr. --

7     A     He said he --

8     Q     What did Mr. Wilz say to you?

9     A     He said he was fine.  He could move it up and

10  down, rotate it with no discomfort.  He said if he

11  actually up, actually would come up and punch me it would

12  probably be sore but otherwise it's fine.

13     Q     And did you take someone who get punched in the

14  shoulder as indicating he was injured or still injured?

15     A     No.

16     Q     Okay, and why?  Who did you send this document

17  to?

18     A     To Jamie and Luke.

19     Q     Did they request you do so?

20     A     I either took it upon myself to check with Steve

21  or Jamie had called me at some point and said, hey, can

22  you check with Steve just to see how his shoulder's doing.

23     Q     Do you recall if in the week that Mr. Wilz

24  received, tweaked his shoulder he sought medical

25  attention?

Neal R. Gross and Co., Inc.
(202) 234-4433              Washington DC              www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 224 of 249   Document 34-2

1          A     I don't, I don't want to say for sure, I don't

2    believe he did.

3          Q     Okay, handing you GX-26.  Do you recognize GX-26?

4                (Government's Exhibit No. GX-26 was marked

5                for identification.)

6          A     Not off-hand here.  Appears to be a, just a list

7    of items to discuss at a union management meeting from

8    June 25th, 2013.

9          Q     Did you type these notes?

10         A     No.

11         Q     Were you at that meeting?

12         A     It says I was.

13         Q     Okay, do you have independent recollection --

14         A     I have no, I have no recollection of this short

15   of reading everything that's on here.

16         Q     Do you know who typed up these, we'll call them

17   notes?

18         A     I would guess Jamie.

19         Q     Okay, but you don't have any personal knowledge?

20         A     I don't know, not 100 percent sure.

21         Q     All right, it indicates, these notes indicate

22   that Jamie, do you see where it says Jamie and Scott

23   conducted the investigation of the accident?

24         A     Yes.

25         Q     Did Ms. Gonnering help you with the investigation

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 225 of 249   Document 34-2

1      of --

2            A      This --

3            Q      -- Mr. Jacobs?

4            A      This was the Scott, this was Scott Gehl.  This

5      is, the reason I know that is because it stopped the

6      machine and talked to Steve Wilz and Tim Jacobs.  This is

7      when I was out of the office.  So, Jamie and Scott Gehl,

8      which she should have put G on there, they were the ones

9      who actually, that's, that's the Scott that she's

10     referring to.

11           Q      Okay, I'm just going to hand you GX-42.  Do you

12     recognize GX-42?

13                        (Government's Exhibit No. GX-42 was marked

14                        for identification.)

15           A      Appears to be some handwritten meeting minutes

16     from a meeting on May 30th, 2013.

17           Q      Is this your handwriting?

18           A      It is not.

19           Q      Do you recall being at this meeting?

20           A      I do not.

21                  MR. RUTENBERG:  I have no further questions.

22                  MR. ZAWADSKY:  So, 9:00 o'clock tomorrow morning

23     with Mr. Benrud?

24                  MR. RUTENBERG:  Yes, sir.

25                  MR. ZAWADSKY:  Okay.

Neal R. Gross and Co., Inc.
(202) 234-4433                    Washington DC                    www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 226 of 249   Document 34-2

1          MR. RUTENBERG:  Thank you very much.

2          (Whereupon, at 3:15 p.m., the deposition was

3     concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Neal R. Gross and Co., Inc.
(202) 234-4433        Washington DC        www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 227 of 249   Document 34-2

228

A

**a.m** 1:23 4:2 15:24
  111:6 199:25
**ability** 11:12,20 28:4
  79:12 93:10 223:12
**able** 24:19 42:22 56:5
  79:16 80:11
**absent** 182:4
**absolute** 70:2
**Absolutely** 47:19
**abuse** 148:11 161:17
  161:23
**abused** 148:6
**accept** 21:17
**accidents** 17:21 56:17
  60:1,18 71:20 72:15
  84:6
**account** 115:4 123:17
  177:11,25 182:10
  192:12
**accountability** 79:9
**accountable** 56:2 88:13
**accrued** 97:17
**accumulate** 23:4 43:2
**accumulated** 3:23
  82:23 98:5,13,20
  101:3,8 180:6
**accumulates** 42:15
**accurate** 11:20 38:22
  54:19 72:5 136:22
  143:17 160:24 196:18
  203:19 205:1 220:9
  222:14
**accurately** 11:12
**acknowledge** 162:23
  162:24
**acknowledging** 109:19
**ACOSTA** 1:5
**act** 15:1,2 44:15,17,19
  47:24 48:3,19,24 49:2
  49:3,16,19,24 50:2,11
  51:13,22 52:5,12,14
  61:16 73:14 77:19
  78:12,13 79:4,7 83:11
  83:12,16,19,24 86:17
  86:25 87:2,7,8,12,18
  93:22 94:16,22 95:1,4
  95:4,6,13,14,19,24
  103:1 134:12,17,19
  135:7 141:11 151:18
  151:25 152:2,12,13
  154:21,22 155:22
  162:12,13 163:13,19
  163:21,23 164:3
  165:8 166:17 167:13
  176:2,6 177:2,3,8,11
  177:15 178:17 182:11
  182:16 184:3,4 185:6

**action** 1:7 28:11 69:10
  69:13,21,24 81:13,17
  81:22 82:2 84:21 91:6
  91:15,24,25 92:1
  147:16 159:18 166:24
  167:1,2 169:14
  170:22 171:4 178:2
  179:4,5 207:16 208:1
  212:6
**actions** 80:4 92:5,7
**activities** 16:22,25
**acts** 43:12 44:23 48:6
  49:25 50:19 81:25
  106:14 156:7 171:24
  175:16,20 176:7,11
  182:7 183:3
**actual** 66:20 71:8
  103:14 106:13 136:21
  156:16 173:3 185:21
  186:16,21 190:2,3,11
  193:21 200:15,21
  206:7 207:10,14,18
  209:21 212:3,11
  213:8,9 214:12
  215:11
**actuality** 192:8
**add** 198:20
**added** 73:4 100:21
  198:15
**addition** 125:11 197:23
**additional** 75:8,8
  207:19
**address** 4:18 137:16
  142:24
**addressed** 36:10
**adjusted** 160:9
**administer** 4:6 139:22
**admit** 142:19
**affect** 11:20 202:23
**afoul** 88:1
**afternoon** 29:11 100:5
  101:24 107:13 108:8
  127:1,1,2,2 128:22
  132:24,25 148:14
**aggravate** 123:6
**aggravation** 186:8
**agitated** 168:23
**ago** 19:1,1 39:7 41:10
**agree** 8:25 80:11
  109:20 122:3 143:23
  143:25 177:24 186:14
**agreed** 8:19,24 12:5
  31:20 36:12 178:5
**agreement** 3:6 34:14,17
  35:8,9 36:13,13,14,16
  36:20,23,24 37:8,21
  38:20 39:4,5,12 40:20

**43**:15 44:2 47:24,25
  48:19 51:9 173:17
  177:5 198:5
**ahead** 58:14 67:11
  84:16 142:9 197:19
**aid** 139:19,21,22 140:3
  173:5 190:18,18,20
  191:4,9,18 223:11,14
  223:17,20,21
**alcohol** 11:7 117:25
  119:25 148:14,18
**ALEXANDER** 1:5
**alleged** 27:5 100:24
  101:17 105:14 124:11
**allegedly** 123:22
**allocations** 19:25
**allow** 193:18
**allowed** 47:7 123:5
**alluded** 159:21
**alternately** 22:9
**ambulance** 139:25
**amended** 41:16,20
  155:12 213:16
**amendments** 153:1
**amount** 48:21 49:21
  62:25 171:19 172:7
  176:9,14,16
**analysis** 185:23 190:4
**and/or** 195:15 214:2
**ankle** 126:9,10 127:6
  128:18,25 129:1,5
  130:1,1,18,24 134:10
  136:14 138:10 143:16
  146:5 159:23 160:4
  163:2,3,6,13,14,20,23
  163:25 167:5,7,10,14
  167:14 168:7,12
  169:21 170:17 171:13
  180:17 187:13,14
  190:21 196:16 201:11
  218:8,10,11
**annually** 56:25
**answer** 7:8 9:18,21
  10:2,5,18,21,22 11:2
  11:3,12 52:22 59:15
  66:8 68:12,12 78:22
  80:10,15 84:24 85:6
  92:12 94:1,1,20 124:7
  126:22,24 139:6
  141:9 143:2 154:25
  157:9 163:16 164:5,7
  164:11,14
**answered** 52:20 59:14
  59:19,20 80:8,10,14
  80:20,24 84:15 121:6
  139:5,9 141:8 154:24
  165:7
**answering** 164:9

**answers** 8:6 9:11,12,14
  10:12 11:21
**anybody** 58:17 85:8
  88:13,18 124:15
  149:11 205:16
**anymore** 16:7 188:19
**anyways** 133:2
**apart** 193:6
**apologize** 33:14 95:16
**apparently** 92:23
  184:13,18 217:25
  223:16
**appear** 38:22 89:16
  106:22 119:9,9
  136:22 143:8,13,17
  160:24 196:17 219:8
  220:9 222:14
**APPEARANCES** 2:2
**appeared** 224:4
**appears** 54:20 72:7
  109:22 112:22 113:6
  114:16 141:25 185:22
  190:7 191:20 203:21
  220:11 222:23 225:6
  226:15
**Appleton** 1:14,22,23
**applicable** 197:23
  199:16
**application** 219:9
**applied** 107:7
**applies** 9:16
**appreciate** 90:6 221:13
**approach** 8:24
**appropriate** 11:1 28:11
  116:20 117:3 156:19
  158:22
**approximately** 19:19
  211:9
**area** 1:22 25:6,7 62:12
  88:4 117:12,17 118:9
  119:18 120:25 124:12
  124:21 125:8 127:24
  139:16 184:11 191:19
  209:17 223:11
**areas** 88:25
**arguable** 59:12
**argue** 125:4 178:10
  198:3
**argued** 198:4
**argumentative** 92:12
  92:15,17
**arms** 127:17
**arrange** 69:7
**Article** 39:21
**articulate** 93:19,20
**aside** 12:5,14 98:20
  135:5,7 147:22
  207:14

Neal R. Gross and Co., Inc.
Washington DC
(202) 234-4433          www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 228 of 249   Document 34-2

**asked** 10:2 11:2 17:2 52:20 59:13,19 80:14 80:19,23 84:15 97:24 111:18,22 121:5 130:12 139:5,9 141:6 141:8 153:20 154:24 164:10 197:17 198:20 216:6
**asking** 10:6,16 11:4 53:22 96:7 157:5 164:21,25 165:3,23 166:5 167:20 175:11 178:11 208:5
**aspects** 31:19,21 39:14
**assess** 181:10
**assessed** 172:10 174:5 211:18
**assign** 31:7 44:4,5,8 93:10 117:7 129:13
**assigned** 24:11 25:17 26:3,4 32:5 42:9 106:9 177:17 181:21 201:4 214:11,15,19
**assignment** 169:15
**associate** 162:10
**associated** 159:23 205:17
**Associates** 12:22
**assume** 20:21 53:18 142:5 148:15 152:4 170:11,15 181:16
**assumed** 158:14
**assuming** 78:17 98:24 188:3,6 196:6
**assumptions** 76:5
**asterisk** 147:12,15
**attached** 6:22 136:21 147:12
**attendance** 97:12 113:25 174:18,20,21
**attention** 39:20 86:7 121:2 149:18 191:12 191:16 215:13,14 224:25
**attitude** 97:13
**attorney** 5:2,20 11:25 12:6
**attorney/client** 12:3
**attributed** 176:4
**authorization** 73:14
**available** 8:3 15:5 44:25 45:3 70:25 71:10 122:5 125:19,22 211:20
**average** 173:9,10
**avoid** 24:11 53:13 56:17 60:1
**award** 23:18,22 118:3

119:10,14,23
**awarded** 27:3 198:22 215:11 223:4
**awarding** 24:18
**aware** 18:16 48:22 56:10 58:10 71:3 78:23 79:10 98:22 101:15 103:15 105:13 107:11,12 115:17 116:5 121:25 135:14 148:16,19,21 198:4 208:25 209:1
**awkward** 188:17,18
**awkwardly** 130:24 138:9,13,20 150:16 163:24 170:10 201:18

**B**

**B** 42:13
**B-L-A-I-R** 4:17
**B-R-A-E-M-E-R** 20:6
**back** 13:5,10,20 23:7 25:2 32:9,15,16 37:3 38:4 47:21 64:25 68:17 71:7 73:6 75:11 76:1 77:9 79:10 89:6 90:8 107:14 108:24 110:20 118:14 119:8 128:22 135:21 136:3,4 148:15 150:25 152:25 154:15 155:25 157:4 157:18 161:23 162:18 172:6,20 175:15,23 179:20 180:8 181:1,4 181:5 182:15,17,20 182:25 183:5 184:14 184:18 185:3 186:8 187:4,10 192:3 193:22 194:24 201:21 208:9 214:8 219:25
**background** 12:19
**bad** 206:14 215:12
**balls** 139:14
**bang** 67:6,6,9,21 68:1
**banged** 67:7 77:25
**bangs** 67:2
**based** 23:2 26:25 31:8 32:5 36:2 50:19 51:15 51:24 54:10 64:11 87:18,19 93:12 98:23 101:3 102:14 103:12 117:22 122:3 123:20 134:12,14 169:9 172:10 174:9,9,12,14 175:16 220:20
**basically** 15:3,3 20:13 31:6,15 32:23 57:4 63:19 107:4 129:9,22

133:11 138:11,14 139:12 140:4 142:17 144:15,22 148:2 167:24 175:22 189:1 190:18,19,22 194:11 207:14
**basis** 26:1 105:2 165:16 174:2
**Bates** 202:10
**BAY** 1:2
**beams** 193:3
**beginning** 41:24 101:14 219:2
**begins** 81:10 90:20
**behalf** 1:21 8:2
**behavior** 44:20 46:20 171:23 175:16,19 176:7 182:16 187:21
**believed** 28:10 153:22
**belligerent** 169:3
**bend** 139:1
**bends** 77:23
**Benrud** 12:8,9,14 17:24 18:17 27:19 152:14 155:4,17 195:15 197:6 226:23
**Benrud's** 18:3
**best** 79:12 144:18
**better** 27:22 32:7 53:9 68:16 85:17 132:4 133:6 134:2 139:3 147:7 178:15 189:1,8 208:3
**beyond** 48:14 126:5 174:7 219:7
**big** 53:11 60:20 104:3
**bigger** 178:8
**birth** 137:16 142:15,24
**bit** 13:12 24:23 37:20 67:14 71:11 120:20 125:8 128:8 143:7 144:2 173:6 190:3
**black** 23:20 24:22,24 120:9 173:3 192:18 193:16
**blade** 64:2
**Blair** 1:19 3:3 4:4,9,17 4:19 5:1 6:10 7:6,16 8:14,20 9:4 47:23 124:3 136:5,11
**blame** 58:17
**blank** 185:21 186:17,18 186:19,24
**blatantly** 149:15,23 150:5,9
**bleeding** 64:16 67:21 140:2
**block** 190:10

**blood** 57:21
**boarder** 20:8
**boards** 74:7
**bodies** 66:15
**body** 64:17 66:21 146:4
**Boerner** 2:18 5:6
**boiler** 184:11
**bold** 61:22
**borne** 57:22
**bother** 85:8
**bottom** 43:18 109:15 114:19 138:11 139:16 140:15,15 143:3,20 161:2 190:9 202:9 204:5 221:21
**bound** 71:19
**box** 135:3 140:24 141:20 151:11,13 152:11,24 154:8 156:5,16,19,23,24,25 157:13,16 158:1,23 161:24 162:9,15,15 162:19 172:8 186:25 214:3
**boxes** 131:20 144:11
**brackets** 206:2
**Braemer** 20:6
**break** 10:25 11:1,3,4 35:6 89:25 96:21 150:9
**breaking** 150:18,19
**Brian** 54:25
**bridge** 220:25
**brief** 65:17
**bring** 71:22 86:6,6 151:23
**brings** 104:3
**broke** 136:11 149:12,22 149:23 150:12
**broken** 23:15
**brother** 113:15
**brought** 99:25 100:2 145:5 152:3 172:13 174:3,3
**bullet** 61:21,23 74:3,4 74:10,10 81:10 90:23
**bulletin** 74:7
**bump** 58:17 61:2 67:14 78:17 79:3
**bumped** 65:8,19 223:1
**bumping** 48:23 78:7,13
**bunch** 38:3
**business** 16:22 98:19
**businesses** 20:17

**C**

**C** 4:1
**call** 19:3 33:8,10 63:19

Neal R. Gross and Co., Inc.
Washington DC
(202) 234-4433
www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 229 of 249   Document 34-2

74:16,19 85:8,11,22
105:15 116:7,9
120:24 122:4,5
125:13,25 166:7
182:22 193:10 225:16
**called** 4:10 14:13,24
18:13 20:11,12 37:9
42:11 120:15 131:15
142:12 164:17,19
224:21
**calling** 22:7 139:24
182:4,4,8
**calls** 24:25
**calm** 165:23,25
**cameras** 130:8
**candidate** 175:6
**capable** 15:19 22:20
45:3
**capacity** 8:15
**care** 14:24 101:23
**careful** 61:11 134:4
192:10
**carefully** 133:8 135:12
135:14
**careless** 44:22,23
46:19 167:16 179:18
188:14
**carelessness** 61:8
150:19 179:16 208:16
**carton** 20:12
**case** 5:7 31:4 32:7
49:13 50:12 83:6
88:15,17 98:21
109:22 115:6 118:1,8
119:17 123:10 137:8
137:13 138:7 140:13
141:15 144:16,23,23
166:22 167:4 170:21
176:1,13 177:10
181:8 190:10 192:15
197:18 199:12,20
203:18 206:22 218:13
223:16
**case-by-case** 26:1
**cases** 25:19 26:2,4 27:8
50:13,25 118:4
119:11,15
**casual** 10:3
**casually** 133:19
**catching** 209:3
**categories** 32:1,21,25
171:22
**categorize** 60:15,16
**categorized** 211:25
212:1
**category** 23:15 32:10
172:5,18 176:1
**caught** 140:23

**cause** 42:16 71:21
**caused** 109:8,10 128:3
194:15,15 206:3
**cell** 4:22,24 74:8 125:18
126:3,4
**certain** 8:1 25:9 30:6
33:19 34:18 35:25
39:13 40:8,12 46:16
48:10,10 49:21 50:20
50:22 52:7 72:23
117:6 149:7 158:12
172:7
**certifications** 47:3
**certified** 47:5
**cetera** 44:1 171:20
**CFR** 74:1
**chain** 70:12 148:3
**chance** 7:13 109:4
186:4 209:20
**chances** 84:4,20
**change** 87:5 155:5
160:5,15 169:6 224:5
**changed** 71:23 73:3
114:13 153:3 158:10
159:25 160:1,14
161:9 201:23,23
214:1
**changes** 14:25 55:2
75:10 84:12 122:25
168:25
**changing** 202:24
**characterization** 9:1
**charge** 70:23
**chart** 31:9
**check** 13:10 140:24
144:21 146:9 148:10
148:23 149:14 153:23
154:2,5,8 156:19
157:10,16 158:23
162:20 166:13 224:20
224:22
**checked** 131:20 135:4
141:19 146:17 148:24
150:6 151:2,11,14
152:11,15,24,24
153:14,19 156:5,16
156:22,23,24 157:6
158:1 159:19 162:15
162:20 204:17 215:24
**checking** 151:12
157:13
**checklist** 47:7
**Chicago** 2:10
**choice** 146:19 147:21
**choose** 55:14
**circumstance** 30:21
67:25 95:18 223:15
**circumstances** 24:21

48:10 153:18 180:22
200:22
**cited** 183:24,25 184:5
185:4,6,12 208:20
**city** 142:24
**Civil** 1:7 8:17
**claim** 22:13
**claims** 123:8
**clarifications** 10:19
**clarifies** 112:25
**clarify** 10:17 35:24
36:20 51:21 113:4,5
124:2 126:19 154:20
**clarifying** 124:5
**cleaned** 147:8 157:7
**clear** 45:13 53:17 77:4
84:10 91:5 106:7
132:15 144:2 157:25
159:3 176:5 182:24
193:6 209:4
**cleared** 146:23,25
219:13
**clearly** 105:5,7 120:8
133:12 151:12 169:4
**clients** 20:16
**close** 63:19 71:9
**coach** 114:25 208:21
208:23
**coached** 116:21 120:22
208:21
**coaching** 69:18 114:17
114:25 117:18 125:7
174:6 177:1 207:11
207:15 208:1 212:6
216:3
**collapse** 206:3,9
**collapsed** 209:19
**college** 13:5,16
**columns** 32:25
**combination** 60:4
82:11 120:1,14,16
158:14
**come** 15:19 18:1 27:1
28:2,4 30:24 33:2,20
36:4,5 54:7 86:19
105:23 140:5 148:15
161:23 173:16 196:5
224:11
**comes** 21:12 25:2 53:4
53:4 75:2 94:6 179:9
**coming** 12:7 33:17
58:13 127:3,4 130:17
130:20
**commented** 202:23
**Commission** 5:4
**commit** 49:15 51:22
**committed** 50:10 55:10
86:25 87:2 94:22

135:7 151:17,18
156:7
**committee** 17:5 19:3
28:10 29:1,9 30:5,12
30:13,16 39:21,25
40:7,20 41:6,8,14
44:16 50:16 51:10
53:7 82:21 86:19
87:10 94:22 99:16
106:8 132:22 133:4
151:23 171:1 172:21
175:18 185:15 190:6
195:6,7,7,22,25
198:10,11 207:9
221:6
**committee's** 87:14,15
**committees** 174:24
**committing** 44:15
49:19 134:17 162:12
162:13 185:6 199:2
**common** 48:16 56:5
58:18,18 60:5,16,17
60:19 61:7 65:1 68:16
68:17
**communication** 125:11
**company** 14:3,6 18:7
18:11 20:2 22:7 23:5
24:15 25:16 30:11
31:17 32:23 33:1,15
34:21 35:6,18,19,20
35:25 36:1,5,11 37:9
37:9,14 39:6,15 40:21
41:2,8 42:8 46:17
47:9 50:15,18 52:8
54:24 61:5,18 63:7,12
68:10,14 69:7 72:4
73:24 75:20 77:14
83:5 90:21 105:11
132:12 141:2,7
145:19 171:16 172:12
172:12 173:18 174:7
174:8 181:8 188:25
190:5 194:2,5 199:3
199:20 206:19,23
208:15
**company's** 28:22 56:15
59:24 93:6
**company-wide** 54:22
**compared** 84:21
**competency** 68:11
92:11 93:25
**competent** 68:15,24
**complaining** 96:11
168:24,24
**complaint** 96:7
**complete** 22:17 38:23
54:19 72:5 136:23
137:4 143:18 160:24

Neal R. Gross and Co., Inc.
Washington DC
(202) 234-4433　　　　　　　　　　www.nealrgross.com
Case 1:17-cv-00589-WCG　　Filed 03/08/18　　Page 230 of 249　　Document 34-2

196:18 203:20 220:9
222:14
**completed** 69:6
**compliance** 40:22
**computer** 58:6
**concerned** 182:23
**concerns** 21:20
**conclude** 103:3 131:23
131:24 132:1 146:4,6
**concluded** 138:16
146:3 185:17 186:11
227:3
**conclusion** 131:19
186:15
**conclusions** 96:8 201:5
**conduct** 152:7 165:20
166:4 184:6 222:12
**conducted** 9:7 136:13
225:23
**confirm** 122:14
**confirmed** 116:4 119:6
120:18 124:19
**confusing** 146:13 157:2
157:3,5,9 163:7
219:11,17
**confusion** 217:6 218:1
218:6
**consider** 60:6 64:14
65:16 67:3 71:12
78:25 79:4 124:10,11
128:4 147:17,20
149:23 163:4 183:2
198:11
**consideration** 28:21
86:16 128:5 175:13
**considered** 49:24 64:20
67:1 79:6 116:3
127:23 141:14 147:18
152:2 169:23,24
170:7,12,18 198:13
202:21 206:20 207:6
207:16
**considering** 200:22
**consistent** 134:21
151:6 191:13
**constitute** 83:20 105:8
**constructed** 140:22
**constructive** 207:11,15
207:25 212:5 216:4
**construed** 48:25 52:10
52:11
**consult** 107:1
**consumer** 20:13
**contact** 70:20 117:3,19
122:18 125:22 126:2
**contacted** 117:5
**contemporaneous**
118:18

**CONTENTS** 3:1
**continually** 78:21
**continue** 24:8 93:2
98:24 108:21 165:11
166:3
**continued** 98:25 104:15
128:7 186:10
**continuing** 136:4
195:14
**contours** 48:19
**contract** 23:14 24:6
29:2 37:18 41:2 42:23
106:12 107:7 197:23
**contradiction** 147:4,5
**contradictory** 153:6,14
**contradicts** 202:16
**contributing** 174:1
191:21 192:6,16
193:23 211:21 223:3
223:14
**control** 49:7,10 59:1,6
187:20 188:13
**controls** 14:25
**convenient** 71:1
**conversation** 10:3
25:20,20,21 99:24
100:10 110:16 113:7
118:12 122:12,13,14
122:16 124:14 128:11
152:8 155:21,25
168:16 224:3
**conversations** 9:17
102:15 141:5 200:15
200:19 216:11
**converting** 16:20 17:3
29:12,18
**conveyors** 44:24
**coordination** 61:9,10
132:4
**coordinator** 74:5
**copies** 6:4,6 205:1
222:15
**copy** 38:23 54:19
136:23 160:18,25
172:23 196:18 203:20
**corner** 46:21
**corporate** 8:7,16,21
136:5
**corporation** 7:17 8:2
**corrective** 69:10,13,21
69:24 207:16 208:1
212:6
**counsel** 1:21 4:10 6:5
6:18 8:18,18 12:11,15
27:12 92:18 136:9
163:9 164:19 165:14
**count** 177:8 182:15
**countless** 189:14

**couple** 7:2,21 14:20
17:15 25:10 27:1
34:14 43:3 53:5 54:9
57:3 107:8 152:25
173:14,15 194:23
205:15 206:3
**course** 14:9 23:5 28:11
34:13 49:4 65:10
104:14 167:9,9
176:20 192:5
**court** 1:1 4:6 9:8,22,25
10:4,9,13
**cover** 57:5 155:14
**covered** 48:5 57:18,19
117:19 120:25 159:9
161:12 191:25 197:14
**covering** 118:16
**covers** 187:15
**CPR** 140:1
**cramp** 223:10
**cramped** 223:11
**created** 39:5 41:11
158:13
**crew** 29:18,18
**criteria** 31:5 43:21
51:20 82:22 87:19
134:15 150:13
**CROSS** 3:2
**crossed** 160:2
**cruising** 149:16
**crush** 209:11
**cumulative** 127:20
128:9
**curiosity** 167:18
**curious** 185:14
**current** 175:5 183:8
**currently** 19:14 27:15
**customer** 17:1
**cut** 20:10,10 56:22
140:2 166:15 175:22
**cutter** 29:13

**D**

**D** 4:1
**damage** 25:7 31:25
32:1 50:2 51:1 52:10
63:7,18,21 66:20
75:20 83:5 168:5,10
168:11 171:20 173:3
206:7,11,13,22
208:15
**damaged** 25:8 206:4,5
**damages** 52:8
**Dan** 200:8
**dangerous** 209:13
**date** 110:25 114:22,23
137:16 142:15,24
144:12 180:10,12

213:4
**dated** 3:12 111:2 213:3
**dates** 38:25 175:25
213:2,5
**dating** 180:8
**Dave** 5:1
**DAVID** 2:6
**day** 15:23 16:25 17:4
25:2 37:15 57:17,17
62:23 66:1 71:3 85:22
86:22 87:23 88:6,8,8
89:9,10 92:3 95:8,13
95:16,17 98:18
101:13,21 103:23
104:14,16,19,22
107:5,13 108:7,19,23
108:25 109:4 110:24
111:5 115:9,16,19
116:11,24 117:3,17
121:2 122:1,13
124:16,17,20 125:3
128:19,24 129:17
133:1 152:21,22
162:6 197:5,9 215:21
222:21
**day-to-** 16:24
**day-to-day** 16:22
**days** 101:12 181:11,12
181:15 182:18
**Dearborn** 2:8
**decide** 119:23 219:5
**decided** 99:17 145:19
216:22
**decision** 26:25 28:14
28:22 30:24 98:9
191:18 218:17,18
**decisions** 15:5,17,18
174:8
**deducting** 223:4
**deep** 149:7
**default** 132:15
**defendant** 1:10 2:15
8:21
**Defendants** 8:19
**define** 76:4 83:21
167:21
**defined** 63:13 169:25
169:25 170:2
**definitely** 184:7
**definition** 63:8,9,10,12
66:6 72:22 75:17
167:23 193:15,24,24
194:3,5
**definitions** 74:23 75:11
75:16 76:6
**Degree** 12:22
**delay** 63:2
**delays** 62:17,21

Neal R. Gross and Co., Inc.
Washington DC
(202) 234-4433
www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 231 of 249   Document 34-2

deliberately 52:8
demanded 141:6
demonstration 58:2
Dennis 210:19,21 213:4
    216:4,16,18 217:19
    218:13
Department 1:6 2:7 5:2
depend 30:1
dependent 83:17
depending 24:21 26:9,9
    32:12 51:19 83:12
    87:23 139:23 158:23
depends 31:12 85:14
    86:23 210:3 214:24
    214:25
deposed 9:4
deposition 1:17 4:4
    5:11,14,16 6:1,1 7:18
    8:1,4,19,20,20 9:7
    11:24 12:6,16 78:22
    93:2 136:4,5 165:1,12
    165:20 227:2
Deposition-company
    3:6
Deposition-personal
    3:5
depositions 8:23
deputy 13:17,17,23
describe 77:11 138:6
described 206:8
describes 105:5 137:17
description 145:24
    204:7
design 102:4
designated 7:25 8:16
    31:9 64:4
designee 5:10 136:6,6
desk 115:19,22 116:6
    116:16,19 119:7
    120:15,19 121:18
    124:20,23 125:4,6
detail 188:14
details 114:23
deteriorate 128:3
determinated 207:10
determination 24:20
    82:16 86:17 108:6
    110:15,15,18 135:5
    148:4 162:18 191:3
    196:5 222:4
determinations 156:4
    201:8
determine 25:14 26:2,4
    26:6 27:2 32:14 44:8
    87:15 90:12 102:5
    103:14 106:9 107:10
    132:6 134:18,22,24
    135:6 162:2 172:25

determined 21:13
    28:23,23,25 29:7
    32:21 50:10 51:13
    52:25 64:9 84:25 85:1
    86:24 87:11 94:18,21
    95:18,24 99:3,5,20
    103:10 107:25 110:23
    127:23 134:11,12,14
    134:18 138:10 145:17
    150:11 151:16,24
    152:1,10 163:24
    169:9,11,18 172:2,4
    190:15 197:10 207:5
    207:13 208:12,19
    211:7 214:4 217:3
determines 23:9 24:16
    24:17 82:4 172:8
    174:5
determining 172:15
    175:12
detriment 208:16
developed 31:16,17
    54:23
devised 31:18 33:1
devising 73:23
diagnose 65:5 82:9,10
diagnoses 78:9
diagnosis 103:14
    108:10 153:4
differ 218:11
difference 35:1,24 48:8
    63:1 75:22 79:23 81:1
    81:2,4 82:25 85:23
    91:8 92:6 179:11
    213:5,5
differences 81:8
different 8:6 14:20
    16:17 17:8 18:10,10
    25:10 26:11 31:4,6
    32:5 48:18 65:24
    67:20 76:9 92:7
    116:22 141:20,21
    149:9 189:16 194:2
    213:2,23
differently 76:20,23
    120:20
difficult 10:5 93:19,20
diligence 25:13
direct 3:2 4:13 39:20
    165:20 189:9
directions 11:17
director 18:4,18,22
    21:18 25:24 26:8
    28:16 110:17 158:15
disagree 92:17 181:17
disagreements 21:20

discharge 42:16,17,20
discharged 43:19,23
disciplinable 94:8
disciplinary 20:20 21:2
    27:5 36:17 42:4 50:9
    50:18 69:15 81:13,16
    81:22 82:2,18 83:15
    83:16 84:21 88:16
    91:16 92:2 93:24 95:2
    95:7,19,24 98:14
    100:12 117:7 118:4
    119:11,14 128:20
    147:16 151:9,10
    159:18 169:14 170:22
    171:4 174:10,16
    175:9 176:16,21
    178:2 179:4,5 208:7
    213:7 215:8 218:22
discipline 3:8,11 21:14
    21:17,18 22:19,21,25
    25:23 26:1,17 31:11
    35:12 41:24 69:14
    82:24 85:1 87:16
    88:18 89:11 94:2,5,15
    100:19 105:25 106:3
    106:24 110:14,19,22
    113:22 118:1 147:23
    150:20 157:14 174:16
    176:23,25 178:18,20
    183:21 196:15 197:1
    198:17 199:10 207:10
    207:14,16,18 208:2,4
    208:13,19 216:12
    217:20
disciplined 35:10 94:4
    102:21,22,24 103:1
    113:24 134:16 216:19
disciplines 50:5 199:15
disciplining 21:6
discomfort 223:1
    224:10
discovered 160:15
discrepancies 173:14
discrepancy 160:15
discretion 21:8 23:18
    118:3 119:10,14,18
    119:19 120:8,21
discriminate 90:21
discriminates 93:13
discrimination 92:10
    93:21
discuss 17:19 27:2
    100:7 110:4 225:7
discussed 27:9 28:12
    41:5 42:9 72:17
    151:21 155:10 171:15
    202:5,25
discussing 30:24 90:10

discussion 3:12 23:8
    26:13 27:10 28:18
    34:13 128:17 150:12
    173:7 210:18 216:4
discussions 26:16 39:6
    173:2
dislodged 206:2
dismissal 24:15 180:7
dispute 157:8
dissent 195:10
dissuade 177:25
    178:12
dissuaded 93:22
distinct 8:23
distinction 35:16 76:18
    79:15 166:25 167:1
distinctions 79:14
distinguish 76:9 77:6
    79:17 80:11
DISTRICT 1:1,1
dives 221:1
DIVISION 1:2
doctor 65:5 140:25
    141:3 145:22 153:2
doctor's 11:17 25:1
document 79:24 111:25
    114:21 159:15 216:6
    216:10 224:16
documentation 3:11,22
    46:4 111:17 114:16
    118:19 129:8 183:22
    216:2
documentations 177:7
documented 112:1,4
    168:17,19 191:24
documenting 131:13
    148:2 174:6 200:14
    210:17
documents 37:5,8,11
    44:7 45:10,21 183:16
    210:14 220:10,20
    222:15
doing 16:23 21:11
    29:16 47:14 49:1 57:4
    57:8 66:4 78:14,15
    86:13 88:24 89:17
    94:6 96:20 97:19
    127:9 128:10 129:4
    129:25 187:16 224:22
DOL/OSHA 1:22
dollar 31:23
door 17:4
doubt 154:6
downstairs 184:11
dozens 61:4
drawn 135:11
drink 13:7
drive 46:25 47:1 52:9

Neal R. Gross and Co., Inc.
Washington DC
(202) 234-4433                                                    www.nealrgross.com
Case 1:17-cv-00589-WCG    Filed 03/08/18    Page 232 of 249    Document 34-2

58:6
driver 104:1
drivers 48:7
driving 45:4 46:15,21
dropped 166:20 206:18
dropping 166:21,23
drove 57:21
drug 117:25 119:25
137:20 148:14,18
161:22
drugs 11:9
dry 174:13 175:2,8,22
dry-end 14:21,24
due 25:13 27:5 51:4
206:9
duly 4:11
dumpster 88:7
Dunsirn 54:25
duplicated 140:12
Dura- 14:10
Dura-Fibre 1:9 4:5 5:7
7:17 12:8,20 13:24,25
14:3,3,13,13,15 16:7
18:21,23 20:7 21:2,5
22:24 24:5 38:20 39:8
39:13 45:5 54:18 55:9
55:10,13,14,15,16,17
58:3 71:15 72:13,21
76:8,9,19 79:19 81:25
88:2 96:6 97:21 98:21
103:3,10 113:18
125:10,22 126:5
141:2 183:19 197:15
197:20 201:4 210:22
Dura-Fibre's 20:16,19
20:21 114:8 115:21
117:2 219:9
DURAFIBRE 202:10
DURAFIBRE00158
75:15
DURAFIBRE00160
90:19
DURAFIBRE00223
211:21
Duren 2:18 5:6
duties 15:12 17:16
duty 40:21 74:16 116:3
dye 20:10,10 29:12

E
E 4:1,1
e-mail 3:12 224:2
earlier 82:22 89:23 98:7
151:15 159:1
earn 23:6
earplugs 45:16
easily 139:2
East 2:19

EASTERN 1:1
easy 190:19
edge 100:17
edges 192:24
edit 112:15
edited 162:18
educated 189:7
education 12:21
effect 80:6 127:20
128:9
effected 146:4 212:19
efficiency 8:25
effort 26:24
egregious 52:5
eight 23:2,16,19 26:13
31:12 44:15 51:9,14
51:19 52:2,3,6 100:23
128:20 129:13 173:25
215:8
either 20:9 41:2 124:15
125:12 131:17 141:19
145:1 151:8 173:4
181:12 196:2 202:1
221:13 224:20
elaborated 169:7
elbow 65:9,20 77:23
78:1,13
elbows 78:18 79:3
elevated 140:4
emergency 25:4 193:16
employed 39:15 128:7
employee's 32:8 39:14
49:10 65:5 137:15
162:21 198:23
employees 16:20 17:20
18:1 21:6,10 24:11
26:18,21 28:4,19,24
28:25 29:4,8,8,15,16
30:4,12 31:5 32:2
33:7,8,17 37:4,7
45:18 47:12 48:2
52:24 56:25 62:19
64:22,23 68:10,24
75:1,6,9,25 79:13,15
79:18,20 80:13,22
90:22 93:22 96:19,21
99:5 109:18 114:9,12
135:12 156:7 173:19
174:15 175:17 198:4
209:16 216:19 217:21
employer 22:13
employment 18:10 81:6
enforce 40:22 73:10
92:13,16 93:3,9
enforced 38:25 81:17
enforcement 76:8,10
77:5
enforces 73:12

enforcing 77:5
engage 207:3
engaging 187:21
entail 14:22 19:23
entire 3:11 10:1 15:3
111:17,25 139:15
144:9 192:25,25
entirely 199:14
entries 198:20
environment 55:11
209:1
equal 84:4,20
equate 186:3
equipment 45:13 52:10
55:22 56:3
Eric 20:6 203:13 204:5
ESQ 2:6,17
essentially 108:12
140:12 142:8
establish 41:9 54:22
established 39:8 40:19
41:5,7,10,20
estimate 73:5
et 44:1 171:20
evening 111:4
event 44:18 49:10 63:5
187:13 189:10
events 42:19,22
eventual 186:7
eventually 14:21 24:14
43:1 70:14 110:22
137:25 150:9,11
157:7 187:17 218:14
219:12
everybody 66:14
172:22 173:11 194:12
evidence 25:11 161:20
evils 179:2
exact 88:23 129:8,16
130:4
exactly 73:25 81:19
129:25 145:3 159:2
192:18 209:3 213:3
EXAMINATION 4:13
examined 4:11
example 24:24 34:25
42:21 49:5,18 89:6
166:18 188:2
examples 16:24 22:8
44:23 45:4 60:14,18
88:20 187:22 192:2
excuse 19:2 24:17
44:12 72:14 81:9
90:19 95:15 110:25
118:3 119:2,9 121:12
129:1 136:8 151:5
164:7 168:6,10
173:23 180:9 187:13

198:23 203:24 216:25
exercising 60:19
exhibit 6:14,22 8:11
38:7,9,17 42:13,14
54:12,14 71:24 72:1
75:16 106:17 111:9
111:11 114:4 135:17
136:17,17 142:19
143:10 160:19,20
171:8 179:25 180:12
183:8,11 196:9,10,11
203:6 210:15 214:11
215:25 219:20,22
221:15 222:8 223:23
223:24,25 225:4
226:13
exhibits 3:4 5:25 6:10
6:12,12 37:23
exist 187:3
existed 20:22
expect 68:10
expectation 81:5
135:12 189:6
expectations 39:15
104:13
expected 30:13 213:15
experience 43:5 188:23
189:4,9
experienced 32:6 189:7
explain 30:17,18,19,23
133:10 169:5
explained 82:22 117:22
134:3 153:2,17
164:11
explaining 9:6 134:13
208:24
explanatory 172:9
exposed 64:2
extent 6:6 78:11 105:17
137:19 149:22 150:8
external 175:3,6
extra 207:19 209:5
extraordinary 194:10
extremities 128:3
extremity 64:17 105:6
eye 45:1,16
eyes 64:21,22 75:24

F
face 220:20
facing 118:1
fact 33:24 77:25 112:19
117:22 118:10 120:2
120:17 125:16 135:7
161:24 169:9 177:10
177:15 180:12 183:4
183:6 188:17 198:15
198:22 200:15 206:15

Neal R. Gross and Co., Inc.
Washington DC
(202) 234-4433
www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 233 of 249   Document 34-2

206:22 212:7 213:16
214:19 218:14
**factor** 174:17 223:14,21
**factors** 64:13 174:1
191:21 192:7,16
193:23 211:21 223:3
**facts** 181:13
**factual** 96:8
**failed** 148:22,24 149:3
150:4
**failing** 100:23 102:22
106:13,25 118:1
129:3
**failure** 34:24 36:8
106:11 124:11 134:16
149:14 150:6 162:3
162:11
**fair** 46:5,7 57:1,2,13,16
222:3
**fairly** 52:7 192:16,17,17
200:21 211:4,17
**fall** 25:4 60:22 175:25
188:8 221:4
**falling** 187:24,25,25
**falls** 25:6 49:6 59:2,3,11
76:1 85:21 188:9,11
188:11
**falsifying** 123:8
**familiar** 96:24 189:12
**family** 25:4
**far** 76:8 108:8 147:20
166:20 195:13
**farther** 172:6
**fashion** 165:1
**faster** 61:14
**fatality** 90:24
**favor** 192:1
**favorably** 179:9
**favoring** 64:17 130:1
**February** 16:11
**Federal** 8:17
**feedback** 207:11,15,25
212:5 216:4
**feel** 14:7 38:8 54:12
65:2,23 67:10 88:9,11
88:11 89:9 107:21
112:22 120:9 150:4
166:4,9 183:9 188:19
203:18,19
**feeling** 108:9
**feels** 64:19 65:19 66:22
**feet** 61:12 62:14 132:9
133:9,11 134:5,7
210:8,12
**fell** 221:5
**felt** 65:20 77:3 86:24
104:22 105:5,7,10
108:13 109:14 120:5

149:12 211:6
**fewer** 23:18 51:23
**Fibre** 14:11
**figure** 196:6
**file** 45:25 175:23
**files** 99:4
**fill** 86:3 96:20 117:23
137:17,21,22 142:7
142:15,16,17,23
143:2 144:3,4,4,10,11
144:14,17,24 145:15
156:11 158:11 159:12
173:8 186:20 190:6
204:2 205:8
**fill-in** 117:16 122:11
125:12
**filled** 21:14 71:8 83:23
86:1 115:11,13,15,18
115:22,24 120:2
124:14,18 127:11
132:19 133:3 137:7,8
143:1 144:21 145:2,4
145:6,12,24 151:19
154:12,21,23 158:3,8
162:17 185:24 187:12
191:14 203:16 204:4
204:5,5,9,15 207:18
**filling** 54:8 115:10
116:2,10,11 117:13
134:24 145:8 147:24
147:24,25 151:16
**fills** 142:13,14 144:8
172:21
**final** 28:17 32:19
130:22,23 159:22
170:4 174:3 180:10
201:4
**find** 121:9,19 124:16
132:13 148:6,22
161:14,16 166:7
192:15 208:10
**findings** 141:12
**fine** 68:2 80:23 89:21
105:20 108:20 167:4
224:9,12
**finish** 92:14
**finished** 10:6
**firm** 5:6
**first** 9:8 11:2 14:15
16:12,13,23 17:7,9,17
19:5 28:24 33:20,21
33:21 37:15 39:7
55:17 69:2 74:4 75:3
85:21 86:1,10 99:22
105:17 114:15 117:20
119:22 121:19 139:19
139:21,22 140:3
142:15 144:11,24

158:20 173:4,5
177:22 190:18,18,20
191:4,9,18 206:24
207:15 208:1 212:6
223:11,14,17,20,20
**five** 15:4 31:6,8 62:9,15
66:24 89:24 90:5
105:6,6 107:24,24
164:5 177:16 181:12
210:11
**Flare** 18:14
**flared** 215:21
**Flexible** 18:14
**flight** 61:3 127:4 130:17
132:10,10 138:9
152:18
**flip** 60:8
**flipping** 64:3
**floor** 28:3,6 58:11 60:20
128:15 131:12 184:12
184:15 192:19 223:12
**FMLA** 25:5
**fo** 80:1
**focusing** 83:8
**folding** 20:12
**folks** 19:5 28:10 29:25
30:1 45:6 46:25
198:11
**follow** 23:13 28:9 31:5
86:21 87:9 169:16
**follow-up** 148:5 197:5,7
**followed** 108:7
**following** 132:23
137:13 156:1 161:12
214:22,23 215:21
**follows** 4:12
**foot** 131:2 138:9,12,14
138:17,21,23 139:1,7
139:11,13,14,16
140:4 150:16 163:22
166:21,23 167:11,17
193:14 210:7
**force** 55:3 72:10
**forget** 182:18
**forgot** 215:20
**forklift** 46:24,25 47:1,8
48:14 49:20,22 57:21
149:16,19 207:20
209:2
**forklifts** 47:1
**forks** 209:2
**formal** 159:6 176:25
**format** 158:7
**former** 96:6 210:22
220:6
**forms** 142:4 154:23
191:13 202:24
**forth** 8:11 34:18 38:4

41:25 43:15 156:13
**forum** 17:19
**forward** 49:22 175:14
**found** 121:21 149:22
150:9 151:5 154:8
156:6 178:15,24
185:10 202:25 208:11
218:13
**four** 15:4 23:2,16,18,23
26:12 29:15 31:11
44:12,12,15 51:9,14
51:19,23 57:3 88:11
98:10 99:6,6,15,17
100:5,15,21 136:6
176:23 180:10,20,22
181:1,4,5,21,25 182:1
182:19 183:25 195:8
195:18 198:25,25
200:5 201:4 207:24
210:7 215:8 221:11
**fourth** 74:3,4 200:9
**Fox** 13:5
**fracture** 78:4,6,8
**fragile** 20:15
**free** 7:10 14:7 38:8
54:13 112:22 150:4
183:9 203:18
**freely** 199:5
**frequency** 172:11
**frequently** 54:1,3,4
**front** 6:11 87:1 132:9
142:20 143:6 180:13
203:8 205:23 208:18
**full** 11:20 38:22 54:19
56:13 72:5 136:22
143:9,17 160:24
196:18 203:19 205:1
220:9 222:14
**fully** 10:21,22 11:12
**functions** 104:10
**furniture** 20:10,11
**further** 21:19 22:15
117:22 128:8 173:16
226:21
**future** 117:18 120:24
122:25 176:17 178:1
178:2

---

**G**

**G** 4:1 226:8
**gained** 181:1,4,5
182:15,25
**gaining** 182:17
**Gehl** 102:2,3 103:18
226:4,7
**general** 48:15 114:7
132:2 183:25 198:17
199:7

Neal R. Gross and Co., Inc.
Washington DC
(202) 234-4433
www.nealrgross.com
Case 1:17-cv-00589-WCG    Filed 03/08/18    Page 234 of 249    Document 34-2

**generally** 12:20 17:24
20:7 21:7 22:19 23:20
24:2 26:19 29:6,10,17
29:20 34:20 36:18
43:21 44:3 45:20,25
53:22 56:5 67:9 71:5
86:2,6,12,21 97:24
104:9 110:13 138:25
168:12 199:10 209:17
**gesture** 9:12
**get-go** 37:19
**getting** 13:12 23:6
24:11 85:16 114:24
117:25 119:25 162:21
174:23 193:22 216:19
217:15,16,20
**gig** 175:10
**gingerly** 163:4
**give** 11:20 16:24 37:18
37:25 56:16 59:25
125:2 208:17 223:23
**given** 10:12 23:10,19
25:21 26:7 30:1 37:4
37:11,14,16 45:21
56:4,4 69:23 71:10
83:16 88:12 95:6 99:7
99:17 105:11 129:22
137:20 140:6,10
149:7 156:23 172:23
174:17 180:10,24
181:9 190:16,17,20
190:22,23 191:1,2,12
191:14 206:13 207:2
207:19 213:6 214:20
**glue** 56:10 60:20
**goggles** 45:15
**Gonnering** 17:25 18:5,7
27:20 33:9 73:22 99:4
99:20 103:18 142:2
152:4,5,14 155:5
156:9 180:7 195:15
196:8 197:6 199:3
221:10,22 225:25
**Gonnering's** 143:22
**gotten** 129:2,3 177:20
179:13 215:2
**govern** 39:13,13 44:5
**Government's** 6:14
38:9 54:14 72:1
106:17 111:11 114:4
135:17 143:10 160:20
171:8 179:25 183:11
196:11 203:6 210:15
219:22 221:15 222:8
223:25 225:4 226:13
**grab** 104:1,4 145:7
**graded** 192:23,24 193:1
**grades** 20:9

**graduate** 13:14
**gray** 191:19
**GREEN** 1:2
**grey** 25:6,7 88:4,25
117:12,17 118:9
119:18 120:25 124:12
124:21 125:8 127:24
**Griffin** 17:12,13 118:12
118:25 119:2,3
120:18 122:10,10
124:19
**ground** 9:7 138:17
210:9,10,12
**grounds** 98:8 165:20
**group** 32:12 43:18
44:12 172:24,25
198:18 199:7
**groups** 32:14
**grow** 76:6
**GS-29** 183:9
**guess** 35:3,15 42:23
51:6 65:23 66:14,16
67:7,12,16,21 68:15
75:24 77:17 79:10
85:6,20 87:2 110:15
110:21 120:22 125:7
132:2 134:8 135:13
138:15 139:23 146:12
146:21 150:17 154:7
156:5,22 157:2,9,12
157:15 158:19 159:19
162:14,18,19 163:1
170:1 172:7,19 174:3
174:16 175:21 187:15
188:16,16 204:9
206:19,19 208:2
212:23 213:15 214:23
214:24 215:1 217:3
219:13 225:18
**guessing** 33:5 37:14
54:6 99:24 154:17
204:4 221:8
**guidance** 45:10 62:18
**guide** 174:4 207:25
**guidelines** 23:12
**GX** 6:11,12 220:3
**GX-** 7:13 114:2 144:5
183:9
**GX-1** 5:24 6:9,14 7:13
**GX-13** 106:15,16,17,22
109:1 110:25 113:10
**GX-14** 135:15,17,21
140:9 150:25 152:20
**GX-15** 143:8,9,10
**GX-16** 160:19,19,20
**GX-17** 171:6,7,8,11
179:22 187:10 193:22
**GX-18** 196:9,11

**GX-21** 111:8,11,14
201:21
**GX-25** 223:25
**GX-26** 225:3,3,4
**GX-29** 183:11
**GX-3** 5:24 6:9,14,23
8:12
**GX-30** 183:11
**GX-33** 210:13,14,15
**GX-34** 220:2,3
**GX-35** 221:14,14,15,21
**GX-37** 203:5,6,12
**GX-38** 222:6,7,8
**GX-42** 226:11,12,13
**GX-44** 114:4,15
**GX-45** 179:23,24,25
**GX-47** 183:12 185:20
186:14
**GX-6** 38:8,9,15,17
39:20 41:22 51:9
**GX-7** 39:19 54:12,14
55:5 69:1
**GX-9** 71:24,25,25 72:1
90:18 122:4

---

**H**

**H** 2:17
**half** 101:6 203:16
**halfway** 221:5
**hand** 4:7 9:12 37:3
105:17 135:15 160:17
160:18 183:8 196:9
210:13 221:14 226:11
**handbook** 3:7 34:21,24
35:7,17,18,19,25 36:3
36:4,5,9,11,11,15,19
36:24 37:9,9,14,16
41:3,4 46:10,18 54:18
107:9 197:15,20,22
198:3,4,5,12,21 199:1
199:15 208:9
**handed** 50:5,9 136:16
173:19
**handing** 5:23 37:21
38:7 106:15 111:8
114:2 143:8 171:6
179:23 203:4 219:20
220:2 222:6 225:3
**handwriting** 106:20
137:2 196:24 203:24
204:3 205:3 226:17
**handwritten** 3:21
226:15
**happen** 18:25 42:24
43:8 54:2,2 62:5 89:3
89:4 137:12 144:20
183:23
**happened** 17:21 21:12

30:1,20 31:4 32:13
42:22 70:16 73:3 77:2
85:19 86:11 88:22,25
89:9 92:1 94:7 101:12
107:6 109:7 115:6,6
118:21 122:11 123:9
123:23 129:10,12,15
130:4 132:13,25
133:1 160:9 181:5,16
181:19 192:11,18
195:6,13 203:18
209:3,16,18 210:11
211:2,16 213:14
217:23 220:14 222:18
222:24
**happens** 25:19 27:4
46:4 58:25 59:1 63:17
75:5 76:24 78:25
94:10 110:12 120:24
173:22
**harassed** 166:10
**harassing** 164:21
**harassment** 164:17,19
166:8
**hard** 139:1 146:19
**harder** 78:3
**harm** 75:19,22,25 76:10
76:17,18,19,25 77:7
77:10,11 79:17 80:12
83:2,18 87:22 91:8
168:11
**harmed** 83:13 93:13
95:18
**harsh** 179:5
**hashed** 32:18
**hazards** 189:13
**head** 9:12 41:21 48:15
48:23 50:8 52:23
58:17 61:2 65:4,4
67:2,6,7,7,9,21 68:1
68:18,23 74:2 113:25
127:17 141:21 188:10
215:22 223:1
**health** 5:3 39:21,24
40:19,22,24 41:6,8
**hear** 70:16
**heard** 99:12 102:14
**hearing** 45:1,16,16
**hearsay** 105:17
**heavier** 45:2
**heavy** 20:15,15 209:7
210:2
**heels** 139:15
**held** 14:20 91:3 110:7
178:1
**help** 104:11,12 131:8
225:25
**helped** 93:3

Neal R. Gross and Co., Inc.
(202) 234-4433    Washington DC    www.nealrgross.com
Case 1:17-cv-00589-WCG    Filed 03/08/18    Page 235 of 249    Document 34-2

236

**helping** 104:8
**hernia** 88:12
**hey** 88:22 108:8 152:25 194:12 195:17 224:21
**high** 20:12 31:13 51:20 149:17 209:22 210:6 210:7,8
**higher** 189:4
**highest** 12:20
**hindsight** 162:15
**hired** 175:4
**history** 32:9 171:24 175:16,20 176:7 180:8 182:16
**hit** 65:3 68:16,18 134:5 134:7 138:17
**hits** 49:11 59:4 188:12
**hitting** 187:25
**hoarse** 13:12
**hoist** 45:3
**hold** 6:5 7:9 38:2 56:2 88:13
**holding** 130:11,13,15 133:11,14
**home** 4:18 74:17,19 85:9 89:2,4 123:5 125:14,18 195:1
**honestly** 199:19 201:3
**horn** 46:22
**horse** 133:22
**hose** 184:12,15,17 185:4,7,8 192:3,6,8 192:10 194:13
**hospital** 85:11 145:20
**hot** 169:4
**hour** 13:10 129:16,16
**hours** 11:7,9 62:24 85:10,20 88:11 107:25
**HR** 24:20 25:24 70:14 70:15,15 158:15 175:22 177:6
**human** 18:6 37:15 62:1 62:10 69:5 70:19 73:12 85:13 86:7,18 137:24 175:10
**hunch** 154:19,19
**hundred** 61:4
**hundreds** 132:11 189:17,19,23
**hungry** 89:20
**hurt** 49:11,15,19 50:1,2 51:4 52:17 58:21 59:8 63:25 64:18 65:2 67:19 68:2,19 76:2,3 77:3,6,25 78:1,3 81:1 87:21,21 88:22 108:20 127:13 157:24

167:8,14 170:10 209:9 218:8
**hurting** 49:3,16 59:12 218:10,11,11
**hurts** 65:4 67:14

**I**

**idea** 66:11 199:17
**identification** 6:15 38:10 54:15 72:2 106:18 111:12 114:5 135:18 143:11 160:21 171:9 180:1 183:12 196:12 203:7 210:16 219:23 221:16 222:9 224:1 225:5 226:14
**identified** 8:4 34:20 41:2 60:14
**identify** 38:18 106:23 210:14
**identifying** 64:25
**Illinois** 2:10
**illness** 90:25
**imagine** 158:16 186:19
**immediate** 62:12,15,21 71:10
**immediately** 61:23 62:2 62:3,6,6,9,9 63:1,2 69:5 70:6,7,9 71:9 74:6 88:3 137:12 149:21
**impact** 176:16
**impacts** 176:18,20
**impair** 11:11
**important** 79:13,14,18 80:13 123:3 179:12 179:13
**improper** 165:19 166:3
**improperly** 45:2
**in-house** 47:12
**inaccurate** 115:4
**inappropriate** 165:1,2
**inattentive** 132:7,17
**inattentiveness** 132:3
**inch** 193:5
**inches** 193:8,12
**incidence** 51:7 63:16
**incidences** 35:11
**incidents** 32:12 60:13 61:15 88:2 101:4 111:17 140:21 172:7 172:16 175:24 176:6 180:16 182:13
**included** 28:25
**including** 61:25 169:14
**inconsistent** 186:15 203:1 219:9
**inconvenience** 65:25

**incorrectly** 156:5 205:25
**increase** 84:3,12,19
**increased** 53:11
**independent** 225:13
**indicate** 225:21
**indicated** 20:20 51:12 87:20 104:21,22 201:22 215:10
**indicates** 187:20 225:21
**indicating** 224:14
**individual** 7:25 8:6,19 43:12 60:19 62:16 63:6 96:20 115:10 136:5 173:8 175:13 175:19 176:10 193:2
**individuals** 15:25 68:24 197:11
**industrial** 20:14
**industry** 20:11
**influence** 25:25 161:21
**influenced** 212:21
**informal** 159:8
**information** 98:23 125:23 126:2 129:23 131:4 137:15,16
**inherited** 73:24
**initial** 115:16 152:16,19 152:19
**initially** 107:25 108:5 159:19 162:16 175:12 215:11,14,18 219:3
**initiate** 67:15
**initiated** 49:12 127:10
**injure** 58:20 59:8
**injured** 51:1 52:18,24 52:25 60:22 62:8 63:6 64:6,7,15 65:6,16 68:21,22 78:10,11 83:13 85:5 87:21 89:13,14 91:12 92:1,8 93:13 94:17,25 95:6 95:17,23 103:4,11 105:3 107:11 115:14 123:21,22 163:23 167:15 169:10 176:10 176:14 177:14 179:7 179:12,13,18 182:3 211:7 214:19,24 217:9,10 224:14,14
**injures** 49:6
**injuries** 53:13,22 60:18 69:3 105:12 114:9 123:3 128:1 168:6 177:24 178:1,12 182:6 183:3 190:8 206:22

**injuring** 49:3
**injury/incident** 190:11
**input** 25:15,24 26:18,21 28:7 31:18 32:15,19 32:24 44:16 51:9 171:16 172:14,14
**ins** 182:22
**inside** 139:2
**instance** 30:13 31:23 36:7 48:7 63:23 171:19 174:12
**instances** 70:4 127:25
**instructions** 149:6
**insubordination** 22:8 169:4
**intending** 98:21
**intent** 187:14 215:17
**intentionally** 78:14,16 78:17
**interactions** 9:11
**interchangeable** 6:13
**interfere** 27:13
**interject** 7:20
**internally** 203:1
**internals** 175:7,8
**interpretation** 149:5,9
**interrupt** 117:2 131:22 187:8 194:1
**interview** 174:12,14 175:11
**interviewing** 174:15
**interviews** 175:2
**intoxicated** 161:21
**invading** 165:18
**investigate** 79:23 127:13
**investigated** 34:10 84:7 153:7 201:13 217:17 219:2
**investigating** 25:13 150:14 157:21
**investigation** 3:7,8 21:11 22:12,15,16 24:16,18 26:23 66:4 68:3 71:21 72:3,18 84:5,13,19,22 86:8,9 101:16,19,23 102:1 103:16 107:14 124:4 127:12 129:19 131:6 131:8,10,17 132:19 133:3 135:24 136:12 136:20,21,23 137:10 137:24 138:4 141:17 142:4 151:1,17 152:7 156:12,13 184:6,8 201:6,9,10,12,17,19 204:22 205:5 206:15 210:18 220:15,21

Neal R. Gross and Co., Inc.
Washington DC
(202) 234-4433                                     www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 236 of 249   Document 34-2

221:18 222:12 225:23
225:25
**involved** 16:21 24:20
24:23 27:10 34:8 39:9
41:18 53:4 59:18
73:22 81:15,16 86:11
87:10 101:18 106:13
152:9 174:25 175:9,9
214:21
**involvement** 158:17
213:18 220:12
**irrelevant** 183:5
**issue** 21:9,25 22:9,19
24:24 25:22 92:25
106:3 110:2 118:3
119:10 166:1
**issued** 21:16 22:11,16
23:10 26:17,24 27:5
49:25 50:1,18,25
100:12 102:20 106:24
113:8 123:18 128:19
150:20 190:12 196:15
198:23 223:5
**issues** 22:18 29:13
97:12,17 105:25
115:16 174:18,20,21
175:4 178:7 189:3
**issuing** 22:20 107:1
**item** 30:24 32:8 179:9
**items** 3:12 31:6 225:7

**J**

**J** 2:6
**Jacobs** 3:23 19:8 50:12
96:2,3,11 99:21
102:11 103:20 104:22
105:3,14 106:3,25
107:10 109:22 111:1
112:8 113:12,14,23
114:17 115:1,7 116:9
116:12 117:7 121:12
123:10 124:11 125:16
125:17 126:15 133:6
134:1,9 135:6 136:13
143:15,23 144:24
148:6 149:22 150:4
151:18 154:22 159:15
162:6 168:5,14
169:10 177:14 180:5
183:24 195:8 196:16
197:12 199:24 200:9
200:23 201:10,10,17
218:7 222:22 223:17
226:3,6
**Jacobs'** 126:9 159:23
160:23 171:13 187:13
203:16 205:14 213:24
**jail** 43:1

**Jamie** 17:24 18:5,7
27:19 30:17 73:22
99:4,20,22 101:22,23
102:15 103:18 107:2
108:7 111:23 141:5
142:2 151:20 152:4
152:14 155:4,8,8,18
156:1,9,9 158:14
159:10 161:5 180:7
195:17 196:4 197:6
197:17 198:19 200:4
216:9 221:10,22
224:2,18,21 225:18
225:22,22 226:7
**Jamie's** 196:2
**January** 72:6,20 73:19
181:6
**job** 10:5 14:19,20 17:14
19:25 69:3 87:14,15
93:5 97:19 103:25
104:7 128:2 139:3
174:18
**jobs** 14:20 96:20
174:11
**Joe** 220:6
**John** 2:17 5:5
**join** 33:8
**joint** 26:24,25
**July** 111:18 112:8
180:20 201:22 202:7
221:19
**June** 39:1 225:8
**jzawadsky@reinhartl...**
2:23

**K**

**keep** 28:17 60:17 69:8
90:5 114:12 153:14
173:18 179:22 202:19
202:24
**keeping** 140:4
**keeps** 99:4
**kept** 46:4 99:4 173:21
**key** 200:18
**knew** 99:12 127:14
129:2 145:1 157:20
157:20,21 212:22,22
**knife** 63:23,25 166:18
**knock** 188:3,6
**knocked** 192:13
**knowing** 48:5 81:8
178:1
**knowledge** 32:2,3
105:17,18 188:21
225:19
**known** 8:3 32:7 71:2
108:18 181:13 189:1
**knows** 65:1 123:6

**Kooy** 115:14 121:13
125:18 145:19 221:11
221:19

**L**

**labeled** 111:8 136:17
202:10 220:2
**labor** 1:6,6 2:7 3:6 4:5
5:3 34:14,17,17 35:8
35:9 36:13,14,16,19
36:23,24 37:8,20
38:20 39:4,5,11 44:2
47:23,24 51:8 177:4
198:5
**lack** 27:22 61:7,8,9,10
68:15 132:4 208:3
**laid** 199:4
**laminate** 20:8
**laminator** 14:17,23
15:15,16,17 16:1
19:24 29:14,16,17
96:15,16,19 211:5
**landed** 127:6 130:18,24
138:20,21 143:16
150:16 152:18 167:16
209:12
**landing** 130:21
**language** 69:24
**lasted** 108:15 211:9
215:19
**lasts** 107:24
**late** 22:8 53:5 88:16,18
106:1,4,6,7
**law** 5:5
**laying** 184:12
**layout** 209:1
**lays** 23:14
**LB** 222:2
**lead** 15:1,1,2,19 42:19
43:12 70:10,11,21,21
70:22,24,24 74:12,14
74:16 83:11,12,21,22
86:4,4 96:15,16
103:20 137:22 138:1
138:2 142:16,17
143:1 144:15,16,17
159:17 174:12 176:23
176:25 178:18 179:3
195:21 204:4,10,11
211:20,23 216:12
218:3 219:6
**leader** 69:7
**leaders** 30:10 31:18
37:18 39:7 200:6
**leading** 152:12
**leads** 24:14 49:2 66:25
77:19 208:6,7
**learned** 99:19

**learning** 76:6
**leave** 90:5 125:4 126:5
153:24,25 199:3,4
**leaving** 117:23 125:3
**led** 75:19,20 76:17
101:16 132:4 159:20
178:19 180:6 187:14
187:17 206:17 219:13
**left** 17:13 18:9 108:25
115:19 117:17 120:14
124:21 126:2 127:18
153:9 154:3,8 161:24
162:9 185:8,11,21
186:17,18,19,24
199:5 200:19 201:16
211:8 220:23
**left-hand** 144:5 145:10
**leg** 220:23 221:3,4
**legal** 96:8
**legally** 71:19
**length** 193:10
**lessor** 179:2
**let's** 32:16 135:15 136:1
144:2 145:7 146:20
170:11,15 172:20
179:22 181:16 223:10
**letting** 12:17 148:3
**leu** 15:1
**level** 12:21 32:3
**life** 60:12,15 65:8 68:16
68:25 76:4,7
**lift** 45:2,6
**lifting** 45:3,8 46:12,13
48:9,14 53:12 88:6,7
89:7 104:6,14
**ligament** 167:25
**ligaments** 168:6,6
**light** 71:22 105:23,24
**lightly** 79:3
**liked** 97:21
**limit** 52:3
**limited** 7:20
**limping** 64:16
**line** 20:12 30:23,23 31:6
32:8 109:13,13
151:10 162:10 164:6
172:25,25 173:23
175:21 176:19 177:9
179:6,9 211:3,5
**lines** 69:20 142:15
**Lisa** 115:14 121:13
125:17 221:10,19
**Lisa's** 124:17
**list** 74:7 180:5 196:4
206:6 208:18 225:6
**listed** 34:23 36:4 52:13
75:15 90:19 107:8
130:6,7 146:16

Neal R. Gross and Co., Inc.
Washington DC
(202) 234-4433
www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 237 of 249   Document 34-2

litigation 96:9,10
little 13:12 24:23 37:20
  53:23 67:14 71:11
  120:20 125:8 128:8
  133:8 134:4 143:7
  144:2 146:12,13
  163:7 173:6 190:2
LLC 1:9 4:5 7:17 12:20
  13:25 14:3
location 144:20 189:13
locations 74:8
long 39:7 41:10 72:13
  72:20 107:17 108:2,2
  108:15 129:6 131:10
  137:5,9 186:9 201:18
  218:7
longer 18:17 90:2
  146:24
Lonnie 40:3,6 194:19
look 6:9,9 38:8 54:12
  71:25 74:9 76:20
  78:10 86:10 111:9
  129:7 137:14 147:3
  157:15 164:4 175:17
  175:18 176:8 179:1,8
  179:19,20,22,23
  183:9,14 202:9 220:3
looked 76:23 118:14
  120:19 128:8 159:2
  170:25 180:18 182:9
  188:16,17 189:11
  191:25 194:16,17
  196:6 202:2 206:1
  212:25 218:4
looking 5:20 75:11
  129:8 150:23 157:2,4
  157:12 175:9,23,24
  182:6
looks 121:17 143:22
  181:1 182:11 221:2,8
  221:12,25 222:25
loss 206:19
lot 16:6 17:9 48:16
  58:18 67:23 149:4,9
  169:6 179:7,14
  200:18 216:10 217:4
low 209:20
lower 184:14 186:8
  200:18
lowering 209:2
Luke 12:8 17:24 18:3
  18:17 27:19 28:16
  99:22,25 107:2
  110:17,17 111:23
  152:9,14 155:4,8,17
  155:19,19 158:15
  197:6 200:4 216:19
  217:20 221:25 224:3

224:18
Luke's 196:3 221:8
lunch 89:18 96:21
  136:4,11

___

M

machine 14:25 15:4,16
  29:13 53:13 58:16
  59:3,4 70:23 97:3,20
  102:8 104:4,5,8,11,12
  109:12 187:25 188:4
  188:6,8,11 189:12
  211:23 226:6
machinery 60:24
machines 16:20 17:3
Madison 2:21
main 14:23 104:9
maintain 19:24
maintenance 28:2
  174:13 184:17 185:11
making 15:19 96:19
management 5:9 22:20
  28:9 70:20 73:11,13
  114:9 125:13 225:7
manager 18:6 19:14,22
  21:22 28:2 102:4
manager/supervisor
  221:9
managers 44:1
manner 55:19,25 56:6,8
  64:3 170:16
March 15:11 16:11,11
  182:1 220:6
Mark 40:9 194:22
marked 6:15 38:9 54:15
  72:2 106:17 111:11
  114:4 135:17 143:10
  153:3 160:20 170:24
  171:8 179:25 183:12
  196:11 203:6 205:20
  205:20,23,24 210:15
  219:22 221:15 222:8
  223:25 225:4 226:13
material 19:25 181:18
materials 57:24 104:10
matter 1:4 4:4 5:4,21
  28:5 69:4 77:4 92:18
  110:5 126:18 178:3
  188:8
matters 7:2,21 8:2,11
mean 7:10 9:17 15:2
  25:1 27:12 30:17
  42:24 43:1 44:21
  49:24 52:7,10 53:1,1
  53:18 55:20,24 56:7
  58:7,24 60:12 62:3,7
  62:8 66:14,16,23
  67:19 75:3 78:16 79:8

81:18 82:6 85:9 91:1
  97:10,11,16 99:15
  104:2,7 109:20 117:1
  123:10 126:10 127:14
  131:23 138:13 139:11
  139:23 140:1,3
  145:19 147:2,20,22
  150:8 152:5 154:11
  156:25 167:7,10
  169:1 171:23,24
  172:8 176:22 177:18
  178:18 179:8,13
  187:14 188:22 191:2
  193:5,17 208:8,11
  209:15 210:9 211:20
  212:13 213:7,7 217:6
  217:12 218:15
meaning 48:2 139:8
  149:8
means 9:12 80:5 81:19
  91:2 166:8 178:4
meant 169:5 177:4
meat 138:15
medical 69:6 85:17
  90:13,15 103:8,13
  108:10 117:24 119:25
  120:11 121:2 137:20
  139:17 145:9 153:4
  167:23 173:4 190:17
  191:12,16 212:20
  215:6,13,14 224:24
medically 167:21
medications 11:11,15
meet 17:18
meeting 3:12,21 18:2
  21:18 26:9 29:1,9
  33:18,21 34:1,6 86:22
  99:10 110:4,7,9,11,12
  110:22 125:2 132:22
  133:2,4 134:19
  151:16 155:25 156:2
  156:18 159:10 160:6
  160:9,12,13 162:7
  169:16 191:8 194:20
  195:7,11,13,14,15,22
  196:1 197:6,8,8,10,11
  198:10,11 200:1,3,12
  205:10,11 213:21
  225:7,11 226:15,16
  226:19
meetings 16:21 29:10
  57:5,9,11,13 110:12
member 22:20 40:7
  53:9 70:20 73:13
  125:13 200:9
members 27:1,23,24,25
  33:16 73:11 114:9
  221:7

mention 118:19 119:3
mentioned 27:18 34:13
  34:14
merely 176:9
message 85:13
met 17:22 51:20 82:23
  100:5 129:11,13
  155:4,4
metal 193:20
meting 66:3
middle 140:15 204:7
  221:22
midnight 222:19,20
Mifflin 2:19
Mike 221:12 222:10,25
mind 42:17 132:16
  179:20 183:13,13
  194:23 196:8 218:10
  219:8
mine 147:24
minimal 29:13 104:7
minimum 29:4 215:1
minor 186:4 188:14
  193:24 194:3,14
  206:13 223:1
minute 89:24
minutes 3:21 47:18
  62:9,15 90:5 105:7
  131:12 194:23 211:9
  215:19 226:15
missed 131:1
misses 61:25 84:6
  190:9 216:20 217:21
mistake 151:12
mister 154:21
mitigating 223:15,21
moment 6:9 64:19
  65:17 71:25 114:3
  131:23 220:3
Monday 101:13
month 54:6 57:5,7
monthly 57:5,9,12
months 23:6 32:4,10,11
  32:16 54:7,8 112:12
  176:15 181:4 182:1
  182:18 183:5
morning 85:14 111:4,5
  116:4 121:25 155:15
  156:1,3 160:8 161:13
  161:13 197:3,3
  226:22
motion 127:17
motor 25:8 45:4 46:16
  46:21,23 47:8 48:7
  49:12 52:9 57:20,21
  150:19 207:6 209:18
move 18:22 56:5,7
  224:9

Neal R. Gross and Co., Inc.
Washington DC
(202) 234-4433
www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 238 of 249   Document 34-2

**moved** 16:12 18:15
**moving** 44:24 104:10
   145:9 175:15 209:4
**multiple** 53:3 55:14
   61:1 88:8 112:17
   174:15
**Munes** 220:7,8
**Munos** 220:6,7
**muscle** 65:2 167:24
**muscles** 168:7

**N**

**N** 4:1
**name** 4:15 5:1 17:12
   19:21 20:6 42:8,10
   137:15 142:14,24
**names** 16:4,4
**narrow** 25:9 193:3,4
**nature** 128:2,2 165:9
**navigate** 61:14 79:11
**navigated** 61:4 132:10
**necessarily** 28:12 41:7
   60:15 85:8 150:15
   156:15 176:22 178:4
   178:18 186:5 188:13
   216:12
**necessary** 24:17,18
   56:16 59:25 69:7
**need** 9:10 10:1,19,25
   22:14 25:12 71:23
   79:23 80:7,7,25 81:3
   88:2 89:17 92:21
   110:19 112:14 114:13
   122:25 145:18 151:23
   152:11 153:1 154:20
   155:11,13 166:6
   173:2 181:9,9,10
   212:17
**needed** 15:18 55:18
   112:11 152:3 155:23
   155:23 199:14 208:12
   208:13,25
**needing** 162:19
**needs** 22:12 57:6 62:5
   70:5,6,7,12 74:19
   79:10 80:3 104:12
   155:11
**negative** 80:6
**neither** 37:3 102:10
**Nelson** 203:13 205:25
   207:3
**Nett** 200:8
**Neubert** 210:19,21
   214:11 218:13
**never** 42:24 179:20
   183:13,13 196:8
**new** 17:13 39:2 41:15
   41:17 75:6 159:11

**164**:23 207:20
**night** 85:7 87:23 88:23
   88:25 89:2 211:16,23
**nine** 55:5
**no-call/no-shows** 43:4
**nod** 9:12
**non-management**
   80:21
**non-supervisors** 80:2
**nonverbal** 9:13
**norm** 77:3
**normal** 9:16
**normally** 25:23 88:6
   139:12,13
**Nos** 6:14 183:11
**note** 25:1 79:24 131:4
   135:1 184:22
**noted** 85:21 131:5
   140:6,7,11,20 161:6
   168:16 206:11,12
**notes** 225:9,17,21
**notice** 1:22 3:5,6 5:19
   7:22 8:4 53:24 65:23
   88:5 89:7 109:20
**notices** 5:14,16
**notifications** 70:15
**notified** 74:6 109:3
   123:14 125:5 222:19
**notify** 62:10 70:24
   74:14 123:11,12
**notifying** 116:20
**November** 1:13 181:6
**number** 4:18,21,22,24
   22:25 32:9 126:4,5,7
   173:13 176:18,21
   183:25 186:1,3
   221:11 223:4
**numbers** 53:10 125:18
   126:7
**numerous** 57:22
   189:15

**O**

**O** 4:1
**o'clock** 29:10 85:7
   125:3 226:22
**Oakwood** 4:20
**oath** 4:6 10:12
**obey** 148:22,25 149:3
   149:14 150:5,6 162:3
   162:11
**object** 12:3 52:19 59:13
   66:7 68:11,12 77:16
   77:16 78:20 80:14,19
   80:19,23 84:15,23
   91:17 92:11,11,12,14
   93:25 94:19 95:9
   118:7 121:5 125:20

**126**:16 139:5,9 141:8
   149:25 154:24 155:7
   163:15 164:4 166:2
   166:20 209:25
**objection** 59:19 92:19
   124:6
**objections** 200:11
**objective** 66:17
**obligated** 114:11
**obstructions** 209:4
**obstructs** 49:23
**obtained** 12:21
**obvious** 149:15,24
   150:5,10,18
**obviously** 22:14 23:7
   71:19,20 86:9 97:18
   139:25 144:19 162:10
   173:2 175:25 200:20
   217:5
**Occupational** 5:3
**occur** 8:22 60:18,19
   128:11,18 141:18
   166:17 186:4,5
**occurred** 51:1 63:21
   64:10 71:22 74:20
   76:10 82:5 87:12 91:9
   93:11 95:1,5 100:24
   114:18 118:5 121:24
   122:8 129:11 148:3
   154:9 161:17 162:2
   183:4,6 209:14
   222:21
**occurrence** 43:9 63:5
   63:16 75:19 76:14,17
**occurrences** 43:7
**occurs** 43:25 62:4 71:2
   74:15 81:20 82:2
   91:25
**October** 39:1 180:22,23
   183:20 210:20 219:16
   219:17
**off-hand** 102:12 225:6
**offense** 94:9 134:14,16
   167:2
**office** 1:22 5:2 16:21
   17:20 53:21 107:14
   108:24 115:9 120:16
   126:7 128:13 137:6
   155:20 196:3,3 226:7
**official** 75:17
**on-duty** 100:24 106:25
**once** 17:19 23:7 24:7
   37:16 51:12 54:5,6,6
   56:19 71:2 75:7 86:24
   90:11 97:12 98:7,7,9
   181:13,13
**one's** 49:25 50:2 187:11
**one-to-five** 194:17

**ones** 173:6,19 193:3
   226:8
**ongoing** 24:17 186:10
**open** 17:19 28:18 68:2
   84:5,13 149:4,8 173:6
   201:10
**opened** 129:18 201:9
   201:12,16
**opening** 84:19,21
   220:25
**openings** 221:1
**operate** 47:7
**operation** 48:8,9
   149:19 207:6
**operations** 18:4,18,22
   21:19 26:8 110:17
   158:15
**operator** 14:18,19,21
   15:7 21:7,16 32:6,7
   70:10 74:12,14 96:15
   96:16 97:14,14
   103:20 104:5 211:23
**operators** 25:10 29:12
   175:3,8
**opinion** 55:20 62:3 65:7
   87:7 156:25 173:11
   178:3,11 194:11
**opinions** 66:16
**opposed** 138:15
**opposite** 154:16
**ops** 25:24
**option** 21:17 26:8
   157:13
**options** 21:21 55:14
**order** 14:25 212:17
**orders** 17:2,3 20:1
**ordinary** 89:8
**organization** 8:3
**orientation** 37:15 45:8
   45:20 48:5 75:2
**original** 113:4 222:15
**orthopedic** 105:11
**OSHA** 53:19,21 96:12
**Oshkosh** 4:20
**outcome** 189:16
**outcomes** 110:22
**outlay** 189:12
**outlined** 106:12 107:7
**outside** 12:10 64:4
   138:23 139:2
**overall** 15:18,20 96:18
   97:9,10,13,16,19,22
   132:2
**overlooked** 188:14
**oversee** 15:3,3
**overseeing** 96:19
**overseer** 15:17
**owners** 54:24 55:1

Neal R. Gross and Co., Inc.
Washington DC
(202) 234-4433
www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 239 of 249   Document 34-2

**ownership** 55:2

**P**

**P** 4:1
**p.m** 15:24 111:7 211:15 227:2
**pace** 14:25
**packaging** 18:14 20:13 20:14
**page** 3:4 39:19 40:15 41:22,23 43:18,18 44:11 55:5 56:12 60:8 60:10 69:1 74:4,9 75:15 90:18 126:20 126:21 128:23 131:17 136:25 197:20 198:5 198:12 204:21,22 205:3,23 206:24 215:25
**pain** 64:19 65:11,20,23 66:23,24 67:10 104:18 128:18 184:14 185:3 186:8 211:6,8 211:13 215:23 218:7
**painful** 77:20,20
**paint** 86:10
**painted** 223:12
**pallet** 88:7 166:21,23 206:1,18
**pallets** 206:3,9 209:7 210:2
**panel** 175:11
**paper** 20:8,9 104:3 109:14 127:18 211:3 211:6 216:5,7 221:1,2
**paperwork** 11:25 12:2
**paragraph** 40:16 42:13 44:11,12 55:12 56:13 81:9 112:19,23 117:21 119:6,22 121:24 202:10,13 216:15
**paramedics** 139:25
**Park** 1:23
**part** 8:24 14:23 17:4,16 28:3 30:18 34:1,4,6 36:19,24 40:20 42:18 43:5 45:25 50:21 55:23 64:17 73:16 97:18 102:2 104:7 118:2 119:24 120:10 123:24,25 124:22 131:7,16 144:5 146:3 157:6 174:9 175:10 213:20 217:7
**partially** 194:15
**particular** 8:10 29:9 33:18 42:8,10 43:9

83:16 88:10 143:13 149:13 156:14 158:9 158:11 168:10,11 176:1,19 177:8 179:9 192:12 197:18
**parties** 31:20
**parts** 20:10 144:3
**pass** 37:16
**passed** 55:1 143:2
**pathogens** 57:22
**pattern** 54:10
**pay** 47:11
**paying** 149:18
**penalty** 178:14,14
**pending** 11:3
**people** 9:16 10:3,4 16:6 22:15 28:6 30:18 50:19 66:5 76:5 78:17 123:5,7 127:25 138:25,25 146:18 159:12 173:14,15 175:1 177:25
**percent** 20:1 25:12 33:19 45:9 46:13 120:6,7 129:15 225:20
**perception** 165:9
**perfect** 188:1
**performed** 151:25 177:15
**performing** 104:9
**period** 75:8 101:13
**periods** 41:18
**permanent** 27:23
**person** 34:9 44:18 83:13 184:17 185:11 188:23,24 193:7 220:22
**personal** 4:22,24 8:15 45:13 55:21 137:16 225:19
**personally** 156:6
**personnel** 45:25 174:7 174:8 175:23
**phone** 4:21,22,24 74:7 125:18,18 126:3
**phones** 126:4
**phrase** 60:17 63:3 78:12 177:3
**phrased** 214:4
**physical** 31:25 32:1 63:21 75:19,22,25 76:10,16,17,19,25 77:7,9,11 79:17 80:12 83:2,18 87:22 91:8 163:13,19 168:11 206:11
**physically** 5:17 64:11

67:5 83:13 90:14,14 93:13 95:18 107:21 120:15 122:18 125:2 125:5 160:9,14 163:12,25 187:16
**pick** 49:20,22
**picked** 184:18
**Picking** 166:21
**picture** 86:10
**piece** 55:6,16 69:3
**pieces** 193:20 204:2
**pile** 88:7
**place** 25:21 26:16 35:4 41:12,13 44:2 56:16 59:25 71:20,21 76:25 107:15 120:17 197:8 200:20
**placed** 133:12
**placing** 116:19
**Plaintiff** 1:7,21 2:4 4:10 8:18
**plan** 3:7 72:3,6,10,14 72:18,21 73:10,18 75:1,5,6 122:20
**planning** 19:14,22
**plant** 15:20 16:12,15 17:6 19:13,16 21:14 23:15 29:14 35:10 40:18,19,24 41:24 42:16 56:6,7 62:10 85:12,22 101:21 117:16 126:8 127:21 144:16 174:11
**play** 73:25 86:19
**playing** 63:23,24,24 64:3 133:22
**please** 4:7,15 8:7 35:24 36:22 39:19 40:18 42:5 54:12,12 61:24 69:1,9 74:9 83:4 95:10 111:9 114:3 117:1 119:13 150:1 164:7 187:10 214:6
**plenty** 192:23
**plow** 89:22
**point** 15:15 17:5 21:9 21:13,15 22:24 23:16 26:12,13 31:13 34:8 41:25 43:6,10 61:22 61:23 74:3,4,10,11 81:10 85:11 86:6 90:23 96:11 99:4,6,6 99:18,25 100:2,20,21 105:16 112:1 113:6,8 116:2,4 117:14 120:16 122:19,19 129:23,24 134:13,24 137:8 143:5 148:20

152:1,10,21,21,24 156:1 160:14 169:3 172:18 173:17 175:13 181:24 182:19 195:17 196:4 202:24 214:1 215:2,4,19,22 216:9 224:21
**Police** 12:24 13:1,2
**polices** 198:8
**policies** 20:20,21 21:3 36:17 45:6 71:23 76:11 77:5 93:6,9 114:13
**policy** 24:3,5 42:1 55:6 69:11,23 71:16 73:25 87:4 88:1 93:3 114:8 115:21 117:2 122:3 124:22 125:10 141:7 141:10 181:9 197:21
**poor** 146:19 147:21
**portion** 86:3 131:17 204:5,6,7
**position** 15:12 16:17 18:3,20 19:12,15,19 20:5 174:12,13,13,14 174:23 175:5,6
**positions** 16:8 86:14 174:14
**positive** 148:15 161:23
**possibility** 212:24
**possible** 49:14,15 51:3 51:6,22 52:1 58:22 59:16,21 62:4,7 66:14 71:10 74:15 85:6 89:5 94:23 167:5 169:14
**possibly** 33:23 59:5 79:8 87:4 177:1 178:13 184:13 185:3 189:25
**posted** 74:7 126:7,8
**potential** 63:6 135:1
**potentially** 26:11 106:14 182:11
**pounds** 49:21 210:5,5
**PowerPoint** 57:25 58:1
**PowerPoints** 57:24 58:4
**PPE** 34:24 36:8,8 44:25 45:12,12,19 46:10 57:20
**practice** 24:2,3
**practices** 179:16
**pre-labeled** 5:23,24 6:8 38:7 106:15 114:2 143:8 196:9
**precaution** 188:15
**prepare** 11:23
**prescribed** 11:16

Neal R. Gross and Co., Inc.
Washington DC
(202) 234-4433
www.nealrgross.com
Case 1:17-cv-00589-WCG    Filed 03/08/18    Page 240 of 249    Document 34-2

**presence** 12:11,15
**present** 1:24 20:24 29:4
   200:10
**presenter** 57:25
**president** 12:8 18:21,23
**presumably** 39:2
**pretty** 15:15 23:20
   172:8 173:1,3 194:14
**prevents** 123:7
**previous** 20:5 34:10
   54:25 158:3,10 176:3
   177:12,12 181:4
   182:7,12 186:8 189:9
   194:20
**previously** 27:9 34:11
   125:9 128:19 129:13
**Primarily** 73:11,17
**primary** 14:20 15:14
   16:12,15 27:24,25
**prior** 8:19 33:17 72:13
   72:20 73:5,7 99:14
   101:2 117:23 124:24
   124:25 129:11 134:19
   151:16 156:6 180:7
   180:16 182:1 205:15
**privilege** 12:3 165:18
**privileges** 39:14
**privy** 155:20
**probably** 20:1 28:16,16
   33:4,24,25 52:13,15
   53:8,9 57:3,12 65:17
   66:2 79:5 100:9
   110:10 111:5,23
   112:13 126:3,4 128:7
   131:6,11,12 132:11
   138:23 146:1 153:20
   153:25 154:4 155:11
   158:16 159:9,11
   170:8,9 173:20
   189:11 193:12 195:24
   200:4,10 208:14,22
   208:24 210:11 211:15
   211:16 215:19 216:6
   216:9 218:5 224:12
**probation** 37:17
**problem** 14:8 94:10
**problems** 97:23 115:12
   115:15,20 148:18
**procedure** 8:17 87:5
**procedures** 53:12
   71:23 114:13 135:9
**proceed** 25:25
**process** 9:6 24:8 47:6
   141:21 147:23,25
   150:15,21 151:8,10
   151:13 152:16 157:19
   163:21,22 200:21
**product** 206:4,5,14

**production** 14:18,19
   15:6 17:25 19:14,22
   29:22 96:18
**products** 20:15
**profanity** 169:2
**Prokash** 222:10
**promote** 174:19
**promoted** 15:8 97:4
   175:4,5
**promotion** 174:24
**promotions** 174:25
**promptly** 69:8,11,22,25
**proper** 45:8 48:8 53:12
   53:12 55:18,19,21,25
   62:16
**properly** 132:8 165:13
**property** 51:1 52:9 63:7
   75:21 83:5 171:19
   173:3 206:7,23
   208:15
**protection** 45:1,1,16
**protective** 34:24 45:13
   55:21
**provide** 30:11 33:15
   47:9 55:15,18 56:15
   59:24 66:4 113:22
   181:10
**provided** 12:1 57:14,24
   58:9 61:18 62:18 75:1
   75:6 111:1 128:19
   162:6 196:17
**providing** 55:10
**pull** 65:3 77:3 127:18
**pulled** 211:5
**pulling** 104:14 109:13
   109:13 167:24,24
   211:3
**punch** 224:11
**punched** 224:13
**punishment** 216:21
   217:23
**purchasing** 20:2
**purpose** 39:11 54:21
   71:18 114:8 155:3
   162:21
**purposes** 5:10 6:13
   7:21 8:25 14:2 53:19
   114:11 123:1 182:16
**pursuant** 1:21 8:16
   11:17
**pursued** 18:10
**purview** 106:10
**push** 53:11
**pushed** 215:7
**pushing** 104:14
**put** 31:21 35:4 41:12,13
   68:4 73:18 99:7,13,19

   99:23 100:1,16,22
   111:18 115:22 142:20
   143:6 146:20 171:16
   172:12 178:5,9 180:2
   180:6 184:15 192:8
   192:11 193:18 194:13
   195:18 198:16,17,17
   212:13 216:2 217:10
   218:19 222:5 226:8
**puts** 100:8 104:5
**putting** 61:12 124:22
   125:6 127:17 132:8
   206:1

**Q**
**quality** 14:24 22:6
   102:4,4 208:16
**question** 10:2,5,7,17
   11:2,2,4 35:14,21
   36:21,22 48:18 49:14
   52:20 59:7,15 66:7,8
   67:8,12 68:12,12,13
   77:17,21 78:22 79:16
   80:9,15 83:9 84:23,24
   91:17,22 92:12 94:1,1
   94:19,20 95:9 112:11
   112:14 114:7 117:1
   123:24,25 124:8
   126:17,22,24 139:6
   140:14 141:9 154:7
   154:25 157:10 159:3
   163:10,16,16,17
   164:5,8,10,12,14,22
   164:23 165:3 166:6
   170:14 182:24 185:14
   194:2
**questioning** 146:1
   164:6
**questions** 5:20 7:7,11
   9:11,18,21,22 10:18
   10:21,22 11:6,12
   78:21 143:3 165:24
   175:11 226:21
**queue** 9:13
**quick** 47:18
**quickly** 65:12,15
**quite** 80:10
**quiz** 45:24,24 47:6 58:2

**R**
**R** 1:5 4:1
**rack** 52:10 60:25 61:1
   206:2 210:11,12
**racking** 209:15,17
**racks** 209:1 210:10
**rail** 133:15
**railing** 130:11,11,12,15
   133:11

**railings** 61:12
**raise** 4:7 92:21 205:16
**raising** 209:2
**ran** 149:17
**Ranges** 210:3
**rate** 149:17
**raw** 19:25 104:10
**re-** 186:7
**re-aggravated** 184:13
   185:3
**re-ask** 36:22 59:7
   119:13
**re-aware** 114:24
**re-certification** 57:20
**re-enact** 130:3
**re-labeled** 219:5
**re-training** 57:7
**reach** 43:20
**reached** 24:7 43:23
   125:13
**reaches** 23:25
**react** 68:9,10
**read** 40:18 42:13 55:8
   56:13,22 59:23 61:23
   69:2 74:3 75:17 81:9
   90:20 109:1 112:23
   114:15 117:20 119:9
   119:21 173:12 202:12
   216:15 221:13
**reading** 117:11,11
   225:15
**reads** 51:15
**ready** 6:17 7:7 38:13,14
   54:13 111:10,13
**real** 54:10 220:14
**realization** 99:23
**realize** 85:5,18,19 87:21
   88:14,19
**realized** 102:9 152:22
   152:23 156:3 195:17
   195:20
**realizing** 85:7 89:12
**reason** 11:19 72:8
   90:15 93:19,20 97:19
   98:16 115:3 118:2
   145:14 157:6 164:13
   165:15 188:18 203:22
   216:18 217:20 219:12
   226:5
**reasonably** 8:3 25:13
**reasons** 98:6 122:23
   223:9
**recall** 51:2,6 73:2,9
   100:3 102:6 103:5
   104:20 108:20 110:10
   112:1 118:12 119:22
   122:15 130:12,16
   131:1,3 132:14

Neal R. Gross and Co., Inc.
Washington DC
(202) 234-4433                                                www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 241 of 249   Document 34-2

133:16,18 136:11,14
144:23 151:12 152:15
154:1 156:8 158:22
158:25 159:6 168:17
168:19 169:7 184:8
185:11 195:12 200:13
201:3 210:25 224:23
226:19
**receipt** 109:20,21
**receive** 30:4 45:19
51:23 52:18 81:13
82:18 85:25 91:15
92:2 95:7,19,24 121:2
121:10,14 139:17,19
139:21 158:18 175:19
191:9 195:8 212:2,7
213:20 223:20
**received** 5:13 26:21
42:20 83:18 98:10
100:23 103:7 181:23
212:7 214:5 218:22
223:17 224:24
**receives** 83:2 84:20
**receiving** 223:14
**reckless** 44:19,19 45:4
46:20 48:8 187:21
**recklessly** 52:9
**recklessness** 179:16
179:18
**recognize** 76:15,15
106:16 111:14 135:21
136:17 171:7 179:24
183:16 196:10 220:3
220:4 221:14,20
222:6 223:24 225:3
226:12
**recognized** 40:20
**recollection** 159:13
225:13,14
**recommendation**
199:22
**record** 4:3,16 5:24 8:8
8:14 13:18,19 47:20
47:21 90:7,8 135:16
135:19 136:1,2,3
172:1 173:21 174:16
174:17 195:4 214:6,7
214:8,10 216:5
217:12 219:20,24,25
**recordable** 53:18,18,19
215:4,5,6
**recordables** 53:3,15
**records** 6:2 175:10
216:12
**refer** 6:11 14:2 40:15
41:22 44:11 54:11
61:21 71:24 90:18
127:15 128:22 149:2

171:6 201:21 203:4
**reference** 36:23 197:17
197:22 199:14
**referenced** 46:17
**referencing** 198:20
**referred** 109:7 206:24
**referring** 6:22 22:23
37:8 40:25 142:11
161:7 197:15 226:10
**reflected** 112:5
**refused** 113:8 161:5
**regard** 8:21 44:19,21
136:13 199:7 216:11
**regarding** 8:10 23:8
25:16 122:17 224:3
**regardless** 52:5 70:11
83:24 84:11 91:14
94:16
**regards** 46:18 110:11
180:24 196:16
**Reinhart** 2:18 5:6
**reiterating** 56:20
**related** 17:20 45:22
90:24 93:23 165:5
**relates** 183:7
**relating** 45:6 46:10
**relatively** 207:20
209:20
**relay** 85:12
**relegated** 207:25
**rely** 44:7
**remainder** 104:16,19
108:22
**remedial** 31:10 51:17
51:19
**remember** 16:4 41:17
41:19 50:4,5,14 57:23
66:9 88:24 100:14
102:18 103:9 107:17
107:18 112:5,7 114:1
114:21,22,25 121:7
129:16 130:7,21
153:20 154:12 158:8
160:10,11,14 169:1
198:1 200:14,17
215:16,16
**removed** 181:24
**repeat** 19:21 33:14
95:10 142:22
**repeated** 189:15
**repeatedly** 164:10,11
**repetitive** 127:16
**rephrase** 10:17 151:5
201:16
**replaced** 20:5 57:13
**reportable** 105:8
**reportables** 122:21
**reported** 62:1 69:5,11

69:22 70:7,7,12 81:14
81:15,20 83:17 84:8,9
86:4 88:3 90:11,13
92:2 93:12 94:25 95:7
95:13,16,17,22
101:22 102:10 115:12
115:14 116:15 117:15
118:14 119:12 123:4
128:17 129:7,9
136:13 137:6 145:3
170:9,13,15 201:11
201:14,17,19 211:16
216:20 217:13,21
**reporter** 4:6,7 9:8,22,25
10:9 38:1
**reporter's** 10:4
**reporting** 3:7 71:9,12
71:13,15 72:3,17,21
88:16,18 90:24 91:4
92:4 93:14,22 94:3,4
94:7,8,13 106:1,4,6
114:11 116:17 121:10
122:20 128:25 137:9
177:25 178:13,14,16
179:4 217:17
**reports** 21:12 81:12
82:19 84:2,11 91:2,11
92:7 106:7
**represent** 5:3 28:7
**representations** 220:10
**representative** 8:7,16
**representing** 7:16
**represents** 5:6,9
**request** 4:5 5:19 6:5
11:3 21:18 224:19
**requested** 110:4
**require** 24:4 104:6
117:2 157:14 159:18
**required** 42:17 90:13
122:20 201:20
**requirement** 49:21
**requirements** 40:23
117:13
**resent** 92:24
**resource's** 86:7
**resources** 18:6 37:15
62:1,11 69:5 70:19
73:13 85:13 86:18
137:24
**resources'** 175:10
**responsibilities** 16:19
17:10 96:17
**responsibility** 56:3,15
56:24 58:8 59:24 60:2
73:10,16 178:8
198:24
**responsible** 16:20
25:14 96:18

**rest** 29:14 176:24
**Restate** 119:13
**restroom** 89:17
**result** 17:6 63:17,18
77:1 80:4 94:6 114:14
150:21 161:17 162:3
163:23 166:24 167:3
201:5,5,7,15 206:14
**resulted** 51:5 170:4
177:17
**resulting** 96:11
**results** 45:24 169:16
**retaining** 93:10
**retraining** 46:2,3
**review** 7:13 17:21 28:5
54:13 142:4 144:19
161:15 171:2 204:13
**reviewed** 11:25 142:5
151:21
**reviewing** 6:10
**revised** 3:9 72:6 73:19
75:5 160:17,18,22
161:7
**revision** 75:7
**rights** 39:14
**rise** 93:23 95:6 96:10
**riser** 193:8
**risk** 185:23 190:4
**road** 4:20 179:5
**role** 79:22
**roles** 30:15
**roll** 104:1,3,4 127:9
210:24 220:24 221:1
222:25
**rolls** 20:9 104:3,5
**room** 2:9 5:5 10:13
172:23 173:12 184:11
195:25 200:19
**rotate** 224:10
**roughly** 193:8 205:13
**routine** 211:4
**row** 144:11,24 193:23
**rubric** 31:14,16 33:9
44:8 175:17 212:3
213:7,10 214:22,23
**rude** 131:23
**rule** 8:16 9:8 35:2,3,5,6
35:10,13 36:8,12
48:15 60:12 62:5
149:13,13,19,22
149:23 150:5,8,11,16
150:18,20,21 151:7
**rules** 8:17 9:7 21:14
23:15 34:19,20 35:17
36:1,1,2,6 40:19,22
40:24 41:1,4,9,12,13
41:15,16,16,19,24
42:9,16 44:5 46:9

Neal R. Gross and Co., Inc.
Washington DC
(202) 234-4433
www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 242 of 249   Document 34-2

54:22 60:3,4,5,6,9,9 60:11,13 73:12 92:13 92:16 134:9 135:6,9 148:22,25 149:2,3,5,6 149:14 150:6 162:3 162:11 183:25 198:18 199:7 219:9
**run** 17:2 49:23 61:13,13 88:1
**running** 56:9 60:21 133:17,18
**runs** 14:23,23 53:1
**Ruten** 221:22
**rutenberg.david.j@d...** 2:12

**S**

**S** 4:1
**S.C** 2:18 5:6
**safe** 48:11 55:10 56:6,7 56:16 59:24 114:12 133:12 149:19 197:14
**safely** 55:18 56:3,24 58:7,8,20,24 59:4,8 59:18 60:2,16 198:24
**safer** 87:6
**sat** 50:15 174:24
**satisfied** 117:12
**saw** 62:24 67:6 146:18 147:9 154:4 157:25
**saying** 9:17,19 10:16 169:1 176:10
**says** 40:18 51:8,8,16 69:3,21 70:2,6,8 76:13,17 81:23,24 109:1,2,15 110:4 112:20 119:23 140:16 141:17 144:6 145:9 146:24 147:16 148:11 166:12 174:6 176:1,6 176:7,12 178:20,22 190:3 191:14 198:19 206:16 217:19 218:20 223:10 225:12,22
**scale** 187:19 194:18
**scene** 86:12
**scenes** 26:17
**scheduler** 15:14,14
**scheduling** 19:24
**science** 12:24 13:1,2
**scoop** 102:15
**score** 172:25 174:4 176:4,9 179:6 207:25
**scores** 173:23,24
**Scott** 1:19 3:3 4:4,9,17 8:20 102:2,3 103:18 136:5 225:22 226:4,4 226:7,9

**scrape** 53:23
**scrapped** 220:23,23 221:3,4
**se** 207:12
**second** 7:9 55:12,23 56:13 65:11 66:1 74:10 77:9 109:1 135:16 136:25 144:25 173:5 202:12 204:21 204:22 205:3 210:11 215:25 219:21
**seconds** 62:15 66:24 105:6 107:24
**Secretary** 1:6 4:5
**section** 107:7 137:17 142:14 144:9,12,15 144:25 145:6 193:23 206:7 208:15
**sections** 107:8 142:24 197:24
**seek** 44:1
**seen** 5:16,17 194:4,7 215:18 221:17
**sees** 73:13
**self** 172:9
**send** 148:18,19 224:16
**sense** 29:22 48:16 56:5 58:18 60:5,16,17,19 61:7 65:1 68:17 219:10
**sent** 148:13,14 161:22 224:2
**sentence** 55:8,17,23 56:23 59:23 63:4 69:9 90:20 109:2 117:20 119:8,21,22 202:12 216:15
**sentences** 69:3
**separate** 45:5,6 198:20
**separately** 36:4 141:5
**sequentially** 5:25
**series** 32:13 193:20
**serious** 117:24 119:24 120:10,11 139:24 140:5 168:4 188:20
**seriousness** 120:1 123:17 214:25,25
**serve** 30:5
**served** 27:25 30:12 34:11 41:13
**serves** 71:20
**service** 17:1
**session** 75:9 117:18 125:7 177:1
**set** 8:11 34:18 41:25 43:15 127:18 130:4 156:13
**sets** 6:2

**settled** 110:3
**seven** 215:3
**severity** 23:3 85:14 87:24 179:20
**sharp** 211:8
**sheer** 94:7,8
**sheet** 20:9 33:10,22,25 34:3,5 173:8 212:21
**sheets** 20:14 88:7 89:7 158:3 173:18,22
**shelf** 49:6 187:25 209:19
**sheriff's** 13:17,23
**shift** 15:8,9,13,13,16,21 15:23 16:9,9,10,12,13 16:17,18,23,23 17:7,8 17:9 19:6 33:3 70:22 71:5,8 81:13,16,21 82:19 83:17 85:5 87:22 88:23 108:22 111:5 115:25 119:12 119:16 123:4 124:25 211:14 216:20 217:22
**ship** 17:2
**shipping** 20:15
**shoes** 45:1,17
**short** 10:25 138:8 225:14
**shortly** 129:9 211:17
**shoulder** 64:18 102:7,9 103:5 104:24 105:15 107:11,18 109:9,11 121:3 123:22,22 128:18 129:1,1 188:1 188:12 211:6,8 218:11 224:4,14,24
**shoulder's** 224:22
**shoulders** 127:8,13,18
**show** 33:9 41:23 130:4 179:7 180:7 220:11
**showed** 155:11
**showing** 42:25
**shows** 179:15 182:17
**shut** 29:12
**sick** 22:7 24:25 96:21 181:25 182:2,3,4,4,8 182:8
**side** 62:10 138:14,16,21 145:10 167:10,11
**sides** 139:14
**sign** 86:5 109:18,19,23 110:2 113:8 137:22 137:23,25 143:5 161:5 168:14 184:22 203:25 204:11
**signage** 223:12
**signature** 109:16 114:19,24 141:25

143:4,20 161:2 162:22 196:20 220:17 221:9
**signatures** 142:18 143:25 221:21
**signed** 127:11 141:23 142:5 159:15 161:4,5 184:7 204:1
**significant** 103:14 194:8,14
**signing** 109:21 114:21
**signs** 138:1
**similar** 175:23 188:24 189:10 208:24
**similarly** 78:12 150:25 151:1,2
**simple** 192:16,17
**simplistic** 133:10
**simultaneously** 8:22
**single** 60:12 88:6
**sir** 226:24
**sit** 205:10
**sits** 76:22
**sitting** 29:8 140:4 174:21 175:17
**situation** 28:8 51:3 52:8 60:12 67:22 68:4,7 94:12 114:24 120:9 124:17 140:3 149:16 150:23 157:6 188:25 189:10,14,15 192:12 208:25
**situations** 48:10
**six** 8:11 29:15 31:6 32:10,10,16 136:7,8 176:15 214:17 215:3
**skill** 79:18 80:13
**skills** 188:21
**skin** 166:18
**skipping** 133:20
**sliding** 60:22
**slight** 69:4
**slightly** 48:18
**slip** 3:8,11,22 20:14 21:9,17 105:25 106:3 106:24 113:4,7,9 196:15 197:1
**slippery** 192:20,20
**slipping** 166:18
**slips** 199:11
**small** 53:23
**smooth** 200:21
**solely** 93:12 106:9
**Solicitors** 5:2
**somebody** 42:23,24,25 52:8 63:18 64:16,16 64:17 66:22 71:2 76:15 77:1,6 78:23

Neal R. Gross and Co., Inc.
Washington DC
(202) 234-4433
www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 243 of 249   Document 34-2

85:12 89:11 91:2
95:17 108:13 118:16
125:3,5 132:15
167:13 174:18,19
179:12,13 199:22
209:18,20
**someone's** 58:5
**somewhat** 66:12
**soon** 62:4,6,16 74:15
85:6 89:5 195:22
**sooner** 85:17
**sore** 127:9,18 224:12
**sorry** 16:13 22:7 38:16
39:20 46:1 55:12,15
56:22 66:19 71:6
74:10 81:3 98:11
115:21 116:9,10
121:21 142:19 160:11
166:4 187:8 188:5
194:1
**sort** 31:10 36:16 58:1
66:5 67:9 174:24,25
193:16
**sought** 215:7 224:24
**sounded** 153:6
**sounding** 46:22
**sounds** 101:10,11
133:10 134:21 209:13
**source** 198:7
**sources** 36:16
**South** 2:8 4:20
**spaced** 193:5
**spaces** 193:11
**speak** 10:3 12:5,6 28:20
156:10 213:16
**speaking** 53:22
**specific** 17:3 48:4,21
51:6 60:13,14 64:24
76:3 88:20 104:7
106:11 119:17 127:15
128:6 129:8 130:16
145:2 158:7 159:13
172:15 176:9 208:10
208:17
**specifically** 36:2,9,10
46:17 63:13 66:9 73:2
73:20 100:3 112:5
114:22 118:11,13,15
123:9,12 125:1
127:14 135:11 143:7
143:15 146:22 147:2
148:11 168:18 172:17
184:2 199:6
**specifics** 100:10
102:18 103:5 110:10
198:1 200:13
**specify** 12:10 70:3
**speculate** 186:16

215:21
**speculative** 78:21
209:25
**speed** 46:21 149:17
**spell** 4:16 35:12,25
60:11
**spelled** 46:14 81:19
**spells** 35:9
**spent** 161:15
**spill** 60:20
**spilled** 56:9
**spills** 56:10
**splices** 127:9,18
**split** 66:1
**spoke** 152:14
**spoken** 12:14,15
**spot** 22:2,10,11 174:16
206:11
**sprain** 65:3 146:8 153:3
160:2 161:9 167:18
167:20
**spreadsheets** 99:5
**square** 139:15
**squarely** 138:11 139:7
139:11,13 209:12
**staff** 16:21 17:20 18:1
27:1
**stages** 104:4
**stair** 130:22,23 132:16
138:11 170:4 192:25
**stairs** 58:12 61:3,14,19
127:4 130:3,4,17,20
132:10,10 133:7,10
133:17,20,24 134:5,7
135:10 152:18 170:16
189:19 192:22,24
193:9,15
**stand** 58:17 61:2
**standing** 29:16 33:8
36:6 59:2 62:14
**standpoint** 29:23
**stands** 104:4 127:10
220:24 221:1 223:1
**start** 9:6 24:9 55:8,16
57:8 75:3 86:8 145:8
**started** 10:10 14:10,16
14:17 210:12
**starting** 56:13 202:14
216:16
**starts** 49:22 55:8,12
61:24 144:12
**state** 4:15 6:11 8:7
**stated** 8:21 49:21 98:7
110:1,1,2 112:22
157:14
**statement** 24:6 77:17
104:23 105:1,2
128:22,23 169:1

201:22,23
**statements** 103:12
**states** 1:1 29:2 184:10
**stayed** 186:9
**steel** 44:25 45:17
192:23 193:2,20
**stemmed** 216:3
**step** 130:25 138:11,13
138:14 139:7,11,13
167:7,9 188:17,18,18
193:6,21 201:18,18
208:1 212:6
**stepped** 138:9,16
169:10 170:4,5,10,16
192:20 201:17 220:24
220:25 221:3
**stepping** 163:22,23
**steps** 127:5 133:12,13
138:9 169:10 189:13
192:20 193:18
**Steve** 17:12,13 19:10
101:16 102:7,11,20
103:3 105:25 107:11
109:3 115:17 116:2,9
116:10,11,12 117:5
117:15,15 118:12,14
118:19,21,23,24,25
119:2,3 120:17,18
121:2 122:10,10,13
122:14 123:21,21
124:10,18 200:8
221:10 224:4,20,22
226:6
**stewards** 30:9
**stick** 26:14
**stink** 178:8
**stood** 149:21
**stop** 13:22 140:2
**stopped** 42:25 57:4
226:5
**stored** 188:10
**straight** 182:18
**strain** 167:22 168:1
**streaks** 53:1,4 54:7
**Street** 2:8,19
**strength** 20:12
**stress** 89:4
**stressing** 53:11
**strike** 79:16 81:9
174:22
**string** 104:8
**stringing** 59:3 102:8
104:11 109:12 211:4
211:4
**strong** 92:25
**strung** 221:2
**stuck** 65:13
**stuff** 58:19 68:25

142:25 168:24
**stumbled** 127:3,6
**sub-section** 208:17
**subject** 7:2,21 8:11
81:22 169:14 170:22
171:3 216:21 217:23
**subjective** 66:12,13,18
66:19 194:11
**subordinate** 97:2,5
**subsequent** 183:20
**substance** 148:11
161:17,23
**substances** 148:7
**substantial** 194:6
**subtotal** 173:25
**successfully** 132:11
**sudden** 61:2 85:10
88:10
**sufficient** 125:6
**suggest** 25:11 155:22
161:21
**suggested** 155:23
**Suite** 2:20
**supervise** 19:5,8,10
**supervision** 15:20
**supervisor** 15:5,8,13
15:25 16:9,12,15,18
17:6,8 19:13,16 21:7
21:21 22:19 23:9,12
24:19 25:15,22 26:6
50:6 62:1,11,14,25
64:14 69:5 70:9,12,15
70:17,21,25 73:12
74:5,14,16,17 82:4,13
82:15 84:4,13 85:13
85:24 87:11 90:10
93:5 97:1,3,6 106:10
109:4 115:11 116:3,3
116:20 117:3,16
118:5 122:4,6,11
124:19 125:2,12,12
144:4 158:19 159:1
166:7 196:22 213:3
216:10 220:16 221:24
221:25
**supervisors** 80:1
**supervisory** 79:22
**supports** 206:2
**suppose** 58:22,23
209:12
**supposed** 7:1 11:16
62:17 85:4,25 86:4
109:18,19 115:23,24
120:3 157:10 184:25
**surface** 150:24 193:17
193:17
**surgery** 66:25
**surrounding** 114:23

Neal R. Gross and Co., Inc.
Washington DC
(202) 234-4433
www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 244 of 249   Document 34-2

**surroundings** 56:11
58:10 78:24 79:11,11
132:3,17 135:14
**surrounds** 78:24
**suspect** 149:12
**swapping** 38:4
**swear** 200:25
**swore** 10:9
**sworn** 4:11
**symptoms** 89:16
**system** 22:24 41:25
43:6,10 172:18
209:15

**T**

**table** 214:16
**taken** 1:21 11:3,9 28:21
69:10,21,24 70:2 82:3
107:14 147:16 173:9
177:11 182:10 183:14
188:15 192:12
**takes** 14:24 25:21 71:21
**talk** 12:9 20:19,24 21:19
22:15,23 30:21 37:20
74:22 76:16 85:12
87:2,3 96:2 118:16
122:6,18 126:9,13,14
129:21 155:24 172:24
172:24 173:16,24
181:17 183:7
**talked** 22:22 39:16 44:9
76:14 94:5 102:9
107:4 108:19 127:8
130:6 151:20 152:23
156:17 174:2 190:2
195:16 226:6
**talking** 12:19 14:6
20:21,25 22:4,5 27:14
27:15 35:18 39:22,25
40:5 42:5 47:23 53:6
53:17 69:15,19 71:11
72:15 74:18,23 75:12
80:21 83:5 94:12
113:9 115:17 126:13
126:14,18,25 136:12
196:2 208:4 213:10
214:10
**talks** 194:12
**tallied** 31:9
**tally** 173:22,23,24
**tape** 193:16,16
**tardiness** 44:1
**TBD** 212:10,13,21
**team** 17:5,17,18,18,23
19:2,3,4 20:3 26:22
26:25 27:9,18 28:1,13
28:15 33:9,16 34:4
39:16,22,24 50:21,23

53:9 76:22 83:22 85:1
86:21 87:1,1 99:17
100:5 106:13 134:13
141:12 148:4 150:13
152:3 169:16 171:13
175:18 183:21 201:8
205:11 213:20
**technical** 13:5 207:12
**technically** 86:3 117:16
149:5 153:7 207:11
**technics** 45:8
**techniques** 48:9 53:12
**Ted** 221:22
**telephone** 4:18
**tell** 21:5 64:12,18 112:6
126:21 127:19 128:25
130:14 138:19 155:5
165:16,17 166:12
168:14 180:2 188:21
191:21 199:6,10
221:6,24
**telling** 67:24 90:17
92:24 127:19 165:19
**tend** 20:16
**tendency** 179:7
**tender** 210:24
**tendons** 168:6
**tense** 20:24
**tenure** 23:5 61:4 97:18
188:25
**term** 39:24 47:24 68:16
77:10,15 107:17
153:13 166:7 177:2,3
202:16 203:3
**terminate** 23:1 98:21
**terminated** 24:1,4 43:2
97:25 98:6,13 99:3,21
100:9,12 112:9,12
197:12 199:4,24
200:17 222:22
**termination** 23:8 24:7,8
24:8 43:6 98:8,9
174:8 195:21 200:21
**terms** 42:3
**test** 117:25 119:25
148:14 161:22
**testified** 4:11 95:12
124:4 144:8 150:3
154:7,9 165:7,8
179:17 191:9
**testify** 7:2,5 8:2 125:9
151:15 163:9 165:16
**testifying** 8:1,10,15
154:6
**tests** 137:20
**text** 120:24 194:25
**thank** 38:11 56:19 69:2
90:6 98:12 119:2

136:8 175:15 222:5
227:1
**they'd** 172:24 184:19
**thick** 210:4
**things** 9:16,19 20:14
24:22,22 34:14 41:10
76:4 84:4,20 89:5
120:6,7 134:22
151:21 158:10 169:5
**thinks** 126:18
**third** 15:8,13,16,21,23
16:9,10,10,18,23 17:8
33:3 59:14 70:22
74:10 112:19 121:24
140:15,16 173:5
204:23
**thought** 18:13 28:19
65:17 100:4 120:6
141:21 147:23,25
149:1 150:15 151:8
151:13 152:16,17,19
153:13 157:19 200:18
214:20
**thousands** 189:17
**three** 29:15 32:11 47:18
54:8 57:3 62:24 69:2
85:10,20 101:13
110:21 119:6 127:5
128:23 131:18 142:15
142:23 172:16 173:15
176:4,23 177:20
180:18 181:4,10,12
181:15 182:18 183:5
192:7 200:5,10
216:15 223:8
**three-and-a-half** 73:6
**threw** 116:16,16
**throw** 65:25,25 110:21
**Thursday** 101:14
121:17 161:13 197:2
197:4,9
**tie** 44:1
**tied** 42:23 43:6,10
149:18
**tilt** 49:22
**Tim** 3:23 19:8 96:2,3,11
102:9,11 104:22
106:24 107:10 109:2
109:3,22 124:11
126:9,14,25 128:6
129:22 136:13 137:5
143:15,22 152:25
155:14 161:5 171:13
180:5 184:10 196:16
200:4,8,9,9 202:23
218:7 226:6
**Tim's** 113:15
**time-frame** 25:9

**timeframe** 172:10,18
**timeline** 129:16
**times** 25:18 26:20
32:13 37:2 61:1,4
62:25 65:15 67:23
78:3 88:8,19,21 89:1
132:11 154:12 158:11
164:5 176:10,14
188:24 189:2,2,14,15
189:18,20
**timing** 86:24
**tip** 139:15
**title** 19:21
**today** 4:3 12:7,18 14:8
123:23 125:9 191:9
**today's** 5:10,25 6:13
11:23 12:16 14:2
**toe** 139:15
**toed** 45:1,17
**told** 5:18 82:7,11
102:11,19 108:19
112:13 115:18 117:15
127:3 145:5,6 154:19
163:3 184:13 185:2
191:8 200:16 202:14
202:16,20 216:16,18
216:19 217:19,21
218:15
**tolerance** 66:15
**Tom** 113:12,14,22
114:17,25 115:7
116:9,12 120:5,5
121:12 122:12 123:10
125:16,17 207:3
**Tom's** 124:17
**tomorrow** 6:6 226:22
**tomorrow's** 6:1
**tools** 55:18,19,20,24
58:9
**top** 41:21 46:21 48:15
50:8 52:23 59:3 69:3
74:1,2 113:25 140:15
140:16 142:14,16,23
144:9,10,14 145:5
190:8 204:6
**topic** 57:6,22 58:1,2
**topics** 8:1,21 17:20
57:17,23 136:6
**total** 22:25 174:3
176:20 177:16
**totaled** 31:13
**totally** 35:15
**touch** 133:9
**tough** 164:20,20
**tow** 25:8 45:4 46:16,21
46:23 47:7 48:7 49:11
52:9 57:20,21 150:19
207:6 209:17

Neal R. Gross and Co., Inc.
Washington DC
(202) 234-4433
www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 245 of 249   Document 34-2

tracked 44:6
traction 192:23
train 40:13
trained 40:6,11 47:1
48:2,6,11,18 56:25
64:23 75:25 140:1,1
158:19 159:1,4 209:6
223:13
trainer 47:5
training 30:4,9,11 31:11
33:15 40:5 45:8,18,22
46:3 47:4,4,6,7,9,13
48:5,21 51:17,19
55:21 56:4,17,20
57:14,17 60:1 61:18
64:24 66:5 75:8,8
105:11 158:18 159:6
159:8 207:19
transcribing 9:9
treat 152:12 155:24
treated 144:20 145:16
156:2 212:16,17
treating 153:17
treatment 69:7 85:17
90:12,13,15 103:8,13
108:10 117:24 119:25
120:11 137:20 139:17
140:6,10,10 144:21
145:10 173:4 190:16
190:17,22,23,25
191:2,11,14 212:20
215:7
treats 76:19
trend 179:15
Tri 1:22
trip 58:12 61:5 130:22
tripped 127:3 130:20,20
131:1,2 184:11 185:9
189:21 192:9
tripping 101:2 132:11
185:4,7
trips 132:16
true 83:15 178:10
trust 68:14
trusting 68:23
truthful 11:21
truthfully 10:22,23
11:13
try 70:20 86:10 132:13
133:18
trying 42:21 45:1 49:20
61:13 142:19 154:12
Tuesday 101:13 121:25
122:11 127:1
turn 12:19 39:19 55:5,5
56:12 69:1 74:9 86:5
143:5 187:10
turned 86:18 103:6

115:23,24 124:24,25
137:23 173:20
turning 144:18 150:25
215:25
turns 178:17
tweak 65:3 77:3 105:5
105:15 107:18,20,21
108:2,13,15 109:8,11
109:14
tweaked 102:7,9 104:23
121:3 224:24
twist 153:3 160:3 161:9
163:2,6 167:5,15
169:18,23 170:4,17
187:13,14 201:11
twisted 127:6 129:5
136:14 160:4 163:3
163:12,25 167:13,15
168:7 169:21
twisting 126:10,11
128:18 134:10 138:9
154:22 159:23 163:13
163:19 171:13 180:17
two 5:13 6:10 8:22 19:1
21:21 26:11,15 28:6
29:4,5,8,8,11,14,25
30:1 32:4 33:6,7,7
37:22 54:7 59:23
61:12 70:11 76:13
92:6,7 101:4 127:5
131:17,20 132:8
144:17 154:23 163:7
168:2 173:15 176:15
177:20 179:2 180:16
181:25 182:13 186:2
197:11 203:15 206:13
two-and-a-half 19:1
type 21:8 25:3 30:8
31:3 32:19 68:7 69:19
73:14 77:1 82:24 87:4
87:16 122:12 128:5
137:16 153:1 159:6
171:25,25 173:2,3
175:22 185:21 186:17
190:3,11 212:4,11
213:8,10 214:12
215:6,12 225:9
typed 225:16
types 61:15 92:6,7
103:8 154:16
typical 199:9
typically 29:5 33:7
134:22 135:1 142:3,3
153:22 154:2,8
156:11 172:20 209:16

U

U.S 1:6 2:7 5:2

ultimate 131:19 218:17
218:18
ultimately 25:21,23
26:6,24 28:14,21
31:19 80:5 82:12,15
176:25 216:22 218:2
un- 132:3
unable 157:9
unavailable 70:17
uncheck 158:23
unchecked 153:10,24
153:25 154:3,8
156:25 161:10,24
162:9 201:24 204:19
underlying 91:6,15,25
underneath 58:16
60:24,25
understand 6:19 7:25
9:23 10:13,15,18 14:4
17:11 20:22 27:14
33:6 36:20 37:4 39:25
66:11 76:5,14 77:21
80:10 83:4,4 92:19,20
93:6,9 98:12 100:14
103:16 129:18 163:12
171:23
understanding 34:18
35:15 96:9,10 125:10
163:8 220:21
understands 7:1,3
understood 18:17
91:22 182:23
unfair 28:20 110:14
union 18:1 23:14 24:6
26:18,21 27:1 28:7,10
28:18,24,25 29:2,4
30:4,9,10,10 31:17,18
32:24 33:7,7 34:24
36:3,4,8,9,11,13 37:2
37:16,17,18 39:7,7
40:21 41:2 42:23
106:12 158:17 171:16
172:12,13 178:5,7
197:23 199:1 200:5
200:11 225:7
UNITED 1:1
unnecessary 140:24
unrecorded 10:3
unsafe 44:15,17 47:24
48:3,6,12,19,24 49:3
49:15,19,24,25 50:1
50:11,19 51:13,22
52:5,11,14 61:15
78:12,13,25 79:4,7
86:17,25 87:2,7,8,12
87:18 94:22 95:1,4,4
95:6,12,14,19,23
103:1 106:14 134:12

134:17,19 135:7
141:11 151:18,25
152:2,12,13 154:21
154:22 155:22 156:7
162:12,13 163:13,19
163:21,23 164:3
165:8 166:17 167:13
171:24 175:16,20
176:2,5,6,7,11 177:2
177:3,7,8,10,15
178:17 179:15 182:7
182:11,15 183:3
184:3,4 185:6 199:2
207:6
unsure 212:15
updated 41:16 168:15
upheld 110:19
ups 182:19,22
upset 168:20
upstairs 58:13
use 9:18 33:15 34:3
39:24 42:8 55:19,24
56:3,4 58:9 77:10,14
125:19 139:15 158:18
169:2
usual 98:19
usually 29:11 30:18
37:14 45:23 64:11
139:21
USW 38:21
utilized 120:21

V

v 1:8 4:5
Vaguely 211:1
Valley 13:5
values 31:23
Van 2:18 5:6 115:14
121:13 125:17 221:10
221:19
various 20:8 32:21
verbal 9:11,14 31:11
51:17,18 69:19
125:11 149:6 207:14
208:1,2 212:6 215:4
verbally 71:3 118:5
153:16
verbiage 73:3,4 130:16
version 3:9 72:5,10
143:18 158:9 159:4
159:22 160:22 204:18
213:23
versions 112:17
versus 62:15 76:19
120:15 122:16 144:3
217:7 218:6 219:11
vertical 193:20,20
Verus 29:14

Neal R. Gross and Co., Inc.
Washington DC
(202) 234-4433
www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 246 of 249   Document 34-2

**veteran** 32:3
**vibration** 188:11
**victim** 49:13
**video** 45:23 47:5
**view** 49:23 112:1 162:19
**viewed** 202:21
**violate** 134:9 141:7 151:7 207:8
**violated** 21:13 26:11 69:12,23 135:6 151:24
**violation** 21:8,22 23:3 23:10,19 26:12,14 35:1,3,4,5,7,7,9 36:8 42:16 73:14 135:2 141:14,17 151:2 156:12,14,17 162:11 199:1 207:4,7,12,21 207:22 208:5,6,6,10
**violations** 22:4,5,6 23:16 26:11 27:6,8 34:23 35:12,16 36:3 42:1
**Voelker** 200:8
**voice** 92:22

W

**wait** 10:1,5 62:23,23 115:21
**waiting** 215:12
**walk** 61:2 62:9 85:24 86:13 129:25 130:2 139:12,13,14
**walked** 129:23,24 159:11
**walking** 44:24 56:9 58:11 60:21 61:3 132:9 133:19 138:8 163:4 209:19
**walkways** 44:25
**wall** 25:8
**wan** 115:14
**wanted** 18:1 98:24 111:25 112:3,14 127:7 129:4 197:22 198:2 208:9
**wants** 25:22 38:18
**warning** 31:11 51:17,18 69:20 207:14 208:1,2 212:6 215:4
**warrant** 82:23 87:4 139:24
**warranted** 85:2
**wasn't** 15:19 28:20 77:6 108:23 116:18 120:8 120:8 124:5,13 127:14 129:6 132:8 133:24 137:9 147:23 147:23 149:18 150:17 150:17,18,22 151:9 151:10 153:6 164:3 169:2,3 170:14 175:5 190:16,17 192:19 202:2 214:2,21 223:12
**wasting** 22:7
**watch** 45:23 47:5
**watching** 49:1 61:11 133:9,9,11,24 134:3,4 134:7
**water** 56:10
**way** 1:23 61:6 63:13 65:18 66:1 76:19 94:15 110:23 116:17 116:22 130:14 134:21 140:22 143:4 146:16 146:20 147:6 148:2 151:9 152:17,18 154:15,16 158:10,22 163:7,12 166:4 169:25 170:3,5 176:24 177:4 187:21 190:7 199:9 217:5 218:11 221:4
**ways** 22:10
**wear** 34:24 36:8
**Wednesday** 1:12 101:14 112:20 121:22 121:25 127:2,2 197:8
**week** 17:19 54:9 86:23 111:18 224:5,23
**week-and-a-** 203:15
**weeks** 12:1 203:15 205:15
**weight** 206:3,9
**welcome** 18:2
**went** 23:5 65:15 102:15 108:9 122:3 160:7,8 162:18 173:12 183:21 186:25 189:17,19,19 200:21 214:10
**weren't** 33:25 34:4 49:1 62:11 86:7 145:17
**wet** 127:4
**whatsoever** 187:20
**whichever** 182:18
**white** 23:20 24:22,24 120:9 155:13 173:3 192:18
**width** 193:8,9,10
**wife** 12:17 194:25
**Wilz** 19:10 102:7,11,20 103:3 104:15,18,21 104:21 105:3 106:1 107:11 108:21 118:19 118:21,23 121:2 123:21 200:8 224:4,8 224:23 226:6
**Wilz's** 101:16 103:20,25 105:14
**Wisconsin** 1:1,14,23 2:21 4:20
**witness** 3:2 4:10 7:9 12:12 13:8,10 27:16 35:22 59:16,20 66:9 68:1,11,14 78:23 80:16,25 84:17,25 92:12 93:25 94:2,21 95:10 105:17 118:8 121:7 139:7 141:10 150:1 155:1,10 163:17 165:20
**witnesses** 21:8,22,22 86:11,14 130:6,7 132:13
**Woody** 40:9 194:22
**word** 27:22 132:4 146:14,18,19 147:4 153:11 154:4 158:1 208:3
**worded** 125:1 147:6 190:7 217:5
**wording** 76:24 140:20 146:20 147:7,21,21 157:7 172:13 207:2 217:2
**words** 9:10,18 76:13
**work** 20:1 22:8 29:21 36:1 42:25 53:21 55:10,18 56:3,16,24 58:7,8,20 59:8,17,25 60:2 71:20 74:8 89:3 90:24 96:14,22,24 98:25,25 101:25 104:15 108:21 128:10 135:12,13,14 148:18 156:24 179:15 182:5 198:24 210:23 223:11
**worked** 15:16,25 33:22 57:21 66:5 172:22
**worker** 97:8
**working** 14:17 17:1,2 58:15,24 59:4 60:16 60:24 97:23 127:20 161:16 207:1 209:16 211:15 222:25
**worthy** 134:16 175:13
**wouldn't** 33:25 34:3,5 52:13 68:2 76:20,23 89:11,11 153:10 156:24 162:17 192:11 206:20
**wound** 184:18
**wrap** 190:21
**wrapped** 131:11
**wrench** 66:1
**write** 21:23 98:10 99:6 99:10,11 100:8 111:20,22 151:2 182:19,22 197:1 199:6,10 202:4
**write-up** 21:9
**writing** 131:13
**written** 21:2 31:11 69:20 88:1 129:3 178:24 184:1 190:24 191:2 194:3,5 197:2 212:22
**wrong** 37:18 47:15 127:6 130:18,21 131:24 141:19 151:11 152:24
**wrote** 123:10,20 128:23 160:3,3 173:11 198:16

X

**X** 32:9 176:14
**X'd** 145:16

Y

**year** 14:10 16:11 32:3 32:11,11,16 46:3 53:14,14,15 159:1 176:2,3,15 177:15 181:23 182:12
**year-and-a-half** 19:20 177:19
**yearly** 46:3 57:7
**years** 13:17 17:15 19:1 19:1 32:10,11 53:2,2 53:5,10 57:3,4 73:5,6 127:20 128:1,10 172:16 176:15 180:16
**yell** 200:23
**yelling** 164:24
**yellow** 193:16

Z

**Zawadsky** 2:17 5:5 6:4 6:7,16,18,21,24 7:1 7:10,20 8:25 9:2 12:1 12:3,10 13:6,9,11 27:12 35:21 37:22,25 38:5,11,18 52:19 59:10,13,19 66:7 68:11 77:16 78:20 80:14,19,23 83:9 84:15,23 89:24 90:2 91:17 92:11,14,18,23 93:25 94:19 95:9

105:16 118:7,23,25
121:5 123:24 124:7
125:20 126:16,21
136:7 139:5,9 141:8
149:25 154:24 155:7
163:9,15 164:4,9,15
164:17,19,23,25
165:4,6,13,17,19,22
165:25 166:5 203:8
209:25 226:22,25
**Zeppel** 40:3,6 194:19
**zero** 32:10,15,16
172:15,17 177:23
180:24 187:20,22
212:7
**zeros** 176:24

---

**0**

**00099** 202:10
**017-C-589** 1:8
**05-30-13** 3:12

---

**1**

**1,500** 210:5
**10** 56:12 62:14,15,25
89:24 131:12 193:12
195:2 197:15,20
198:5,12
**10/18** 182:13 213:4
**10/18/12** 181:18
**10/18/2012** 182:12
**10/23** 213:4
**10/25** 181:3,17 182:13
**10:00** 15:24
**100** 25:12 33:18 45:9
46:13 120:5 129:15
210:4 225:20
**106** 3:8
**10th** 61:21
**11:00** 211:15
**11:25** 113:7
**11:45** 199:25
**111** 3:11
**114** 3:22
**11th** 221:19
**12** 69:1 100:12 101:3
**12:15** 89:18
**13** 3:8
**135** 3:8
**13th** 180:20
**14** 3:8 8:11 13:17 136:7
136:8,17,17
**143** 3:9
**15** 3:9 144:6 152:20
**15th** 220:6
**16** 3:9 136:6 160:19
**160** 3:10 90:19
**1648** 1:22

**16th** 210:20
**17** 3:10 39:19 40:15
180:12 183:8
**171** 3:10
**179** 3:23
**18** 3:11 174:22 196:9,10
**183** 3:13,13,24
**18th** 180:22 183:20
**1904** 74:1
**196** 3:11
**1995** 13:15
**19th** 39:1 182:1

---

**2**

**2** 111:7
**2:00** 29:10 125:3
**20** 32:3 41:22,23 44:11
98:18 100:21
**2009** 14:12,13 39:1 73:1
73:2
**2011** 180:8,20
**2012** 15:11 33:4 53:16
183:20 210:20 219:16
220:6 221:19
**2013** 16:11 20:22,25
27:14 39:1 55:3 57:15
72:6,11,20 73:5,19
98:2,13 100:25 112:8
112:20 180:9,9 182:1
201:22 202:7 203:14
219:14,17 222:11,17
224:3 225:8 226:16
**2014** 57:12
**2015** 57:12
**2017** 1:13
**203** 3:19
**21** 3:11 43:18 111:9
**210** 3:14
**219** 3:16
**21st** 100:11,25 101:9
**22** 2:19 43:18
**221** 3:18
**222** 3:20
**223** 3:12
**225** 3:12
**226** 3:21
**22nd** 39:1 101:9 112:20
180:9
**230** 2:8
**23rd** 72:6,20 73:19 98:2
98:13 197:3 213:1
222:11
**24** 11:7,9 22:25 23:2,7
23:25 24:7 42:15,20
43:4,13,20,23 98:5,8
98:11,14,20,24 99:8
99:13,19,24 100:1,8
101:3,6 195:18

**24th** 222:17
**25** 3:12 223:23,24
**25th** 180:23 181:6
199:25 225:8
**26** 3:12 201:22
**26th** 111:19 112:8
121:22 202:7
**29** 1:13 3:13 74:1 183:9
183:10

---

**3**

**3** 3:6 7:14 43:18
**3(b)(6)** 5:10
**3:15** 227:2
**30** 3:13 183:9,10 211:9
215:19
**30(b)(6)** 7:22 8:17,20
136:6
**30th** 224:3 226:16
**312-353-6990** 2:11
**33** 3:14 214:11 215:25
**34** 3:15 39:21 219:20,22
**34.2** 40:15,16
**35** 3:17
**37** 3:19
**38** 3:6,20

---

**4**

**4** 3:3
**40** 78:3
**42** 3:21
**44** 3:22 114:3
**45** 3:23
**47** 3:24 183:9,10

---

**5**

**5/20** 109:3
**5/21** 109:5
**5/22** 111:2
**53703** 2:21
**54** 3:7
**54904** 4:20

---

**6**

**6** 3:5,6,6 38:7,17 42:14
111:6
**6:00** 15:24
**600** 2:20
**602-229-2202** 2:22
**60604** 2:10

---

**7**

**7** 3:7 54:12
**72** 3:7
**73** 4:20
**7th** 203:14

---

**8**

**8:55** 4:2
**80** 120:6
**844** 2:9

---

**9**

**9** 3:7 71:24 75:16
**9:00** 1:23 85:7 226:22
**90** 20:1 120:7 182:18
**920-237-0336** 4:21
**920-420-0423** 4:25

Neal R. Gross and Co., Inc.
Washington DC
(202) 234-4433
www.nealrgross.com
Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 248 of 249   Document 34-2

C E R T I F I C A T E

This is to certify that the foregoing transcript

Deposition of: Scott Blair

In the matter of: Dept of Labor v DURA-FIBRE, LLC

Before: US District Court of Green Bay District, WI

Date: 11-29-17

Place: Appleton, Wisconsin

were duly recorded and accurately transcribed under
my direction; further, that said transcript is a
true and accurate record of the proceedings; and
that I am neither counsel for, related to, nor
employed by any of the parties to this action in
which this deposition was taken; and further that I
am not a relative nor an employee of any of the
parties nor counsel employed by the parties, and I
am not financially or otherwise interested in the
outcome of the action.

_____
Court Reporter

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433       WASHINGTON, D.C. 20005-3701       www.nealrgross.com

Case 1:17-cv-00589-WCG   Filed 03/08/18   Page 249 of 249   Document 34-2