2017 WL 4772411
Only the Westlaw citation is currently available.
United States District Court,
D. Minnesota.

Jonathan HALL, Plaintiff,

v.

SOO LINE RAILROAD COMPANY, d/
b/a Canadian Pacific Railway, Defendant.

Civ. No. 17–2120 (PAM/SER)
|
Signed October 19, 2017
|
Filed 10/20/2017

**Attorneys and Law Firms**

Thomas W. Fuller, Hunegs LeNeave & Kvas, Wayzata, MN, for Plaintiff.

Margaret M. Bauer Reyes, Tracey Holmes Donesky, Stinson Leonard Street LLP, Minneapolis, MN, for Defendant.

**Opinion**

### MEMORANDUM AND ORDER

Paul A. Magnuson, United States District Court Judge

**\*1** This matter is before the Court on Defendant's Motion to Dismiss. For the following reasons, the Motion is denied without prejudice.

### BACKGROUND

Plaintiff Jonathan Hall worked as a conductor at Defendant Canadian Pacific Railway ("CP")[1] for slightly more than one year. (Compl. (Docket No. 1) ¶¶ 12–13.) On October 3, 2015, Hall injured his back while working. (Id. ¶ 16.) The parties vehemently dispute the injury—both how it occurred and how serious it was. It is undisputed, however, that Hall did not report the injury to his supervisor on that day.

Hall went to the emergency room the following day, October 4, 2015. (Id. ¶ 18.) He was prescribed pain medication and the physician told him not to take certain

of the medicines while working. (Donesky Decl. (Docket No. 11) Tab A (Hall Dep.) at 164–66; see also Fuller Aff. (Docket No. 14) Ex. 10 at 8 ("[The doctor] told me to only use those [pills] on my days off.").) Hall did not report the injury to CP that day, either, and in fact he continued working. (Compl. ¶ 23.)

On October 15, Hall went to the emergency room again. (Id. ¶ 25.) The doctor prescribed additional medication and told Hall not to work temporarily. The next day, Hall visited a general practitioner, who gave Hall workers' compensation paperwork. Hall contends that he tried to call his supervisor on October 15 but did not reach him; according to Hall, he slipped the workers compensation paperwork under his supervisor's door on October 16 after his doctor's visit. (Id. ¶¶ 28–29.) Hall's supervisor, Chris Danula, did not receive the papers until October 18. (Id. ¶ 30.) Danula called Hall that day; the call was recorded and a transcription is in the record. (Fuller Aff. Ex. 10.) During the call, Hall described the injury and his medical treatment; his description of the injury conflicts with the Complaint's depiction of the injury as very minor.

CP's rules require its employees to report any injury sustained on the job "immediately." (Compl. ¶ 37 (quoting CP's Gen. Code of Operating Rules ("GCOR") 1.2.5).) Because CP did not think that Hall reported his injury immediately after he suffered it, CP scheduled a disciplinary hearing as the parties' Collective Bargaining Agreement required. (Fuller Aff. Ex. 13.) The hearing was held on November 3, 2015; Hall appeared, was represented by his union representative, testified, examined witnesses, and presented evidence. (Fuller Aff. Ex. 17; Donesky Decl. Tab Q.)[2] After the hearing, the hearing officer determined that Hall had violated GCOR 1.2.5. (Donesky Decl. Tab BB.) Another reviewer then examined the hearing officer's conclusions and the record. That reviewer determined that Hall had violated GCOR 1.2.5 and that, in light of Hall's previous disciplinary history and his short employment with CP, the appropriate punishment was dismissal. (Id.) After several other reviewers concurred in the recommendation, CP terminated Hall's employment on November 17, 2015. (Fuller Aff. Ex. 15.)

**\*2** Hall appealed his termination to CP, and that appeal was denied. Hall also filed for arbitration under the Railway Labor Act, which remains pending.

Case 1:17-cv-00589-WCG Filed 04/06/18 Page 1 of 40 Document 36-11

After the disciplinary hearing but before the decision issued, Hall also filed a complaint under the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109, with the Occupational Safety and Health Administration ("OSHA"). (Donesky Decl. Tab JJ.) OSHA investigated, and on August 8, 2016, it dismissed Hall's complaint because it found that the complaint was unsupported by reasonable cause. (Id. Tab KK.) Hall objected to the dismissal and sought a de novo hearing before an Administrative Law Judge ("ALJ"), as provided in the regulations. (Id. Tab LL.) The parties then engaged in extensive discovery, including expert discovery and multiple depositions. (See Fuller Aff. Exs. 18–20 (depositions for ALJ proceeding).)

In May 2017, Hall moved the ALJ for a partial summary decision. [3] At about the same time, CP asked the ALJ to exclude two of Hall's expert witnesses who had been disclosed after the discovery deadline passed. (Donesky Decl. Tab QQ.) On Thursday, June 15, 2017, the ALJ granted CP's motion to exclude the expert witnesses. (Id. Tab RR.) On Friday, June 16, 2017, the ALJ denied Hall's motion for partial summary determination. (Id. Tab SS.) The hearing in front of the ALJ was scheduled for Monday, June 26. But on Monday, June 19, Hall instead filed this federal lawsuit, claiming that CP violated the FRSA by retaliating against him for reporting his work-related injury.

CP now moves to dismiss. CP first asks that the Court find that Hall has waived his right to file a federal lawsuit by litigating the propriety of his termination before the ALJ. CP also contends that Hall has failed to state a claim on which relief can be granted, or in the alternative that CP is entitled to summary judgment. CP argues that pre-discovery summary judgment is appropriate because the record before the ALJ was ostensibly fully developed.

## DISCUSSION

### A. Waiver
The FRSA provides that a railroad employee challenging an employment action must pursue administrative remedies through the Department of Labor, which includes OSHA. 49 U.S.C. § 20109(d). Although this remedy is initially exclusive, the FRSA also provides a mechanism for the employee to bring a federal lawsuit:

> [I]f the Secretary of Labor has not issued a final decision within 210 days after the filing of the complaint and if the delay is not due to the bad faith of the employee, the employee may bring an original action at law or equity for de novo review in the appropriate district court of the United States ....

Id. § 20109(d)(3). An employee who receives a final decision on his administrative complaint, however, may only seek review of that decision in the Court of Appeals. Id. § 20109(d)(4).

CP asks the Court to determine that an employee who participates in the administrative review process, including engaging in discovery and motion practice, at some point waives his right to bring a lawsuit. CP points to the expenses it incurred defending the administrative action, and the prejudice it will suffer from the now two-year time period between Hall's injury and discovery in this matter. According to CP, equitable principles should bar Hall from pursuing this litigation.

**\*3** But no federal case has held that the statutory right to bring a federal suit is subject to waiver. As another Judge in this District noted, although it is

> extremely wasteful to permit a plaintiff to do what [the railroad employee] has done—that is, to pursue an administrative process almost to its conclusion ... and then start all over again in federal court[,] ... based on the plain language of § 20109(d)(3) and the weight of the case law interpreting that provision, the Court has no choice but to hold that [the employee] did not waive his right to bring this lawsuit.

Gunderson v. BNSF Ry. Co., 29 F. Supp. 3d 1259, 1262 (D. Minn. 2014) (Schiltz, J.). The plaintiff in Gunderson litigated before the ALJ for four years, including participating in a six-day evidentiary hearing and receiving an unfavorable ruling from the ALJ, before filing a lawsuit during the 10–day period between that

ruling and the date the ALJ's decision became a final order under 29 C.F.R. § 1982.114(a). Gunderson v. BNSF Ry. Co., 850 F.3d 962, 967 (2017).

CP relies solely on the Eighth Circuit's opinion in Gunderson for its argument here. See id. But Gunderson did not hold that a railroad employee can waive his federal-court rights in some circumstances. Rather, the court merely stated that it disagreed with Gunderson's argument that an employee could never waive his right to bring a lawsuit. Id. at 972. Noting that the Supreme Court has in general presumed the applicability of waiver, and that the FRSA allows for equitable remedies, "it is likely that common law principles of laches may apply to cut off an employee's right to sue, or at least to seek equitable relief, some time after the § 20109(d)(3) action accrues." Id. Thus the court did not definitively determine that waiver was appropriate in that case or any other, instead reserving the question for another day because BNSF had not developed the record on waiver before the district court. Id. Indeed, one member of the panel did not join the opinion's discussion of the waiver issue because it was "pure dicta, on an issue raised sua sponte." Id. (Colloton, J., concurring).

CP has attempted to do here what BNSF failed to do in Gunderson: develop a record of delay and prejudice. See id. (quoting Brown–Mitchell v. Kan. City Power & Light Co., 267 F.3d 825, 827 (8th Cir. 2001)). And although CP's argument is attractive, this is not the appropriate case to determine that a railroad employee can waive the right to file a lawsuit. Hall actively pursued his administrative remedies for less than a year, from the OSHA decision in August 2016 until mid-June 2017. While it is undoubtedly frustrating to spend time and money defending an administrative action, all of the discovery the parties engaged in before the ALJ hearing will be applicable to this proceeding. The discovery process here will therefore be short, reducing costs and the consequent prejudice to CP considerably. CP's Motion on this point is denied.

**B. Motion to Dismiss/Summary Judgment**
CP also contends that the Court can rely solely on the record before the ALJ to determine that Hall's dismissal was not in retaliation for engaging in protected activity under the FRSA.

**\*4** The FRSA prohibits rail carriers from retaliating against employees who engage in safety-related protected activities. 49 U.S.C. § 20109. As relevant here, the FRSA provides that a rail carrier "may not discharge ... or in any other way discriminate against" an employee for, lawfully and in good faith, reporting a workplace injury. Id. § 20109(a)(4). To prove unlawful retaliation, the employee must show that (1) he engaged in a protected activity, (2) the rail carrier knew that he engaged in that activity, (3) he suffered an adverse employment action, and (4) the circumstances raise an inference that the protected activity was a "contributing factor" in the adverse employment action. See id. § 20109(d)(2)(A)(i); 29 C.F.R. § 1982.104(e)(2). Even if the employee makes that showing, the rail carrier may avoid liability by furnishing "clear and convincing evidence" that it would have taken the same adverse employment action regardless of any protected activity. 29 C.F.R. § 1982.104(e)(4).

CP contends that the "contributing factor" requirement means more than "but-for" causation. But while the employee "must demonstrate more than a mere factual connection between his injury report and his discipline," he need not "conclusively demonstrate [the company's] retaliatory motive to establish a prima facie case." Heim v. BNSF Ry. Co., 849 F.3d 723, 727 (8th Cir. 2017). Rather, the employee "must demonstrate that [the company's] discipline was, at least in part, intentional retaliation prompted by his injury report." Id. Even the case CP relies on most heavily describes the "contributing factor" standard as "lenient." Kuduk v. BNSF Ry. Co., 768 F.3d 786, 792 (8th Cir. 2014).

FRSA requires an employee to show that the employee intended to retaliate against him because he reported an injury. But an employee need not demonstrate that retaliation was the only motive, and in any event the existence of a retaliatory motive is necessarily record-specific. See BNSF Ry. Co. v. U.S. Dep't of Labor Admin. Review Bd., 867 F.3d 942, 947 (8th Cir. 2017) ("[I]ntentional discrimination may be inferred 'from evidence the falsity of the employer's explanation.") (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000)).

In this case, CP's rules require that an injured employee file an injury report "immediately" and thus any discipline for violating this rule will almost by definition be caused by the filing of an injury report. There is therefore

no question that Halls' termination was caused by the filing of his injury report. The question is whether CP retaliated against him for reporting that he was injured, or legitimately disciplined him for failing to comply with CP's rules. All of these issues depend on an evaluation of the facts in the record, and Hall insists that the record is not as fully developed as CP contends. For example, in this proceeding Hall will likely be allowed to present expert testimony, which is missing from the administrative record due to the ALJ's determination that Hall's expert designations were untimely. If Hall's evidence is insufficient as a matter of law to establish his prima facie case, CP can move for summary judgment at that time.

The determination that summary judgment is premature is not, however, an invitation for the parties to engage in extensive discovery in this matter. Both parties have taken multiple depositions and engaged in document production. There is no need to reinvent the wheel in this proceeding. The Court expects any scheduling order to reflect a greatly truncated discovery schedule, so that this dispute, which has already been litigated for two years, can be resolved.

**CONCLUSION**

CP has not established that Hall waived his right to bring this lawsuit, nor has it established that summary judgment on his FRSA is appropriate at this stage of the litigation. Accordingly, **IT IS HEREBY ORDERED that** the Motion to Dismiss and/or for Summary Judgment (Docket No. 7) is **DENIED without prejudice**.

**All Citations**

Slip Copy, 2017 WL 4772411

Footnotes

1   Plaintiff's actual employer was Dakota, Minnesota & Eastern Railroad Corporation d/b/a Canadian Pacific Railway, not Defendant Soo Line Railroad Company.

2   Plaintiff's attorney's affidavit contains only the first two pages of the hearing transcript. Defendant's attorney's declaration contains the entire transcript.

3   Neither party included this motion in the supporting documents provided to the Court.

**End of Document**                         © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:17-cv-00589-WCG   Filed 04/06/18   Page 4 of 40   Document 36-11

Short v. Springfield Terminal Railway Company, Slip Copy (2017)

2017 WL 3203391, Fed. Carr. Cas. P 84,883

2017 WL 3203391
United States District Court,
D. Maine.

Derek SHORT, Plaintiff
v.
SPRINGFIELD TERMINAL
RAILWAY COMPANY, Defendant

CIVIL NO. 2:16-CV-74-DBH
|
Signed 07/26/2017

**Attorneys and Law Firms**

David S. Sherman, Jr., Drummond Woodsum, Portland,
ME, Marc Wietzke, Flynn & Wietzke, PC, Garden City,
NY, for Plaintiff.

Glen L. Porter, Eaton Peabody, Bangor, ME, Jason C.
Barrett, Eaton Peabody, Ellsworth, ME, for Defendant.

**Opinion**

### DECISION AND ORDER ON DEFENDANT'S
### MOTION FOR PARTIAL SUMMARY JUDGMENT

D. Brock Hornby, United States District Judge

**\*1** There is one central issue in this partial summary
judgment motion on Count I. Can employer initiation
of disciplinary proceedings under a collective bargaining
agreement—where the ultimate outcome is no discipline
—ever amount to "adverse action" under the Federal
Railroad Safety Act's prohibition of discrimination
against whistle-blowers? I conclude that the question here
is for the jury and **DENY IN PART** the Railway's motion
for partial summary judgment on Count I.

For purposes of the motion, the following facts are
undisputed. The plaintiff Short, a trackman, injured his
knee at work, but did not report it that day, contrary
to an Employee Safety Rule that requires immediate
notification. [1] Def.'s Statement of Material Fact (SMF)
(ECF No. 33) ¶¶ 11-14; Pl.'s Opposing Statement of
Material Fact (OSMF) (ECF No. 37) ¶¶ 11-14, 49-53;
Def.'s Reply to Pl.'s OSMF (ECF No. 42) ¶ 3. He reported
it around 6 A.M. the next day when he went to his
doctor rather than to work. The day after that, Springfield

Railway Terminal Corporation, his employer, served on
him a Notice of Hearing that said it was being issued:

> to develop the facts and place your
> responsibility, if any, in connection
> with the incident(s) outlined below:
> On Wednesday, October 29, 2014,
> at approximately 0605 hours, you
> informed your supervisor, Jason
> Beaudry, that you were involved in
> an accident that occurred on the
> property on Tuesday, October 28,
> 2014, between 1500 hours and 1530
> hours, while you were performing
> your duties as a Trackman in crew
> # 2723, while dumping rocks on the
> mainline at or around MP 140.

Def.'s SMF ¶ 15; Pl.'s OSMF ¶ 15. In Count I of
his Complaint, (ECF No. 1) ¶ 25, Short alleges that
reporting his injury was protected activity under the
Federal Railroad Safety Act, 49 U.S.C. § 20109. The
Railway has not challenged that assertion in its summary
judgment motion. Short also alleges that the Railway

> took adverse or unfavorable actions
> against the plaintiff in whole or
> in part due to plaintiff's protected
> activities when it charged plaintiff
> with company rule violations in
> connection [sic], denied him work
> opportunities and denied him
> promotion opportunities as a result
> of the protected activity.

Compl. (ECF No. 1) ¶ 27. The railroad agrees that if
"the hearing process reveals that a rule violation occurred,
appropriate discipline is assessed." Def.'s Mot. for Partial
Summ. J. (ECF No. 32) at 7. But here, the ultimate
outcome was a decision that Short had not broken the
rule, and his employment record was cleared.

In responding to the motion for summary judgment,
Short has not addressed the Railway's assertions that
no work or promotion opportunities were forfeited and
that late payment for his hours attending the hearing
was inadvertent, and I treat those claims of alleged
retaliation as waived. The only issue, therefore, is whether
initiation of the unsuccessful discipline charge can support
the claim. Since the Railway has moved for summary

Case 1:17-cv-00589-WCG   Filed 04/06/18   Page 5 of 40   Document 36-11

Short v. Springfield Terminal Railway Company, Slip Copy (2017)

2017 WL 3203391, Fed. Carr. Cas. P 84,883

judgment on that issue alone, I assume for purposes of the motion that Short can demonstrate that the Railway initiated the disciplinary proceedings *because* Short engaged in protected activity.

**\*2** The FRSA provides that a railroad carrier

> may not ... discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done ... (4) to notify ... the railroad carrier ... of a work-related personal injury....

49 U.S.C. § 20109(a). The Supreme Court interpreted similar language in Burlington Northern & Santa Fe Railway Co., 548 U.S. 53 (2006). There the Court interpreted anti-retaliation language in Title VII of the Civil Rights of 1964 that makes it "an unlawful employment practice for an employer to discriminate against any of his employees" because he has engaged in protected activity. Id. at 62. The Court held that the language "covers those (and only those) employer actions that would have been materially adverse to a reasonable employee ... [T]he employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. at 57. I apply the principles of Burlington Northern given the parallel ("discriminate against") language in the FRSA. [2]

The question, then, is whether a jury may find that the proceedings here, although they ultimately resulted in no discipline, could dissuade a reasonable railway employee from engaging in protected activity. [3] After being served, Short attended "a pre-discipline investigation hearing" on November 20. Def.'s Mot. (ECF No. 32) at 7; Def.'s SMF (ECF No. 33) ¶ 17; Pl.'s OSMF (ECF No. 37) ¶ 17. Two weeks later the Railway's then-Vice President of Engineering notified Short that he had violated a Company rule and would receive "two days of without pay as discipline." Def.'s SMF (ECF No. 33) ¶ 18; Pl.'s OSMF (ECF No. 37) ¶ 18. Short appealed the finding and discipline. Railway management and the Union General Chairman discussed the appeal. The upshot was that the rule violation finding was vacated, all discipline was withdrawn, and Short's employee record was completely expunged of any reference to the issue. According to the Railway's superintendent of engineering, employees are "definitely" justified in being nervous when they have to attend such a hearing and there is always the potential of being fired. Pl.'s OSMF (ECF No. 37) ¶ 68; Def.'s Reply (ECF No. 42) ¶ 3. And, said the Railway's former Vice President of Engineering, "[u]ntil an employee received the letter stating the outcome of the hearing, he was justified in being concerned." Pl.'s OSMF (ECF No. 37) ¶ 97; Def.'s Reply (ECF No. 42) ¶ 3.

**\*3** The Railway characterizes all this activity as "simply conducting an investigation" that "cannot be an adverse action," Def.'s Mot. (ECF No. 32) at 13. But I conclude that a jury might reasonably find that this treatment and process, although they ultimately came to naught, "could well dissuade a reasonable worker from" engaging in the protected activity of reporting an injury. Burlington Northern, 548 U.S. at 57. True, courts in Title VII cases have sometimes concluded that investigations resulting in no discipline were *under the circumstances* too trivial for any reasonable jury to find material adversity in Burlington Northern's sense. See, e.g., Tepperwein v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 569-70 (2d Cir. 2011). Ultimately, though, under Title VII and the FRSA alike, material adversity is a question of fact for the jury so long as a reasonable jury could answer it either way; Burlington Northern itself contemplates a jury decision. 548 U.S. at 69-70 (explaining what "a reviewing court or jury" would need to focus on under the material adversity standard).

I respectfully disagree with the district court's decision in Brisbois v. Soo Line Railroad Co., 124 F. Supp. 3d 891 (D. Minn. 2015), that even after Burlington Northern, it can never be an adverse action when "a rail carrier attempts to determine whether [an employee] has violated a rule—typically by following an investigatory process mandated under a CBA...." Brisbois, 124 F. Supp. 3d at 903. Each case is different, and each disciplinary treatment is different. Brisbois distinguishes being *accused* of violating a rule and being *disciplined* for violating the rule. But I conclude that if, as is the case here, a reasonable jury may find the Railway's motivation bad, [4] and may find that a reasonable employee would be deterred from engaging in protected activity by the treatment that goes along with the accusation, then summary judgment is inappropriate for the question of material adversity. [5] The Department of Labor's Administrative Review Board has reached the

same result. Vernace v. Port Auth. Trans-Hudson Corp., ARB Case No. 12-003, ALJ Case No. 2010-FRS-018, 2012 WL 6849446, at *1 (ARB Dec. 21, 2012).[6] (I do not rely on Vernace, either pursuant to Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), or the First Circuit's willingness to sometimes find the ARB's "interpretation[ ] persuasive." Worcester v. Springfield Terminal Ry. Co., 827 F.3d 179, 183 (1st Cir. 2016).)

**\*4** Accordingly the defendant's motion for summary judgment is **DENIED** except as to the claims of denied work / promotion opportunities and delayed payment for time spent at the hearing, as to which it is **GRANTED.**

**SO ORDERED.**

**All Citations**

Slip Copy, 2017 WL 3203391, Fed. Carr. Cas. P 84,883

Footnotes

1    The reason for his failure—he says he did not realize he had injured it until the next day—is not material at this stage.

2    I recognize that several lower court Title VII decisions grant summary judgment in an employer's favor on the basis that "investigating" an employee does not amount to adverse action. See, e.g., Kuhn v. Washtenaw Cty., 709 F.3d 612, 625-26 (6th Cir. 2013). Nonetheless, "context matters," Siegner v. Township of Salem, 654 Fed.Appx. 223, 232 (6th Cir. 2016) (quoting Burlington Northern), and for the reasons stated in text I am satisfied that the actions the Railway took in this case present a jury issue.

3    The Railway argues from the FRSA's statutory language that the mere initiation of disciplinary proceedings cannot, as a matter of law, constitute discrimination under subsection (a) of 49 U.S.C. § 20109. A separate provision of the same statute, subsection (c)(2), defines prohibited "discipline" against employees seeking or complying with medical treatment to include "bring[ing] charges against a person in a disciplinary proceeding...." 49 U.S.C. § 20109(c)(2). Since that definition of "discipline" applies only "[f]or the purposes of this paragraph," the argument goes, Congress cannot have meant subsection (a) also to prohibit retaliatory investigative proceedings. I disagree. Congress added subsection (c) to the Act a decade ago in order to strengthen promotion of railroad safety. See, e.g., Jones v. Illinois Cent. R.R. Co., CA No. 15-635, 2015 WL 5883030, at *6 (E.D. La. Oct. 8, 2015) (interpreting subsection (c)(1) but recounting legislative history pertinent to all of subsection (c)); Santiago v. Metro-North Commuter R.R. Co., ARB Case No. 10-147, ALJ Case No. 2009-FRS-011, 2012 WL 3164360, at *8-9 (ARB July 25, 2012). Although subsection (a) and subsection (c)(2) are both anti-retaliatory in nature, the latter was added to supplement the Act's already-existing anti-retaliatory measures in the name of greater safety, and there is no reason to think it should instead be interpreted to constrain the meaning of "discriminate" in the former.

4    The Railway says that the investigation and hearing process were required by its collective bargaining agreement, and Brisbois v. Soo Line Railroad Co., 124 F. Supp. 3d 891, 903 (D. Minn. 2015) suggests that simply adhering to such an agreement cannot amount to an adverse action. But the collective bargaining agreement only requires the investigation and hearing process be adhered to *in order* to discipline an employee. Def.'s SMF (ECF No. 33) ¶ 4-6 & Ex. B-1; Pl.'s OSMF (ECF No. 37) ¶ 4-6. A jury could still find a retaliatory motivation behind the decision to initiate the disciplinary process in the first place. An investigation and hearing are necessary for legitimately imposed discipline, but not by themselves sufficient to defeat an allegation of adverse action.

5    Unlike the defendant, I do not find pertinent Judge Posner's "by the way" paragraph in Koziara v. BNSF Railway Co., 840 F.3d 873, 878 (7th Cir. 2016):

    by the way there is nothing sinister, as the term "initiating event" may seem to suggest, in deeming the submission of an injury report a proper occasion for an employer's conducting an investigation. An injury report is a normal trigger for an investigation designed to uncover facts that can prompt corrective action that will reduce the likelihood of a future injury.

    In Koziara the determination was that the injury report was not the proximate cause of the employee's termination for theft. The case did not address the issue of what is adverse action. Heim v. BNSF Railway Co., 849 F.3d 723 (8th Cir. 2017), cited by the defendant, also was a causation case, not an adverse action case.

6    In interpreting the parallel Wendell H. Ford Aviation Investment and Reform Act, the Administrative Review Board concluded that the statute was more protective than Title VII's ban on retaliation as interpreted in Burlington Northern. Williams v. American Airlines, Inc., ARB Case No. 09-018, ALJ Case No. 2007-AIR-004, 2010 WL 5535815, at *8 (ARB Dec. 29, 2010). While trivial actions with de minimis harm should be excluded, the ARB said that any act of "deliberate

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.                    3

**Short v. Springfield Terminal Railway Company, Slip Copy (2017)**

2017 WL 3203391, Fed. Carr. Cas. P 84,883

retaliation" should be covered "without any expressed limitation to those actions that might dissuade the reasonable employee." Id.

---

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 733279
United States District Court,
E.D. Michigan, Southern Division.

Jacob WAGNER, Plaintiff,
v.
GRAND TRUNK WESTERN
RAILROAD, Defendant.

Case No. 15-10635
|
Signed 02/24/2017

**Attorneys and Law Firms**

David A. Kotzian, Donald J. Gasiorek, Gasiorek, Morgan, Greco, McCauley & Kotzian, PC, Farmington Hills, MI, Nicholas D. Thompson, James H. Kaster, Nichols Kaster, Attorney at Law, Minneapolis, MN, for Plaintiff.

William B. Balke, Rachel M. Enoch, Littler Mendelson, P.C., Detroit, MI, Joseph D. Weiner, Littler Mendelson, P.C., Minneapolis, MN, for Defendant.

**Opinion**

### OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT 45)

TERRENCE G. BERG, UNITED STATES DISTRICT JUDGE

### I. INTRODUCTION

**\*1** This is a workplace retaliation case. Plaintiff Jacob Wagner alleges that Defendant Grand Trunk Western Railroad retaliated against him in violation of the Federal Railroad Safety Act, 49 U.S.C. § 20101 et. seq., ("FRSA") by suspending him for 15 days because he reported an on-the-job injury. Defendant argues that it disciplined Plaintiff for not wearing the proper safety equipment, and that the evidence in this case is so clear that the Court must enter summary judgment in Defendant's favor. For the reasons outlined below, Defendant's motion is **DENIED**.

### II. BACKGROUND

In December of 2011, Plaintiff cut his finger on sheared metal siding because he handled the siding without wearing gloves. Dkt. 45, Pg. ID 1160. Plaintiff and his co-workers were repairing a garage door using barn-seam siding. Dkt. 45, Pg. ID 1159. When the day began, Plaintiff was working outside in the cold rain and was wearing gloves, but took off the gloves after moving inside because his hands were going numb. Dkt. 47, Pg. ID 1602. Once inside he noticed a piece of barn-seam siding sitting in a walkway and went to move it to prevent an accident. Dkt. 45-2, Pg. ID 1223. What he did not notice was that the siding had been sheared, making its edges sharper than normal. Dkt. 47-2, Pg. ID 1703. He picked up the siding with his bare hands, his grip slipped, and a sharp edge cut his finger. Dkt. 47-2, Pg. ID 1800.

Plaintiff reported his injury to his foreman and went to the hospital to get stitched up. Dkt. 47-2, Pg. ID 1802. He returned to work the same day, and detailed what had happened in a "Report of Personal Injury or Occupational Illness." Dkt. 47-2, Pg. ID 1845; Dkt. 1-4. The Report triggered an investigation, where Defendant inquired whether Plaintiff had violated any workplace safety rules. Dkt. 45, Pg. ID 1161. Under the collective bargaining agreement in place, if after the investigation Defendant concluded that Plaintiff had violated one or more rules, a hearing was required before Defendant could impose any discipline. Dkt. 45, Pg. ID 1161. Defendant believed that Plaintiff had violated the company's safety rules and sought to discipline him, and so a hearing took place in January of 2012. Dkt. 45, Pg. ID 1162. Lawrence Wizauer, an Operations Supervisor for Defendant who presided over the hearing, concluded that Plaintiff had violated multiple rules, and as a result Defendant suspended Plaintiff from work for 20 days, but called him back to work after he had served 15 days of the suspension. Dkt. 45, Pg. IDs 1162-1164.

Plaintiff challenged the penalty by filing a complaint with the Secretary of Labor, by way of the Occupational Safety and Health Administration ("OSHA"), pursuant to § 20109(d)(1) of the FRSA. Dkt. 45, Pg. ID 1167. OSHA found reasonable cause to believe that Defendant violated the FRSA, and awarded damages to Plaintiff. Dkt. 47, Pg. ID 1601. Defendant objected to OSHA's ruling and requested a hearing before an Administrative Law Judge. Dkt. 45-2, Pg. ID 1485. A hearing was scheduled, and in preparation the parties took discovery. Dkt. 45, Pg. ID 1167. The parties presented evidence at the hearing, and the ALJ ultimately found for Defendant. Dkt. 45, Pg. ID 1167. Plaintiff appealed to the Appeals Review Board (ARB), Dkt. 12-2 Pg. ID 640, but then filed a notice of

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 1

intent to file suit in federal court and did so in February of 2015. Dkt. 1. After receiving a copy of Plaintiff's federal complaint, the ARB dismissed Plaintiff's appeal. Dkt. 12-2 Pg. ID 676.

**\*2** Plaintiff raises a single count of retaliation for engaging in protected activities under the FRSA, 49 U.S.C. § 20109(d)(1). Dkt. 1. Plaintiff alleges that he participated in protected activity in three ways (1) by reporting his injury to his foreman; (2) by submitting an injury report to Defendant; and (3) by refusing to waive his right to a hearing. Dkt. 1, Pg. ID 13. He also alleges that Defendant retaliated against him in three ways: (1) by suspending him; (2) by increasing the severity of his discipline after he refused to waive his right to a hearing; and (3) by deeming him a "needs improvement" employee. Dkt. 1, Pg. ID 13. Defendant has moved for summary judgment, Dkt. 45, which Plaintiff opposes. Dkt. 47. Following full briefing, the Court held oral argument on November 14, 2016.

### III. ANALYSIS

#### A. Standard of Review

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

"As the moving parties, the defendants have the initial burden to show that there is an absence of evidence to support [plaintiff's] case." *Selhv v. Caruso*, 734 F.3d 554 (6th Cir. 2013); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party " 'may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a

genuine issue for trial.' " *Ellington v. City of E. Cleveland*, 689 F.3d 549, 552 (6th Cir. 2012) (citing *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009)).

#### B. Discussion

In 1970, Congress enacted the FRSA, a statutory scheme intended to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 347 (2000) (quoting 49 U.S.C. § 20101). The original version did not prohibit railroad carriers from retaliating against employees, but Congress amended the Act in 1980 to include an anti-retaliation provision. *See* Federal Railroad Safety Authorization Act of 1980, Pub. L. 96-423, § 10, 94 Stat. 1811 (1980); *Norfolk S. Ry. Co. v. Perez*, 778 F.3d 507, 509-10 (6th Cir. 2015). After a series of additional amendments, the FRSA now prohibits a railroad carrier from discharging, demoting, suspending, reprimanding, or in any other way discriminating against an employee because the employee reports a workplace injury. *See Ortiz v. Grand Trunk W. R.R. Co.*, 2014 U.S. Dist. LEXIS 132666, at \*14 (E.D. Mich. 2014) (citing 49 U.S.C. § 20109(a) and *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 156 (3d Cir. 2013)).

The FRSA incorporates the burden-shifting approach applicable to whistleblower claims arising under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR-21"). 49 U.S.C. § 42121(b)(2)(B)(i)-(ii). Thus, to prevail on a FRSA retaliation claim, an employee must show that "(1) he engaged in protected activity; (2) the employer knew that he engaged in protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable personnel action." *See Ortiz*, 2014 U.S. Dist. LEXIS 132666, at \*15-16. "The employee bears the initial burden, and must show 'by a preponderance of the evidence that protected activity was a contributing factor in the adverse action alleged in the complaint.' " *Id.* Once Plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the employer to demonstrate "by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of that behavior." *Id.*

**\*3** Here, Defendant argues that it is entitled to summary judgment for two reasons. First, Defendant submits that there is no genuine issue of material fact concerning whether Plaintiff's injury report was a contributing factor

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

in Defendant's decision to suspend Plaintiff, and that no reasonable jury could find that Plaintiff has made a *prima facie* case that the report was a contributing factor. Dkt. 45, Pg. IDs 1168-1173. Second, Defendant submits that the evidence also would require a jury to find that Defendant would have suspended Plaintiff even if he had not reported his injury report. Dkt. 45, Pg. IDs 1173-1176. The Court considers each argument in turn.

### 1. Plaintiff's *prima facie* showing

In challenging Plaintiff's ability to make his *prima facie* case of retaliation, Defendant argues only that Plaintiff's injury report was not a contributing factor to Defendant's decision to suspend him. Dkt. 45, P. IDs 1168-1173. Thus the first three prongs of Plaintiff's *prima facie* case are uncontested: Plaintiff filed an injury report, Defendant knew that he filed it, and Defendant suspended him. The contributing-factor prong is all that remains. How the Court should analyze that prong, however, is uncertain; the Sixth Circuit has yet to confront the contributing-factor analysis head on, and the other circuits are split on the issue.

The Third Circuit was the first to address the contributing-factor analysis as applied under the FRSA. In *Araujo v. New Jersey Trans. Rail Operations, Inc.*, the Third Circuit adopted the definition of a "contributing factor" from the Federal Circuit's opinion in a Whistleblower Protection Act case (which uses the same burden-shifting framework as the FRSA): "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." 708 F.3d 152 (3d Cir. 2013) (quoting *Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993)).

The Sixth Circuit adopted *Araujo*'s definition in *Consolidated Rail Corp. v. United States Dep't of Labor*, but then concluded that in its case there was "substantial evidence that *animus* was a contributing factor" in the plaintiff's termination. 567 Fed.Appx. 334, 338 (6th Cir. 2014). Importantly, in *Consolidated Rail* the Sixth Circuit was not asked to clarify the scope of the term "contributing factor," so it did not hold that showing some form of retaliatory animus was the only way to meet the factor.

The Eighth Circuit referenced *Consolidated Rail* when noting that "the contributing factor that an employee must prove is intentional retaliation prompted by the employee engaging in protected activity," but did so in its discussion of whether the employer had knowledge of the employee's protected activity. *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014).

Finally, the Seventh Circuit recently departed from *Araujo* completely, and instead adopted a proximate cause standard. *Koziara v. BNSF Railway Co.*, 2016 WL 6407246 at *4 (7th Cir. 2016).

Defendant relies on *Araujo*, *Consolidated Rail*, and *Kuduk* as authority for the proposition that Plaintiff "must demonstrate retaliatory animus." Dkt. 45, Pg. ID. 1170. Plaintiff disagrees, and responds that the test is the same under both *Araujo* and *Consolidated Rail* and does not change based on *Kuduk*'s reference to *Consolidated Rail*. Dkt. 47, Pg. ID. 1608-1611.

Plaintiff is correct. In *Consolidated Rail* the Sixth Circuit did not define the contributing-factor test's contours: it did not definitively say what kind of proof an employee must present to establish that a protected activity was a contributing factor to an allegedly retaliatory employment action. And *Kuduk*'s use of the term "intentional retaliation" came in its discussion of whether the plaintiff could even show that the defendant had knowledge of the plaintiff's protected activity. In other words, the point that the *Kuduk* court was making was that an employee's protected activity must be known to the employer for the activity to contribute to the employer's decision. The state of the law in this Circuit is not sufficiently clear to conclude that Plaintiff *must* provide evidence of discriminatory animus to meet the contributing factor prong of his *prima facie* showing. But even if Plaintiff had to make that showing, the genuine issues of fact in this case are sufficient to permit a jury to find discriminatory animus and then conclude that Plaintiff has made its *prima facie* showing on the contributing-factor prong.

**\*4** An employee can demonstrate that his protected activity was a contributing factor in his employer's adverse employment decision through either direct or circumstantial evidence. Neither party argues that there is direct evidence in the record, so the Court must look for circumstantial evidence.

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Courts have referenced the following categories of proof as examples of circumstantial evidence that a protected activity was a contributing factor to a negative employment action:

# Temporal proximity;

# Indications of pretext;

# Inconsistent application of an employer's policies;

# Shifting explanations for an employer's actions;

# Antagonism or hostility toward a complainant's protected activity;

# Falsity of an employer's explanation for the adverse action taken; and

# Change in the employer's attitude toward the complainant after he engages in protected activity

*Kuduk v. BNSF Ry. Co.*, 980 F. Supp. 2d 1092, 1101 (D. Minn. 2013). Here, Plaintiff has shown indications of pretext sufficient to permit a reasonable jury to find that he has made a *prima facie* showing that his injury report contributed to Defendant's decision to suspend him.

### a. Indications of Pretext

"A plaintiff can demonstrate pretext by showing that the employer's proffered reason for the adverse action (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 513 (6th Cir. 2016) (citations omitted).

Defendant argues that Plaintiff can make no showing of pretext, and provides two reasons for support. First, Defendant submits that it has consistently explained and demonstrated that it was Plaintiff's failure to wear gloves that caused Defendant to suspend him. Dkt. 45, Pg. ID 1170. Second, Defendant submits that it once disciplined another worker for using a chainsaw without wearing chaps, even though that worker did not report an injury. Dkt. 45, Pg. ID 1170.

In response, Plaintiff argues that the safety rules, on their face, do not prohibit his conduct; they say that gloves "may be required" rather than making gloves mandatory. Dkt. 47, Pg. IDs 1604, 1612. Plaintiff submits that he had discretion to decide whether to wear gloves, and that these two reasons, alone, would permit a reasonable jury to find pretext, and from that, to infer that his reporting an injury was a contributing factor. Dkt. 47, Pg. ID 1612.

Defendant replies that Plaintiff's position "strains credulity" because the rules state that "gloves may be required when lifting and carrying certain materials" and "provide employees some discretion," but "common sense dictates" that he should have been wearing them. Dkt. 45, Pg. IDs 1170-1171. Defendant submits that "permissive language does not allow an employee to check common sense at the door and plead ignorance of his responsibility to wear proper PPE for the task at hand." Dkt. 45, Pg. ID 1171. And Defendant further contends that the rules prohibited Plaintiffs conduct because "there is no doubt gloves must be worn when working with razor-sharp metal"—indeed, Defendant makes the bold statement that "[t]he rule is clear: wear gloves when handling dangerous material." Dkt. 48, Pg. ID 2271.

**\*5** Defendant's arguments are unavailing. Here is the relevant rule chart:

| Engineering General PPE Requirements | Hearing Protection | Gloves | Rubber Gloves | Goggles | Faceshield | Shin Guards | Respiratory Protection Contact Safety Department |
|---|---|---|---|---|---|---|---|
| R = Required equipment  X = May be required based on task and materials  ✓ = Recommended additional equipment | | | | | | | |
| Chop saw | R | R | | | R | | |
| Cleaning agents: spraying/general use | | X | X | X | X | | X |
| Climbing equipment | | R | | | | | |
| Climbing poles and rail/work equipment | | R | | | | | |
| Cut-off disks, saws, or other tools with carbide bits | R | R | | | R | | |
| Cutting rivets, bolts, or cotter keys; splitting nuts; etc. (mechanically) | R | R | | | R | | |
| Cutting rivets, bolts, or cotter keys; splitting nuts; etc. (mechanically with torch) | R | R | | R | | | |
| Dusty conditions | | | | | | | X |
| Electrical hazard | | X | | | | | |
| Electrical welding | R | R | | | | | X |
| Gas welding, cutting, or heating | X | R | | | | | X |
| Hammer-punch | R | R | | | | | |
| Hand tools | X | X | | | | | |
| Intermodal facility, outside of offices | R | X | | | | | |
| Lifting and carrying | | X | | | | | |
| Machining steel, iron, or other metals | R | R | | | X | | |
| MIG/TIG welding | R | R | | | | | X |

Dkt. 45-2, Pg. ID 1437.

As shown in the key in the upper left-hand corner, there are three options: "R" (Required equipment); "X" (May be required based on task and materials) and "¶#" (Recommended additional equipment). The third row from the bottom references the task description at issue here. For there to truly be "no doubt" that Plaintiff needed to wear gloves when lifting and carrying the sheared metal, there should be an "R" in the "Gloves" column. But there is an "X" there, indicating that gloves may (or may not) be required based on the task and materials. This rule seems to leave the worker and his foreman some discretion.

To be sure, the rules are not a model of clarity. In stating gloves "may be required," the rules leave open the question of how a worker should know when gloves are or are not required in any given situation, or who makes that call. Defendant has not identified any additional rule that tells employees how to determine whether something *might be* required actually *is* required. Instead, Defendant points to "common sense." Dkt. 45, Pg. ID 1171. But Defendant cannot, with the benefit of hindsight, rely on a combination of an ambiguous rule ("may be required")

and an even more ambiguous concept ("common sense") to obtain summary judgment.

Defendant's second argument is that in the past it disciplined another employee for not wearing protective equipment even where that employee did not report any injury. Defendant suggests that this shows that Plaintiff's injury report could not have been a contributing factor in its decision to discipline him because safety is so important that the company disciplines failure to wear protective gear as a matter of course—not in retaliation. But the example Defendant relies upon is quite different from Plaintiff's experience; operating a chainsaw without chaps is not the same as picking up siding without gloves. The activities are different (power sawing v. lifting metal), and so are the types of personal protective equipment that Defendant claims must be worn (chaps v. gloves). Defendant cannot rely on a prior unrelated incident involving a different activity and different allegedly required [1] protective equipment to overcome the uncertainty of whether, on these facts, Plaintiff's injury report contributed to Defendant's decision to impose discipline. This argument is also insufficient for Defendant to win summary judgment.

**\*6** In short, whether the safety rules required Plaintiff to wear gloves when picking up the barn-seam siding is an issue of material fact. Taking the evidence in the light most favorable to Plaintiff, a reasonable jury could find that the rule, given its less than clear language, did not *require* Plaintiff to wear gloves. Further, the jury could determine that Plaintiff had discretion to wear gloves depending on his assessment of the safety risk in view of the task and materials. Therefore, the jury could conclude that Plaintiff did not violate any safety rules, [2] meaning Defendant's proffered reason for suspending Plaintiff (violating the rules) had no basis in fact and was insufficient to warrant suspension (because Plaintiff didn't violate them). If the jury reached such a conclusion, it could also conclude that Plaintiff made out a *prima facie* showing that his injury report contributed to Defendant's decision to suspend him.

**2. Defendant's burden to show by clear and convincing evidence that it would have imposed the same discipline on Plaintiff even if he had not reported his injury**

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

5

As noted above, if Plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the employer to demonstrate "by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of that behavior." *See Ortiz*, 2014 U.S. Dist. LEXIS 132666, at *15-16. Defendant argues that there is no genuine issue of fact as to whether it has established by clear and convincing evidence that it would have suspended Plaintiff absent his report, and offers as support 16 reasons:

1. Defendant disciplined Plaintiff twice before for rule violations

2. Defendant disciplined another employee for failing to wear chaps while using a chainsaw, and this employee had not reported an injury

3. Twelve of the 14 reported injuries in the department where Plaintiff worked resulted in no discipline

4. A third employee who violated a rule by using accelerants in a fire and caused an explosion admitted responsibility for the violation and received discipline

5. That third employee later reported an injury from a separate incident and received no discipline

6. The two other employees who Defendant disciplined received the discipline because of clear rule violations

7. Plaintiff is the only employee in the his department to receive discipline for two rule violations in a two-month period, and for three rule violations in a three-year period

8. All of Plaintiff's discipline stemmed from the same type of rule violation: rushing the activity

9. Defendant's policies prohibit a supervisor from disciplining an employee for getting injured

10. It is important to have safety rules

11. Defendant wants accurate injury reporting so it can improve its safety plans to better protect its employees

12. Had Plaintiff's foreman seen Plaintiff's violation, he would have disciplined Plaintiff regardless of injury

13. Plaintiff has faced no animosity or ill treatment since the report

14. It is important for Defendant to focus on minor rule violations so those violations don't compound and create a major risk of harm

15. Plaintiff wore gloves the entire time he was installing the siding

16. Common sense dictates that one must wear gloves when handling sharp metal siding

Dkt. 45, Pg. ID 1174.

Plaintiff responds by returning to the same argument, that the rule did not on its face prohibit Plaintiff from picking up the siding without wearing gloves. Dkt. 47, Pg. ID 1616.

**\*7** Defendant's arguments are unavailing. If the Court viewed the evidence in the light most favorable to Defendant, summary judgment might well be appropriate. But that is not the standard; the Court must give Plaintiff the benefit of the doubt. As noted above, whether the safety rules required Plaintiff to wear gloves is an issue of material fact and a reasonable jury could conclude from the evidence that Plaintiff did not actually violate any rules. (It could also reasonably find the opposite.) If the jury concluded that there was no rule violation, it could also conclude that the 16 reasons above do not constitute clear and convincing evidence that Defendant would have suspended Plaintiff even if he had not reported his injury. Plaintiff's argument for pretext directly attacks Defendant's proffered reason for the discipline. Thus, unlike cases where the discipline is justifiable for a reason unrelated to any protected activity and a plaintiff must argue that retaliatory reasons rather than the legitimate reason motivated the employer, Plaintiff's claim here is that there was never a legitimate reason to begin with. To be sure, a jury could conclude that Defendant simply misinterpreted the rule (reading it to require gloves when it did not) and therefore reached the wrong conclusion about whether Plaintiff violated it. But the jury would not be required to reach that conclusion; it could find that Defendant knew Plaintiff did not violate the rule but was so miffed by his injury report that it suspended him and then tried to hide behind the rule.

Defendant has strong evidence to support its position at trial—Plaintiff did not forgo gloves while picking up a box of tissues or some other seemingly innocuous item,

he used bare hands to lift a long piece of the same kind of material that he had worn gloves to handle for the entire day leading up to that point—but this evidence is not sufficient to prevent the case from going to a jury.

\* \* \*

Before concluding, the Court must note its disappointment that the parties have been unwilling or unable to reach a settlement in this matter. Five years ago, Plaintiff missed 15 days of work. Dkt. 45, Pg. ID 1164. The damages from that are not substantial, but the attorneys' fees amassed from continuing this dispute are: two levels of administrative hearings; then to federal court with a motion to dismiss, a motion for summary judgment, and now a trial; then likely an appeal to the Sixth Circuit. The cost of this process is enormous, and far exceeds Plaintiff's lost wages. At oral argument, Defense counsel asserted bluntly that attorneys' fees are what has kept this case from settling. If Plaintiff prevails, he is entitled to recover those fees. When fees are high and mounting, it might be understandably difficult to place the proper emphasis on the client's best interests. But regardless of whether Plaintiff's counsel have given proper weight to their client's interests, for this case to go to trial is troubling in light of what Plaintiff had to say in 2014:

18 Q. This litigation itself though is stressful for you?

19 A. Yes.

20 Q. And the continuation of this dispute is stressful?

21 A. Correct.

Dkt. 47-2, Pg. ID 1863.

Perhaps Mr. Wagner no longer experiences stress from the continuing and expensive litigation of this dispute—the Court certainly hopes that is the case—but if he does, it is disturbing that the parties have been unable to find a fair and appropriate resolution of this dispute.

### IV. CONCLUSION
For the forgoing reasons, Defendant's motion is **DENIED**.

**SO ORDERED.**

**All Citations**

Slip Copy, 2017 WL 733279, 2017 IER Cases 58,081

Footnotes

1    The same rules chart depicted above (on its second page not here reproduced) includes the task description for operating a chainsaw and the same protective gear options. Out of those options, the closest thing to "chaps" is "shin guards." Defendant has not stated that the two are equivalent, but, regardless, the rule chart nowhere requires chaps or shin guards when operating a chain saw. Gloves, hearing protection, and a face shield are required; the chart indicates an "R" for each option. But under the column for "shin guards" there is nothing, not even a "¶ª#" for "recommended." So it is not clear to the Court what rule Defendant relied upon in disciplining the employee who used a chainsaw without wearing chaps. In any event, what *is* clear is that the two events Defendant seeks to compare are materially different.

2    The other rules Defendant accuses Plaintiff of having violated (besides not wearing gloves) all trigger only if Plaintiff was required to wear gloves. For example, one rule requires Plaintiff to "Know, wear, and maintain approved personal protective equipment (PPE) and clothing as required by job task and/or work environment, including off-site industries as required." The chart above is what would determine whether gloves were required by the task and environment.

End of Document        © 2018 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Called into Doubt by Oldershaw v. DaVita Healthcare Partners, Inc.,
D.Colo., June 1, 2017

197 F.Supp.3d 1007
United States District Court,
N.D. Illinois, Eastern Division.

Jason PIETRZYCKI, on behalf of himself and
all other plaintiffs similarly situated, Plaintiff,
v.

HEIGHTS TOWER SERVICE, INC.,
and Mark Motter, Defendants.

No. 14-cv-6546
|
Signed 07/11/2016

**Synopsis**

**Background:** Operations employees, including technicians and foremen who serviced cellular towers, brought action against employer alleging that employer failed to include drive time when calculating total hours and regular rate for employees, in violation of Fair Labor Standards Act (FLSA) and Illinois Minimum Wage Law (IMWL). Following joint request of parties, a FLSA collective action was conditionally certified. Employees moved to certify class of Illinois employees for IMWL claim, and employer moved to decertify FLSA collective action.

**Holdings:** The District Court, Jeffrey T. Gilbert, United States Magistrate Judge, held that:

[1] proposed class of about 90 Illinois employees was sufficiently numerous, as prerequisite for class certification;

[2] proposed class representative satisfied adequacy of representation prerequisite for class certification;

[3] whether employer had custom or policy of compensating for drive time was question that satisfied commonality prerequisite for class certification; and

[4] common questions of law and fact predominated over individual issues, as required for class certification.

Employees' motion granted; employer's motion denied.

**Attorneys and Law Firms**

**\*1011** Kimberly A. Hilton, Sarmistha Banerjee, David J. Fish, The Fish Law Firm, P.C., Naperville, IL, for Plaintiff.

Douglas P. Holthus, Mazanec, Raskin & Ryder Co., LPA, Columbus, OH, Mary Christine O'Connor, Quintairos, Prieto, Wood & Boyer, Michael H. McColl, Foran, Glennon, Palandech Ponzi & Rudloff PC, Chicago, IL, for Defendant.

**Opinion**

**MEMORANDUM OPINION AND ORDER**

Jeffrey T. Gilbert, United States Magistrate Judge

**\*\*1** Plaintiff Jason Pietrzycki ("Pietrzycki") has sued Defendants Heights Tower Service, Inc. ("HTS") and Mark Motter ("Motter"), alleging violations of the Illinois Minimum Wage Law ("IMWL"), 820 ILL. COMP. STAT. § 105/1 *et seq.,* and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* [ECF No. 74.] Early last year, the Court, at the joint request of the parties, conditionally certified an FLSA collective action. [ECF Nos. 30, 34.] Pietrzycki has now moved to certify a class of Illinois workers for the IMWL claim pursuant to Federal Rule of Civil Procedure 23. [ECF No. 86.] Defendants oppose certification of a Rule 23 class and move to decertify the FLSA collective action. [ECF No. 93.] For the reasons stated below, Pietrzycki's Amended Motion for Class Certification [ECF No. 86] is granted, and Defendants' Motion for FLSA Decertification [ECF No. 93] is denied.

**I. BACKGROUND**

Motter owns and is the president of HTS, a company that services and upgrades cellular towers ("towers"). Rule 30(b)(6) Deposition of Matthew Overholt (HTS's Controller) ("Overholt Dep."), ECF No. 94-1, at 6:5-8, 121:8-14. At one point, HTS had about seventy-seven employees. *Id.* at 7:8-10. Twenty-three of those employees performed office jobs. *Id.* at 7:11-15. The other fifty-four worked in the field servicing the towers. *Id.* at

7:11-21. Although the number of workers employed by HTS fluctuated over time, these totals **\*1012** are representative of the size of HTS's workforce throughout the relevant period. Regardless, HTS called the employees who serviced the towers "operations employees." *Id.* Of those, some were "foremen" and the others were "tower technicians." *Id.* Tower technicians serviced the cell towers: they installed antennas, ran cables, and so on. *Id.* at 8:5-16, 10:4-7. Foremen also climbed and serviced the towers. But they had many additional responsibilities. *Id.* at 9:17-10:3-19. Foremen told tower technicians what to do, supervised them as they did it, and completed daily activity reports tracking what was done. *Id.*

To service a tower, HTS usually sent a four-person crew. *Id.* at 7:16-21. Each crew typically consisted of one foreman and three tower technicians. *Id.* But a crew's membership was not set, meaning each crew for each project could be composed of different employees. Often, a crew might include a foreman and tower technicians who did not live close to each other or to the day's jobsite. While some of the operations employees resided in the two states where HTS had warehouses, Illinois and Ohio, others resided in Michigan and Wisconsin. Primarily, HTS serviced towers in Wisconsin, Ohio, and Illinois, with these three states accounting for roughly 97% of HTS's business in 2014. *Id.* at 27:21-24, 28:10-29:13. But HTS also serviced towers in other states, including Kentucky, Pennsylvania, Georgia and South Dakota, *See id.* at 27:17-20; Deposition of Jason Pietrzycki ("Pietrzycki Dep."), ECF No. 94-2, at 53:10-11, 101:19-23; Deposition of Tevin Gomez ("Gomez Dep."), ECF No. 94-5, at 24:16-17. [1]

**\*\*2** To get to the jobsites in all of these states, crew members had to drive. This lawsuit revolves around whether the compensation HTS paid to foremen and tower technicians properly reflected how much time they spent traveling in vehicles to jobsites.

## II. LEGAL STANDARD

**[1]** **[2]** "Under Section 216(b) of the FLSA, employees may bring a collective action on behalf of themselves and other 'similarly situated' employees against employers who violate the Act's minimum wage or overtime provisions." *Smallwood v. Illinois Bell Tel. Co.,* 710 F.Supp.2d 746, 750 (N.D.Ill.2010). A collective action

proceeds in two steps. *Rottman v. Old Second Bancorp, Inc.,* 735 F.Supp.2d 988, 990 (N.D.Ill.2010). At step one, the court decides whether to conditionally certify a collective action. *Smith v. Family Video Movie Club, Inc.,* 2015 WL 1542649, at \*2 (N.D.Ill. Mar. 31, 2015). Then, at step two, the court more stringently evaluates whether certification is appropriate. *Jirak v. Abbott Labs., Inc.,* 566 F.Supp.2d 845, 848 (N.D.Ill.2008). "At this stage, the court reviews several factors including the employment settings of the individual plaintiffs, defenses available to the defendant that may be individual to each plaintiff, and fairness and procedural considerations." *Madden v. Corinthian Colleges, Inc.,* 2009 WL 4757269, at \*2 (N.D.Ill. Dec. 8, 2009).

**[3]** **[4]** A collective action under the FLSA is different from a class action certified under Federal Rule of Civil Procedure 23. *Flores v. Lifeway Foods, Inc.,* 289 F.Supp.2d 1042, 1044 (N.D.Ill.2003). But "the case law has largely merged the standards ...." *Espenscheid v. DirectSat USA, LLC,* 705 F.3d 770, 772 (7th Cir.2013). Therefore, when a court is deciding whether to certify a collective action and a **\*1013** class action in one lawsuit, the court treats them as "a single class action" and applies "the Rule 23 standards." *Sanchez v. Roka Akor Chicago LLC,* 2016 WL 74668, at \*5 (N.D.Ill. Jan. 7, 2016); *Elder v. Comcast Corp.,* 2015 WL 3475968, at \*5 (N.D.Ill. June 1, 2015); *Dailey v. Groupon, Inc.,* 2014 WL 4379232, at \*4 (N.D.Ill. Aug. 27, 2014). [2]

**[5]** **[6]** **[7]** **[8]** The party seeking class certification bears the burden of proving by a preponderance of the evidence that he is entitled to it. *Starr v. Chicago Cut Steakhouse, LLC,* 75 F.Supp.3d 859, 871 (N.D.Ill.2014); *Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n,* 286 F.R.D. 355, 363 (N.D.Ill.2012). He must prove that the proposed class meets the four requirements of Rule 23(a) and at least one of the three alternatives provided in Rule 23(b). *Costello v. BeavEx, Inc.,* 810 F.3d 1045, 1059 (7th Cir.2016). Rule 23(a) requires numerosity, typicality, commonality, and adequacy of representation. *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir.2012). Only two of Rule 23(b)'s alternatives are relevant to this case. Under Rule 23(b)(2), certification is proper "when the plaintiffs' primary goal is not monetary relief, but rather to require the defendant to do or not do something that would benefit the whole class." *Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago,* 797 F.3d 426, 441 (7th Cir.2015). Under

Rule 23(b)(3), certification is proper when questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members, and a class action is superior to other methods of resolving the controversy. *Messner,* 669 F.3d at 811.

## III. DISCUSSION

### A. HTS's General Compensation Structure

**\*\*3** All of HTS's foremen and tower technicians are nonexempt employees. Overholt Dep., at 100:18-20. HTS paid all of them hourly wages. *Id.* at 13:2-5, 16:3-10. HTS paid all of them overtime. *Id.* at 13:6-8, 16:11-18. Specifically, HTS paid foremen and tower technicians one-and-one-half times their hourly rates of pay for each hour of overtime. *Id.* at 16:11-21. It was HTS's "uniform practice" to compensate foremen and tower technicians in this manner. *Id.* at 17:22-18:13. At one point in time, HTS paid its foremen and tower technicians the same wage for the time they spent working and the time they spent traveling in vehicles to jobsites. Pietrzycki Dep., at 32:23-33:7. But that changed, seemingly around 2011 to 2012. *Id.*; Deposition of Tab Petersen, Jr. ("Petersen Dep."), ECF No. 94-3, at 38:5-22.

After this change, HTS paid each foreman and tower technician different hourly wages, depending on what he or she was doing. Each of these employees earned a higher hourly wage (which the Court will refer to as a "regular wage") when performing certain activities, such as working at a jobsite. Overholt Dep., at 18:17-20:5. Each also earned a lower hourly wage of $10 ("drive time wage" for short) for what HTS called "Drive Time." *Id.* It was HTS's "practice" not to include drive time wages when determining a foreman or tower technician's regular rate of pay, as defined in the FLSA. *Id.* at 101:11-24, 131:18-21. It also was HTS's "standard practice" not to include drive time when calculating the number of overtime hours worked in a given week. *Id.* at 131:5-12.

**\*1014** HTS maintained a system for tracking how foremen and tower technicians spent their time. Every day, each crew's foreman filled out a Daily Activity Report ("DAR") on his or her laptop. *Id.* at 59:21-60:6, 60:20-23, 62:22-23, 84:15-19. A DAR reported in very general terms what the crew completed during the day, without necessarily specifying which crew member performed a certain task. *Id.* at 90:12-19; Pietrzycki Dep., at 106:3-8;

Petersen Dep., at 9:8-10:15. Importantly, the DARs listed for each crew member: (1) the total number of hours for which he or she should be paid his or her regular wage, and (2) the total number of hours for which he or she should be paid the drive time wage. Overholt Dep., at 63:4-64:5; 67:15-24; *see also* Deposition of Allen Robinson ("Robinson Dep."), ECF No. 94-4, at 15:7-19.

HTS did not maintain any records other than the DARs that tracked how much time foremen and tower technicians spent working. Overholt Dep., at 62:1-5; *see also* Petersen Dep., at 22:10-13. HTS trusted its foremen to accurately record the total time for which crew members earned either wage. Overholt Dep., at 67:6-14, 68:6-12. HTS does not appear to have had written guidelines instructing foremen how to fill out DARs. *See* Petersen Dep., at 52:20-23. But HTS provided at least some training. *Id.* at 62:22-63:16; Robinson Dep., at 16:16-18, 131:3-19. Moreover, HTS's Rule 30(b)(6) witness, Matthew Overton, who serves as the company's Controller, said that DARs were reliable sources of information that reliably indicated the amount of time each employee earned his or her regular wage and the drive time wage. Overholt Dep., at 122:15-123:13.

After the foremen completed their DARs, they sent them to HTS's payroll clerk, who put the relevant information into Employee Job Detail Reports and Timecard Lists. *Id.* at 135:20-136:4. These records were then used to produce each employee's paystub, which listed as a separate item the number of drive time hours worked, the drive time wage, and the total compensation earned for drive time. *See, e.g.,* ECF No. 52-3. HTS has the ability to run summaries on these records to tabulate how much drive time each employee worked (as reflected in these payroll-related records) over a certain period of time. Overholt Dep., at 136:5-13.

### B. Paying the Drive Time Wage

**\*\*4** According to HTS's Rule 30(b)(6) deponent, it was the company's "custom and practice" to pay the drive time wage to all foremen and tower technicians who were passengers in a company vehicle traveling to a jobsite. Overholt Dep., at 102:16-23; *see also id.* at 75:17-21; Peterson Dep., at 94:16-96:4 (explaining that whether time was marked as drive time or regular time was standard and consistent, and should not vary from crew to crew). But HTS "always" paid foremen and tower technicians their regular wages, rather than the drive time wage,

Case 1:17-cv-00589-WCG Filed 04/06/18 Page 18 of 40 Document 36-11

for time they spent driving an HTS-owned vehicle to a jobsite. Overholt Dep., at 64:3-5, 98:2-11; *see also* Petersen Dep., at 37:14-39, 56:6-12; Deposition of Curtis Duncan ("Duncan Dep."), ECF No. 94-6, at 42:16-19; Robinson Dep., at 190:5-8. Also, HTS paid foremen and tower technicians their regular wages when they did work (color-coded wires, reviewed blueprints, filled out forms, etc.) while traveling to a jobsite in an HTS-owned vehicle (even if they were passengers, not drivers). Overholt Dep., at 74:4-10, 75:17-21, 80:21-81:4, 81:13-82:10, 83:2-6; *see also* Pietrzycki Dep., at 32:23-33:7, 43:12-44:2, 142:13-143:11; Petersen Dep., at 44:7-45:6, 61:21-62:4, 63:8-16; Robinson Dep., at 118:15-22, 190:5-8.

The parties dispute whether HTS consistently paid the drive time wage to foremen and tower technicians when they drove a personal vehicle from their homes **\*1015** to a jobsite. When asked if an employee is paid the drive time wage when driving separately, HTS's Rule 30(b)(6) deponent said, "Yes." Overholt Dep., at 121:2-4. He also explained that HTS trained foremen to record on DARs when an employee traveled separately. *Id.* at 85:10-17. Other deposition testimony supports this understanding. *See* Pietrzycki Dep., at 114:12-115:2; Robinson Dep., at 29:3-9; Petersen Dep., at 55:20-56:5. The only contrary evidence cited by Defendants is the deposition of Tevin Gomez. [ECF No. 99, at 11-12.] The page cited by Defendants, however, does not exist; although Defendants cited "p. 86," Gomez's deposition ends at page 85. [ECF No. 94-5, at 22.] Thus, Defendants have not identified anything in the record showing that HTS did not consistently pay the drive time wage for travel in personal vehicles.

Moreover, the Court has reviewed Gomez's deposition in its entirety and cannot find any contrary testimony based on personal knowledge. As a general matter, Gomez testified he had very limited personal knowledge of HTS's compensation structure. For instance, Gomez testified he "never" tried to figure out in-depth what he was supposed to be paid. Gomez Dep., at 49:4-11. Relatedly, he stated he "didn't really look into ... too much" whether HTS was paying him properly. *Id.* at 48:21-49:3. Unsurprisingly, in light of this testimony, Gomez admitted he "probably didn't" understand the breakdown between his regular wage and the drive time wage, saying he "didn't really too much know anything like that." *Id.* at 49:12-19. Gomez also described how he relied solely on HTS's paystubs to determine for how many hours he earned

his regular wage and for how many hours he earned the drive time wage. *Id.* at 74:11-14. Consistent with this general lack of knowledge, Gomez's deposition contains several contradictions and multiple admissions of lack of knowledge about basic aspects of HTS's compensation practices. *See, e.g., id.* at 18:17-19:18 (claiming that the drive time wage was time-and-a-half, and then conceding a lack of knowledge about the amount of the drive time wage); *id.* at 43:2-6 (Q: "And it's your understanding that you were paid drive time when you were at the Columbus warehouse?" A: "I'm not sure how that went. I'm really not.").

Gomez's testimony with respect to travel in a personal vehicle is consistent with this lack of knowledge. Gomez said that he was told during an interview that he was not required to drive to jobsites in an HTS-owned vehicle. *Id.* at 33:19-34:16.[3] In the context of talking about this "interview," Gomez also asserted in a solitary deposition answer that, if an employee drove a personal vehicle to a warehouse or jobsite, "I want to say you didn't get the drive time." *Id.* at 34:4-9. Gomez's deposition testimony does not reveal what personal knowledge he has that supports this equivocal statement. Further, Gomez never drove a personal vehicle to a warehouse or jobsite because he did not have a car. *Id.* at 34:10-16. And he never saw any other HTS employee drive a personal vehicle to a warehouse or jobsite. *Id.* at 35:4-7. Therefore, there is no indication that Gomez had any personal knowledge of whether HTS paid the drive time wage for lime spent driving a personal vehicle to a jobsite.[4]

**\*\*5 \*1016** Finally, in some instances—and it appears from the record currently before the Court that these instances are rare—a foreman may have marked regular wage time on a DAR when he or she should have marked drive time. For instance, Allen Robinson, a former HTS foreman who is now in safety and quality management at the company, said in his deposition that he would sometimes credit someone on his crew with regular wage time even when that employee should have received drive time. *See, e.g.,* Robinson Dep., at 35:7-18. To be clear, though, Robinson's deposition testimony reveals that he usually followed HTS's normal policy, as described above. While Robinson would bend the rules at times to do "a favor" for members of his crew who were hard workers, he did not get permission from HTS before doing so. *Id.*

Case 1:17-cv-00589-WCG   Filed 04/06/18   Page 19 of 40   Document 36-11

at 137:2-13. Moreover, he admitted that doing so was contrary to HTS's "policy." *Id.* [5]

## C. The Meaning of Drive Time within the Context of Pietrzycki's Proposed Class Definition

Pietrzycki proposes in his brief that the Court certify a class that includes "all current and former HTS Tower Technicians and Foreman (sic) who received compensation for Drive Time and who worked in Illinois since August 25, 2011." [ECF No. 87, at 5.] The phrase "Drive Time" is not defined within the context of Pietrzycki's proposed class definition. While Pietrzycki notes that HTS's Rule 30(b)(6) deponent defined drive time as "time spent riding in a vehicle," Pietrzycki does not state that he intends this broad definition of the phrase to be incorporated within the class definition.

Pietrzycki is not claiming that HTS failed to pay its employees the drive time wage when it was supposed to pay them that wage. He clearly states, "To the extent that a non-Drive Time rate was applied (or no rate at all) through discretion or otherwise, Plaintiffs will not seek damages in this case for those hours." [ECF No. 99, at 11.] Instead, "[d]amages are based on the number of Drive Time hours—according to HTS's payroll records." *Id.* In other words, Pietrzycki is "only seeking to recover for those hours that were recorded [by HTS] as 'Drive Time.'" *Id.* Pietrzycki is "not seeking more hours," but rather the "overtime pay on the Drive Time hours as determined by HTS and ... identified as such on payroll records." *Id.*

This understanding of Pietrzycki's claims is confirmed by reading his Second Amended Complaint. [ECF No. 74.] His regular rate claim is premised on the allegation that Defendants "failed to capture all remuneration *paid*" because they "did not include compensation *earned* through Drive Time ...." *Id.* ¶ 24 (emphasis added). **\*1017** As this language unambiguously illustrates, Pietrzycki's regular rate claim turns on how HTS treated the drive time wages that it actually paid. The same is true with respect to Pietrzycki's total hours claim. *Id.* ¶ 23. This conclusion is confirmed by the proposed class definition which only includes those "who *received* compensation for Drive Time." [ECF No. 87, at 5] (emphasis added).

In light of Pietrzycki's actual claims, therefore, drive time should be understood to refer to the time spent traveling in a vehicle to a jobsite *for which HTS paid the drive time wage*

as reflected in HTS's payroll records. Drive time should not be understood as referring to all time spent riding in a vehicle, including travel time for which HTS paid no compensation or paid regular wages.

## D. Pietrzycki's Claims

**\*\*6** Pietrzycki's first claim is that, despite a legal duty to do so, Defendants did not count drive time recorded in HTS's payroll records when calculating how many total hours each employee worked during a given week. [ECF No. 74, ¶¶ 19, 40, 45, 47; ECF No. 86, ¶ 6; ECF No. 87, at 2, 4.] As a result, Pietrzycki argues, Defendants determined that employees worked fewer hours than they actually did. In turn, this failure led Defendants to undercount the number of overtime hours worked by employees.

Pietrzycki's second claim turns on the meaning of "regular rate," as used in the below-quoted provisions of the FLSA and the IMWL. The FLSA defines "regular rate" to include, subject to some exceptions (as always), "all remuneration for employment paid to, or on behalf of, the employee." 29 U.S.C. § 207(e). Pietrzycki asserts that HTS did not include drive time wages when calculating each employee's regular rate. [ECF No. 74, ¶¶ 19, 40, 45, 47; ECF No. 86, ¶ 6; ECF No. 87, at 2-4.] This, in turn, allegedly led HTS to pay its employees a lower regular rate than it should have paid.

**[9]** The FLSA and the IMWL require employers to pay their non-exempt employees one and one-half times the regular rate for any hours worked in excess of 40 hours per week, unless a relevant exemption applies. *Schaefer–LaRose v. Eli Lilly & Co.,* 679 F.3d 560, 572 (7th Cir.2012); *Brand v. Comcast Corp.,* 135 F.Supp.3d 713, 726 (N.D.Ill.2015). Specifically, 29 U.S.C. § 207(a) (1) provides that non-exempt employees shall not be employed "for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The IMWL imposes a parallel requirement, again subject to some exceptions, that "no employer shall employ any of his employees for a workweek of more than 40 hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than 1 1/2 times the regular rate at which he is employed." 820 ILL. COMP. STAT. 105/4a. As the similarity of these two provisions

illustrates, the "IMWL parallels the FLSA ...." *Skelton v. Am. Intercontinental Univ. Online,* 382 F.Supp.2d 1068, 1074 (N.D.Ill.2005), *amended* 2005 WL 2649190 (N.D.Ill. Oct. 11, 2005). Therefore, the same analysis applies to claims made under the FLSA and the IMWL. *Id.*; *see also Driver v. AppleIllinois, LLC,* 917 F.Supp.2d 793, 798 (N.D.Ill.2013); *Camilotes v. Resurrection Health Care Corp.,* 286 F.R.D. 339, 355 (N.D.Ill.2012); *Villareal v. El Chile, Inc.,* 776 F.Supp.2d 778, 784 (N.D.Ill.2011). Consistent with this principle, none of the parties in this case distinguished between **\*1018** the FLSA claims and the IMWL claims in their class certification arguments.

### E. Federal Rule of Civil Procedure 23(a)

The four requirements for class certification under Federal Rule of Civil Procedure 23(a) are numerosity, typicality, commonality, and adequacy of representation. *Messner,* 669 F.3d at 811.

In this case, two of these requirements, numerosity and adequacy, are not in dispute. Therefore, the Court will briefly address these before turning to the contested issues.

#### 1. Numerosity

**[10]** The numerosity requirement is satisfied where a class is "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1); *see also Parko v. Shell Oil Co.,* 739 F.3d 1083, 1084 (7th Cir.2014), *reh'g denied* (Mar. 10, 2014). To establish that a class is sufficiently numerous, a plaintiff need not identify exactly how many members will be in the class. *Barnes v. Air Line Pilots Ass'n, Int'l,* 310 F.R.D. 551, 557 (N.D.Ill.2015). In assessing the size of a class, a court "may rely on common sense assumptions and reasonable inferences ..." *Beley v. City of Chicago,* 2015 WL 8153377, at \*2 (N.D.Ill. Dec. 7, 2015).

**\*\*7** As previously discussed, the Court understands Pietrzycki's proposed class to include "all current and former HTS Tower Technicians and Forem[e]n who received compensation for Drive Time [as reflected in HTS's payroll records] and who worked in Illinois since August 25, 2011." [ECF No. 87, at 5.] According to Pietrzycki, HTS has identified 123 foremen and tower technicians, of whom about three-quarters worked from Illinois. *Id.* at 6. Based on these numbers, Pietrzycki estimates the size of the proposed class to be roughly 90

employees. *Id.* Defendants have not contested the issue of numerosity.

**[11]** The Court finds the proposed class to be sufficiently numerous. Indeed, "the number forty is often cited as the point at which joinder becomes impracticable." *Smith v. Family Video Movie Club, Inc.,* 311 F.R.D. 469, 476 (N.D.Ill.2015); *Sturdy v. A.F. Hauser Inc.,* 2014 WL 2210391, at \*2 (C.D.Ill. May 28, 2014); *Fonder v. Sheriff of Kankakee Cty.,* 2013 WL 5644754, at \*6 (C.D.Ill. Oct. 15, 2013). The proposed class in this case is more than double that size.

#### 2. Adequacy

**[12]** Federal Rule of Civil Procedure 23(a)(4) requires that the representative parties of a class "will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). To assess whether this requirement is satisfied, a court must consider both "the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and ... the adequacy of the proposed class counsel." *Healey v. Int'l Bhd. of Elec. Workers, Local Union No. 134,* 296 F.R.D. 587, 593 (N.D.Ill. 2013) (quoting *Gomez v. St. Vincent Health, Inc.,* 649 F.3d 583, 592 (7th Cir.2011)); *see also Sanchez v. Roka Akor Chicago LLC,* 2016 WL 74668, at \*4 (N.D.Ill. Jan. 7, 2016).

**[13]** **[14]** To be an adequate representative, the named plaintiff " 'must be part of the class and possess the same interest and suffer the same injury as the class members.' " *Steimel v. Minott,* 2014 WL 1213390, at \*18 (S.D.Ind. Mar. 24, 2014) (quoting *Am. Chem. Prods., Inc. v. Windsor,* 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)), *aff'd sub nom. Steimel v. Wernert,* 823 F.3d 902 (7th Cir.2016). "Absent any conflict between the interests of the representative and [other class members], and absent any indication that the representative will not aggressively **\*1019** conduct the litigation, fair and adequate protection of the class may be assumed." *In re Gen. Motors Corp. Dex–Cool Products Liab. Litig.,* 241 F.R.D. 305, 313 (S.D.Ill.2007) (internal quotation marks omitted); *see also Phillips v. WellPoint Inc.,* 2012 WL 4904523, at \*6 (S.D.Ill. Oct. 15, 2012); *Cima v. WellPoint Health Networks, Inc.,* 250 F.R.D. 374, 380 (S.D.Ill.2008).

**[15]** In this case, Pietrzycki's claims are essentially identical to the claims of other potential class members. Pietrzycki worked as both a foreman and a tower

technician while he was employed by HTS. Pietrzycki worked at HTS during the class period and was one of HTS's longer-tenured employees. HTS compensated Pietrzycki in the same way that it compensated its other foremen and tower technicians. Moreover, there has not been any indication that Pietrzycki has been less than diligent in pursuing this case. According to his counsel, Pietrzycki has "cooperated throughout this litigation ...." [ECF No. 87. at 9-10.] Thus, the Court finds that Pietrzycki can adequately represent the interests of all potential class members. Defendants have not argued otherwise.

**[16]** To satisfy the adequacy requirement, proposed class counsel "must be experienced and qualified and generally be able to conduct the litigation." *Young v. Fortis Plastics, LLC,* 294 F.R.D. 128, 137 (N.D.Ind. 2013), *modified in part sub nom. Lace v. Fortis Plastics LLC*, 2015 WL 1383806 (N.D.Ind. Mar. 24, 2015). David Fish, Pietrzycki's counsel and the proposed class counsel, has submitted a declaration demonstrating his academic credentials, and litigation experience in labor/employment cases as well as class actions. [ECF No. 87-5.] His law firm. The Fish Law Firm, P.C., has pursued this lawsuit from its inception to the present moment. The Court has not observed any indication that Mr. Fish or his firm has been less than diligent in this capacity. Thus, the Court finds that proposed class counsel can adequately represent the class. Again, Defendants have not argued to the contrary.

### 3. Commonality

**\*\*8** **[17]** **[18]** **[19]** Federal Rule of Civil Procedure 23(a)(2) "requires that the class claims involve 'questions of law or fact common to the class.' " *Jamie S. v. Milwaukee Pub. Sch.,* 668 F.3d 481, 497 (7th Cir.2012) (quoting FED. R. CIV. P. 23(a)(2)). Even a single common question is enough to satisfy this commonality requirement. *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 376, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). The common question cannot be "superficial." *Jamie*, 668 F.3d at 497. Instead, commonality "requires the plaintiff to demonstrate that the class members have suffered the same injury" and that the class claims "depend on a common contention" that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 349–50, 131 S.Ct. 2541; *see also Bell v. PNC Bank, Nat. Ass'n,* 800 F.3d 360, 374 (7th Cir.2015). The proposed class's members,

however, need not have identical claims, and "some degree of factual variation will not defeat commonality" if the common question can yield a common answer. *Gehrich v. Chase Bank USA, N.A.,* 316 F.R.D. 215, 224-25, 2016 WL 806549, at \*4 (N.D.Ill. Mar. 2, 2016); *see also Bell*, 800 F.3d at 374.

In this case, Pietrzycki identifies three common questions. [ECF No. 87, at 8.] The first is "[w]hether Drive Time hours must be included in determining the 'regular' rate of pay." *Id.* This issue matters in this case because 29 U.S.C. § 207(a)(1) **\*1020** provides that non-exempt employees shall not be employed "for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a) (1). The FLSA defines "regular rate" to include "all remuneration for employment paid to, or on behalf of, the employee." 29 U.S.C. § 207(e). Whether drive time wages are "remuneration for employment paid to, or on behalf of, the employee" is a question that will have one answer. It is a yes or no question that does not turn on any facts that vary employee-by-employee. Defendants have not argued that this issue is incapable of classwide resolution.

The second, related question is "whether 29 U.S.C. § 207(e) provides any applicable exemptions from including Drive Time in the regular rate of pay." [ECF No. 87, at 8.] As this question would imply, 29 U.S.C. § 207(e) has eight exclusions that limit the broad definition of "regular rate." If one of these applies, the proposed class's claims would seem to fail. None of these exemptions appear to turn on individualized facts, and Defendants have not argued that this issue is incapable of classwide resolution.

**[20]** **[21]** The third common question identified by Pietrzycki is "whether the Defendants' custom and practice of compensating for Drive Time (even at a lower rate of pay) requires that such hours count towards overtime purposes and whether the time spent driving constitutes work requiring compensation." [ECF No. 87, at 8.] This issue is crucial in this case. Under the FLSA, "[n]ot all work-related activities constitute 'work' that must be compensated." *Musch v. Domtar Indus., Inc.,* 587 F.3d 857, 859 (7th Cir.2009). Specifically, under 29 U.S.C. § 254(a) —part of the Employee Commuting Flexibility Act of 1996, which amended the Portal-to-

Portal Act of 1947, 29 U.S.C. § 254—the FLSA does not cover "(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and (2) activities which are preliminary to or postliminary to said principal activity or activities." *Gallardo v. Scott Byron & Co.,* 2014 WL 126085, at *6 (N.D.Ill. Jan. 14, 2014). Defendants contend that this statutory provision precludes the proposed class's claims. [ECF No. 94, at 22.]

**\*\*9** Section 254(b), however, provides "that subsection (a) does not relieve an employer of liability when such activity is compensable by contract, custom, or practice." *Graham v. City of Chicago,* 828 F.Supp. 576, 579 n. 2 (N.D.Ill.1993); *see also O'Brien v. Encotech Const.,* 2004 WL 609798, at *4 n. 9 (N.D.Ill. Mar. 23, 2004) ("The activity could also be time covered by the statutes if it is compensable under the terms of a contract or based on custom or practice."). Thus, the factual question of whether HTS had a custom or policy of paying the drive time wage is essential to this case. Of course, the existence of a custom and practice is only capable of classwide resolution. Either HTS had a custom and practice of doing something or it did not. This fact *cannot* vary from employee to employee. That is, HTS cannot have had a custom and practice for one employee and not for another. If that were the case, HTS simply would not have had a custom and practice. The related legal question, whether that custom and practice is sufficient under 29 U.S.C. § 254(b) to make drive time into compensable work within the meaning of the FLSA, also is a question capable of classwide resolution.

Defendants' efforts to complicate these common questions are unsuccessful. Specifically, Defendants note that HTS paid **\*1021** regular wages to the driver of a company-owned vehicle and to the passengers in that vehicle who were working while traveling in the vehicle. [ECF No. 94, at 11.] This seems to point to the existence of a custom and practice, rather than cut against it. Moreover, to the extent this occurred, Pietrzycki's claims will not reach such hours because they were not paid as drive time hours on HTS's books. Defendants also contend that employees were only sporadically paid for traveling in their personal vehicles and that foremen had discretion to decide whether to award the drive time wage. *Id.* at 10-12. As detailed previously, neither of these assertions is supported by the record now before this Court.

Regardless, all of Defendants' factual variations miss the mark. If Pietrzycki were asserting that HTS failed to pay drive time wages when it should have paid them, then the proposed class's claims would require the Court to decide when each employee should have been paid the drive time wage and whether HTS paid or did not pay the drive time wage in that specific instance. As already explained, though, that is not Pietrzycki's claim. Instead, this case has to do with whether HTS, when calculating each employee's regular rate and overtime hours, failed to include drive time wages that it *actually paid* to the respective employee and his or her corresponding drive time, and, if HTS did so, whether that was lawful. In essence, all of Defendants' arguments reference a point that is too early in the compensation process. Defendants are focused on the decision to pay drive time wages. But this case has to do with whether and how HTS incorporated paid drive time wages into employees' overtime compensation.

The flaw in Defendants' argument is highlighted by one of the cases upon which they rely. In *Dailey v. Groupon, Inc.,* a group of Account Representatives sued Groupon, their employer. 2014 WL 4379232, at *1. The employees claimed that Groupon failed to include earned commissions when calculating their regular rates of pay. *Id.* Groupon responded by arguing that the plaintiff employees fell within the FLSA's administrative exemption. *Id.* at *4. The Court recognized that this specific issue demanded an evaluation of each plaintiff's *"actual* day-to-day job duties." *Id.* at *5. Crucially, though, the Court described how Groupon lacked a "systemized process" of supervising these employees for part of the time covered by the lawsuit. *Id.* at *8. The Court noted that if the plaintiffs had limited their claims to the time when Groupon had a consistent company-wide policy regarding the work done by Account Representatives, then the commonality requirement could be satisfied. *Id.* This case, by contrast, deals solely with time periods that involve an allegedly uniform HTS custom and practice.

**\*\*10** For that reason, this case is more analogous to *Bell v. PNC Bank, Nat. Ass'n,* 800 F.3d 360 (7th Cir.2015). In *Bell,* the Seventh Circuit affirmed the district court's decision to certify a class of PNC Bank employees who claimed that PNC had an unofficial policy or practice of denying overtime. *Id.* at 372, 381. The court of appeals rejected the defendant's argument that the named plaintiff

must prove the existence of a policy or practice before a class could be certified. *Id.* at 374–75. The Seventh Circuit instead explained that a court weighing class certification should evaluate the evidence "to determine whether a common question exists and predominates, without weighing that evidence to determine whether the plaintiff class will ultimately prevail on the merits." *Id.* at 377. In the end, the court of appeals concluded that whether PNC had the alleged policy or practice was a common question capable of classwide resolution **\*1022** that justified certification under Federal Rule of Civil Procedure 23. *Id.* at 375.

For these reasons, the Court finds that the proposed class's claims raise multiple common questions of fact or law that are susceptible to classwide resolution.

### 4. Typicality

 **[22]**   Under Federal Rule of Civil Procedure 23(a)(3), the claims or defenses of the representative parties must be typical of the claims or defenses of the class. *Chicago Teachers Union, Local 1 v. Bd. of Educ. of the City of Chicago,* 307 F.R.D. 475, 481 (N.D.Ill.2015). "A claim is typical if it 'arises from the same event or practice or course of conduct that gives rise to the claims of other class members and ... her claims are based on the same legal theory." *Oshana v. Coca–Cola Co.,* 472 F.3d 506, 514 (7th Cir.2006). As the above discussion reveals, Pietrzycki's claims are based on the exact same alleged practice and course of conduct that gives rise to the other proposed class members' claims. Likewise, his claims are based on the same legal theory. Neither party has presented an argument with respect to typicality that is substantively different from their commonality arguments. That is because the "commonality and typicality requirements of Rule 23(a) tend to merge," and they do so in this case. *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 158, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The Court finds Pietrzycki's claims are typical of the claims of the proposed class.

### F. Federal Rule of Civil Procedure 23(b)

Under Federal Rule of Civil Procedure 23, a class cannot be certified unless, in addition to meeting the four requirements of Rule 23(a), the class also meets at least one of the three alternatives in Rule 23(b). Only two of these are at issue in this case.

### 1. Rule 23(b)(2)

Under Rule 23(b)(2), a class may be certified where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole ...." FED. R. CIV. P. 23(b)(2). Pietrzycki contends that the class "would be protected by an injunction barring future failure to properly compute Drive Time." [ECF No. 87, at 11.] Although the operative complaint does not specifically seek injunctive relief, that request may be included in the general prayer for "other legal and equitable relief as this Court may deem appropriate." [ECF No. 74, at 9, 11.] Further, the Second Amended Complaint seeks declaratory relief. And Defendants have not presented any argument against certification under Rule 23(b)(2). Thus, the Court finds this requirement to be satisfied.

### 2. Rule 23(b)(3)

 **[23]**     **[24]**     **[25]**  Rule 23(b)(3) "allows for class certification when 'questions of law or fact common to the class members predominate over any questions affecting individual members' and 'when a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.' " *Chicago Teachers Union,* 797 F.3d at 443 (quoting FED. R. CIV. P. 23(b)(3)). Predominance does not exist where liability determinations will be individualized and fact-intensive or where affirmative defenses will require person-by-person evaluations. *In re Nat'l Collegiate Athletic Ass'n Student–Athlete Concussion Injury Litig.,* 314 F.R.D. 580, 592-93, 2016 WL 305380, at \*11 (N.D.Ill.2016). Predominance does not demand, however, that every element of each claim be susceptible to classwide proof. *Chicago Teachers Union,* 797 F.3d at 444. Instead, the predominance **\*1023** requirement is satisfied where "common questions represent a significant aspect of a case and ... can be resolved for all members of a class in a single adjudication." *Young,* 294 F.R.D. at 138 (quoting *Messner,* 669 F.3d at 815).

 **\*\*11**   **[26]**  As the Court's discussion of the commonality requirement illustrates, many of the questions of law or fact in this case are common to the proposed class and capable of classwide resolution. Therefore, the Defendants' discussion here will focus on Defendants' arguments against predominance.

**[27]** Defendants argue that the proposed class's theory of liability rests on the custom and practice exception to the Portal-to-Portal Act, 29 U.S.C. § 254(b), and they contend that the proposed class will be unable to prove the existence of any custom or practice. [ECF No. 94, at 21-22.] This argument misses the mark because the predominance analysis is not about whether a class ultimately will succeed on the merits. *Chicago Teachers Union,* 797 F.3d at 444. Pietrzycki need not prove at the certification stage that HTS had such a custom or practice, but, rather, he only must show that there are common questions "capable of proof at trial through evidence that is common to the class rather than individual to its members." *Messner,* 669 F.3d at 818. As previously explained, the existence of a custom or practice is such a common question.

Defendants also contend that they have individualized defenses under 29 C.F.R. § 778.320(b). That regulation, however, is only relevant where an employer and employee have "reasonably agreed not to treat time as hours worked." 29 C.F.R. § 778.320(b). In this case, Defendants have not identified any evidence that HTS reached such an agreement with even one of its employees. Instead, Defendants cite one page of one deposition which they characterize as showing that the deponent was "unsure as to whether employees get paid overtime on the drive time hours they work." [ECF No. 100, at 7.] Uncertainty as to whether a company pays overtime for certain work is not the same as an agreement between the company and an employee not to count as hours worked the time for which the company does pay. Moreover, Defendants have not identified any fact or made any argument showing the supposed agreement was reasonable. Where no reasonable agreement exists, "29 C.F.R. § 778.320(b) does not apply." *Jones v. C & D Techs., Inc.,* 8 F.Supp.3d 1054, 1068–69 (S.D.Ind.2014). Thus, at this time, there is no indication that this regulation will create individualized issues in this case.

Defendants' main substantive predominance argument is that the ECFA, 29 U.S.C. § 254(a), provides a defense from any liability they might otherwise have for the proposed class's claims. As the employer, HTS would, at the merits stage, bear "the burden of proving that an exception applies to the general rule that 'work' is 'compensable' under the FLSA." *DeKeyser v. Thyssenkrupp Waupaca, Inc.,* 747 F.Supp.2d 1043, 1051 (E.D.Wis.2010). The ECFA provides that an employer

shall not be liable under the FLSA for failing to pay an employee overtime compensation for "traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform." 29 U.S.C. § 254(a); *see also Brand,* 135 F.Supp.3d at 731. Therefore, the ECFA typically relieves employers of liability under the FLSA for failing to provide compensation for "normal home to work travel." *Gallardo v. Scott Byron & Co.,* 2014 WL 126085, at *7 (N.D.Ill. Jan. 14, 2014), Crucially, though, the ECFA does not relieve an employer of liability where the employer either had a custom or practice of covering some activity, or contracted to do so. 29 U.S.C. § 254(b).

**\*\*12 \*1024** As already discussed, whether HTS had a custom or practice of paying for drive time is not an individualized question. With respect to his contract theory, Pietrzycki has identified evidence that HTS represented to each new employee that the company paid drive time wages. Specifically, HTS's Rule 30(b)(6) deponent stated,

> Q: Well one of the—when you're trying to attract talent for tower technicians and foremen, one of the things you tell them the benefit of working at Heights Tower is that they're going to get paid $ 10 per hour when they're a passenger, Right?
>
> A: Yea. That is covered, yes.
>
> Q: You explain that all to them, correct?
>
> A. Sure.

Overholt Dep., at 116:22-117; *see also* Petersen Dep., at 39:4-9 ("If I speak to new hires, I inform them of the situation" with respect to drive time wages). Defendants have not identified any contrary evidence or argued that such a representation was not made to every employee. Given the seeming uniformity of the operative facts, the related legal question—whether informing new employees that they will be paid drive time is sufficient to create the necessary contract—is susceptible to a common answer.

There is only one instance in which it seems that Defendants' § 254(a) defense may raise individualized issues. Pietrzycki asserts that, if the proposed class loses on the custom, practice, and contract theories, it will argue that § 254(a) could not, as a matter of law, relieve Defendants from liability for failing to include for overtime purposes the drive time from HTS's warehouses

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

to jobsites that occurred after the foremen and tower technicians did work at HTS's warehouse. This contention may raise a common legal question capable of resolution without an in-depth consideration of what exact work each employee performed. If the Court were to find in Defendants favor on this legal question, the case would be over, with no need for any individualized inquiry. If the Court were to find in the proposed class's favor, that would necessitate individualized proof of damages sufficient to show exactly what drive time wages were paid for such travel. But individualized damages issues should not and will not preclude certification in this case.

Defendants rely heavily on two cases that discussed the impact of individualized damages. In *Groupon*, discussed above, the plaintiffs proposed "no method for calculating their individualized damages other than having hundreds, or even thousands, of individualized hearings." *Dailey*, 2014 WL 4379232, at *9. In the second case, the Seventh Circuit found that the damages inquiry would require 2,341 separate evidentiary hearings. *Espenscheid*, 705 F.3d at 773. The employee plaintiffs claimed they should be paid for time that they did not report to the company and was not tracked in any records. *Id.* at 774, Moreover, the company had a complicated piece-rate pay system that varied for every job and every employee. *Id.*

In this case, however, Pietrzycki has explained how this Court could use paystubs and other payroll records maintained by HTS to determine each employee's damages. If the proposed class wins on one of its custom, practice, or contract theories, the assessment of damages would be strictly mathematical. This is the type of inquiry that the Seventh Circuit has said could be conducted "effortlessly, mechanically." *Id.* at 773. If the proposed class loses on all of its claims, there will be no need for any damages inquiry, individualized or otherwise. The only instance in which a significantly individualized damages inquiry will be required is if the proposed class loses on the custom, practice, and contract theories but wins on the **\*1025** non-commuting theory. Even in this instance, though, the damages determination at least still would be limited to time identified on HTS's payroll records.

**\*\*13** In other words, while there is the potential for some individualized damages issues in this case, there remain "common questions" that "represent a significant aspect of a case and ... can be resolved for all members of a class in a single adjudication." *Young*, 294 F.R.D. at

138. The Seventh Circuit has recognized that an issue " 'central to the validity of each one of the claims' in a class action, if it can be resolved 'in one stroke,' can justify class treatment." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir.2013).

Again *Bell* is instructive. In that case, PNC argued that common issues did not predominate over individualized ones because the court could find at the merits stage that PNC did not have a policy or practice of failing to pay overtime. *Bell*, 800 F.3d at 378. The Seventh Circuit refuted this contention, explaining that even such a finding would significantly advance the litigation because all of the class members' claims were based on the existence of a policy or practice "would fail in unison." *Id.* Therefore, the court of appeals determined that class certification should not be denied solely because the common question with regards to PNC's policy or practice could be resolved in such a way as to leave only individualized claims. *Id.* at 379.

Although Pietrzycki has advanced some additional theories, this case is primarily about whether HTS had a custom or practice of paying for drive time wages that is sufficient to establish liability under the FLSA and the IMWL. The parties' briefs reflect as much, with their initial arguments focused solely on this theory and their latter briefs devoting most of their attention to it. This issue, which seems to be the most significant one in the case, is capable of classwide resolution. And, of course, there are the other non-individualized issues discussed in the commonality section of this Opinion. The Court finds that all of these common issues predominate over the possibility that Defendants' § 254(a) defense will require some individualized inquiry. *See Bell*, 800 F.3d at 379–81; *Gomez v. PNC Bank, Nat'l Ass'n*, 306 F.R.D. 156, 168 (N.D.Ill.2014), *aff'd sub nom. Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360 (7th Cir.2015) (distinguishing cases where "the plaintiffs either *alleged* in the first instance that the overtime denials at issue were the result of decisions made by individual managers, or the only evidence in the record showed that no unofficial company-wide policy against payment of overtime existed); *Driver v. AppleIllinois, LLC*, 2013 WL 5818899, at *1 (N.D.Ill. Oct. 29, 2013) ("The class is held together by the common question of whether AppleIllinois' policy and practice prevented employees from earning their minimum wage and the common proof responsive to that inquiry.").

Case 1:17-cv-00589-WCG Filed 04/06/18 Page 26 of 40 Document 36-11

The second requirement of Rule 23(b)(3) is that a class action be superior to "other available methods for fairly and efficiently adjudicating the controversy." *Chicago Teachers Union*, 797 F.3d at 443 (quoting FED. R. CIV. P. 23(b)(3)). The relevant factors for this inquiry are: (1) "class members' interests in individually controlling the prosecution or defense of separate actions;" (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members;" (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and (4) "the likely difficulties in managing a class action." FED. R. CIV. P. 23(b)(3)(A)-(D). Neither party has even suggested that a potential class member has an interest in controlling a separate action or has been involved in separate, related litigation. Because the **\*1026** common issues in this case predominate over individualized issues, concentrating the claims in one forum will serve judicial economy. For this same reason, managing this class action should not be exceedingly difficult. *See Messner*, 669 F.3d at 815 n. 5 ("There are so many common issues of law and fact relating to the issue of Northshore's liability, however, that the superiority requirement likely poses no serious obstacle to class certification here.").

**\*\*14** Defendants' argument with respect to superiority —contained in one three sentence paragraph—relies on the same contentions that underlie their commonality, typicality, and predominance arguments. [ECF No. 94, at 23.] The Court has already explained its assessment of these assertions, and need not repeat that analysis again. Therefore, the Court finds that a class action is a superior method of resolving the claims at issue in this case.

### G. Class Definition

Accordingly, the Court will certify a class of Illinois workers under the IMWL that is comprised of "all current and former HTS Tower Technicians and Foremen who received compensation for Drive Time as reflected in HTS's payroll records and who worked in Illinois since August 25, 2011."

### IV. CONCLUSION

For all of the reasons stated above, Pietrzycki's Amended Motion for Class Certification [ECF No. 86] is granted, and Defendants' Motion for FLSA Decertification [ECF No. 93] is denied.

### All Citations

197 F.Supp.3d 1007, 2016 WL 3766344, 95 Fed.R.Serv.3d 228, 2016 Wage & Hour Cas.2d (BNA) 221,855

Footnotes

1   As noted above, Pietrzycki's proposed class under the IMWL is composed only of Illinois workers.

2   Even if the collective action standards controlled, instead of the Rule 23 standards, the Court's ruling on Defendants' Motion for FLSA Decertification would not change.

3   It is unclear whether Gomez learned anything about the drive time wage from the interview.

4   Even were the Court to speculate that Gomez learned this fact through the interview, it is not clear that would be enough to establish personal knowledge. Simply repeating hearsay is not the same as laying foundation. *See MCI Worldcom Network Servs., Inc. v. Atlas Excavating, Inc.,* 2005 WL 1300766, at *5 (N.D.Ill. Feb. 23, 2005). While the Court could speculate that the interviewer may have worked for HTS, meaning his or her statements would not be hearsay, *see* FED. R. CIV. P. 801(d)(2), Gomez did not testify that the interviewer was an HTS employee; in fact, he did not remember with whom he interviewed, Gomez Dep., at 34:2–3. Therefore, the deposition does not provide a sufficient basis for the Court to conclude that what the interviewer said was not hearsay even if the record indicated, which it does not, what the interviewer said to Gomez. *See Overton v. City of Harvey,* 29 F.Supp.2d 894, 904–05 (N.D.Ill.1998).

5   Robinson also claimed that, on occasion, he called Motter to ask if he could mark regular wage time for himself. Robinson Dep., at 120:1-23. These were one-off occurrences, and Robinson only did this about a dozen times during his many years at HTS. *Id.* Moreover, Robinson said he made these requests when he expected to do work in the car. *Id.* at 189:8-15. It also appears that Robinson may have been driving during some of these instances. Thus, even if Motter granted Robinson's requests under these circumstances, it seems that would have been consistent with HTS's policy, not contrary to it.

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.                    13

2016 WL 302109
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Daniel Burton, Plaintiff,
v.
Illinois Central Railroad Company
formerly d/b/a Canadian National/illinois
Central Railroad Company, Defendant.

No. 13-cv-00769
|
Signed 01/25/2016

**Attorneys and Law Firms**

John S. Bishof, Jr., Patricia N. Gerberich, Zahra Sagha, Law Office of John S. Bishof, P.C., Chicago, IL, for Plaintiff.

Kathryn Mrkonich Wilson, Noah Gordon Lipschultz, Joseph D. Weiner, Littler Mendelson P.C., Minneapolis, MN, Peter Colin McLeod, Colleen Konicek, Fletcher & Sippel, LLC, Chicago, IL, for Defendant.

Opinion

## MEMORANDUM OPINION

Andrea R. Wood, United States District Judge

 *1 Plaintiff Daniel Burton worked as an assistant signalman for Defendant Illinois Central Railroad Company ("Illinois Central"). On May 13, 2011, Burton was laying cable for his employer when the tail end of the cable came loose from its spool and struck him above the knee, causing him to fall. Several days later, Burton was diagnosed with a knee contusion and a shoulder sprain. He continued to work with these injuries for some time before reporting them to his employer. After Burton reported his injuries, Illinois Central instituted a formal investigation and ultimately terminated his employment. Burton subsequently brought this action pursuant to the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*, and the whistleblower provision of the Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20109 *et seq.* Before the Court are the parties' cross-motions for summary judgment. (Dkt. Nos. 49, 52, 55.) For the

reasons stated below, the Court finds that there are genuine issues of material fact with respect to both of Burton's claims and thus denies the parties' motions.

## FACTUAL BACKGROUND

The following facts are undisputed unless otherwise noted.

Burton was hired by Illinois Central in December 2010 as an assistant signalman. (Pl.'s Resp. to Def.'s Stmt. of Undisputed Facts ("SUF") re FRSA Claim ¶ 10, Dkt. No. 67.) His job duties included installing switches and wires, setting up and repairing crossing gates, and digging trenches for the wiring. (*Id.*) Burton reported to Illinois Central construction supervisors Michael Youngman and Charles Woodbridge. (*Id.*) He also worked under the direction of Illinois Central foremen. (*Id.* ¶ 12.) Foremen direct the on-site work of crew members but are not part of Illinois Central management; foremen play no role in hiring, firing, or promoting employees, cannot issue discipline or transfer employees, and do not make any decisions concerning employee benefits. (*Id.*)

Illinois Central is required by the Federal Railroad Administration to report certain accidents and injuries that occur while employees are working. Accordingly, Illinois Central instructs its employees that all injuries that occur on duty should be reported to a supervisor. (*Id.* ¶ 5.) This requirement is codified in Illinois Central's United States Operating Rule ("USOR") D, which provides:

> Employees must report promptly to the proper authority any injury sustained on duty or on company property. Notification of the injury must be made prior to the end of the employee's tour of duty and before leaving company property.

(*Id.* ¶ 6.) Burton received a copy of Illinois Central's injury reporting policy and received training on it. (*Id.* ¶¶ 13-14.)

Although there is evidence that Youngman instructed Burton and other employees that injury reports should be made to him or "another supervisor" (*id.* ¶ 14), the record does not indicate whether Rule D or any other rule promulgated by Illinois Central specifies what constitutes a "proper authority" or "supervisor" for injury reporting purposes. Furthermore, there is some

Case: 1:17-cv-00589-WCG  Filed 04/06/18  Page 29 of 40  Document 36-11

evidence that Illinois Central at least tacitly accepted that employees would not strictly comply with USOR D. Illinois Central foreman Howard McKeehan testified at his deposition that the USOR included a safety test that "specifies if you get hurt, you have the freedom to choose to either report it or not report it, depending on the injury. It's up to that individual." (McKeehan Dep. Tr. 48-49, Dkt. No. 56-6.) Thus, according to McKeehan, it is not unusual for an Illinois Central worker to suffer a minor injury, such as a cut, and not report it as an injury depending on the worker's choice and how badly the worker is hurt. [1] (Id.)

**\*2** On May 13, 2011, Burton was assigned to work with a signal crew of co-workers assigned to lay power cable in trenches near Matteson, Illinois. (Def.'s Resp. to Pl.'s SUF ¶¶ 3, 6, Dkt. No. 64; Pl.'s Resp. to Def.'s SUF re FELA ¶ 6, Dkt. No. 68.) Burton was responsible for maintaining the spool of cable, which was suspended from a back-hoe, while the rest of the crew pulled the cable from the spool and laid it in the trenches. (Pl.'s Resp. to Def.'s SUF re FELA ¶ 7, Dkt. No. 68.) Because his designated task was to maintain the spool, Burton was expected to keep an eye on the unraveling cable, to yell for the crew to stop pulling or to slow down if the spool was spinning too fast, or otherwise to alert the crew if something unexpected occurred. (Pl.'s Resp. to Def.'s SUF re FELA ¶ 8, Dkt. No. 68.) Besides Burton, the other members of the work crew assigned to lay cable that day included Woodbridge, Jeffrey Irzyk, Brad Mazies, and Joel Datil. (Def.'s Resp. to Pl.'s SUF ¶ 6, Dkt. No. 64.) McKeehan, who was the foreman of this work crew, and Sidikly Kone, who would act as foreman of the group if McKeehan was unavailable, were part of the same work group but were not present at the time of this job. (Kone Dep. Tr. 16:3-8, Dkt. No. 56-3; McKeehan Dep. Tr. 16:12-14, Dkt. No. 56-6.)

Irzyk and other members of the crew were pulling the cable, [2] while Burton's assignment was to stay by the reel to watch it in order to monitor whether the reel was spinning too fast—in other words, whether the cable was being released from the reel faster than the slack was being picked up by the crew pulling the cable. (Def.'s Resp. to Pl.'s SUF ¶ 18, Dkt. No. 64.) If that occurred, Burton was supposed to yell to the crew to slow down. (Id.)

The cable that was being unwound at this project was ordered by the railroad and came directly from the manufacturer; it was not unwound and placed on another

spool for this project. (Id. ¶ 16.) Generally, the tail end of the cable would be secured to the reel, either by being tied with a rope or stapled, depending on the size, and the fastener would have to be removed in order to detach the cable from the spool. (Id. ¶ 21.) Although Burton had been assigned to this task on two prior occasions, he had never seen a spool with the tail or tag end unattached in the times he had protected the spool's unraveling or been in the shop to dismantle the spools. (Pl.'s Resp. to Def.'s Stmt. of Additional Facts ("SAF") ¶ 33, Dkt. No. 74.) Youngman, Irzyk, and McKeehan testified that they had seen the end of the cable not secured to the spool on prior occasions. (Id. ¶¶ 33, 35.) It was not generally possible, however, to determine before the cable was mostly pulled off of the reel whether the end of the cable was secured to the spool. (Pl.'s Resp. to Def.'s SUF re FELA ¶¶ 14-16, Dkt. No. 68.)

Perhaps for this very reason, McKeehan testified that a job briefing would generally include whether the cable would be pulled manually or with a backhoe, and on occasions where a backhoe was used, a work crew would determine how much cable was left on the spool before the rest was pulled off manually so that no one would get "helicoptered" or "smacked" by the end of the cable. (Pl.'s Resp. to Def.'s SAF ¶ 35, Dkt. No. 74.) There is no evidence in the record regarding whether the job briefing on May 13, 2011 included any instruction regarding this hazard. For example, Woodbridge testified that he does not recall if the job briefing on May 13, 2011 included the contingency of the cable not being properly tagged. (Def.'s Resp. to Pl.'s SUF ¶ 31, Dkt. No. 64.)

As the crew pulled the cable, the reel began moving too fast and Woodbridge and others yelled to the crew pulling the cable to slow down. (Id. ¶ 19.) At this point, about half of the cable was unreeled. (Id.) When the last layer of cable was left on the reel, Woodbridge yelled for everybody to stop. (Id. ¶ 21.) At this time, he saw that the tail end of the cable was loose and had started to come out. (Id.) The "tail" end of the cable then shot out, striking Burton just above his right knee. (Id. ¶ 10; Pl.'s Resp. to Def.'s SUF re FELA ¶ 9, Dkt. No. 68.) After Burton was struck, he fell backwards and stumbled over a pile of debris consisting of the pallet that the cable reel was on, which was leaning against a mound of dirt, breaking his fall with his left arm. [3] (Pl.'s Resp. to Def.'s SUF re FELA ¶ 9, Dkt. No. 68.) Burton testified that he felt "excruciating" pain behind his right knee as a result of the blow from the tag

end of the cable. (Pl.'s Resp. to Def.'s SUF re FRSA ¶ 16, Dkt. No. 67.) At the time, however, Burton believed that the pain would go away, he did not need medical treatment, and the injury would result only in bruising. (*Id.*)

**\*3** At some point after Burton was struck by the end of the cable on May 13, Woodbridge gathered the work crew to have a group meeting to discuss a "close call incident." (Def.'s Resp. to Pl.'s SUF ¶ 15, Dkt. No. 64.) Burton testified that Woodbridge asked him whether he was "okay" at this safety meeting; Woodbridge denies that he spoke to Burton about his injury or the incident, however. (*Id.*) Later that evening, Burton told Datil and Mazies that he had been hit by the cable and was in pain. (Pl.'s Resp. to Def.'s SUF re FRSA ¶ 17, Dkt. No. 67.) That evening, Burton and Datil told Kone, who arrived on the work site that evening to begin his shift the next morning, that Burton had been hurt when he was struck by the end of the cable. (Def.'s Resp. to Pl.'s SUF ¶ 25, Dkt. No. 64; Kone Dep. Tr. 15:18-16:14, Dkt. No. 56-3.)

Burton returned to work the morning after the incident, May 14, 2011, when Kone was serving as the acting foreman. (Def.'s Resp. to Pl.'s SUF ¶ 26, Dkt. No. 64.) Kone asked Burton about his leg, and Burton told Kone it was sore around the thigh. (*Id.*) Because Burton was in pain, Kone assigned him lighter duty. (*Id.*) On May 15, Burton again reported for work and did not participate in his normal work activities because of his pain; however, Burton did not discuss his injury or whether he should report it with anyone that day. (Pl.'s Resp. to Def.'s SUF re FRSA ¶ 19, Dkt. No. 67.) On May 16, Burton spoke with foreman McKeehan about being hit by the cable and being in pain, and he told McKeehan that he was unsure if he was injured and that he was a little stiff and sore. (*Id.* ¶ 20.)

After finishing his shift that day, Burton went to the emergency room of Silver Cross Hospital and told the doctor that he had been injured at work. (*Id.* ¶ 22.) X-rays were negative, but Burton was diagnosed with a knee contusion and shoulder sprain. (*Id.*) The doctor told him to rest his knee and shoulder and he would be fine. (Def.'s Resp. to Pl.'s SUF ¶ 39, Dkt. No. 64.) The doctor also prescribed Burton pain medication and told him to follow up with his primary care physician within the next two or three days.[4] (Def.'s SUF re FRSA ¶ 23, Dkt. No. 67.) On May 17 and 18, Burton called McKeehan to tell him

that the doctor had prescribed rest and that he would not come to work. (Pl.'s Resp. to Def.'s SUF re FRSA ¶ 24, Dkt. No. 67.) Burton did not speak with anyone other than his foreman about his injury, however. (Burton Dep. Tr. 123:21-124:21, Dkt. No. 56-4.) He was not scheduled to work again until the following Monday, May 23. (Pl.'s Resp. to Def.'s SUF re FRSA ¶ 24, Dkt. No. 67.) Burton returned to work on May 23 and performed his regular duties. (*Id.* ¶ 25.) He worked four days that week but was still in pain, and icing and elevating his injury because of the pain. (*Id.* ¶ 26.) He did not discuss his pain or injury with anyone that week, and he did not report the injury to Youngman even though he was at the worksite. (*Id.* ¶ 27.)

On May 31, 2011, Burton told his acting foreman, an individual from Mississippi named Byron, that he was going home because he was in pain. He was told to call his supervisor, Youngman, to advise him about how the injury occurred. (Def.'s Resp. to Pl.'s SUF ¶ 40, Dkt. No. 64.) Burton called Youngman and explained that he had been injured on May 13. (*Id.*) Burton testified that he finally reported his injury because he felt he could no longer perform his duties. (Pl.'s Resp. to Def.'s SUF re FRSA ¶ 28, Dkt. No. 67.) Youngman asked Burton if he wanted to report the injury, and Burton said he was unsure. Youngman told Burton that he had been required to report his injury by the end of his shift on May 13, his failure to do so was not good, and Youngman would call him back. (*Id.* ¶ 30.) Later that day, Youngman called Burton, this time with Youngman's supervisor, Senior Manager for Construction Tom Hilliard, on the call. (*Id.* ¶ 31.) Hilliard told Burton that if he wanted to report the injury he needed to come in the following day and fill out an injury form. (*Id.* ¶ 33.) So Burton reported to Illinois Central's administration building the next day to fill out an injury report. (*Id.* ¶ 34.) He met Hilliard in the parking lot. (*Id.*) Burton claims that during this encounter, Hilliard asked Burton if he was sure that he wanted to fill out the injury report.(Burton Dep. Tr. 170:12-20, Dkt. No. 56-4.) Hilliard gives a somewhat different account of the meeting in the parking lot; according to Hilliard, he asked Burton how he was feeling. (Hilliard Dep. Tr. 16:1-17, Dkt. No. 56-8.) After the discussion with Hilliard, Burton then went inside the building to meet with Risk Mitigation Officer Larry Sands, at which time he completed Form 0475 required by the FRA. (Pl.'s Resp. to Def.'s SUF re FRSA ¶ 34, Dkt. No. 67.)

**\*4** The day after Burton reported his injury, Hilliard ordered Youngman to initiate a formal investigation under the collective bargaining agreement into whether Burton violated any work rules by reporting his injury 18 days after it occurred. (*Id.* ¶ 35.) As part of this investigation, Hilliard instructed Youngman to get the facts related to the issue, so Youngman interviewed the individuals who worked with Burton from May 13 through 16 and examined the injury site. (*Id.* ¶ 37.) On June 2, 2011, Illinois Central sent Burton a notice of the formal investigation. (*Id.* ¶ 38.) During the investigative hearing on August 17, Burton was represented by his union and allowed to present witnesses and evidence and ask questions of witnesses. (*Id.*) A court reporter made an accurate transcript of the investigation. (*Id.*) During the formal investigation, Burton stated that he experienced "severe" pain when the cable struck him, but he thought he could work through it. (*Id.*) Burton also stated that he knew he was in pain the entire 18 days before he reported the injury, but he did not understand that he was injured until he reported it on May 31. (*Id.* ¶¶ 39-41.)

On August 26, 2011, Burton received a letter from Illinois Central stating that he was dismissed from service immediately. (Def.'s Resp. to Pl.'s SUF ¶ 68, Dkt. No. 64.) This was the first time that Burton had received any formal discipline in the five months that he worked for Illinois Central. (*Id.* ¶ 67.) Hilliard and Youngman determined what charges to bring against Burton in the formal investigation, and Hilliard made the decision to terminate Burton. (*Id.* ¶¶ 45, 46.) During Hilliard's deposition, he testified that in deciding what discipline to assess Burton for his purported rule violation, he considered statements by employees involved in the investigation, work history, PMRC failures, employee audits, and rules. (Def.'s Resp. to Pl.'s SUF ¶ 47, Dkt. No. 64.) When pressed at his deposition, however, Hilliard could not recall any specific part of the investigation that led to his termination of Burton.[5] (Hilliard Dep. Tr. 27:14-23, Dkt. No. 56-8.) Hilliard represents that he has not disciplined an employee for reporting an injury. (Pl.'s Resp. to Def.'s SUF re FRSA ¶ 48, Dkt. No. 67.)

## DISCUSSION

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In seeking summary judgment, the moving party must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 324. A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).

### A. Burton's FELA Claim

Section 1 of FELA provides that "[e]very common carrier by railroad...shall be liable in damages to any person suffering injury while he is employed by such carrier...for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51. A relaxed standard of causation applies under FELA: "[u]nder this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers v. Missouri Pac. R. Co.*, 352 U.S. 500, 506 (1957). Thus, the plaintiffs' burden in a FELA action is significantly lighter than it would be in an ordinary negligence case. *Williams v. Nat'l R.R. Passenger Corp.*, 161 F.3d 1059, 1061 (7th Cir. 1998). Indeed, a FELA action may proceed past the summary judgment stage to get to a jury based upon "evidence scarcely more substantial than pigeon bone broth." *See Harbin v. Burlington N. Ry. Co.*, 921 F.2d 129, 132 (7th Cir. 1990). This is not to say, however, that a plaintiff in a FELA case may present no evidence whatsoever of negligence. A FELA plaintiff must "offer evidence proving the common law elements of negligence, including duty, breach, foreseeability, and causation," and a plaintiff who fails to produce "even the slightest evidence" as to those elements will lose on summary judgment. *See Williams*, 161 F.3d at 1062.

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**\*5** Illinois Central argues that Burton's claim cannot survive summary judgment because he has failed to adduce evidence of foreseeability. Foreseeability in this context involves a showing of either actual or constructive notice on the part of the railroad. *Id.* "[A]n employer is not liable if it has no way of knowing that a potential hazard exists." *Id.*; *see also Geraty v. Ne. Ill. Reg'l*, No. 06-CV-0815, 2009 WL 691280, at *8 (N.D. Ill. Mar. 16, 2009) (citing *Kaminski v. Chicago River & Ind. R. Co.*, 200 F.2d 1, 4 (7th Cir. 1952)) ("To be sure, when a defect is hidden from view, the potential for harm is less foreseeable").

Here, the undisputed evidence establishes that when a reel of cable is completely wound, it is impossible to discern whether the anchor end has been properly fastened to the reel. (Pl.'s Resp. to Def.'s SUF re FELA ¶¶ 14-16, Dkt. No. 68.) This is not dispositive of the foreseeability analysis, however. Youngman, Irzyk, and McKeehan all testified that they had seen instances when the end of the cable was not secured to the spool. (Pl.'s Resp. to Def.'s SAF ¶ 35, Dkt. No. 74.) Indeed, McKeehan testified that countermeasures had to be taken to prevent workers from getting "helicoptered" or "smacked" by the end of an unsecured cable—the very thing that caused Burton's injury. (*Id.*) Because the record indicates that multiple workers on Burton's own work crew were conscious of a possible risk of the very injury Burton sustained, the Court finds that there is sufficient evidence of foreseeability for Burton to survive summary judgment on his FELA count.

Illinois Central cites a number of cases that it contends establish that the loose cable does not reach the foreseeability threshold to allow Burton to defeat summary judgment. (Def.'s Mem. re FELA at 5-8, Dkt. No. 53.) In all of those cases, however, the events causing injuries were one-off occurrences and the plaintiffs were unable to adduce evidence that there was any forewarning of these incidents. In contrast, here the record indicates that an injury caused by unsecured "tag" ends of cable was a repeated (even if rare) occurrence. Under the relaxed standard of proof applicable to FELA claims, this is sufficient to survive summary judgment on the issue of foreseeability.

Illinois Central also argues that the Court should grant summary judgment in its favor because there is no legitimate issue of fact regarding whether it provided Burton with a reasonably safe place to work. The company argues that Burton himself "was the precaution that [Illinois Central] put into place to control any dangerous conditions involved in the cable coming off the spool" by controlling the speed of the spool to "ensure the efficient unraveling of the cable and the safety of the crew." (Def.'s Mot. re FELA at 9, Dkt. No. 53.) But Illinois Central does not address how it undertook reasonable safety measures against the foreseeable risk of a loose end of cable striking Burton. The record indicates that this danger was sufficiently common that workers had been instructed to take precautions against such an injury. Yet there is no indication that Burton, who had been working for Illinois Central for only five months and had only performed this particular task twice, was ever informed about the possibility that the tag end of the cable could possibly be loose. A railroad may be held liable under FELA "when it knows or should know of a potential hazard in the workplace, yet fails to exercise reasonable care to inform and protect its employees." *Moreno v. Grand Victoria Casino*, 94 F. Supp. 2d 883, 893 (N.D. Ill. 2000) (quoting *Gallose v. Long Island R.R.*, 878 F.2d 80, 84–85 (2d Cir. 1989)). The record evidence shows that Burton's injury—being "smacked" or "helicoptered" by a loose end of cable—was a known potential hazard. (*See* Pl.'s Resp. to Def.'s SAF ¶¶ 33, 35, Dkt. No. 74.) Furthermore, although job instructions on some previous occasions included warnings concerning the potential danger of loose ends of cable, it is an open issue whether such a warning was provided on this occasion. (*Id.* ¶¶ 31, 35.) Accordingly, the Court finds that there is an issue of fact regarding whether Illinois Central provided a reasonably safe workplace within the meaning of FELA.

**\*6** Although there is sufficient evidence for Burton to overcome Illinois Central's motion for summary judgment, the record does not support summary judgment in his favor either. There are issues of fact as to whether the incident was foreseeable, whether proper instructions were provided during the job briefing, and whether the failure to provide these instructions constitutes negligence. Notwithstanding Burton's suggestion to the contrary, FELA's lower standard of proof does not allow a Court to grant summary judgment in a plaintiff's favor simply because he has adduced evidence sufficient to survive summary judgment. *Harbin*, 921 F.2d at 131 ("The lenient standard for ***avoiding*** summary judgment under the FELA merely mirrors the pro-plaintiff slant of the substantive law") (emphasis added).

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**B. Burton's FRSA Retaliation Claim**

The FRSA prohibits a rail carrier from discharging an employee who reports a work-related injury in good faith. 49 U.S.C. § 20109(a). FRSA claims are governed by the legal burdens of proof set forth in 49 U.S.C. § 42121. *See* 49 U.S.C. § 20109(d)(2)(A). To establish a *prima facie* case under the FRSA, Burton must demonstrate that "(i) he engaged in a protected activity; (ii) [Illinois Central] knew or suspected, actually or constructively, that he engaged in the protected activity; (iii) he suffered an adverse action; and (iv) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action." *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014). If Burton establishes a *prima facie* case, the burden then shifts to Illinois Central to demonstrate by clear and convincing evidence that it would have terminated his employment in the absence of any alleged protected activity. *Id.*

The FRSA only protects an employee's "good faith act done...to notify, or attempt to notify, the railroad carrier or the Secretary of Transportation of a work-related personal injury." 49 U.S.C. § 20109(a)(4). According to Illinois Central, Burton cannot establish good faith because he was injured but did not report his injury for 18 days. But the railroad fails to cite any authority for the proposition that a delay in reporting an injury implicates the FRSA's "good faith" provision. Instead, the relevant inquiry is whether an FRSA plaintiff genuinely believes that the injury being reported was work-related. *See, e.g., Cash v. Norfolk S. Ry. Co.*, No. 6:13-CV-00056, 2015 WL 178065, at *11 (W.D. Va. Jan. 14, 2015); *Koziara v. BNSF Ry. Co.*, No. 13-CV-834-JDP, 2015 WL 137272, at *6 (W.D. Wis. Jan. 9, 2015); *Davis v. Union Pac. R.R. Co.*, No. 5:12-CV-2738, 2014 WL 3499228, at *6-7 (W.D. La. July 14, 2014); *Ray v. Union Pac. R.R. Co.*, 971 F. Supp. 2d 869, 884 (S.D. Iowa 2013). Here, there is no suggestion that Burton has been disingenuous in claiming that his injuries were work-related. Accordingly, the Court denies Illinois Central's motion for summary judgment to the extent it asks the Court to find that Burton reported his injury in bad faith.

Illinois Central also contends that there is insufficient evidence to establish a causal connection between Burton's injury report and his termination. The FRSA incorporates by reference the rules and procedures applicable to whistleblower cases under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR–

21"). 49 U.S.C. § 20109(d)(2)(A). Thus, Burton may make his *prima facie* case if he can show that his injury report was "a contributing factor in the unfavorable personnel action alleged in the complaint." *Id.* (incorporating by reference 49 U.S.C. § 42121(b)(2)(B)(i)); *see also Araujo v. NJ Transit Rail Operations, Inc.*, 708 F.3d 152, 157 (3d Cir. 2013). Once a plaintiff makes a showing that the protected activity was a "contributing factor" to the adverse employment action, the burden shifts to the employer to demonstrate "by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior." 49 U.S.C. § 20109(d)(2)(A) (incorporating by reference 49 U.S.C. § 42121(b)(2)(B)(ii)).

*\*7* Although the Seventh Circuit has not explicitly addressed the "contributing factor" analysis in the FRSA context, when analyzing similar language it has stated that "a 'contributing factor' is something less than a substantial or motivating one." *Addis v. Dep't of Labor*, 575 F.3d 688, 691 (7th Cir. 2009) (citing *Frobose v. Am. Sav. & Loan Ass'n*, 152 F.3d 602, 612 (7th Cir. 1998)). Congress defined "contributing factor" as "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Id.* (quoting *Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993)). The "contributing factor" phrase "is specifically intended to overrule existing case law, which requires a whistleblower to prove that his protected conduct was a 'significant,' 'motivating,' 'substantial,' or 'predominant' factor in a personnel action in order to overturn that action." *Id.* (quoting *Marano*, 2 F.3d at 1140); *see also Ameristar Airways, Inc. v. Admin. Rev. Bd.*, 650 F.3d 562, 567 (5th Cir. 2011) (a "contributing factor" in the FRSA retaliation context "is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision.") (citations omitted). Thus, under the relevant language, Burton may establish his *prima facie* case with a "lesser showing than plaintiffs must make in the traditional *McDonnell Douglas* employment action." [6] *Id.*; *see also Araujo*, 708 F.3d at 157 (*prima facie* case under the "contributing factor" analysis is "much easier for a plaintiff to satisfy then the *McDonnell Douglas* standard.").

Under this standard, Burton has established a sufficient causal connection between his injury report and his termination to survive summary judgment. Just two days after Burton filed his injury report, Illinois Central

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.    6

began a formal investigation.[7] It is undisputed that the investigation was occasioned by Burton's injury report; thus, if Burton had not reported his injury, Illinois Central would not have instituted an investigation into the timeliness of Burton's injury report and Burton would not have been fired. This chain of events is sufficient to create a genuine issue of material fact as to whether his injury report was a "contributing factor" to Burton's termination. *See, e.g., Smith–Bunge v. Wis. Cent., Ltd.,* No. 13-cv-2736, 2014 WL 5023471, at *7 (D. Minn. Oct. 8, 2014) (employee's injury report was a "contributing factor" in a railroad's decision to suspend him for failing to timely report injuries); *Ray*, 971 F. Supp. 2d at 888 (same); *see also Koziara*, 2015 WL 137272, at *9 (report of injury was "contributing factor" in adverse employment action that plaintiff claimed was taken due to rule violations that were discovered during investigation prompted by plaintiff's accident report).

Illinois Central suggests that it has rebutted Burton's *prima facie* case by presenting undisputed facts showing that it terminated Burton due to his delay in reporting his injuries in violation of USOR D. The Court disagrees, as there are myriad disputed facts relating to this purported motivation. For instance, there is a genuine issue of material fact regarding whether USOR D was enforced in a uniform manner. McKeehan testified that USOR D specifies that an injured worker has a choice as to whether to report an injury depending on the severity of the injury, and that it was not unusual for Illinois Central workers not to report minor injuries. (McKeehan Dep. Tr. 48-49, Dkt. No. 56-6.) Although Illinois Central maintains that USOR D is strictly enforced, there is sufficient evidence from which a reasonable trier of fact could conclude that Illinois Central selectively enforced USOR D against Burton in retaliation for his reporting his injury.

Additionally, a reasonable factfinder could conclude that Burton did not actually violate USOR D. That regulation requires an injured worker to report an injury "to the proper authority." (Pl.'s Resp. to Def.'s SUF re FRSA Claim ¶ 10, Dkt. No. 67.) Burton discussed his injury with Kone, an acting foreman, on the very evening of the accident, and he spoke with foreman McKeehan about the incident on May 16. (Def.'s Resp. to Pl.'s SUF ¶¶ 13-14, 16, Dkt. No. 64.) Although Illinois Central argues that a foreman is not a "proper authority" within the meaning of USOR D, it does not provide any evidence of who

would constitute "proper authority" under its relevant safety rules.[8] Furthermore, although Illinois Central cites Supreme Court authority indicating that foremen are not "supervisors" within the meaning of Title VII (Def.'s Mot. re FRSA at 5, Dkt. No. 50), the issue here is whether Burton reported his injury to the "proper authority" as defined in USOR D.

**\*8** As a final example, the Court notes that a reasonable jury could conclude that various statements and testimony evidence animus or pretext. Burton testified at his deposition that prior to filling out his injury report, Hilliard asked him if he was sure he wanted to fill out the report. A reasonable jury could see this as a statement meant to discourage Burton from filling out an injury report, with the subsequent investigation and termination constituting retaliation for doing so. Additionally, although Hilliard now provides an affidavit describing the particular factors that led him to decide on the discipline he imposed on Burton, at Hilliard's deposition he was utterly incapable of identifying a single fact that he considered in rendering his decision. Suffice it to say that a jury may question Hilliard's credibility on the reasons for Burton's termination, and credibility is an issue of fact.

The Court also cannot grant summary judgment in favor of Burton on his FRSA retaliation claim. Again, although there is sufficient evidence to allow his claim to survive summary judgment, there are issues of fact as to whether Burton has established a sufficient causal connection between his injury report and his termination, and whether Illinois Central can meet its burden to show, by clear and convincing evidence, that it would have terminated his employment in the absence of any alleged protected activity.

## CONCLUSION

For the foregoing reasons, the Court denies Illinois Central's motions for summary judgment and Burton's motion for summary judgment.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 302109

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Footnotes

1     Illinois Central denies that the safety rules and company policy specify that if an employee gets hurt he has the choice or reporting it or not reporting it, depending on the injury. However, McKeehan's testimony indicates that employees are given some latitude in deciding whether or not to report an injury.

2     It is unclear by what means the work crew was pulling the cable. At his deposition, Irzyk testified that he was pulling the cable by backhoe (Irzyk Dep. Tr. at 12:2-20, Dkt. No. 56-2.) However, other witnesses, including Burton, testified that the cable was pulled by hand. (*See* Burton Dep. at 76:8-77:3, 303:3-18, Dkt. No. 56-4.) It appears only Izryk testified that the cable was being pulled using a backhoe.

3     Illinois Central "denies" that Burton fell, citing testimony that none of Burton's coworkers saw him fall. (Def.'s Resp. to Pl.'s SUF ¶ 11, Dkt. No. 64.) However, Burton testified that he did fall after being struck by the cable (Burton Dep. Tr. 81:10-83:12, Dkt. No. 56-4) and Illinois Central does not identify evidence in the record that actually contradicts Burton's testimony.

4     Burton now denies that he was instructed to follow up with his primary care physician but, at his deposition, Burton clearly testified that he was instructed to do so. (Burton Dep. Tr. at 119-20, Dkt. No. 56-4.)

5     Although Illinois Central now denies it, Hilliard clearly testified at his deposition that he could not recall what evidence led to his termination of Burton. (Hilliard Dep. Tr. 27:14-23, Dkt. No. 56-8.)

6     For this reason, the Court rejects as irrelevant cases cited by Illinois Central that utilize the *McDonnell Douglas* burden shifting test.

7     Although timing alone cannot suffice to establish a *prima facie* retaliation claim under *McDonnell Douglas*, such evidence is sufficient in the FRSA context. *See Araujo*, 708 F.3d at 160.

8     Illinois Central cites evidence that foremen are part of the same collective bargaining group as Burton and are not considered part of Illinois Central management. (Pl.'s Resp. to Def.'s FRSA Rule 56.1 St. ¶¶ 11-14, Dkt. No. 67.) However, Illinois Central fails to put forward evidence that either the text of USOR D or the training provided in support of that rule explains the import of that fact to the USOR D reporting requirement.

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 485471
Only the Westlaw citation is currently available.
United States District Court,
M.D. Georgia,
Macon Division.

Elaine L. CHAO, Secretary of Labor,
U.S. Department of Labor, Plaintiff,
v.
BLUE BIRD CORPORATION, Defendant.

No. 5:06–CV–341 (CAR).
|
Feb. 26, 2009.

**Attorneys and Law Firms**

Kristina T. Harrell, Atlanta, GA, Robert Milton Lewis, Jr., McDonough, GA, for Plaintiff.

Carla J. Gunnin, Atlanta, GA, Frank L. Butler, III, Constangy Brooks & Smith LLC, Macon, GA, for Defendant.

**Opinion**

### *BENCH TRIAL ORDER*

C. ASHLEY ROYAL, District Judge.

**\*1** The Secretary of Labor filed this action on behalf Ricky Dye, a former employee of Defendant Blue Bird Corporation ("Blue Bird"), contending that Mr. Dye was unlawfully discharged in retaliation for raising safety concerns about a work assignment in violation of section 11(c)(1) of the Occupational Safety and Health Act, 29 U.S.C. § 660(c)(1) ("OSHA"). The Court heard this case without a jury on November 25, 2008, and after considering the evidence and the applicable law, the Court makes the following Findings of Fact and Conclusions of Law. As explained herein, the Court grants judgment in favor of **PLAINTIFF** and against **DEFENDANT** on all claims.

### FINDINGS OF FACT

Based on the testimony heard at trial and other evidence submitted, the Court makes the following findings of fact:

Blue Bird hired Ricky Dye in 1979, and at all times relevant to this action, Mr. Dye worked in Blue Bird's Tool and Die Department. The events giving rise to this action occurred on November 18, 2004. At that time, Donald Martin was the group leader of the Tool and Die Department, and Steve Hamlan was the Facilities Manager. Although Don Martin was the Group Leader of the Tool and Die Department, he was not Mr. Dye's supervisor; Steve Hamlan was both Mr. Dye's and Don Martin's direct supervisor. On November 18, 2004, Steve Hamlan instructed Don Martin to have two employees from the Tool and Die Department hang approximately six large Christmas wreaths on the front exterior of the Blue Bird building. In the past, this job had been performed by the Maintenance Department, and this occasion was the first time the Tool and Die Department had been requested to perform the job. At approximately 1 p.m., Don Martin asked Mr. Dye and another employee, Steve Mygrant, to hang the Christmas wreaths. Don Martin explained that he asked Mr. Dye to perform this particular job because he "felt like Dye would do anything. He could hang the moon if need be." (Testimony of Don Martin.) In order to hang the wreaths, it was determined that Mr. Dye and Mr. Mygrant would have to operate a JLG lift or "bucket lift."

After seeing how large the wreaths were—measuring approximately 15 feet in diameter and weighing between fifty and one hundred pounds each—Mr. Dye expressed concerns to Don Martin regarding the proper procedure in hanging the wreaths. Steve Mygrant was present when Mr. Dye expressed his concerns. Specifically, Mr. Dye told Don Martin that neither he nor Mr. Mygrant knew how to operate a JLG lift, that neither he nor Mr. Mygrant had ever hung the wreaths before, and that hanging the wreaths would be dangerous. (Testimony of Ricky Dye and Steve Mygrant.) Mr. Dye also expressed concerns that, in hanging the wreaths on the front of the building, they would be out in the parking lot, twenty-five feet up in the air, with no knowledge of how to operate the lift. Mr. Dye also asked for instructions on how to operate the bucket lift. Mr. Dye did not refuse to perform the job, he just expressed his safety concerns and wanted proper instructions on how to properly hang the wreaths.

**\*2** After expressing these safety concerns, Don Martin instructed Mr. Dye to contact their supervisor, Steve Hamlan. Thus, at approximately 1:30 p.m., Mr. Dye

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 1

called Steve Hamlan on the telephone. Mr. Dye told Hamlan that they "could get killed trying to do this;" that they "[did not] know what they [were] doing;" that they "[did not] know how to operate the lift;" and that they "could get hurt." Thereafter, Hamlan told Mr. Dye to "not worry about it," that he would get someone else to do the job. Again, Mr. Dye told Hamlan that he was not refusing to perform the job, he just wanted proper instructions on how to operate the lift and properly hang the wreaths.

Having been told that Steve Hamlan would get someone else to hang the wreaths, Mr. Dye went back to working in other capacities. At approximately 2:30 p.m., Mr. Dye was told by another employee that Steve Hamlan had given Mr. Dye a "strike." Although Mr. Dye had never heard the term before, he believed it to be some sort of disciplinary action taken against him for not hanging the wreaths. Thus, Mr. Dye went to Don Martin and asked him to set up a meeting with Steve Hamlan to determine what the term "strike" meant and whether he had, in fact, received such a "strike" because he had not hung the Christmas wreaths. Mr. Dye was concerned about his employment record and was also concerned about his job because Mr. Hamlan had a reputation for firing people.

Approximately thirty minutes later, around 3:00 p.m., a meeting took place in Hamlan's office wherein Mr. Dye, his group leader Don Martin, and his supervisor Steve Hamlan were present. At the meeting, Hamlan asked Mr. Dye why he had refused to hang the wreaths. Mr. Dye responded that he did not refuse to perform the work, he just felt that he could have gotten hurt, and it was not safe to perform the tasks without proper instructions on how to operate the bucket lift. After further exchange and disagreement on whether Don Martin had given Mr. Dye instructions on how to operate the bucket lift, Steve Hamlan told Mr. Dye to lay his work badge on the table, lock his tool box, and get out, thereby terminating him from employment. Mr. Dye laid his badge on the table, and Don Martin escorted him out of Mr. Hamlan's office. As Mr. Dye and Don Martin were leaving Mr. Hamlan's office, Mr. Dye told Martin to "get away from [him]," that Martin had just "gotten [him] fired." (Testimony of Don Martin.) Don Martin stated that he believed that Mr. Dye had quit, that he had not been fired. Thereafter, another Blue Bird employee escorted Mr. Dye out of the building and to his vehicle. Mr. Dye did not clock out when he left the building.

The next day, Mr. Dye called Mike McCurdy, vice president of Blue Bird's human resources department, and told McCurdy that he had been fired because he had not hung the Christmas wreaths. Mr. Dye requested that McCurdy investigate the reasons why he had been fired and specifically asked him to also interview his co-worker, Steve Mygrant. McCurdy informed Mr. Dye that he could not be officially terminated unless he, McCurdy, was involved. He told Mr. Dye that he would investigate the situation. During his investigation, McCurdy spoke with Steve Hamlan and Don Martin, both of whom told McCurdy that Mr. Dye had turned in his badge and quit. McCurdy also spoke with Joe Belcastro, Hamlan's supervisor. McCurdy did not interview Steve Mygrant. After speaking with these individuals, McCurdy determined that Mr. Dye would no longer be employed with Blue Bird. McCurdy called Mr. Dye the following Tuesday and told Mr. Dye that he was officially terminated from Blue Bird.

**\*3** McCurdy testified that he believed that Mr. Dye had voluntarily quit his employment with Blue Bird. In completing the official paperwork after Mr. Dye's official termination, McCurdy, however, wrote "insubordination" as the reason for Mr. Dye's separation from Blue Bird. McCurdy explained that he wrote "insubordination" on the paperwork because Mr. Dye had "walked off the job and did not punch out." (Testimony of Mike McCurdy.) McCurdy also testified that it was proper for Mr. Dye to report safety concerns to his group leader, Don Martin, and that it was not required that Mr. Dye report any safety concerns in writing. (Testimony of Mike McCurdy.)

After Mr. Dye's termination, on December 2, 2004, Steve Mygrant wrote and signed a statement that he was given the task to hang the wreaths and that he "was able" to perform the task and "had clear instructions without any problem." (Trial Ex. J–15.) However, Mr. Mygrant testified that the statement was untrue, written at the instruction of Steve Hamlan because he was afraid of losing his job. Steve Hamlan had a reputation of firing people, and Mr. Mygrant did not want to lose his employment.

During the 15 to 16 years Mr. Dye worked in the Tool and Die Department, he had never received any verbal or written reprimands. By all accounts, Mr. Dye was a very

Case 1:17-cv-00589-WCG Filed 04/06/18 Page 38 of 40 Document 36-11

good employee. In fact, the month before this incident occurred, Mr. Dye had been given his 25th year of service accommodation.


### CONCLUSIONS OF LAW

**Liability under OSHA**

The Secretary filed this action alleging that Blue Bird violated Section 1 1(c)(1) of OSHA by terminating Mr. Dye's employment due to his refusal to work under allegedly unsafe conditions. Section 11(c)(1) provides:

> No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter.

29 U.S.C. § 660(c)(1); 29 C.F.R. § 1977.3. Claims alleging wrongful discharge in retaliation for exercising rights afforded under the Act are analyzed under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff must present sufficient evidence to satisfy the elements of her prima facie case. *Id.* at 802. If a prima facie case is established, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment action. *Id.* If articulated, the plaintiff must show that the defendant's reason was pretextual in order to prevail. *Id.* at 802–03.


*Prima Facie Case*

To establish her prima facie case, the Secretary must show by a preponderance of the evidence that (1) Mr. Dye engaged in protected activity; (2) Blue Bird took adverse action against Mr. Dye; and (3) a causal connection exists between the protected activity and the adverse action. *Cotton v. Cracker Barrel Old Country Store, Inc.,* 434 F.3d 1227, 1233 (11th Cir.2006). The Court finds that the Secretary has established a prima facie case of unlawful retaliatory discharge.

**\*4** First, Mr. Dye engaged in protected activity when he, in good faith, complained about safety concerns first, to his group leader, Don Martin, and second, to his direct supervisor and the Facilities Manager, Steve Hamlan. Under the Act, an employer may not discharge "any employee because such employee has filed any complaint ... under or related to this Act[.]" 29 U.S.C. § 660(c)(1); 29 C.F.R. § 1977.3. "The range of complaints 'related to' the Act is commensurate with the broad remedial purposes of this legislation and the sweeping scope of its application, which entails the full extent of the commerce power." 29 C.F.R. § 1977.9(a). "Further, the salutary principles of the Act would be seriously undermined if employees were discouraged from lodging complaints about occupational safety and health matters with their employers. Such complaints to employers, if made in good faith, therefore would be related to the Act, and an employee would be protected against discharge or discrimination caused by a complaint to the employer." 29 C.F.R. § 1977.9(b). It is undisputed that it was proper for Mr. Dye to make safety complaints to his supervisor.

Moreover, the Act protects Mr. Dye's refusal to hang the Christmas wreaths because he in good faith refused to perform the job in lieu of subjecting himself to serious injury. Although, "as a general matter, there is no right afforded by the Act which would entitle employees to walk off the job because of potential unsafe conditions at the workplace," 29 C.F.R. § 1977.12(b)(1), an employee is protected from discrimination upon a good faith refusal to expose himself to conditions the employee reasonably believes would expose him to death or serious injury. *See* 29 C.F.R. § 1977.12(b)(2).

Based on the Court's finding that Mr. Dye was terminated from employment, it is clear that the adverse action prong of the prima facie case is met. Thus, the final inquiry the Court must make in determining whether Mr. Dye establishes a prima facie case is whether there is a causal connection between the protected activity and the adverse action. The Court finds that there is. To establish a causal connection, a plaintiff must show that (a) the decision-makers were aware of the protected conduct; and (b) the protected activity and the adverse employment action were not wholly unrelated. *Gupta v. Fla. Bd. of Regents,* 212 F.3d 571, 590 (11th Cir.2000). "The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 3

and the negative employment action are not completely unrelated." *Pennington v. City of Huntsville,* 261 F.3d 1262, 1266 (11th Cir.2001).

Here, Blue Bird was aware of Mr. Dye's protected activity as evidenced by the fact Mr. Dye repeatedly expressed his safety concerns to both his group leader and his direct supervisor. Additionally, the very close temporal proximity between the safety complaints and his termination—mere hours—is certainly sufficient to meet the causal connection prong. Very close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to raise an inference of causation. *See Clark v. Cty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); *Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir.2004). Thus, Plaintiff has established his prima facie case.

*Legitimate Non–Discriminatory Reason for Termination and Pretext*
**\*5** The Court further finds that Blue Bird's proffered reasons for discharging Mr. Dye are merely pretext for discrimination. Although Blue Bird maintains that Mr. Dye voluntarily quit, it simultaneously maintains that he was fired for insubordination. Changes in the employer's proffered reason for its employment decision support a finding of pretext. *See Kobrin v. Univ. of Minn.,* 34 F.3d 698, 703 (8th Cir.1994); *see also E.E.O.C. v. Ethan Allen, Inc.,* 44 F.3d 116, 120 (2nd Cir.1995). Moreover, although Mike McCurdy, the Vice President of Human Resources, stated that he investigated the incident, the

Court finds that the investigation was neither thorough nor complete. McCurdy only interviewed Don Martin, Steve Hamlan, and Joe Belcastro, Hamdan's supervisor, who knew nothing of the incident. Despite the fact Mr. Dye specifically told McCurdy to interview Steve Mygrant—Mr. Dye's co-worker who was also asked to hang the wreaths and was present when Mr. Dye first expressed his safety concerns to Don Martin—McCurdy did not do so.

### Damages
The parties have filed a Joint Stipulation [Doc. 21] as to damages which this Court adopts and makes a part of this Order. Plaintiff shall be reinstated at Blue Bird in his prior position with all prior benefits, and shall receive back pay in accordance with the Stipulation.

## CONCLUSION

The Court heard this case without a jury, and after considering the evidence and the applicable law, the Court makes the Findings of Fact and Conclusions of Law as stated herein. For the foregoing reasons, the Court grants judgment in favor of **PLAINTIFF** and against **DEFENDANT** on all claims.

### SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 485471, 22 O.S.H. Cas. (BNA) 1665, 2009 O.S.H.D. (CCH) P 32,989

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.