2015 WL 12618779
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

Thomas E. Perez, Secretary of Labor, United States Department of Labor, Plaintiff,
v.
DSI Contracting, Inc., DSI Contracting, Inc. Profit Sharing Plan, a benefit plan, and Burgess Baird, Jr., an individual, Defendants.

CIVIL ACTION NO. 1:14-CV-282-LMM
|
Signed 07/23/2015
|
Filed 07/24/2015

**Attorneys and Law Firms**

Lydia Jones Chastain, Robert Milton Lewis, Jr., U.S. Department of Labor, Atlanta, GA, for Plaintiff.

Tom Pye, Law Offices of Tom Pye, P.C., Norcross, GA, for Defendants.

### ORDER

LEIGH MARTIN MAY, UNITED STATES DISTRICT JUDGE

*1 This is an action arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461. It is before the Court on Plaintiff's Motion for Summary Judgment [18] and Defendants' Motion to Strike the Affidavit of Genevieve Schmidt [28]. After reviewing the record and considering the arguments of the parties, the Court enters the following Order.

**I. Background**
Plaintiff Thomas E. Perez, Secretary of Labor for the United States Department of Labor ("Secretary") filed this action on January 31, 2014, alleging Defendants Burgess Baird, Jr. and DSI Contracting, Inc. ("DSI") violated various ERISA provisions in the management of the DSI Contracting, Inc. Profit Sharing Plan ("the Plan"). Dkt. No. [1]. Baird is the sole owner and President of DSI, a residential development company based in Lilburn, Georgia. Dkt. No. [18-1] ¶¶ 3, 7; Dkt. No. [26] ¶¶ 3, 7. DSI adopted the Plan in 1980 as an employee benefit plan within the meaning of ERISA. Dkt. No. [18-1] ¶¶ 9-10; Dkt. No. [26] ¶¶ 9-10. The Plan is a defined contribution pension plan that allows for discretionary profit sharing contributions to be made by the employer. Dkt. No. [18-1] ¶ 12; Dkt. No. [26] ¶ 12. DSI is the Plan Sponsor and the Plan Administrator, and Baird is the Plan Trustee. Dkt. No. [18-1] ¶¶ 11, 13-14; Dkt. No. [26] ¶¶ 11, 13-14. Baird managed and controlled the Plan's assets, set contribution requirements, and made investment decisions. Dkt. No. [18-1] ¶¶ 15, 17-18; Dkt. No. [26] ¶¶ 15, 17-18. Because of their roles, DSI and Baird are "fiduciaries" and "parties in interest" to the Plan within the meaning of ERISA. Dkt. No. [18-1] ¶¶ 19-20; Dkt. No. [26] ¶¶ 19-20. The Plan has fifteen participants, including Baird. Dkt. No. [18-1] ¶ 21; Dkt. No. [26] ¶ 21.

Baird, a real estate developer with over 40 years of experience, entered into a contract with Centex Homes in or around 2004[1] to develop a 140-lot residential subdivision. Dkt. No. [27] ¶¶ 1, 3; Dkt. No. [31] ¶¶ 1, 3. The development was expected to take 18 months to complete, at which time Centex Homes would purchase the subdivision for $7 million. Dkt. No. [27] ¶ 3; Dkt. No. [31] ¶ 3.

Baird created Eight Stones, L.L.C. ("Eight Stones") in August 2004 in order to purchase a piece of property in Austell, Georgia ("Stonebrook Property"), which he intended to develop into the 140-lot residential subdivision for Centex Homes ("Stonebrook Development"). Dkt. No. [18-1] ¶ 24; Dkt. No. [26] ¶ 24. Baird owned a 60% interest in Eight Stones, and eight other individuals, five of which were DSI employees and Plan participants, held smaller ownership interests. Dkt. No. [18-1] ¶¶ 23, 27, 34; Dkt. No. [26] ¶¶ 23, 27, 34. Baird and other members of Eight Stones researched factors relevant to developing the Stonebrook Property and "costed it out," concluding it would cost approximately $5 million. Dkt. No. [27] ¶ 5; Dkt. No. [31] ¶ 5.

*2 In order to secure a loan with which to purchase and develop the Stonebrook Property, Baird needed to raise $500,000.00 in capital. Dkt. No. [18-1] ¶ 25; Dkt. No. [26] ¶ 25. In August 2004, Baird caused the Plan to issue participant loans totaling $154,000.00 to five DSI employees so that they could purchase ownership interests in Eight Stones. Dkt. No. [18-1] ¶¶ 27, 30; Dkt. No. [26]

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 7

1

¶¶ 27, 30. The promissory notes underpinning the five participant loans to DSI employees required four annual repayments of principal and a static 6% interest rate, with the first payment due on August 25, 2005. Dkt. No. [18-1] ¶¶ 28-29; Dkt. No. [26] ¶¶ 28-29. At the time the loans were issued, neither Baird nor the participant borrowers expected the loans to be repaid according to their terms; instead, he expected the borrowers to repay the loans after Centex Homes purchased the Stonebrook Development. Dkt. No. [18-1] ¶¶ 38, 44; Dkt. No. [26] ¶¶ 38, 44.

In 2004, after raising the requisite capital from his Eight Stones co-owners, Baird personally guaranteed a $4.5 million development loan from Southern Heritage Bank which Eight Stones used to purchase the Stonebrook Property. Dkt. No. [18-1] ¶ 33; Dkt. No. [26] ¶ 33; Dkt. No. [19] at 59:7-9. Eight Stones contracted with DSI to clear, grade, and lay pipes and pavement for the lots of the Stonebrook Property. Dkt. No. [18-1] ¶ 35; Dkt. No. [26] ¶ 35. However, in 2006, Centex Homes declined to buy the Stonebrook Development, defaulting on their contract with Baird to purchase 140 lots. Dkt. No. [18-1] ¶ 39; Dkt. No. [26] ¶ 39; Dkt. No. [27] ¶ 7; Dkt. No. [31] ¶ 7.

After the contract with Centex Homes fell through, Eight Stones began selling lots within the Stonebrook Development to individual home builders. Dkt. No. [18-1] ¶ 40; Dkt. No. [26] ¶ 40. Eight Stones sold approximately 60 lots, but by September 2008 it defaulted on its development loan, and Southern Heritage Bank foreclosed on the remaining lots. Dkt. No. [18-1] ¶¶ 40-41; Dkt. No. [26] ¶¶ 40-41. The Plan participants who took participant loans to invest in Eight Stones never made any payments on those loans, and Baird did not take any steps to change the terms of the loans or compel repayment. Dkt. No. [18-1] ¶¶ 42-43, 45; Dkt. No. [26] ¶¶ 42-43, 45.

Between 2004, when Eight Stones purchased the Stonebrook Property, and 2006, when Centex Homes defaulted on their contract, Baird caused the Plan to purchase three parcels of real estate contiguous to the Stonebrook Property on Causey Road in Cobb County, Georgia (collectively "Causey Properties"). Dkt. No. [18-1] ¶¶ 48-49; Dkt. No. [26] ¶¶ 48-49. The Causey Properties include the Brown Property, the Few Property, and the Moon Property. Dkt. No. [18-1] ¶ 48; Dkt. No. [26] ¶ 48. Baird intended for the Causey Properties to be developed into a subsequent phase of the Stonebrook Development. Dkt. No. [18-1] ¶ 50; Dkt. No. [26] ¶ 50. Baird caused the Plan to pay "what [the sellers] were asking for" the Causey Properties without having any of the parcels independently appraised. Dkt. No. [18-1] ¶¶ 53-54; Dkt. No. [26] ¶¶ 53-54. The Plan paid $193,716.00 for the Brown Property, $269,903.00 for the Few Property, and $74,500.00 for the Moon Property. Dkt. No. [18-1] ¶ 48; Dkt. No. [26] ¶ 48. The Plan still owns the Causey Properties, which were valued by an independent appraiser in January 2014 at $226,000.00— less than the original purchase prices. Dkt. No. [18-1] ¶¶ 62-64; Dkt. No. [26] ¶¶ 62-64. Defendants have not paid property taxes on the Brown Property and the Few Property, resulting in tax liens exceeding $26,000.00. Dkt. No. [18-1] ¶¶ 60-61; Dkt. No. [26] ¶¶ 60-61.

In 2007, Baird caused the Plan to loan $490,000.00 to builder Burge Realty, L.L.C. ("Burge Realty") so that it could purchase ten lots in the Stonebrook Development ("the ten lots") from Eight Stones. Dkt. No. [18-1] ¶¶ 65-66; Dkt. No. [26] ¶¶ 65-66. The ten lots served as collateral for the loan. Dkt. No. [18-1] ¶ 70; Dkt. No. [26] ¶ 70. Defendants admit that they did not have the ten lots independently appraised prior to accepting them as collateral for the $490,000.00 loan, but explain that other lots in the area were selling for $54,000.00 each. Dkt. No. [18-1] ¶ 71; Dkt. No. [26] ¶ 71. Defendants also admit that they did not run a credit check on Burge Realty, but add that Baird had known and done business with Dan Burge, the principal of Burge Realty, for 25 years. Dkt. No. [18-1] ¶¶ 68-69; Dkt. No. [26] ¶¶ 68-69; Dkt. No. [27] ¶ 10; Dkt. No. [31] ¶ 10. Baird testified that the purpose of the loan was to "get money into Eight Stones" so that it could "pay for the sewer outfalls and interest on the note to Southern Heritage Bank." Dkt. No. [18-1] ¶¶ 72-73; Dkt. No. [26] ¶¶ 72-73. Burge Realty has never repaid the loan or made interest payments, and Defendants have not taken action to foreclose on the ten lots. Dkt. No. [18-1] ¶¶ 74-75; Dkt. No. [26] ¶¶ 74-75. In March 2014, the ten lots were valued at $180,000.00 by an independent appraiser. Dkt. No. [18-1] ¶ 77; Dkt. No. [26] ¶ 77. Defendants claim that the Plan will "take back" the property either by foreclosure, deed in lieu, or a quitclaim deed after this litigation is resolved. Dkt No. [26] ¶ 75; Dkt. No. [27] ¶ 14.

**\*3** The Secretary initiated this lawsuit in January 2014, alleging that Defendants' conduct involving the participant loans, the Causey Properties, and the Burge Realty loan was in breach of their ERISA fiduciary duties.

Dkt. No. [1]. The Secretary now moves for summary judgment.

## II. Legal Standard

Federal Rule of Civil Procedure 56 provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the Court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp., 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996). Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. Id. All reasonable doubts, however, are resolved in the favor of the non-movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

## III. Discussion

The Secretary moves for summary judgment, arguing that the undisputed facts show that Defendants breached their fiduciary duties by causing the Plan to issue participant loans for investment in Eight Stones, causing the Plan to invest in the Causey Properties, and causing the Plan to issue a loan to Burge Realty. Dkt. No. [18] at 2. The Secretary seeks an order from the Court requiring Defendants to compensate the Plan for all losses attributable to the wrongful transactions, permanently enjoining Defendants from acting in a fiduciary capacity to an ERISA plan and from future ERISA violations, and appointing an independent fiduciary for the Plan at Defendants' expense. Id. at 2-3.

Defendants respond that their actions surrounding the prohibited transactions were objectively prudent and reasonable, and were not performed in bad faith. Dkt. No. [25] at 7-8. Defendants also argue that ERISA does not necessarily mandate a remedy for a breach of a fiduciary duty, and damages would be inappropriate in this case because the losses were a result of Baird's "inability to foresee the future of the Great Recession." Id. at 8-9. Furthermore, Defendants allege that the Secretary's calculation of losses to the Plan is not supported by the evidence, and if interest is applicable to the amount of the award, a material issue of fact exists. Id. at 9.

**\*4** ERISA § 409(a) provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach ... and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including the removal of such fiduciary.

29 U.S.C. § 1109(a). To establish a claim under ERISA, the Secretary must prove that the Plan is an ERISA covered plan, that Defendants were fiduciaries to the Plan, and that Defendants breached their fiduciary duties, resulting in loss to the Plan.[2] Solis v. Seibert, No. 8:09-cv-1726-T-33AEP, 2011 WL 398023, at \*4 (M.D. Fla. Feb. 4, 2011), aff'd, 464 Fed.Appx. 820 (11th Cir. 2012).

### A. Breach of Fiduciary Duties

The Secretary contends that Defendants breached their fiduciary duties by (1) causing the Plan to issue $154,000.00 in participant loans, which indirectly transferred Plan assets to party in interest Eight Stones, (2) causing the Plan to invest $538,119.00 in the Causey Properties, which directly benefited Baird and Eight Stones, and (3) causing the Plan to issue a $490,000.00 loan to Burge Realty to "get money into Eight Stones." Dkt. No. [18] at 2. The Secretary alleges that each of these transactions were prohibited as transfers of Plan assets to a party in interest pursuant to ERISA § 406(a)(1)(D), and as uses of Plan assets in the fiduciaries' own interest pursuant to ERISA § 406(b)(1). Id. Further, the Secretary claims that by engaging in the prohibited transactions, Defendants failed to discharge their fiduciary duties of loyalty and prudence required by ERISA § 404(a)(1)(A) and (B), respectively.

Defendants do not oppose the Secretary's argument that these transactions constitute prohibited transactions pursuant to ERISA § 406(a)(1)(D) and (b)(1). See 29 U.S.C. § 1106(a)(1)(D) ("A fiduciary ... shall not cause the plan to engage in a transaction ... [that] constitutes a direct or indirect ... transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."); 29 U.S.C. § 1106(b)(1) ("A fiduciary ... shall not ... deal with the assets of the plan in his own interest or for his own account."). Defendants also fail to respond to the Secretary's argument that by engaging in these transactions, they violated the duty of loyalty imposed by ERISA § 404(a)(1)(A). See 29 U.S.C. § 1104(a)(1)(A) ("[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries ... [and] defraying reasonable expenses of administering the plan."). Because the undisputed facts support the Secretary's conclusions, the Court finds that Defendants breached the fiduciary duties imposed by ERISA §§ 406(a)(1)(D), (b)(1), and 404(a)(1)(A) when they engaged in each of the transactions surrounding the Stonebrook development.[3]

### B. Loss Causation

**\*5** Defendants argue that damages for losses to the Plan are not required under ERISA and are inappropriate because the losses were a result of Baird's "inability to foresee the future of the Great Recession." Dkt. No. [25] at 8.

Section 409(a) imposes liability on a fiduciary for "any losses to the plan *resulting from* each such breach." 29 U.S.C. § 1109(a) (emphasis added). The Eleventh Circuit has interpreted this language to "require that the breach of the fiduciary duty be the proximate cause of the losses claimed." Willett v. Blue Cross & Blue Shield of Ala., 953 F.2d 1335, 1343 (11th Cir. 1992). Because of this requirement, a fiduciary is not liable under ERISA § 409 where his actions—"although a breach of his fiduciary duty—did not cause the loss to the Fund." Ironworkers Local No. 272 v. Bowen, 695 F.2d 531, 536 (11th Cir. 1983).

The Circuit Courts of Appeal are split on who bears the burden of demonstrating causation. Compare Silverman v. Mut. Benefit Life Ins. Co., 138 F.3d 98, 104 (2d Cir. 1998), (holding ERISA § 409 requires plaintiff to show that the loss claimed resulted from the fiduciary's breach), cert. denied, 525 U.S. 876 (1998); Kuper v. Iovenko, 66 F.3d 1447, 1459 (6th Cir. 1995) ("[A] plaintiff must show a causal link between the failure to investigate and the harm suffered by the plan"), abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer, 134 S. Ct. 2459 (2014), with Tatum v. RJR Pension Inv. Comm., 761 F.3d 346, 363 (4th Cir. 2014) ("[O]nce a fiduciary is shown to have breached his fiduciary duty and a loss is established, he bears the burden of proof on loss causation."), McDonald v. Provident Indem. Life Ins. Co., 60 F.3d 234, 237 (5th Cir. 1995) ("[A]n ERISA plaintiff must prove a breach of a fiduciary duty and a prima facie case of loss to the plan ... [then] 'the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by the breach of duty.' " (quoting Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 917 (8th Cir. 1994))), and Martin v. Feilen, 965 F.2d 660, 671 (8th Cir. 1992) (same). It appears that the Eleventh Circuit allocates the burden of proving loss causation to the Plaintiff. See Willett, 953 F.2d at 1343-44 ("On remand, the burden of proof on the issue of causation will rest on the beneficiaries; they must establish that their claimed losses were proximately caused either by a failure by Blue Cross to cure Mays' breach or knowing participation by Blue Cross in Mays' breach."); but see Pension & Emp.

Stock Ownership Plan Admin. Comm. v. Patterson, 547 F. Supp. 2d 1230, 1250-51 (N.D. Ala. 2008) ("[T]he court is aware of no case [ ] of the Eleventh Circuit addressing the allocation of the causation burden in [ERISA breach of fiduciary duty] cases.").

Assuming the Secretary bears the burden of proof with regard to loss causation, the Court finds that burden is met. The undisputed facts establish that Defendants' breaches of their fiduciary duties involving the prohibited transactions proximately caused losses to the Plan. Defendants admit that the participant loans in the amount of $154,000.00 have never been repaid and were not treated as distributions from the Plan. Dkt. No. [18-1] ¶¶ 27, 42, 47; Dkt. No. [26] ¶¶ 27, 42, 47. Defendants also admit that the Causey Properties, which they caused the Plan to purchase for $538,119.00, are now worth approximately $226,000.00 and are encumbered by tax liens exceeding $26,000.00. Dkt. No. [18-1] ¶¶ 48, 61, 63; Dkt. No. [26] ¶¶ 48, 61, 63. In addition, the $490,000.00 they caused the Plan to loan to Burge Realty has never been repaid; Defendants have not yet foreclosed on the property serving as collateral, and even so, that property is only worth approximately $180,000.00. Dkt. No. [18-1] ¶¶ 74-77; Dkt. No. [26] ¶¶ 74-77.

*6 Defendants' argument that the Great Recession caused the Plan losses is unavailing. While the Great Recession may have played a part in the failure of the Stonebrook Development and the resulting impacts to the prohibited investments, this is insufficient to negate the causal link established by Plaintiff. Ultimately, if Defendants had not invested Plan assets into prohibited investments, the failure of the Stonebrook Development would not have affected the Plan.

In addition, these transactions were tainted with Defendants' self interest, which would be impossible to separate from their losses. Baird issued participant loans from the Plan that he did not expect the participants to repay *unless and until* the Stonebrook Development made a *profit*. Baird Depo., Dkt. No. [19] at 82-83 ("If [Centex Homes] had gone through with their contract, they were supposed to pay [Eight Stones] take all the lots at one time, pay off our bank loan[,] and we would get the balance of the money at one time ... when [the development] was a hundred percent complete."). Even if the Stonebrook Development had made a profit and the participant loans were repaid in full, the Plan would have earned no more than 6% interest on $154,000.00 for two years—approximately $19,000.00. Dkt. No. [18-1] ¶ 28; Dkt. No. [26] ¶ 28; Dkt. No. [19] at 83:16-21. Similarly, Baird caused the Plan to purchase the Causey Properties for "what they were asking for," without an independent appraisal. Dkt. No. [18-1] ¶ 53; Dkt. No. [26] ¶ 53. Baird intended the Causey Properties to be a second phase of the Stonebrook Development, but used Plan assets to purchase them before the first phase was complete and before its profitability could be assessed. Baird Depo., Dkt. No. [19] at 34-35. Finally, after Centex Homes backed out of the contract which made the Stonebrook Development appear to be a profitable investment, and while Baird was struggling to repay the development loan on behalf of Eight Stones, he effectively invested $490,000.00 of Plan assets into the Stonebrook Development through the loan to Burge Realty for the purchase of the ten lots. Dkt. No. [18-1] ¶¶ 39, 65; Dkt. No. [26] ¶¶ 39, 65. Baird even allowed the ten lots to serve as collateral for the loan, all without an independent appraisal. Dkt. No. [18-1] ¶¶ 70-71; Dkt. No. [26] ¶¶ 70-71. These undisputed facts show, contrary to Defendants' argument, that the "loans and investments by the Plan were not objectively prudent and reasonable transactions." Dkt. No. [25] at 8.

The Court concludes that Defendants' breaches of their fiduciary duties to the Plan were the proximate cause of the Plan's losses. The facts are undisputed that Defendants' self-dealing and desire to fund their own investment schemes caused them to overlook their fiduciary duties.

### C. Plan Losses

The Secretary claims that the Plan losses, including lost opportunity costs, totals $1,761,444.78. Dkt. No. [18] at 23. To explain this calculation, he submits the Affidavit of Genevieve Schmidt [18-3], an investigator with the Employee Benefits Security Administration ("EBSA") who participated in the investigation of Defendants and the Plan. Dkt. No. [18-3] ¶ 1. Ms. Schmidt's affidavit includes her calculation of the Plan losses, including lost opportunity costs based on the underpayment rate provided in Internal Revenue Code § 6621(a)(2) ("IRC Rate"), 26 U.S.C. § 6621(a)(2). See generally Dkt. No. [18-3].

*1. Admissibility of the Schmidt Affidavit*

**\*7** Defendants object [4] to the admissibility of Ms. Schmidt's affidavit, arguing that she does not lay a foundation for her knowledge or opinions. Dkt. No. [28] at 4.

Federal Rule of Civil Procedure 56 allows the use of an affidavit to support a motion for summary judgment, so long as it is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). The personal knowledge requirement ensures that statements based "upon information and belief," instead of knowledge, are excluded from consideration on summary judgment. Pace v. Capobianco, 283 F.3d 1275, 1278 (11th Cir. 2002). "However, when an affiant avers that his statements are based on personal knowledge, a district court is 'bound to accept [such] statements as true, unless the context demonstrates otherwise.' " HomeBingo Network, Inc. v. Chayevsky, 428 F. Supp. 2d 1232, 1238 (S.D. Ala. 2006) (quoting Martin v. Rumsfeld, 137 Fed.Appx. 324, 326 (11th Cir. 2005)).

The Court finds that Ms. Schmidt's testimony is based on personal knowledge. In her affidavit, Ms. Schmidt asserts that she is an investigator for the Atlanta office of the EBSA, a division of the United States Department of Labor, and that she "ha[s] personal knowledge of the facts and circumstances stated herein." Dkt. No. [18-3] ¶ 1. The context of her testimony supports this assertion. Ms. Schmidt explains that she participated in the EBSA's investigation of Defendants, which began in August 2004. Id. ¶¶ 2-3. Defendants argue that Ms. Schmidt's participation in an investigation that began in August 2004 "does not state the time period of any knowledge possessed by her." Dkt. No. [28] at 4. Although the wording of the affidavit creates some ambiguity about when Ms. Schmidt became involved in the investigation, it does not create ambiguity about whether she had personal knowledge of the facts to which she testifies. The context of Ms. Schmidt's testimony demonstrates that she personally examined the "Plan documents, records of investments and loans made by the Plan, contribution and distribution records, corporate records, and interviews of Defendant Baird." Id. ¶ 3. Accordingly, Ms. Schmidt's affidavit is admissible.

*2. Measure of Damages*

In her affidavit, Ms. Schmidt testifies that "[a]s part of [her] employment" and "in accordance with EBSA procedures" she calculated a "reasonable estimate of lost earnings and interest on the losses resulting from [the] prohibited transactions." Id. ¶ 10. The correct measure of losses, she contends, is "the difference between the current total value of the Plan assets and the value the Plan would have been, had the funds invested in these prohibited transactions been instead invested in prudent investment vehicles." Id. ¶ 9. Ms. Schmidt estimates the Plan's losses by "applying the IRC Section 6621(a)(2) interest rate to the amount invested in each prohibited transaction from the date of the individual transaction through a hypothetical repayment date of September 2014." [5] Id. ¶ 11.

**\*8** In opposition to the Secretary's summary judgment motion, Defendants argue that there is "no reasonable support for the Secretar[y's] damage claim" because Ms. Schmidt has "made a calculation based upon some, unexplained, range of interest rates." Dkt. No. [25] at 9. Defendants argue that "[i]f interest is applicable ... a material issue of fact exists." Id.

The Secretary asserts that the IRC Rate is a reasonable measure of lost opportunity costs because (1) another ERISA provision allows a fiduciary acting on behalf of the plan to recover unpaid plan contributions plus interest at the IRC Rate, (2) other district courts have accepted EBSA investigators' calculations applying the higher of actual interest owed or the IRC Rate to determine the amount of pre-judgment interest, and (3) applying the IRC rate would promote good public policy because it provides simplicity and uniformity. Dkt. No. [18] at 21-22.

ERISA § 409(a) requires a breaching fiduciary to "make good the loss to the plan." 29 U.S.C. § 1109(a). This provision "primarily seeks to undo harm that may have been caused [to] a pension plan by virtue of the fiduciaries' acts." Donovan v. Bierwirth, 754 F.2d 1049, 1056 (2d Cir. 1985). Based on this intent, the proper measure of loss under ERISA § 409(a) "requires a comparison of what the Plan actually earned ... with what the Plan would have earned had the funds been available for other Plan purposes." Id.; see also GIW Indus., Inc. v. Trevor,

Stewart, Burton & Jacobsen, Inc., 895 F.2d 729, 733 (11th Cir. 1990) ("The question of loss to the Plan ... requires a comparison between the actual performance of the Plan and the performance that otherwise would have taken place." (quoting Bierwirth, 754 F.2d at 1057)). The formula used to calculate such damages is essentially a question of law. Bierwirth, 754 F.2d at 1052.

The Court finds that the measure of Plan losses offered by Ms. Schmidt comports with the requirements of ERISA § 409(a). See Dkt. No. [18-3] ¶ 9 ("the difference between the current total value of the Plan assets and the value the Plan would have been, had the funds invested in these prohibited transactions been instead invested in prudent investment vehicles"). The Court also finds that the IRC Rate is a reasonable measure of lost opportunity costs. Although it is impossible to determine exactly "what the Plan would have earned had the funds been available for other Plan purposes," it is fair to assume that the Plan's assets would have earned interest had Defendants not withdrawn those funds for the prohibited transactions. The IRC Rate, which fluctuates based on the federal short-term rate as determined by the Secretary of the Treasury, reflects the reasonable rate of interest applicable during the time period the Plan assets were unavailable. 26 U.S.C. § 6621(b)(3). Defendants do not address the propriety of the IRC Rate or offer an alternative method for calculating lost opportunity costs. Instead, they contend that "[i]f interest is applicable ... a material issue of fact exists." Dkt. No. [25] at 9.[6] The Court disagrees. The formula used to calculate Plan losses necessarily includes the applicable rate of interest, if any. Because that formula is a question of law, there is no issue of material fact. Bierwirth, 754 F.2d at 1056.

*3. Calculation of Damages*

**\*9** Ms. Schmidt explains that she calculated an estimate of losses suffered by the Plan "by taking the initial amount invested in each prohibited transaction, then applying the [IRC Rate] to each amount from the date of the individual prohibited transaction through a hypothetical repayment date of September 2014." She provides a table detailing the amount of Plan assets expended in each prohibited transaction, the lost earnings on those assets, and the total losses for each transaction. Dkt. No. [18-3] at 9. Ms. Schmidt also explains that the IRC Rate fluctuated between 3% and 7% during the relevant time period, and provides a citation to the interest rate tables published on the Department of Labor's website. Id. ¶¶ 11-12.

The Court finds that Ms. Schmidt's calculations comport with the undisputed facts. Baird caused the Plan to issue five participant loans on August 26, 2004: $50,000.00 to Truitt Sims, Jr., $25,000.00 to Truitt Sims, III, $50,000.00 to Marcia Carter, $15,000.00 to Ann Baird, and $14,000.00 to Jason Baird, for a total of $154,000.00. Dkt. No. [18-1] ¶ 27; Dkt. No. [26] ¶ 27. These amounts are consistent with Ms. Schmidt's table listing the "Amount of Plan Assets Expended in Prohibited Transaction." Dkt. No. [18-3] at 9. The table also reflects Baird's expenditures on the Causey Properties: $193,716.00 for the Brown Property, $269,903.00 for the Few Property, and $74,500.00 for the Moon Property, for a total of $538,109.00. Dkt. No. [18-3] at 9-10; Dkt. No. [18-1] ¶ 48; Dkt. No. [26] ¶ 48. Similarly, Ms. Schmidt includes the $490,000.00 loan to Burge Realty. Dkt. No. [18-3] at 9-10; Dkt. No. [18-1] ¶ 65; Dkt. No. [26] 65. Applying the IRC Rate, Ms. Schmidt calculated what the undisputed expenditures would have earned in interest from the date of each transaction through September 2014. Dkt. No. [18-3] at 9-10. Ms. Schmidt estimates that the Plan lost a total of $1,761,444.78 as a result of the prohibited transactions. Id. at 10.

After comparing the undisputed facts to Ms. Schmidt's table of calculations, the Court accepts that Ms. Schmidt's calculation of $1,761,444.78 represents "what the Plan would have earned had the funds been available for other Plan purposes." Bierwirth, 754 F.2d at 1056. Other courts have accepted the calculations of EBSA investigators in determining ERISA plan losses in similar contexts. See, e.g., Solis v. Spencer, No. 3:12cv00283, 2013 WL 3935060, *1-*2 (S.D. Ohio July 30, 2013) (awarding amount fiduciary defendant withheld from participants but failed to remit to ERISA plan plus lost opportunity costs calculated by EBSA investigator on default judgment); Solis v. J.W. Buckholz Traffic Eng'g, Inc., No. 3:11-cv-248-J-34MCR, 2012 WL 6761600, *4 (M.D. Fla. Dec. 6, 2012) (default judgment against fiduciary defendant for plan losses as calculated by EBSA investigator); Seibert, 2011 WL 398023, at *2 n.3 (summary judgment order requiring fiduciary defendant to restore lost opportunity costs to ERISA plan, as calculated by EBSA investigator pursuant to EBSA procedures); Chao v. Johnson, No. Civ. A. H-03-5394, 2005 WL 2095109, *1, *2 n.4 (S.D. Tex. Aug. 30, 2005) (summary judgment ordering

fiduciary defendant to restore to ERISA plan the amounts it withheld from employees' paychecks plus interest at the IRC Rate). Furthermore, Defendants do not point to any evidence disputing the accuracy of Ms. Schmidt's calculation.

Defendants do, however, dispute the Secretary's claim that $1,761,444.78 represents the amount of damages owed to the Plan. Dkt. No. [25] at 8. They argue that amount includes "loss of value of real estate which is still owned (outright or by security deed) by the Plan." Id. The Court agrees. While Ms. Schmidt's calculation of Plan losses is a proper measure of "what the Plan would have earned had the funds been available for other Plan purposes," it does not subtract "what the Plan actually earned" as required by ERISA § 409(a). Bierwirth, 754 F.2d at 1056. As the Secretary admits, "the Plan today holds real estate and a secured interest in real estate whose values are significantly less than the value prudent investments would bear. That difference in value represents the losses the Plan has suffered." Dkt. No. [29] at 3.

 *10 The undisputed facts show that the Plan currently owns the Causey Properties, which were independently appraised at $226,000.00 at the commencement of this litigation. Dkt. No. [18-1] ¶ 64; Dkt. No. [26] ¶ 64. The City of Austell and Cobb County have tax liens on the Causey Properties which exceed $26,000.00. Dkt. No. [18-1] ¶ 61; Dkt. No. [26] ¶ 61. Therefore, the Causey Properties are currently worth $200,000.00. The Plan also has a secured interest in ten lots within the Stonebrook Development, which Burge Realty will quitclaim to the Plan, or suffer foreclosure, at the resolution of this litigation. Dkt. No. [27] ¶ 14; Dkt. No. [31] ¶ 14; Dkt. No. [18-1] ¶¶ 66, 76; Dkt. No. [26] ¶¶ 66, 76. The ten lots were independently appraised at $180,000.00 during the course of this litigation. Dkt. No. [18-1] ¶ 77; Dkt. No. [26] ¶ 77. Therefore, the Plan currently holds real estate and a secured interest in real estate worth $380,000.00.[7] The difference between that value and what the Plan would have earned if Defendants had invested Plan funds in prudent, non-prohibited transactions is $1,381,444.78. This amount represents the full measure of losses available under ERISA § 409(a).

The Secretary also requests a permanent injunction barring Defendants from serving as fiduciaries and from future violations of ERISA. As a result of such injunction, the Secretary asks that this Court appoint a qualified independent fiduciary to administer the Plan at Defendants' expense. Defendants do not oppose these requests. Because ERISA § 409(a) allows for "equitable or remedial relief as the court may deem appropriate, including removal of [a] fiduciary," 29 U.S.C. § 1109(a), the Court finds that the Secretary's requests should be granted.

### IV. Conclusion

Based on the foregoing, Defendants' Motion to Strike the Affidavit of Genevieve Schmidt [28] is **DENIED** and the Secretary of Labor's Motion for Summary Judgment [18] is **GRANTED**.

Defendants Baird and DSI Contracting, Inc. are **ORDERED** and **ADJUDGED TO** restore to the Plan a total of $1,381,444.78 ($1,182,119.00 in prohibited expenditures and $579,325.78 in lost opportunity costs, minus $380,000.00 in actual Plan earnings) plus any additional lost opportunity costs accruing after September 2014.

Defendants Baird and DSI Contracting, Inc. are **PERMANENTLY ENJOINED** from serving as fiduciaries or from having control over the assets of any employee benefit plan and are enjoined from future violations of ERISA. Defendants shall be removed from their position as fiduciaries to the Plan and the Court shall appoint an independent fiduciary to administer the Plan. The Secretary is invited to suggest an independent fiduciary to the Court.

The Clerk is **DIRECTED** to close this case.

**IT IS SO ORDERED** this 23rd day of July, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 12618779

Footnotes

1   Defendants state this contract was entered into in 2007. Dkt. No. [27] ¶ 3. However, Defendants also allege that the contract was executed "prior to seeking a loan from a bank," id., which occurred in 2004. Baird Depo, Dkt. No. [19] at 59:7-9. Based on this evidence, as well as the context of other undisputed facts, the Court presumes the contract with Centex Homes was executed in or around 2004.

2   There is no dispute that the Plan is an ERISA plan or that Defendants are fiduciaries to the Plan. Dkt. No. [18-1] ¶¶ 10, 19-20; Dkt. No. [26-1] ¶¶ 10, 19-20.

3   Defendants argue that the prohibited transactions were objectively prudent and reasonable, and were not performed in bad faith. Dkt. No. [25] at 7-8. To the extent that this argument contests *liability* for breach of a fiduciary duty, it is responsive only to the Secretary's allegations that Defendants violated ERISA § 404(a)(1)(B). That subsection requires a fiduciary to "discharge his duties ... with the care, skill, prudence, and diligence under the circumstances." 29 U.S.C. § 1104(a)(1)(B). However, ERISA § 409(a) affords the same remedies for a breach of "*any* of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter." 29 U.S.C. § 1109(a) (emphasis added). Because the Secretary establishes that Defendants violated other ERISA-imposed duties, the Court need not determine whether Defendants' actions also violated ERISA § 404(a)(1)(B).

4   Defendants filed an Objection to and Motion to Strike the Affidavit of Genevieve Schmidt [28]. A motion to strike is not the appropriate method for challenging the admissibility of evidence in an affidavit. See FED. R. CIV. P. 56(c)(2) advisory committee's note to 2010 amendment; FED. R. CIV. P. 12(f) (allowing motion to strike "from any pleading"); FED. R. CIV. P. 7(a) (providing that "pleadings" include only complaints, answers, and replies to an answer); see also Morgan v. Sears, Roebuck & Co., 700 F. Supp. 1574, 1576 (N.D. Ga. 1988) (noting motion to strike is improper method to challenge admissibility of evidence in an affidavit). Therefore, Defendants' Motion to Strike [28] is **DENIED**. The Court instead considers Defendants' objections to testimony presented in Ms. Schmidt's affidavit.

5   Defendants argue that Ms. Schmidt does not offer testimony as to her training, experience, or education, nor does she describe her duties or responsibilities as an investigator. Dkt. No. [28] at 4. However, "experience, training, or education" is only required for testimony by an expert witness. FED. R. EVID. 702. The Secretary submits Ms. Schmidt's testimony as that of a lay witness. To the extent that Ms. Schmidt applies an interest rate to undisputed values, her testimony is based on simple math and is not "scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EVID. 701.

6   It appears that Defendants were attempting to cite Brock v. Walton, 794 F.2d 586 (11th Cir. 1986) for this proposition. However, that case does not support Defendants' contention, as it does not present any issue regarding the amount of plan losses. Instead, it addresses whether an ERISA fiduciary was prudent in issuing mortgage loans to plan participants at an interest rate lower than market rate.

7   The Court notes that this value is based on (1) the value of an appraisal conducted on January 24, 2014 of the Causey Properties, (2) the amount of tax liens Defendants reported in their July 3, 2014 Responses to Plaintiff's Interrogatories, and (3) the value of an appraisal conducted on March 24, 2014 on the ten lots. Because the parties do not dispute these values in their briefs, the Court relies upon them in calculating the amount of the judgment. However, the Court recognizes that these values may have changed due to the passage of time. Therefore, the parties may file motions to modify the judgment based on any *significant* change in these values.