UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

R. ALEXANDER ACOSTA,
Secretary of Labor, United States
Department of Labor,

        Plaintiff,

  v.                                          Case No. 17-C-589

DURA-FIBRE LLC,

        Defendant.

---

## DECISION AND ORDER

---

The Occupational Safety and Health Act (OSH Act) prohibits employers from discharging or discriminating against an employee for engaging in activity protected by the Act. *See* 29 U.S.C. § 660(c)(1). Plaintiff R. Alexander Acosta, Secretary of Labor, brought this action against Defendant Dura-Fibre LLC, alleging Dura-Fibre violated the OSH Act's anti-retaliation provisions by punishing its former employee, Tim Jacobs, for reporting injuries to the company and thus interfering with Jacobs' right to report under the Act. Federal jurisdiction exists pursuant to 28 U.S.C. § 1331. The case is before the court on the parties' cross motions for summary judgment. For the following reasons, both summary judgment motions will be denied.

### BACKGROUND

**A. Dura-Fibre's Accident Reporting/Investigation Plan**

Dura-Fibre, LLC, located in Menasha, Wisconsin, manufactures industrial packaging and specialty laminated paperboard products. Pl.'s Proposed Findings of Fact (PPFOF) ¶ 2, ECF No. 30. In an effort to improve safety, Dura-Fibre instituted a multi-component safety program

comprised of an accident reporting plan, training on safety in the workplace, audits to ensure compliance with safety procedures, and a progressive discipline program to address safety and reporting violations. Def.'s Proposed Findings of Fact (DPFOF) ¶ 4, ECF No. 27. The company's employee handbook also explains Dura-Fibre's dedication to a safe workplace. The handbook provides: "It is the company's responsibility to provide you with a safe place to work and to give you the necessary safety training so that you can avoid accidents to yourself or to others. It is your responsibility to work safely." ECF No. 33-14 at 10.

Under Dura-Fibre's Accident Reporting/Investigation Plan, if an employee is injured or almost injured at work, he must report the injury or "near miss." Dura-Fibre instituted this plan to emphasize timeliness in reporting injuries and to create a "near miss" program to increase reports of unsafe acts that did not result in injury. PPFOF ¶ 33. The plan requires that an employee notify a supervisor of an accident or "near miss" as soon as possible or by the end of the employee's shift. It defines accident as "any occurrence that led to physical harm or injury to an employee and/or led to damage of company property" and near miss as "any occurrence that did not result in an accident but could have." ECF No. 32-2 at 2. Dura-Fibre requires that employees report all injuries, even if the employee does not consider the injury to be serious, reasoning that an employee may be hurt more than he initially believes. DPFOF ¶ 11. Any employee that fails to report an accident or near miss in a timely manner is subjected to discipline up to and including termination. *Id.* ¶ 14.

Once an employee reports an occurrence to his supervisor, the supervisor must decide if the incident was an accident or a near miss by determining whether the employee was injured. Although the plan does not define "injury" and "physical harm," in deciding whether an employee is injured, the supervisor considers whether the employee is bleeding, limping, favoring a body part, or hurting.

If the supervisor determines that an accident occurred, as a result of his finding that the employee suffered physical harm or injury, he must investigate the situation to determine why the accident happened, where it occurred, and if there are any trends related to the accident. After the supervisor completes his investigation and fills out an investigation form, Dura-Fibre's safety coordinator reviews the completed form. Then the Health and Safety Committee, which is comprised of two representatives of management and at least two union members, assesses the accident by reviewing the incident report and accident investigation form. After its assessment, the Committee completes its own Safety Incident Report and determines whether the employee should receive disciplinary points in accordance with Dura-Fibre's 24-point disciplinary program.

Under the disciplinary program, which is set forth in the labor agreement between Dura-Fibre and the United Steelworkers Local 2-432, employees may be assigned a designated number of points for violations of the company's rules and policies, such as failing to report an injury to a supervisor by the end of his shift, failing to use safety equipment, or committing an "unsafe act." Although an employee may gain points back if he does not commit an infraction during a three-month period, he may ultimately be terminated for "just cause" if he accumulates 24 points. In deciding whether to assess disciplinary points, the Committee considers a number of factors, including whether the employee has a past history of unsafe acts, the severity of the employee's injury caused by the unsafe act, and other contributing factors. As relevant to the instant case, an employee who fails to report an on-duty accident or injury to a supervisor before leaving work will receive eight disciplinary points. An employee who commits an unsafe act will be assessed between four to eight disciplinary points as determined by the Health and Safety Committee.

The Accident Reporting/Investigation Plan does not define the phrase "unsafe act," because the company believes no definition is required. PPFOF ¶ 21. The Committee is nevertheless more likely to consider conduct unsafe under the disciplinary policy if the employee injures himself in performing an act he otherwise frequently engages in. *Id.* ¶ 29. In other words, an employee would generally not be disciplined for timely reporting an "unsafe act" that did not result in injury and thus was considered a "near miss," whereas an employee would more likely be disciplined if he timely reported that the same "unsafe act" resulted in injury. *Id.* ¶ 40. The Secretary notes that from May 20, 2011 through May 20, 2014, Dura-Fibre did not assign disciplinary points to an employee for committing an unsafe act where no injury occurred. *Id.* ¶ 27. If the Committee decides to assess disciplinary points, Dura-Fibre issues the employee a discipline slip that describes the incident, the points ultimately assessed, and the section of the contract the employee violated.

Given the uncertain definition of the term "unsafe act" and the disciplinary points employees receive for committing an "unsafe act," employees are naturally reluctant to report any injury to themselves. In theory, almost any act that results in a workplace injury can qualify as an unsafe act. The current president of Dura-Fibre has defined "unsafe act" as "any action by an employee that either resulted in, or could have resulted in, themselves or another employee being harmed." *Id.* ¶ 25. Thus, employees who suffer injuries on the job find themselves in a classic "catch 22": if they are injured at work, they must report the injury to a supervisor or face discipline, but if they do report an injury, management may well conclude the injury resulted from their own unsafe act for which they will also face discipline. Either way, the employee risks discipline. It is in this context that Jacobs' claim arises.

4

**B. Jacobs' Injury Reporting**

Jacobs began working for Dura-Fibre as a laminator machine lead operator in 2008. He had worked for Dura-Fibre's predecessor, Menasha Corporation, from 1985 to 2004. As lead operator, Jacobs was responsible for the overall production of the laminating machine and oversaw four or five other employees who ran the machine. He was also required to notify his supervisor when any employee reported an accident or near miss to him. Dura-Fibre valued Jacobs as an employee because he knew how to run the machines better than most other operators. DPFOF ¶ 53.

On May 20, 2013, Steven Wilz informed Jacobs that he "tweaked his shoulder." *Id.* ¶ 56. Jacobs asked if Wilz wanted to fill out an accident report. Wilz reported that he did not believe submitting a report was necessary because his shoulder did not hurt and he felt fine. Wilz continued to work the rest of his shift without complaints about his shoulder, and he did not clutch or favor his shoulder. The next morning, Jacobs asked Wilz about the condition of his shoulder. Wilz explained that his shoulder had stiffened up overnight and was sore, but he was not concerned and continued to believe that the incident did not need to be reported. Jacobs nevertheless decided to complete an incident form. He noted that Wilz "strained" his right shoulder and that no medical treatment was required. Jacobs gave the completed form to Jamie Gonnering, Dura-Fibre's human resources manager and safety manager. Gonnering and Scott Gehl investigated the incident. Jacobs' supervisor, Scott Blair, consulted with Gonnering and Director of Operations Luke Benrud and concluded Dura-Fibre would issue Jacobs and Wilz eight points for the untimely reporting of the injury. This assignment of points increased Jacobs' point total to twenty disciplinary points.

On May 22, 2013, Blair gave Jacobs a discipline slip and explained that he had been assessed eight disciplinary points for his failure, as lead operator, to timely report injuries. Shortly thereafter,

5

Jacobs reported that he had twisted his right ankle earlier in his shift when he stepped off the last step in a flight of five stairs that he used hundreds of times throughout the day. Although Jacobs did not consider himself injured, he recognized that he was walking gingerly on the ankle and reported the incident because he did not want to "get in trouble" for failing to notify his supervisor of the incident by the end of his shift. PPFOF ¶ 93. Blair filled out an incident report, recorded that Jacobs sprained his ankle, identified the incident as a "near miss accident," and opened an investigation into the incident to determine if Jacobs committed an unsafe act. Dura-Fibre asserts that even though Blair indicated in his report that the incident was a near miss, he considered it an accident from the beginning.

As part of the investigation, Blair asked Jacobs what had happened, but did not talk to any witnesses. The Secretary asserts Jacobs held the handrails when he went down the stairs, he did not rush or run down the stairs, he did not skip stairs, and he was not horse playing. Blair determined that when "[c]oming off the last step Tim stepped awkwardly on his right ankle, twisting it." ECF No. 33-19. He concluded Jacobs could prevent injury in the future by planting "his foot on [the] ground more squarely when coming off stairs or any locations off ground floor." *Id.* Jacobs, Blair, and Gonnering signed the incident report. The Safety Committee, comprised of Blair, Gonnering, and two union employees, reviewed the incident report on May 22, 2013 and assessed four disciplinary points to Jacobs for committing an unsafe act. The two union employees did not provide any input during the meeting regarding the disciplinary points. In reaching its conclusion, the Committee considered a previous, unrelated incident in which Jacobs injured his back by tripping over a hose another employee had placed on the floor. It also noted that Jacobs had experience going up and down the stairs and that Jacobs' ankle injury required first aid care, even though he

never received medical treatment. Although the Accident Reporting/Investigation Plan requires that the Safety Committee investigate the site of the accident to discuss how the injury occurred, the Committee did not inspect the stair case during its deliberations. After discussing the incident with Gonnering, Blair revised the incident report to reflect that the injury was a twist, rather than a sprain, and unchecked the box that indicated the incident was a near miss accident. ECF No. 33-26.

On May 23, 2013, Blair gave Jacobs the revised incident form, but Jacobs refused to sign it. Later that day, Jacobs met with Gonnering, Benrud, and Blair and received a discipline slip stating that the Committee assessed four disciplinary points because Jacobs committed an unsafe act when he "stepped awkwardly on his right foot coming off a stairway and twisted his ankle." ECF No. 33-27. Dura-Fibre then terminated Jacobs because he had accumulated 24 disciplinary points. Jacobs subsequently filed a grievance seeking review of the eight-point violation for his failure to timely report Wilz' injury. He did not seek review of the four-point violation. Dura-Fibre and Jacobs mediated their dispute, and the mediator upheld Dura-Fibre's assessment of the disciplinary points.

Jacobs called OSHA's Appleton office on June 4, 2013 and discussed his ankle twist and subsequent termination with Compliance Health and Safety Officer Jason Grunow. Grunow completed an intake form and told Jacobs an OSHA Whistleblower Investigator would contact him. On June 21, 2013 and June 23, 2013, Jacobs provided a statement to Investigator Claudia Johnson about his claims. She subsequently emailed a copy of the statement to Jacobs on July 3, 2013. Jacobs reviewed and edited the statement and returned a signed copy of the statement to the OSHA office on July 12, 2013. Investigator Johnson also interviewed Dura-Fibre's management employees, such as Gonnering and Blair, as well as other employees. OSHA ultimately concluded

in February 2017 that Dura-Fibre violated the OSH Act by assessing Jacobs disciplinary points for reporting Wilz' shoulder tweak and his own ankle twist. The Secretary filed the instant action on behalf of Jacobs on April 25, 2017.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The fact that the parties filed cross-motions for summary judgment does not alter this standard. In evaluating each party's motion, the court must "construe all inferences in favor of the party against whom the motion under consideration is made.'" *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 691 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

The Secretary asserts that Dura-Fibre retaliated against Jacobs for reporting injuries in violation of Section 11(c)(1) of the OSH Act, 29 U.S.C. § 660(c)(1). The OSH Act is aimed at assuring "so far as possible every working man and woman in the Nation safe and healthful working

8

conditions and to preserve our human resources." 29 U.S.C. § 651(b). The Act "is remedial and preventative in nature and is to be liberally construed to effectuate its congressional purpose." *Reich v. Hoy Shoe Co., Inc.*, 32 F.3d 361, 368 (8th Cir. 1994) (citing *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 13 (1980)); *see also E & R Erectors, Inc. v. Sec'y of Labor*, 107 F.3d 157, 160 (3d Cir. 1997); *Nat'l Eng'g & Contracting Co. v. OSHA, U.S. Dep't of Labor*, 928 F.2d 762, 767 (6th Cir. 1991). Due to the shortage of federal and state occupational safety inspectors, the Act places "great reliance on employee assistance in enforcing the Act." *Reich*, 32 F.3d at 368 (quoting *Marshall v. Whirlpool Corp.*, 593 F.2d 715, 722 (6th Cir. 1979), *aff'd*, 445 U.S. 1 (1980)). Section 11(c) prohibits employers from taking adverse actions against employees that engage in protected activity under the Act by reporting health and safety violations. This section provides:

> No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter.

29 U.S.C. § 660(c)(1). The parties do not dispute that Dura-Fibre is a "person" subject to the Act or that Jacobs qualifies as an employee under the Act's regulations. 29 U.S.C. §§ 652(4)–(6). The parties also agree that reporting workplace injuries is a protected activity. Before addressing the merits of the underlying claim, however, the court must address Dura-Fibre's contention that Jacobs failed to file a timely complaint in accordance with § 11(c)(2) of the OSH Act.

**A. Filing a timely complaint under the OSH Act**

Dura-Fibre contends that Jacobs did not file a complaint with the Secretary within thirty days as required by § 11(c)(2) of the OSH Act. This section provides in relevant part:

9

> Any employee who believes that he has been discharged or otherwise discriminated against by any person in violation of this subsection may, within thirty days after such violation occurs, file a complaint with the Secretary alleging such discrimination. Upon receipt of such complaint, the Secretary shall cause such investigation to be made as he deems appropriate. If upon such investigation, the Secretary determines that the provisions of this subsection have been violated, he shall bring an action in any appropriate United States district court against such person.

§ 11(c)(2). After his termination on May 23, 2013, Jacobs called OSHA's Appleton office on June 4, 2013 to discuss the events leading up to his termination with Compliance Officer Jason Grunow. Grunow reduced Jacobs' complaint to writing and forwarded the complaint to an investigator. Investigator Claudia Johnson took an oral statement from Jacobs on June 21, 2013 and emailed him a copy of the complainant statement on July 3, 2013. Jacobs subsequently signed the statement and returned it to the OSHA office on July 12, 2013, fifty days after his termination.

The Secretary maintains that Jacobs filed a timely complaint when he called OSHA's Appleton office and spoke to Grunow about his termination. At that time, Jacobs' complaint was reduced to writing and a "file" was presumably opened in which his complaint was placed, whether physically or electronically. In plain terms, a complaint was then filed by him or on his behalf. Thus, I am satisfied that Jacobs' complaint was timely filed. Dura-Fibre nevertheless argues that to follow the procedure outlined in § 11(c)(2), Jacobs must do more than merely call an OSHA office about any concerns related to his termination; he must file a *written* complaint with the Secretary of Labor. The issue, in Dura-Fibre's view, is therefore whether § 11(c)(2) permits the filing of both written and oral complaints.

The Supreme Court recently considered whether the phrase "file[] any complaint" in the context of the FLSA anti-retaliation provision, 29 U.S.C. § 215(a)(3), encompasses both oral and

written complaints. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1 (2011). The Court's analysis began with the text of the statute, with particular focus on the word "filed." After reviewing dictionary definitions of the word; its use in state and federal statutes, administrative regulations, and judicial opinions; and its other appearances in the FLSA, the Court determined that the word "filed" does not unambiguously require a writing. *Id.* at 7–11. Although it acknowledged that filings "may more often be made in writing," the fact that the statute contemplated the filing of "*any* complaint" suggested "a broad interpretation that would include an oral complaint." *Id.* at 9–10. Thus, the Court concluded that "the text, taken alone, cannot provide a conclusive answer to our interpretive question." *Id.* at 11.

Once it found the text of the statute ambiguous, the Court concluded that Congress intended for the anti-retaliation provision to cover both oral and written complaints. It recognized that an interpretation limiting § 215's coverage to written complaints would undermine the FLSA's basic objectives and enforcement scheme. *Id.* at 11–14. The Court further acknowledged that the Secretary of Labor and the EEOC have "consistently held the view" that § 215 covered oral and written complaints and that these views were reasonable. *Id.* at 15–16. In light of these considerations, the Court found that oral complaints fell within the scope of the phrase "filed any complaint" in the FLSA's anti-retaliation provision. *Id.* at 17.

Although *Kasten* analyzed the phrase "filed any complaint" in a wholly unrelated statute and in an entirely different context than the phrase is used in § 11(c)(2), I nevertheless find that the text of § 11(c)(2) does not unambiguously require a writing. The "plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519

11

U.S. 337, 341 (1997). As the Court noted in *Kasten*, "the word 'filed' has different relevant meanings in different contexts." 563 U.S. at 7. It appears that in the context of the OSH Act, the word "filed" has different meanings even within the Act itself. For instance, § 11(a) explicitly requires a writing. *See* § 11(a) ("Any person adversely affected or aggrieved by an order of the Commission issued under subsection (c) of section 10 may obtain a review of such order . . . *by filing . . . a written petition* praying that the order be modified or set aside." (emphasis added)). Section 11(c)(2), by contrast, does not expressly require that a complaint filed with the Secretary be in writing. In short, it is unclear from the text of the statute whether the phrase "file a complaint" encompasses both written and oral complaints.

The Secretary asserts that the court should look to the agency's regulation for guidance in interpreting the language of § 11(c)(2). A court applies *Chevron* deference to an agency's regulation when "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). The court must give considerable weight "to an executive department's construction of a statutory scheme it is entrusted to administer" and will not substitute its own interpretation for that of a permissible agency interpretation. *Ali v. Achim*, 468 F.3d 462, 468 (7th Cir. 2006) (quoting *Chevron U.S.A. v. Nat'l Res., Defense Council, Inc.*, 467 U.S. 837, 844 (1984)). Because the OSH Act grants the Secretary of Labor broad discretion to promulgate rules that serve the objectives of the Act, *see* § 6(b), the court will defer to the Secretary's reasonable and longstanding interpretation of § 11(c)(2), which indicates that this provision covers both written and oral complaints. *See* 29 C.F.R. § 1977.15 (When filing a complaint for discrimination pursuant to § 11(c)(2), "[n]o particular

12

form of complaint is required."). In short, the court finds that Jacobs filed a timely complaint with the Secretary when he called OSHA's Appleton office on June 4, 2013. The court will now turn to the merits of the Secretary's claim.

**B. § 11(c) Retaliation Claim**

The Secretary asserts that Dura-Fibre violated the OSH Act when it retaliated against Jacobs by assessing him disciplinary points after he reported injuries on two separate occasions and ultimately terminated him under its disciplinary policy. While the Seventh Circuit has not analyzed a claim of retaliatory discharge under § 11(c), other courts have applied the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), in this context. *See Reich*, 32 F.3d at 365; *Solis v. Blue Bird Corp.*, 404 F. App'x 412 (11th Cir. 2010); *Perez v. U.S. Postal Serv.*, 76 F. Supp. 3d 1168 (W.D. Wash. 2015). To establish a *prima facie* case, the Secretary must show that (1) Jacobs engaged in protected activity; (2) Dura-Fibre took adverse action against him; and (3) a causal connection exists between the two. *See Roadway Exp., Inc. v. U.S. Dep't of Labor*, 495 F.3d 477, 481–82 (7th Cir. 2007). If the plaintiff satisfies this burden, then the employer must articulate "a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Dura-Fibre does not dispute that the Secretary has satisfied the first and second elements of the *prima facie* case. Jacobs engaged in protected activity when he reported to Dura-Fibre management that Steve Wilz injured his shoulder and that he injured his ankle. Protected activity includes reporting workplace injuries. OSHA regulations then in effect required that employers

13

maintain records of work-related injuries and that employees participate in the recordkeeping system by reporting work-related injuries and illnesses. 29 C.F.R. § 1904.35 (2001). In addition, Jacobs suffered three adverse actions in the form of disciplinary points for the late reporting of Wilz' injury and for engaging in an unsafe act in relation to his own injury, as well as termination of his employment. Dura-Fibre does dispute, however, that a causal connection exists between Jacobs' reports of injury and the adverse actions he suffered.

"A plaintiff demonstrates a causal connection by showing that the defendant 'would not have taken the adverse . . . action but for [the] protected activity.'" *Bains v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (quoting *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015)). A plaintiff may show causation through both direct and circumstantial evidence. "Direct evidence, such as an admission by the employer of unlawful animus, is sufficient but rare." *Id.* Circumstantial evidence, on the other hand, may include "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013). If a plaintiff produces sufficient circumstantial evidence that allows "the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not appropriate." *Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013).

Dura-Fibre challenges the causal link between Jacobs' reporting of the two injuries and the resulting adverse employment actions. Clearly, the protected conduct, i.e., reporting of injury, and adverse employment actions were temporally related. Dura-Fibre issued Jacobs 12 disciplinary

14

points for reporting injuries to Wilz and to himself and terminated him for accumulating 24 points shortly thereafter. But more than temporal proximity is required to show retaliation. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011) (noting "temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter"). Despite the temporal proximity between Jacobs' protected conduct and the adverse employment actions, Dura-Fibre denies that it was retaliating against Jacobs for reporting injuries. Dura-Fibre contends that Jacobs was given eight disciplinary points because he failed to timely report the injury to Wilz and he was given the additional four points because he engaged in an unsafe act which led to his own injury. Having received a total of 24 disciplinary points, Dura-Fibre contends, Jacobs was properly terminated from employment under the its agreement with the Union.

The Secretary argues in response that Dura-Fibre's stated reasons for taking the adverse actions were pretextual. A plaintiff may demonstrate pretext by showing that the defendant's proffered reasons for taking adverse employment actions "(1) had no basis in fact; (2) did not actually motivate [the adverse employment actions]; or (3) [were] insufficient to motivate [the adverse employment actions]" and were therefore pretextual. *Davis v. Wis. Dept. of Corr.*, 445 F.3d 971, 977 (7th Cir. 2006). "To demonstrate a material issue of fact as to pretext, a plaintiff must show that 'either (1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or (2) that an employer's explanation is not credible.'" *Mullin v. Temco Machinery, Inc.*, 732 F.3d 772, 778 (7th Cir. 2013) (quoting *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004)).

The Secretary's evidence is more than sufficient to withstand Dura-Fibre's motion for summary judgment. Viewing the evidence in the light most favorable to the Secretary, a reasonable jury could infer that Jacobs would not have been terminated in the absence of a retaliatory motive. The Secretary has presented evidence that Dura-Fibre's Accident Reporting/Investigation Plan and disciplinary policy actually deter employees from accurately reporting workplace injuries, which is itself a violation of the regulation currently in effect. *See* 29 C.F.R. § 190435(b)(1)(i) (2017) ("You must establish a reasonable procedure for employees to report work-related injuries and illnesses promptly and accurately. A procedure is not reasonable if it would deter or discourage a reasonable employee from accurately reporting a workplace injury or illness."). The Secretary maintains that the Accident Reporting/Investigation Plan is discriminatory and interferes with employees' statutory rights because employees who report injuries caused by "unsafe acts" are punished, whereas employees who report the same "unsafe acts" but instead of an injury report a "near miss" are not punished. Even aside from its disparate treatment of injuries and near misses, however, a reasonable jury could also regard Dura-Fibre's willingness to treat even routine injuries such as pulled muscles or sprained ankles as evidence of "unsafe acts," and thereby subject the employees who report such injuries to disciplinary points and even termination, as direct evidence of retaliation.

As further evidence that Dura-Fibre's claim that Jacobs committed an unsafe act was a pretext for terminating him, the Secretary contends that Dura-Fibre failed to follow its own accident investigation procedures established by the Accident Reporting/Investigation Plan in analyzing the events surrounding Jacobs' ankle injury. The plan provides:

> For all accident investigations, the Supervisor will perform the following duties:
> - Complete an investigation with the injured party and the witness using the attached form, immediately after the accident occurs if possible. If the

16

> employee seeks medical attention and the lead or employee is not able to complete the form, the Supervisor should fill out the form with the affected employee as soon as possible.
>
> - The Safety Coordinator must be given the safety investigation form upon completion (no later than 24 hours after the incident).
>
> - The Supervisor will pull together the Safety Team at the site of the accident to discuss how the injury occurred and determine any recommendations including any necessary policy/procedure changes and/or equipment changes.
>
> - The Safety Committee upon review of the accident form and investigation form will complete the Safety Incident Report . . . .

ECF No. 33-17 at 3. When investigating Jacobs' injury, however, the Safety Committee did not inspect the stair case where the incident occurred or determine whether any policy or equipment change was necessary. In addition, Gonnering, Dura-Fibre's human resources manager and safety manager, did not know which safety or work rule Jacobs violated in twisting his ankle while going down the stairs. This apparent deviation from Dura-Fibre's investigation procedures is enough to create a triable issue of fact as to whether Dura-Fibre's claim that Jacobs was punished for an unsafe act, as opposed to reporting an injury, was pretextual.

In sum, considering the temporal proximity between Jacobs' reporting of injuries and his termination, along with the questionable reasons for the discipline provided by Dura-Fibre, the court finds that a reasonable juror could infer that Dura-Fibre's purported reasons for Jacobs' termination are pretextual and his reports of injury were a but-for cause of his termination. While the Secretary's evidence by itself may not be enough to overcome Dura-Fibre's denials and show a causal connection between Jacobs' protected activity and the adverse employment actions as a matter of law, at this stage, it is more than sufficient to withstand summary judgment and create an issue of fact that must be resolved by a jury. Given these factual disputes, neither party is entitled to summary judgment.

**C. Damages**

The Secretary asserts Dura-Fibre is liable for at least $220,884.82 in damages. The parties disagree about the amount of damages Jacobs would be entitled to under the OSH Act if the Secretary proves Dura-Fibre violated the Act. Because the court has not yet found that Dura-Fibre violated the Act and because the parties dispute the facts relevant to the damages analysis, the court will not decide this issue now.

**CONCLUSION**

For the foregoing reasons, Dura-Fibre's motion for summary judgment (ECF No. 25) is **DENIED** and the Secretary's motion for summary judgment (ECF No. 29) is **DENIED**. The Clerk is directed to set this matter on the court's calendar for a telephone conference to discuss the status of the case and the scheduled jury trial.

**SO ORDERED** this   30th   day of May, 2018.

> s/ William C. Griesbach
> William C. Griesbach, Chief Judge
> United States District Court